**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 2 2 2021 ★

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

```
--------------------------------------------------------------
GILEAD SCIENCES, INC., GILEAD SCIENCES    :
IRELAND UC, and GILEAD SCIENCES, LLC,     :
                                          :
                     Plaintiffs,          :
                                          :
                                          :
v.                                        :
                                          :
SAFE CHAIN SOLUTIONS, LLC; PATRICK        :
BOYD; CHARLES BOYD; WORLDWIDE             :
PHARMA SALES GROUP, INC. d/b/a            :
PHARMASALES.COM; ADAM S. BROSIUS;         :
BOULEVARD 9229 LLC; ISHBAY SHUKUROV;      :
PETER KHAIM; ZAFAR ABDULLAEV;             :
PROPHARMA DISTRIBUTION LLC; LEVI          :
ELLIS; SYNERGY GROUP WHOLESALERS          :
LLC; CARLOS VEGA; ISLAND CHEMISTS,        :
INC. d/b/a MEADOW DRUGS & SURGICAL;       :
RANDOLPH MOHABIR; V.L.S. PHARMACY         :
INC.; GOPESH M. PATEL; LIN PHARMACY       :
INC. d/b/a MAKKI PHARMACY; SAMUEL         :
YAKUBOV; MONICA A. NGO; ASCENSION         :
PHARMACY HOLDINGS I LLC d/b/a             :
MERMAID RX AND ARIEL PHARMACY; and        :
ALEX GELBINOVICH,                         :
                                          :
                     Defendants.          :
                                          :
--------------------------------------------------------------
```

Case No. 21-cv-4106 (AMD) (RER)

**FILED UNDER SEAL
PURSUANT TO 15 U.S.C. § 1116(d)
AND COURT ORDER (DKT. NO. 20)**

## PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF ORDER TO SHOW CAUSE FOR CONTEMPT SANCTIONS AGAINST DEFENDANTS PETER KHAIM, BOULEVARD 9229 LLC, <u>SYNERGY GROUP WHOLESALERS LLC, AND CARLOS VEGA</u>

Geoffrey Potter
Aron Fischer
Timothy A. Waters
Thomas P. Kurland
Joshua R. Stein
PATTERSON BELKNAP WEBB & TYLER LLP

*Attorneys for Plaintiffs Gilead Sciences, Inc.,
Gilead Sciences Ireland UC, and Gilead Sciences, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

I.      INTRODUCTION ...................................................................................................1

II.     THE RELEVANT SEIZURE ORDERS .................................................................3

III.    PRIOR PROCEEDINGS .........................................................................................4

IV.     APPLICABLE LAW ...............................................................................................5

        A.      Standards for Contempt .................................................................................5

        B.      Corporate Custodians Have No Fifth Amendment Rights to Refuse to
                Produce Corporate Records ............................................................................6

        C.      Corporate Custodians Must Produce All Documents in Their Possession *or*
                *Control* ...........................................................................................................6

        D.      Defendants Bear the Burden of Proving That Compliance Is Impossible ...............7

        E.      Incarceration Is an Appropriate Remedy ..........................................................8

V.      MR. KHAIM SHOULD BE INCARCERATED UNTIL HE PRODUCES THE
        BOULEVARD RECORDS REQUIRED BY THE SEIZURE ORDER ..........................9

        A.      Mr. Khaim Has Failed to Produce Required Boulevard Business Records .............9

        B.      Mr. Khaim Has Possession and Control of Boulevard Business Records
                He Refuses to Produce ...................................................................................11

                1.      Mr. Khaim Has Failed to Produce Documents from Numerous
                        Known Boulevard Email Addresses .....................................................11

                2.      Mr. Khaim Has Failed to Produce Documents from the Primary
                        Phone He Used for Boulevard Business ................................................13

                3.      Mr. Khaim Has Failed to Produce Boulevard Financial Records .............15

        C.      Mr. Khaim Has Failed to Meet His Burden of Proving That He Is Unable
                to Comply with the Seizure Orders ................................................................16

VI.     MR. VEGA SHOULD BE INCARCERATED FOR FAILURE TO PRODUCE
        REQUIRED SYNERGY DOCUMENTS ...............................................................17

# TABLE OF CONTENTS
## (continued)

**Page**

    A.    Mr. Vega Refuses to Produce Responsive Synergy Business Records In His Control. ........................................................................................18

          1.    Mr. Vega Provided False Information About the Source of Synergy's Counterfeits. .................................................................19

          2.    Mr. Vega Failed to Produce the Carlos@Synergy Emails in His Possession or Control. ...............................................................21

    B.    Mr. Vega's Attempt to Point the Finger at Julio Martin Gonzalez is Not Credible. .........................................................................................24

    C.    Mr. Vega Has Failed to Meet His Burden of Proving That He Is Unable to Comply with the Seizure Order ...................................................26

VII.    THE COURT HAS JURISDICTION TO HOLD MR. VEGA IN CONTEMPT .............27

    A.    This Court Has Personal Jurisdiction Over Mr. Vega and Synergy Because They Transacted Business In New York and Have Numerous Contacts Here ........................................................................................27

    B.    This Court Has Personal Jurisdiction Over Mr. Vega and Synergy Because They Conspired to Sell Counterfeits in New York ...............................29

    C.    Mr. Vega Consented to this Court's Jurisdiction ...................................32

VIII.    CONCLUSION ..............................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Nev., LLC v. Grand Majestic Riverboat Co. LLC,*
 No. 19-cv-11479 (PKC), 2020 U.S. Dist. LEXIS 159391 (S.D.N.Y. Sep. 1,
 2020) ................................................................................................................5, 27

*Armstrong v. Guccione,*
 470 F.3d 89 (2d Cir. 2006).................................................................... *passim*

*Braswell v. United States,*
 487 U.S. 99 (1988)...........................................................................................6

*Burlington Indus., Inc. v. Salem Int'l Co.,*
 645 F. Supp. 872 (S.D.N.Y. 1986) ................................................................29

*Carrington v. Graden,*
 2021 U.S. Dist. LEXIS 24563 (S.D.N.Y. Feb. 8, 2021)..................................8

*CBS Broadcasting Inc. v. FilmOn.com, Inc.,*
 814 F.3d 91 (2d Cir. 2016)...............................................................................5

*Charles Schwab Corp. v. Bank of Am. Corp.,*
 883 F.3d 68 (2d Cir. 2018)..............................................................................30

*Chevron Corp. v. Donziger,*
 2020 U.S. Dist. LEXIS 14077 (S.D.N.Y. Jan. 27, 2020)................................28

*Chloe v. Queen Bee of Beverly Hills, LLC,*
 616 F.3d 158 (2d Cir. 2010)............................................................................28

*Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-*
 *Exploración Y Producción,*
 832 F.3d 92 (2d Cir. 2016)..............................................................................32

*Dandong Old N.-East Agric. & Animal Husbandry Co. v. Gary Ming Hu,*
 2017 U.S. Dist. LEXIS 122471 (S.D.N.Y. Aug. 3, 2017)...............................29

*Dandong v. Pinnacle Performance Ltd.,*
 966 F. Supp. 2d 374 (S.D.N.Y. 2013)............................................................29

*De Paulino v. N.Y.C. Dep't of Educ.,*
 959 F.3d 519 (2d Cir. 2020)............................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hartford Fire Ins. Co. v. Evergreen Org., Inc.*,
    410 F. Supp. 2d 180 (S.D.N.Y. 2006)......................................................................32

*Huber v. Marine Midland Bank*,
    51 F.3d 5 (2d Cir. 1995).........................................................................................7

*ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*,
    2016 U.S. Dist. LEXIS 177549 (S.D.N.Y. Dec. 15, 2016) .....................................33

*Int'l Union v. Bagwell*,
    512 U.S. 821 (1994)...............................................................................................8

*Matter of Marc Rich & Co., A.G.*,
    707 F.2d 663 (2d Cir. 1983)...................................................................................6

*In re Martin-Trigona*,
    732 F.2d 170 (2d Cir. 1984)...................................................................................8

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*,
    260 F.3d 453 (5th Cir. 2001) .................................................................................33

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    673 F.2d 53 (2d Cir. 1982).....................................................................................8

*In re Platinum and Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020)................................................................29, 32

*Scottish Air Int'l v. British Caledonian Grp., PLC.*,
    152 F.R.D. 18 (S.D.N.Y. 1993) .............................................................................32

*SEC v. Homa*,
    514 F.3d 661 (7th Cir. 2008) .................................................................................27

*United States v. Edgerton*,
    734 F.2d 913 (2d Cir. 1984)...................................................................................17

*United States v. Fridman*,
    974 F.3d 163 (2d Cir. 2020)............................................................................6, 7, 16

*United States v. Rylander*,
    460 U.S. 752 (1983)...........................................................................................2, 7

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947)...............................................................................................8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Various Grand Jury Subpoenas,*
2017 U.S. Dist. LEXIS 20087 (S.D.N.Y. Feb. 13, 2017)...............................................7, 17, 26

*Vasquez v. H.K. & Shanghai Banking Corp.,*
477 F. Supp. 3d 241 (S.D.N.Y. 2020)......................................................................................29

*Waffenschmidt v. MacKay,*
763 F.2d 711 (5th Cir. 1985) ...................................................................................................28

*XpresSpa Holdings, LLC v. Cordial Endeavor Concessions of Atlanta, LLC,*
171 A.D.3d 511 (1st Dep't 2019) .............................................................................................29

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (together, "Gilead") respectfully submit this memorandum of law in further support of their Order to Show Cause for Contempt Sanctions against Defendant Boulevard 9229 LLC ("Boulevard") and its principal Peter Khaim (together, the "Boulevard Defendants") and Synergy Group Wholesalers LLC ("Synergy") and its principal Carlos Vega (together, the "Synergy Defendants").

## I.    INTRODUCTION

By Order to Show Cause served on September 2, 2021, Gilead moved for contempt sanctions against the Boulevard Defendants and the Synergy Defendants. Dkt. No. 64. Gilead sought an order requiring Mr. Khaim and Mr. Vega, on behalf of the corporations they controlled, to immediately comply with the Court's Seizure Orders (Dkt. Nos. 12, 46), including, critically, disclosing the identities of their suppliers of counterfeit Gilead-branded HIV medication so that Gilead can move quickly to remove these potentially dangerous products from the U.S. market. Despite two intervening hearings and an Order of this Court setting a September 17, 2021 deadline for compliance, Mr. Vega and Mr. Khaim have still not identified Synergy's or Boulevard's suppliers. Furthermore, they continue to withhold troves of business records that are demonstrably in their possession and control, notwithstanding their unsupported and outlandishly false representations to the contrary.

Seeking to excuse their noncompliance, Mr. Khaim and Mr. Vega both make the same untenable argument. Defendants begin by representing through counsel, incredibly and without any corroboration whatsoever, that although they have failed to produce critical information required by the Seizure Orders (*e.g.*, the identities of their suppliers and most of their corporate emails and texts), they supposedly do not possess the missing information, and are therefore incapable of compliance. *See* Sept. 17, 2021 Khaim Letter ("Khaim Letter") at 1; Sept. 17, 2021

1

Vega Letter ("Vega Letter") at 4. Defendants then contend that because of their bare assertions that they are unable to comply— and their invocation of the Fifth Amendment, Gilead cannot establish that they are in contempt. *See* Khaim Letter at 2; Vega Letter at 4.

As shown below, Defendants' representations are demonstrably untrue: Mr. Khaim and Mr. Vega possess great swaths of corporate information they are refusing to disclose. Furthermore, Defendants' contention that they can avoid contempt by making unsupported appeals to impossibility is directly contrary to controlling precedent. *See, e.g., United States v. Rylander*, 460 U.S. 752 (1983); *Armstrong v. Guccione*, 470 F.3d 89 (2d Cir. 2006). These cases hold that it is the ***party that fails to comply with a court order*** that bears the burden of proving that compliance is impossible. *Rylander*, 460 U.S. at 757; *Armstrong*, 470 F.3d at 99-100. The case law further holds that although a corporate custodian has a Fifth Amendment privilege·to refuse to testify about why he is allegedly unable to produce corporate records, this "***testimonial privilege . . . does not relieve him of his burden***" to prove that he is incapable of complying with an order requiring him to do so. *Armstrong*, 470 F.3d at 100 (emphasis added) (citing *Rylander*, 460 U.S. at 758).

Thus, where, as here, a corporate custodian fails to produce corporate records and chooses to exercise his Fifth Amendment right not to explain why, he fails to meet his burden of proving that compliance is impossible, and is subject to civil contempt sanctions, including incarceration. *See Armstrong*, 470 F.3d at 100 (affirming seven-year incarceration of corporate custodian who refused to turn over corporate records and property and asserted Fifth Amendment privilege not to testify as to why he was purportedly not in possession of them).

Here, Defendants have not merely failed to prove that they are incapable of complying with the Seizure Orders. Rather, as detailed below, the record proves beyond doubt that

Defendants *are, in fact*, in possession of corporate records they are refusing to turn over. Defendants should be incarcerated until they turn over the required information they are withholding. Indeed, the sanction of incarceration is uniquely appropriate here, because this information is critical to Gilead's efforts to protect the public health.

Finally, Mr. Vega's contention that the Court lacks jurisdiction to hold him in contempt fails on many levels. First, Mr. Vega and Synergy conducted crucial elements of their counterfeiting business in New York, including paying millions of dollars to New York-based jewelry stores in an apparent effort to launder the proceeds of their counterfeiting and conceal the identities of their suppliers. Second, Mr. Vega and Synergy conspired to sell counterfeit Gilead products to New York pharmacies under the false pretense of running a legitimate business. And third, Mr. Vega consented to this Court's jurisdiction when he appeared in this action, agreed to be bound by a preliminary injunction, and affirmatively sought court intervention to modify the Asset Freeze against him, all without asserting a personal jurisdiction defense.

## II.   THE RELEVANT SEIZURE ORDERS

The Court's second Seizure Order, issued by Judge Kovner on August 20, 2021, and served on Mr. Vega, Mr. Khaim, and Synergy, on August 23, 2021 (Dkt. No. 46), and the Court's first Seizure Order, issued by Judge Kovner on July 23, 2021 and served on Boulevard on July 26, 2021 (Dkt. No. 18), contain the following provisions requiring the Synergy Defendants and the Boulevard Defendants to provide documents and information:

- "[I]mmediately upon receipt of this Order, Defendants shall disclose to Gilead's attorneys and investigators the following information concerning their purchases and/or sales of any product bearing any of the Gilead Marks . . . from January 1, 2019 to the present: (1) the Drug Supply Chain Security Act pedigree documentation; *(2) the price and quantity of each purchase* or sale; (3) the product, including the specific type or variety of product; (4) the lot numbers; *(5) the contact information, including names, address, email addresses, and telephone numbers of all associate individuals and/or companies from which Defendants have purchased* or to whom

3

Defendants sold the products . . . ." Dkt. No. 46, at 6 (emphasis added); Dkt. No. 18, at 4-5.

- "ORDERED that Defendants serve by email and mail upon Gilead's counsel ... five days before the [September 3, 2021] confirmation hearing [i.e., by August 29, 2021] scheduled herein copies . . . of *all business records, inventory records, invoices, emails, text messages, instant messages [and other types of documents]* ... relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, shipment, purchase, sale, offer for sale or distribution of any merchandise bearing any of the Gilead Marks . . . *that are in the possession custody, or control of any Defendant* . . . ." Dkt. No. 46, at 7-8 (emphasis added); Dkt. No. 18, at 6.

As shown below, the Synergy Defendants and the Boulevard Defendants have willfully violated these Orders.

## III.    PRIOR PROCEEDINGS

Gilead executed seizures at the premises of Mr. Khaim and Mr. Vega on August 23, 2021, and served them with copies of the Seizure Order. Since that time, the Boulevard Defendants and the Synergy Defendants have stubbornly refused to meet their affirmative disclosure obligations under the Seizure Order.

Gilead moved by Order to Show Cause to hold the Boulevard Defendants and the Synergy Defendants in contempt on September 2, 2021. On September 3, 2021, the Court notified Defendants that as corporate custodians, they could not assert Fifth Amendment rights, and that as a result "Khaim and Vega, in their representative capacities as custodians holding the records of Boulevard and Synergy, respectively, must comply with the Courts seizure and asset freeze orders." Sept. 3, 2021, Minute Entry and Order.

On September 13, 2021, the Court held a hearing on Gilead's application, at which Mr. Khaim and Mr. Vega appeared, represented by counsel. At the hearing, Defendants' counsel argued that the information that Gilead was seeking would violate their Fifth Amendment rights and that they did not have possession of all the required information. *See generally* Decl. of

4

Geoffrey Potter, dated Sept. 21, 2021 ("Fourth Potter Decl."), Ex. 77 ("Hearing Tr.") at 6:13-10:11; 32:20-33:24. Again, the Court reiterated that what the Seizure Order requires is production of Defendants' corporate records related to their role in the scheme to counterfeit Gilead's HIV medicines—documents to which no Fifth Amendment privilege attaches and which Defendants' obviously do have in their possession. *See id.* at 10:12-20:5; 32:22-33:21. At the conclusion of the September 13, 2021 hearing, Defendants were directed to produce the materials contemplated by the Court's prior orders no later than Friday, September 17, 2021. *See* Sept. 13, 2021 Minute Entry.

Defendants failed to comply with the Court's orders by September 17, 2021. On that date, counsel for Mr. Vega and Mr. Khaim filed letters with the Court admitting that their clients had not fully complied with the orders and purporting to excuse their failures. *See generally* Khaim Letter; Vega Letter. On September 17, the Court issued an order calling for further briefing and setting a contempt hearing for September 30, 2021. *See* Sept. 17, 2021 Minute Entry. This brief is in response to that order.

## IV.    APPLICABLE LAW

### A.    Standards for Contempt

Civil contempt sanctions are appropriate where "(1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broadcasting Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016); *accord, e.g., Absolute Nev., LLC v. Grand Majestic Riverboat Co. LLC,* No. 19-cv-11479 (PKC), 2020 U.S. Dist. LEXIS 159391, at *16 (S.D.N.Y. Sep. 1, 2020); *see* Hearing Tr. at 35:10-17.

Defendants do not dispute that the Seizure Orders are clear and unambiguous. Defendants also do not dispute that they have failed to comply with the orders. Defendants

5

contend that they have diligently and reasonably attempted to comply.  But as shown below, this contention is false.

       **B.**      **Corporate Custodians Have No Fifth Amendment Rights to Refuse to Produce Corporate Records**

Although individuals subpoenaed in their individual capacities enjoy limited Fifth Amendment rights with respect to document production, "a corporate custodian . . . may not resist a subpoena for corporate records on Fifth Amendment grounds." *Braswell v. United States*, 487 U.S. 99, 101 (1988).  As the Second Circuit recently summarized the law: "Because the Fifth Amendment privilege protects only natural persons, collective entities such as corporations or partnerships may not invoke it to evade document requests.  Nor may an individual custodian holding a collective entity's records in a representative capacity refuse to produce documents." *United States v. Fridman*, 974 F.3d 163, 180 (2d Cir. 2020) (citations omitted); *see also Armstrong*, 470 F.3d at 97-100.  Under *Braswell* and its progeny, it is immaterial whether the custodian of corporate records happens to be the sole owner and principal of the corporation.  Even in "one-person corporations," the Fifth Amendment does not apply, and the custodian must produce the corporate documents.  *See Fridman*, 974 F.3d at 181.

       **C.**      **Corporate Custodians Must Produce All Documents in Their Possession *or Control***

To establish that a corporate custodian is required to produce documents, a moving party is "not required to establish that [the defendant] possessed the documents; rather, it [is] required to prove possession *or control* of the documents." *Fridman*, 974 F.3d at 178 (emphasis in original).  "The test for the production of documents is control, not location." *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983) (a witness cannot resist the production of documents on the ground that the documents are located abroad); *Fridman*, 974 F.3d at 175 (citing definition of "control" from Black's Law Dictionary (11th ed. 2019) as "[t]o exercise

power or influence over"). For example, "[a] former client of a bank is still entitled to seek records of a closed account" and therefore "has control over them," even though the records are in the possession of the bank and not the client. *Fridman*, 974 F.3d at 179 n.9. Accordingly, even if Defendants' contention that they do not "currently possess[]" certain corporate records (Khaim Letter at 1) were true (which it is not), this would not be a defense to contempt so long as they have the power to obtain those records, which they clearly do.

### D.    Defendants Bear the Burden of Proving That Compliance Is Impossible

As noted above, Defendants admit that they have failed to provide information required by the Seizure Orders, but contend that they are unable to do so because no further information is in their possession. *See generally* Khaim Letter; Vega Letter. Their submissions fall far short of excusing their contempt.

Although a defendant can avoid contempt by "demonstrating that compliance" with an order is "impossible," the ***burden to demonstrate impossibility remains at all times*** with the defendant. *Armstrong*, 470 F.3d at 99-100 (emphasis added) (citing *Rylander*, 460 U.S. at 757-58); *see Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) ("[T]he alleged contemnor's burden is to establish his inability clearly, plainly, and unmistakably."); *In re Various Grand Jury Subpoenas*, 2017 U.S. Dist. LEXIS 20087, at *3 (S.D.N.Y. Feb. 13, 2017) ("If a party believes it has done all it can to comply with a court order, the burden is on the contemnor to show plainly and unmistakably that compliance is impossible." (internal quotation marks omitted)).

As discussed above, moreover, a defendant's reliance on the Fifth Amendment privilege to avoid explaining why he is purportedly unable to comply with a court order ***does not relieve him of his burden*** " of proving that compliance is impossible. *Armstrong*, 470 F.3d at 100.

Where, as here, a corporate custodian exercises his Fifth Amendment right not to explain why he is allegedly unable to produce to corporate records, he fails to meet his burden and can be incarcerated for civil contempt. *Id.* That is the proper remedy here.

### E.      Incarceration Is an Appropriate Remedy

When issuing contempt sanctions, "the district court has broad discretion to design a remedy that will bring about compliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982).  In exercising their discretion, courts should consider the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Carrington v. Graden*, 2021 U.S. Dist. LEXIS 24563, at *3 (S.D.N.Y. Feb. 8, 2021) (*quoting United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)).

The "paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command." *Armstrong*, 470 F.3d at 101 (quoting *Int'l Union v. Bagwell*, 512 U.S. 821, 828 (1994)).  Indeed, the remedy of incarceration is squarely within the district court's discretion whenever it is confronted with an ongoing act of civil contempt such that the incarceration is coercive rather than punitive.  *See In re Martin-Trigona*, 732 F.2d 170, 174 (2d Cir. 1984) ("Since the civil contempt order was proper, incarceration was an appropriate remedy."); *cf. Carrington*, 2021 U.S. Dist. LEXIS 24563, at *3 (S.D.N.Y.) (ordering "incarceration as a coercive sanction for civil contempt" where "'the contemnor is able to purge the contempt and obtain his release by committing an affirmative act.'" (quoting *International Union, UMW v. Bagwell*, 512 U.S. 821, 828-29 (1994)).

Here, as shown below, Defendants are in willful contempt of the Court's Seizure Order, and the coercive sanction of incarceration against Mr. Khaim and Mr. Vega is necessary and appropriate to protect the public from the dangerous counterfeit products whose source the

Defendants refuse to reveal.

## V.   MR. KHAIM SHOULD BE INCARCERATED UNTIL HE PRODUCES THE BOULEVARD RECORDS REQUIRED BY THE SEIZURE ORDER

### A.   Mr. Khaim Has Failed to Produce Required Boulevard Business Records

On September 17, Mr. Khaim's counsel submitted a letter to the Court representing that he had "arranged for delivery to Plaintiffs" of "all Boulevard 9229 LLC records that Mr. Khaim currently possesses for that entity." Khaim Letter at 1. By "arranged for delivery," counsel meant that instead of producing Mr. Khaim's electronic records to Gilead as they are kept in the ordinary course of business, he printed them out in hard copy and had them delivered to Gilead's counsel's offices in banker's boxes. Fourth Potter Decl. ¶¶ 7-8. When contacted by phone to ask why he had produced the documents in this gratuitously burdensome form, counsel replied that nothing in the order required the documents to be produced electronically, and then added "have a nice weekend" and hung up. Decl. of Aron Fischer, dated Sept. 21, 2021 ("Fischer Decl.") ¶ 5.

In his Sept. 17 letter to the Court, Mr. Khaim's counsel acknowledged that Gilead would consider his production to be in "only partial compliance" with the Seizure Orders because the production does not contain all the information required by the orders. Khaim Letter at 1. Once Gilead had the opportunity to scan and review Mr. Khaim's email printouts, it became clear that "partial compliance" is an understatement. Far from including all of the Boulevard Defendants' corporate records "relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, shipment, purchase, sale, offer for sale or distribution" of any counterfeit Gilead medicines (*see* ECF No. 18 at 6, at 6; ECF No. 46 at 7-8), Mr. Khaim's productions consists solely of paper printouts of a few hundred emails (and their attachments) from a single email account (consulting012345@gmail.com) that only document

9

Boulevard's sales to a single customer, Safe Chain. Fourth Potter Decl. ¶¶ 9-10. And the email attachments consist only of sales orders, invoices, and T3 pedigrees related to those specific sales. *Id.* No other documents have been produced.

Not coincidentally, Mr. Khaim's production contains no new information about Boulevard Defendants' role in this counterfeiting scheme. The only corporate records that the Boulevard Defendants have now provided are paper printouts of the other side of email chains (and attachments) that Gilead has already collected from Safe Chain.[1] Information concerning individuals and entities not already known to Gilead appears to have been systematically excluded from the production.

Critically, Mr. Khaim's production contains no information about Boulevard's suppliers of Gilead-branded products. While the T3 pedigree documents purport to identify suppliers, Gilead has already determined that the T3's that Boulevard sent to Safe Chain are falsified. *See* Decl. of Susmitha Sunkara, dated Aug. 17, 2021 ("Second Sunkara Decl."), ¶ 17. The counterfeit Gilead products that Boulevard supplied to Safe Chain did not come from the sources listed on the pedigrees. They had to come from somewhere. But Mr. Khaim has failed to produce any business records regarding Boulevard's source of counterfeits.

---

[1] Moreover, that the Boulevard Defendants produced these emails as *paper printouts* instead of in native electronic form speaks volumes about their steadfast intent to delay, obstruct, and otherwise impede Gilead's ability to make use of this information to track down the source of counterfeits, as contemplated by the Court's orders. Not only is such a voluminous paper production unwieldy to handle and expensive to review—requiring, among other things, manual conversion to a text-searchable format—it also strips off all electronic metadata from the documents, including metadata showing when various invoices and T3's were created, who created them, and whether they were edited or otherwise manipulated to obfuscate information. This is precisely why electronic metadata—in addition electronic documents themselves—is unquestionably within the scope of the Court's prior orders. *See generally* ECF No. 18 at 6, at 6; ECF No. 46 at 7-8. In this sense, even the Boulevard Defendants' self-proclaimed "compliance" with the Court's orders is not fully compliant.

10

**B.    Mr. Khaim Has Possession and Control of Boulevard Business Records He Refuses to Produce**

Since this case was first filed in July 2021, Gilead has uncovered ample evidence which clearly establishes that the Boulevard Defendants regularly utilized email, telephone, text messages, and other electronic messenger services to documents their purchase and sale of counterfeit Gilead medicines, and also transferred funds related to these activities through numerous financial institutions.  All of these activities give rise to electronic business records, all of which are in Mr. Khaim's custody and control.  But to date, in direct contravention of this Court's clear and unambiguous orders, Mr. Khaim has produced virtually none of these materials.

**1.    Mr. Khaim Has Failed to Produce Documents from Numerous Known Boulevard Email Addresses**

First, there are numerous email accounts associated with the Boulevard Defendants, including not only the one from which paper printouts of emails have been produced (consulting012345@gmail.com), but also Boulevard9229@gmail.com; 9229sales@gmail.com; Consultinggroup910@gmail.com; Pkhaim01@gmail.com; and consulting010203@gmail.com. Mr. Khaim has produced no documents from these other email addresses.

During the seizure at Mr. Khaim's residence, Gilead uncovered a single phone (after disregarding Mr. Khaim's lie that he did not have a phone), eventually succeeded in unlocking it (without Mr. Khaim's assistance), and learned that it was associated with two email addresses: pkhaim01@gmail.com and consultinggroup910@gmail.com.  Decl. of Timothy Waters, dated Sept. 2, 2021 ("Waters Decl."), ¶ 7; Decl. of Ryan Frye, dated Sept. 21, 2021 ("Frye Decl.") ¶ 3, 25.  For both addresses, the seized phone had a limited number of cached emails—*i.e.*, locally stored copies of messages that could be accessed without an internet connection.  Waters Decl. ¶ 7.  The cached emails did not have any attachments stored locally, and they could not be

11

copied, forwarded, or forensically collected—they could only be viewed on the device itself. *Id.* The cached emails showed that on the morning of the seizure, Mr. Khaim's phone had downloaded emails from both of these email addresses. *Id.* Though Mr. Khaim subsequently changed the passwords to these accounts rendering it impossible for Gilead to review anything beyond the cached emails on this phone, even from those emails it is clear that Mr. Khaim used both accounts to conduct Boulevard business. *See id.*; Frye Decl. ¶ 25. For example, on the morning of the seizure, August 23, 2021, Boulevard's insurance broker emailed copies of Boulevard's latest policy to Mr. Khaim at pkhaim01@gmail.com; a copy of that email was stored in the cache. Decl. of Geoffrey Potter, dated Sept. 2, 2021 ("Third Potter Decl."), Ex. 68. And locally saved on one of Mr. Khaim's seized computers, there was a July 2019 email from his corporate agent sent to consultinggroup910@gmail.comproviding copies of Boulevard's initial corporate filings, including its articles of incorporation and New York filing receipt. Third Potter Decl. Ex. 67

Gilead has also been able to confirm through seizures and subpoena responses from *other* parties that the Boulevard Defendants conducted business with at least three other email accounts: Boulevard9229@gmail.com; 9229sales@gmail.com; and consulting010203@gmail.com. For example, Boulevard's Safe Chain vendor intake application, as well as invoices for Gilead medicines that Boulevard sent to Safe Chain, use Boulevard9229@gmail.com. *See* Fourth Potter Decl. Exs. 78, 79. Similarly, invoices Boulevard sent to Safe Chain and Defendant Worldwide Pharma use 9229sales@gmail.com. *See* Fourth Potter Decl. Ex. 80. And the Apple ID associated with the phone that Gilead seized from Mr. Khaim on August 23, 2021 is associated with the email address consulting010203@gmail.com. *See* Frye Decl. ¶ 24. Gilead knows Mr. Khaim used this phone to conduct Boulevard business

12

because the same phone had recent text messages in which Mr. Khaim attempted to sell large quantities of purported Gilead medications to another customer as recently as August 2021. Third Potter Decl. Ex. 66.

Finally, the paper emails from the consulting012345@gmail.com account that Mr. Khaim *did* produce last Friday only confirm that these other accounts are associated with Boulevard's business, because emails sent from *that* account either carbon-copy or are forwarded from these other accounts. Fourth Potter Decl. Ex. 81 (showing emails with Safe Chain from 9229sales@gmail.com and boulevard9229@gmail.com). Yet Mr. Khaim produced no documents from the Boulevard email addresses other than consulting012345@gmail.com.

In sum, the evidence Gilead has collected thus far makes plain that *all six* of these accounts comprise the Boulevard Defendants' corporate emails, they are well within the scope of the Court's prior orders, they are all in Mr. Khaim's control, and only a portion of one of them has been produced.

### 2. Mr. Khaim Has Failed to Produce Documents from the Primary Phone He Used for Boulevard Business

Furthermore, Gilead has collected overwhelming evidence that Mr. Khaim conducted a significant amount of Boulevard's business via phone, text, and email utilizing the phone number 646-678-7468 (the "7468 Phone"). But Mr. Khaim has produced no documents from the 7468 Phone.

For example, Gilead knows from Safe Chain's documents that Charles Boyd, one of Safe Chain's principals, routinely communicated with "Peter Boulevard" on the 7468 Phone to

13

arrange purchases of counterfeit Gilead medicine from Boulevard, to discuss payment and

shipping terms, and to discuss falsifying T3 pedigree forms for the counterfeits[2]:



Decl. of Geoffrey Potter, dated Aug. 18, 2021 ("Second Potter Decl.") Ex. 49.



Second Potter Decl. Ex. 50.

---

[2] As noted above, Gilead already knows that these T3's—at least insofar as they relate to Gilead products—are fraudulent. *See* Second Sunkara Decl. ¶ 17.

14

Second Potter Decl. Ex. 54.

Gilead also knows that the 7468 Phone is within Mr. Khaim's custody and control, because Mr. Khaim repeatedly wrote to others that *his* phone number was 646-678-7468. Not only does this comport with Safe Chain's documents showing communications with "Peter Boulevard," screenshots from email messages on Mr. Khaim's *seized* phone show Mr. Khaim directing others to call him on the 7468 Phone. Frye Decl. ¶ 26. Nevertheless, despite being directly within the scope of the Court's orders, the 7468 Phone itself was not previously seized, and none of this information has been produced.

### 3. Mr. Khaim Has Failed to Produce Boulevard Financial Records

Finally, Gilead has collected overwhelming evidence that Mr. Khaim managed the Boulevard Defendants' corporate finances and banking affairs, which undoubtedly resulted in the creation of a significant number of bank records and other documents, all of which would be subject to the Court's Seizure Order—both as responsive business records and as records of Boulevard's suppliers, purchases, and sales of Gilead products. Yet Mr. Khaim has produced no financial records to Gilead.

15

From subpoena responses and executing the Court's asset freeze order, for example, Gilead knows that Safe Chain wired millions of dollars to Boulevard to an account held in the name of "MFK Management LLC d/b/a Boulevard 9229" by Metro City Bank. *See generally* Fourth Potter Decl. Ex 82 (bank statement excerpts showing wire transfers from Safe Chain); *id.* Ex. 83 (account opening information). The signature card provided by Metro City Bank clearly identifies the authorized signatory of that account as Peter Khaim, listing the 7468 Phone number. *See id.* But the same signature card also indicates that this account was only created in February 2021, months after Safe Chain's purchases from (and payments to) Boulevard began. *See id*; *see also, e.g.*, Second Potter Decl. Ex. 49 (messages between "Peter Boulevard" and Safe Chain discussing delivery and wire transfer in September 2020). Thus, there can be no doubt additional Boulevard corporate financial records subject to this Court's prior orders exist, that Mr. Khaim is the custodian of those records, and that Mr. Khaim continues to defy this Court's orders by not producing this information.

C.   **Mr. Khaim Has Failed to Meet His Burden of Proving That He Is Unable to Comply with the Seizure Orders**

Mr. Khaim seeks to excuse his failure to provide information about his suppliers (and to otherwise comply with the Seizure Order) by representing that he has produced all the documents he "currently possesses" and contending that the Fifth Amendment protects him from having to provide further information. Khaim Letter at 1-2. For the above reasons, Mr. Khaim's representation is false. He has not produced all the responsive documents in his possession. And he has not even *asserted* that he has produced all responsive documents in his "possession *or control*." *Fridman*, 974 F.3d at 178 (emphasis added). There can be no question that if certain Boulevard business records do not happen to be—in his counsel's carefully chosen words—

16

"currently" in Mr. Khaim's possession, he has the ability to get them. Mr. Khaim is required to produce such documents but he has refused to do so.

Even if Mr. Khaim's representation that he is unable to fully comply with the Court's orders was not provably false (it is), Mr. Khaim certainly has not met his burden to "show plainly and unmistakably that compliance is impossible." *In re Various Grand Jury Subpoenas*, 2017 U.S. Dist. LEXIS 20087, at *3. And as discussed above, Mr. Khaim's invocation of the Fifth Amendment "does not relieve him of [this] burden." *Armstrong*, 470 F.3d at 100.

Contrary to Mr. Khaim's contention, Gilead is not seeking information that exists only in Mr. Khaim's "mind." Khaim Letter at 2 (citing *United States v. Edgerton*, 734 F.2d 913, 920-21 (2d Cir. 1984)). As the Court observed at the September 13 hearing, "it is 2021." Hearing Tr. at 37:17. Mr. Khaim did not conduct Boulevard's business by committing information to memory and then transmitting it exclusively in unrecorded voice conversations. The information called for by the Seizure Order exists in electronic form, whether in emails, text messages, Microsoft Office documents, calendar invitations, financial records, voice messages, phone contacts, databases, or some combination thereof. The Fifth Amendment does not protect Mr. Khaim from producing these records. He should be held in contempt and incarcerated for his refusal to do so.

## VI.   MR. VEGA SHOULD BE INCARCERATED FOR FAILURE TO PRODUCE REQUIRED SYNERGY DOCUMENTS

As this Court has already held—and as Mr. Vega[3] does not dispute—Judge Kovner's orders are clear and unambiguous in requiring the Synergy Defendants to produce specific information and records concerning their sale of counterfeit Gilead products. *See* Dkt. No. 46;

---

[3] Only Mr. Vega has opposed Gilead's motion for contempt. *See* Vega Letter (submitted on behalf of Mr. Vega only). Although Mr. Berrio initially appeared on behalf of Synergy, *see* J. Berrio Letter to Court, Sept. 2, 2021 ("Please be advised that this office was retained to represent Synergy Group Wholesalers LLC and Carlos Vega in the above referenced case."), he did not file an appearance or any further pleadings on Synergy's behalf and Synergy has not otherwise appeared in this action.

17

Hearing Tr. at 35:10-12; Vega Letter at 4. Mr. Vega also admits his noncompliance with the Court's orders, contending only that he has produced "*much of* the requested documents and or information." *Id.* at 2 (emphasis added). Mr. Vega's contention that he has made a "good faith" effort to comply (*id.*), and that he "cannot provide Gilead with more informative documentation because he does not possess it" (*id.* at 4) is demonstrably false. The record shows that Mr. Vega is withholding responsive information, and attempting to conceal this through a series of clumsy and absurd lies. He should be incarcerated until he provides true information about Synergy's suppliers.

### A.    Mr. Vega Refuses to Produce Responsive Synergy Business Records In His Control.

Pursuant to the Court's order, Mr. Vega, on behalf of Synergy, produced a total of only **43 pages** to Gilead on September 17. The entirety of that production is attached as **Exhibits 84 and 85** to the Potter Declaration submitted herewith.

Mr. Vega's document production is woefully inadequate. The production consisted of only 11 documents, including state and federal tax documents; business registrations and licensing paperwork; insurance and lease paperwork; and the UnitedLex chain of custody forms from the seizure. Fourth Potter Decl. Ex. 84. Mr. Vega's lawyer also provided a one-page, undated, unsworn document purporting to summarize the payments made to Synergy from Safe Chain. Fourth Potter Decl. Ex. 85. As described in Mr. Vega's cover letter to Gilead's counsel, these documents represent "all the Synergy documents in *Mr. Vega's physical possession*." Fourth Potter Decl. Ex. 86 (emphasis added). Mr. Vega's counsel continued: "You have all other Synergy documents on his computers and cell phones." *Id.*

Mr. Vega remains in contempt of the Seizure Order. In particular, Mr. Vega did not provide a single document identifying the source of Synergy's counterfeits. Nor did he provide a

single email from the Synergy email account Carlos@synergygroupwholesaler.com (the "Carlos@Synergy Account"), on which Mr. Vega conducted Synergy business with Safe Chain.

### 1. Mr. Vega Provided False Information About the Source of Synergy's Counterfeits

The driving motivation of Gilead's motion for contempt is to obtain documents and information needed to identify the source of the counterfeits and remove them from the market. But rather than provide that critical, potentially life-saving information, Mr. Vega has engaged in gamesmanship, providing Gilead with information about Synergy's purported suppliers that he knows to be false and misleading.

Mr. Vega has represented to Gilead and the Court that "Synergy only purchased the subject medicine from DNS Distributor . . . and Cesar Castillo." Vega Letter at 3; *see also id.* at 5 ("He has . . . identified his suppliers of the subject medication (DNS Distributors and Cesar Castillo)."). As Gilead showed in its second seizure application, the "Cesar Castillo" that purportedly supplied Synergy with Gilead medication is a fraudulent and deceptive entity formed by Vega to create a false paper trail that Synergy was purchasing from Gilead's authorized distributor in Puerto Rico (also called Cesar Castillo).[4] As Mr. Vega is well aware, Cesar Castillo (and DNS Distributor) are not actually suppliers. Rather, they are shell entities *created by Vega himself* to launder the proceeds of Synergy's sales of the counterfeits.

On the computer seized at his home, Mr. Vega had the corporate registration documents for DNS Distributor LLC. Fourth Potter Decl. Ex. 87. And in his residence, he had a checkbook and bank records for "Cesar Castillo LLC," as well as a corporate deposit stamp. Third Potter

---

[4] Cesar Castillo LLC, a Puerto Rican corporation, is a Gilead authorized distributor. The Director of Sales for the Pharmaceutical Group at the real Cesar Castillo has already submitted a declaration stating that Cesar Castillo has had no communications or business relationship with Synergy. Decl. of Luis Vazquez, dated July 20, 2021 ("Vazquez Decl."), ¶ 15. The corporation set up by Mr. Vega in Colorado was created to impersonate the real authorized distributor.

Decl. Exs. 69, 70. Both companies are Colorado LLCs that were registered at 1005 Norwood Avenue, Colorado Springs, Colorado. Decl. of Hannah Coleman, dated Sept. 21, 2021 ("Third Coleman Decl.") ¶¶ 4-5. Records seized from Mr. Vega's computer also show that Mr. Vega was listed as the 50% owner of "Group Synergy LLC," another corporate entity at the 1005 Norwood Avenue address. Fourth Potter Decl. Ex. 88. Neither DNS Distributor LLC nor the Colorado Cesar Castillo entity has a license to distribute pharmaceuticals. Third Coleman Decl. ¶ 6.

Rather than supply Gilead products, these two companies were created as pass-through entities to conceal the proceeds of Synergy's counterfeiting, ultimately laundering the money by purchasing large quantities of jewelry, diamonds, and other luxury goods in New York. Subpoenaed bank records for DNS Distributor LLC and Cesar Castillo Wholesalers LLC show that *over $6 million* of the proceeds paid by Safe Chain to Synergy flowed directly to accounts held by DNS Distributor and Cesar Castillo, which then laundered millions of dollars through jewelry, high-end watch, and precious metal dealers—many in Manhattan's Diamond District, such as Avital Gold & Platinum, JD Watches Corp., and Shemtov & Co. Jewelry Inc. *See* Fourth Potter Decl. Ex. 89 (Synergy bank records); *id.* Ex. 90 (DNS Distributor and Cesar Castillo bank records).

What happened to Synergy's money after it flowed through DNS Distributor and Cesar Castillo to these New York-based jewelers is unknown. Presumably, some of the money was exchanged for the counterfeit Gilead products that Synergy supplied to Safe Chain. Those products had to come from somewhere, after all. But they did not come from DNS Distributor or Cesar Castillo. Mr. Vega's representation that those entities were Synergy's sole suppliers is false and misleading.

20

As the President of Synergy and the creator of the shell entities through which Synergy moved its money, Mr. Vega obviously has access to information about the source of Synergy's products that he is withholding from Gilead. And because, as the Court has noted, "it is 2021" (Hearing Tr. at 37:17), there can be no doubt that this information can be found in electronic records of some form. Mr. Vega's refusal to turn over the records containing this information is a willful violation of the Court's Orders.

### 2. Mr. Vega Failed to Produce the Carlos@Synergy Emails in His Possession or Control

Mr. Vega's representation that he has given Gilead access to all the Synergy business records in his possession and control is also false. Mr. Vega has repeatedly represented that he does not have the password for the Carlos@Synergy Account, the email account through which he did business with Safe Chain. J. Berrio Letter to the Court, Sept. 8, 2021, at 2 n.2 ("Mr. Vega did not use or have access to emails carlos@synergygroupwholesalers.com . . . and as such could not provide said password."); Vega Letter, at 2 ("Mr. Vega had indicated that the email account Carlos@synergygroupwholesalers.com was not his and that he did not have the password to it."); Hearing Tr., at 25:9 (Mr. Berrio: "He doesn't have the password for that [account].").

This is a blatant lie. Not only is the email account in Mr. Vega's name, but documents seized from Safe Chain show that every email sent from the account is signed "Carlos Vega." *See, e.g.*, Decl. of Hannah Coleman, dated Aug. 18, 2021 ("Second Coleman Decl."), Ex. 25 (email from Carlos@Synergy Account, attaching Safe Chain vendor application, signed by Mr. Vega, the "President" of Synergy). Furthermore, Mr. Vega (inadvertently) provided Gilead with the password to the Carlos@Synergy Account.

Mr. Vega admits that he operates the SynergyGroupWholesalers@gmail.com email address (the "Synergy Gmail Account"), and provided Gilead access to that account. Frye Decl.

21

¶¶ 7-9. The emails from that account show that, on February 13, 2021, Mr. Vega registered the "Synergygroupwholesaler.com" domain with GoDaddy and set up the Carlos@Synergy Account. Fourth Potter Decl. Ex. 91. On September 2, 2021, at 4:32 P.M., Mr. Vega's counsel emailed Gilead's counsel, writing "Mr. Vega did do Synergy business with email synergygroupwholesalers@gmail.com and the password for that account is Luiscarlos79." Fourth Potter Decl. Ex. 92. Three minutes later, Mr. Vega's counsel wrote back: "Sorry, the correct password for synergygroupwholesalers@gmail.com is Aitanita2015$." *Id.* UnitedLex confirmed that Aitanita2015$ was the correct password for the Synergy Gmail Account. Frye Decl. ¶¶ 7, 10. UnitedLex also, on a whim, tried the previous password Mr. Vega had provided, Luiscarlos79, on the Carlos@Synergy Account. *Id. **The password that Mr. Vega inadvertently provided was the correct password to the Carlos@Synergy Account.** Id.*

Both the Synergy Gmail Account and the Carlos@Synergy have enabled two-step authentication– *i.e.*, the password alone is not sufficient to unlock the account. *Id.* ¶¶ 8, 11. Both accounts offer a variety of ways to provide the second authentication step, such as a phone call or text message to a pre-set number. *Id.* In fact, both accounts are set to use a phone number ending in the digits 59 as the second authentication step:

22

| **Synergy Gmail Account** | **Carlos@Synergy Account** |
|---|---|

Frye Decl. ¶¶ 8, 11.  Mr. Vega is associated with a number ending in 59:  In his email signature in his emails to Safe Chain, Mr. Vega lists his phone number as 609-635-1559.  Second Coleman Decl. Ex. 25.  This is also the phone number Mr. Vega provided to FedEx when creating (through the Synergy Gmail Account) a FedEx account for Synergy.  Fourth Potter Decl. Ex. 93.  However, this phone was not presented to UnitedLex for imaging at the seizure.  Frye Decl. ¶ 13.

Although Mr. Vega provided UnitedLex the two-step authentication code for the Synergy Gmail Account, he refused to do so for the Carlos@Synergy Account.  Frye Decl. ¶¶ 9, 12.  And even if Mr. Vega's preposterous position that he does not have access to the Carlos@Synergy Account were true (which it is not), the account was registered by Mr. Vega using the Synergy Gmail Account, so he could, at any time, remove the two-step authentication and access those documents or permit UnitedLex to do so.  *Id.* ¶ 13.  But Mr. Vega has refused to do so, continuing to insist, falsely, that he has no access to the account.

In sum, there is no question that Mr. Vega created and manages the Carlos@Synergy Account, but refuses to produce any documents from that account or provide Gilead access to the account—in clear contempt of the Court's orders.

23

**B.     Mr. Vega's Attempt to Point the Finger at Julio Martin Gonzalez is Not Credible**

Mr. Vega, through counsel, has represented to Gilead and the Court that one Julio Martin Gonzalez controlled Synergy, as well as Synergy's purported suppliers DNS Distributor and Cesar Castillo, and that Gilead should look to Mr. Martin Gonzalez[5] for additional information about Synergy business that Mr. Vega did not know.  This is not credible.  Indeed, Mr. Vega previously sought to blame Mr. Martin Gonzalez for Mr. Vega's own alleged criminal conduct, and Mr. Martin Gonzalez was *convicted of perjury* immediately after testifying at Mr. Vega's trial.

In a prior letter to Gilead, Mr. Vega asserted that it was "Julio Martin Gonzalez" that was "controlling Synergy," that Mr. Martin Gonzalez could be contacted at "juliomartingonzalez44@gmail.com," and "Mr. Vega did not use or have access to email . . . juliomartingonzalez44@gmail.com."  J. Berrio Letter to the Court, Sept. 8, 2021, at 2 & n.2.  These assertions are false.  The juliomartingonzalez444@gmail.com email address was present on a Samsung Galaxy A11 smartphone seized from *Mr. Vega's residence*.  Frye Decl. ¶¶ 16-18.  At the seizure, Mr. Vega confirmed that he used the phone and that nobody other than himself and his children used it.  Fischer Decl. ¶ 3.  The emails on this phone were notices from banks regarding bank accounts registered in Mr. Martin Gonzalez's name, including accounts under the name "Cesar Castillo Wholesalers LLC" and "DNS Distributor LLC"  Frye Decl. ¶ 20-

---

[5] "As a general rule, according to Spanish naming conventions, Hispanics typically have two surnames. The first last name is the father's family name, and the second last name is the mother's paternal family name.  A person may be 'known by merely his father's name, as in English; still in all formal cases,' or where the father's name is common, the mother's name is often used in addition to the father's name." *De Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 524 n.4 (2d Cir. 2020).

24

22.[6] As noted, checks connected to the Cesar Castillo's bank account were found at Mr. Vega's residence. Third Potter Decl. Ex. 69.

Beyond this email account, Mr. Vega was in possession of additional documents belonging to Julio Martin Gonzalez. As noted above, Mr. Vega possessed corporate registration documents for DNS Distributor LLC and bank account information for Cesar Castillo Wholesalers LLC, on the email account juliomartingonzalez444@gmail.com, accessible on Mr. Vega's personal phone. Frye Decl. ¶¶ 17-22; Fischer Decl. ¶ 3. The registered agent for each of these companies is "Julio Martin Gonzalez." Third Coleman Decl. ¶¶ 4-5. Mr. Vega was also in possession of the 2016 personal income tax returns for Mr. Martin Gonzalez. Fourth Potter Decl. Ex. 94. Given his access to Mr. Martin Gonzalez's business records, Mr. Vega's contention that Mr. Martin Gonzalez is in possession of information about the Synergy business that Mr. Vega does not control cannot be credited.

Tragicomically, this is not the first time that Mr. Vega has sought to blame Mr. Martin Gonzalez for his own legal troubles. On May 5, 2018, in connection with a prosecution against him for growing substantial quantities of marijuana on his property, Mr. Vega submitted a sworn affidavit stating that Julio Martin Gonzalez was the one who had grown the marijuana. Third Coleman Decl. Ex. 35. Apparently, Mr. Martin Gonzalez submitted a video confession to the same effect. *Id.* According to Mr. Vega's 2018 affidavit, Mr. Martin Gonzalez was a tenant that Mr. Vega knew as "Joseph Abdad." *Id.* (In fact, however, Mr. Vega maintained Mr. Martin Gonzalez's 2016 tax returns and certainly knew his real name.) Mr. Vega swore incredibly that although he had personally purchased the equipment used to grow the marijuana, he did so unwittingly at the behest of Mr. Martin Gonzalez, thinking it was for a "lawn sprinkler system."

---

[6] Although Gilead was able to access the phone, without the password and any two-step authentication codes for the account, UnitedLex cannot fully access the emails held on the phone. Frye Decl. ¶¶ 3-5, 17.

*Id.* Mr. Martin Gonzalez testified at Mr. Vega's trial, where he admitted to lying, and was arrested and convicted of perjury. Third Coleman Decl. Ex. 36.

In connection with the present proceeding, Mr. Vega has submitted a declaration from "Aurelio Martin" and video recorded statement from Mr. Vega's tenant denying that he is Julio Martin Gonzalez.[7] Fourth Potter Decl. Ex. 75. Close examination of the video recording, however, reveals that the tenant uses his finger to cover a portion of his name after "Martin" that appears to be "Gonzalez." Fourth Potter Decl. ¶¶ 3-6. Interestingly, public records indicate that one "Aurelio Julio Martin" is associated with Julio Martin Gonzalez. Third Coleman Decl. ¶ 9. Whatever the relationships may be among Carlos Vega, Aurelio Julio Martin, Aurelio Martin (Gonzalez), and Julio Martin Gonzalez, it is clear that Mr. Vega is not being truthful when he says that Gilead must look to Julio Martin Gonzalez rather than himself to find further business records of Synergy.

### C.    Mr. Vega Has Failed to Meet His Burden of Proving That He Is Unable to Comply with the Seizure Order

Like Mr. Khaim, Mr. Vega's representation that he has provided Gilead with all the responsive business records in his possession and control is demonstrably false. Also like Mr. Khaim, Mr. Vega's has not met his burden to "show plainly and unmistakably" that compliance with the Seizure Order "is impossible." *In re Various Grand Jury Subpoenas*, 2017 U.S. Dist. LEXIS 20087, at *3. To the extent Mr. Vega relies on the Fifth Amendment to avoid providing further information, this "does not relieve him of his burden" of proving impossibility. *Armstrong*, 470 F.3d at 100. Having failed to comply with the Seizure Order or prove that he is

---

[7] During the seizure, a prescription pill vial bearing the name "Julio Martin" was observed in "Aurelio Martin's" efficiency apartment. Fischer Decl. ¶ 4

unable to do so, Mr. Vega should be held in contempt until he produces the information necessary for Gilead to locate Synergy's suppliers.

## VII.   THE COURT HAS JURISDICTION TO HOLD MR. VEGA IN CONTEMPT

After Gilead moved for contempt, Mr. Vega asserted, for the first time, that the Court lacks personal jurisdiction over him. This argument fails for many reasons. Recently discovered facts demonstrate that Mr. Vega conducted a large portion of Synergy's business in New York and conspired to sell counterfeit Gilead products in New York. Furthermore, Mr. Vega consented to New York jurisdiction by applying to modify his asset freeze and agreeing to a preliminary injunction without asserting a personal jurisdiction defense.

### A.   This Court Has Personal Jurisdiction Over Mr. Vega and Synergy Because They Transacted Business In New York and Have Numerous Contacts Here

As Gilead noted in its original motion for contempt, it does not seek to hold Mr. Vega in contempt for his failure to produce information in his individual capacity, but rather for his role in causing Synergy to defy this Court's Seizure Order. To hold Mr. Vega in contempt on that basis, it is not necessary for the Court to have personal jurisdiction over Mr. Vega individually. Rather, it is sufficient to show that the Court has jurisdiction over Synergy and that Mr. Vega has assisted Synergy in violating this Court's orders. *See, e.g.*, *Absolute Nev., LLC v. Grand Majestic Riverboat Co. LLC,* No. 19-cv-11479 (PKC), 2020 U.S. Dist. LEXIS 159391, at \*15 (S.D.N.Y. Sep. 1, 2020) ("A nonparty respondent may be held in contempt of a court order if the respondent abets the party named in the order in its noncompliance or if it is legally identified with that party."); *SEC v. Homa*, 514 F.3d 661, 673 (7th Cir. 2008) ("Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order.

This is so despite the absence of other contacts with the forum." (quoting *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985))); *Chevron Corp. v. Donziger*, 2020 U.S. Dist. LEXIS 14077, at *22-23 (S.D.N.Y. Jan. 27, 2020) ("Courts routinely exercise personal jurisdiction in contempt proceedings over nonparties on the basis that nonparties may not assist, aid, or abet a violation of an order that directly binds a party.").

Here, the facts demonstrate that this Court has personal jurisdiction over Synergy—and, indeed, although not required, also over Mr. Vega in his individual capacity. Under the New York long-arm statute, personal jurisdiction exists, if, among other things, the defendant "1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting CPLR 302(a)). In determining personal jurisdiction under the New York statute and the constitution, courts "look to the totality of Defendants' contacts with the forum state." *Id.* at 164. "Section 302(a) also confers jurisdiction over individual corporate officers who supervise and control an infringing activity." *Id.*

Synergy, supervised and controlled by Mr. Vega, conducted its infringing business in New York and has numerous contacts in this state. In April 2021, Synergy obtained a wholesale license in New York, one of only three states in which it had such a license. Third Coleman Decl. ¶ 10 & Ex. 37. In the four months of Synergy bank records that Mr. Vega produced, Synergy's corporate debit card was used for five different transactions in New York, indicating that it conducted business there. Fourth Potter Decl. Ex. 89. (And by Mr. Vega's own account, Synergy's sole business involved the sale of counterfeit Gilead products. *See* Fourth Potter Decl. Ex. 85.) Most significantly, as discussed above, Synergy, using shell entities under Mr. Vega's personal control, funneled millions of dollars into Manhattan jewelry stores, in an effort either to

28

launder the proceeds of its fraud, to pay its suppliers of counterfeit Gilead products, or both. *See* Fourth Potter Decl. Ex. 90.

These repeated business contacts, coming in the few short months that Synergy is known to have been in operation, are more than sufficient to confer personal jurisdiction over Synergy and Mr. Vega. *See, e.g., Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 254-55 (S.D.N.Y. 2020) (laundering money through New York gives rise to jurisdiction pursuant to CPLR 302(a)(1)); *Dandong Old N.-East Agric. & Animal Husbandry Co. v. Gary Ming Hu*, 2017 U.S. Dist. LEXIS 122471, at *17-18 (S.D.N.Y. Aug. 3, 2017) (CPLR 302(a)(1) satisfied where defendant used funds obtained as a part of illegal scheme to purchase property in New York); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382 (S.D.N.Y. 2013) (CPLR 302(a)(1) satisfied where defendant utilized New York bank accounts to hold money defrauded from investors); *XpresSpa Holdings, LLC v. Cordial Endeavor Concessions of Atlanta, LLC*, 171 A.D.3d 511, 512 (1st Dep't 2019) (three New York business meetings sufficient to establish jurisdiction under 302(a)(1)); *Burlington Indus., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874 (S.D.N.Y. 1986) (two New York meetings where business decisions were discussed and made sufficient to establish jurisdiction under 302(a)(1)). This Court clearly has jurisdiction to hold Mr. Vega in contempt.

**B.    This Court Has Personal Jurisdiction Over Mr. Vega and Synergy Because They Conspired to Sell Counterfeits in New York**

Furthermore, Mr. Vega and Synergy are subject to conspiracy jurisdiction in New York. In order to "alleg[e] a conspiracy theory of jurisdiction[,] the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *In re Platinum and Palladium Antitrust Litig.*, 449 F.

29

Supp. 3d 290, (S.D.N.Y. 2020) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)). Here, Gilead has alleged, and set forth evidence proving, that Mr. Vega and Synergy conspired with Safe Chain to illegally sell purported Gilead products with fake pedigrees to New York pharmacies. There is no dispute that Mr. Vega caused Synergy to sell purported Gilead product to Safe Chain, which Safe Chain then sold to multiple New York pharmacies. Fourth Potter Decl. Ex. 95. There is also no dispute that in connection with those sales, Mr. Vega and Synergy falsely claimed that the purported Gilead product was sourced from Cesar Castillo, a Gilead-authorized distributor located in Puerto Rico.

As Gilead has set forth in detail in prior filings, Mr. Vega and Synergy perpetrated a scam to create false documentation showing Synergy's counterfeits were sourced from Cesar Castillo, a Gilead-authorized supplier located in Puerto Rico. In reality, Synergy never purchased any Gilead product from Cesar Castillo, as Cesar Castillo's sales director has confirmed in a sworn declaration. Vazquez Decl. ¶ 14.

Gilead now understands that Safe Chain was in on this scam. In April 2020, Patrick Boyd of Safe Chain wrote to Mr. Vega at his corporate Carlos@Synergy Account asking for written confirmation that Synergy had purchased the Gilead products from Cesar Castillo, and specifically requesting confirmation of Synergy's account number with Cesar Castillo. Second Potter Decl. Ex. 58. In response, Mr. Vega forwarded Mr. Boyd's email to one "Bary Sanchez" at the email address bary.sanchez@cesarcastilloinc.co, who purported to provide the requested verification. *Id.*

But that email did not come from the real Bary Sanchez at Cesar Castillo—it is a spoof. Cesar Castillo's website is http://www.cesarcastillo.com, and its employees have @cesarcastillo.com email addresses. Second Coleman Decl. ¶ 31. The sham email uses a

30

@cesarcastilloinc.*co* email address.  According to public records, that fraudulent domain name was registered just a week before the sham "Cesar Castillo" email above was sent.  *Id.* ¶ 32.  Mr. Vega personally ran the fake "Cesar Castillo" scam:  as noted, blank checks for a "Cesar Castillo LLC" were found in his apartment, as well as a stamp for endorsing checks to that lookalike "Cesar Castillo LLC."  Third Potter Decl. Exs. 69, 70; *see also* Frye Decl. ¶¶ 20-21.

Recently obtained documents show that Mr. Vega and Synergy conspired with Safe Chain to sell counterfeits under a false Cesar Castillo pedigree.  Shortly before the spoofed "Bary Sanchez" email was sent, Safe Chain's Director of Compliance noticed that Synergy was listing a fake email address for Cesar Castillo on its paperwork, and alerted Safe Chain's co-owners Charles and Patrick Boyd, writing that the "email is incorrect, from the company webpage their emails end with 'cesarcastillo.com' not the 'cesarcastilloinc.com' as listed on the Pedigree." Second Potter Decl. Ex. 59.  The Direct of Compliance also included a link to www.cesarcastillo.com, the distributor's actual website.  *Id.*  Patrick Boyd privately responded to Charles Boyd by saying of the Director of Compliance she needed to tone down her language, because her email "wouldn't cover us" if there were a problem.  *Id.*  When the scam "Cesar Castillo" email came in two weeks later, using the spoofed email address that he had just been warned about, Patrick Boyd immediately responded, "Thanks for your help with this Bary." Second Potter Decl. Ex. 58.  Thus, the evidence demonstrates that Safe Chain knowingly conspired with Mr. Vega and Synergy to create the fake "Cesar Castillo" email trail for the purpose of passing off their illegitimate product as authentically sourced Gilead medication.

In sum, the evidence shows that Vega and Synergy conspired with Safe Chain to sell infringing products with fraudulent pedigrees in New York.  This Court therefore may exercise

31

personal jurisdiction over both Vega and Synergy on a conspiracy theory of jurisdiction as well. *In re Platinum*, 449 F. Supp. 3d at 290.

### C.    Mr. Vega Consented to this Court's Jurisdiction

Finally, Mr. Vega and Synergy consented to this Court's jurisdiction by appearing before the Court, and making an affirmative application for relief, without asserting a personal jurisdiction defense.  On September 2, 2021, Mr. Vega and Synergy appeared through counsel and informed the Court that they would "stipulate to the entry of the requested injunction." Berrio Letter to Court, Sept. 2, 2021.  No mention was made of personal jurisdiction.  At a September 3, 2021 hearing, Mr. Vega reiterated through counsel that he would agree to a preliminary injunction.  Mr. Vega also "requested a modification to the Courts asset freeze order. The Court denied his application to release funds."  Minute Entry Order of Sept. 3, 2021.  Again, Mr. Vega did not assert any defense of personal jurisdiction at this time.

By agreeing to the entry of a preliminary injunction and applying to the Court for a modification of the asset freeze order, without asserting a personal jurisdiction defense, Mr. Vega has already consented to the Court's jurisdiction. *See Scottish Air Int'l v. British Caledonian Grp., PLC.*, 152 F.R.D. 18, 24 (S.D.N.Y. 1993) (finding jurisdiction and holding defendants in contempt where stipulation to agreement so-ordered by Judge operates as a waiver of personal jurisdiction defense); *Hartford Fire Ins. Co. v. Evergreen Org., Inc.*, 410 F. Supp. 2d 180, 183-84 (S.D.N.Y. 2006) (personal jurisdiction defense waived where parties "appeared by counsel in opposition to the motion for provisional relief" and made "no objection to the Court's personal jurisdiction"); *Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción*, 832 F.3d 92, 101 (2d Cir. 2016) ("[W]hen 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the

adjudication of claims arising from the same subject matter.'" (*quoting PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 460-61 (5th Cir. 2001))).

Ultimately, Mr. Vega had no choice but to consent to this Court jurisdiction, because Synergy conducted business in New York and laundered millions of dollars in illicit proceeds through New York-based jewelers. There can be no serious question that this Court has personal jurisdiction to hold Mr. Vega in contempt for his refusal to comply with the Seizure Order.

## VIII.  CONCLUSION

As Judge Kaplan once observed, "a person jailed for civil contempt holds the keys to the jail in his or her pocket. All that needs to be done to gain release is to do what the Court has ordered." *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 2016 U.S. Dist. LEXIS 177549, at *12 (S.D.N.Y. Dec. 15, 2016). Gilead respectfully contends that in light of their continued refusal to comply with this Court's Seizure Orders, Mr. Khaim and Mr. Vega should be jailed for contempt, in the hopes that the incentive of a jail key in their pockets will lead them to provide Gilead with the critical information it needs to protect the public from counterfeit HIV medication.

33

Dated:      New York, New York
            September 21, 2021

                              Respectfully Submitted,

                              PATTERSON BELKNAP WEBB & TYLER LLP

                              By:  _____
                                   Geoffrey Potter
                                   Aron Fischer
                                   Thomas P. Kurland
                                   Timothy A. Waters
                                   Joshua R. Stein
                              1133 Avenue of the Americas
                              New York, NY  10036-6710
                              T:  212-336-2000
                              F:  212-336-2222
                              E:  gpotter@pbwt.com
                                   afischer@pbwt.com
                                   tkurland@pbwt.com
                                   twaters@pbwt.com
                                   jstein@pbwt.com

                              *Attorneys for Plaintiffs*
                              *Gilead Sciences, Inc., Gilead Sciences Ireland UC,*
                              *and Gilead Sciences, LLC*

34

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2021, I served the foregoing upon the following:

Todd Mizeski
Jesse Dresser
Lucas Morgan
FRIER LEVITT, LLC
tmizeski@frierlevitt.com
jdresser@frierlevitt.com
lmorgan@frierlevitt.com

*Counsel for Defendants Safe Chain Solutions,
LLC, Patrick Boyd, Charles Boyd, Worldwide
Pharma Sales Group, Inc. d/b/a
Pharmasales.com, and Adam S. Brosius*


Susan Brichler Trujillo
Gregory T. Everts
Hector J. Diaz
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004
Susan.trujillo@quarles.com
Gregory.everts@quarles.com
Hector.diaz@quarles.com
Tel: (602) 229-5200

Andrey Spektor
BRYAN CAVE LEIGHTON PAISNER LLP
andrey.spektor@bclplaw.com

*Counsel for Defendants ProPharma
Distribution LLC and Levi Ellis*

Jonathan Savella
40 Exchange Place, Ste. 1800
New York, NY 10005
Jonathan.savella@gmail.com

*Attorney for Defendant Ishbay Shukurov*


James R. Froccaro
20 Vanderventer Avenue
Suite 103W
Port Washington, NY 11050
jrfesq61@aol.com

*Attorney for Defendant Peter Khaim*


Juan Diego Berrio
Berrio & Berrio PA
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
Jdberrio@hotmail.com

*Attorney for Defendant Carlos Vega*


Gerald J. Di Chiara
585 Stewart Ave. - L16
Garden City, NY 11530
jdichiarag@aol.com

*Attorney for Defendant Zafar Abdullaev*


*/s/ Joshua R. Stein*

35