# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------
GILEAD SCIENCES, INC., et al.,                   :
                                                 :
                              Plaintiffs,        :        Case No. 21-cv-4106 (AMD) (RER)
                                                 :
v.                                               :
                                                 :        FILED EX PARTE AND UNDER SEAL
SAFE CHAIN SOLUTIONS, LLC, et al.,               :        PURSUANT TO 15 U.S.C. § 1116(d)
                                                 :
                              Defendants.        :
                                                 :
                                                 :
-----------------------------------------------------------
```

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR *EX PARTE* SEIZURE ORDER, TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION, AND <u>LEAVE TO FILE AN AMENDED COMPLAINT</u>

Geoffrey Potter
Aron Fischer
Timothy A. Waters
Thomas P. Kurland
Gizele Rubeiz
Angelica H. Nguyen
Maxwell Weiss
PATTERSON BELKNAP WEBB & TYLER LLP

*Attorneys for Plaintiffs*
*Gilead Sciences, Inc., Gilead Sciences Ireland UC,*
*and Gilead Sciences, LLC*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................2

    **A.**    Overview of Structure of the Counterfeiting Conspiracy ........................................3

    **B.**    The Defendant Groups and Their Roles In the Conspiracy....................................4

    **C.**    The Newly Named Defendants At Issue In this Motion..........................................8

    **D.**    The Relief Requested in This Motion .....................................................................9

STATEMENT OF FACTS ................................................................................................11

I.      GILEAD'S HIV MEDICATIONS .........................................................................11

    **A.**    Gilead's Trademarks .............................................................................................11

    **B.**    Gilead's Medications ............................................................................................11

II.    THE DEFENDANTS' COUNTERFEIT GILEAD-BRANDED MEDICATIONS..........11

    **A.**    Many of the Counterfeits Use Once-Authentic Gilead Bottles but Are Filled with the Wrong Medication .................................................................12

    **B.**    The Counterfeit HIV Medications Pose a Severe Risk to Public Health ...................................................................................................................12

    **C.**    The Defendants' Use of Bottles Bought on the Street from HIV Patients with Counterfeit Patient Instructions and Other Counterfeit Elements ...........................................................................................14

    **D.**    Defendants' Use of Counterfeit and Fraudulent Pedigrees...................................17

III.   THE KINGPIN DEFENDANTS: CAREER CRIMINALS WHO ORGANIZED AND OVERSAW THE COUNTERFEITING RING................................................19

    **A.**    Kingpin Defendant Lazaro Roberto Hernandez a/k/a "Rob" ...............................20

        **1.**    "Rob": The Shadowy Individual Behind the Counterfeit Suppliers ...................................................................................................20

        **2.**    Identifying "Rob"....................................................................................25

        **3.**    Mr. Hernandez's Money Laundering and Criminal History....................28

i

        4.      Mr. Hernandez's Recent Indictment, Arrest, and
                Confinement to Supervised House Arrest....................................30

   B.      The Kingpin Defendants and Those Below Them in the
           Conspiracy Threaten Violence Against Those Who "Snitch"..............34

   C.      Kingpin Defendant Armando Herrera a/k/a "Thomas" ......................35

           1.      "Thomas" the "HIV middle man"...........................................36

           2.      Identifying "Thomas" ...........................................................38

           3.      Kingpin Defendant Armando Herrera ......................................41

IV.   THE NEW LEADER DEFENDANTS...............................................................42

   A.      Leader Defendant John Levitan ......................................................43

   B.      Leader Defendant David Dunn and His Companies, PCSIONE,
           LLC and Pharmacy Consulting Services, Inc. ...................................46

V.    THE NEW FLY-BY-NIGHT COUNTERFEIT SUPPLIER DEFENDANTS THAT
      SOLD TO SCRIPTS ....................................................................................48

   A.      Supplier Defendants My Meds and Its Principals, Stephen Smith
           and Emilio Juvier Vina .................................................................50

           1.      My Meds' Ties to the Counterfeiting Conspiracy .....................51

           2.      My Meds' Use of Shell Companies that Fraudulently
                   Appropriated the Identity of a Legitimate Distributor ..............51

   B.      Supplier Defendants ITC Group, LLC and Its Principal, Frank
           Betancourt ..................................................................................53

           1.      ITC's Ties to the Counterfeiting Conspiracy...........................53

           2.      ITC's Initial Lack of Licensure and Obviously Fake
                   Pedigrees .............................................................................53

   C.      Supplier Defendants Abacus Distributors and Its Principals, Jose
           Hernandez and Carlos Pimentel.......................................................55

           1.      Abacus's Ties to the Counterfeiting Conspiracy ......................56

           2.      Abacus's Sale of Counterfeits With the Wrong Pills In the
                   Bottle and the Subsequent FDA Criminal Investigation............57

    **D.**   Supplier Defendants V & G Wholesale and Its Principal, Pavel Lashkevich ...................................................................................58

        **1.**   V & G's Relationship with Distributor Defendant Scripts ........................58

        **2.**   V & G's Lack of Registration and Obviously Suspect Product ...................................................................................59

    **E.**   Supplier Defendant Mainspring and Its Principals, Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman...................60

**VI.**   ADDITIONAL NEW COUNTERFEIT SUPPLIER DEFENDANTS THAT SOLD DIRECTLY TO PHARMACIES...................................................................................62

    **A.**   Supplier Defendants Pharma Pac LLC and Daynel Garcia ................................62

        **1.**   The "New" Pharma Pac LLC Is Running the Same Scam as the Previous Pharma Pac Defendants .........................................................63

        **2.**   With Its Former Customers Enjoined by This Court, Pharma Pac LLC Now Sells Directly to Pharmacies................................64

    **B.**   Supplier Defendants CompaRx and Its Principal, Yusniel Forcelledo Perez...................................................................................64

        **1.**   CompaRx's Ties to the Counterfeiting Network ......................................65

        **2.**   CompaRx's Sales Directly to a Retail Pharmacy ......................................65

**VII.**  THE RETAIL PHARMACY TURNED COUNTERFEIT SUPPLIER: VALUECARE PHARMACY AND ITS PRINCPAL, BAKHTIYAR NABIEV ......................................66

        **1.**   Valuecare's Sale of Counterfeit Gilead-Branded Medication ...................................................................................66

        **2.**   Valuecare's Ties to the Counterfeiting Conspiracy ...................................67

**VIII.** THE NEW DISTRIBUTOR DEFENDANT: PROVEN PHARMACEUTICALS AND ITS PRINCIPAL, WILLIAM SCOTT WISE...................................................................69

        **1.**   ProVen's Recruitment Into the Counterfeiting Conspiracy......................70

        **2.**   ProVen's Purchase of Counterfeits from Known Counterfeit Suppliers ...................................................................................71

**IX.**   THE NEW PHARMACY DEFENDANTS...................................................................72

    **A.**   Pharmacy Defendant Laconia Avenue Pharmacy Corp. and its Principal, Stanislaus Mgbeojirikwe ...................................................................73

1.    Laconia's Very Recent Sale of Counterfeit Gilead-Branded HIV Medication with the Wrong Pills in the Bottle ..............................73

2.    Laconia Refuses to Identify Its Source and Refuses to Cooperate with Gilead ............................................................................74

B.    Pharmacy Defendant Total Remedy Its Principal, Mohammad Etminan ............................................................................................76

1.    Total Remedy's Willful, High-Volume Counterfeit Purchases...................................................................................................76

2.    Total Remedy's Continued Purchase of Counterfeits In Recent Weeks...................................................................................77

X.    THE STREET-LEVEL COLLECTOR DEFENDANTS ...................................................78

A.    Collector Defendant Nicole Aston, the Street-Level Buyer ...................................79

B.    Collector Defendant Boris Abramov, the Buy-Back Coordinator, and His Company, Hashem Yitbarach LLC ........................................................81

1.    Mr. Abramov's Illegal Patient Buy-Back Operation ...............................81

2.    Mr. Abramov's Conspiring With the Distributor Defendants Who Purchased the Counterfeits. ............................................83

3.    Cleaning the Bottles and Creating the Counterfeit Pedigrees...................84

4.    Mr. Abramov's Attempts to Conceal His Role and Avoid Getting Caught ..................................................................................85

5.    Mr. Abramov's Company, Hashem Yitbarach LLC..................................86

XI.   THE ASSET HOLDER DEFENDANTS: MONEY LAUNDERERS WHO RECEIVED THE COUNTERFEITING PROFITS FROM THE SUPPLIER DEFENDANTS...........87

A.    The Colombian Cellphone Money Launderers.......................................................88

B.    The Kessler and Aminov Money Launderers .........................................................91

C.    The Abacus Money-Laundering Network ..............................................................93

D.    The My Meds Money Laundering Network ...........................................................95

E.    Kingpin Defendant Herrera's Girlfriend, Asset Holder Defendant Yisel Lopez ............................................................................................................96

XII.  THE NEW RELIEF DEFENDANT, ETZHAIM INC. ...................................................98

ARGUMENT ..................................................................................................99

I.      THE COURT SHOULD GRANT LEAVE FOR GILEAD TO AMEND ITS
        COMPLAINT .....................................................................................99

II.     THIS COURT HAS PERSONAL JURISDICTION OVER ALL THE NEWLY NAMED
        DEFENDANTS ..................................................................................100

III.    GILEAD IS ENTITLED TO AN *EX PARTE* SEIZURE ORDER.................................103

        A.      Gilead Satisfies All the Requirements for an *Ex Parte* Seizure
                Under the Counterfeiting Act..............................................................104

                1.      An order other than an *ex parte* seizure order is not
                        adequate to achieve the purposes of the Lanham Act (15
                        U.S.C. § 1116(d)(4)(B)(i)) ........................................................104

                2.      Gilead has not publicized the requested seizure (15 U.S.C.
                        § 1116(d)(4)(B)(ii))...................................................................107

                3.      Gilead is likely to succeed in showing that the persons
                        against whom seizure would be ordered used a counterfeit
                        mark in connection with the sale, offering for sale, or
                        distribution of goods or services (15 U.S.C.
                        § 1116(d)(4)(B)(iii))..................................................................107

                4.      An immediate and irreparable injury will occur if such
                        seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)) .........................107

                5.      The matter to be seized will be located at the place
                        identified in the application (15 U.S.C. § 1116(d)(4)(B)(v))..................108

                6.      The harm to the applicant of denying the application
                        outweighs the harm to the legitimate interests of the
                        persons against whom seizure would be ordered (15 U.S.C.
                        § 1116(d)(4)(B)(vi))..................................................................110

                7.      Defendants would destroy, move, hide, or otherwise make
                        such matter inaccessible to the court, if the applicant were
                        to proceed on notice to such persons (15 U.S.C.
                        § 1116(d)(4)(B)(vii))..................................................................111

        B.      The Seizure Order Should Include All Gilead-Branded Products ......................115

        C.      This Court Has Authority to Order Seizures Anywhere in the
                United States ...............................................................................115

v

IV.   GILEAD IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A
      PRELIMINARY INJUNCTION ...............................................................116

      A.   Gilead Has a Strong Likelihood of Success on the Merits ................................116

           1.   Consumer Confusion Is Established as a Matter of Law for
                Counterfeits.............................................................................117

           2.   Each Defendant Is Individually Liable for Its Role in the
                Counterfeiting ...........................................................................120

           3.   The Defendants Are Willful Infringers, but Gilead Needs to
                Establish Only Strict Liability ................................................121

      B.   Gilead Is Suffering Irreparable Harm as a Result of Defendants'
           Activities.............................................................................................122

      C.   The Balance of Equities Tips Decisively in Gilead's Favor...............................123

      D.   An Injunction Is in the Public Interest ..................................................123

V.    GILEAD IS ENTITLED TO AN *EX PARTE* ORDER FREEZING DEFENDANTS'
      ASSETS .......................................................................................................124

      A.   Legal Standard for Asset Freezes under the Lanham Act...................................124

      B.   Gilead Has a Strong Likelihood of Success on the Merits ................................126

      C.   Defendants Are Likely to Dissipate Assets, and Gilead Will Suffer
           Additional Irreparable Harm If Their Assets Are Not Frozen............................126

           1.   The Kingpin Defendants.........................................................127

           2.   The New Leader Defendants: John Levitan and David
                Dunn..........................................................................................128

           3.   The New Supplier Defendants: My Meds, ITC, Abacus, V
                & G, Pharma Pac LLC, CompaRX, Mainspring, and Their
                Principals...................................................................................128

           4.   The Pharmacy Turned Counterfeit Supplier, Valuecare.........................129

           5.   The New Distributor Defendant, ProVen ................................129

           6.   The New Pharmacy Defendants: Total Remedy and
                Laconia.......................................................................................129

           7.   The New Asset Holder Defendants.........................................130

**8.**     The New Relief Defendant, Etzhaim ....................................................131

**D.**     The Balance of the Equities Strongly Favors Gilead............................................131

**E.**     The Public Interest Is Served by an Asset Freeze..................................................132

**F.**     The Asset Freeze Should Be Global in Scope and *Ex Parte* ..............................132

**G.**     The Court May in the Alternative Attach the Defendants' Assets *Ex Parte* Under New York Law............................................................................133

VI.     CONCLUSION...................................................................................................135

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*135 Flat LLC v. Triadou SPV NA*,
   No. 15-cv-5345 (AJN), 2016 WL 5945912 (S.D.N.Y. June 24, 2016) ................................133

*Abbott Labs. et al. v. H&H Wholesale Servs., Inc.*,
   No. 17-cv-3095, 2018 WL 2459271 (CBA) (LB) (E.D.N.Y.) ...............................................105

*Allstate Ins. Co. v. Rozenberg*,
   No. 08-CV-565, 2009 WL 9081080 (E.D.N.Y. Jan. 26, 2009) ....................................133, 134

*Balenciaga Am., Inc. v. Dollinger*,
   No. 10 Civ 2912 (LTS), 2010 U.S. Dist. LEXIS 107733 (S.D.N.Y. Oct. 8,
   2010) ........................................................................................................................124, 131

*Burger King Corp. v. Stephens*,
   No. 89-CV-7691, 1989 U.S. Dist. LEXIS 14527 (E.D. Pa. Dec. 6, 1989) ..........................122

*Cartier v. Aaron Faber Inc.*,
   512 F. Supp. 2d 165 (S.D.N.Y. 2007)..................................................................................117

*Chanel, Inc. v. Classic-Bag-Shop*,
   No. 19-cv-60492, 2019 U.S. Dist. LEXIS 42688 (S.D. Fla. Mar. 14, 2019).......................126

*Chloe v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010)................................................................................................100

*Church of Scientology Int'l v. Elmira Mission*,
   794 F.2d 38 (2d Cir. 1986)..................................................................................................122

*City of N.Y. v. Cyco.Net, Inc.*,
   383 F. Supp. 2d 526 (S.D.N.Y. 2005)..................................................................................101

*Coty Inc. v. Cosmopolitan Cosmetics Inc.*,
   432 F. Supp. 3d 345 (S.D.N.Y. 2020)..................................................................................118

*CSC Holdings, Inc. v. Redisi*,
   309 F.3d 988 (7th Cir. 2002) ..............................................................................................124

*Cytosport, Inc. v. Vital Pharms., Inc.*,
   617 F. Supp. 2d 1051 (E.D. Cal. 2009)................................................................................123

viii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Dong v. Miller*,
    No. 16-CV-5836 (NGG)(JO), 2018 U.S. Dist. LEXIS 48506 (E.D.N.Y. Mar.
    23, 2018) ...................................................................................................................131

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir. 1986)......................................................................................116

*Gmurzynska v. Hutton*,
    355 F.3d 206 (2d Cir.2004)........................................................................................120

*Gucci Am., Inc. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014)...............................................................................124, 130

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
    286 F. Supp. 2d 284 (S.D.N.Y. 2003).......................................................................117

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
    955 F.2d 1143 (7th Cir. 1992) ...................................................................................121

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
    176 F.Supp.3d 137 (E.D.N.Y. 2016) .........................................................................120

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
    846 F.2d 1079 (7th Cir. 1988) ...................................................................................123

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
    No. 21CV10940 (DLC), 2022 WL 827094 (S.D.N.Y. Mar. 16, 2022)...............133, 134

*Johnson & Johnson and Lifescan, Inc. v. South Pointe Wholesale, Inc.*,
    No. 08-cv-1297 (SLT) (SMG), 2014 WL 12558573 (E.D.N.Y. Mar. 28, 2014) .................118

*Johnson & Johnson et al. v. Advanced Inventory Management, Inc. d/b/a*
    *eSutures.com et al.*,
    No. 20-cv-3471, 2020 WL 6119516 (N.D. Ill. Oct. 16, 2020) ............................................105

*Johnson & Johnson et al. v. XS Supply, LLC et al.*,
    No. 8:19-cv-1673, 2019 WL 11025502 (M.D. Fla. July 11, 2019).......................................105

*Johnson & Johnson v. South Pointe Wholesale, Inc. et al.*,
    No. 08-1297 (SLT) (SMG), 2009 WL 10706651 (E.D.N.Y. June 6, 2009).........................106

*Johnson & Johnson v. Stone Medical Group, LLC*,
    No. 15-cv-3221 (PKC) (LB) (E.D.N.Y. Aug. 17, 2017) ....................................................106

*KatiRoll Co. v. Kati Junction, Inc.*,
    33 F. Supp. 3d 359 (S.D.N.Y. 2014)........................................................................119

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading*,
  No. 07-CV-2568 (CPS), 2007 WL 9723382 (E.D.N.Y. July 19, 2007) ...............................110

*Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt.*,
  No. 04-CV-2293 (JFB) (SMG), 2007 U.S. Dist. LEXIS 1404 (E.D.N.Y. Jan.
  8, 2007) ....................................................................................................................116

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
  51 F.3d 982 (11th Cir. 1995) ....................................................................................124

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
  378 F. Supp. 2d 448 (S.D.N.Y. 2005)........................................................................117

*Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*,
  No. 03-cv-4844, 2005 U.S. Dist. LEXIS 28917
  (N.D. Ill. Nov. 8, 2005) ..........................................................................125, 126, 131

*Matsunoki Grp., Inc. v. Timberwork Or., Inc.*,
  2009 U.S. Dist. LEXIS 37573 (N.D. Cal. Apr. 16, 2009) ....................................119

*Microsoft Corp. v. ATEK 3000 Computer, Inc.*,
  No. 06-CV-6403 (SLT)(SMG), 2008 U.S. Dist. LEXIS 56689 (E.D.N.Y. Jul.
  23, 2008) ....................................................................................................................122

*Monsanto Co. v. Haskel Trading, Inc.*,
  13 F. Supp. 2d 349 (E.D.N.Y. 1998) ........................................................................118

*Motorola Inc. v. Abeckaser*,
  No. 07-cv-3963 (CPS)(SMG), 2009 U.S. Dist. LEXIS 40660 (E.D.N.Y. May
  14, 2009) ....................................................................................................................125

*Multi-Local Media Corp. v. 800 Yellow Book, Inc.*,
  813 F. Supp. 199 (E.D.N.Y. 1993) ............................................................................115

*N. Face Apparel Corp. v. TC Fashions, Inc.*,
  No. 05-cv-9083 (RMB), 2006 U.S. Dist. LEXIS 14226 (S.D.N.Y. Mar. 30,
  2006) ..........................................................................................................................125

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y 2010)........................................................................122

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
  451 F.2d 1190 (2d Cir. 1971) (Friendly, C.J.).............................................116, 121

*Pantheon Props. Inc. v. Houston*,
  No. 20-cv-03241, 2022 WL 785168 (S.D.N.Y. March 14, 2022) ................132, 133

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Philip Morris USA, Inc. v. Felizardo*,
   No. 03-CV-5891(HB), 2004 U.S. Dist. LEXIS 11154 (S.D.N.Y. June 17,
   2004) ..................................................................................................................117

*Philip Morris USA Inc. v. Liu*,
   489 F. Supp. 2d 1119 (C.D. Cal. 2007) ...............................................................121

*Philip Morris USA Inc. v. Shalabi*,
   352 F. Supp. 2d 1067 (C.D. Cal. 2004) ...............................................................121

*In re Platinum & Palladium Antitrust Litig.*,
   449 F. Supp. 3d 290 (S.D.N.Y. 2020)..................................................................102

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961)..................................................................................117

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*,
   778 F. Supp. 2d 261 (E.D.N.Y. 2011) ..................................................................121

*Proctor & Gamble Co. v. Quality King Distribs., Inc.*
   123 F. Supp. 2d 108 (E.D.N.Y. 2000) ..........................................................116, 117

*Reebok Int'l, Ltd. v. Marnatech Enters.*,
   970 F.2d 552 (9th Cir. 1992) ...........................................................................124, 125

*S.E.C. v. Homa*,
   514 F.3d 661 (7th Cir. 2008) ................................................................................130

*Shamrock Power Sales, LLC v. Scherer*,
   No. 12-cv-8959 (KMK)(JCM), 2016 U.S. Dist. LEXIS 144773 (S.D.N.Y. Oct.
   18, 2016) ..............................................................................................................125

*State Farm Mutual Automobile Insurance Company v. 21st Century Pharmacy,
   Inc.*,
   No. 17-cv-05845 (E.D.N.Y. July 23, 2019)............................................................92

*State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
   425 F.3d 708 (9th Cir. 2005) ................................................................................119

*Std. & Poor's Corp. v. Commodity Exch., Inc.*,
   683 F.2d 704 (2d Cir. 1982)..................................................................................131

*Sunward Elecs., Inc. v. McDonald*,
   362 F.3d 17 (2d Cir. 2004)..........................................................................102, 121

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp.*,
  803 F. Supp. 606 (E.D.N.Y. 1992) ....................................................................116

*Taubman Co. v. Webfeats*,
  319 F.3d 770 (6th Cir. 2003) ...........................................................................121

*Transgo, Inc. v. Ajac Transmissions Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) .........................................................................120

*U.S. v. Petrosian*,
  126 F.3d 1232 (9th Cir. 1997) .........................................................................117

*United States v. Ovasapyan et al.*,
  No. 3:18-cr-00533-RS (N.D. Cal.), Dkt. No. 106 ..............................................60

*USA v. Valdez et al*,
  No. 0:90-cr-06091-NCR-2 (S.D. Fla. June 7, 1990) ............................30, 31, 32

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*,
  106 F.3d 894 (9th Cir. 1997) ...........................................................................117

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................................115

**Statutes**

15 U.S.C. § 1116(a) ...........................................................................................121

15 U.S.C. § 1116(d)(1)(A) .................................................................................103

15 U.S.C. § 1116(d)(2) .......................................................................................103

15 U.S.C. § 1116(d)(4)(A) .................................................................................103

15 U.S.C. § 1116(d)(4)(B) .................................................................................103

15 U.S.C. § 1116(d)(4)(B)(ii) ............................................................................106

15 U.S.C. § 1116(d)(4)(B)(iii) ...........................................................................106

15 U.S.C. § 1116(d)(4)(B)(iv) ...........................................................................107

15 U.S.C. § 1116(d)(4)(B)(v) ............................................................................108

15 U.S.C. § 1116(d)(4)(B)(vi) ...........................................................................110

15 U.S.C. § 1116(d)(4)(B)(vii) ..........................................................................110

# TABLE OF AUTHORITIES
## (continued)

Page(s)

18 U.S.C. § 1965 ................................................................................................101

18 U.S.C. § 2320 ...............................................................................................114

21 U.S.C. § 331 .................................................................................................114

21 U.S.C. § 360eee-1(c)(4)(a)(i) ......................................................................115

21 U.S.C. §§ 360eee(2), (23) ............................................................................18

Counterfeiting Act ...................................................................................... *passim*

Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq.* .................. *passim*

Lanham Act (15 U.S.C. §§ 1116-1117 et seq.)........................................... *passim*

RICO .......................................................................................................... *passim*

**Other Authorities**

31 C.F.R. § 103.21 .............................................................................................29

130 Cong. Rec. H12076 .....................................................................................110

1984 U.S.C.C.A.N. .....................................................................................103, 105

Corinne Ramey, *Justice Department Probes Network Accused of Selling Counterfeit HIV Drugs*, Wall Street Journal (Mar. 30, 2022), *available at* https://www.wsj.com/articles/justice-department-probes-network-accused-of-selling-counterfeit-hiv-drugs-11648653345 ................................30

CPLR 6201........................................................................................................132

CPLR 6201(3) ............................................................................................133, 134

CPLR 6212........................................................................................................134

FDA, *Pharmacists: Utilize DSCSA Requirements to Protect Your Patients, Guidance Document* (July 3, 2019), https://www.fda.gov/drugs/drug-supply-chain-security-act-dscsa/pharmacists-utilize-dscsa-requirements-protect-your-patients ................................18

FDA, *Wholesale Distributor and Third-Party Logistics Providers Reporting*, https://www.accessdata.fda.gov/scripts/cder/wdd3plreporting/index.cfm ................................18

Federal Rule of Civil Procedure 15(a) ..............................................................99

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Federal Rule of Civil Procedure 64 ..................................................................132, 134

http://www.vcic.vu/.................................................................................................94

https://pharmapac.com ...........................................................................................63

https://www.justice.gov/archive/opa/pr/2008/January/08_crm_049.html....................41

https://www.morrisdickson.com/md-specialty-distribution/ ......................................51

Joseph Walker, Corinne Ramey, *Drugmaker Gilead Alleges Counterfeiting Ring
    Sold Its HIV Drugs*, WALL STREET JOURNAL (Jan. 18, 2022), *available at*
    https://www.wsj.com/articles/drugmaker-gilead-alleges-counterfeiting-ring-
    sold-its-hiv-drugs-11642526471;.........................................................................30

*Man Arrested for Allegedly Distributing Over $230 Million of Adulterated HIV
    Medication*, U.S. DOJ (Jun. 17, 2022), *available at*
    https://www.justice.gov/opa/pr/man-arrested-allegedly-distributing-over-230-
    million-adulterated-hiv-medication .....................................................................31

March 2021, https://www.sec.gov/Archives/edgar/data/
    0001300514/000130817921000126/llvs2021_def14a.ht......................................26

S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984
    U.S.C.C.A.N. 3627 ...........................................................................................103

*Sale: Fugitives, Politicians and Disgraced Businesspeople Buying Vanuatu
    Passports*, THE GUARDIAN (July 14, 2021),
    https://www.theguardian.com/world/2021/ jul/15/citizenship-for-sale-
    fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passport ......94

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (together, "Gilead" or "Plaintiffs") submit this memorandum of law in support of their application seeking immediate injunctive relief against several newly added Defendants.[1]

Gilead seeks an *ex parte* seizure order, a temporary restraining order, and an asset freeze order against the following newly added Defendants:  Kingpin Defendant Armando Herrera; Leader Defendants John Levitan and David Dunn; Supplier Defendant My Meds and its principal, Stephen Smith; Supplier Defendant ITC and its principal, Frank Betancourt; Supplier Defendant Abacus and its principal, Jose Hernandez;[2] Pharmacy Defendant Laconia; and Collector Defendants Nicole Alston and Boris Abramov.

For other newly added Defendants, Gilead seeks a temporary restraining order and asset freeze order, but not a seizure order.  These Defendants include Kingpin Defendant Lazaro Hernandez; Leader Defendant Dunn's companies Pharmacy Consulting Services, Inc. and PCSIONE, LLC; My Meds principal Emilio Juvier Vina; Abacus principal Carlos Pimentel; Supplier Defendant V & G Wholesale and its principal Pavel Lashkevich; Supplier Defendant Mainspring and its principals, Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman; Supplier Defendant Pharma Pac LLC and its principal, Daynel Garcia; Supplier Defendant CompaRx and its principal, Yusniel Forcelledo Perez; Supplier Defendant Valuecare

---

[1] Attached as **Appendix B** to this memorandum of law is a list, by category, of all Defendants in this action, including newly named and previously named Defendants.  Gilead herein refers to corporate Defendants by the shortened names listed in that Appendix.

[2] As described below, the newly named Supplier Defendants have abandoned their corporate offices.  Consistent with prior *ex parte* seizure orders issued in this action, Gilead seeks to have the seizures of Supplier Defendants My Meds, ITC, and Abacus to occur at the residences of their respective principals.

1

and its principal, Bakhtiyar Nabiev; Distributor Defendant ProVen and its principal, William Scott Wise; and Pharmacy Defendant Total Remedy and its principal, Mohammad Etminan.

Finally, Gilead seeks only an asset freeze order against the following newly added Asset Holder and Relief Defendants. Vibe and its principal, Ronald Vidaurre; Sofitel; Skyline and its principal Francy Bedoya; Elite; Maria Bedoya; Precious Metals and its principal Avi Kessler; Madison Bullion; Green Capital and its principal, Sam Kessler; Gold Tower and its principal, Igor Aminov; All American; Blue Sea and its principal, Alexander Orriols; AMG and its principal, Alex Galvan; Power Pro; M&D Co.; MDSD Enterprises and its principal, Liliana Teresa Sampayo Mena; and Yisel Lopez.  Gilead also seeks only an asset freeze order against newly added Relief Defendant Etzhaim, Inc.

Gilead has included as **Appendix A** to this memorandum of law a chart listing all of the newly named Defendants that are the subject of this motion, a brief description of their role in the counterfeiting conspiracy, the injunctive relief Gilead seeks against them, and the bases upon which this Court has personal jurisdiction over them.

## <u>INTRODUCTION</u>

This is Gilead's fourth motion for civil seizures and other *ex parte* injunctive relief against willful counterfeiters who are selling dangerous counterfeit HIV and other medications in the United States.  Gilead filed this instant action after receiving eight reports of counterfeit HIV medications with the wrong pills inside the bottle, all sold to pharmacies by Safe Chain, a gray-market pharmaceutical distributor that refused to stop buying counterfeits from shady suppliers and selling them to pharmacies.  Gilead's goal is (and has always been) to stop those trafficking in these counterfeits and to shut down the process by which these counterfeits are manufactured.

The counterfeiting conspiracy that Gilead has uncovered through its execution of this Court's prior *ex parte* seizure orders, as well as third-party discovery and its own independent

investigation, is staggering in scope.  The counterfeiting ring spans coast-to-coast across the United States and into Canada, involves at least several dozens of co-conspirators at different levels and with different roles in the organization, and is responsible for selling several hundred million dollars' worth of counterfeit HIV medication into the U.S. pharmaceutical supply chain. All of the counterfeits moved through the conspiracy are sold at too-good-to-be-true pricing, and all of them are accompanied by counterfeit and fraudulent pedigrees that lie about the origin of the medication and falsely claim it was sold through legitimate channels.  The counterfeiting conspiracy is still active: Gilead identified two sets of newly named Defendants selling high volumes of counterfeit Gilead-branded medication within the past several weeks, and just nine days ago received a report that a newly named Pharmacy Defendant had dispensed counterfeit HIV medication with the wrong pills in the bottle to a patient in the Bronx.

### A.     Overview of Structure of the Counterfeiting Conspiracy

Through the latest round of seizures, as well as months of independent investigative work, Gilead has recently identified the individuals it now understands to be at the top of the counterfeiting conspiracy: the Kingpin Defendants.  As with many complex criminal organizations, the counterfeiting conspiracy is set up to conceal the identity and involvement of those at the top, and the Kingpin Defendants took extreme measures to remain anonymous. Identifying the Kingpin Defendants is a major step toward shutting down the conspiracy's operations.

At a high level, the evidence shows the conspiracy operates as follows.  The **Kingpin Defendants** organized the conspiracy and control the supply of counterfeits.  The Kingpin Defendants direct the initial sale of the counterfeits through the **Supplier Defendants:** a series of fly-by-night entities created to sell counterfeit HIV medications.  This large collection of Supplier Defendants is managed by the **Leader Defendants**, who find customers for the Supplier

3

Defendants and act as their brokers.  With the Leader Defendants' help, the Supplier Defendants sell the counterfeits to the **Distributor Defendants**: preexisting gray-market distributors with proper licensure and an established pharmacy customer base.  The Distributor Defendants then sell the counterfeits to U.S. pharmacies, who dispense them to patients.



*Overview of the distribution of counterfeits through the counterfeiting conspiracy*

Other key members of the conspiracy are the **Collector Defendants**, who illegally buy empty or full bottles of HIV medication from patients on the street to be used to create more counterfeits, and the **Asset Holder Defendants** who launder the conspiracy's illicit gains.

### B.    The Defendant Groups and Their Roles In the Conspiracy

The various groups of Defendants and their roles in the conspiracy are summarized in greater detail below.

The two **Kingpin Defendants** are the organizers and the head of the conspiracy. They exercise control over the supply of counterfeits to the rest of the conspiracy, including by ultimately controlling the network of fly-by-night Supplier Defendants. The Kingpin Defendants took extraordinary measures to protect their identities, using only pseudonyms even with their lieutenants, avoiding email, and using a series of "burner" cell phones. The majority of the illicit counterfeiting proceeds was funneled to the Kingpin Defendants through a complex money-laundering network. Gilead was able to identify the Kingpin Defendants only through a complex investigation spanning several months.

The Kingpin Defendants use the **Supplier Defendants** to introduce the counterfeits to the stream of commerce. They are fly-by-night shell companies who do not register with the FDA, each created to sell the counterfeits for as long as possible until garnering unwanted attention, at which point it disappears. When one Supplier Defendant disappears, a new fly-by-night Supplier Defendant emerges to take its place and keeps the supply of the counterfeits flowing. The Supplier Defendants are designed to be independently operating entities: they are located throughout the country and have their own, seemingly unconnected principals.

The ultimate goal of the conspiracy is to sell the counterfeits to pharmacies, but the fly-by-night Supplier Defendants lack the credentials and credibility to attract pharmacy customers. And so the Kingpin Defendants employ their lieutenants, the five **Leader Defendants**, to find customers for the Supplier Defendants and broker the sales of the counterfeits. The Leader Defendants recruit the Distributor Defendants into the conspiracy, introduce them to various Supplier Defendants, and facilitate the sale of counterfeits from Supplier Defendants to Distributor Defendants. The Leader Defendants also handle day-to-day issues in the Supplier-

Distributor relationship, such as supply and payment concerns, and even work to find pharmacy customers to buy from the Distributor Defendants and keep demand for the counterfeits high.

The four **Distributor Defendants** were existing gray-market pharmaceutical distributors that were already in the business of selling prescription drugs to pharmacies when they were recruited by the conspiracy. The Distributor Defendants used their licensure, their FDA registration, and more established business presence to lend a veneer of legitimacy to the counterfeits and put them in the hands of pharmacists and, ultimately, patients.

Most of the newly named Supplier Defendants sold counterfeits to previously named Distributor Defendant Scripts – Gilead identified them by reviewing documents seized from Scripts in the last round of seizures. However, a few of the newly named Supplier Defendants break the mold. With most of the Distributor Defendants already enjoined by this court, two newly named Supplier Defendants have recently managed to bypass the middle man entirely, and sold counterfeits directly to pharmacies. Finally, one newly named Supplier Defendant, Valuecare, is itself a retail pharmacy, but it is controlled by members of the counterfeiting conspiracy, who used Valuecare as a vehicle to sell counterfeits to another supplier.



*The distribution of the counterfeits through the newly named Supplier Defendants*

Every pharmacy that purchased counterfeits from the Distributor Defendants (or, more recently, directly from one of the newly named Supplier Defendants), all at too-good-to-be-true prices, is strictly liable under the Lanham Act.  Gilead has named as defendants in this action certain **Pharmacy Defendants**, retail pharmacies that clearly stand out as bad actors because they willfully purchased large volumes of counterfeits even after being warned.

The counterfeits sold by the conspiracy use once-authentic Gilead-branded bottles of HIV medication: either empty bottles that are refilled with the wrong medication and then re-sealed,

or unopened bottles that are paired with counterfeit patient instructions and/or counterfeit pedigrees. The **Collector Defendants**' role in the conspiracy was to buy already-dispensed bottles (whether full or empty) of Gilead-branded HIV medication for cash from vulnerable individuals who were prescribed the medication and received it for free. This illegal street-level buy-back operation provided, at least in large part, the supply of authentic Gilead-branded bottles used by the counterfeiting conspiracy.

Finally, the counterfeiting conspiracy could not operate without a vast money-laundering apparatus to clean and funnel the illicit proceeds from the fly-by-night counterfeit suppliers. The **Asset Holder Defendants** are various shell companies, gold and jewelry dealers, and others who knowingly participated in the conspiracy by laundering its counterfeiting proceeds.

### C.    The Newly Named Defendants At Issue In this Motion

Gilead has already named and received *ex parte* injunctive relief against several members of the counterfeiting conspiracy. In this motion, Gilead seeks injunctive relief against the following defendants who are newly named in Gilead's proposed amended pleadings. Gilead identified these newly named defendants in large part through documents and information it received in the last round of *ex parte* seizures and Gilead's subsequent investigation.

- The two Kingpin Defendants <u>Lazaro Roberto Hernandez</u> and <u>Armando Herrera,</u> who took extensive measures to keep their identities a secret, and whom Gilead only recently identified through an extensive investigation.

- The two newly named Leader Defendants <u>John Levitan</u> and <u>David Dunn</u>. Gilead previously named three other Leader Defendants (Ralhan, Rossel, and Mannava) who performed similar functions in the conspiracy.

- Eight newly named Supplier Defendants and their respective principals, all counterfeit sellers following the same playbook as the several previously named Supplier Defendants. The newly named Supplier Defendants are:

  o <u>My Meds</u> and its principals <u>Stephen Smith</u> and <u>Emilio Vina</u>

8

- o   ITC and its principal Frank Betancourt

- o   Abacus and its principals Jose Hernandez and Carlos Pimentel

- o   V & G and its principal Pavel Lashkevich

- o   Mainspring and its principals Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman

- o   Pharma Pac LLC and its principal Daynel Garcia

- o   CompaRx and its principal Yusniel Perez

- o   Valuecare and its principal Bakhtiyar Nabiev

- One newly named Distributor Defendant, ProVen, which purchased counterfeits from Supplier Defendants and sold them to pharmacies.  Gilead previously named three other Distributor Defendants (Safe Chain / Worldwide Pharma, ProPharma, and Scripts) who did the same.

- Two newly named Pharmacy Defendants Total Remedy and Laconia, which Gilead discovered were dispensing counterfeits to patients in the past several weeks.

- The two newly named Collector Defendants, Nicole Alston and Boris Abramov, who ran an illegal street-level buy-back operation.  Gilead has not previously named any Collector Defendants.

- Twenty-one newly named Asset Holder Defendants who laundered the conspiracy's illicit gains.  Gilead previously named a small number of other Asset Holder Defendants.  The newly named Asset Holder Defendants fall into four categories:

  - o   Money launderers involved in a scheme to sell of cell phones into Colombia

  - o   Money launderers centered around the New York-based Kessler brothers

  - o   Money launderers associated with newly named Supplier Defendant Abacus

  - o   Money launderers associated with newly named Supplier Defendant My Meds

  - o   A money launderer in a personal relationship with Kingpin Defendant Herrera

## D.   The Relief Requested in This Motion

While the counterfeiting ring has been dealt a major blow by the seizure orders and injunctions this Court has issued against the existing Defendants, the conspiracy is not defunct.

9

The defining feature of the counterfeiting conspiracy, as established by the Kingpin Defendants, is its use of an ever-expanding cast of newly formed and ultimately expendable fly-by-night Supplier Defendants. This allows the supplier of record for any particular shipment of counterfeits to simply vanish on a moment's notice when the government or Gilead starts to ask questions, whereupon it is quietly replaced by a new, seemingly unconnected and geographically distinct Supplier Defendant that keeps the supply of counterfeits flowing. The conspiracy is thus specifically structured to allow its operations to continue even after individual members are shut down.

That is why Gilead continued to seize thousands of bottles of counterfeits, sitting on warehouse shelves ready to be shipped out, even after the Court had already issued multiple rounds of *ex parte* seizures and injunctions. Indeed, Gilead discovered two sets of newly added Defendants in this action actively selling counterfeit Gilead-branded medication in the past several weeks, and received a report that a newly named Pharmacy Defendant dispensed a counterfeit with the wrong pills in the bottle only days ago. Especially in light of the extensive countersurveillance efforts the Kingpin Defendants used to conceal their identities, the issuance of *ex parte* seizure orders and other injunctive relief remain the only viable way to continue to reveal the extent of the conspiracy and shut down the counterfeiters' operation for good.

This case remains first and foremost about patient safety. Defendants are engaged in a massive scheme to sell counterfeit HIV drugs that pose a serious and ongoing physical danger to the American public. Gilead respectfully urges the Court to issue a seizure order, along with the other relief requested in this motion, so that Gilead can put an immediate stop to the newly added Defendants' counterfeiting and continue to track down the counterfeit medications that are flowing through U.S. commerce.

# STATEMENT OF FACTS

## I.   GILEAD'S HIV MEDICATIONS

### A.   Gilead's Trademarks

Gilead is the owner of several different registered, well-established, and famous trademarks that appear on the packaging of genuine Gilead HIV medications.  Those trademarks and proof of their registration are set forth as Exhibit 1 of the Declaration of Gretchen Stroud, dated July 20, 2021, Dkt. No. 7-1 ("7/20/21 Stroud Decl.").  Ms. Stroud's declaration also sets forth evidence of the marks' famousness and use.

### B.   Gilead's Medications

Gilead described in prior filings its well-known HIV treatments, including BIKTARVY®, a complete, one-pill once-a-day prescription medication used to treat HIV, and DESCOVY®, which when taken once a day as prescribed is approved for use in certain populations as pre-exposure prophylaxis ("PrEP") – a method to decrease the risk of acquired HIV in at-risk, HIV-negative adults and adolescents.  Declaration of Joel Gallant, dated July 21, 2021, Dkt. No. 6 ("Gallant Decl.") ¶¶ 8-13.  In its initial filings in this action, Gilead described samples it obtained of counterfeits of BIKTARVY® and DESCOVY®.  Plaintiffs' Mem. of Law, dated August 19, 2021 at 22, Dkt. No. 50-1.  Gilead has since recovered counterfeits of STRIBILD®, GENVOYA®, ATRIPLA®, and TRUVADA®, which are other HIV treatment or PrEP medications; VOSEVI® and SOVALDI®, which are hepatitis C medications; and RANEXA®, which treats chronic angina.  Plaintiffs' Mem. of Law, dated August 19, 2021 at 3.

## II.   THE DEFENDANTS' COUNTERFEIT GILEAD-BRANDED MEDICATIONS

In the months leading up to the initial seizures, Gilead learned through patient and pharmacy complaints that bottles of counterfeit Gilead-branded HIV medications were

circulating in the pharmaceutical supply chain. *See* Declaration of Susmitha Sunkara, dated July 21, 2021, Dkt. No. 8 ("7/21/21 Sunkara Decl.") ¶¶ 4-6. Shockingly, these counterfeit HIV pill bottles were filled with foreign pills such as headache medicine and antipsychotic drugs that did not treat HIV and had potentially dangerous side effects. *See id.* ¶¶ 16-58. Gilead retrieved several of these counterfeit bottles, tested them both internally and through an outside laboratory, and confirmed them to be counterfeit. *Id.* Gilead also confirmed that it was impossible for the foreign medications inside the counterfeits to have been inserted through an error in the original manufacturing or packaging process. *Id.*; *see also id.* ¶¶ 7-9.

### A. Many of the Counterfeits Use Once-Authentic Gilead Bottles but Are Filled with the Wrong Medication

Gilead's HIV medications must be dispensed in their original, sealed manufacturer bottles; unlike many prescription drugs, they cannot lawfully be dispensed in generic pharmacy bottles. 7/21/21 Sunkara Decl. ¶ 14. For many of the counterfeits, the counterfeiters began with empty authentic Gilead bottles bearing authentic labels. The counterfeiters then refilled those bottles with pills that are *not* the medication listed on the label, and heat-sealed the bottles with a replica of Gilead's tamper-evident foil seal. As a result, the counterfeits appeared to be new, sealed, authentic bottles of Gilead medication, when in fact they contained other drugs entirely. *See id.* ¶¶ 16-58.[3]

### B. The Counterfeit HIV Medications Pose a Severe Risk to Public Health

Both BIKTARVY® and DESCOVY® come in thirty-tablet bottles, representing a one-month supply of the drug. Gallant Decl. ¶ 14. For patients treating HIV infection, it is important

---

[3] In one instance, a counterfeit appeared to be an original and originally sealed bottle of one Gilead medication that had its label removed, and had an authentic label for another, newer Gilead medication applied in its place. 7/21/21 Sunkara Decl. ¶¶ 54-58.

that the patient take the Gilead medication once a day, every day. *Id.* ¶ 15.  If a patient skips doses for even a short period of time, the patient faces the risk that the patient's viral load – *i.e.*, the amount of HIV in their blood – will increase.  *Id.*  Viral rebound can have severe consequences: over time, it can weaken the patient's immune system and increase the possibility of infections; it can result in progression of the disease and lead to the development of AIDS; and it can make patients more likely to infect their sexual partners.  *Id.*  ¶ 16.

Patients taking DESCOVY for PrEP® must also take the genuine medication regularly to receive the prophylactic benefits of the drug. *Id.* ¶ 18.  DESCOVY for PrEP® is recommended only for certain individuals at risk for HIV infection.  *Id.* ¶ 12.  People who unknowingly discontinue their DESCOVY® prophylactic treatment because they have received counterfeit medication are at a higher risk for contracting HIV, because the counterfeits offer no protection, although those individuals will continue to believe they are being protected from infection.  *Id.* ¶ 18.

Finally, the wrong drugs inside the counterfeit bottles pose a host of potentially serious risks to patients who have never been prescribed that medication and have no idea they are taking it.  The wrong drug most commonly appearing in the recovered counterfeits is the antipsychotic quetiapine, marketed under the brand name SEROQUEL XR®.  Quetiapine is a prescription antipsychotic medication with a number of known potentially serious side effects that require vigilant medical supervision.  *Id.* ¶¶ 22-23.  Quetiapine also poses serious dangers to patients with common health conditions, such as high blood pressure, diabetes, and low white blood cell counts, whose conditions must be closely monitored while taking quetiapine.  *Id.*

Quetiapine may cause a strong sedated state or drowsiness.  *Id.*  Patients are also susceptible to fainting when taking quetiapine.  *Id.*  As noted on the FDA labelling for the drug,

these effects are especially acute for first-time users.  *Id.*  One patient who unknowingly took SEROQUEL XR® when he received a counterfeit bottle of BIKTARVY® reported that he could not speak or walk afterwards.  7/21/21 Sunkara Decl. ¶ 23.  Patients who are prescribed quetiapine are warned against driving or operating machinery.  Gallant Decl. ¶ 22.

In part because of this strong sedative effect, the FDA labelling for quetiapine recommends that new patients be given a small dose – 50 milligrams a day for many conditions – that can be increased over time as the patient's physician tracks the side effects and monitors the patient's reaction to the drug.  *Id.*  ¶ 23.  The counterfeit Gilead HIV medication contained 300-milligram tablets of quetiapine.  *Id.*

Of course, patients who ingest quetiapine from a counterfeit bottle of HIV medication have no idea that they are taking a medication with these potential side effects and receive no warning of the possible consequences of doing so.  They have no idea they are not supposed to drive, operate heavy machinery, or engage in other activities where sedation or drowsiness are dangerous, and as a result are placed in grave danger.

### C.   The Defendants' Use of Bottles Bought on the Street from HIV Patients with Counterfeit Patient Instructions and Other Counterfeit Elements

As described below, the counterfeiting conspiracy obtains authentic Gilead bottles of HIV medication by purchasing already-dispensed bottles (whether full or empty) on the street from vulnerable individuals.  Members of the conspiracy then add counterfeit elements to the bottles to pass them off as legitimate Gilead-branded medication.

Gilead has conducted an initial analysis of the thousands of bottles seized from the three previously named Distributor Defendants: Scripts, ProPharma, and Safe ChainDeclaration of Harpreet Dhanota, dated July 28, 2022, ¶ 1.  The FDA requires that every bottle of Gilead-branded medication be sold with FDA-approved Patient Information documents, which include

14

patient instructions on how to store and take the medication, potential side effects, and other important information. *Id.* ¶ 2. Because Gilead-branded HIV medications must be sold in their original Gilead bottle, on authentic products, the Patient Information document is folded up and adhered to the side of the bottle. *Id.* These are often referred to as "outserts" (as opposed to inserts, which go inside packaging). *Id.* A high percentage of bottles seized from the Distributor Defendants had poor-quality, counterfeit outserts attached to them. *Id.* ¶¶ 1-2.

Approximately half of the bottles that Gilead seized from the Distributor Defendants did not have an authentic outsert attached. *See id.* ¶¶ 13-16. Approximately 30% of the seized bottles had a counterfeit outsert, and another approximately 20% of the seized bottles had no outsert whatsoever. *Id.* ¶ 16.

Authentic outserts are printed on one large, specially-sized sheet of high-quality paper, which is machine-folded and attached to the bottle using a special adhesive designed to allow the outsert to be removed and opened by the patient without damaging the paper. *Id.* ¶ 3. The preparation of the outserts, including the paper, printing, and folding, is a highly controlled process to ensure quality control and FDA compliance. *Id.*

The counterfeit outserts, on the other hand, were poor-quality fakes. For example, most of the counterfeit outserts were printed on two or more separate sheets of paper that were subsequently glued or taped together. *Id.* ¶ 4. On some of the counterfeits, these separate sheets of paper were not properly aligned, such that a portion of the text of the instructions was flipped the wrong way. *Id.* Moreover, the adhesive holding the sheets of paper together easily came apart upon opening. *Id.* The quality of the paper used to make the counterfeit outserts is also of a noticeably poorer quality, and tore easily when unfolded. *Id.* ¶ 5.

The counterfeit outserts also had numerous printing errors. For example:  scientific names, such as the name of an active ingredient, were misspelled; entire sections of the instructions were omitted, such as drug interaction tables; text was printed misaligned and slanted; and text was cut off at the margin, such that only a portion of the text appeared on the page.  *Id.* ¶ 6.  Generally speaking, the printing quality of the counterfeit outserts was also of a significantly poorer quality than legitimate outserts, making them difficult to read, and sometimes contained large ink stains.  *Id.* ¶¶ 6-7.

Moreover, the counterfeit outserts were attached to the bottles with glue that is different than the adhesive specified for use on authentic Gilead medications.  *Id.* ¶ 8.  Unlike authentic outserts, most of the counterfeit outserts were nearly impossible to remove from the bottle and open without significant tearing and defacement of the instructions.  *Id.*  Examples of the counterfeit outserts are shown below:



 

The counterfeit outserts among the seized bottles were used on at least ten different Gilead-branded medications. *Id.* ¶ 9.  And the counterfeit outserts were not uniform: Gilead identified over 50 different "versions" of the counterfeit outserts, each with a distinct set of errors. *Id.* ¶ 10.  Moreover, multiple bottles had counterfeit outserts attached ***for the wrong medication***. *Id.* ¶ 11.

In addition to the counterfeit outserts, Gilead identified a smaller number of bottles that had other counterfeit elements, such as counterfeit caps, i.e., counterfeit screw-on lids to the bottles that clearly did not match the caps used on authentic Gilead bottles. *Id.* ¶ 12.

## D.   Defendants' Use of Counterfeit and Fraudulent Pedigrees

As described in Gilead's initial papers, the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. §§ 360eee *et seq.*, establishes a regulatory regime for the tracking and verification of every sale or transfer of a prescription drug in the United States, implemented specifically to combat counterfeiting.  Plaintiffs' Mem. of Law, dated August 19, 2021 at 6-7.  The central feature of the DSCSA is the requirement that every time a prescription drug is sold or transferred, it ***must*** be accompanied by what is known in the industry as a "pedigree" or "T3"

17

document.  *Id.* § 360eee-1(b)(1).  Drugs that are sold with a false or suspect pedigree must be quarantined and cannot be sold.  *Id.* § 360eee-1(c)(4)(A).[4]

Pedigrees must list a chain of custody for every sale of the bottle, going back to the manufacturer.  They must also include affirmative statements by the seller, including that the seller purchased the drug from an "authorized" trading partner.  An "authorized" trading partner is one who:  (1) is a licensed pharmaceutical distributor both in its home state and in the state into which it is selling the drugs; and (2) has registered with the FDA and has met its licensing reporting requirements to the FDA.  21 U.S.C. §§ 360eee(2), (23); *see id.* § 353(e)(1)(A)(ii).  It takes mere seconds to confirm whether a distributor is "authorized" under the DSCSA:  as required by the statute, the FDA has established a searchable online database of all registered pharmaceutical distributors in the nation, and typing a distributor's name into the search bar on the FDA's webpage will display all of that distributor's applicable licensures.[5]

As described below, *all* of the purported Gilead-branded medications sold by the Defendants were accompanied by counterfeit and false pedigrees:  *i.e.*, pedigrees that fraudulently list a purchase from Gilead or a Gilead-authorized supplier that never occurred.  These fake pedigrees create a fraudulent chain of custody for the medications, allowing the Defendants to conceal their illegal trade and fraudulently claim their HIV medications come from authorized, legitimate sources.  Falsified pedigrees undermine the entire anti-counterfeiting

---

[4] *See also, e.g.*, FDA, *Pharmacists: Utilize DSCSA Requirements to Protect Your Patients, Guidance Document* (July 3, 2019), https://www.fda.gov/drugs/drug-supply-chain-security-act-dscsa/pharmacists-utilize-dscsa-requirements-protect-your-patients (requiring pharmacies to "[q]uarantine and investigate suspect prescription drugs to determine if they are illegitimate" upon receipt of drugs that may be counterfeit).

[5] FDA, *Wholesale Distributor and Third-Party Logistics Providers Reporting*, https://www.accessdata.fda.gov/scripts/cder/wdd3plreporting/index.cfm.

regime established by the DSCSA, which is why it is unlawful to sell a drug with even a suspect pedigree. *Id.* § 360eee-1(c)(4)(A). Moreover, as set forth below, the falsified pedigrees bear unauthorized reproductions of Gilead's trademarks and are themselves counterfeit under the Lanham Act. *See infra* Facts Part IV-XI.

## III.   THE KINGPIN DEFENDANTS: CAREER CRIMINALS WHO ORGANIZED AND OVERSAW THE COUNTERFEITING RING

In its previous seizure application, Gilead identified the "Leader Defendants": individuals who acted as managers, brokers, and liaisons who facilitated the sale from numerous fly-by-night Supplier Defendants to the licensed, more established Distributor Defendants. The Leader Defendants were living proof that the counterfeits were being sold through a large, organized conspiracy: although the fly-by-night Supplier Defendants were set up to appear to be disparate, unconnected entities, the same set of Leader Defendants worked behind the scenes for all of them. At the time it named the Leader Defendants to this action, Gilead had not identified any particular individuals above them directing the conspiracy.

Through documents seized from the Leader Defendants and others, as well as its independent investigative efforts, Gilead has now identified the Kingpin Defendants: the individuals at the very top of the known counterfeiting conspiracy. The Kingpin Defendants are sophisticated career criminals who set up the complex structure of the counterfeiting ring and its money-laundering apparatus. The Leader Defendants reported to the Kingpin Defendants, and acted as their lieutenants: the on-the-ground operatives who directly interfaced with, and acted as liaisons between, the Supplier Defendants and the Distributor Defendants.

Identifying the Kingpin Defendants was far from simple. Like many complex criminal organizations, the counterfeiting conspiracy was organized to keep those at the top of organization, the Kingpin Defendants, out of view and therefore insulated from civil and

19

criminal liability. Whereas the Leader Defendants openly traded and communicated with the downstream members of the conspiracy, using their real names and shell companies that they publicly owned and operated, the Kingpin Defendants operated in the shadows. The evidence shows that even the Leader Defendants did not know the Kingpin Defendants' identities, and knew each of them only as a voice on the phone using a pseudonym. The Kingpin Defendants avoided email, spoke only on "burner" phones, and took pains to never reveal their real names.

As described below, Gilead was able to identify the Kingpin Defendants only through an intensive, multi-stage investigation through which Gilead's investigators were able to link the air travel patterns revealed by their "burner" phones to specific flight manifests.

### A.     Kingpin Defendant Lazaro Roberto Hernandez a/k/a "Rob"

Kingpin Defendant Lazaro Roberto Hernandez directly controlled the source of supply of the counterfeits for numerous fly-by-night counterfeit suppliers in this action, including major Supplier Defendants Gentek and Omom. Kingpin Defendant Hernandez undertook extensive measures to keep his identity a secret, and to minimize his visible footprint in the counterfeiting scheme. The evidence shows that even to the Leader Defendants who acted as his lieutenants in the counterfeiting ring, Kingpin Defendant Hernandez was never more than a voice on the telephone using a single-name pseudonym: "Robert" or "Rob."

### 1.     "Rob": The Shadowy Individual Behind the Counterfeit Suppliers

Gilead first learned of "Rob" from communications copied at seizures in this action and through party discovery and witness interviews. For example, in his written communications with co-conspirators, Leader Defendant Ralhan describes a man named "Rob" or "Robert" as "the AD" – that is, the supposed authorized distributor – that was selling the Gilead-branded products to counterfeit Supplier Defendant Gentek LLC ("Gentek"). Supplier Defendant Gentek

was one of the first fly-by-night suppliers in the counterfeiting ring, and before it shut down, it sold over $100 million worth of counterfeits.  On paper, Gentek was owned by Defendant Edel Reyes, and via email Mr. Reyes coordinated the shipment of counterfeits to fulfill orders from the Distributor Defendants.  However, it was "Rob" who handled the financial arrangements and controlled the source of Supplier Defendant Gentek's counterfeit supply behind the scenes.  In short, although the Distributor Defendants were buying from Supplier Defendant Gentek and wiring payment for the counterfeits to a Gentek bank account, the evidence shows that "Rob" was ultimately receiving the bulk of the counterfeiting proceeds.  For that reason, Leader Defendant Ralhan and Distributor Defendants Safe Chain / Worldwide Pharma frequently worried about paying for the counterfeits quickly to keep "Rob" happy and avoid losing their access to the counterfeits.

For example, on June 3, 2020, Leader Defendant Ralhan texted with Defendant Adam Brosius – the principal of Distributor Defendant Worldwide Pharma, the company that partnered with Distributor Defendant Safe Chain to source Safe Chain's counterfeit HIV medication, and essentially operated as a division of Safe Chain. In that text, Leader Defendant Ralhan referenced "Robert @ Gentek" in connection with the sale of HIV medications to Distributor Defendant Safe Chain.  Declaration of Geoffrey Potter, dated July 29, 2022 ("Potter Decl.") Ex. 227.  A month later, after Distributor Defendants Safe Chain / Worldwide Pharma made an initial order from Gentek, Leader Defendant Ralhan wrote: "Hi Adam I sent you some **more inventory that Robert had in stock**.  **Rob is willing to work with us** on prod mix and he is excited about Truvada.  He did strictly mention this time that without timely payment they will not be able to release much." *Id.*  In this conversation, Leader Defendant Ralhan began describing "Rob" as "AD – Robert," meaning the "authorized distributor" that was supplying Supplier Defendant

21

Gentek with the purported Gilead-branded medication.  *Id.*  "Rob" was, of course, not actually a Gilead-authorized distributor: Gilead had 16 authorized distributors, which were publicly listed on Gilead's website, all of which are established and reputable companies.  Plaintiffs' Mem. of Law, dated October 14, 2021, Dkt. No. 150-1 at 31.  The claim that "Rob" was actually an authorized distributor, or the representative of one, was farcical, but the point Leader Defendant Ralhan was making is clear: "Rob" was the source of the counterfeits that Supplier Defendant Gentek was selling.

Nowhere in Leader Defendant Ralhan's texts, or in any other documents that Gilead seized from Mr. Ralhan, does he identify "Rob" or give a description of him.  Nowhere does Leader Defendant Ralhan mention "Rob's" last name or initials.  It is clear that Mr. Ralhan knew "Rob" merely as a voice on the phone.  And the record is equally clear that "Rob" would not speak to anyone other than the Leader Defendants working directly below him in the counterfeiting ring.  For example, when Defendant Brosius suggested a call between "Rob" and owners of Distributor Defendants Safe Chain and Worldwide Pharma, Leader Defendant Ralhan wrote back: "**Robert doesn't want to talk to anyone**… I've tried trust me, he is not interested." *Id.*  (emphasis added).

Similarly, on July 20, 2020, Defendant Brosius wrote to Defendant Charles Boyd, the co-owner of Distributor Defendant Safe Chain: "just crossed 1 million [HIV] in sales today. … I have a client with 23 stores that does about 6mil a month in HIV they will buy at WAC-7 as soon as we are at SW.  we make real $$ there.  … no bullshit.  **Gotta get Robert (the AD) happier**." Potter Decl. Ex. 228 (emphasis added).

The next day, Defendants Boyd and Brosius continued their conversation, emphasizing Distributor Defendant Safe Chain's ability to move large quantities of the counterfeits, and worrying about how to pay for the supply to keep up with demand:

> **Mr. Brosius**: gm any luck with edel [Reyes, of Supplier Defendant Gentek]? [A]ny payment plan with amanda?
>
> **Mr. Boyd**: GM! we are paying half ($1.2) this week and the rest next . . . I asked Edel to call me last night but no response. I'm calling him again this AM. . . . how much Biktarvey do we need?
>
> **Mr. Brosius**: I could sell 1000 in 10 days.  So as many as you can get.  We prob turn down 100-150 a day.
>
> **Mr. Boyd**: he hasn't gotten back to me but I'm trying.  Is there anything we can do to have the AD push him **or they need to be paid first**?  [N]ot a good luck to not respond to a big customer, even if they owe you money.
>
> **Mr. Brosius**: I agree.  **Dhruv is pushing Robert the AD.  Robert is the guy upset about the money.**

Potter Decl. Ex. 229 (emphasis added).  Later, in November 2020, Defendant Brosius complained that the "inventory situation is really bad with gentek," and Leader Defendant Ralhan explained that "Robert had warned me about shortages coming close to December." Potter Decl. Ex. 230.

As the source of supply for Supplier Defendant Gentek's counterfeits, "Rob" is responsible for selling over 13,000 bottles of counterfeit Gilead-branded HIV medication to Distributor Defendant Safe Chain beginning in June 2020  (*see* Dkt. No. 108, Ex. 1), and over 18,000 bottles of counterfeit Gilead-branded HIV medication to Distributor Defendant Scripts starting in July 2020  (*see* Dkt. No. 432-1, 459 ¶ 8).  Several of those bottles have been confirmed to have the wrong pills inside the bottle, including high-dose tablets of the antipsychotic quetiapine.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 7, 18, 25.

And Supplier Defendant Gentek was just one of the fly-by-night suppliers for the counterfeiting ring connected to "Rob."  For example, one of the burner cell phone numbers that "Rob" used to conduct counterfeiting business was (786) 603-1983 (the "1983 Number"). Declaration of Hannah Coleman, dated July 29, 2022 ("Coleman Decl.") ¶ 33.  That 1983 Number was used to open a Bank of America account for Omom Wholesale Corp., another of the major fly-by-night Supplier Defendants.  Potter Decl. Ex. 231 (bank records listing 1983 Number).  And the evidence shows that "Rob" used that same 1983 Number to log into that bank account after its opening:  through subpoenaed records, Gilead has confirmed that the 1983 Number received two-factor authentication texts from Bank of America, used as part of the account login process.  Coleman Decl. ¶ 36.  The evidence shows that "Rob," at minimum, controlled Supplier Defendant Omom Wholesale Corp.'s finances.

Supplier Defendants Gentek and Omom sold enormous quantities of counterfeits to multiple Distributor Defendants, and they are central members of the counterfeiting conspiracy at issue.  The numerous Supplier Defendants are all connected through common operators, including Leader Defendants Ralhan and Mannava and newly named Leader Defendant David Dunn.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 10; *infra* Facts Part IV.B.  At least a dozen Supplier Defendants, all with ties to the South Florida area and represented by the Leader Defendants, sold counterfeit Gilead-branded medication with foreign pills inside, counterfeit patient instructions attached, and/or accompanied by counterfeit pedigrees.  *See generally* Plaintiffs' Mem. of Law, dated October 14, 2021 at 5-24; *infra* Facts Part V-VIII.  And as described above and in Gilead's prior filings, the counterfeiting conspiracy's *modus operandi* was to operate through a series of newly formed, seemingly unrelated, and ultimately expendable suppliers.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 2-3.  This evidence, as confirmed

24

by additional evidence discussed below, demonstrates that "Rob," alone or with other kingpins, controlled and financially benefitted from most or all of the named Supplier Defendants – and likely others that Gilead has not yet uncovered.

### 2. Identifying "Rob"

"Rob" was successful at hiding his identity.  Leads Gilead generated through review of seized documents and standard investigative techniques led to dead ends. After months and extraordinary efforts, Gilead unmasked "Rob" despite his use of a pseudonym and burner cell phones, with no paper (or e-mail) trail and with no money flowing directly to him.

From documentary evidence, seized phone contact lists, and witness interviews, Gilead identified four burner cell phone numbers "Rob" used in connection with the counterfeiting. Coleman Decl. ¶ 33.  Among those numbers was the 1983 Number, which was also listed on Supplier Defendant Omom Wholesale Corp.'s bank account opening documents, *see* Potter Decl. Ex. 231, and the number (786) 857-8893 ("the 8893 Number"), *see* Coleman Decl. ¶ 33.  These were the two burner phones that "Rob" used to direct his lieutenants, the Leader Defendants. Coleman Decl. ¶ 36.  Gilead subpoenaed records from T-Mobile, the carrier for both phones. Consistent with prepaid "burner" cell phones, there was no subscriber data to identify the owner of the phone, but T-Mobile was able to provide basic call records and cell phone location data. Those records showed that Leader Defendant Ralhan was, by far, the most frequent contact on the phone, with more than 300 calls and texts between the 1983 and 8893 Numbers and Mr. Ralhan.  Coleman Decl. ¶ 36.

The cell phone location data for the 1983 Number is *not* GPS data, but provides location information based on the phone's proximity to the cell towers.  Gilead's investigators were able to use the location data to identify that "Rob" lived in downtown Miami near the bay.  Coleman Decl. ¶ 38.  The geolocation data also allowed Gilead's investigators to identify "Rob's" long-

distance travel.  *Id.* ¶ 39.  For example, the 1983 Number pinged on the evening of February 4,

2021, in Miami, Florida, and then pinged again on February 5, 2021, in Las Vegas, Nevada.

Coleman Decl. ¶ 39.  A few days later, on February 8, 2021, the 1983 Number pinged from a

location in Las Vegas, and the next day from Miami.  *Id.*  The cell phone geo-location data also

showed another flight from Las Vegas to south Florida that summer, with the phone pinging a

tower in Las Vegas on June 21, 2021 at 12:37 pm eastern time, and pinging a tower immediately

adjacent to the Ft. Lauderdale airport at 5:51 p.m. the same day.  *Id.*

      For any given time window, there is a limited universe of flights between south Florida

and Las Vegas.  Gilead's investigators searched for and identified the commercial and private

flights that made the trip within the parameters set by the 1983 Number's geolocation data.

Coleman Decl. ¶¶ 40-43.  There were no identifiable commercial flights that departed from Las

Vegas to Fort Lauderdale that matched the times of June 21, 2021 flight, suggesting that "Rob"

flew on a private plane.  *Id.* ¶ 41.  Further research identified a private Gulfstream jet that took

off from the Las Vegas Harry Reid (McCarran) International Airport around 1:14 p.m. and

landed at Fort Lauderdale around 5:31 p.m. – times that were within 30 minutes of the

corresponding cell phone "pings."  *Id.*  Through Federal Aviation Administration data, Gilead

determined that the plane was affiliated with the Las Vegas Sands Corporation, which at the time

of the flights owned two casinos in Las Vegas: The Venetian and The Palazzo.  *Id.* ¶ 42.[6]  It

seemed almost certain that "Rob" flew on that private, casino-sponsored plane.

      Gilead's investigators were then able to identify flights corresponding to "Rob's"

February 2021 Las Vegas trip to another private plane, a Boeing 737 owned by Sands Aviation

---

[6] *See also* Las Vegas Sands Corp. Schedule 14A March 2021, https://www.sec.gov/Archives/edgar/data/ 0001300514/000130817921000126/llvs2021_def14a.htm.

Aircraft LLC, which flew from Fort Lauderdale to Las Vegas on February 5, 2021, and made a return trip on February 8, 2021. *Id.* ¶¶ 43-44. Once again, the departure times lined up perfectly with the corresponding cell tower phone pings by the 1983 Number. *Id.*

Through third-party subpoenas, Gilead received the flight manifests of each of these flights. Coleman Decl. ¶ 44. Consistent with casino-subsidized, high-roller private air travel, the passenger lists were small: the February 5 and February 8 flights on the Boeing 737 had 18 passengers total, while the June 21 flight had only 12 passengers. *Id.* There were only four individuals that flew on all three flights: four potential "Robs." *Id.* ¶ 45.

Gilead and its investigators examined each of the four individuals, and concluded that passenger Lazaro Roberto Hernandez was "Rob." *See id.* ¶¶ 45-47. Among other considerations, Mr. Hernandez's middle name is "Roberto," making "Rob" an obvious pseudonym. Public records also link Mr. Hernandez to another high-ranking member of the counterfeiting conspiracy: both Mr. Hernandez and newly named Leader Defendant John Levitan (discussed below) have or had executive positions in a Florida-based company called Streamline Performance Boats Corp. Coleman Decl. ¶ 46 & Ex. 117 at *e.g.*, 7 & 15-16.



*A post from one of Mr. Hernandez's Instagram accounts showing*
*his flight on a private casino-sponsored plane, posted June 21, 2021.*

Gilead has verified Mr. Hernandez to be "Rob" from multiple additional sources. As discussed below, The Venetian maintained dozens of Suspicious Activity Reports regarding Mr. Hernandez's spending at the casino, including that he frequently deposited hundreds of thousands in dollars in cash carried in plastic shopping bags, accompanied with false explanations of how he acquired the money. *See* Coleman Decl. ¶ 50. Moreover, Mr. Hernandez's social media profiles show numerous posts from an apartment confirmed to be in the luxury high-rise building The Aria in the waterfront of downtown Miami. Coleman Decl. ¶ 47. The Aria is located in the geographical area that Gilead's investigators identified as "Rob's" home based on the cell towers to which the 1983 Number frequently connected. *Id.*

Subpoenaed data for the 8893 Number confirms Mr. Hernandez is "Rob." As with the 1983 Number, the 8893 Number most frequently contacted Leader Defendant Ralhan. Coleman Decl. ¶ 36. Geo-location data for the 8893 Number shows that "Rob" was in Las Vegas on October 8, 2021, and casino records from The Venetian confirm that Mr. Hernandez was at the casino on that date. Coleman Decl. ¶ 49. And the records of both the 1983 Number and the 8893 Number indicate that over 20% of the total cell phone tower pings were generated from two locations in close proximity to Rompe Records Entertaiment, LLC, [sic] a Florida corporation of which Mr. Hernandez is an officer. *Id.* ¶ 48 & Ex. 118.

### 3. Mr. Hernandez's Money Laundering and Criminal History

As his casino-chartered flights to Las Vegas indicate, Mr. Hernandez is a high-stakes gambler and poker player. The Venetian casino has a large file on Mr. Hernandez, including

over a dozen "Suspicious Activity Reports" or "SARs" that a casino is required to file when it has reason to believe a gambler is using the casino for money-laundering purposes.[7]

Most of the SARs documented that Mr. Hernandez, alone or with an associate, deposited large quantities of cash at the casino with unverifiable and almost certainly false explanations. For example, in November 2021, Hernandez deposited over $150,000 in cash that he carried into the casino in a yellow plastic bag.  Potter Decl. Ex. 232.  Just a month earlier, he had deposited $320,700 in cash with the casino, and three months before that, he had deposited another $250,000 in cash.  *Id.*  The below image from security-camera footage shows Mr. Hernandez making a large cash deposit with the casino:



Mr. Hernandez told The Venetian the large stacks of cash he was depositing represented his poker winnings at other casinos – Caesars Palace in Las Vegas and the Seminole Hard Rock casino in Hollywood, Florida – but The Venetian notes in its SARs those claims were inconsistent with records that track poker players' winnings across casinos and poker rooms. Potter Decl. Ex. 232.  Mr. Hernandez also represented that some of his funds came from his ownership interest in Red Ace Holdings LLC, which he claimed was an investment company,

---

[7] *See* 31 C.F.R. § 103.21.

but the casino noted that the address he provided for the company is a residential address in a

residential neighborhood.  *Id.*  The Venetian's SARs also noted that Mr. Hernandez had on

several occasions exited the casino with tens of thousands dollars' worth of uncashed chips – a

classic money-laundering scheme.  Potter Decl. Ex. 233.  By 2021, the Venetian calculated that

Mr. Hernandez had lost a total of approximately $3 million at that casino alone. Potter Decl. Ex.

234.

Mr. Hernandez also has a criminal record.  He was first arrested in 1988 for attempted

armed robbery with a deadly weapon.  Coleman Decl. ¶ 52.  Just two years later, he was charged

with and ultimately convicted of conspiring to possess two kilograms of cocaine with the intent

to distribute it.  He was incarcerated for this offense until 2000.  *See USA v. Valdez et al*, No.

0:90-cr-06091-NCR-2 (S.D. Fla. June 7, 1990).

### 4.    Mr. Hernandez's Recent Indictment, Arrest, and Confinement to Supervised House Arrest

Throughout this litigation, Gilead has at the government's request cooperated with

federal criminal authorities, including the Department of Justice and the Federal Bureau of

Investigation, with regard to the counterfeiting ring at issue.  Indeed, the Wall Street Journal has

published articles about the federal criminal investigation into the sale of counterfeit Gilead-

branded HIV medication.[8]  Among the information Gilead has shared with the federal criminal

---

[8]  Joseph Walker, Corinne Ramey, *Drugmaker Gilead Alleges Counterfeiting Ring Sold Its HIV Drugs*, Wall Street Journal, (Jan. 18, 2022), *available at* https://www.wsj.com/articles/drugmaker-gilead-alleges-counterfeiting-ring-sold-its-hiv-drugs-11642526471; Corinne Ramey, *Justice Department Probes Network Accused of Selling Counterfeit HIV Drugs*, Wall Street Journal, (Mar. 30, 2022), *available at* https://www.wsj.com/articles/justice-department-probes-network-accused-of-selling-counterfeit-hiv-drugs-11648653345.  Gilead was not the source of the *Journal's* original story.

authorities was information about "Rob," including the flight information Gilead deduced from his phone records.

On June 17, 2022,[9] while Gilead was preparing the instant motion, the FBI arrested Mr. Hernandez, charging him with multiple counts of conspiring to introduce adulterated and misbranded drugs, conspiring to traffic drugs with false documentation, and several crimes related to money laundering.  Coleman Decl. Ex. 89.  The government's case against Mr. Hernandez, based on the testimony of confidential informants and other information, confirms both his identity as "Rob," as well as several of the details about the counterfeiting ring that Gilead has described in its filings in this action.

The indictment alleges that from 2019 to at least the end of 2021, Mr. Hernandez conspired to "establish[] and obtain[] wholesale drug distributor licenses for" fly-by-night companies across the United States, including Supplier Defendant Gentek and newly named Supplier Defendant My Meds LLC.  *Id.* at 6-7.  According to the indictment, Mr. Hernandez and his co-conspirators illegally diverted "large quantities" of HIV medication and "repackaged these drugs and falsified their packaging, T3s/pedigrees, and other labeling," and "introduced these adulterated, misbranded, and diverted drugs into interstate commerce" by selling and distributing them to co-conspirators at unnamed "Wholesale Companies," who then sold the bottles to "pharmacies located throughout the United States."  *Id.* at 7.  In all, the indictment alleges Mr. Hernandez and his co-conspirators received over $230 million for these illegally sold

---

[9] U.S. Justice Department, *Man Arrested for Allegedly Distributing Over $230 Million of Adulterated HIV Medication*, Press Release No. 22-647, (Jun. 17, 2022), *available at* https://www.justice.gov/opa/pr/man-arrested-allegedly-distributing-over-230-million-adulterated-hiv-medication

medications.  *Id.*  Mr. Hernandez is alleged to have laundered those illicit gains by causing the fly-by-night distributors to send the funds to various shell companies, including newly named Asset Holder Defendant MDSD Enterprises LLC.  *Id.* at 12-13.

The indictment lists three brick-and-mortar pharmaceutical distributors as Mr. Hernandez's co-conspirators.  The indictment identifies these co-conspirators only as unnamed "Wholesale Companies" that sold to pharmacies.  The indictment specifies that one of the Wholesale Companies is a licensed distributor headquartered in Maryland that was incorporated in Delaware, and that another is a licensed distributor headquartered and incorporated in New York.  Coleman Decl. Ex. 89 at 5.  Those descriptions match Distributor Defendants Safe Chain and Scripts, respectively.  The indictment further specifies that these two co-conspirator "Wholesale Companies" paid millions of dollars to Supplier Defendant Gentek for the HIV medication.  *Id.* at 9-10.  As noted above, Gilead has already shown that both Distributor Defendants Safe Chain and Scripts paid Supplier Defendant Gentek millions of dollars for counterfeit Gilead-branded HIV medication.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 18.

At Mr. Hernandez's detention hearing, the government specified that Mr. Hernandez "led an organization in Miami that acquired expensive prescription drugs on the street and by other means and repackaged those drugs and created fraudulent documentation" to sell them, naming as examples Gilead's HIV medications "Biktarvy and Truvada."  Coleman Decl. Ex. 90 at 7-8.  The government specified that "[t]he mere nature of this scheme involves a lot of cash.  The drugs have to be acquired from the street [i.e., purchased from patients] or by theft.  Then they have to be relabeled and their pedigrees falsified."  *Id.* at 14-15.  The government noted that this

causes harm to patients, including because some of the repackaged HIV drugs sold by Mr. Hernandez's network had foreign medication inside. *Id.* at 9-10.

The government further explained that "Mr. Hernandez actually controlled" several fly-by-night counterfeit suppliers that were "located in several different states" and nominally owned by other individuals. *Id.* at 8-12. The government also discussed the instant civil action, noting that Gilead was "able to seize thousands of bottles of HIV prescription drugs and tie them back to companies [i.e., Supplier Defendants] that the evidence shows were really controlled by Lazaro Hernandez. One of those companies is [Supplier Defendant] Gentek." *Id.* at 9.

The government also described the lengths Mr. Hernandez went to ensure there is no financial paper trail connecting him to the $230 million in counterfeiting profits his organization made. Coleman Decl. Ex. 90 at 15-16. Mr. Hernandez oversaw the creation of numerous shell companies to move around and launder the funds, and then paid others to eventually withdraw the funds to be hand-delivered to him as cash. *Id.* at 16. The government gave the example of one co-conspirator who, in exchange for a fee of "approximately 12 percent to launder this money … he pays people to create the phony companies and pull the cash out and bring it to him, [and] he gives the money – he meets with Mr. Hernandez directly to give him the cash." *Id.* As noted above, the evidence shows that Mr. Hernandez laundered (and also lost) many millions of dollars' worth of those cash receipts through casinos.

The government sought to have Mr. Hernandez detained based on the risk to patients caused by his scheme, the fact that he faces life in prison if convicted of the alleged crimes, that he was implicated in the assault and intimidation of a cooperating witness (described further below), and the fact that he is a Cuban national with substantial means to flee the country. *Id.* at 61-63. The government also noted that the nominal owner of Supplier Defendant Gentek,

Defendant Edel Reyes, fled to Cuba shortly after his role in the counterfeiting scheme came to light. *Id.* at 12, 63.  The government and Mr. Hernandez eventually agreed upon monitored home confinement, with Mr. Hernandez directly supervised at all times by an armed private security team paid at his expense. *Id.* at 98.

Here, because Kingpin Defendant Hernandez is under home detention pending trial, under round-the-clock guard by a private security firm, Gilead does not seek an *ex parte* seizure at his home, but does seek a temporary restraining order and asset freeze order against him.

### B.  The Kingpin Defendants and Those Below Them in the Conspiracy Threaten Violence Against Those Who "Snitch"

Kingpin Defendant Hernandez's detention hearing revealed evidence that the counterfeiting conspiracy as a whole – from the Kingpin Defendants on down – threatens and practices violence against members of the conspiracy that "snitch."  This confirms the need for *ex parte* relief that Gilead seeks against members of the conspiracy in this motion.

As noted above, part of the government's argument that Mr. Hernandez should be detained without bail involved an assault on a member of the counterfeiting conspiracy who was cooperating with the government.  Specifically, the government proffered that an associate who was "helping Lazaro Hernandez in the prescription drug scheme" ended up cooperating with the government, and that his cooperation became known to Mr. Hernandez and his close associates. In July 2021, that cooperator was assaulted in the bathroom of a strip club in a Miami suburb by another of Mr. Hernandez's associates.  The assailant told the cooperator, "in Spanish, 'this is for snitching' and beat him up," before being removed by club security.  Coleman Dec. Ex. 90 at 21-22; Coleman Decl. Ex. 102 at 4-6.  The incident could have been much worse.  The assailant had originally been in the strip club with another man, who upon spotting the cooperator left the club, went to his car, and attempted to re-enter the club with a concealed pistol on his person.  *Id.*

Fortunately, club security discovered the pistol and turned him away.  *Id.*  After the assault, the assailant met his companion with the gun in the parking lot and drove off with him.  *Id.*

The day after he was assaulted, the cooperating witness received an Instagram post that stated: "I saw you get dropped last night at BTS [the strip club].  You rat.  Rene is on you, bitch.  Mr. Lux, nawww, Mr. RAT better."  *Id.*  The Instagram account that sent the threat was activated using the 8893 Number – i.e., the same burner cell number that "Rob" (actually Mr. Hernandez) used to conduct business on behalf of the conspiracy, including opening the bank account for Supplier Defendant Omom Wholesale Corp.  Coleman Decl. Ex. 90 at 23.

Finally, at Mr. Hernandez's detention hearing it was established that there were other members of the conspiracy who were under investigation but had not yet been charged, and that "some of those people are known to be violent," and in particular "one [such] individual is known to be very violent," including allegations that he hires criminals to cause physical harm to others.  *Id*. at 36.  In short, the evidence shows that, like many large criminal organizations, the counterfeiting ring can and does attempt to silence cooperators through threats and acts of violence, and has among its members criminals known to be "violent" or "very violent."  The co-conspirators risk injury or death, by the hands of their co-conspirators, if they provide information in civil discovery.  Moreover, the counterfeiting crimes they have committed expose them to criminal charges that could result in incarceration for the remainder of their lives.  These new defendants have strong incentives to destroy documents and to refuse to participate in civil discovery.  The conspiracy's threats and acts of violence against cooperators are thus compelling grounds to grant *ex parte* seizure orders against these new defendants.

### C.   Kingpin Defendant Armando Herrera a/k/a "Thomas"

Mr. Hernandez is not the only kingpin running the counterfeiting conspiracy.  Communications obtained from seizures and from third-party discovery in this action identify

35

another behind-the-scenes operator hiding behind a fake name, burner cell phones, and straw

owners: a man who went by "Thomas" or the Spanish-language diminutive, "Tomasito."  This

"Thomas" was referred to as the "HIV middle man" that supplied the counterfeits and controlled

their flow through various fly-by-night suppliers.  For example, the evidence shows that

"Thomas" controlled Supplier Defendant Invicta, and with his co-Kingpin Defendant "Rob,"

controlled Supplier Defendant Omom.  Using the same investigative techniques described above,

Gilead and its investigators have been able to definitively identify "Tomasito" as Armando

Herrera, a convicted felon who served years in a prison for Medicaid fraud in connection with an

HIV infusion clinic.

### 1.    "Thomas" the "HIV middle man"

Documents that Gilead obtained from previous *ex parte* seizures reference "Thomas" as a

source of counterfeits from multiple fly-by-night suppliers.  For example, on April 21, 2021,

Defendant Brosius texted Defendant Patrick Boyd – the respective owners of Distributor

Defendants Worldwide Pharma and Safe Chain, who partnered to purchase and sell counterfeits

through Safe Chain.  In that text, Defendant Brosius stated that he was "waiting [o]n Thomas

for invicta/CM . . . he said he would call at 2."  Potter Decl. Ex. 235.  Distributor Defendants

Safe Chain / Worldwide Pharma purchased counterfeit Gilead-branded medications from

Supplier Defendant Invicta, which used Supplier Defendant CM Pharmaceutical LLC as a pass-

through entity.  *See* Plaintiffs' Mem. of Law, dated October 14, 2021 at 23-24.  Distributor

Defendant Safe Chain ended up returning some or all of the counterfeits it purchased from

Supplier Defendant Invicta.  *Id.*  And so, the next month, Supplier Defendant Invicta began

selling counterfeits to another Distributor Defendant, ProPharma, eventually collecting over $11

million from ProPharma for its counterfeit Gilead-branded medication.  *See id.* at 20-21.

Because Distributor Defendant Safe Chain – which knew at the time it was under scrutiny from Gilead – rejected the stock from Supplier Defendant Invicta, "Thomas" followed the counterfeiting ring's playbook and simply started selling Safe Chain counterfeits through a different fly-by-night supplier.  In late April 2021, Defendant Brosius of Distributor Defendant Worldwide Pharma wrote to his partners at Distributor Defendant Safe Chain that he was "going to meet [T]homas the HIV middle man now he has a new source."  Potter Decl. Ex. 236.

That new source was Supplier Defendant Omom.  As noted above, the evidence shows that the other Kingpin Defendant, "Rob," opened and accessed Supplier Defendant Omom's bank account, but "Thomas" took the lead in managing the supply of counterfeits sold by Omom. In May 2021, an agent for Distributor Defendant Safe Chain emailed OmomPharmaceuticals80@gmail.com with the subject line "Safechain HIV Usage," writing "Good Afternoon Thomas, Please see below is our projected monthly HIV usage.  Also when you have a minute please send me the contact info to send the Safechain Vendor application."  Potter Decl. Ex. 237.  That chart projected that Safe Chain would need ***thousands*** of bottles of Gilead-branded HIV medications – valued at over ten million dollars – every month.  *Id.* Supplier Defendant Omom went on to sell over 18,000 bottles of counterfeit Gilead medications to Distributor Defendants Safe Chain and ProPharma, totaling over $52 million.  *See* Plaintiffs' Mem. of Law, dated October 14, 2021 at 19-20; Plaintiffs' Mem. of Law, dated August 19, 2021, at 20-23.

As with "Rob," his fellow Kingpin Defendant, the evidence shows that "Thomas" largely relied on the Leader Defendants to act as his lieutenants and manage the day-to-day relationships between the counterfeit suppliers and the distributors who purchased the counterfeits and sold them to pharmacies.  As described in Gilead's previous filings, Leader Defendants Paul Rosell

and Dhruv Ralhan were responsible for managing Supplier Defendant Omom's relationships with Distributor Defendants Safe Chain and ProPharma.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 11-13.  But there were times when "Thomas" – still just a voice on a burner cell phone with no last name – was directly involved with Supplier Defendants Omom's sale of counterfeits.  For example, on June 10, 2021, Mr. Mellott of Distributor Defendant Worldwide Pharma texted the number he had for "Thomas," saying: "Hi, I just tried calling you. I apologize but can you hold on that courier/shipment tomorrow until you hear back from me.  There was a miscommunication with compliance and we are just waiting on 100% confirmation that everything is good to go.  I will reach out as soon as I get confirmation."  Potter Decl. Ex. 238. Mr. Garrett then copied that text and sent it to his boss, Defendant Brosius, writing, "I sent Tomasito that."  *Id.*  Despite the text message, "Thomas's" courier arrived at Distributor Defendant Safe Chain's Utah warehouse the next day: on June 11, 2021, Safe Chain compliance director Abbie Divilio wrote to Safe Chain's owner, Defendant Charles Boyd, stating that she had learned after the fact that Safe Chain "declined the order from Omom which arrived to Utah in a beat up minivan."  Potter Decl. Ex. 239.  Although Distributor Defendant Safe Chain rejected the particular order that it had tried to cancel in advance and that nevertheless arrived in a beat-up minivan, Safe Chain went on to purchase, from June 24 to July 26 alone, roughly $2.5 million of purported Gilead product from Supplier Defendant Omom.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 32.

## 2.    Identifying "Thomas"

The evidence shows that, like his fellow Kingpin Defendant "Rob" (now known to be Lazaro Hernandez), the man known as "Thomas" used a pseudonym with no last name, spoke only on burner phones, and was careful to ensure he left limited written communications and never tied his real name to the counterfeiting business.  As with "Rob," the evidence shows that

"Thomas" was nothing more than a voice on the phone, even to his lieutenants, the Leader Defendants.  And as with "Rob," Gilead and its investigators were able to unmask "Thomas" using geolocation data from his burner cell phone to identify his travel patterns, and thereby to identify potential flights "Thomas" took, allowing flight records to be subpoenaed and passenger manifests to be cross-referenced.

As mentioned above, Distributor Defendant Worldwide Pharma's employee, Mr. Mellott, texted "Thomas"; he did so at the phone number (305) 281-5050 ("the 5050 Number").  Potter Decl. Exs. 240-241.  Mr. Mellott's boss, Defendant Brosius, had the 5050 Number saved in his phone as "Tomasito."  *Id.*  Gilead subpoenaed the carrier of the 5050 Number, which, unsurprisingly, was a prepaid burner phone with no subscriber records or identifying information.  Coleman Decl. ¶ 54 & Potter Decl. Ex. 366.  However, AT&T provided detailed location data for the burner phone, which enabled Gilead's investigators to identify long-distance trips taken by "Thomas."  Coleman Decl. ¶ 55.  For example, on September 17, 2021, the 5050 Number pinged from squarely in the middle of the Miami International Airport at 7:16 a.m. eastern time, and pinged squarely in Philadelphia International Airport at 9:27 a.m. eastern time, as shown below.  *Id.*; Potter Decl. Ex. 366.



Historical Precision Location Information

| Item | IMSI/Phone Number | Connection Date | Connection Time (GMT) | Longitude | Latitude | Location Accuracy |
|------|-------------------|-----------------|------------------------|-----------|----------|-------------------|
| 1065 | 3052815050 | 2021-09-17 | 14:18:14 | -75.249945 | 39.87486 | Location accuracy likely better than 1000 meters |
| 1066 | 3052815050 | 2021-09-17 | 13:32:55 | -75.243222 | 39.87522 | Location accuracy likely better than 600 meters |
| 1067 | 3052815050 | 2021-09-17 | 13:31:21 | -75.243222 | 39.87522 | Location accuracy likely better than 600 meters |
| 1068 | 3052815050 | 2021-09-17 | 13:28:15 | -75.257631 | 39.85857 | Location accuracy likely better than 1500 meters |
| 1069 | 3052815050 | 2021-09-17 | 13:27:56 | -75.252609 | 39.860262 | Location accuracy likely better than 400 meters |
| 1070 | 3052815050 | 2021-09-17 | 13:27:52 | -75.266109 | 39.876147 | Location accuracy likely better than 1500 meters |
| 1071 | 3052815050 | 2021-09-17 | 13:27:48 | -75.294225 | 39.863988 | Location accuracy likely better than 5000 meters |
| 1072 | 3052815050 | 2021-09-17 | 13:27:38 | -75.282921 | 39.862179 | Location accuracy likely better than 2500 meters |
| 1073 | 3052815050 | 2021-09-17 | 11:16:20 | -80.066949 | 26.168544 | Location accuracy likely better than 10000 meters |
| 1074 | 3052815050 | 2021-09-17 | 11:11:35 | -80.132256 | 25.773696 | Location accuracy likely better than 300 meters |
| 1075 | 3052815050 | 2021-09-17 | 11:10:44 | -80.19252 | 25.760349 | Location accuracy likely better than 200 meters |
| 1076 | 3052815050 | 2021-09-17 | 11:10:19 | -80.188281 | 25.819002 | Location accuracy likely better than 300 meters |
| 1077 | 3052815050 | 2021-09-17 | 11:10:16 | -80.196714 | 25.792066 | Location accuracy likely better than 300 meters |
| 1078 | 3052815050 | 2021-09-17 | 11:09:58 | -80.219574 | 25.80237 | Location accuracy likely better than 400 meters |
| 1079 | 3052815050 | 2021-09-17 | 11:09:50 | -80.219574 | 25.80237 | Location accuracy likely better than 600 meters |
| 1080 | 3052815050 | 2021-09-17 | 11:09:47 | -80.300448 | 25.807536 | Location accuracy likely better than 600 meters |
| 1081 | 3052815050 | 2021-09-17 | 11:09:34 | -80.239608 | 25.794675 | Location accuracy likely better than 400 meters |

Gilead's investigators identified an American Airlines flight as the only commercial or private flight that matched those parameters.  Coleman Decl. ¶ 55; Potter Decl. Ex. 365.  Similarly, the AT&T geo-location data showed that "Thomas" flew back to Miami from Philadelphia on September 19, 2021, and again only a single flight, again on American Airlines, matched the itinerary.  Coleman Decl. ¶ 55.

Gilead subpoenaed American Airlines for the flight manifests for each of these flights.  Only eight individuals flew on both flights.  Coleman Decl. ¶ 56.  From there, Gilead was able to identify that "Thomas" was passenger Armando Jorge Herrera.  Mr. Herrera was quickly flagged as likely to be "Thomas" because public records showed he had a current residential address in Pembroke Pines, Florida, which is in the area of heaviest concentration of cell phone tower pings for the 5050 Number.  *Id.* ¶ 57.

Gilead then confirmed Mr. Herrera was "Thomas" by following Supplier Defendant Omom's counterfeiting proceeds to his front door.  As described in Gilead's previous filings, Supplier Defendant Omom laundered millions of dollars by sending them to a shell company, Asset Holder Defendant Titan Distribution & Service, LLC, in June and July 2021.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 31-32.  Omom and Titan have both defaulted, but from subpoenaed bank records Gilead learned that Asset Holder Defendant Titan had spent a significant amount of the counterfeiting proceeds at a store called PrimeStones in Miami, which sells high-end stonework for interior design – kitchen counters, shower walls, etc.  Gilead subpoenaed PrimeStones and received a copy of a purchase order for several hundred square feet of Italian stonework, indicating it was for use in a family home: *e.g.*, "TV wall," "master [bedroom] wall."  Potter Decl. Ex. 242.  Although Asset Holder Defendant Titan was listed as

40

the "bill to" entity for this order, the individual who placed the order is listed as "ARMANDO HERRERA." *Id.*

In addition to using Supplier Defendant Omom's counterfeiting proceeds (as laundered through Asset Holder Defendant Titan) to renovate his home, Mr. Herrera also received money directly from another Titan payee: a company called LE Marketing Solutions Inc. ("LE Marketing"), with a listed address in Mr. Herrera's home town of Pembroke Pines, Florida. In late 2020 and early 2021, LE Marketing issued four checks, totaling tens of thousands of dollars, directly to Mr. Herrera. Coleman Decl. ¶¶ 60-61.

### 3.    Kingpin Defendant Armando Herrera

Kingpin Defendant Herrera has a history of defrauding individuals living with HIV to make an illicit profit. In 2008, he pled guilty and was sentenced to three years' imprisonment for running what the government called "a fraudulent HIV infusion clinic" that made fake Medicare claims and also subjected patients to "unnecessary procedures such as paravertebral joint injections."[10]

Mr. Herrera lives in a high-end house in a luxury gated community with his girlfriend, Asset Holder Defendant Yisel Lopez. Mr. Herrera does not own or lease any real estate in his own name. Instead – and consistent with other money-laundering schemes Gilead has described in previous filings – Mr. Herrera keeps his assets hidden by putting them in the name of his girlfriend, Ms. Lopez. For example, Mr. Herrera's home is owned by an LLC for which Ms. Lopez is the principal. Coleman Decl. ¶ 59 & Exs. 120-21. Ms. Lopez is also the principal of a different LLC that owns Mr. Herrera's *mother's* home. *See id.* Through this chain of ownership,

---

[10] DOJ, *Nine Miami Defendants in Strike Force Cases Sentenced for $56.5 Million in Medicare Fraud* (Jan. 23, 20180) https://www.justice.gov/archive/opa/pr/2008/January/08_crm_049.html

Asset Holder Defendant Lopez helps Mr. Herrera enjoy the fruits of his crimes while remaining anonymous

Mr. Herrera also does not have any vehicles licensed or registered in his name.  However, when a private investigator conducted a site visit outside Mr. Herrera's home, there was a 2022 white Lamborghini Huracan sitting in the parking area immediately outside of, and designated for, Mr. Herrera's home:



Coleman Decl. ¶ 59.  That new Lamborghini was registered to a local exotic car rental agency, which leases 2022 Lamborghini Huracans for approximately $12,000 per week.  *Id.*

In this motion¸ Gilead seeks an *ex parte* seizure, temporary restraining order, and asset freeze against Kingpin Defendant Herrera.

## IV.  THE NEW LEADER DEFENDANTS

In the previous section, Gilead described the two newly named Kingpin Defendants, who operate in the shadows and are at the top of the known counterfeiting conspiracy.  Operating below the Kingpin Defendants are their lieutenants, the Leader Defendants.  The Leader Defendants acted as managers and brokers for the Supplier Defendants, supervising the day-to-day interactions between the fly-by-night Supplier Defendants (who were in fact controlled by

the Kingpin Defendants) and the more established, licensed Distributor Defendants.  The Leader

Defendants also helped the Distributor Defendants market the counterfeits to pharmacies.

Because they acted as outside brokers and facilitators, the Leader Defendants do not

appear on the pedigrees, the invoices, or any of the other paperwork associated with the sale of

the counterfeits.  But unlike the Kingpin Defendants, the Leader Defendants did not operate

entirely in the shadows.  Whereas the Kingpin Defendants were paid through a series of

obfuscating money-laundering transactions, the Leader Defendants were paid a cut of the

counterfeiting proceeds directly from the Distributor Defendants.  And whereas the Kingpin

Defendants left little or no email trail, the Leader Defendants had extensive email

correspondence with the Distributor Defendants with whom they worked, and with each other.

In its prior application, Gilead identified three Leader Defendants: Messrs. Ralhan,

Rosell, and Mannava.  From seized documents and additional investigation, Gilead has identified

two new Leader Defendants: John Levitan and David Dunn.

### A.     Leader Defendant John Levitan

Leader Defendant John Levitan stands apart from his co-Leader Defendants because he

knows Kingpin Defendant Lazaro Hernandez personally – not just as "Rob."  Publicly, both Mr.

Hernandez and Mr. Levitan are executives at Streamline Performance Boats Corp. in Miami – a

company that was referenced repeatedly at Mr. Hernandez's detention hearing.  Coleman Decl.

Ex. 90 at 31, 48-49, 54, 60, 86.  Privately, Mr. Levitan is the man who connected the other

Leader Defendants with Kingpin Defendant Hernandez, whom they knew only as "Rob."

Mr. Levitan is also a money-laundering expert.  He is a convicted felon who was

sentenced to **14 years** in prison on money-laundering charges.  Coleman Decl. ¶ 64 & Exs. 93-

94.  Among the evidence introduced against Mr. Levitan was the fact that he offered a detailed

plan to an undercover IRS agent to launder what Mr. Levitan thought was $1 million in illegal

43

narcotics profits.  *Id.*  Since 2005, Mr. Levitan has formed or been named the principal of over 40 different Florida corporate entities, almost of all them registered to the same address in Pensacola, Florida, and approximately a dozen of which purport to be in the medical field. Coleman Decl. ¶ 65.  Evidence that Gilead has obtained from seized documents shows that since at least 2021, Mr. Levitan directed his criminal skills toward the sale of counterfeit Gilead-branded medication.

However, Mr. Levitan's primary day-to-day role in the conspiracy mirrored that of the other Leader Defendants: he worked behind the scenes to act as broker and day-to-day manager of at least three different fly-by-night Supplier Defendants suppliers who sold or offered to sell counterfeit Gilead-branded HIV medication to Distributor Defendants.

Mr. Levitan has a longstanding relationship with Defendant Adam Brosius.  Defendant Brosius, himself an indicted healthcare fraudster, is the principal of Distributor Defendant Worldwide Pharma, which worked with Distributor Defendant Safe Chain to source Safe Chain's counterfeit HIV medication.  Although not an employee or officially affiliated with the company, Mr. Levitan was given a Worldwide Pharma email address.  Potter Decl. Ex 243.  Mr. Levitan used that email address to introduce and coordinate the sale of counterfeit Gilead-branded medications from at least three different fly-by-night suppliers.

First, Mr. Levitan acted as the broker for Supplier Defendant Synergy Group Wholesaler LLC, and worked directly with Synergy's principal, Defendant Carlos Vega.  In March 2021, Distributor Defendant Safe Chain's director of compliance caught Supplier Defendant Synergy using a fraudulent pedigree (*see* Plaintiffs' Mem. of Law, dated August 19, 2021 at 18-19). That incident prompted Defendant Vega to text Defendant Brosius (of Distributor Defendant Worldwide Pharma) to "apologize for the miscommunication" – and then Defendant Vega

followed up with the question, "Did you ever speak with our mutual friend?"  Potter Decl. Ex.

244.  Defendant Brosius replied: "I talk to everyone in the industry.  Not sure which gentleman

you are talking about.  What are his initials," to which Defendant Vega replied simply "J."  *Id.*

Defendant Brosius responded, "I speak to him often.  Has nothing to do with compliance and

paperwork."  *Id.*

The evidence shows that the "mutual friend" "J." is Leader Defendant John Levitan, who

became more visibly involved as Supplier Defendant Synergy's supply of counterfeits ramped

up.  For example, in May 2021, Distributor Defendant Safe Chain had cut ties with the other

Supplier Defendants it had used to date, and relied entirely on Supplier Defendant Synergy for its

supplier of counterfeits.  At that point, Mr. Levitan became more directly involved in brokering

the sale of Supplier Defendant Synergy's counterfeits.  *See* Potter Decl. Ex. 245 ("I believe you

know John [Levitan]. . . . John is going to be involved with inventory and acquisition . . . .  Feel

free to discuss things with him.  Nothing else will change on  Po's and payments and such").

And in June 2021, Mr. Levitan followed up with Synergy's principal, Defendant Vega, in

writing: "We are looking for [more] inventory and I wanted to speak to you, to lock in an

agreement for future orders."  Potter Decl. Ex. 246.  Under Mr. Levitan's direction, Synergy

supplied a large volume of counterfeits to Safe Chain, selling millions of dollars of purported

Gilead-branded medications with counterfeit pedigrees.  *See* Plaintiffs' Mem. of Law, dated

August 19, 2021, at 16-19.

Mr. Levitan was also involved in introducing Supplier Defendant Invicta to Distributor

Defendant Safe Chain.  On May 21, 2021, Supplier Defendant Invicta's owner on paper,

Defendant Jorge Caba, emailed Defendants Levitan and Brosius, writing, "Here is a copy of how

the t3 [*i.e.*, the pedigree] is gonna look like.  SafeChain address is  not on the paper because I

dont have it, but it will be there.  Thank you for the opportunity."  Potter Decl. Ex. 247.  A few days later, on May 25, 2021, Defendant Caba sent a copy of Supplier Defendant Invicta's state distribution license directly to Mr. Levitan.  Potter Decl. Ex. 248.

In June 2021, Mr. Levitan also brought on a third fly-by-night supplier, CMV Wholesalers, as a vendor of counterfeit Gilead-branded medications for Distributor Defendant Safe Chain.  Potter Decl. Ex. 243; *see also* Potter Decl. Ex. 249.  After making the initial introduction, Mr. Levitan relied on Leader Defendant Mannava to negotiate pricing and establish the supplier relationship.  On June 8, 2021 CMV Wholesalers offered Mr. Mannava hundreds of bottles of Gilead-branded medications.  Potter Decl. Ex. 250.  Mr. Mannava responded to confirm that the price is "wac-13%" – that is, 13% below the wholesale price at which Gilead sells the medications to its authorized distributors – and asked "Is the product coming from [Supplier Defendant] Invicta?"  Potter Decl. Ex. 251.  This too-good-to-be-true pricing, which simply does not exist for legitimate branded medication, is consistent with the other counterfeits sold through the counterfeiting ring.  It appears that before CMV Wholesaler had the opportunity to deliver the promised counterfeits, Gilead shut down Safe Chain's operation by executing this Court's seizure order.

Gilead seeks an *ex parte* seizure, temporary restraining order, and asset freeze order against Leader Defendant Levitan.

### B.    Leader Defendant David Dunn and His Companies, PCSIONE, LLC and Pharmacy Consulting Services, Inc.

The second newly named Leader Defendant is David Dunn, whom Gilead identified through documents seized from Distributor Defendant Scripts.  Consistent with the role played by the other Leader Defendants, Mr. Dunn introduced several of the newly named Supplier

Defendants to Distributor Defendant Scripts, acting as a broker between Scripts and the fly-by-night suppliers.

For example, Mr. Dunn was the key point of contact between Distributor Defendant Scripts and newly named Supplier Defendants ITC Group LLC ("ITC") and Abacus Distributors ("Abacus").  As described below, Supplier Defendants ITC and Abacus are quintessential examples of the fly-by-night supplier used by the counterfeiting ring, and every Gilead-branded medication they sold was counterfeit.  *See infra* Facts Part V.B-C.  Mr. Dunn communicated the available inventory of counterfeits from ITC and Abacus, and ensured Scripts paid for the counterfeits it received.  *See* Potter Decl. Ex. 252 (Mr. Dunn sending Scripts a list of available counterfeits from Abacus); Potter Decl. Ex. 253 (Mr. Dunn sending ITC offer sheets and asking Mr. Diamantstein when ITC can expect payment).  Mr. Dunn also set the pricing of the counterfeits from Abacus and ITC.  *See e.g.* Potter Decl. Ex. 254 ("They will sale [*sic*] your company at WAC -8% on these HIV products").  Mr. Dunn also managed the flow of money to those Supplier Defendants, including by depositing checks directly into the Suppliers' accounts.  Potter Decl. Ex. 255 ("He wants you to send it to me to deposit in SE Bank."); Potter Decl. Ex. 256 (Mr. Dunn confirming to Mr. Diamantstein that he deposited a check made out to Supplier Defendant ITC).

Mr. Dunn was also the individual responsible for sending Distributor Defendant Scripts the pedigrees for the counterfeits delivered by Supplier Defendants ITC and Abacus.  *See, e.g.*, Potter Decl. Ex. 257.  Those pedigrees were counterfeit and fraudulent.  Declaration of Susmitha Sunkara, dated February 11, 2022, Dkt. No. 433 ("2/11/22 Sunkara Decl.") ¶ 7.  Because the counterfeit pedigrees often contained obvious errors, Mr. Dunn worked closely with Distributor Defendant Scripts to "correct" the pedigrees and make them less obviously fake.  *See, e.g.*, Potter

Decl. Ex. 258, 259.  Mr. Dunn also ensured that the rest of the paperwork associated with the purchase and sale of the counterfeits was in place.  *See, e.g.*, Potter Decl. Ex. 260 ("Going forward we would like Script Wholesale to send a PO to Abacus Distributors on each order after the offer sheet has been accepted and send [sic] in from Total Remedy").

As with other Leader Defendants, Mr. Dunn also helped recruit pharmacies to purchase the counterfeit HIV medication he was supplying to Scripts.  *See* Potter Decl. Ex. 261 ("Here is another Large HIV customer in California that I am bring [sic] on").  Again consistent with the other Leader Defendants, Mr. Dunn was paid an additional cut of the counterfeiting proceeds based on those sales to pharmacies.  *See, e.g.*, Potter Decl. Ex. 256.

Also like the other Leader Defendants, Mr. Dunn operated in part through two companies he wholly owned: newly named Defendants Pharmacy Consulting Services, Inc. and PCSIONE, LLC.  Mr. Dunn received his cut of the counterfeiting proceeds through PCSIONE, LLC.  *See* Potter Decl. Ex. 262 ("Steven [Diamantstein, the owner of Scripts] wires my commission to my company [PCSIONE, LLC]"); Potter Decl. Ex. 263.  And Mr. Dunn conducted business with Scripts using the email signature for his other company, Pharmacy Consulting Services, Inc. *See, e.g.*, Potter Decl. Ex. 264, 265.  Gilead seeks an *ex parte* seizure against Leader Defendant Dunn, and a temporary restraining order and asset freeze against Mr. Dunn and his two companies.

## V.   THE NEW FLY-BY-NIGHT COUNTERFEIT SUPPLIER DEFENDANTS THAT SOLD TO SCRIPTS

In its last round of seizures, Gilead executed a seizure at the offices of Scripts Wholesale, a brick-and-mortar pharmaceutical distributor located in Brooklyn.  Through that seizure, Gilead learned that Scripts purchased over $97 million in counterfeit Gilead-branded HIV medication from a variety of fly-by-night Supplier Defendants.  Many of Scripts' counterfeit suppliers are

48

already Defendants in this action, familiar names that also sold to earlier-named Distributor Defendants Safe Chain and ProPharma.  However, Scripts also purchased counterfeits from a handful of newly discovered fly-by-night Supplier Defendants.  This is unsurprising, given that Scripts sold counterfeits for significantly longer than its peers, and the counterfeiting ring operates by creating new Supplier Defendants to replace the old ones as time goes on.

These new Supplier Defendants that sold to Scripts precisely fit the mold of the other Supplier Defendants in the counterfeiting ring.  The evidence shows that, like the other Supplier Defendants, they are recently created entities that exist solely to sell counterfeits; they have not registered with the FDA; they concealed their illegal sources by selling the medications using counterfeit and fraudulent pedigrees; and they were ready to shut down their operations on short notice, thereby insulating the rest of the counterfeiting ring.

Moreover, like the other counterfeit suppliers, these new Supplier Defendants could not sell directly to pharmacies, because pharmacists, generally speaking, are cautious enough not to buy from sketchy, unregistered suppliers.  And so, the Leader Defendants managed these new Supplier Defendants, as they did with the other suppliers in the conspiracy, brokering and supervising their sales of counterfeits to Distributor Defendant Scripts.  Scripts, in turn, had the business presence, licensure, and existing pharmacy customers that allowed it to add a veneer of legitimacy to the counterfeits and sell them to pharmacies.  In short, the evidence shows that these new Supplier Defendants are very much part of the counterfeiting conspiracy at issue, and follow its playbook to the letter.

To date, Gilead has identified five new Supplier Defendants that sold counterfeits to Scripts.  In total, they sold tens of millions of dollars' worth of counterfeit Gilead HIV medication, and Gilead has confirmed that *every* bottle they sold was a misbranded drug with a

counterfeit pedigree that lied about the bottle's origin and distribution.  Gilead was able to seize some of those bottles from Scripts' shelves, and they include counterfeit patient instructions and other elements identical to the counterfeits sold by the other counterfeit suppliers in this case. Consistent with the conspiracy's playbook, every one of these Supplier Defendants had shuttered its doors and abandoned its offices by the time Gilead's investigators visited.  However, nothing is preventing the principals of these shuttered Supplier Defendants from continuing their counterfeiting scheme under a new entity, and they should not be allowed to enjoy the illicit proceeds of their work.  Gilead therefore seeks a temporary restraining order and asset freeze against these newly named Supplier Defendants and their principals.  And because the principals of these shell companies will have important communications and other information about the manufacture and supply of the counterfeits, Gilead also seeks *ex parte* seizures against some of these newly named Supplier Defendants (as Gilead has in previous applications against previously named Supplier Defendants).

### A.   Supplier Defendants My Meds and Its Principals, Stephen Smith and Emilio Juvier Vina

The first of the new Supplier Defendants is My Meds LLC, a fly-by-night counterfeit supplier who sold at least 4,783 bottles of counterfeit Gilead-branded medication to Distributor Defendant Scripts for over $13.6 million.  Potter Decl. Ex. 266.  Scripts then sold those counterfeits to retail pharmacies, who dispensed them to patients.  *Id.*  Every pedigree for every one of those bottles was counterfeit and fraudulent.  2/11/22 Sunkara Decl. ¶ 7.  As described below, My Meds followed the lead of several other Supplier Defendants by establishing a series of shell companies that mimicked the name of a legitimate distributor.  My Meds abandoned its offices after Gilead conducted the seizure at Scripts' warehouse.  Coleman Decl. ¶ 73.

## 1.    My Meds' Ties to the Counterfeiting Conspiracy

My Meds was first registered in March 2020, and corporate records list Defendant Emilio Juvier Vina and Stephen Smith is the owners and principals of My Meds.  Coleman Decl. ¶¶ 69-72 & Exs. 131-32.  As noted above, the federal government identified My Meds as one example of many of a counterfeit supplier that was in fact established and ultimately controlled by Kingpin Defendant Lazaro Hernandez.  Coleman Decl. Ex. 89 at 12-13.

As described above, Kingpin Defendant Hernandez worked anonymously in the background and used the Leader Defendants to manage the sales of the counterfeits from the various Supplier Defendants to the Distributor Defendants.  The facts confirm that to be the case with My Meds: as soon as My Meds received its wholesale licensure in New York in October 2020, Potter Decl. Ex. 267, the Leader Defendants – first Defendant Ralhan and then also Defendant Mannava – began preparing My Meds to become another addition to Distributor Defendant Scripts' stable of fly-by-night counterfeit suppliers. Potter Decl. Exs. 268, 269, 270. Within weeks, My Meds was selling large quantities of counterfeit Gilead-branded medication to Distributor Defendant Scripts.  Potter Decl. Ex. 271.  Defendant Smith, one of My Meds' owners, was the primary contact with both Distributor Defendant Scripts and the Leader Defendants in connection with My Meds' sale of the counterfeits.  Potter Decl. Ex. 268, 270.

## 2.    My Meds' Use of Shell Companies that Fraudulently Appropriated the Identity of a Legitimate Distributor

Supplier Defendant My Meds' pedigrees for the counterfeits all fraudulently list "M&D Specialty Wholesale" as My Meds' source of the medication.  2/11/22 Sunkara Decl. ¶ 10; *see, e.g.*, Potter Decl. Ex. 272.  "M&D Specialty Wholesale" is a fictitious name clearly intended to be confused with, and trade on the name of, the legitimate wholesaler "M&D Specialty

51

Distribution."[11]  That is a now-familiar scam employed by various members of the counterfeiting conspiracy.

In furtherance of this fraud, My Meds funneled its counterfeiting proceeds through a series of shell companies that mimicked the name of the legitimate distributor, creating what would appear at first glance to be a legitimate financial trail for the medicines.  For example, My Meds sent over $12 million in its counterfeiting proceeds to a shell company named "M&D Co. Distributors, LLC."  Coleman Decl. App'x D & Ex. 116.  That shell company was created by My Meds owner and principal, Defendant Vina, and it proceeded to pay over $8 million to Mr. Vina himself.  *Id.*  My Meds also sent substantial counterfeiting proceeds to another shell company called "MDSD Enterprises, LLC" – MDSD being a common abbreviation for the legitimate company, M&D Specialty Distribution.  "MDSD Enterprises, LLC" has a registered d/b/a/ as "M & D Specialty Wholesale," the fake supplier listed on My Meds' fraudulent pedigrees.  Coleman Decl. Ex. 168.

In this motion, Gilead seeks a temporary restraining order and asset freeze order against My Meds and Messrs. Smith and Vina.  Gilead further seeks an *ex parte* seizure to take place at Mr. Smith's residence, given that My Meds has abandoned its corporate offices, and given that Mr. Smith was the principal most directly involved in sourcing the counterfeits.

---

[11] *See, e.g.*, Morris & Dickson, *MDSD: M&D Specialty Distribution,* https://www.morrisdickson .com/md-specialty-distribution/ (last visited July 29, 2022) ("MDSD distributes specialty and niche pharmaceutical products to institutional, hospital, and clinical pharmacies.").

### B.   Supplier Defendants ITC Group, LLC and Its Principal, Frank Betancourt

The second of the new Supplier Defendants is ITC Group, LLC ("ITC"), a fly-by-night counterfeit supplier that sold at least 3,730 bottles of counterfeit Gilead-branded medication to Scripts for over $10.6 million.  Potter Decl. Ex. 273.

Supplier Defendant ITC was founded on June 26, 2020, but did not receive licensure as a pharmaceutical wholesaler until November 16, 2020 (New York) and July 1, 2021 (Connecticut). Coleman Decl. ¶ 74 & Exs. 133-34.  Frank Betancourt is the registered agent, manager, and president of ITC.  *Id.* ¶ 75; Potter Decl. Ex. 274 (Vendor Agreement listing Betancourt as president).  As with the other Supplier Defendants, ITC has shuttered its doors and abandoned its office space.  Coleman Decl. ¶ 76.

### 1.   ITC's Ties to the Counterfeiting Conspiracy

Supplier Defendant ITC was introduced to Distributor Defendant Scripts through the newly named Leader Defendant David Dunn.  *See, e.g.*, Potter Decl. Ex. 275.  Mr. Dunn connected Scripts' owner, Defendant Steven Diamantstein, with ITC's principal Mr. Betancourt, and the two began corresponding in October 15, 2020.  Potter Decl. Ex. 276.  Scripts and ITC entered into a Vendor Agreement the next day. Potter Decl. Ex. 274.  These initial communications between Distributor Defendant Scripts and Supplier Defendant ITC began about a month before ITC obtained its New York license on November 16, 2020.  Coleman Decl. Ex. 134.  Almost immediately after ITC's New York license went through, Scripts placed its first order for counterfeit Gilead-branded HIV medications from ITC.  Potter Decl. Ex. 277.

### 2.   ITC's Initial Lack of Licensure and Obviously Fake Pedigrees

The record makes clear that Supplier Defendant ITC was not, and was never intended to be, a legitimate pharmaceutical wholesaler.  Rather, ITC and Defendant Betancourt relied on

Distributor Defendant Scripts, and Defendant Diamantstein in particular, to walk them through the process of setting up a company that had the appearance of being a legitimate wholesaler in order to sell counterfeits.  For example, in their first written conversation, Defendant Betancourt texted Defendant Diamantstein, asking basic questions about how to get licensure, such as "Do we need to apply in NYC or Jersey?" to which Defendant Diamantstein responded, "NY State." Potter Decl. Ex. 278.  In the same conversation, Defendant Betancourt asked Defendant Diamantstein to name "someone we can use as a registered agent in NYS." *Id.*  Defendant Betancourt also pressed Defendant Diamantstein to have Distributor Defendant Scripts begin making purchases immediately, despite the lack of licensure, because "the wheels are already in motion" and "we already green lit the delivery," to which Defendant Diamantstein responded, "I asked my legal advisor Waiting for a response." *Id.*

As with all the other Supplier Defendants – and as with every bottle of Gilead-branded medication Distributor Defendant Scripts sold – every pedigree for every bottle that ITC sold to Scripts was fraudulent and counterfeit.  2/11/22 Sunkara Decl. ¶ 7.  Throughout their relationship, Distributor Defendant Scripts complained about glaring problems with the (counterfeit) pedigrees that Scripts received from Supplier Defendant ITC, and Scripts and Defendant Diamantstein worked with ITC to make those counterfeit pedigrees more plausible. For example, after there were serious problems with ITC's first shipment of counterfeits, Defendant Betancourt texted Defendant Diamantstein to say that the "[p]ics and videos" Defendant Diamantstein had sent him "were very helpful thank you again for the effort," and promising that "moving forward all will refine and improve."  Potter Decl. Ex. 279.  Defendant Betancourt then acknowledged that the people who had created the pedigrees for that first shipment "failed us in the midst of our initial transaction," but reported that "[w]e were able to

secure someone from our accounts office to handle this 'data entry' portion related to pedigrees." *Id.* Defendant Betancourt's use of the phrase "data entry" in quotes appears to be a wink to Defendant Diamantstein: both men knew the information on ITC's pedigrees was being invented out of whole cloth. *Id.*

Precisely because they were fraudulent inventions, Supplier Defendant ITC's pedigrees retained glaring errors throughout the parties' relationship. *See e.g.*, Potter Decl. Ex. 280 (Scripts instructing ITC to "correct" counterfeit pedigrees that listed the same date of sale for every transaction, from the first supposed sale by Gilead through the final sale to Scripts); Potter Decl. Ex. 281 (Scripts instructing ITC to "correct" counterfeit pedigrees that did not even list the sales to Scripts); Potter Decl. Ex. 282 (Scripts instructing ITC to correct counterfeit pedigrees that did not list lot numbers and had incorrect quantities).

In this motion, Gilead seeks a temporary restraining order and asset freeze order against Supplier Defendant ITC and Defendant Betancourt. Gilead further seeks an *ex parte* seizure to take place at Defendant Betancourt's residence given that ITC has abandoned its corporate offices.

### C.   Supplier Defendants Abacus Distributors and Its Principals, Jose Hernandez and Carlos Pimentel

The third new Supplier Defendant that sold to Distributor Defendant Scripts is Abacus Distributors Inc. ("Abacus"), a fly-by-night counterfeit supplier that over the course of approximately one and a half years, sold Scripts 5,597 bottles of counterfeit Gilead-branded medication for over $14.3 million. Potter Decl. Ex. 283. Every one of those bottles was accompanied by a counterfeit and fraudulent pedigree. 2/11/22 Sunkara Decl. ¶ 7. Because the counterfeit pedigrees were invented from whole cloth, Supplier Defendant Abacus complained to

Distributor Defendant Scripts that creating the pedigrees was "a tedious process." Potter Decl. Ex. 284.

Supplier Defendant Abacus was first formed in Texas in February 2019.  Coleman Decl. ¶ 77 & Ex. 135.  Defendant Carlos Pimentel holds himself out to be the president and owner of Abacus, and is also its organizer and registered agent.  *Id.* ¶¶ 77-78; Potter Decl. Ex. 285.  A second, identically named Abacus entity was incorporated in Florida a few months later, in May 2019.  Coleman Decl. ¶ 79 & Ex. 137.  The president of the Florida entity is Defendant Jose Hernandez.  *Id.* ¶ 80.

Supplier Defendant Abacus received a Texas pharmaceutical distribution license in March 2019, and began selling counterfeit Gilead medication to Distributor Defendant Scripts within months, beginning August 2019.  Coleman Decl. Ex. 136; Potter Decl. Ex. 286.  However, Abacus did not receive licensure in New York until November 2020, and so for over a year its sales to Scripts in New York were unlawful on their face.  Coleman Decl. Ex. 136 at 2.

### 1.    Abacus's Ties to the Counterfeiting Conspiracy

Like other Supplier Defendants, Abacus's relationship with Distributor Defendant Scripts was managed through one of the Leader Defendants – in this instance, David Dunn, a newly named defendant.  *See, e.g.*, Potter Decl. Ex. 287.  In many cases, Leader Defendant Dunn himself handled the sales to pharmacies.  *See* Potter Decl. Ex. 288, 289 (Mr. Dunn soliciting and receiving orders from pharmacy on behalf of Abacus, and then forwarding the order to Scripts for fulfillment); Potter Decl. Ex. 290 ("Going forward we would like [Scripts] to send a PO to Abacus Distributors on each order after the offer sheet has been accepted and send in from Total Remedy Pharmacy.  So we can put that on the Pedigree.").

### 2. Abacus's Sale of Counterfeits With the Wrong Pills In the Bottle and the Subsequent FDA Criminal Investigation

Gilead has confirmed that some counterfeits sold by Supplier Defendant Abacus to Distributor Defendant Scripts, which eventually reached the hands of patients, contained the wrong medication inside.  In January of 2020, Gilead received a report directly from a pharmacy that stated one of its patients had returned a bottle of DESCOVY® that appeared to have the wrong medication.  Declaration of Susmitha Sunkara, dated October 13, 2021, Dkt. No. 155 ("10/13/21 Sunkara Decl.") ¶ 18 & Exs. 13.  Gilead had an outside laboratory test the medication inside the bottle and confirmed that it was in fact aripiprazole, an antipsychotic medication that does not treat HIV and is not manufactured or sold by Gilead.  *Id.*  The dispensing pharmacy had purchased that counterfeit from Distributor Defendant Scripts, who had purchased it from Supplier Defendant Abacus.  *Id.*; Declaration of Susmitha Sunkara, dated February 17, 2022, Dkt. No 444 ("2/17/22 Sunkara Decl.") ¶ 3.

Gilead now knows that the FDA's Office of Criminal Investigation was actively investigating Supplier Defendant Abacus at the time Abacus was selling counterfeit HIV medication to Distributor Defendant Scripts.  Specifically, on February 8, 2021, the FDA Office of Criminal Investigation, which was already investigating other of Scripts' fly-by-night counterfeit suppliers, asked Scripts to provide information about Abacus.  Declaration of Steven Diamantstein, dated February 4, 2022, Dkt. No. 421-3 ("Diamantstein Decl.") Ex. S.  When Scripts asked why the FDA was asking questions about yet another of its HIV medication suppliers, the FDA Office of Criminal Investigation responded: "Our job is to determine breaches in the supply chain.  Investigative research has led us to another supplier" – i.e., Abacus.  *Id.*  After receiving that inquiry from the FDA, Scripts immediately sold off all of its remaining stock of counterfeit Gilead medication supplied by Abacus.  Declaration of Geoffrey

57

Potter, dated Feb. 22, 2022, Dkt. No. 443-8 ("2/22/22 Potter Decl.") Ex. 223.  Abacus thereafter abandoned its corporate offices as well.  Coleman Decl. ¶ 81.

     In this motion, Gilead seeks a temporary restraining order and asset freeze order against Supplier Defendant Abacus and Defendants Hernandez and Pimentel.  Gilead further seeks an *ex parte* seizure to take place at Defendant Hernandez's residence given that Abacus has abandoned its corporate offices.

### D.     Supplier Defendants V & G Wholesale and Its Principal, Pavel Lashkevich

     The fourth new Supplier Defendant that sold counterfeits to Scripts is V & G Wholesale Inc. ("V & G").  Supplier Defendant V & G sold Scripts 54 bottles of counterfeit Gilead-branded medication for over $91,000. Potter Decl. Ex. 291.  As with the counterfeits sold by the other Supplier Defendants, V & G sold the counterfeits at too-good-to-be-true prices well below WAC.  Potter Decl. Ex. 292. Unsurprisingly, each of those bottles had a counterfeit and fraudulent pedigree.  2/11/22 Sunkara Decl. ¶ 16.

### 1.     V & G's Relationship with Distributor Defendant Scripts

     Supplier Defendant V & G is a smaller-scale supplier that appears to have reached out to Distributor Defendant Scripts directly, without using a different member of the conspiracy to manage the relationship.  Scripts' employees immediately raised red flags about V & G, but that did not deter Scripts' owner, Defendant Diamantstein – if anything, it piqued his interest.

     Supplier Defendant V & G, through its owner Defendant Lashkevich, first reached out to Distributor Defendant Scripts via phone and email seeking to establish a business relationship in January 2019.  *See* Potter Decl. Ex. 293.  A few weeks later, the Scripts employee who had been assigned to contact V & G reported back to Defendant Diamantstein.  Potter Decl. Ex. 294.  The employee flagged for Defendant Diamantstein that he was "pretty sure [V & G] is fraud," but

stated he was following up with Defendant Diamantstein because he "just wanted to make sure wasnt someone you worked with as he was trying to move brands" – i.e., V & G was selling brand-name drugs (like Gilead-branded HIV medication) as opposed to less-expensive generic medication.  Simply ignoring his employee's assessment that Supplier Defendant V & G was fraudulent, and clearly never having worked with the company before, Defendant Diamantstein eagerly responded: "He wanted to sell me brands?  Send me his phone number please."  *Id.*  The following day, Defendant Diamantstein responded to V & G's January email by requesting that V & G "[p]lease contact me[.]"  *Id.;* Potter Decl. Ex. 293.

## 2.    V & G's Lack of Registration and Obviously Suspect Product

Supplier Defendant V & G clearly had no experience as a pharmaceutical wholesaler – or at least not as one that adhered to bare-minimum licensure requirements.  And so (as with Supplier Defendant ITC), Distributor Defendant Scripts worked to help Supplier Defendant V & G set itself up with the appearance of a legitimate wholesaler.  For example, on March 20, 2019, Scripts' owner, Defendant Diamantstein, texted V & G's principal, Defendant Lashkevich: "Did you report you licenses on the FDA website ? Deadline next Friday.  **If you need help, I can show you how to do it.  It's easy**."  Potter Decl. Ex. 295 (emphasis added).

Distributor Scripts clearly knew that the Gilead-branded medication being sold by Supplier Defendant V & G was not legitimate.  When V & G sent Scripts its first shipment of purported Gilead-branded HIV medication, Scripts' owner Defendant Diamantstein instructed his employees to put all of those bottles "in a closet[,] Separate it from all the other brands" and to lock the closet.  Potter Decl. Ex. 296.  Scripts nevertheless sold all of those counterfeits to pharmacies.

Like the other Supplier Defendants, V & G has abandoned its offices.  Gilead seeks a temporary restraining order and asset freeze against V & G and its owner, Defendant Lashkevich.

### E.    Supplier Defendant Mainspring and Its Principals, Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman

The fifth and final new Supplier Defendant that sold to Distributor Defendant Scripts is the oldest: Mainspring Distribution LLC ("Mainspring").  From February 2017 to November 2018, Distributor Defendant Scripts purchased $34 million "black market" counterfeit Gilead-branded medications from Supplier Defendant Mainspring, which are the earliest known sales of the counterfeits through the conspiracy at issue. Coleman Decl. ¶ 85 & Ex. 171 Through seizures and third-party discovery, Gilead has obtained Mainspring pedigrees that accompanied the sale of Gilead branded medicine that Distributor Defendant Scripts purchased from Supplier Defendant Mainspring (via Lieb Pharmacy).[12]  All of these pedigrees are falsified.  2/11/22 Sunkara Decl. ¶ 17.

The federal government shut Supplier Defendant Mainspring down in 2018.  Four of Mainspring's principals—Defendants Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman—have all been charged with multiple felonies in connection with this counterfeiting scheme, and all but Defendant Silverman have pleaded guilty.  *See* Coleman Decl. Ex. 108 (*United States v. Ovasapyan et al.*, No. 3:18-cr-00533-RS (N.D. Cal.), Dkt. No. 106 (minutes from Kojoyan plea hearing)); Coleman Decl. Ex. 110 (Dkt. No. 113 at 3 (forfeiture

---

[12] Lieb Pharmacy is a retail pharmacy located downstairs from Scripts and is owned by Steven Diamantstein's father.  Declaration of Hannah Coleman, dated October 13, 2021, Dkt. No. 156 ("10/13/21 Coleman Decl.") ¶ 23.  The Diamantstein family owns the building that houses both companies.  *Id.*

application referring to Ovasapyan's guilty plea)); Coleman Decl. Ex. 109 (Dkt. No. 191 (minutes from Papyan plea hearing)).  Defendant Kojoyan has been sentenced to thirty-three months in prison, *see* Coleman Decl. Ex. 111 (Dkt. No. 159 (minutes from Kojoyan sentencing hearing)), while Defendants Ovasapyan and Papyan are awaiting sentencing.  According to the Department of Justice, the Mainspring principals used the company "to pose as legitimate prescription drug wholesalers" and then "obtained prescription drugs from unlicensed, black market sources."  2/11/22 Potter Decl. Ex. 205, Dkt. No. 431-1.  They then "sold the drugs through Mainspring" to wholesalers, "falsely representing that the drugs were legitimately sourced from licensed suppliers."  Supplier Defendant Mainspring "specialized in expensive name-brand prescription drugs used to treat HIV, such as Atripla," which is a Gilead-branded HIV medication.  *Id.*

At least some of Supplier Defendant Mainspring's counterfeits did not have the correct medication inside the bottle.  According to the sworn testimony of the investigating FBI special agent, a Mainspring principal stated that his operation would "re-label bottles of drugs for something more expensive, or a bottle of drugs would contain 'candy' instead of drugs."  2/11/22 Potter Decl. Ex. 206, Dkt. No. 431-2, ¶ 21.

Distributor Defendant Scripts was Supplier Defendant Mainspring's biggest customer by far, having paid at least $34 million to Mainspring for the counterfeits.  Coleman Decl. ¶ 85 & Ex. 171.  Distributor Defendant Scripts also paid an additional $5 million cash "advance" to Supplier Defendant Mainspring to cover the production of more counterfeits, but Mainspring disappeared with that money.  2/11/22 Potter Decl. Ex. 207, Dkt. No. 431-3, ¶¶ 7–15.

Supplier Defendant Mainspring used techniques to conceal its counterfeiting that were adopted by many other Supplier Defendants in the conspiracy.  The Department of Justice stated

that the Mainstream principals "stole the identity of a licensed prescription drug company supplier in California and prepared paperwork falsely suggesting their drugs came from that supplier," and "further mimicked the appearance of a legitimate supply chain by opening bank accounts in names misleadingly similar to the licensed supplier and routing the proceeds of their fraudulent sales through the accounts." 2/11/22 Potter Decl. Ex. 205, Dkt. No. 431-1. As noted above, new Supplier Defendants My Meds and Pharma Pac LLC, as well as several other previously named Supplier Defendants, also stole the identities of real pharmaceutical companies and/or opened shell companies and bank accounts mimicking the name of licensed suppliers.

In this motion, Gilead seeks a temporary restraining order and asset freeze against Supplier Defendant Mainspring and Defendants Ovasapyan, Kojoyan, Papyan, and Silverman.

## VI.   ADDITIONAL NEW COUNTERFEIT SUPPLIER DEFENDANTS THAT SOLD DIRECTLY TO PHARMACIES

The five new Supplier Defendants described in the immediately preceding section all sold to Distributor Defendant Scripts. As described above, that is how the counterfeiting ring is structured: the fly-by-night Supplier Defendants sell to the Distributor Defendants, who use their licensure and business presence to market the counterfeits to pharmacies. However, Gilead has identified two additional new Supplier Defendants that were able to skip the middle man and sell to pharmacies directly. They are examples of the counterfeiting ring adapting to the realities of this litigation, as Gilead's lawsuit and this Court's orders have shut down other Distributor Defendants' counterfeiting one by one.

### A.   Supplier Defendants Pharma Pac LLC and Daynel Garcia

The first new Supplier Defendant that is selling directly to pharmacies is actually an old Supplier Defendant in a new guise. In its Second Amended Complaint, Gilead sued Supplier Defendant Pharma Pac Wholesale Corp. and its principal, Angel Toral. This originally named

62

Pharma Pac fit the standard mold: it was a fly-by-night counterfeiter that sold millions of dollars' worth of counterfeit Gilead HIV medications to Distributor Defendant ProPharma before disappearing.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 21-22.  The originally named Pharma Pac and its principal were properly served with the Complaint and Temporary Restraining Order against them, but they failed to appear and have defaulted.  *See* Dkt. No. 422.

Gilead has recently learned that Pharma Pac has continued selling counterfeit Gilead medication, in willful violation of this Court's orders, by simply opening a new business under a slightly different name: instead of Pharma Pac Wholesale Corp., it is now selling counterfeits under the name Pharma Pac LLC.  The owner and organizer of this new Supplier Defendant Pharma Pac LLC is newly named Defendant Daynel Garcia.  Coleman Decl. ¶ 95 & Ex. 142.

### 1.    The "New" Pharma Pac LLC Is Running the Same Scam as the Previous Pharma Pac Defendants

There can be no doubt that this new counterfeiting entity, Supplier Defendant Pharma Pac LLC, is being run by the same counterfeiters behind the originally named Supplier Defendant Pharma Pac Wholesale Corp., because it is running the exact same scam.  Both counterfeiters have fraudulently appropriated the name, logo, and licensure of a real pharmaceutical company "Pharma Pac," which is a name under which the longstanding corporation H.J. Harkins Co., Inc. does business.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 22.

For example, the new Supplier Defendant Pharma Pac LLC sends invoices that state the company's name is simply "Pharma Pac," and fraudulently bear the logo of the already existing company whose name the counterfeiters have stolen.[13]  Potter Decl. Ex. 297.

---

[13] *See* https://pharmapac.com.

### 2. With Its Former Customers Enjoined by This Court, Pharma Pac LLC Now Sells Directly to Pharmacies

When the fly-by-night counterfeiter resumed operations under the new entity Pharma Pac LLC, it had a problem: Gilead had shut down the Distributor Defendants that were its customers. And so Supplier Defendant Pharma Pac LLC cut out the distributors entirely and found at least one pharmacy who was willing to buy counterfeits directly from it. Gilead has learned that Pharma Pac LLC sold at least 636 bottles of counterfeit Gilead-branded medication for over $6.9 million to Total Remedy Pharmacy, also a newly named defendant, located in Los Angeles. Coleman Decl. ¶ 105; *see also* Potter Decl. Exs. 298, 368. Gilead has confirmed the pedigrees for those bottles are all fraudulent and counterfeit – they all state that Pharma Pac purchased from Drogueria Betances (an authorized Gilead distributor) who has not sold Gilead-branded product to any companies in the 48 contiguous United States. 2/11/22 Sunkara Decl. ¶ 9.

Gilead reserves its right to seek sanctions and other remedies against Supplier Defendants Pharma Pac LLC, Pharma Pac Wholesale Corp., and their respective principals for their gross violations of this Court's orders. For present purposes, Gilead seeks a temporary retraining and asset freeze against the newly named Supplier Defendants Pharma Pac LLC and its principal, Defendant Garcia.

### B. Supplier Defendants CompaRx and Its Principal, Yusniel Forcelledo Perez

CompaRx LLC ("CompaRx") is another fly-by-night counterfeit supplier that sold counterfeit Gilead-branded medication, all with counterfeit and fraudulent pedigrees. Like the other Supplier Defendants, CompaRx's sale of counterfeit HIV medication was managed by two of the Leader Defendants – here, Defendants Ralhan and Mannava. *See* Potter Decl. Ex. 299. CompaRx deviates from the other Supplier Defendants in that, to the best of Gilead's knowledge,

CompaRx sold counterfeits not to any Distributor Defendants, but rather directly to a pharmacy, newly added Pharmacy Defendant Ascan Pharmacy.

### 1.    CompaRx's Ties to the Counterfeiting Network

Supplier Defendant CompaRx's name first appeared in the record thanks to an inadvertent error made by Leader Defendant Mannava.  Defendant Mannava filled out and submitted paperwork for a previously named Supplier Defendant, Pharma Pac Wholesale Corp., to become a vendor for Distributor Defendant ProPharma.  Potter Decl. Ex. 300.  But Leader Defendant Mannava must have been reusing a previous version of the same form that he had filled out for CompaRx: he left the name "CompaRx" on one line of the paperwork after forgetting to replace it with Pharma Pac.  *Id.*   In short, the evidence is clear that Supplier Defendant CompaRx is a co-conspirator in the counterfeiting network at the heart of this case.  CompaRx's owner and principal is Defendant Yusniel Forcelledo Perez, who personally sold the counterfeits.  Potter Decl. Exs. 301, 302.

### 2.    CompaRx's Sales Directly to a Retail Pharmacy

Supplier Defendant CompaRx was incorporated in August 2020.  Coleman Decl. ¶ 97 & Ex. 143.  Two months later, from October 4 to October 11, 2021, it made a series of five shipments of counterfeit Gilead-branded HIV medication directly to Pharmacy Defendant Ascan, a retail pharmacy located in Queens.  In that ten-day period, Supplier Defendant CompaRx sold 149 bottles of counterfeit Gilead-branded medication for over half a million dollars.  *See* Potter Decl. Ex. 299.  All of those bottles had counterfeit and fraudulent pedigrees, and were advertised as being sold at significantly "below WAC" pricing.  Declaration of Susmitha Sunkara, dated July 28, 2022 ("Sunkara Decl.") at ¶ 17; Potter Decl. Ex. 303.

Through a subpoena to FedEx, Gilead has learned that Supplier Defendant CompaRx has continued to make shipments to Ascan Pharmacy through at least June 2022.  Potter Decl. Ex.

304. Although the FedEx records do not disclose the contents of those shipments, the history of Supplier Defendant CompaRx's sales of counterfeit Gilead-branded medications to Ascan Pharmacy, and its significant ties to the rest of the counterfeiting network, make it likely that the ongoing shipments contained more counterfeits.

In this motion, Gilead seeks a temporary restraining order and asset freeze order against Supplier Defendant CompaRx and Defendant Perez.

## VII.   THE RETAIL PHARMACY TURNED COUNTERFEIT SUPPLIER: VALUECARE PHARMACY AND ITS PRINCPAL, BAKHTIYAR NABIEV

Supplier Defendant Valuecare Pharmacy Inc. ("Valuecare") is unique in that, unlike the other Supplier Defendants, it has a brick-and-mortar location operating as a retail pharmacy in Queens.  Behind this pharmacy façade, Supplier Defendant Valuecare worked with the Leader Defendants to sell tens of thousands of dollars' worth of bottles of counterfeit Gilead-branded HIV medication to multiple other Supplier Defendants.  Valuecare has deep ties to the counterfeiting network, and was used by the conspiracy to move the counterfeits before it shuttered its doors several weeks before the filing of the instant motion.

### 1.   Valuecare's Sale of Counterfeit Gilead-Branded Medication

Supplier Defendant Valuecare was founded on March 8, 2010 by a third party, who on March 22, 2021 sold the pharmacy to its current owner and CEO, Defendant Bakhtiyar Nabiev. Coleman Decl. ¶ 99 & Exs. 144-45.  Shortly after Defendant Nabiev took control, Valuecare crossed the line from retail pharmacy to wholesale counterfeit distributor.  In April 2021 – just weeks after Defendant Nabiev took over – Supplier Defendant Valuecare sold several counterfeit Gilead-branded products to previously named Pharmacy Defendant Medicine Shoppe, all at prices far below WAC and with counterfeit and fraudulent pedigrees.  *See, e.g.*, Potter Decl. Ex. 305.

Two months later, in June 2021, Supplier Defendant Valuecare sold at least 25 bottles of counterfeit Gilead-branded medication to newly named Supplier Defendant My Meds at prices far below WAC.  Potter Decl. Exs. 306, 307, 308, 309.  Supplier Defendant My Meds then sold the counterfeits to Distributor Defendant Scripts.  Potter Decl. Ex. 310.  The counterfeit pedigrees for these bottles of counterfeit Gilead-branded HIV medications claimed that Supplier Defendant Valuecare purchased the medication directly from Gilead, which is of course completely false: Gilead sells to authorized wholesale distributors, and Valuecare is a small retail pharmacy in Queens.  Sunkara Decl. ¶¶ 14, 15.

## 2.    Valuecare's Ties to the Counterfeiting Conspiracy

Supplier Defendant Valuecare is deeply enmeshed in the counterfeiting ring at issue.  As with the other Supplier Defendants, its counterfeit sales were managed by Leader Defendants: in this case, Defendants Mannava and Ralhan.  Potter Decl. Ex. 306.

Text messages among various Defendants in this action also demonstrate that Supplier Defendant Valuecare is connected to, and at least in part controlled by, Defendant Peter Khaim. Defendant Khaim, who is currently under two separate indictments for health-care and pharmacy fraud, is the main principal behind Queens-based fly-by-night Supplier Defendant Boulevard 9229 LLC ("Boulevard").  As set forth in previous filings, Defendant Khaim and his co-conspirator, Defendant Abdullaev, are the principals of Supplier Defendant Boulevard.  *See* Aug. 19, 2021, Mem. (Dkt. No. 50-1) at 10-15.  Supplier Defendant Valuecare's owner, Defendant Nabiev, is Defendant Abdullaev's father-in- law.  Coleman Decl. ¶ 100.

Defendant Khaim, the principal of Supplier Defendant Boulevard, used at least two known phone numbers to sell counterfeit Gilead-branded medication for Boulevard.  First, Defendant Khaim used a cell phone with the number 646-247-1380 (the "1380 Number"), which Gilead seized from Defendant Khaim directly at his home.  Second, Defendant Khaim used the

cell number 646-678-7468 (the "7468 Number"), which among other things he used to communicate with Defendant Boyd, the co-owner of Distributor Defendant Safe Chain, about the sale of counterfeits from Supplier Defendant Boulevard – Mr. Boyd had the 7468 Number saved in his phone as "Peter Boulevard."  Declaration of Geoffrey Potter, dated August 18, 2021 ("8/18/21 Potter Decl.") Ex. 49, Dkt. No. 51-1.  However, other Defendants had those same Peter Khaim phone numbers saved in their phones under a pseudonym: "Alex Kim" from Valuecare Pharmacy.

For example, the owner of Pharmacy Defendant Medicine Shoppe, who purchased counterfeits from Supplier Defendant Valuecare in July 2021, had the 1380 Number saved in his phone as "Alex Valuecare Pharmacy."  Potter Decl. Exs. 311-312.  Pharmacy Defendant Medicine Shoppe texted "Alex" at the 1380 Number in July 2021 to attempt to purchase more counterfeit Gilead-branded HIV medication.  Potter Decl. Ex. 311.

Similarly, in July 2021 an employee of Distributor Defendant ProPharma texted the 7468 Number writing: "Alex Kim?  My name is Mark and I work with Levi at ProPharma, do I have the right number?"  Potter Decl. Ex. 313.  The supposed "Alex Kim" responded "Yes," and ProPharma expressed interest in purchasing medications from him.  *Id.*  Leader Defendant Mannava also had the 1380 Number saved in his phone as "Alex Kim – NY Wholesaler."  Potter Decl. Ex. 314.  In sum, the evidence shows that Defendant Khaim, the recidivist pharmaceutical fraudster and counterfeiter, used his various cell phones to sell counterfeits on behalf of Distributor Defendant Valuecare under the pseudonym "Alex Kim."

In this motion, Gilead seeks a temporary restraining order and asset freeze order against Distributor Defendant Valuecare and its owner, Defendant Nabiev.  Because Valuecare has

shuttered its doors and Defendant Nabiev appears to have left the country, Gilead does not seek an *ex parte* seizure against them.

## VIII.   THE NEW DISTRIBUTOR DEFENDANT: PROVEN PHARMACEUTICALS AND ITS PRINCIPAL, WILLIAM SCOTT WISE

To date, there have been three Distributor Defendants named in this action: Safe Chain (in partnership with Defendant Worldwide Pharma), ProPharma, and Scripts.  Unlike the fly-by-night Supplier Defendants, the Distributor Defendants are relatively established, brick-and-mortar businesses with offices, warehouse space, on-the-books employees, and licensure to sell into most of the United States.  Unlike the Supplier Defendants, which were shell companies created by the Kingpin Defendants for the purpose of selling counterfeits, the Distributor Defendants were all ongoing businesses before they were recruited into the counterfeiting conspiracy.  The counterfeiting conspiracy needed the Distributor Defendants to use their licensure, their business presence, and their relationships with pharmacists to push the counterfeits into the hands of their pharmacy customers.

From seized documents and information gained in discovery, Gilead has identified a fourth Distributor Defendant that sold large volumes of counterfeit Gilead-branded HIV medication: ProVen Pharmaceuticals, LLC ("ProVen"), located in Pennsylvania.  ProVen followed the same path as the other Distributor Defendants in the counterfeiting ring.  Distributor Defendant ProVen was an established business that became a counterfeiter when it conspired with the Leader Defendants to buy highly discounted, counterfeit Gilead-branded HIV medication and sell them to pharmacies.  And like the other Distributor Defendants, ProVen is responsible for putting these counterfeits into the hands of pharmacists, and ultimately patients, throughout the United States.

### 1. ProVen's Recruitment Into the Counterfeiting Conspiracy

Distributor Defendant ProVen was incorporated in Delaware in 2006 and is headquartered in Plymouth Meeting, Pennsylvania. Coleman Decl. ¶ 101 & Ex. 146. ProVen is properly registered as a pharmaceutical wholesaler with the FDA, with which it has listed its wholesale licensure in 44 states, including Pennsylvania, Florida, and New York. *Id.* ¶ 102 & Ex. 147. Defendant William Scott Wise is the owner, CEO, and president of ProVen and was the company's primary contact with regard to its purchase of counterfeit Gilead-branded medications. Coleman Decl. ¶ 103 & Ex. 146; Potter Decl. Exs. 315, 316.

From seized documents, Gilead has learned Distributor Defendant ProVen, through Defendant Wise, negotiated with Leader Defendant Rosell in August 2020 for what the emails called an "HIV Business Opportunity," with "WAC minus" pricing to be determined based on "what kind of volume can we put together." Potter Decl. Ex. 317. Leader Defendant Rosell and Defendant ProVen reached a deal later that same month. Potter Decl. Ex. 318-319. Leader Defendant Rosell went on to facilitate as broker Distributor Defendant ProVen's counterfeit HIV medications orders with various fly-by-night Supplier Defendants. *See* Potter Decl. Ex. 320-321.

Throughout the course of this relationship, Mr. Rosell and the other Leader Defendants connected Distributor Defendant ProVen to numerous fly-by-night counterfeit suppliers that Gilead has already named as Supplier Defendants: Gentek, Boulevard, Invicta, and RXWholesale. *See, e.g.*, Potter Decl. Ex. 322 (August 2020 ProVen customer and credit applications to Gentek); Potter Decl. Ex. 323 (May 2021 ProVen applications to Invicta); Potter Decl. Ex. 324 (June 2021 Invicta vendor application to ProVen); Potter Decl. Ex. 325 (August 2020 Boulevard 9229 LLC vendor application to ProVen); Potter Decl. Ex. 326 (August 2021 RX Wholesale vendor application to ProVen).

2.      **ProVen's Purchase of Counterfeits from Known Counterfeit Suppliers**

Seized documents show that Distributor Defendant ProVen purchased and then sold counterfeit Gilead medication from at least two fly-by-night suppliers: Supplier Defendants Boulevard and Invicta.  Among the documents seized from the Leader Defendants are copies of invoices and pedigrees showing that ProVen paid at least $53,757.00 to Invicta on June 16, 2021 for 18 bottles of Gilead-branded medication.  Potter Decl. Exs. 327, 328.  Unsurprisingly, the pedigrees for these bottles are counterfeit and fraudulent: they claim that Supplier Defendant Invicta purchased from Smith Drug Company, a Gilead authorized distributor, which has never sold anything to Invicta.  10/13/21 Sunkara Decl. ¶ 15; Potter Decl. Ex. 328 (pedigrees).

Subpoenaed bank records also show that Distributor Defendant ProVen also paid over $1.25 million to Supplier Defendant Boulevard (through the account for Defendant MFK Management, which Boulevard used to receive counterfeiting proceeds)[14] between September 10, 2020 and November 25, 2020.  Coleman Decl. ¶ 104 & Ex. 148.  The record shows that ProVen went on to sell those Gilead-branded medications to retail pharmacies.  *See, e.g.*, Potter Decl. Exs. 329, 330.  At least some of the pedigrees for those medications were among the documents Gilead seized from the Leader Defendants.  Unsurprisingly, they are all counterfeit and fraudulent.  Sunkara Decl. ¶ 16; Potter Decl. Ex. 331 (pedigrees).

Gilead currently only has access to Distributor Defendant ProVen's documents that were emailed to, and subsequently seized from, the Leader Defendants.  Given the incomplete record

---

[14] The alter ego relationship between Supplier Defendants Boulevard 9229 and MFK Management was discussed in more detail in Gilead's Ex Parte Memorandum of Law dated October 14, 2021 (Dkt. No. 150-1) at 16-17.

available to Gilead, it is extremely likely that Distributor Defendant ProVen's sales of purported Gilead-branded medication are significantly greater than set forth above.

In this motion, Gilead seeks a temporary restraining order and asset freeze against Distributor Defendant ProVen and its owner, Defendant Wise.

## IX.    THE NEW PHARMACY DEFENDANTS

The ultimate goal of the counterfeiting conspiracy was to sell as many counterfeit Gilead-branded HIV medications as possible to pharmacies, and ultimately to patients, creating vast profits for the conspiracy and creating more demand for their counterfeits.  Purchasing and selling counterfeits is a strict-liability offense, and the pharmacies who purchased and dispensed the counterfeits are liable under the Lanham Act (as well as federal criminal law).  In previous applications, Gilead has added five Pharmacy Defendants who were especially bad actors, willfully continuing to purchase the counterfeits in large volume after being warned that they were counterfeits with falsified pedigrees.  Plaintiffs' Mem. of Law, dated August 19, 2021 at 42; Plaintiffs' Mem. of Law, dated October 14, 2021 at 28.

Gilead here seeks injunctive relief against two new Pharmacy Defendants: Laconia Avenue Pharmacy Corp. ("Laconia"), and Everything Pharmacy Related II Inc., which does business as Total Remedy Pharmacy ("Total Remedy").  Both pharmacies were caught very recently dispensing counterfeits.  Just over a week before the date of this motion, a patient reported that Laconia Pharmacy dispensed him counterfeit Gilead-branded HIV medication with the wrong pills in the bottle.  And Total Remedy is a willful, long-term, high-volume purchaser of Gilead counterfeit medications that was continuing to actively buy counterfeits at least within the past several weeks, if not more recently.

A.   **Pharmacy Defendant Laconia Avenue Pharmacy Corp. and its Principal, Stanislaus Mgbeojirikwe**

Pharmacy Defendant Laconia is a brick-and-mortar pharmacy located in the Bronx, New York.  Coleman Declaration Ex. 150.  Defendant Stanislaus Mgbeojirikwe is a principal of Laconia Avenue Pharmacy Corp.: he is listed in Laconia's New York State Pharmacy Establishment profile as its supervising pharmacist.  Coleman Declaration Ex. 151.

1.   **Laconia's Very Recent Sale of Counterfeit Gilead-Branded HIV Medication with the Wrong Pills in the Bottle**

On July 20, 2022 – i.e, nine days from the filing date of the instant motion – a patient contacted Gilead to report that Pharmacy Defendant Laconia dispensed him counterfeit HIV medication.  Sunkara Decl. ¶¶ 4-5.  This patient said that Pharmacy Defendant Laconia had delivered him a sealed bottle of GENVOYA®, and that he had consumed one of the pills inside before he noticed the pills appeared wrong.  *Id.*  The patient had been taking GENVOYA® for years, and knew that authentic GENVOYA® pills are green and embossed with the phrase "GSI," but the pills inside this bottle were blue, and embossed with the word "GILEAD."  *Id.*  The patient further reported that the pills "smelled like paint" and the bottle was stained blue on the inside.  *Id.*  And rather than the polyester fiber coil contained in legitimate bottles of GENVOYA® to prevent pill breakage, the bottle delivered to the patient contained a cotton pad. *Id.* ¶ 7.  The patient delivered the bottle and some of the pills to Gilead, and upon initial inspection Gilead noted that part of the blue coloring had scraped off one of the pills, and that bottle came with a cardboard circle cut out to fit the bottom of the interior of the bottle, which was stained blue.  *Id.* ¶ 11.  Authentic bottles do not contain such a cardboard circle, or anything like it. *Id.*

 

GENVOYA® is a combination medication containing four active ingredients. *Id.* ¶ 4. It is approved as one-pill, once-a-day full HIV treatment regimen for adults. *Id.* ¶ 4. The blue pills inside the bottle are generally consistent with a different Gilead-branded HIV medication, TRUVADA®. *Id.* ¶ 6. TRUVADA® contains one of the four active ingredients in GENVOYA®, and is only indicated for treatment of HIV in adults when taken in combination with other HIV medications. *Id.* Gilead has sent the counterfeit sample for testing, which has not yet completed. *Id.* ¶ 11.

The reporting patient stated that he was a new customer of Laconia, and that he had been paid a $50 VISA gift card for transferring his prescription to Laconia. *Id.* ¶ 9. The patient stated that the counterfeit GENVOYA® had been delivered on behalf of the pharmacy by a driver. *Id.* ¶ 10 The patient later provided a screenshot of a text message in which that driver stated, "I am trying to explain to you the problem that has happened." *Id.* The patient stated that the driver offered no explanation other than that there was a "mixup." *Id.*

### 2. Laconia Refuses to Identify Its Source and Refuses to Cooperate with Gilead

A Gilead represented contacted Laconia Pharmacy to discuss the patient's report. *Id.* ¶ 12. The pharmacy claimed it had opened only two months prior, in May 2022. *Id.* The pharmacy confirmed it had dispensed a bottle of GENVOYA® to the patient, and stated that it had purchased GENVOYA® from multiple sources, including from another pharmacy that had gone out of business. *Id.* Laconia Pharmacy refused to identify the supposed out-of-business

pharmacy that had sold it GENVOYA®, refused to provide the pedigree information for the counterfeit bottle it dispensed, and hung up the phone. *Id.* ¶ 13. Laconia Pharmacy's refusal to provide that information was unlawful: as noted above, the DSCSA requires pharmacies and suppliers to provide pedigree information when there is a report of even a suspected counterfeit medication or falsified pedigree. *See supra* Facts Part II.D. More generally, an unknowing victim of counterfeiting, one trying to do the right thing, does not simply hang up the phone when it receives a report that it sold counterfeit HIV medication with the wrong pills inside to one of its patients.

The evidence strongly indicates that Laconia is a willful counterfeiter: its concealment of its supplier and its refusal to cooperate with Gilead; the reported kickback scheme in which Pharmacy Defendant Laconia pays cash cards to patients to fill their HIV prescriptions at the pharmacy; and the sketchy behavior of its delivery driver after the patient noticed the counterfeit pills. Moreover, Pharmacy Defendant claimed to have been open for only two months, but corporate records show the company itself has been in existence for over five years – so either Laconia lied, or it very recently changed ownership to someone willing to sell counterfeit HIV medication. Gilead has every reason to believe that Pharmacy Defendant Laconia is continuing to dispense counterfeit HIV medication to patients.

Given the evidence of Laconia's willful counterfeiting and the fact that it very recently dispensed a bottle of HIV medication with the wrong pills inside, Gilead seeks an *ex parte* seizure at the pharmacy, as well as a temporary restraining order and asset freeze against Pharmacy Defendant Laconia and its principal, Defendant Mgbeojirikwe.

### B.      Pharmacy Defendant Total Remedy Its Principal, Mohammad Etminan

Pharmacy Defendant Total Remedy is a brick-and-mortar retail pharmacy in Los Angeles owned by Defendant Mohammad Etminan.  Coleman Decl. ¶¶ 105-06 & Ex. 149.  Total Remedy willfully purchased an enormous volume of counterfeits despite many, many warnings from Gilead and others, and was continuing to do so at least as of several weeks ago.

### 1.      Total Remedy's Willful, High-Volume Counterfeit Purchases

Seized documents show that from April 2020 to August 2021, Pharmacy Defendant Total Remedy purchased a staggering volume of counterfeit Gilead-branded medications from each of the three previously named Distributor Defendants: 818 bottles from Safe Chain for approximately $2 million; 1,152 bottles from ProPharma for approximately $3.1 million; and 6,636 bottles from Scripts, in Brooklyn, for $18.4 million.  Potter Decl. Exs. 332, 333, 334.  In total, over the course of eleven months this single retail pharmacy purchased over **$15 million** in counterfeit Gilead-branded medication, all of it accompanied by counterfeit and fraudulent pedigrees.  Total Remedy is a single-location retail pharmacy.  Even putting aside the fact that it was purchasing counterfeits, the volume of Pharmacy Defendant Total Remedy's purchases of HIV medication is highly suspicious.

It is beyond reasonable dispute that Pharmacy Defendant Total Remedy's counterfeiting is willful.  Over the past year and a half Total Remedy has received a number of separate formal warnings about the counterfeits it purchased:  each time Gilead executed a Seizure Order and seized counterfeits from the Supplier Defendants that were selling counterfeits to Total Remedy – first Distributor Defendants Safe Chain, then ProPharma, and most recently Scripts – Gilead sent Total Remedy a warning letter about the counterfeits and the dangers of buying on the so-called secondary market, and asking Total Remedy to quarantine any bottles it had left in stock.

76

Potter Decl. Exs. 335, 336, 337.  Finally, Distributor Defendant ProPharma itself warned Pharmacy Defendant Total Remedy about the counterfeits by issuing a voluntary recall of the HIV medications it had sold to Total Remedy after Gilead's seizure.  Potter Decl. Ex. 338.

### 2.    Total Remedy's Continued Purchase of Counterfeits In Recent Weeks

Pharmacy Defendant Total Remedy was not deterred by those warnings.  It was also not deterred by the fact that this Court disrupted its supply chain by shutting down the Distributor Defendants' counterfeiting operations.  Instead, Pharmacy Defendant Total Remedy escalated its counterfeiting by simply cutting out the middlemen: it bypassed the distributors entirely, and began buying counterfeits directly from one of the upstream fly-by-night Supplier Defendants. As discussed above, *see supra* Facts Part VI.A.2, Pharmacy Defendant Total Remedy's latest counterfeit supplier is Supplier Defendant Pharma Pac LLC, which is a new entity formed in the mold of previously named Supplier Defendant Pharma Pac Wholesale Corp.  In the first half of 2022 alone, Total Remedy purchased at least 1,636 bottles of counterfeit Gilead-branded medication from Supplier Defendant Pharma Pac LLC, paying over $6.9 million.  Coleman Decl. ¶ 105 Ex. Potter Decl. Ex. 298, 368.  As with every other bottle of Gilead-branded medication that Total Remedy bought from the Defendants in this action, those bottles were accompanied by counterfeit and fraudulent pedigrees.  2/11/22 Sunkara Decl. ¶ 9, *supra* Facts Part VI.A.2.

Given Pharmacy Defendant Total Remedy's pattern of willful, high-volume counterfeiting that continued after all its counterfeit suppliers were enjoined by this Court, in this action Gilead seeks a temporary restraining order and asset freeze against Total Remedy and its principal, Defendant Etminan.

## X.      THE STREET-LEVEL COLLECTOR DEFENDANTS

The counterfeits sold by the counterfeiting ring at issue appear to always or almost always be sold in what were once original, authentic, Gilead-manufactured bottles.  Some of those original bottles had been emptied, filled with foreign medication, and then resealed with a counterfeit replica of Gilead's tamper-evident foil seal.  Plaintiffs' Mem. of Law, dated October 14, 2021 at 6.  Others appear to be original and sealed bottles paired with counterfeit patient instructions for use, counterfeit bottle caps, counterfeit labels, and/or counterfeit pedigrees.  In short, the evidence shows that the conspiracy's supply of the counterfeits begins with the collection of very large volumes of authentic Gilead bottles.

As Gilead has set forth in prior filings, and as the government stated in its prosecution of Kingpin Defendant Hernandez, the evidence shows that the counterfeiting conspiracy obtained most of these bottles on the street, by purchasing already-dispensed bottles (whether empty or full) of Gilead-branded HIV medication directly from the individuals for whom it was prescribed and dispensed.  *See* Plaintiffs' Mem. of Law, dated October 14, 2021 at 5; *see also* Coleman Decl. Ex. 89 at 3.  The criminals running these cash-for-bottles schemes prey on especially vulnerable individuals living with HIV, such as those experiencing homelessness or using drugs, who receive their HIV medication for free.  Purchasing medication from patients has a devastating effect on those individuals, who do not receive the medication they need to take daily to manage their disease, as well as on the community, because individuals living with HIV who do not regularly take their prescribed medication are more likely to infect others.

Through seized documents and other information gained through discovery, Gilead has identified newly named "Collector Defendants" who were involved in the scheme to buy already-dispensed bottles of Gilead-branded medication back from patients for cash.  In this

78

motion, Gilead seeks *ex parte* seizures and other relief against two Collector Defendants who spearheaded such patient buy-back efforts in New York City.

Gilead identified the Collector Defendants largely through party discovery, and specifically from text messages produced by previously named Defendant Daniel Gelbinovich. Gilead originally named Defendant Gelbinovich as a principal of fly-by-night counterfeit Supplier Defendant RxWholesale.  Defendant Gelbinovich also operated several independent pharmacies in New York City.  At the time it named Defendant Gelbinovich, Gilead did not know that he used those pharmacies to spearhead a major patient buy-back operation for HIV medication, and thus was ultimately the source of many of the counterfeits sold in this action. Defendant Gelbinovich is already the subject of injunctive relief ordered by this Court.  Gilead now seeks asset freezes and seizure orders against two of Defendant Gelbinovich's operators who were responsible for buying bottles back from individuals living with HIV on the street, cleaning and repackaging these bottles for illegal resale, and creating the counterfeit pedigrees necessary to conceal their illegal provenance and sell them on the gray market.

### A.  Collector Defendant Nicole Aston, the Street-Level Buyer

Nicole Alston, who also goes by Nikki, is a resident of the Bronx employed by Mr. Gelbinovich to buy HIV medications back directly from patients.  Ms. Alston and Mr. Gelbinovich referred openly to individuals living with HIV patients who sold back their medications on the street as "buybacks," sometimes using the abbreviation "bbs."  *See, e.g.*, Potter Decl. Ex. 339 (Mr. Gelbinovich: "Ok – need a list of all bb[]s."  Ms. Alston: "[patient name] is a buyback."); Potter Decl. Ex. 340 ("I forgot you owe me $500 for client last name [providing name].  I'll let you know on Sunday if you need to order [different patient name] it might be a buy back.").  Ms. Alston was well aware that these patients living with HIV desperately needed the medications she was repurchasing from them, and simply laughed at their

plight: "Everybody is good **lol I told you money talks with these people they don't care about their health lol sorry to say. they rushing me to go sell it**."  Potter Decl. Ex. 341 (emphasis added).

Ms. Alston took direction from Mr. Gelbinovich as to which HIV medications to buy back from patients, and received cash from him to make the purchases.  *See, e.g.*, Potter Decl. Ex. 342 (Ms. Alston: "I have a guy coming with some inventory.  I need some cash."  Mr. Gelbinovich: "Can you get 2 [Gen]voyas"); Potter Decl. Ex. 343 (Ms. Alston: "How many gvoya [Genvoya] do you need[.] i have one bvtary [Biktarvy] and one gvoya already."  Mr. Gelbinovich: "Yea get another.  And 1 more bik [Biktarvy] if you can."); Potter Decl. Ex. 344 (Ms. Alston sending pictures of ten assorted loose bottles of Gilead-branded HIV medication and saying "We need to grab the bik"); Potter Decl. Ex. 345 (Ms. Alston: "I'm picking up 4 biks." Mr. Gelbinovich: "Nice."  Ms. Alston: "Send a Zelle [*i.e.,* send cash through the Zelle app] please.").

Ms. Alston at least in part requested and received payment for in the form of luxury handbags and luggage.  *See, e.g.*, Potter Decl. Ex. 346 (Mr. Gelbinovich texting an order confirmation for Ms. Alston to pick up at the Louis Vuitton store in Manhattan); Potter Decl. Ex. 339 (Ms. Alston texting pictures of luxury handbags to Mr. Gelbinovich).

Ms. Alston was aware of the illegal nature of her operation.  For example, in November 2020 she texted to Mr. Gelbinovich: "You need to call me ASAP.  Jeff [another Collector Defendant] is calling me and everybody else.  People are talking about calling the cops and shit you need to answer the phone."  Potter Decl. Ex. 347.

### B.   Collector Defendant Boris Abramov, the Buy-Back Coordinator, and His Company, Hashem Yitbarach LLC

Collector Defendant Boris Abramov was a higher-level organizer and supervisor in Mr. Gelbinovich's buy-back operation.  Mr. Abramov kept track of demand and directed and approved the purchases by the street-level criminals buying back from HIV patients.  Mr. Abramov also paid his team to "clean" the bottles to remove patient labeling and signs of wear.  Finally, Mr. Abramov helped create the counterfeit and fraudulent pedigrees that accompanied the counterfeit bottles, and interfaced with the Distributor Defendants who were buying the counterfeits and selling them to pharmacies.

### 1.   Mr. Abramov's Illegal Patient Buy-Back Operation

Mr. Abramov's team of street-level collectors included newly named Defendants Nicole Alston (described above), Jeffrey Peterson, and Brennan Page, as well as others Gilead has not yet been able to identify.  These collectors would typically write on scraps of paper the drugs they were able to buy back from patients on any given day and seek Mr. Abramov's approval to make the purchases.  For example, in early January 2021, Mr. Abramov texted the following photograph to Mr. Gelbinovich, with the note, "From Misha.  You wan to get?  Triu[meq] doesn't move so well."



Potter Decl. Ex. 348.  The price for the Gilead-branded HIV medication listed on the note, DESCOVY®, for $250 a bottle is approximately 90% off the WAC price for the medication, and

reflects the price of obtaining the drug from a street-level buy-back. (The other two medications listed on the note are other manufacturers' HIV medications.)  *See also, e.g.*, Potter Decl. Ex. 349 (Mr. Abramov sending a picture of a similar handwritten note listing small quantities of Gilead-branded HIV medications, and Mr. Gelbinovich responding, "Tell Page to bring.  I'll pay."); Potter Decl. Ex. 350 (Mr. Abramov stating, "Vika is going to write down now," sending a similar picture of a handwritten note listing small quantities of Gilead-branded medications).

Mr. Abramov, working with Mr. Gelbinovich, kept these loose bottles repurchased from patients concealed in safes, presumably at Mr. Gelbinovich's pharmacies.  For example, on January 19, 2021, Mr. Abramov wrote to Mr. Gelbinovich that he had to fill an order for, among other drugs, "1 bik[tarvy] 1 gen[voya] 1 des[covy]."  Potter Decl. Ex. 351.  Mr. Gelbinovich wrote back: "do we have any of that from Nicole [Alston?]  You said Nicole bought."  Mr. Abramov responded that she had purchased "1 bik[tarvy] 1 sym[tuza]," and asked "What's her number?  I mean safe number.  Code f[or] safe."  *Id.*  After clarifying that Mr. Abramov meant "the big safe," Mr. Gelbinovich provided him the combination to open it.  *Id.*

However, on at least some occasions, Mr. Abramov had the illegally repurchased drugs brought to his home, and simply stored them there.  For example, after sending another photograph showing a handwritten list of small amounts of Gilead HIV medication, including BIKTARVY, Mr. Abramov asked Mr. Gelbinovich: "I have biks at home. Want me to take ours or you wanna get from him."  Potter Decl. Ex. 352.  Mr. Gelbinovich responded: "Please tell him to bring everything expect [sic] the Biks."  *Id.*  In another instance, Mr. Abramov wrote to Mr. Gelbinovich about another street-level collector: "I'm pushing him bro.  He's more cautious than I am.  He says yes and then no.  I'm trying my best."  Potter Decl. Ex. 353.  Mr. Abramov apparently succeeded in his efforts, because he soon followed by saying, "He brought more stuff

in," sending the following picture of 27 bottles of BIKTARVY, laid out on what appears to be

Mr. Abramov's bedspread.



*Id.*

### 2.    Mr. Abramov's Conspiring With the Distributor Defendants Who Purchased the Counterfeits.

Mr. Abramov also had direct contact with at least one of the Distributor Defendants that

sold the counterfeits he was helping create.  For example, on July 29, 2021, Mr. Abramov texted

Mr. Gelbinovich:  "I'll see soon, **let me finish here at scripts**.  lots to do." Potter Decl. Ex. 354

(emphasis added).  A few hours later, he texted a picture of a shelf full of loose bottles of

TRUVADA, a Gilead HIV medication, from the Scripts warehouse:



*Id.* Seeing the full stock of TRUVADA at Scripts, Mr. Gelbinovich texted back: "OK, so no Truvada?" – meaning they should forego buying more of that that particular medication back from patients. *Id.* Mr. Abramov responded, "I'm gonna ask scripts but my opinion is it won't move." *Id.*; *see also* Potter Decl. Ex. 355 ("Are we selling [t]o scripts at 20% of wac…?").

### 3.    Cleaning the Bottles and Creating the Counterfeit Pedigrees

Mr. Abramov's illegal operation had to deal with a problem inherent to street-level buy-backs: bottles that have been dispensed to patients rarely look like new bottles purchased from an authorized distributor. Gilead's HIV medications must be dispensed to patients in their original manufacturer's bottle, not a generic pharmacy bottle, and so patient stickers with the prescriber's instructions are often placed directly over the label of the original bottle. The bottles also have FDA-required patient instructions folded and glued directly to the side of the bottle, which can become damaged or dislodged, leaving visible glue dots. And like any bottle of medication, the bottles that Mr. Abramov and his co-conspirators were purchasing off the street can be scuffed and show other signs of wear after being handled by a patient. Mr. Abramov therefore supervised the process of removing patient labels, scraping off residue, and generally cleaning

the bottles of medication he illegally purchased from patients. *See, e.g.*, Potter Decl. Ex. 356 ("Also I've been paying workers to clean the bottles. It's averaging 800-1000 so far[.] Almost done cleaning"); Potter Decl. Ex. 357 ("Bottles are cleaned. Now gotta scan them all in."); Potter Decl. Ex. 358 (voicemail from Mr. Gelbinovich to Mr. Abramov: "The buyers are talking to me about making sure the product is handled better. So you and I will work on that. Just like make sure that it's handled better, like no sticky stuff, et cetera, et cetera.").

Once the illegally repurchased bottles were cleaned, they needed to be paired with counterfeit pedigrees that fraudulently misrepresented that the drugs were legitimately purchased from Gilead. (The pedigrees could not, of course, state the truth: that the drugs had been illegally repurchased from patients.) Mr. Abramov was directly involved in the creation of those counterfeit and fraudulent pedigrees. For example, during one of his visits to Scripts, Mr. Abramov texted Mr. Gelbinovich: "Lol I'll stall. There is gonna to be a lot of editing [to the pedigrees] so it'll take me sometime…. Bro he's asking me to take off the closed pharmacy on the pedigree. He wants abc to rxwholesale to scripts. . . . But how are we supposed to write that." Potter Decl. Ex. 359. Although Mr. Abramov did not name the individual at Scripts who was making these demands, he did state "I'm with his guys in his office," suggesting he was dealing directly with Scripts' owner, Mr. Diamantstein. *Id.*; *see also* Potter Decl. Ex. 360 (discussing difficulties drafting pedigrees).

### 4.      Mr. Abramov's Attempts to Conceal His Role and Avoid Getting Caught

Collector Defendant Abramov was well aware of the illegal nature of his scheme and took steps to avoid getting caught. For example, he told Mr. Gelbinovich, "I can't keep using my cell for all this business stuff," and discussed with Mr. Gelbinovich that "we gotta keep changing our number every month or so," and so agreed to buy himself and Mr. Gelbinovich

burner phones using "[c]ash only in a small bodega place." Potter Decl. Ex. 361. Moreover, in an effort to create a legitimate paper trail for some drugs in the event they were caught, Mr. Abramov would occasionally purchase HIV medication from distributors, as opposed to from patients. For example, on December 22, 2020, Mr. Abramov sent another picture of a handwritten list of Gilead medications, to which Supplier Defendant RXWholesale's Principal Mr. Gelbinovich responded: "OK, so you only need the G[envoya] and T[ruvada] today," and instructed Mr. Gelbinovich to "[o]rder the T legit[.] See if Safe chain has." Potter Decl. Ex. 353. The unspoken message is that the rest of the HIV medications would not be ordered "legit," but rather illegally acquired on the street.

### 5.   Mr. Abramov's Company, Hashem Yitbarach LLC

In January 2021, when he was actively involved in the illegal buy-back operation, Mr. Abramov organized a company called Hashem Yitbarach LLC in New York, listing himself as the sole officer and organizer of the entity. Coleman Decl. Ex. 152. "Hashem yitbarach" is a religious phrase that Messrs. Abramov and Gelbinovich often used to greet each other in their texts. *See, e.g.*, Potter Decl. Ex. 354.

Collector Defendant Abramov directed Mr. Gelbinovich to make payments to him via Hashem Yitbarach LLC's bank account. Potter Decl. Ex. 362. That same account also received payments from co-conspirators Scripts and from Our Town Pharmacy, which is owned by Daniel Gelbinovich, who was previously named as a defendant in this action. In addition to seeking a temporary restraining order, asset freeze, and seizure order against Mr. Abramov, Gilead also seeks an asset freeze against Hashem Yitbarach LLC, through which Mr. Abramov received the counterfeiting proceeds.

XI. **THE ASSET HOLDER DEFENDANTS: MONEY LAUNDERERS WHO RECEIVED THE COUNTERFEITING PROFITS FROM THE SUPPLIER DEFENDANTS**

One of the essential operations of the counterfeiting conspiracy is its sophisticated, wide-ranging money-laundering apparatus. At the end of the day, counterfeiting is a crime of money. The counterfeiting conspiracy at issue could not function without the means to distribute its illicit proceeds to those at the top, without giving away their roles in the scheme, as well as to fund the scheme's day-to-day operations. As noted above, core members of the conspiracy are experienced and either convicted or indicted money launderers: Leader Defendant Levitan spent fourteen years in prison for money laundering; Kingpin Defendant Hernandez has been indicted in multiple conspiracies on several money-laundering counts, including related to his sale of Gilead-branded HIV medication; and Defendant Peter Khaim, who is behind Supplier Defendant Boulevard and Supplier Defendant Valuecare, is currently under two separate indictments for pharmacy fraud, both of which involve multiple counts of money laundering. Coleman Decl. Exs. 89, 93, 96, 100, 103.

When a counterfeit is sold to a pharmacy, the proceeds of that counterfeit sale flow upwards through the counterfeiting ring. The pharmacy pays the Distributor Defendant who sold it the counterfeit. The Distributor Defendant earns a net profit on the sale, and splits some of that loot with the Leader Defendants and Marketer Defendants who facilitated the transaction. There are enormous illicit profits earned on these counterfeit sales, and in the end everyone walks away with millions in counterfeiting profits. But the bulk of the revenue that the Distributor Defendant receives from the pharmacy goes straight to the Supplier Defendant who provided the bottle to the Distributor Defendant in the first place. The majority of the money earned by the counterfeiting ring thus flows up to the Supplier Defendants.

87

But the Supplier Defendants are fly-by-night entities, controlled from the shadows by the Kingpin Defendants.  And so the hundreds of millions of dollars that the various Supplier Defendants earned from their counterfeit sales were almost immediately laundered through a dizzying array of shell companies, gold and jewelry stores, casinos, and more.  Those at the top of the conspiracy went to great lengths to keep their names off of the money trail: as noted above, government prosecutors revealed that Kingpin Defendant Hernandez not only hired associates to create the money-laundering shell entities, but he also paid an associate to withdraw cash from the money-laundering entities' accounts and hand-deliver it to him.

In its most recent motion for a seizure order and other *ex parte* relief, Gilead identified a handful of Asset Holder Defendants: shell companies that received vast sums of counterfeiting proceeds directly from certain Supplier Defendants.  This Court granted an asset freeze order against those Asset Holder Defendants.  Dkt. No. 512.  After receiving additional information from seized documents, subpoenaed bank records, and its ongoing independent investigation, Gilead now names several additional Asset Holder Defendants that the evidence clearly shows are knowing members of the conspiracy's money-laundering operation.  As with the previous Asset Holder Defendants, Gilead seeks an asset freeze order to shut down these money launderers' operations and recover any illicit proceeds they have retained.

## A.    The Colombian Cellphone Money Launderers

At least **five** of the fly-by-night counterfeit Supplier Defendants in this action laundered tens of millions of dollars through a series of companies as part of a scheme to use their illegal profits to purchase cell phones in bulk and sell those phones into Colombia for cash.  Some of the money laundering entities used in this scheme are already under indictment for laundering the illicit proceeds of Supplier Defendant Gentek.  *See* Coleman Decl. Ex. 104.  As described in

the indictment, the cellphone scheme allows the money launderers to avoid the international money transmitting regulations and oversight that would be triggered if the illicit proceeds had been sent directly overseas.  *See id.*

First, Defendant Vibe Enterprise, Inc. ("Vibe")[15] is a shell company currently under indictment for its role in the cellphone money-laundering scheme.  Supplier Defendant Gentek made 79 payments totaling over **$17.5 million** between June 2020 and January 2021 to Vibe. Coleman Decl. App'x A.  Supplier Defendants Boulevard and My Meds (through a shell entity) also made smaller payments to Vibe.  *Id.*  Vibe's principal and registered agent, Defendant Ronald Vidaurre, is also named in the indictment.  Coleman Decl. Ex. 104.  The indictment specifies that Mr. Vidaurre owned and operated Vibe, used it to receive millions upon millions of dollars from Gentek and others for no consideration, used those illicit proceeds to purchase cell phones and other goods, and then exported those products to entities in Colombia, who received them for no consideration.  *Id.* at 3-4.  In short, Mr. Vidaurre was key to funneling money from Supplier Defendant Gentek and other suppliers out of the United States and into Colombia, primarily through the purchase and resale of cellular telephones.  *Id.*

Mr. Vidaurre also established and operated Defendant Sofitel Trading Corp ("Sofitel"), another shell company under indictment for its role in the cellphone money-laundering scheme. *Id.*  Sofitel received over $100,000 from Supplier Defendant Abacus.  Coleman Decl. App'x A. Mr. Vidaurre used those funds from Abacus, as well as additional funds funneled through Vibe, to run the money laundering scheme.  Coleman Decl. Ex. 104 at 3-4.

---

[15] Newly named Asset Holder Defendants' names are underscored when first mentioned.

Defendant Skyline World Group Inc. ("Skyline") is yet another shell company used in the scheme.  Skyline received over $2.25 million from Supplier Defendant Gentek and over $1.75 million from Supplier Defendant Omom.  Coleman Decl. App'x A.  Skyline's principal and registered agent is Defendant Francy Bedoya, who was indicted for her role in the money-laundering scheme.  Coleman Decl. ¶ 119 & Ex. 104.  As set forth in the indictment, Ms. Bedoya worked with Mr. Vidaurre, Vibe, and Sofitel to illegally obfuscate the transfer of funds from the United States and elsewhere to Colombia.  Coleman Decl. Ex. 104 at 3-4.  Ms. Bedoya incorporated Skyline, opened bank accounts on its behalf, and used those accounts as part of the illegal money transmitting scheme.  *Id.* at 6-7.  Ms. Bedoya and Mr. Vidaurre used Skyline to add an additional layer between incoming transfers and cell phone purchases, often moving funds from Skyline to Vibe or Sofitel shortly after it was received.  *Id.* at 7.

Finally, Defendant Elite Distribution Inc ("Elite") received over $5 million from Supplier Defendant Gentek, and proceeded to funnel over $1.6 million of those counterfeiting proceeds into Asset Holder Defendant Vibe.  Coleman Decl. App'x A.  Elite's registered agent, Defendant Maria Bedoya, is a relative of Defendant Francy Bedoya.  *Id.* ¶ 120.  As with Skyine, the Bedoyas used Elite to wash funds and add another layer of shell companies between the counterfeiters paying into the cellphone scheme (e.g., Gentek) and the cell phones used as a vehicle to move funds to Colombia.

In sum, the Asset Holder Defendants involved in the cellphone scheme knowingly and intentionally laundered counterfeiting proceeds from at least **five** different Supplier Defendants (Gentek, Omom, Abacus, My Meds, and Boulevard) in this action.  The evidence shows that these defendants – Vibe, Sofitel, Skyline, Elite, and their respective principals, Ronald Vidaurre,

Francy Bedoya, and Maria Bedoya – are knowing members of the counterfeiting conspiracy, and Gilead therefore seeks an asset freeze order against them.

### B.     The Kessler and Aminov Money Launderers

Defendants Sam Kessler and Avi Kessler are New York-based brothers who share an address in Far Rockaway, have deep ties to the counterfeiting network, and used their precious-metals companies and other shell companies to launder the counterfeiting proceeds of several Supplier Defendants in this action.  At least four of these fly-by-night Supplier Defendants, all created for the sole purpose of selling counterfeit HIV medication, sent millions of dollars in counterfeiting profits to gold dealers owned by the Kessler brothers.

Avi Kessler owns and operates two gold and precious metal shops in New York City. The first, Defendant The Precious Metals Group Inc. ("Precious Metals"), received over **$3.1 million** directly from **four different** Supplier Defendants in this case: Valuecare, MFK Management, Boulevard 9229, and Make it Happen Marketing.  Coleman Decl. App'x B.  With the exception of a highly suspicious amount of cash deposits, those transfers of counterfeiting profits from the Supplier Defendants dwarf Precious Metals' other receipts during the time period (between February and July 2021).  *Id.* App'x B.

The second of Avi Kessler's precious-metals businesses, Madison Bullion LLC ("Madison Bullion").  Madison Bullion received over $700,000 from Supplier Defendant Make It Happen Marketing and $222,781.12 from Supplier Defendant Valuecare.  *Id.* App'x B.

Some of the funds laundered through Precious Metals were first laundered by Avi's brother, Sam Kessler, through his shell company Green Capital Investors LLC ("Green Capital").  Seized text messages reference an in-person meeting between Supplier Defendant Quan Hernandez, the principal of Supplier Defendant Make It Happen Marketing, and Sam Kessler.  Potter Decl. Ex. 363.  Although they were careful not to reveal the contents of their

conversation in writing, the text ended with Sam Kessler sending the wire information for Green Capital.  *Id.*  Between May and August 2021, Green Capital received a total of over $1.1 million from both Supplier Defendant Make It Happen Marketing and Supplier Defendant Valuecare. Coleman Decl. App'x B.  That $1.1 million represented approximately 40% of Green Capital's total receipts from any source over its three-year account history.  *Id.*  During approximately the same time period, Green Capital funneled that money over to Precious Metals.  *Id.*

The final step in this money-laundering scheme was to wire the counterfeiting proceeds from Precious Metals (including its infusion of cash from Green Capital) and Madison Bullion to a fourth company, Defendant Gold Tower Refinery Inc. ("Gold Tower").  Between February and August 2021, Precious Metals wired Gold Tower over $6.8 million, most of which represented counterfeiting proceeds from the four Supplier Defendants who laundered through Precious Metals.  And for its part, Madison Bullion transferred over $1 million to Gold Tower between July and November 2021.  Coleman Decl. App'x B.

Gold Tower is owned and operated by Defendant Igor Aminov, who also has ties to the counterfeiting ring.  First, Igor Aminov is a business associate of Defendant Peter Khaim, the owner of Supplier Defendants Boulevard and MFK Management.  A series of insurance companies have brought a civil RICO suit against Igor Aminov and Peter Khaim, alleging them to be co-conspirator fraudsters.[16]  Moreover, public databases suggest Igor Aminov is related to Koyen Aminon, the owner of the now-closed Amsterdam Wellness Pharmacy, Inc. (named for its location on Amsterdam Avenue in Manhattan).  Amsterdam Wellness Pharmacy was used as a front to whitewash counterfeits: thousands of bottles of counterfeit Gilead-branded HIV

---

[16] Amended Complaint, *State Farm Mutual Automobile Insurance Company v. 21st Century Pharmacy, Inc.*, 17-cv-05845 (E.D.N.Y. July 23, 2019) (Dkt. Nos. 132-133).

medication were sold with fraudulent pedigrees falsely claiming that Amsterdam Wellness Pharmacy had purchased the bottles from authorized distributer AmerisourceBergen.  8/17/21 Sunkara Decl. ¶ 17.

In sum, the evidence shows that Avi Kessler, Sam Kessler, and Igor Aminov were knowing participants in, and managers of, the counterfeiting conspiracy.  They intentionally used their respective companies – Precious Metals, Madison Bullion, Green Capital, and Gold Tower – to obfuscate and launder illicit counterfeiting proceeds from a half-dozen Defendants in this action.  Gilead seeks an asset freeze order against these companies and their principals.

### C.    The Abacus Money-Laundering Network

Newly named Supplier Defendant Abacus is another fly-by-night counterfeiter that was formed to sell counterfeit HIV medication, made tens of millions doing so, and then closed its doors after the FDA Office of Criminal Investigation opened an investigation.  Abacus sent some of its funds to the Colombian cellphone launderers described above, but used a separate network of related shell companies to launder the bulk of its illicit proceeds.

The main shell company used to launder Abacus's counterfeiting profits, Defendant All American Heavy Equipment Import & Export, LLC ("All American"), was opened by one of Abacus's principals, Defendant Jose Hernandez.  There is no evidence that All American ever had any business operations of any kind.  Instead, it received approximately **$5 million** in counterfeiting proceeds directly from Abacus, comprising the vast majority of funds that All American received from any source.  Coleman Decl. App'x C.

All American distributed Abacus's counterfeiting proceeds to a series of additional money-laundering entities, most of whom also received payments directly from Abacus itself. For example, All American sent over $1 million to Blue Sea Marine Inc. ("Blue Sea"), a boat sales and service company that has nothing to do with All American's purported business.  *Id.*

93

Blue Sea also received over $17,000 from Abacus directly.  *Id.*  Blue Sea Marine's sole principal is Defendant Alexander Orriols.  *Id.* ¶ 136.  Mr. Orriols has a lengthy criminal history, and spent years in prison for his role in a bank fraud and money laundering scheme.  *Id.* ¶ 136 & Exs. 105-107.

All American and Abacus also paid a combined $1.8 million-plus to Defendant AMG Logistics Sky LLC ("AMG"), a company with no public profile and no apparent operations. *Id.* App'x C.  The owner of AMG is Defendant Alex Galvan, who registered the company to his home address.  *Id.* ¶ 138.  Mr. Galvan is also the registered agent and CFO of yet another money-laundering entity, Defendant Power Pro Logistics LLC ("Power Pro"), whose registered address is a UPS Store and who received over $1.5 million in counterfeiting proceeds directly from Abacus.  *Id.* ¶¶ 139-140 & App'x C.

All American distributed most of the rest of the approximately $5 million in counterfeiting proceeds it received from Abacus in cash withdrawals, payments directly to Abacus's principal, Defendant Jose Hernandez, payments to various jewelry and precious-metal stores, and payments to luxury car agencies.  *Id.* App'x C & Ex. 115.  All American also paid over $150,188 to Vanuatu City Consultant, a company that advertises it can secure Vanuatuan citizenship to married couples for $150,000.[17]  *Id.* App'x C.  Such "[c]itizenship for sale" has proven popular for "disgraced businesspeople and individuals sought by police in countries all over the world."[18]

---

[17] http://www.vcic.vu/

[18] Euan Ward and Kate Lyons, *Citizenship for Sale: Fugitives, Politicians and Disgraced Businesspeople Buying Vanuatu Passports*, THE GUARDIAN (July 14, 2021), https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports

Given that All American was founded by Abacus's principal, Jose Hernandez, and that Blue Sea, AMG, and Power Pro are all downstream recipients of Abacus's counterfeiting proceeds for no apparent consideration, the evidence shows that those companies and their principals are all knowing and intentional money launderers and members of the counterfeiting conspiracy. Gilead therefore seeks an asset freeze against each of them.

### D.     The My Meds Money Laundering Network

Finally, newly named Supplier Defendant My Meds is yet another fly-by-night counterfeiter that earned over $12.8 million in sales of counterfeit Gilead-branded HIV medication. My Meds transferred its counterfeiting proceeds to a series of shell companies to wash its illicit gains.

First, one of My Meds' principals, Defendant Emilio Vina, registered a Florida shell company named M & D Co. Distributors, LLC ("M&D Co.") on September 27, 2021. Coleman Decl. ¶¶ 142-43. But before the company existed, it had a bank account, opened by Mr. Vina in November 2020. *Id.* That account received over $11 million in counterfeiting proceeds from My Meds between January and May 2021. Coleman Decl. App'x D & Ex. 116. In that same time period, the majority of those funds, over $8 million, were then sent directly to Mr. Vina or accounts associated with him. *Id.* Other funds were sent from M & D Co. to newly named Asset Holder Defendant Vibe, the company under indictment for running the Colombian cellphone money-laundering scheme. *Id.*

Second, My Meds sent a total of approximately $1.5 million to three different accounts held by Defendant MDSD Enterprises LLC ("MDSD Enterprises"). *Id.* MDSD Enterprises is a Florida LLC that has a listed "doing business as" name M&D Specialty Wholesale – the name of the supposed upstream supplier of the Gilead-branded medications listed on My Meds' counterfeit and fraudulent pedigrees. *Id.* Ex. 168; *see supra* Facts Part V.A.2. MDSD

Enterprises' bank accounts list addresses in New York City and Miami, the two epicenters of the counterfeiting ring's money-laundering apparatus.  *Id.* ¶ 144.

MDSD Enterprises's principal, Defendant <u>Liliana Teresa Sampayo Mena</u>, is on Gentek's payroll.  Through other shell companies with non-descript names associated with Supplier Defendant Gentek, Ms. Sampayo Mena received nearly $75,000 over fifteen transactions in late 2020 alone.  *Id.* App'x D.[19]

As discussed above, My Meds used M&D Co. and MDSD Enterprises not only to launder money, but also to lend false credence to their counterfeit pedigrees.  *See supra* Facts Part V.A. The names of M&D Co. and MDSD are calculated to be confused with the name of a real, well-known authorized distributor from whom My Meds falsely claimed to be purchasing the counterfeits.  *See id.*  The fact that these shell companies are doing double duty as both money launderers and impersonators of legitimate suppliers leaves no room for doubt that M&D Co., MDSD Enterprises, and their principals, Mr. Vina and Ms. Sampayo Mena, are knowing and intentional members of the counterfeiting conspiracy.  Gilead therefore seeks an asset freeze against them.

### E. Kingpin Defendant Herrera's Girlfriend, Asset Holder Defendant Yisel Lopez

As noted above, Asset Holder Defendant <u>Yisel Lopez</u> is Kingpin Defendant Herrera's live-in girlfriend; the principal of the LLC that owns their home, which was purchased with counterfeiting proceeds; and the principal of the LLC that owns Mr. Herrera's mother's home,

---

[19] Ms. Sampayo Mena received money from XPEX Wholesale Corp., YHM Wholesale Supply, and BMR Distribution, which themselves were funded by Supplier Defendant Gentek. Coleman Decl. ¶ 146. MDSD Enterprises' former officers, Jesus E. Moreno and Carlos J. Molero Rodriguez, similarly received money from XPEX Wholesale Corp. and/or YHM Wholesale Supply.  *Id.* Appendix D.

which was also purchased with counterfeiting proceeds.  *See supra* Facts Part III.C.  Living with Kingpin Defendant Herrera, she undoubtedly knows a great deal about the conspiracy.  And by keeping significant assets in her name, Ms. Lopez allows Mr. Herrera to operate incognito while still enjoying the fruits of his criminal enterprise.

Ms. Lopez has also been the direct recipient of counterfeiting proceeds.  As noted above, Supplier Defendant Omom, which Mr. Herrera and the other Kingpin Defendants controlled, laundered millions of dollars through a shell company, Asset Holder Defendant Titan.  Titan in turn made substantial payments to two companies registered to a residential address that is in the same gated community as Kingpin Defendant Herrera and Asset Holder Defendant Lopez: LE Marketing and Golden Business Consulting Corp.  ("Golden Business").  Coleman Decl. ¶ 60.[20] Bank records show that both LE Marketing and Golden Business each sent multiple "CashApp" payments directly to Yisel in late 2020, and again from March until October 2021.  *Id.* ¶ 60. Bank records further show that Asset Holder Lopez herself paid Golden Business $10,000 in October 2021.  This flow of money back and forth through a web of enterprises has become a familiar pattern.

In this motion¸ Gilead seeks an *ex parte* seizure and asset freeze against Asset Holder Defendant Lopez, as Ms. Lopez is a direct recipient of counterfeiting proceeds and (b) facilitates Kingpin Defendant Herrera's counterfeiting activities by holding his assets in her name.

---

[20] Both LE Marketing and Golden Business also received (sometimes directly, sometimes through another shell company) counterfeiting proceeds from newly named Supplier Defendant Abacus.  *Id.* ¶ 60 & Ex. 122.  And as noted above, LE Marketing paid Kingpin Defendant Herrera directly.  *See supra* Facts Part III.C.

## XII.   THE NEW RELIEF DEFENDANT, ETZHAIM INC.

Finally, Gilead adds a new Relief Defendant, Etzhaim Inc. ("Etzhaim").  Etzhaim is a company owned on paper by the wife of Supplier Defendant Peter Khaim, and it is being used to hold title to real estate purchased by Mr. Khaim using illicit counterfeiting proceeds.  This Court has already held this property, located at 80-74 188th St., Hollis Hills, New York (the "188th Street Property"), was purchased with counterfeiting proceeds and should be frozen.

On March 4, 2022, Gilead filed a motion to freeze the assets of several Relief Defendants connected to Supplier Defendant Khaim, the principal of counterfeit Supplier Defendant Boulevard.  Dkt. No. 505.  Gilead set forth evidence that Mr. Khaim had used Boulevard's proceeds from its sales of counterfeits to purchase several parcels of real estate, and that he utilized shell companies held under his name, or the names of his wife and/or mother, to take title to those properties.  *Id.* at 15-24.  Among those Relief Defendants was La Vie, which Mr. Khaim founded in February 2021 and which purchased the 188th Street Property on February 12, 2021.  *Id.* at 19-21.  Gilead set forth substantial evidence that Mr. Khaim personally provided funds from Boulevard's counterfeiting proceeds to effect the purchase of the 188th Street property and have it titled to La Vie.  *Id.*  On the strength of that evidence, this Court issued an asset freeze order against La Vie, prohibiting it from, among other things, selling, transferring, or encumbering the 188th Street property.  Dkt. No. 512.  La Vie has not contested that asset freeze.

Gilead did not realize that at the time it filed its motion, La Vie had already transferred title to the 188th Street Property to another Khaim-family shell company: Etzhaim.  Coleman Decl. ¶ 149 & Ex. 170.  Consistent with the other shell-company Relief Defendants, Etzhaim was founded on paper by Mr. Khaim's wife, Oksana Politilova, with Mr. Khaim's mother, Riva Mushiyeva, listed as an officer.  Coleman Decl. ¶ 148 & Ex. 169.  Etzhaim was founded on February 10, 2021 – two days before La Vie purchased the 188th Street Property – and lists its

address as the 188th Street Property itself.  Coleman Decl. Ex. 148.  Public records show that La Vie subsequently "sold" the 188th Street Property to Etzhaim for zero dollars.  *Id.* Ex. 170.  To the best of Gilead's knowledge, Etzhaim is the current owner of the 188th Street Property.  Given (1) this Court's previous finding that the 188th Street Property was purchased with counterfeiting proceeds and should be frozen; (2) the fact that Etzhaim, like the other Relief Defenants, is a shell company owned on paper by Mr. Khaim's wife; and (3) the transfer of the property from La Vie to Etzhzaim was between two Khaim family shell companies for zero consideration, Gilead seeks an asset freeze order prohibiting Etzhaim from selling, transferring, or encumbering the 188th Street Property as well.

## ARGUMENT

Gilead respectfully submits that the extraordinary facts of this case and the serious public health risk presented by the products sold by Defendants make it clear that Gilead is entitled to the relief it seeks in this motion.

## I.    THE COURT SHOULD GRANT LEAVE FOR GILEAD TO AMEND ITS COMPLAINT

As set forth above, through the execution of this Court's prior seizure orders, extensive non-party discovery, and a thorough, multifaceted independent investigation, Gilead has uncovered several additional members of the counterfeiting conspiracy, including the identity of the Kingpin Defendants, career criminals who took sophisticated measures to keep their identities a secret.  Gilead therefore seeks to amend its pleadings to add the new defendants, and to add additional factual allegations against existing Defendants based on seized documents and information uncovered in discovery.  Gilead does *not* seek leave to add any additional claims to already-named Defendants.

Under Federal Rule of Civil Procedure 15(a), leave to amend pleadings "sh[all be] freely given when justice so requires."  Here, Gilead has moved expeditiously to investigate the counterfeiting and discover the new facts that are the basis of its amended pleadings, including extraordinary, months-long investigative efforts to identify top-level orchestrators of the counterfeiting ring who did not want to be found.  Granting leave to amend will also not prejudice any other parties to the action.  Without objection from any Defendant, the discovery schedule for this case has been extended until March 31, 2023, and the few existing Defendants who have indicated they intend to file motions to dismiss have not yet filed such motions.  Gilead therefore respectfully requests that the Court grant Gilead permission to file its proposed Fourth Amended Complaint.

## II.   THIS COURT HAS PERSONAL JURISDICTION OVER ALL THE NEWLY NAMED DEFENDANTS

This Court has personal jurisdiction over all of the newly named Defendants at issue in this motion.  There are five separate applicable jurisdictional bases, each of which is independently sufficient to establish personal jurisdiction here.  At least two such jurisdictional bases applies to each of the newly named Defendants at issue in this motion.[21]

First, several of the newly named Defendants are New York residents and therefore subject to this Court's general jurisdiction.  The following newly named Defendants are New York residents: Supplier Defendants Valuecare and Mr. Nabiev, Pharmacy Defendant Laconia, Collector Defendants Alston and Abrimov, and Asset Holder Defendants Avi Kessler, Sam Kessler, Previous Metals, Madison Bullion, Green Capital, Igor Aminov, and Gold Tower.

---

[21] The Appendix to this brief includes a listing of every newly named Defendant that is the subject of the instant motion and states for each Defendant the bases upon which this Court has personal jurisdiction

Second, the majority of the newly named Defendants sold counterfeits to Scripts, which is located in Brooklyn.  The sale of a single counterfeit into New York is sufficient to confer personal jurisdiction.  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010).  The following Supplier Defendants (and their respective principals) sold counterfeits to Distributor Defendant Scripts in New York: My Meds, ITC, Abacus, V & G, and Mainspring.  Distributor Defendant CompaRx also sold counterfeits to a retail pharmacy in New York.  The Kingpin Defendants also sold counterfeits to Distributor Defendant Scripts in New York through, at minimum, their control of newly named Supplier Defendant My Meds and previously named Supplier Defendants Gentek and Omom.  Leader Defendant Dunn and his companies brokered sales of counterfeits from Supplier Defendants ITC and Abacus to Distributor Defendant Scripts.  Pharmacy Defendant Laconia dispensed a counterfeit to a New York patient.  And .Gilead has alleged that Distributor Defendant ProVen has sold counterfeits in New York based on the available evidence, including that ProVen has a New York wholesaler's license for the purpose of selling pharmaceuticals into New York; that ProVen is a regional Northeast distributor well-situated to sell into New York; that New York is a central hub for the conspiracy's sale of counterfeits to pharmacies; that ProVen purchased large volumes of counterfeits from a New York supplier; and that New York has a large population of patients who are prescribed Gilead-branded HIV medication.

Third, Gilead has alleged and submitted extensive evidence demonstrating that the following newly named defendants are co-conspirators in a counterfeiting conspiracy: the Kingpin Defendants, the Leader Defendants, the Supplier Defendants, the newly named Pharmacy Defendants, the Collector Defendants, and named Asset Holder Defendants.  On the basis of those co-conspirators' predicate acts – which include counterfeiting, wire fraud, and

money laundering – Gilead has brought RICO claims against those defendants.  Civil RICO provides for nationwide jurisdiction over each and every co-conspirator, so long as one of those co-conspirators is subject to jurisdiction in the forum state.  18 U.S.C. § 1965; *see*, *e.g.*, *City of N.Y. v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 541 (S.D.N.Y. 2005) ("[A] civil RICO action may be brought in [a] district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." (internal quotes omitted).

Fourth, in addition to its RICO claims, Gilead has also alleged and submitted substantial evidence showing the same co-conspirator Defendants conspired to violate the Lanham Act, including by selling counterfeits into New York.  New York law provides for conspiracy jurisdiction where the plaintiff establishes "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that coconspirator to jurisdiction in that state." *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 323 (S.D.N.Y. 2020) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)).

Fifth, and finally, several newly named Defendants transacted business in New York via longstanding, high-volume business relationships with counterfeit sellers based in New York.  For example, ProVen purchased over $1.25 million in counterfeit Gilead-branded medications from Queens-based Supplier Defendant Boulevard, and Total Remedy purchased over $33.4 million in counterfeit Gilead-branded medications from Scripts over the course of nearly a year. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (noting that "the amount of purchases by Defendants from New York alone may be sufficient to confer jurisdiction," and finding personal jurisdiction over defendants who purchased between $75,000 and $92,000 in supplies from a New York vendor).

III.     **GILEAD IS ENTITLED TO AN *EX PARTE* SEIZURE ORDER**

    Gilead seeks an *ex parte* seizure order pursuant to the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d)(1).  Gilead seeks the seizure to occur at nine locations: the residence of the Kingpin Defendant Herrera; the residences of Leader Defendants Levitan and Dunn; the residences of Supplier Defendants Smith, Betancourt, and Hernandez, the respective principals of My Meds, ITC, and Abacus (all fly-by-night companies that have abandoned their corporate offices); the retail pharmacy location of Pharmacy Defendant Laconia; and the residences of Collector Defendants Alston and Abramov.  Gilead seeks these seizures to, among other things, collect and preserve documents concerning the manufacture, sale, and distribution of the counterfeits that would otherwise be destroyed by these willful members of the counterfeiting conspiracy.

    Passed in response to "an 'epidemic' of commercial counterfeiting," *see* S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3627, 3631 (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)), the Counterfeiting Act permits a court to grant an *ex parte* order of seizure in "[c]ivil actions arising out of [the] use of counterfeit marks," including seizure of counterfeit goods and "records documenting the manufacture, sale, or receipt" of the counterfeit goods.  15 U.S.C. § 1116(d)(1)(A).  As Congress explained in the Senate Report accompanying this bill, "[t]he reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice."  1984 U.S.C.C.A.N. at 3629.

### A.      Gilead Satisfies All the Requirements for an *Ex Parte* Seizure Under the Counterfeiting Act

The Counterfeiting Act enumerates several prerequisites for obtaining an *ex parte* seizure order.  *See* 15 U.S.C. § 1116(d)(4)(B).[22]  Gilead has satisfied all of them.  Gilead therefore respectfully requests that the Court issue an *ex parte* seizure order.  A proposed order is being filed simultaneously with this motion.

### 1.      An order other than an *ex parte* seizure order is not adequate to achieve the purposes of the Lanham Act (15 U.S.C. § 1116(d)(4)(B)(i))

As set forth below, the Lanham Act's goals are to protect manufacturers' marks and goodwill, to allow manufacturers to control the quality of their products, and to protect the American consumer from confusion.  *See infra* Argument Part IV.  Here, the newly added Defendants have each engaged in the reckless, wholesale distribution of counterfeit prescription HIV medications.  Moreover, the Defendants that are the subject of the requested seizure order are key co-conspirators in a well-organized, large-scale, counterfeiting ring.  The counterfeits are trafficked through a series of fly-by-night suppliers, each of which exists as a separate cell with no visible connection to the others, and each of which is ultimately expendable: the counterfeit suppliers consistently abandon their offices before Gilead can make contact with them, and then the Leader Defendants, assign a new supplier to fill the gap in the supply chain.

And as set forth in detail above, the Kingpin Defendants, named for the first time here, are all convicted felons and sophisticated career criminals who undertook serious and substantial

---

[22] The Counterfeiting Act separately requires plaintiffs to notify the local U.S. Attorney before seeking an *ex parte* seizure.  15 U.S.C. § 1116(d)(2).  Gilead has done so.  Oct. 13, 2021, Potter Decl. ¶ 8 & Ex. 112.  In its proposed seizure order, Gilead has also included a provision requiring a seizure bond pursuant to 15 U.S.C. § 1116(d)(4)(A).

efforts to not only keep themselves off the paper trail, but to completely hide their identity from all other members of the counterfeiting ring.  Gilead learned of the Kingpin Defendants only by seizing information on the cell phones of the Leader Defendants using complex and lengthy investigative techniques to deduce their identities.

And the Kingpin Defendants' lieutenants, the Leader Defendants, including newly named Leader Defendants Levitan and Dunn, also worked behind the scenes, openly communicating with co-conspirators but ensuring their names did not appear on the paper trail as the counterfeits are sold.  Gilead learned of the Leader Defendants only by seizing and reviewing Safe Chain, ProPharma, and Scripts' email servers and the cellphone texts and Microsoft Team Chats of its employees.

Moreover, as detailed above, the counterfeiting ring, like many organized criminal conspiracies, utilizes violence to scare and punish "snitching" co-conspirators.  The government has shown that the conspiracy has "violent" and even "very violent" members.  Even if Defendants wanted to cooperate with Gilead or participate in civil discovery, they could easily decide not to do so due to the threat of violence.

If Gilead is to stop this counterfeiting ring and uncover who is manufacturing the counterfeits, it cannot do so through serving discovery requests through normal service of process.  The only feasible means of stopping the Defendants, collecting the evidence of their counterfeiting, and continuing to trace the ongoing manufacture and distribution of these counterfeits is through an *ex parte* seizure.

As recognized by Congress in enacting the Counterfeiting Act, counterfeiters are more likely than not to dispose of or conceal the counterfeit goods when confronted with a trademark action.  1984 U.S.C.C.A.N. at 3632-33 ("[M]any of those who traffic in counterfeits have

become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon.").  Accordingly, courts have regularly issued *ex parte* seizure orders against entities and individuals, such as the Defendants here, who have been shown to be distributing counterfeit products in the secondary market for drugs and medical supplies.  *See, e.g.*, *Johnson & Johnson et al. v. Advanced Inventory Management, Inc. d/b/a eSutures.com et al.*, No. 20-cv-341 (N.D. Ill.) (involving counterfeit surgical devices); *Johnson & Johnson et al. v. XS Supply, LLC et al.*, No. 8:19-cv-1673 (M.D. Fla.) (involving counterfeit surgical hemostats); *Abbott Labs. et al. v. H&H Wholesale Servs., Inc.*, No. 17-cv-3095 (CBA) (LB) (E.D.N.Y.) (involving counterfeit blood-glucose test strips); *Johnson & Johnson v. Stone Medical Group, LLC*, No. 15-cv-3221 (PKC) (LB) (E.D.N.Y.) (involving counterfeit blood-glucose test strips); *Johnson & Johnson v. South Pointe Wholesale, Inc. et al.*, No. 08-1297 (SLT) (SMG) (E.D.N.Y.) (involving counterfeit blood-glucose test strips).

The Counterfeiting Act's provision for *ex parte* seizures was enacted for precisely these types of defendants: willful counterfeiters who create counterfeit and fraudulent pedigrees (to conceal the true origin of the counterfeits), and who continue their large-scale counterfeiting in the face of indisputable evidence that they are selling counterfeit and infringing product. Moreover, Gilead respectfully submits that the facts here are far more grave than in the typical counterfeiting case envisioned by the statute, because the counterfeits at issue are of medication intended to treat or prevent a life-threatening medical condition, HIV.  Congress recognized that the slow wheels of ordinary civil procedure, which rely on the voluntary compliance of honest litigants, are not adequate to address counterfeiting.  It is difficult to envision a more appropriate use for the potent procedural mechanism created by the Counterfeiting Act than to rapidly trace and seize dangerous counterfeit HIV medication from a large-scale counterfeiting ring.

### 2. Gilead has not publicized the requested seizure (15 U.S.C. § 1116(d)(4)(B)(ii))

Gilead has not publicized the requested seizure.  Potter Decl. ¶ ¶ 4-7. Gilead has filed the instant papers, and the other filings made in connection with it, under seal and *ex parte*, as it did with its previous seizure applications.

### 3. Gilead is likely to succeed in showing that the persons against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services (15 U.S.C. § 1116(d)(4)(B)(iii))

As demonstrated above, the evidence shows that the newly added Defendants against whom Gilead seeks a seizure have engaged in distributing, selling, and offering for sale a variety of counterfeit Gilead medicines with counterfeit packaging, including counterfeit pedigrees and counterfeit patient instructions for use, that falsely bear Gilead's registered trademarks.  *See supra* Facts Part II.  And Gilead has set forth evidence proving that these Defendants are members of a coordinated, large-scale counterfeiting conspiracy.  Gilead is more than likely to succeed on its counterfeiting claims, and that is more than sufficient to satisfy this statutory criterion.  *See infra* Argument Part IV.A.

### 4. An immediate and irreparable injury will occur if such seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv))

As discussed below, Gilead (and others) are being irreparably harmed by Defendants' dangerous counterfeit medications being distributed to, and used by, patients in the United States.  *See infra* Argument Part IV.B.

The counterfeiting conspiracy at issue is designed to continue its operations even as individual members are taken out of operation, with new counterfeit suppliers being added on a regular basis to keep the supply of counterfeits moving.  Gilead has identified multiple newly named Defendants who actively sold counterfeit Gilead-branded medication just weeks ago.

Moreover, although the evidence shows that the newly named Kingpin Defendants ultimately controlled the supply of counterfeits through the Supplier Defendants, many questions concerning the manufacture of the counterfeits – including the insertion of the wrong medication into empty bottles and resealing them with a counterfeit foil seal – remain unanswered.  Seizing documentation concerning the manufacture, sale, and distribution of these counterfeits is a necessary step to prevent the newly added Defendants from selling the counterfeits, to identify counterfeit manufacturers and other members of the counterfeiting ring who are still active, and to warn customers who may have purchased counterfeit product.  The destruction of that documentary evidence will irreparably harm Gilead's ability to shut down the manufacture and sale of these counterfeits for good.

> **5.      The matter to be seized will be located at the place identified in the application (15 U.S.C. § 1116(d)(4)(B)(v))**

The requested seizure will take place at nine locations, discussed below in turn.

The techniques through which Gilead and its investigators identified Kingpin Defendant Herrera are described in detail above.  *See supra* Facts Part III.C; Coleman Decl. ¶¶ 53-62. Through public-records searches, Gilead's investigators located Mr. Herrera's current residence at 660 Enclave Circle West in Pembroke Pines, Florida.  As set forth in their accompanying Declarations, Gilead's investigators have recently visited that residence and confirmed that Mr. Herrera is currently living at that locations.  Declaration of Gabriel Calderon ("Calderon Decl.") ¶ 4.

Gilead's investigators identified Leader Defendant Levitan's current residence as 511 Windrose Circle, Pensacola, Florida 32507 and Leader Defendant Dunn's current residence as 385 Conkinnon Drive, Lenoir City, Tennessee 37772.  As set forth the accompanying declaration, Gilead investigators recently visited those residences and confirmed that the

respective Leader Defendants are currently living there.  Declaration of Amanda LaFratta ¶¶ 2-6; Declaration of Robert Wigley ¶¶ 3-7.

As has occurred with several previously named Supplier Defendants, the newly named Supplier Defendants My Meds, ITC, and Abacus, have all abandoned their corporate offices. Coleman Decl. ¶¶ 73, 76, 81.  Because these Supplier Defendants have no other known locations, Gilead seeks seizures at the homes of those Supplier Defendants' respective principals, Messrs. Smith, Betancourt, and Hernandez.  These principals are likely to have electronic communications, texts and chat messages, and other documents concerning their counterfeiting at their homes, including on electronic personal devices they are likely to keep at home and on their person.  Several previously named Supplier Defendants have also abandoned their offices before Gilead brought suit, and Gilead successfully executed prior Seizure Orders and seized evidence concerning the counterfeiting at the residences of their principals.  All of those prior seizures have been confirmed.

Through public-records searches, Gilead's investigators have determined that Mr. Smith's current residence is 816 Ridgeview Court, Sellersville, Pennsylvania, 18960that Mr. Betancourt's current residence is 1756 N. Bayshore Drive, #35I, Miami, Florida 33132; and that Mr. Hernandez's current residence is 601 NE 36th Street, #3307, Miami, Florida.  Gilead's investigators have recently visited these residences and confirmed Messrs. Smith, Betancourt, and Hernandez are currently residing at their respective homes. Calderon Decl. ¶¶ 5-10; Declaration of Dawn Certo ¶¶ 3-6.

Pharmacy Defendant Laconia openly does business as a retail pharmacy located at 4041 Laconia Ave, Bronx, New York, 10466.  An investigator recently visited the pharmacy and

confirmed that it is an open, active business.  Declaration of Patrick McAllister ("McAllister Decl.") ¶¶ 9-11.

Finally, through public-records searches, Gilead's investigators have identified Collector Defendant Alston's current residence as 3560 Webster Avenue, #11F, Bronx, New York and Collector Defendant Abramov's residence as 147-55 71st Avenue, Flushing, New York 11367. As discussed above, these Collector Defendants maintained at least some of the illegally obtained bottles of Gilead-banded medication in their homes.  Gilead's investigators have recently visited these residences and confirmed Ms. Alston and Mr. Abramov are currently living at those respective locations.  McAllister Decl. ¶¶ 1-8.

### 6.  The harm to the applicant of denying the application outweighs the harm to the legitimate interests of the persons against whom seizure would be ordered (15 U.S.C. § 1116(d)(4)(B)(vi))

The Defendants against whom Gilead seeks seizures have no legitimate interest in selling counterfeit Gilead medication, and no legitimate interest in selling prescription medication that cannot lawfully be sold because it is the subject of a counterfeit pedigree and/or illegally purchased from patients on the street.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading*, No. 07-CV-2568 (CPS), 2007 WL 9723382, at *5 (E.D.N.Y. July 19, 2007) ("[T]o the extent that items seized are counterfeit, defendants have no legitimate interest in the physical goods to be seized.").  The Defendants therefore cannot suffer any harm from the seizure of such goods. The individual Defendants against whom Gilead seeks seizures likewise have no legitimate interest in storing counterfeits or documents concerning the counterfeits at their personal residences. Gilead, on the other hand, has a very strong interest in protecting the public's health and safety, as well as its own trademarks and goodwill, from the counterfeits that Defendants are selling.

110

7. **Defendants would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such persons (15 U.S.C. § 1116(d)(4)(B)(vii))**

As noted above, Congress determined in passing the Counterfeiting Act that counterfeiters "have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon." 130 Cong. Rec. H12076, at 12080. Here, in addition to the bottles of counterfeits themselves – small, highly valuable, easily moved bottles of medication – the evidence shows that members of the counterfeiting conspiracy maintain the counterfeit pedigrees electronically. Moreover, the evidence summarized above shows – and Gilead's experience in prior seizures confirms – that significant volumes of electronic communications and other data concerning the manufacture and sale of the counterfeits exist on individual conspirator's computers, cell phones and other electronic devices. Moreover, as detailed above, individual members of the conspiracy communicate about the counterfeits using "burner" cell phones, and by using phone-based messaging platforms like WhatsApp, which are encrypted end-to-end and can only be recovered directly from one of the interlocutor's cell phones. Those records can be, and indeed are designed to be, quickly and easily deleted *en masse* if prior notice is given.

As also noted above, the Defendants that are the subject of the requested seizure order are key members of an organized, large-scale counterfeiting conspiracy. The conspiracy is purposefully organized to move the counterfeits through a seemingly endless series of recently formed, fly-by-night counterfeit suppliers that can and do quickly disappear when they are found out. Moreover, the entirety of the conspiracy turns on the use of counterfeit and fraudulent pedigrees for every bottle sold: fake documents whose purpose was to lie about the provenance of the medication and fraudulently conceal its illegitimacy. The evidence leaves no room for

111

serious question that the Defendants are purposefully flooding the market with counterfeit Gilead-branded HIV medication, and are doing so in a manner meant to evade detection.

The Kingpin Defendants established the structure of the counterfeiting conspiracy and operated in the shadows, controlling multiple fly-by-night Supplier Defendants while keeping their identities a secret.  Mr. Herrera was so successful at concealing his identity by using a pseudonym and "burner" cell phones that, despite having seized the records of the Leader Defendants upon whom he relied, Gilead only learned his identity by using his "burner" cell phone's geolocation data to deduce his air travel patterns.  Moreover, Mr. Herrera is a convicted felon who served time in prison for running a fraudulent scheme concerning HIV treatment.

Like the previously named Leader Defendants, newly named Leader Defendants Levitan and Dunn are connected to multiple fly-by-night Supplier Defendants and facilitated their sales to Distributor Defendants, but took care to ensure that their names did not appear on the paper trail for those sales.  Mr. Dunn and Mr. Levitan each provided a rotating cast of shady suppliers to ensure that Distributor Defendants had access to a steady flow of counterfeits even as some suppliers went underground – for example, after the FDA's Office of Criminal Investigation started asking questions about Supplier Defendant Abacus.  Mr. Levitan is also a convicted felon who spent nearly a decade and a half in prison for money laundering.

Defendants Herrera, Levitan, and Dunn have just seen their co-conspirator, Kingpin Defendant Lazaro Hernandez, arrested, indicted, told in open court that he faces life in prison if convicted, and placed under home confinement under round-the-clock armed guard. If given notice of a civil suit regarding the same counterfeiting conspiracy, Messrs. Herrera, Levitan, and Dunn have every incentive to destroy the evidence that could land them back in prison.

Supplier Defendants My Meds, ITC, and Abacus and their principals are classic fly-by-night counterfeiters.  As described above and proven by Gilead's experiences with previously named Supplier Defendants, the manifest purpose of the Supplier Defendants is to push the counterfeits into the U.S. pharmaceutical supply chain until they are caught or attract unwanted attention, at which point they can be quickly dismantled.  That is what occurred here: the Supplier Defendants started selling counterfeits shortly after obtaining state licensure, and then abandoned their offices by the time Gilead's investigators came to visit them.  And there can be no question that the Supplier Defendants were willful counterfeiters: they supplied the counterfeit pedigrees that they knew were fake, because those pedigrees fraudulently described purchases from Gilead or authorized distributors that the Supplier Defendants knew they had not made.

Pharmacy Defendant Laconia has already demonstrated that it will refuse to provide information required to protect the health of its own patients and customers.  Laconia claims to have opened just two months ago, and has already been caught dispensing counterfeit Gilead-branded HIV medication with the wrong pills inside the bottle, which could have a devastating effect on patient health.  The evidence summarized above shows Pharmacy Defendant Laconia is a willful counterfeiter, and its flat-out refusal to cooperate with Gilead and provide even the most basic information, including its source of the counterfeits and the DSCSA pedigree information they are legally obligated to share, is proof that Laconia will not hand over incriminating evidence if given normal service of process.

Finally, Collector Defendants Alston and Abramov coordinated manifestly illegal street purchases of critical prescription HIV medication from patients in desperate need of cash.  Ms. Alston openly worried about patients calling the police on her, and was herself paid in cash and

in designer handbags.  Mr. Abramov conducted business by sending photographs of handwritten lists of HIV medication that could be repurchased from patients, and expressly discussed the need to change burner phones every month, purchasing new phones for cash at small convenience stores, to avoid detection.

Moreover, these Defendants are members of a large, well organized and highly sophisticated counterfeiting conspiracy.  As noted above, one member of the conspiracy was the subject of violence, followed by additional threats, for his "snitching" by cooperating with the government.  That assault occurred in a strip club with an in-house security force, and was captured on camera – it was carried out publicly to send a message.  The threat of violence from a conspiracy known to have "violent" and "very violent" members provides members of the conspiracy a strong incentive to ensure evidence of the conspiracy's crimes does not end up in the hands of a civil plaintiff.

Finally, by knowingly trafficking counterfeit Gilead medications and/or conspiring to do street-level purchases to obtain the bottles (empty or full) to manufacture those counterfeits, these Defendants conspired to engage in criminal counterfeiting.  *See* 18 U.S.C. § 2320.  They also conspired to commit the crime of selling misbranded drugs, which is one of very few federal strict-liability crimes, and which carries substantial jail time when done knowingly.  21 U.S.C. § 331. As detailed above, they also committed a host of violations of the DSCSA.  And, of course, both the corporate and individual Defendants are all subject to extensive civil liability for their actions, including under the Lanham Act and civil RICO.  The incentives for Defendants to cover up their criminal behavior are clear.  The newly added Defendants are precisely the type of defendants that Congress had in mind when it authorized *ex parte* seizure orders in the Counterfeiting Act.

**B.      The Seizure Order Should Include All Gilead-Branded Products**

As set forth in Gilead's previous applications, Gilead has already seized confirmed counterfeits of a wide variety of Gilead medications, including BIKTARVY®, DESCOVY®, TRUVADA®, GENVOYA®, ATRIPLA®, VOSEVI®, RANEXA®, STRIBILD®, and SOVALDI®.  Declaration of Susmitha Sunkara, dated Aug. 17, 2021, Dkt. No. 53 ("8/17/21 Sunkara Decl.") ¶¶ 6-13.  Gilead was able to recover those counterfeits because both of the Seizure Orders previously issued by this Court permitted Gilead to seize all Gilead products on the premises.  Moreover, there is little risk of harm to the Defendants, because to date every bottle of purported Gilead-branded medication sold by the conspiracy has been sold with a counterfeit and fraudulent pedigree, and so are not legally salable in any event.  21 U.S.C. § 360eee-1(c)(4)(a)(i).  The same is true of every pedigree to which Gilead has access for the newly named Defendants.  For these reasons, as well as those stated in Gilead's prior applications, which are incorporated here by reference, the Court should include all Gilead-branded products in the scope of the requested seizure order.

**C.      This Court Has Authority to Order Seizures Anywhere in the United States**

Gilead set forth in its opening papers the authority showing this Court has the authority to issue an *ex parte* Seizure Order to occur anywhere in the United States, not just this District; Gilead incorporates that authority by reference.  *See* Plaintiffs' Mem. of Law, dated July 22, 2021, at 54-55.  This Court's previously issued Seizure Orders permitted Gilead to execute seizures in various U.S. states where the seizure targets were located, and the same should be true of the requested seizure order.

## IV.  GILEAD IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

"Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages." *Multi-Local Media Corp. v. 800 Yellow Book, Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993).  Here, Gilead seeks a temporary restraining order to stop the newly added Defendants' trafficking of counterfeit Gilead medication and ensure that evidence, including the counterfeit product itself, is preserved.  To obtain such relief, Plaintiffs must demonstrate "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Gilead easily meets all of those elements and therefore is entitled to immediate injunctive relief.

### A.  Gilead Has a Strong Likelihood of Success on the Merits

Among other claims, Gilead has alleged various causes of action against the newly added Defendants for violating Gilead's trademark rights under the Lanham Act and state law.  Gilead can prevail on its trademark claims by showing "(1) that it owns a valid, protectable trademark; (2) that the defendants used the registrant's trademark in commerce and without consent; and (3) that there was a likelihood of consumer confusion." *Proctor & Gamble Co. v. Quality King Distribs., Inc.* 123 F. Supp. 2d 108, 113 (E.D.N.Y. 2000); *see also Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp.*, 803 F. Supp. 606, 608-09 (E.D.N.Y. 1992).

None of these elements is remotely in question here.  Gilead owns multiple distinct, valid registered trademarks for the products at issue.  Declaration of Gretchen Stroud, dated August 17, 2021, Dkt. No. 52 ("8/17/21 Stroud Decl.") ¶ 4.  Defendants are "using" those marks in

116

interstate commerce by advertising, buying, and selling counterfeit Gilead drugs.  There also can be no dispute that Defendants are not authorized to use Gilead's marks to sell counterfeits.  *Id.* ¶¶ 16-18.

### 1.    Consumer Confusion Is Established as a Matter of Law for Counterfeits

Because Defendants sold counterfeits, likelihood of consumer confusion is established as a matter of law.  *See El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) (holding "it is plain" that the sale of products that are "not genuine" violates the Lanham Act); *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1194 (2d Cir. 1971) (Friendly, C.J.) ("The probabilities of confusion from the sale of another [product] bearing the identical name are too obvious to require detailed proof."); *Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt.*, No. 04-CV-2293 (JFB) (SMG), 2007 U.S. Dist. LEXIS 1404, at *32-33 (E.D.N.Y. Jan. 8, 2007); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005); *Philip Morris USA, Inc. v. Felizardo*, No. 03-CV-5891(HB), 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 17, 2004) ("[C]ounterfeit marks are inherently confusing."); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[C]ounterfeits, by their very nature, cause confusion."); *Procter & Gamble Co.*, 123 F. Supp. 2d at 115 ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety.'" (citation omitted)).[23]

--------

[23] Because counterfeit marks are inherently confusing, there is no need to analyze the so-called *Polaroid* factors to determine the likelihood of confusion between the genuine and the counterfeit goods.  *Jamelis*

Several aspects of the purported Gilead-branded medication sold by the conspiracy each independently renders the products counterfeit under the Lanham Act.  First, the Gilead-branded bottles that contained the wrong medication inside were undoubtedly counterfeits.  The fact that they were manufactured in part by using once-authentic Gilead packaging does not, of course, alter the fact that they are counterfeits within the meaning of the Lanham Act.  *See, e.g.*, *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 900 (9th Cir. 1997) ("When an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit' just as it would if an imitation of the mark were attached."); *U.S. v. Petrosian*, 126 F.3d 1232, 1233-34 (9th Cir. 1997); *Cartier v. Aaron Faber Inc.*, 512 F. Supp. 2d 165, 169 (S.D.N.Y. 2007) (holding that watches that retained the manufacturer's original marks, but were significantly altered by the defendant, "constitute 'counterfeit' merchandise for purposes of the Lanham Act.").

Second, separately from the bottles, each of the fake Instructions for Use, which contains unauthorized reproductions of Gilead registered trademarks, also renders the product counterfeit under the Lanham Act.  *See, e.g.*, *Johnson & Johnson and Lifescan, Inc. v. South Pointe Wholesale, Inc.,* 2014 WL 12558573 at **5, 32-33 (E.D.N.Y. Mar. 28, 2014) (finding that authentic medical devices sold with counterfeit patient instructional inserts, reprinted without the manufacturer's permission, rendered the products counterfeit under the Lanham Act).

Third, independent of the bottles and the fake Instructions for Use, each of the Defendants' fake pedigrees themselves render the products counterfeit within the meaning of the Lanham Act.  *See* 15 U.S.C. § 1116(d)(1); *id.* § 1141(1)(a).  The fake pedigrees reproduce

---

*Grocery*, 378 F. Supp. 2d at 455 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961)).  Counterfeits create consumer confusion as a matter of law.  *Id.*

without permission Gilead's registered trademarks, *e.g.* BIKTARVY®.  *See id.* (counterfeits must be of a registered mark).  The fake pedigrees are unquestionably used "in connection with the sale, offering for sale, or distribution of" Gilead's medications.  *Id.*  And the fake pedigrees reproduce Gilead's trademarks without permission in order to make false and fraudulent statements concerning, among other things, the origin and authenticity of the Gilead products. *See id.*; *see also Coty Inc. v. Cosmopolitan Cosmetics Inc.*, 432 F. Supp. 3d 345, 349, 352-353 (S.D.N.Y. 2020) (defendant's removal or obscuring of "production code" on packaging, done to conceal that it was "diverting the products outside of authorized distribution channels," rendered product counterfeit within the meaning of the Lanham Act because the altered packages "bear Plaintiffs' registered trademark, are not authorized for resale, and are sold in an 'intentionally fraudulent' manner" that concealed the fact they had been altered); *Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 357 (E.D.N.Y. 1998) (repacking "authentic" product into counterfeit boxes rendered the products counterfeit, including because the genuine boxes allowed plaintiff "to track the manufacture and packing of the product" and "are designed to expedite recalls in the event of any problems with the health, safety, or freshness of food products.") (citation omitted); *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 722 (9th Cir. 2005) (continuing to use plaintiff's "Idaho potatoes" mark to sell potatoes after license expired constituted counterfeiting, even though the potatoes continued to be genuine and met the plaintiffs' quality standards for "Idaho potatoes," because the use of the mark implied that the products "distributed in accordance with [plaintiff's standards], and the fact this was not the case was likely to cause consumer confusion.") (citing *El Greco Leather Prods. Co.* , 806 F.2d at 395).

### 2.   Each Defendant Is Individually Liable for Its Role in the Counterfeiting

Generally speaking, the counterfeits at issue were purchased, sold, shipped, and paid for through corporations and other business entities.  The corporate entities that bought or sold counterfeits are, of course, liable for their infringement.  But any Defendant, including individual officers or agents of corporate entities, who was "a moving, active, conscious force behind the defendant corporation's infringement" is also individually liable, on a joint-and-several liability basis. *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014); *see Matsunoki Grp., Inc. v. Timberwork Or., Inc.*, 2009 U.S. Dist. LEXIS 37573, at *9 (N.D. Cal. Apr. 16, 2009) ("A plaintiff may show that a corporate employee is [a] moving, active, conscious force behind the infringing activity by demonstrating that [he or she] direct[ed], control[led], ratifie[d], *or* participate[d] in the infringing activity.").  Thus, there may be – and in large-scale operations, almost always are – multiple Defendants who are individually liable for the same company's counterfeiting.  In other words, it is no defense to argue that others "had more significant roles in executing the operation."  *See Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F.Supp.3d 137, 173, 178 (E.D.N.Y. 2016).

For example, a person or entity involved in paying for counterfeits, including effecting wire transfers, is subject to individual liability as an active and moving force.  *Id.* at 173, 178. Here, the evidence shows that several of the Supplier Defendants paid for the counterfeits they sold by transferring a portion of the revenue of their sales to one of the Asset Holder Defendants. *See supra* Facts Part XI.  Regardless of whether the Asset Holder Defendants supplied the counterfeits in the first place, or whether their role is to launder or concealed the payments and distribute them to the upstream supplier, they are directly liable as an active and moving force. *See id.*

Moreover, as described in detail above, the Defendants are engaged in an organized counterfeiting conspiracy.  In addition to their civil liability under RICO, for which counterfeiting is a predicate act, the Defendants are liable for conspiring to violate the Lanham Act.  Under the Lanham Act, a "civil conspiracy occurs when the parties have reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.  A conspiracy must be looked at as a whole, and acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Transgo, Inc. v. Ajac Transmissions Parts Corp.*, 768 F.2d 1001, 1020-21 (9th Cir. 1985) (citations and internal quotation marks omitted); *cf. Gmurzynska v. Hutton*, 355 F.3d 206, 211 (2d Cir.2004) (accepting that co-conspirators are liable under the Lanham Act, but finding no liability because plaintiff failed to prove an underlying Lanham Act violation).

### 3.   The Defendants Are Willful Infringers, but Gilead Needs to Establish Only Strict Liability

Notably, while there is extremely powerful evidence that each of the Defendants knowingly and intentionally engaged in the sale of counterfeits, trademark infringement is a strict-liability offense.  *Sunward Elecs., Inc.*, 362 F.3d at  25  ("[I]t is well established that wrongful intent is not a prerequisite to an action for trademark infringement . . . and that good faith is no defense." (citations and internal quotations omitted)); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act."); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003); *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2004). Therefore, defendants are liable under the Lanham Act regardless of whether they were aware of the counterfeit nature of the products they sold and their accompanying fake pedigrees.  *Id.*;

*Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1122 (C.D. Cal. 2007).  Gilead's Lanham Act claims are not merely likely, but virtually certain to succeed.

### B.      Gilead Is Suffering Irreparable Harm as a Result of Defendants' Activities

Because Gilead has demonstrated a likelihood of success on the merits on its Lanham Act claims, it is entitled to a rebuttable presumption of irreparable harm as a matter of law pursuant to the Trademark Modernization Act of 2020.  15 U.S.C. § 1116(a).

Even without that presumption, where, as here, a Lanham Act plaintiff has succeeded in showing a likelihood of confusion, irreparable injury "almost inevitably follows."  *Omega Importing Corp.*, 451 F.2d at 1195.  The reason is simple: "because the losses of reputation and goodwill and subsequent loss of customers that Plaintiff will suffer are not precisely quantifiable[,] remedies at law cannot adequately compensate Plaintiff for its injuries."  *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 270 (E.D.N.Y. 2011); *see also Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 44 (2d Cir. 1986) ("[A]llowing defendants the opportunity to reduce the marks' reputational value and goodwill by its continued unauthorized use constitutes the irreparable harm that is requisite to the issuance of the preliminary injunction."); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y 2010) ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard.").

There is no question that Defendants' sale of dangerous counterfeits of Gilead's HIV medications is causing great harm to Gilead's goodwill, and that its continued sale will irreparably harm Gilead.  8/17/21 Stroud Decl. ¶¶ 14-18.  Immediate injunctive relief is, therefore, necessary to prevent further damage to Gilead's reputation and goodwill – and, of course, to patient health and safety, none of which can be undone.

### C.      The Balance of Equities Tips Decisively in Gilead's Favor

Here, the equities emphatically support the issuance of a temporary restraining order.

First and foremost, the counterfeit products pose a serious threat to patient health and safety.  *See*

*supra* Facts Part II.  Quite apart from the harm to Gilead's goodwill, this threat to public health

justifies immediate injunctive relief.  *See, e.g.*, *Burger King Corp. v. Stephens*, No. 89-CV-7691,

1989 U.S. Dist. LEXIS 14527 at *33 (E.D. Pa. Dec. 6, 1989).

Because the law recognizes no excuse for selling counterfeit goods, the harm to Gilead

should the requested injunction be denied far outweighs the harm to Defendants if their conduct

is preliminarily enjoined.  Each and every sale of counterfeit Gilead medication infringes

Gilead's trademarks, causes harm to Gilead's reputation, and places patients at risk.  *See*

*Microsoft Corp. v. ATEK 3000 Computer, Inc.*, No. 06-CV-6403 (SLT)(SMG), 2008 U.S. Dist.

LEXIS 56689, at *17 (E.D.N.Y. Jul. 23, 2008).  The Defendants have no right to sell counterfeit

Gilead medication, and no right to buy or sell medication with fraudulent pedigrees.  Defendants

thus cannot validly claim hardship based on the proposed injunctive relief.

### D.      An Injunction Is in the Public Interest

The public interest in an injunction is self-evident in this case.  It is in the public interest

to prevent the sale of potent antipsychotics and other medication being sold in bottles

masquerading as authentic Gilead HIV medication.  It is also in the public interest to prevent

confusion and protect informed choice when patients' health is at stake.  *Cytosport, Inc. v. Vital*

*Pharms., Inc.*, 617 F. Supp. 2d 1051, 1081 ("When a trademark is said to have been infringed,

what is actually infringed is the right of the public to be free of confusion and the synonymous

right of the trademark owner to control his products' reputation.") (E.D. Cal. 2009) (internal

citation omitted); *aff'd*, 348 F. App'x 288 (9th Cir 2009); *Int'l Kennel Club of Chicago, Inc. v.*

*Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.8 (7th Cir. 1988) ("[T]he relevant consideration in

determining whether the public interest will be disserved by the grant of an injunction is the consumer's interest in not being deceived about the products they purchased.'" (alteration omitted)).

## V.   GILEAD IS ENTITLED TO AN *EX PARTE* ORDER FREEZING DEFENDANTS' ASSETS

As part of its efforts to immediately remove this counterfeit medication from the U.S. market, Gilead also seeks an asset freeze against the newly added Defendants.  Gilead received and executed a substantially identical Asset Freeze Orders against the Defendants previously named in this action (with the exception of certain pharmacy defendants against whom Gilead did not move for any injunctive relief).  Gilead seeks the same order with regard to the newly added Defendants.

Under the Lanham Act, Gilead is entitled to an accounting and disgorgement of Defendants' illicit profits from their sale and distribution of counterfeit Gilead medication that bears Gilead's trademarks.  An *ex parte* asset freeze order will maintain the status quo, which includes preserving Gilead's ability to recoup the profits that Defendants earned from the sale of the counterfeit Gilead medication.  This relief is not merely consistent with, but critical to, putting an immediate stop to Defendants' sale of counterfeits in the United States.  Moreover, this relief is routinely granted in counterfeiting cases.  The asset freeze order proposed here is functionally identical to the Court's earlier orders in this case, as well as an order that was recently granted by another court in an anti-counterfeiting case, which is attached as Exhibit 4 to the 7/21/21 Potter Declaration.

### A.   Legal Standard for Asset Freezes under the Lanham Act

Where, as here, a plaintiff seeks lost profits and equitable remedies under the Lanham Act, 15 U.S.C. §§ 1116(a) and 1117, a federal court has the "inherent equitable powers to order

preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). The Second Circuit has joined its "sister circuits to have considered the issue" in holding that in trademark infringement actions, "the district court ha[s] the inherent equitable authority to issue [an] Asset Freeze Injunction." *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 130, 132 (2d Cir. 2014); *see also Reebok Int'l, Ltd.* v. *Marnatech Enters.*, 970 F.2d 552, 559 (9th Cir. 1992) (because "the Lanham Act authorizes the district court to grant [plaintiff] an accounting of [defendants'] profits as a form of final equitable relief, the district court ha[s] the inherent power to freeze [defendants'] assets in order to ensure the availability of that final relief."); *Balenciaga Am., Inc. v. Dollinger*, No. 10 Civ 2912 (LTS), 2010 U.S. Dist. LEXIS 107733, at *22-24 (S.D.N.Y. Oct. 8, 2010) (collecting cases); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("[S]ince the assets in question ... were profits  the [defendants] made by unlawfully stealing [the plaintiffs'] services, the freeze was appropriate and may remain in place pending final disposition of this case."); *Motorola Inc. v. Abeckaser*, No. 07-cv-3963 (CPS)(SMG), 2009 U.S. Dist. LEXIS 40660, at *8 (E.D.N.Y. May 14, 2009); *N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-cv-9083 (RMB), 2006 U.S. Dist. LEXIS 14226, at *10 (S.D.N.Y. Mar. 30, 2006) (In counterfeiting cases, "[d]istrict courts have the 'authority to freeze those assets which could [be] used to satisfy an equitable award of profits.'"). The purpose of such an order is "to preserve the possibility of an effective accounting of [the counterfeiter's] profits and the return of the profits fraudulently obtained." *Reebok*, 970 F.2d at 560. The requested injunctive relief will preserve the status quo and will also help secure the participation of the Defendants in this litigation.

Motions for an asset freeze under the Lanham Act are evaluated under the familiar standard for a preliminary injunction. *See Shamrock Power Sales, LLC v. Scherer*, No. 12-cv-8959 (KMK)(JCM), 2016 U.S. Dist. LEXIS 144773, at *6 (S.D.N.Y. Oct. 18, 2016); *see also Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, No. 03-cv-4844, 2005 U.S. Dist. LEXIS 28917, at *48 (N.D. Ill. Nov. 8, 2005).

### B.      Gilead Has a Strong Likelihood of Success on the Merits

As set forth above, the evidence leaves no room for doubt that the Defendants have sold counterfeit Gilead HIV medication with counterfeit pedigrees, which is all that Gilead needs to establish to prevail on its strict-liability Lanham Act claims. *See supra* Facts Part III.

### C.      Defendants Are Likely to Dissipate Assets, and Gilead Will Suffer Additional Irreparable Harm If Their Assets Are Not Frozen

Counterfeiters like Defendants make their living by secrets and subterfuge, and therefore are likely to "hide their allegedly ill-gotten funds" if their assets are not frozen. *Reebok*, 970 F.2d at 563; *accord Chanel, Inc. v. Classic-Bag-Shop*, No. 19-cv-60492, 2019 U.S. Dist. LEXIS 42688, at *10 (S.D. Fla. Mar. 14, 2019) ("In light of the inherently deceptive nature of the counterfeiting business ... Plaintiff has good reason to believe Defendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless those assets are restrained."). When engaged in the practice of selling counterfeit HIV medication with an entirely different drug inside, serious civil and criminal exposure is a given – as the indictment of Kingpin Defendant Lazaro Hernandez recently emphasized.  Each Defendant operates outside of and in violation of the law while doing business in a heavily regulated industry, and each depends on fraud and subterfuge to sell its highly illegal product in U.S. commerce.  The record evidence strongly supports the conclusion that the Defendants will conceal or dissipate their illegal profits when given the chance. *See Lorillard Tobacco Co.*, 2005 U.S. Dist. LEXIS 28917, at *56 ("In

126

this case, the Lanham Act provides [Plaintiffs] with the equitable remedy of recovering the

[Defendants'] profits.  In such cases, courts have generally concluded that an asset freeze is

appropriate to ensure that permanent equitable relief will be possible." (quoting *Levi Strauss &*

*Co.*, 51 F.3d at 987; *Reebok*, 970 F.2d at 559)).

Moreover, the Defendants here are engaged in an organized counterfeiting conspiracy

that operates through an ever-increasing series of seemingly unconnected fly-by-night entities

that routinely abandon their offices before Gilead's investigators knock on their warehouse door.

The conspiracy as a whole is set up to split the risk and the profits among multiple entities that

can disappear with the money at on moments' notice.

### 1.     The Kingpin Defendants

Gilead has detailed above how the Kingpin Defendants took extraordinary measures to

conceal their identities even from the Leader Defendants who acted as their lieutenants.  The

conspiracy they controlled utilized a complex and sophisticated money-laundering operation,

whereby funds from the fly-by-night Supplier Defendants disappeared into a maze of shell

companies and crooked jewelry stores.  Although hundreds of millions of dollars from the

counterfeiting operation flowed upward to the Kingpin Defendants, Gilead has uncovered no

evidence of a payments to them.  Indeed, the government has already detailed that Kingpin

Defendant Hernandez paid an associate to withdraw cash from the money-laundering entities and

hand-deliver the currency to him, ensuring that he never had any contact whatsoever with the

money launderers.

Kingpin Defendant Hernandez is currently indicted on several money-laundering charges

connected to the conspiracy.  Kingpin Defendant Herrera was so adept at hiding his income from

the conspiracy that Gilead had to track him down by subpoenaing a tile company for invoices

that were with counterfeiting funds to renovate his home.  There can be little question that these

career criminals who ran a vast counterfeiting enterprise from the shadows will dissipate funds if given the opportunity to do so.

### 2.     The New Leader Defendants: John Levitan and David Dunn

Like the other Leader Defendants, John Levitan and David Dunn orchestrated the conspiracy's use of a string of fly-by-night entities to sell counterfeits to Distributor Defendants. Messrs. Levitan and Dunn personally facilitated the sales several fly-by-night Supplier Defendants to Safe Chain and Scripts, respectively, and their names never appear on an invoice, shipping record, pedigree, or other paperwork as the counterfeits get pushed through the supply chain.  Moreover, Mr. Levitan has already served fourteen years in prison for money laundering.

The evidence leaves no room for doubt that Messrs. Levitan and Dunn, along with their fellow Leader Defendants, were knowingly supervising a criminal counterfeiting conspiracy that is set up to evade detection and limit the losses caused by any particular member getting caught. There is no reason to believe that any of their funds left unfrozen will ever be seen again.

### 3.     The New Supplier Defendants: My Meds, ITC, Abacus, V & G, Pharma Pac LLC, CompaRX, Mainspring, and Their Principals

The new Supplier Defendants are prototypical fly-by-night counterfeiters against whom courts routinely grant asset freezes.  Gilead's experience has borne this out: all of the new Supplier Defendants closed up shop and went underground before Gilead's investigators could make contact.  That is precisely what the Supplier Defendants were set up to do: sell as many counterfeits as possible as quickly as possible, and then disappear at the first sign of trouble. Gilead has also detailed above how the Supplier Defendants laundered their ill-gotten gains through the counterfeiting conspiracy's money-laundering operation.  The need for an asset freeze against these defendants is manifest.

### 4. The Pharmacy Turned Counterfeit Supplier, Valuecare

Valuecare is a retail pharmacy that acted as a counterfeit supplier, selling counterfeit Gilead-branded medication to Distributor Defendant MyMeds and Pharmacy Defendant Medicine Shoppe. The evidence shows that Valuecare's sales of counterfeits was at least in large part controlled by Defendant Peter Khaim, acting under a pseudonym. Mr. Khaim is the career fraudster behind counterfeit Supplier Defendant Boulevard, and he is currently facing money-laundering charges under two separate indictments for two different pharmacy and medical fraud schemes. Mr. Khaim also laundered his counterfeiting proceeds from Boulevard 9229 through various real-estate purchases made in the name of his family members, and this Court has frozen that real estate as well. Dkt. No. 512. And consistent with the other counterfeit suppliers in this action, Valuecare closed its doors and abandoned its retail location before Gilead was able to add it to this action.

### 5. The New Distributor Defendant, ProVen

ProVen fits the same mold as previously named Distributor Defendants Safe Chain, ProPharma, and Scripts, all of whom are currently the subject of an asset freeze order. The Distributor Defendants are critical members of the counterfeiting conspiracy: they provide the licensure and the pretense of legitimacy necessary to take the counterfeits out of the hands of shady fly-by-night entities and get them on the shelves of retail pharmacies (and from there, into the hands of unsuspecting patients). As with the previously named distributors, every pedigree that Gilead has seen for Gilead medications sold by ProVen is fraudulent. ProVen should not be given the opportunity to hide or dissipate its counterfeiting profits.

### 6. The New Pharmacy Defendants: Total Remedy and Laconia

A retail pharmacy with a single location, Total Remedy purchased over $20 million in counterfeit Gilead-branded HIV medication in the course of less than a year. It persisted in its

extremely high-volume counterfeiting, buying from each of the Distributor Defendants in turn, despite at least a half-dozen warnings that it was breaking the law and endangering patients. After Gilead shut down the last of the Distributor Defendants and effectively shut off Total Remedy's supply, Total Remedy escalated to buying directly from the already-enjoined fly-by-night counterfeit Supplier Defendant Pharma Pac LLC.  Total Remedy has embedded itself in the counterfeiting conspiracy and has made it abundantly clear that it will do whatever it can to continue raking in its illegal counterfeiting profits.  It is, to put it mildly, highly implausible that Total Remedy, if given notice of a civil suit seeking the disgorgement of those counterfeiting profits, would leave those illicit funds sitting in its bank account, awaiting a judgment against it.

Pharmacy Defendant Laconia has already refused to provide legally mandated information required to stop the counterfeiting and protect the health of its patients.  Laconia is also engaged in an illegal kickback scheme, paying patients to fill their HIV prescriptions at its pharmacy, only to receive counterfeits in return.  The evidence shows that Laconia is a willful counterfeiter willing to sacrifice its patients for an illicit profit, and it cannot be trusted to leave its illicit funds in place for collection at the conclusion of this litigation.

### 7.    The New Asset Holder Defendants

As set forth above, the new Asset Holder Defendants are knowing and intentional participants in the counterfeiting conspiracy's money-laundering operation who washed the Supplier Defendants' illicit proceeds while masking the transfer of those gains to upstream members of the conspiracy.  They are critical members of the conspiracy who ensured that the counterfeiting can continue (and continue to be profitable).[24]  The risk that these defendants

---

[24] Gilead also notes that, in the alternative, the Court may bind the Asset Holder Defendants to an asset freeze order pursuant to Rule 65(d)(2)(C), which provides that an injunction may cover not just a defendant and its employees and agents, but also "other persons who are in active concert or participation

130

would dissipate the counterfeiting proceeds if given the opportunity is plain.  This Court has already issued asset freeze orders based on similar evidence against all of the previously named Asset Holder Defendants.  In light of the evidence that the new Asset Holder Defendants have directly received the proceeds of counterfeiting, the court should freeze their accounts and prevent them from further dissipating these illicit funds.

### 8.    The New Relief Defendant, Etzhaim

As set forth above, this Court previously issued an asset freeze against Relief Defendant La Vie, preventing it from selling a piece of real estate that was purchased with counterfeiting proceeds.  Before that freeze was issued, La Vie transferred title to that real estate for no consideration to Etzhaim, another Khaim family shell company.  For the reasons stated above and in Gilead's original motion to freeze the Relief Defendants' assets (Dkt. No. 505), the Court should freeze newly named Relief Defendant Etzhaim's assets as well.

### D.    The Balance of the Equities Strongly Favors Gilead

The balance of harms also heavily weighs in favor of an asset freeze.  The evidence shows that Defendants knowingly sold counterfeit medications in violation of the Lanham Act.  Any harm an asset freeze may cause to Defendants was "brought upon themselves with their tactics of deception and underhandedness." *Lorillard Tobacco Co.*, 2005 U.S. Dist. LEXIS 28917, at *58.  By comparison, the harm caused by Defendants' actions – both to unsuspecting patients and to Gilead's trademarks and goodwill – is clear.

---

with" them.  Here, the evidence shows that the Asset Holder Defendants are working in active concert and participation with the Supplier Defendants by working to conceal, launder, and/or distribute the Supplier Defendants' proceeds from counterfeiting.  Thus, in issuing an asset freeze order against the Distributor Defendants, the Court may specifically name the Asset Holder Defendants as entities "in active concert or participation with" the Distributor Defendants.  *See S.E.C. v. Homa*, 514 F.3d 661, 665 & n.5 (7th Cir. 2008); *see also Gucci Am., Inc.*, 768 F.3d at 137 (citing *Homa* with approval).

To the extent that the Defendants can demonstrate – contrary to the overwhelming evidence – that their assets are not the fruits of their counterfeiting, they can make such a showing to the Court and have the freeze lifted or amended. *See Balenciaga Am*, 2010 U.S. Dist. LEXIS 107733, at *24-26.  Defendants can also move to have sufficient funds released to pay their lawyers and other necessary expenses.  Gilead, on the other hand, will have no recourse if the Defendants dissipate their assets.  *See Dong v. Miller*, No. 16-CV-5836 (NGG)(JO), 2018 U.S. Dist. LEXIS 48506, at *41-42 (E.D.N.Y. Mar. 23, 2018).  Once hidden or removed from the Court's reach, there is very little that can be done to recover a counterfeiter's assets.

### E.      The Public Interest Is Served by an Asset Freeze

An asset freeze is in the public interest because it will help secure the Defendants' participation in this lawsuit and ensure they do not continue to purchase and sell counterfeits during the course of litigation.  *See Std. & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) ("[A] court of equity … may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved.").  There will be no harm to the public from the asset freeze, as there is no shortage of legitimate distributors who can deliver authentic Gilead medication to any pharmacy in the nation.

### F.      The Asset Freeze Should Be Global in Scope and *Ex Parte*

This Court's Asset Freeze Orders against the Defendants named in Gilead's original and First Amended Complaints have no geographical limitations and were issued *ex parte*, and Gilead respectfully requests that the Court do the same here.  Gilead set forth in its opening brief authority stating the asset freeze should be global in scope and *ex parte* and incorporates that authority by reference here.  Plaintiffs' Mem. of L., dated July 22, 2021 at 74-76.

### G.     The Court May in the Alternative Attach the Defendants' Assets *Ex Parte* Under New York Law.

The Court can and should freeze all of the newly named Defendants' assets pursuant to its well-established equitable powers under the Lanham Act, as the Court has done with respect to every previously named Defendant, including the previously named Asset Holder Defendants. However, in light of the counterfeiting conspiracy's wide-ranging money-laundering operation, Gilead notes that the newly named Defendants who engaged in money laundering – at minimum, the Kingpin Defendants, Supplier Defendants, and Asset Holder Defendants – are also subject to having their assets attached *ex parte* under New York law.

Pursuant to Federal Rule of Civil Procedure 64, a "plaintiff in federal court may attach the assets of a defendant under the circumstances and in the manner provided by the law of the state in which the district court is located." *Pantheon Props. Inc. v. Houston*, 2022 WL 785168, at *2 (S.D.N.Y. March 14, 2022).  In New York, CPLR 6201 describes the circumstances in which assets can be attached.  The effect of an attachment pursuant to CPLR 6201 is the same as an asset freeze under the Court's equitable powers: the freezing of the subject assets.  *Id.*  Federal courts sitting in New York can and do issue attachment orders pursuant to CPLR 6201 on an *ex parte* basis.  *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 2022 WL 827094, No. 21CV10940 (DLC), at *8 (S.D.N.Y. Mar. 16, 2022).

As applicable here, CPLR 6201(3) provides that an order of attachment may be granted when "the defendant, **with intent to defraud** his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." *Id*. (emphasis added). "Thus, § 6201(3) requires a plaintiff to prove two elements: '1) that defendant either is about to or has assigned, disposed of, encumbered, or secreted property, or removed it from the

state; and 2) that defendant has acted or will act with the intent to defraud her creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor.'" *Allstate Ins. Co. v. Rozenberg*, 2009 WL 9081080, No. 08-CV-565, at *5 (E.D.N.Y. Jan. 26, 2009) (quoting *Encore Credit Corp. v. LaMattina*, 2006 WL 148909, No. CV-05-5442 (CPS), at *3 (E.D.N.Y. Jan. 18, 2006)).  In order to obtain an order of attachment, the plaintiff must demonstrate that "(a) there is a cause of action; (b) it is probable the plaintiff will succeed on the merits; (c) one or more grounds for attachment provided in § 6201 exist; and (d) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." *Pantheon Props.*, 2022 WL 785168, at *2 (citing CPLR 6212(a)).

Courts have recognized that the fraudulent intent required under CPLR 6201(3) is rarely susceptible to direct proof, and have thus developed "badges of fraud" that are sufficient to establish the requisite "intent to defraud," including transfers without sufficient consideration and purchases of gold, jewelry, and luxury items.  *See, e.g.*, *CF 135 Flat LLC v. Triadou SPV NA*, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016) (citing *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983)).  Importantly, evidence that the defendants engaged in a money-laundering conspiracy is on its own sufficient to support a finding of fraudulent intent under CPLR 6201(3). *See Allstate Ins. Co.*, 2009 WL 9081080, at *6  (finding that "[b]y presenting evidence of this money laundering scheme, the Plaintiffs have made a prima facie showing that [various entities] secreted assets for the purpose of evading creditors.").  Because Gilead has set forth extensive evidence of the money-laundering schemes entered into by the Kingpin Defendants, the Supplier

Defendants, and the Asset Holder Defendants, the court can, in the alternative, attach their assets pursuant to Rule 64 and CPLR 6201(3).[25]  *See id.*

## VI.    CONCLUSION

For the reasons stated above, the Court should grant Gilead's motion for an *ex parte* seizure order, a temporary restraining order (to be followed by a preliminary injunction), and an asset freeze order, and should award any other and further relief that the Court may deem just and proper.  Proposed orders for the requested relief are being filed simultaneously herewith.

---

[25] CPLR 6212 provides that the plaintiff shall post a bond in connection with an order of attachment of no less than $500.  The amount of the bond is set at the "discretion of the Court." *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 2022 WL 827094, at *8 (S.D.N.Y. Mar. 16, 2022). The court in *Iraq Telecom* ordered an attachment of "up to $100 million" in assets under a $100,000 bond.  *Id.* at *4.

Dated: July 29, 2022

Respectfully submitted,

_____
  Geoffrey Potter
  Aron Fischer
  Timothy A. Waters
  Thomas P. Kurland
  Gizele Rubeiz
   Angelica H. Nguyen
   Maxwell Weiss
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel:     (212) 336-2000
Fax:     (212) 336-2222
gpotter@pbwt.com
afischer@pbwt.com
twaters@pbwt.com
tkurland@pbwt.com
grubeiz@pbwt.com
anguyen@pbwt.com
maweiss@pbwt.com

*Attorneys for Plaintiffs*
*Gilead Sciences, Inc., Gilead Sciences Ireland UC,*
*and Gilead Sciences, LLC*

136