UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

GILEAD SCIENCES, INC., GILEAD SCIENCES   :
IRELAND UC, and GILEAD SCIENCES, LLC,   :
                                        :   Case No. 21-cv-4106 (AMD) (RER)
                     Plaintiffs,   :
                                          :

v.   :
                                          :

SAFE CHAIN SOLUTIONS, LLC; PATRICK   :
BOYD; CHARLES BOYD; WORLDWIDE   :
PHARMA SALES GROUP, INC. d/b/a   :
PHARMASALES.COM; ADAM S. BROSIUS;   :
BOULEVARD 9229 LLC; ISHBAY SHUKUROV; :
PETER KHAIM; ZAFAR ABDULLAEV;   :
PROPHARMA DISTRIBUTION LLC; LEVI   :
ELLIS; SYNERGY GROUP WHOLESALERS   :
LLC; CARLOS VEGA; ISLAND CHEMISTS,   :
INC. d/b/a MEADOW DRUGS & SURGICAL;   :
RANDOLPH MOHABIR; V.L.S. PHARMACY   :
INC.; GOPESH M. PATEL; LIN PHARMACY   :
INC. d/b/a MAKKI PHARMACY; SAMUEL   :
YAKUBOV; MONICA A. NGO; ASCENSION   :
PHARMACY HOLDINGS I LLC d/b/a   :
MERMAID RX AND ARIEL PHARMACY;   :
ALEX GELBINOVICH; PAUL ROSELL; MED-   :
CONNECT ENTERPRISES, LLC; DHRUV   :
RALHAN; D&K HEALTHCARE SOLUTIONS   :
LLC; VENKATA SRINIVAS MANNAVA; DSP   :
CONSULTING INC.; JOHN   :
PANAGIOTOPOULOS; MIKE ZANGARI;   :
RICCARDO MASSANA; STREAMLINE RX   :
LLC; PAVAN MANTRIPRAGADA; MFK   :
MANAGEMENT LLC d/b/a BOULEVARD 9229   :
& 9229 BOULEVARD; MAKE IT HAPPEN   :
MARKETING INC.; QUAN HERNANDEZ;   :
SCRIPTS WHOLESALE INC.; STEVEN   :
DIAMANTSTEIN; USDV PHARMA LLC;   :
NER250 LLC d/b/a SCRIPTS WHOLESALE;   :
JEFFREY S. BEETLEY; MARYLAND   :
PHARMACIES INC. d/b/a THE MEDICINE   :
SHOPPE #1802; PRIMERX INC.; SEKAR   :
VENKATESH; OMOM PHARMACEUTICALS   :
INC.; OMOM WHOLESALE CORP.; GUSTAVO   :

1

FERNANDEZ; LUIS D. GONZALEZ HERRERO; :
JORDAN RODRIGUEZ MATO; INVICTA :
WHOLESALE SUPPLY LLC; JORGE CABA; :
RXWHOLESALE.COM LLC; GABRIEL :
BETESH; DANIEL GELBINOVICH; CESAR :
CASTILLO WHOLESALERS LLC f/k/a CESAR :
CASTILLO LLC; DNS DISTRIBUTOR LLC; :
JULIO MARTIN GONZALEZ; PHARMA PAC :
WHOLESALE CORP.; ANGEL TORAL; :
GENTEK LLC; EDEL REYES; RAPID'S TEX :
WHOLE SALES CORP; JOHN SANTOS; TITAN :
DISTRIBUTION & SERVICES LLC; TIDY :
GARAGES L.L.C.; GABRIEL DELGADO :
RAMIREZ; CM PHARMACEUTICAL LLC; :
JEFFREY W. GAFNEA; ROBERT W. GAFNEA; :
JM SMITH DISTRIBUTION CORP.; CARLOS :
HERNANDEZ; ASB WHOLESALE :
DISTRIBUTORS LLC; SILVERLINE PHARMA :
LOGISTICS LLC; ALBERTO ALONSO DIAZ, :
LAZARO ROBERTO HERNANDEZ; :
ARMANDO HERRERA; JOHN LEVITAN; :
DAVID DUNN; PCSIONE, LLC; PHARMACY :
CONSULTING SERVICES, INC.; STEPHEN :
SMITH; EMILIO JUVIER VINA; MY MEDS :
LLC; FRANK BETANCOURT; ITC GROUP, :
LLC; JOSE ANTONIO HERNANDEZ; CARLOS :
PIMENTEL; ABACUS DISTRIBUTORS INC.; :
ABACUS DISTRIBUTORS INC.; PAVEL :
LASHKEVICH; V & G WHOLESALE INC; :
EDVIN OVASAPYAN; HAKOB KOJOYAN; :
LORIK PAPYAN; STEPHEN SILVERMAN; :
MAINSPRING DISTRIBUTION LLC; DAYNEL :
GARCIA; PHARMA PAC LLC; YUSNIEL :
FORCELLEDO PEREZ; COMPARX LLC; :
BAKHTIYAR NABIEV; VALUECARE :
PHARMACY INC.; RAOUL DIAMANTSTEIN; :
LIEB PHARMACY, INC.; MOHAMMAD :
ETMINAN; EVERYTHING PHARMACY :
RELATED II, INC., D/B/A TOTAL REMEDY :
AND PRESCRIPTION CENTER; WILLIAM :
SCOTT WISE; PROVEN PHARMACEUTICALS :
LLC; NICOLE ALSTON; BORIS ABRAMOV; :
HASHEM YITBARACH LLC; JEFFREY :
PETERSON; BRENNAN PAGE; TARIEL :
BEGIYEV; JUAN HERNANDEZ; 2040 :
HAVILAND CORP.; RONALD VIDAURRE; :

VIBE ENTERPRISE, INC.; SOFITEL TRADING       :
CORP; FRANCY BEDOYA; SKYLINE WORLD           :
GROUP INC.; MARIA BEDOYA; ELITE              :
DISTRIBUTION INC; SAM KESSLER; AVI           :
KESSLER; THE PRECIOUS METALS GROUP           :
INC.; MADISON BULLION LLC; GREEN             :
CAPITAL INVESTORS LLC; IGOR AMINOV;          :
GOLD TOWER REFINERY INC.; ALL                :
AMERICAN HEAVY EQUIPMENT IMPORT &            :
EXPORT, LLC; ALEXANDER ORRIOLS; BLUE         :
SEA MARINE INC.; ALEX GALVAN; AMG            :
LOGISTICS SKY LLC; POWER PRO                 :
LOGISTICS LLC; M & D CO. DISTRIBUTORS,       :
LLC; LILIANA TERESA SAMPAYO MENA;            :
MDSD ENTERPRISES LLC; FRANCIS FATA;          :
ASCAN PHARMACY INC.; STANISLAUS              :
MGBEOJIRIKWE; LACONIA AVENUE                 :
PHARMACY CORP.; and YISEL LOPEZ,             :
                                             :
                       Defendants, and       :
                                             :
SWETHA KETINENI; BABASHILOH                  :
ENTERPRISES LLC; 5 CONTINENTAL               :
VENTURES LLC; AP FUNDING LLC; 441            :
WILLIS AVE LLC; LA VIE JEWELS OF NY          :
LLC; AG WORLDWIDE SALES, INC.; AND           :
ETZHAIM INC.,                                :
                       Relief Defendants.    :
-------------------------------------------------------------- X

## CORRECTED FOURTH AMENDED COMPLAINT

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC

(together, "Gilead" or "Plaintiffs"), by and through their counsel, Patterson Belknap Webb &

Tyler LLP, for their Fourth Amended Complaint against the Defendants listed above and in the

Appendix attached hereto, allege as follows:

## SUMMARY OF THE ACTION

1.      In this action, Gilead seeks to put an immediate and permanent stop to

Defendants' knowing and willful manufacture, sale, marketing, and distribution of counterfeit

3

prescription drugs.  The counterfeits are of Gilead medications, including Gilead HIV medications: life-saving treatments for patients living with HIV, and pre-exposure prophylactic, or PrEP, medication that protects against HIV-1 infection when taken as prescribed.  Defendants sold authentic-looking bottles of Gilead HIV and other medication to distributors and pharmacies throughout the United States, including in New York City, who in turn dispensed them to patients.  But, for some of those bottles of purported Gilead HIV medications, the tablets inside those bottles were not Gilead's HIV medication.  They were completely different drugs.  And all of the purported Gilead HIV medications sold by Defendants were sold with counterfeit documentation that misrepresented the provenance of the medications.

2.      The counterfeiters used authentic Gilead bottles that at one point contained authentic Gilead HIV or other medications.  In many cases, the tamper-evident seals of these authentic bottles had been broken and their contents emptied.  The counterfeiters inserted the foreign tablets into these empty bottles, and then re-sealed the bottles.  The counterfeits were thus engineered to resemble a new, unopened, and authentic bottle of authentic Gilead medication.  Because federal law requires that all prescription drugs be accompanied by a "pedigree" – a document tracking every sale of the bottle from seller to seller, all the way back to the manufacturer – Defendants distributed the counterfeits with counterfeit pedigrees that fraudulently purported to trace the counterfeits to an authentic source.

3.      The danger these counterfeits pose is dire.  Those who receive and ingest these counterfeits unwittingly miss their HIV treatment or falsely believe themselves to be protected against HIV infection.  The foreign drugs in the counterfeit bottles were never prescribed by those individuals' doctors and could cause serious harm or death, through contraindicated drug-drug interactions or the onset of unanticipated side effects such as loss of consciousness while

4

operating heavy machinery or driving.  The counterfeit pedigrees with which these products are sold makes it impossible to verify where the products came from, how they have been handled and stored, and what pills are in the bottles.

4.      Gilead's investigation, including its review of documents seized from previously named Defendants in this action, has revealed that these counterfeits are being manufactured, marketed, sold, and distributed through a large-scale, sophisticated counterfeiting conspiracy.

5.      At the head of the conspiracy are the Kingpin Defendants, career criminals who organized the conspiracy and controlled the flow of the counterfeits, all while operating from the shadows and using extensive measures to conceal their identities.  The Kingpin Defendants, directly and through co-conspirators, established and controlled a series of fly-by-night pharmaceutical wholesalers set up for the purpose of selling counterfeit medication.

6.      These fly-by-night counterfeit wholesalers are the "Supplier Defendants."  Each Supplier Defendant was an ultimately expendable shell company, intended to sell counterfeits until it started to garner unwanted attention, at which point it would shut down and disappear. The conspiracy would then introduce a new, seemingly unconnected Supplier Defendant to fill the gap and to keep the flow of counterfeits moving.  The Supplier Defendants all have different owners on paper and are located throughout the United States.  This protected the conspiracy by creating the false appearance that the Supplier Defendants were disparate, unrelated entities.  In reality, the Supplier Defendants are co-conspirators in an organized counterfeiting ring, controlled by the Kingpin Defendants.

7.      Pharmacies typically will not buy from shady fly-by-night entities like the Supplier Defendants, and so to move the counterfeits the conspiracy needed more established businesses to conduct business with the pharmacies.  The "Distributor Defendants" filled that

role.  The Distributor Defendants had the existing pharmacy customers and the licensure and FDA registration that the Supplier Defendants lacked.  The Distributor Defendants used those credentials to give a veneer of legitimacy to the counterfeits by buying from the Supplier Defendants, adding their names to the pedigrees, and selling hundreds of millions of dollars' worth of counterfeits to pharmacies across the country.

8.      A group of higher-level individuals in the conspiracy, the Leader Defendants, were tasked with managing the flow from Supplier Defendants to Distributor Defendants to pharmacies.  The Leader Defendants recruited the Distributor Defendants into the conspiracy, connected them with the various fly-by-night Supplier Defendants, and managed inventory as the products were sold and shipped to the Distributor Defendants' pharmacy customers.  And when a Supplier Defendant suddenly went underground to avoid detection, the Leader Defendants introduced a new Supplier Defendant to take its place.

9.      The counterfeiting network also utilized a dedicated sales force, the "Marketer Defendants," to aggressively market the counterfeit Gilead medications to pharmacies in the United States. The Marketer Defendants partnered with the Distributor Defendants in order to market the counterfeit Gilead-branded medications to pharmacies.

10.     The counterfeiting network replenished its supply of counterfeits through the "Collector Defendants," a network of street-level operatives and their managers who illegally bought already-dispensed bottles (whether full or empty) of Gilead-branded medication from patients for cash.  The Collector Defendants prepared the bottles to be sold as counterfeits by scraping off pharmacy labeling, removing residue, and attaching counterfeit patient information documents, which include patient instructions for use.

6

11.     Finally, the "Asset Holder Defendants" are a series of money launderers, including shell companies, purported gold dealers, and cell-phone scammers (the "Asset Holder Defendants") who laundered the conspiracy's ill-gotten gains and obfuscated the massive illegal profits being earned by the Kingpin Defendants and their co-conspirators.

12.     In this action, Gilead seeks injunctive relief, including a seizure at certain Defendants' premises, in order to put an immediate stop to the sale of these dangerous counterfeit medications.  Gilead also seeks other injunctive and monetary relief against all Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; common-law unjust enrichment and unfair competition; engaging in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c); and conspiracy to engage in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(d).

## THE PARTIES

13.     A list of the parties to this action, and of the Defendant Groups referred to here, is presented in Appendix A hereto, which is hereby incorporated into this Fourth Amended Complaint as if fully set forth herein.

## A.     PLAINTIFFS

14.     Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 12,000 employees.  Its principal place of business is 333 Lakeside Drive, Foster City, California 94404.  Gilead develops and markets a large portfolio of

lifesaving medications, including drugs for the treatment or prevention of HIV.  Gilead is the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine HIV and other medications.

15.     Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Sciences, Inc. is the ultimate parent of Gilead Ireland.  Gilead Ireland is the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine HIV and other medications.

16.     Plaintiff Gilead Sciences, LLC is a private limited liability company organized under the laws of the State of Delaware, with its principal place of business at 333 Lakeside Drive, Foster City, California 94404.  Gilead Sciences, Inc. is the ultimate parent of Gilead Sciences, LLC.  Gilead Sciences, LLC is the owner of at least one well-established and famous registered trademark that appears on the packaging, tablets, and instructional inserts of certain genuine HIV and other medications.

17.     Gilead Sciences, Inc., Gilead Ireland, and Gilead Sciences, LLC (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on its genuine medications.  A complete list of these trademarks is depicted at Exhibit A hereto.  Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its medications in the marketplace, which is depicted at Exhibit B hereto.

**B.**     **DEFENDANTS NAMED IN GILEAD'S ORIGINAL COMPLAINT**

**1.**     **Safe Chain Defendants**

18.     Defendant Safe Chain Solutions, LLC ("Safe Chain") is a Delaware limited liability corporation with a principal place of business in Cambridge, Maryland.

19.     Defendant Patrick Boyd is an individual residing in Maryland.  Together with his brother Charles, Patrick Boyd is a founder, owner, and managing principal of Safe Chain. Patrick Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications.  Patrick Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

20.     Defendant Charles Boyd is an individual residing in Maryland.  Together with his brother Patrick, Charles Boyd is a founder, owner, and managing principal of Safe Chain. Charles Boyd serves as CEO of Safe Chain.  Charles Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications. Charles Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

**2.**     **Worldwide Pharma Defendants**

21.     Defendant Worldwide Pharma Sales Group, Inc. d/b/a Pharmasales.com ("Worldwide Pharma") is a Delaware corporation with a principal place of business in Delray Beach, Florida.

22.     Defendant Adam S. Brosius is an individual residing in the United States. Brosius is the founder, owner, and principal of Worldwide Pharma.  Brosius managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications.  As principal of Worldwide Pharma, Defendant Adam Brosius personally

financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### 3. Boulevard Defendants

23.     Defendant Boulevard 9229 LLC ("Boulevard") is a New York limited liability corporation with a principal place of business in Rego Park, Queens, New York.

24.     Defendant Ishbay Shukurov is an individual residing in Brooklyn, New York. Shukurov is the owner of record of Boulevard.  Shukurov managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications. As principal of Boulevard, Defendant Ishbay Shukurov personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

## C.     DEFENDANTS NAMED IN FIRST AMENDED COMPLAINT

### 1. Additional Boulevard Defendants

25.     Defendant Peter Khaim is an individual residing in Queens, New York.  Khaim is an off-the-books principal of Boulevard.  Khaim has sometimes used the last name "Khaimov." Khaim managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications. As an off-the-books principal of Boulevard, Defendant Peter Khaim personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

26.     Defendant Zafar Abdullaev is an individual residing in Queens, New York. Abdullaev is an off-the-books principal of Boulevard.  Abdullaev managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications. As an off-the-books principal of Boulevard, Defendant Zafar Abdullaev personally financially

benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### 2. ProPharma Defendants

27.    Defendant ProPharma Distribution LLC ("ProPharma") is a Colorado limited-liability corporation with a principal place of business in Colorado.

28.    Defendant Levi Ellis is an individual residing in Colorado.  Ellis is the founder and owner of ProPharma.  Ellis managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications. As an owner of ProPharma, Defendant Levi Ellis personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### 3. Synergy Defendants

29.    Defendant Synergy Group Wholesalers LLC is a New Jersey limited liability corporation with a principal place of business in New Jersey.

30.    Defendant Carlos Vega is an individual residing in Florida.  Vega is the founder and owner of Synergy.  Vega, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications. As an owner of Synergy, Defendant Carlos Vega personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### 4. Pharmacy Defendants

31.    Defendant Island Chemists, Inc. d/b/a Meadow Drugs & Surgical is a retail pharmacy with a principal place of business in East Meadow, New York.

32.    Defendant Randolph Mohabir is the principal and supervising pharmacist of Island Chemists, Inc. d/b/a Meadow Drugs & Surgical and is a resident of New York.  Among

other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the Drug Supply Chain Security Act ("DSCSA") and other laws and ensuring the authenticity of medications and pedigrees purchased and sold by the pharmacy.

33.     Defendant V.L.S. Pharmacy Inc. is a retail pharmacy with a principal place of business in Brooklyn, New York.

34.     Defendant Gopesh M. Patel is the principal and supervising pharmacist of V.L.S. Pharmacy Inc. and a resident of New York.  Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medications and pedigrees purchased and sold by the pharmacy.

35.      Defendant Lin Pharmacy Inc. d/b/a Makki Pharmacy is a retail pharmacy with a principal place of business in Queens, New York.

36.     Defendant Samuel Yakubov is the principal of Lin Pharmacy Inc. d/b/a Makki Pharmacy and is a resident of New York.

37.     Defendant Monica A. Ngo is the supervising pharmacist of Lin Pharmacy Inc. d/b/a Makki Pharmacy and a resident of New York.  Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medications and pedigrees purchased and sold by the pharmacy.

38.     Defendant Ascension Pharmacy Holdings I LLC d/b/a/ Mermaid RX and Ariel Pharmacy is a retail pharmacy with a principal place of business in Brooklyn, New York.

39.     Defendant Alex Gelbinovich is the supervising pharmacist of Ascension Pharmacy Holdings I LLC d/b/a/ Mermaid Rx and Ariel Pharmacy and a resident of New York. Among other things, supervising pharmacists are individually responsible for ensuring a

pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medications and pedigrees purchased and sold by the pharmacy.

40.     Collectively, Defendants Island Chemists, Inc. d/b/a Meadow Drugs & Surgical, Randolph Mohabir, V.L.S. Pharmacy Inc., Gopesh M. Patel, Lin Pharmacy Inc. d/b/a Makki Pharmacy, Samuel Yakubov, Monica A Ngo, Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy, and Alex Gelbinovich are referred to herein as the "Pharmacy Defendants."

**D.     DEFENDANTS NAMED IN SECOND AMENDED COMPLAINT**

**1.     Leader Defendants**

41.     Defendant Paul Rosell is an individual residing in Miami, Florida.  Rosell is a broker and salesman.  Rosell is the registered agent and principal of Med-Connect Enterprises, LLC.  As alleged herein, Rosell managed and directed an enterprise dedicated to the sale of counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documentation.

42.     Defendant Med-Connect Enterprises, LLC is a Florida limited liability corporation with a principal place of business in Florida.  Its principal is Defendant Rosell.

43.     Defendant Dhruv Ralhan is an individual residing in Saint Petersburg, Florida. Ralhan is the sole member of the limited liability corporation D & K Healthcare Solutions LLC. As alleged herein, Ralhan managed and directed an enterprise dedicated to the sale of counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documentation.

44.     Defendant D & K Healthcare Solutions LLC is a Wyoming limited liability corporation with a principal place of business in Florida.  D & K Healthcare Solutions LLC is registered as a foreign corporation in the state of Florida.  Its sole member is Defendant Dhruv Ralhan.

13

45.     Defendant Venkata Srinivas Mannava is an individual residing in Carteret, New
Jersey.  Mannava is the registered agent, board of directors, and incorporator of DSP Consulting
Inc.  As alleged herein, Mannava managed and directed an enterprise dedicated to the sale of
counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documentation.

46.     Defendant DSP Consulting Inc. is a New Jersey corporation with a principal place
of business in New Jersey.  Its registered agent, board of directors, and incorporator is Defendant
Venkata Srinivas Mannava.

**2.      Marketer Defendants**

47.     Defendant John Panagiotopoulos is an individual residing in Quebec, Canada.  He
is affiliated with Defendant Streamline RX LLC.  Panagiotopoulos actively participated in the
marketing and sale of counterfeit Gilead HIV products accompanied by counterfeit
documentation.

48.     Defendant Mike Zangari is an individual residing in Quebec, Canada.  He is
affiliated with Streamline RX LLC.  Zangari actively participated in the marketing and sale of
counterfeit Gilead HIV products accompanied by counterfeit documentation.

49.     Defendant Riccardo Massana is an individual residing in Canada.  He is affiliated
with Streamline RX LLC.  Massana actively participated in the marketing and sale of counterfeit
Gilead HIV products accompanied by counterfeit documentation.

50.     Defendant Streamline RX LLC is a Florida limited liability corporation with a
principal place of business in Florida.  Its registered agent and manager is Defendant Pavan
Mantripragada.

51.     Defendant Pavan Mantripragada is an individual residing in Tampa, Florida.
Mantripragada is the registered agent and manager of Streamline RX LLC.  As discovery will

confirm, Mantipragada knowingly participated in the counterfeiting enterprise organized and led by the Leader Defendants.

### 3. Supplier Defendants

#### a. Additional Boulevard Defendants

52.     Defendant MFK Management LLC d/b/a Boulevard 9229 & 9229 Boulevard is a New York corporation with a principal place of business in New York.  MFK Management is closely affiliated with Boulevard 9229 LLC.  Its owners of record are New York corporation Boulevard 9229 LLC (1%) and New York trust Castle Rock Irrevocable Trust (99%).  Boulevard 9229 LLC's owner of record is Defendant Ishbay Shukurov.  Castle Rock Irrevocable Trust's grantor and trustee is Defendant Peter Khaim, and its beneficiaries are Khaim's descendants. Defendant Peter Khaim is MFK Management's off-the-books principal.

#### b. Additional Synergy Defendants

53.     Defendant Cesar Castillo Wholesalers LLC f/k/a Cesar Castillo LLC is a Colorado corporation with a principal place of business in Colorado.  Its registered agent and principal is Defendant Julio Martin Gonzalez.  Cesar Castillo Wholesalers LLC is affiliated with Defendants Synergy and Carlos Vega and participates in their counterfeiting operation.

54.     Defendant DNS Distributor LLC is a Colorado limited liability company with a principal place of business in Colorado.  Its registered agent and principal is Defendant Julio Martin Gonzalez.  DNS Distributor LLC is affiliated with Defendants Synergy and Carlos Vega and participates in their counterfeiting operation.

55.     Defendant Julio Martin Gonzalez is an individual residing in Colorado Springs, Colorado.  Martin Gonzalez is the registered agent and principal of Cesar Castillo LLC and DNS

Distributor LLC.  As discovery will confirm, Martin Gonzalez knowingly participated in the counterfeiting activities of Synergy.

### c.    Omom Defendants

56.    Omom Pharmaceuticals, Inc. is the name of two entities incorporated under different states' laws, both listing as their principal place of business the same address of 9265 Archibald Avenue in Rancho Cucamonga, California.

57.    Defendant Omom Pharmaceuticals, Inc. is the name of a Florida domestic corporation with a principal place of business in California.  Its owner, founder, and principal is Defendant Luis D. Herrero Gonzales.

58.    Defendant Omom Pharmaceuticals, Inc. is also the name of a California domestic corporation with a principal place of business in California. It owner, founder, and principal is Defendant Gustavo Fernandez.

59.    Defendant Omom Wholesale Corp. is a California corporation also with a listed principal place of business at 9265 Archibald Avenue in Rancho Cucamonga, California. Defendant Jordan Rodriguez Mato is the owner, founder, and principal of Omom Wholesale Corp.

60.    Omom Wholesale Corp. and both entities named Omom Pharmaceuticals, Inc., along with their respective principals, conspired together to traffic counterfeit Gilead-branded medications.  Counterfeit Gilead-branded medications and other shipments related to the counterfeiting were delivered to the 9265 Archibald Avenue address listed for all three companies.

61.    Collectively, Omom Wholesale Corp. and both Omom Pharmaceuticals, Inc. entities are referred to herein as "Omom."

16

62.     Defendant Gustavo Fernandez is an individual residing in Miami, Florida. Fernandez is the CEO, secretary, CFO, and Director of Omom Wholesale Corp.  Fernandez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of Omom Wholesale Corp., Defendant Gustavo Fernandez personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

63.     Defendant Luis D. Gonzalez Herrero is an individual residing in Hialeah, Florida. Gonzalez Herrero supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications.

64.     Defendant Jordan Rodriguez Mato is an individual believed to reside in Texas. Rodriguez Mato is the agent and incorporator of Omom Wholesale Corp.  Rodriguez Mato supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications.

### d.     Invicta Defendants

65.     Defendant Invicta Wholesale Supply LLC is a Washington state limited liability company with a principal place of business in Washington.  Its principal, president, and owner is Defendant Jorge Caba.

66.     Defendant Jorge Caba is an individual residing in West Palm Beach, Florida. Caba is the principal, president, and owner of Invicta Wholesale Supply LLC.  Caba supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of Invicta Wholesale Supply LLC, Defendant Jorge Caba personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### e.  RXWholesale.com LLC Defendants

67.     Defendant RXWholesale.com LLC is a New Jersey limited liability company with a principal place of business in New Jersey.  Its president and accounts receivable contact is Defendant Gabriel Betesh.

68.     Defendant Gabriel Betesh is an individual residing in Brooklyn, New York. Betesh is the president and accounts receivable contact for RXWholesale.com LLC.  Betesh supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the president of RXWholesale.com LLC, Defendant Gabriel Betesh personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

69.     Defendant Daniel Gelbinovich is an individual residing in Brooklyn, New York. Gelbinovich is affiliated with RXWholesale.com LLC.  Gelbinovich supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications.

### f.  Pharma Pac Defendants

70.     Defendant Pharma Pac Wholesale Corp. is a California corporation with a principal place of business in California.  Pharma Pac Wholesale Corp. is also registered in the state of New Jersey with a principal place of business in New Jersey.  Its CEO and secretary in California is Defendant Angel Toral.  Its incorporator, board of directors, and agent in New Jersey is also Defendant Angel Toral.

71.     Defendant Angel Toral is an individual residing in Miami, Florida.  Toral is the CEO and secretary of California registered Pharma Pac Wholesale Corp.  Toral is the incorporator, board of directors, and agent of New Jersey registered Pharma Pac Wholesale Corp.  Toral supervised, ratified, and/or personally participated in the trafficking of counterfeit

18

Gilead medications. As the CEO of Pharma Pac Wholesale Corp., Defendant Angel Toral personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

> **g.  Gentek Defendants**

72.    Defendant Gentek LLC is a Connecticut limited liability company with a principal place of business in Connecticut.  Its manager and CEO is Defendant Edel Reyes.

73.    Defendant Edel Reyes is an individual residing in Hialeah, Florida.  Reyes is the manager and CEO of Gentek.  Reyes supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the CEO of Gentek LLC, Defendant Edel Reyes personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

> **h.  Rapid's Tex Defendants**

74.    Defendant Rapid's Tex Whole Sales Corp. is a Texas corporation with a principal place of business in Texas.  Rapid's Tex is owned and operated by Defendant John Santos.

75.    Defendant John Santos is an individual residing in Houston, Texas.  Santos owns and operates Defendant Rapid's Tex.  Santos supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the owner of Rapid's Tex Whole Sales Corp., Defendant John Santos personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

> **i.  CM Pharmaceutical Defendants**

76.    Defendant CM Pharmaceutical LLC is an Alabama limited liability company with a principal place of business in Alabama.  Its manager and principal are Defendants Jeffrey W. Gafnea and Robert W. Gafnea, respectively.

77.     Defendant Jeffrey W. Gafnea is an individual residing in Tuscaloosa, Alabama.
Jeffrey W. Gafnea is the manager of CM Pharmaceutical LLC.  Jeffrey W. Gafnea supervised,
ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As
the manager of CM Pharmaceutical LLC, Defendant Jeffrey W. Gafnea personally financially
benefited from the trafficking of counterfeit Gilead medications and failed to exercise his
authority to stop it.

78.     Defendant Robert W. Gafnea is an individual residing in Alabaster, Alabama.
Robert W. Gafnea is the principal of CM Pharmaceutical LLC.  Robert W. Gafnea supervised,
ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As
the principal of CM Pharmaceutical LLC, Defendant Robert W. Gafnea personally financially
benefited from the trafficking of counterfeit Gilead medications and failed to exercise his
authority to stop it.

### j.     Scripts Defendants

79.     Defendant Scripts Wholesale Inc. is a New York corporation with a principal
place of business in New York.  Its principal is Defendant Steven Diamantstein. Scripts
Wholesale Inc is a brick-and-mortar distributor that sells counterfeit Gilead medication.

80.     Defendant Steven Diamantstein is an individual residing in Brooklyn, New York.
Diamantstein is the principal of NER250 LLC d/b/a Scripts Wholesale Inc., USDV Pharma LLC,
and Scripts Wholesale Inc.  Diamantstein supervised, ratified, and/or personally participated in
the trafficking of counterfeit HIV medications. As the principal of Scripts Wholesale Inc., USDV
Pharma LLC, and NER250 LLC, Defendant Steven Diamantstein personally financially
benefited from the trafficking of counterfeit Gilead medications and failed to exercise his
authority to stop it.

81.     Defendant USDV Pharma LLC is a New York limited liability corporation with a principal place of business in New York.  Its principal is Defendant Steven Diamantstein.

82.     Defendant NER250 LLC d/b/a Scripts Wholesale is a New York limited liability corporation with a principal place of business in New York.  Its principal is Defendant Steven Diamantstein.

83.     Defendant Jeff Beetley is a resident of Tennessee.  Beetley holds himself out as the CEO of USDV Pharma.  Beetley is also a Scripts employee whose job duties included selling Scripts' purported Gilead mediations. As the CEO of USDV Pharma LLC, Defendant Jeff Beetley personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### k.     The Medicine Shoppe Defendants

84.     Defendant Maryland Pharmacies Inc. d/b/a The Medicine Shoppe #1802 is a Maryland corporation with a principal place of business in Maryland.  Its resident agent and authorized person is Defendant Sekar Venkatesh.

85.     Defendant PrimeRX Inc. is a Maryland corporation with a principal place of business in Maryland.  Its principal is Defendant Sekar Venkatesh.  PrimeRX Inc. is a New York-licensed pharmaceutical wholesaler.

86.     Defendant Sekar Venkatesh is an individual residing in Maryland.  Venkatesh is the principal of PrimeRX Inc and resident agent and authorized person of Maryland Pharmacies Inc. d/b/a The Medicine Shoppe #1802.  Venkatesh supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of PrimeRX Inc. and resident agent of Maryland Pharmacies Inc. d/b/a The Medicine Shoppe #1802,

Defendant Sekar Venkatesh personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

### 4. The Asset-Holder Defendants

#### a. Make It Happen Defendants

87.     Defendant Make It Happen Marketing Inc. is a New York corporation with a principal place of business in New York.  Its principal is Defendant Quan Hernandez.  As alleged herein, Make It Happen Marketing Inc. received proceeds of counterfeit Gilead medications from the Boulevard Defendants.

88.     Defendant Quan Hernandez is an individual residing in New York, New York. Hernandez is the principal of Make It Happen Marketing Inc.

#### b. Titan Distribution & Tidy Garages Defendants

89.     Defendant Titan Distribution & Services LLC is a Florida limited liability company with a principal place of business in Florida.  Its principal is Defendant Gabriel Delgado Ramirez.  Titan Distribution & Services LLC received proceeds of counterfeit Gilead medications from the Omom Defendants for the purpose of laundering the funds and funneling them back to the suppliers of the counterfeits and the beneficiaries of the counterfeiting enterprise.

90.     Defendant Tidy Garages LLC is a Florida limited liability company with a primary place of business in Florida.  Its registered agent and manager is Defendant Gabriel Delgado Ramirez.  Tidy Garages LLC received proceeds of counterfeit Gilead HIV medication from the Omom Defendants for the purpose of laundering the funds and funneling them back to the suppliers of the counterfeits and the beneficiaries of the counterfeiting enterprise.

91.     Defendant Gabriel Delgado Ramirez is an individual residing in Miami, Florida. Delgado Ramirez is the principal of Titan and registered agent and manager of Tidy Garages LLC.  As discovery will confirm, Delgado Ramirez knowingly participated in the counterfeiting enterprise described herein.

### c.     ASB and Silverline Defendants

92.     Defendant ASB Wholesale Distributors LLC is a Florida limited liability company with a principal place of business in Florida.  Its registered agent and principal is Defendant Alberto Alonso Diaz.  ASB Wholesale Distributors LLC received proceeds of counterfeit Gilead HIV medication that were routed from the Omom Defendants through Titan Distribution & Services LLC for the purpose of laundering the funds and funneling them back to the suppliers of the counterfeits and the beneficiaries of the counterfeiting enterprise.

93.     Defendant Silverline Pharma Logistics LLC is a Florida limited liability company with a principal place of business in Florida.  Its registered agent and principal is Defendant Alberto Alonso Diaz.  Silverline Pharma Logistics LLC received proceeds of counterfeit Gilead HIV medication that were routed from the Omom Defendants through Titan Distribution & Services LLC, for the purpose of laundering the funds and funneling them back to the suppliers of the counterfeits and the beneficiaries of the counterfeiting enterprise.

94.     Defendant Alberto Alonso Diaz is an individual residing in Miami, Florida. Alonso Diaz is the registered agent and principal of ASB Wholesale Distributors LLC and Silverline Pharma Logistics LLC.  As discovery will confirm, Alonso Diaz knowingly participated in the counterfeiting enterprise described herein.

### d. JM Smith Distribution Corp. Defendants

95.     Defendant JM Smith Distribution Corp. is a New Jersey corporation with principal place of business in New Jersey.  Its principal is Defendant Carlos Hernandez.  JM Smith Distribution Corp received proceeds of counterfeit Gilead HIV medication from the Invicta Defendant, for the purpose of laundering the funds and funneling them back to the suppliers of the counterfeits and the beneficiaries of the counterfeiting enterprise.

96.     Defendant Carlos Hernandez is an individual residing in Hackensack, New Jersey. Hernandez is the principal and incorporator of JM Smith Distribution Corp.  As discovery will confirm, Hernandez knowingly participated in the counterfeiting enterprise described herein.

## E.   RELIEF DEFENDANTS NAMED IN THE THIRD AMENDED COMPLAINT

97.     Relief Defendant 5 Continental Ventures LLC ("Continental") is the nominal owner of real property located at 107-27 71st Ave. and 107-29 71st Ave., Forest Hills, New York (the "71st Avenue Property"), which Continental purchased on September 11, 2020 for $10,600,000.  Continental was organized on April 1, 2020, five months before the purchase of the 71st Avenue Property.  In public filings, Defendant Khaim's wife, Oksana Politiva, is listed as the organizer of Continental, with no other officers or owners identified.  Ms. Politiva signed the deed for the 71st Avenue Property.  In reality, the purchase of the 71st Avenue Property was orchestrated entirely by Defendant Khaim, who among other things negotiated the terms of the purchase, provided the funds for the purchase, and instructed his real-estate lawyer to effect the purchase.  Defendant Khaim caused the 71st Avenue Property to be purchased with the illicit proceeds of his counterfeiting, and the purpose of the purchase was to launder the proceeds of the counterfeiting and maintain those illicit assets nominally in the name of the shell company Continental.

24

98.     AP Funding LLC is the supposed lender on a publicly filed mortgage agreement claiming to have fully funded Continental's purchase of 71st Avenue Property.  The supposed mortgage is a sham.  AP Funding LLC was created just a week before the purchase of the 71st Avenue Property closed.  The mortgage agreement is unsigned and contains incorrect information about the purchase.  Neither the mortgage agreement nor any other public documents concerning AP Funding LLC list any individuals associated with the company.  However, AP Funding LLC lists a business address of 67-43 Woodhaven Boulevard, Queens, which is the same address used by several other Khaim shell companies, including Defendant MFK Management and A&P Holding Group, another entity that uses the initials of the first names of Defendant Peter Khaim and his brother (and criminal co-defendant) Arkadiy.  AP Funding LLC was founded by or at the direction of Defendant Khaim for the purpose of laundering the proceeds of the counterfeiting, including by facilitating the straw-man purchase of the 71st Avenue Property by Continental.

99.     441 Willis Ave LLC is the nominal owner of real property located at 447 to 453 Willis Ave. and 441 to 459 Willis Ave., Bronx, New York (the "Willis Avenue Property"), which 441 Willis Ave LLC purchased on September 20, 2021 for $5,200,000.  411 Willis Ave LLC was organized the month before the purchase of the Willis Avenue Property, on August 3, 2021, by a third-party corporate services vendor.  Defendant Khaim's mother, Riva Musheyeva, signed the deed for the Willis Avenue Property.  In reality, the purchase of the Willis Avenue Property was orchestrated entirely by Defendant Khaim, who among other things negotiated the terms of the purchase, provided the funds for the purchase, and instructed his real-estate counsel to effect the purchase.  Defendant Khaim caused the Willis Avenue Property to be purchased with the illicit proceeds of his counterfeiting, and the purpose of the purchase was to launder the

proceeds of the counterfeiting and maintain those illicit assets nominally in the name of the shell company 411 Willis Ave LLC.

100.    La Vie Jewels of NY LLC ("La Vie") is the nominal owner of real property located at 80-74 188th St., Hollis Hills, New York (the "188th Street Property"), which La Vie purchased on February 12, 2021, for $2,100,000.  Defendant Khaim organized La Vie and signed the deed for the 188th Street Property.  The purchase of the 188th Street Property was orchestrated entirely by Defendant Khaim, who among other things negotiated the terms of the purchase, provided the funds for the purchase, and instructed his real-estate counsel to effect the purchase.  Defendant Khaim caused the 188th Street Property to be purchased with the illicit proceeds of his counterfeiting, and the purpose of the purchase was to launder the proceeds of the counterfeiting and maintain those illicit assets nominally in the name of the shell company La Vie.

101.    Relief Defendant AG Worldwide Sales, Inc. ("AG Worldwide") is a lookalike shell company created to imitate the identity of Defendant Worldwide Pharma.  Worldwide Pharma's owner, Defendant Brosius, caused AG Worldwide to be founded under the nominal ownership of one of his employees, Garrett Mellott.  Defendant Brosius then instructed Safe Chain to pay his cut of the counterfeiting proceeds, which normally would have been paid to Worldwide Pharma, to be paid to AG Worldwide instead – including payments for counterfeits that were sold before AG Worldwide even existed.  The purpose of AG Worldwide's creation was to transfer and conceal Defendant Brosius's and Worldwide Pharma's the illicit counterfeiting proceeds.

102.    Relief Defendant Swetha Ketineni is the wife of Defendant Mannava.  Ms. Ketineni was present on October 18, 2021 when Gilead executed this court's Seizure Order and

served Defendant Mannava with the Asset Freeze Order at their shared residence, and received actual notice of this court's asset freeze.  In blatant violation of that order, Defendant Mannava transferred over $3.3 million to Ms. Ketineni, beginning on the day of the seizure itself and continuing over the following several days.  All of the $3.3 million transferred to Ms. Ketineni were the illicit proceeds of the counterfeiting, and included funds from Defendant Mannava's company, DSP.  Ms. Ketineni then quickly dissipated the funds her husband had illegally transferred to her, including by sending it to individuals in India and by transferring over a million dollars to a shell corporation she founded, Babashiloh Enterprises LLC.

103.    Relief Defendant Babashiloh Enterprises LLC ("Babashiloh") was formed on October 29, 2021 in New Jersey by Ms. Ketineni, shortly after Defendant Mannava unlawfully transferred over $3.3 million in counterfeiting proceeds to Ms. Ketineni.  Within days of founding Babashiloh, Ms. Ketineni transferred at least $1.1 million of those unlawfully transferred funds to Babashiloh.  Ms. Ketineni's purpose in creating Babashiloh was to further dissipate and conceal the proceeds of the counterfeiting, which were already the subject of this Court's freeze order.

## F.    DEFENDANTS NAMED IN FOURTH AMENDED COMPLAINT

### 1.    Kingpin Defendants

104.    Defendant Lazaro Roberto Hernandez is an individual residing in Miami, Florida. Lazaro Roberto Hernandez managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications.  Lazaro Roberto Hernandez controlled the supply of the counterfeits, including by exercising ultimate control over numerous fly-by-night counterfeit Supplier Defendants in this action.

105.     Defendant Armando Herrera is an individual residing in Pembroke Pines, Florida. Armando Herrera managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications.  Armando Herrera controlled the supply of the counterfeits, including by exercising ultimate control over numerous fly-by-night counterfeit Supplier Defendants in this action.

### 2.     Leader Defendants

106.     Defendant John Levitan is an individual residing in Pensacola, Florida.  John Levitan managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV and other medications.  As alleged herein, John Levitan managed and directed an enterprise dedicated to the sale of counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documentation.

107.     Defendant David Dunn is an individual residing in Lenoir City, Tennessee. As alleged herein, David Dunn managed and directed an enterprise dedicated to the sale of counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documentation.

108.     Defendant PCSIONE LLC is a Florida limited liability corporation with a principal place of business in Florida. PCSIONE LLC maintains an office address of 2631-A NW 41st Street, Gainesville, FL 32606. Defendant David Dunn is the sole owner of PCSIONE LLC.

109.     Defendant Pharmacy Consulting Services Inc. is a Tennessee corporation with a principal place of business in Tennessee. Pharmacy Consulting Services Inc. maintains an office address of 385 Conkinnon Drive, Lenoir City, Tennessee 37772. Defendant David Dunn is the sole owner of Pharmacy Consulting Services Inc.

3. **Supplier Defendants**

a. **My Meds Defendants**

110.    Defendant Stephen Smith is an individual residing in Sellersville, Pennsylvania. Stephen Smith supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of My Meds LLC, Defendant Stephen Smith personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

111.    Defendant Emilio Juvier Vina is an individual residing in Hialeah, Florida. Emilio Juvier Vina supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. Emilio Juvier Vina also participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to clean and obscure illegal profits earned by the conspiracy. As the principal of My Meds LLC, Defendant Emilio Juvier Vina personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

112.    Defendant My Meds LLC operates using two identically named companies registered in different states.   My Meds LLC is a Florida limited liability corporation with its principal place of business at 12260 SW 8th Street, Miami, Florida 33184. Defendant Emilio Juvier Vina is the principal of My Meds LLC.

113.    Defendant My Meds LLC is also a Pennsylvania limited liability corporation with a principal place of business of 589 Bethlehem Pike, Suite 500, Montgomeryville, PA 18936. Defendant Stephen Smith is the owner and principal of My Meds LLC (Pennsylvania).

b. **ITC Group Defendants**

114.     Defendant Frank Betancourt is an individual residing in Miami, Florida. Frank Betancourt supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of ITC Group, Defendant Frank Betancourt personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

115.     Defendant ITC Group, LLC is a Connecticut limited liability corporation with a principal place of business in Connecticut. ITC Group, LLC maintains an office address of 378 Boston Post Road, Orange, CT 06477. Defendant Frank Betancourt is the principal of ITC Group, LLC.

c. **Abacus Defendants**

116.     Defendant Jose Antonio Hernandez is an individual residing in Miami, Florida. Jose Antonio Hernandez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of Abacus Distributors Inc., Defendant Jose Antonio Hernandez personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

117.     Defendant Carlos Pimentel is an individual residing in Miami, Florida. Carlos Pimentel supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As the principal of Abacus Distributors Inc., Defendant Carlos Pimentel personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

118.     Defendant Abacus Distributors Inc. is a Texas corporation with a principal place of business in Texas. Abacus Distributors Inc. maintains an office address of 2601 East Yandell

Drive, Suite 105, El Paso, Texas 79903. Defendant Carlos Pimentel is the owner and president of Abacus Distributors Inc.

119.     Defendant Abacus Distributors Inc. is also a Florida corporation with a principal place of business in Florida. Abacus Distributors Inc. maintains an office address of 20905 SW 236 Street, Homestead, FL 33031. Defendant Jose Antonio Hernandez is the president of Abacus Distributors Inc. (Florida).

### d.   V & G Wholesale Defendants

120.     Defendant Pavel Lashkevich is an individual with a last-known address in Pennsylvania. Pavel Lashkevich supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of V & G Wholesale Inc., Defendant Pavel Lashkevich personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

121.     Defendant V & G Wholesale Inc. is a Pennsylvania corporation with a principal place of business in Pennsylvania. V & G Wholesale Inc. maintains an office address of 1057 Millcreek Drive, Unit 1057, Feasterville Trevose, Pennsylvania 19053. Defendant Pavel Lashkevich is the owner and president of V & G Wholesale Inc.

### e.   Mainspring Defendants

122.     Defendant Edvin Ovasapyan is an individual residing in Beverly Hills, California. Edvin Ovasapyan supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Mainspring Distribution LLC, Defendant Edvin Ovasapyan personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

31

123.    Defendant Hakob Kojoyan is an individual residing in Palm Springs, California. Hakob Kojoyan supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Mainspring Distribution LLC, Defendant Hakob Kojoyan personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

124.    Defendant Lorik Papyan is an individual residing in Burbank, California. Lorik Papyan supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Mainspring Distribution LLC, Defendant Lorik Papyan personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

125.    Defendant Stephen Silverman is an individual residing in Los Angeles, California. Stephen Silverman supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Mainspring Distribution LLC, Defendant Stephen Silverman personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

126.    Defendant Mainspring Distribution LLC is a Pennsylvania limited liability corporation with a principal place of business in Pennsylvania. Mainspring Distribution LLC maintains an office address of 569 Abbott Drive, Broomall, Pennsylvania 19008. Defendants Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman are principals of Mainspring Distribution LLC.

### f.  **Pharma Pac LLC Defendants**

127.    Defendant Daynel Garcia is an individual residing in Miami, Florida. Daynel Garcia supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead

medications. As principal of Pharma Pac LLC, Defendant Daynel Garcia personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

128.    Defendant Pharma Pac LLC is a California limited liability corporation with a principal place of business in California. Pharma Pac LLC maintains an office address of 1400 S Grand Avenue, Grover Beach, California 93433. Defendant Daynel Garcia is the sole member of Pharma Pac LLC.

### g.   CompaRx Defendants

129.    Defendant Yusniel Forcelledo Perez is an individual residing in Miami, Florida. Yusniel Forcelledo Perez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of CompaRx LLC, Defendant Yusniel Forcelledo personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

130.    Defendant CompaRx LLC is a New Jersey limited liability corporation with a principal place of business in New Jersey. CompaRx LLC maintains an office address of 701 Hartle Street, Suite 704, Sayreville, New Jersey 08872. Defendant Yusniel Forcelledo Perez is the owner and principal of CompaRx LLC.

### h.   Valuecare Defendants

131.    Defendant Bakhtiyar Nabiev is an individual with a last-known address in Queens, New York. Defendant Bakhtiyar Nabiev supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Valuecare Pharmacy Inc., Defendant Bakhtiyar Nabiev personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

132.    Defendant Valuecare Pharmacy Inc. is a New York corporation with a principal place of business in New York. Defendant Valuecare Pharmacy Inc. maintains an office address of 82-69 Parsons Boulevard, Jamaica, New York 11432. Defendant Bakhtiyar Nabiev is the owner and Chief Executive Officer of Valuecare Pharmacy Inc.

### i.    Lieb Pharmacy Defendants

133.    Defendant Raoul Diamantstein is an individual residing in Brooklyn, New York. Diamantstein supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Lieb Pharmacy, Inc., Defendant Raoul Diamantstein personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

134.    Defendant Lieb Pharmacy, Inc. is a New York Corporation with a principal place of business in New York. Defendant Lieb Pharmacy maintains an office address of 5006 16th Avenue, Brooklyn, New York 11204. Defendant Raoul Diamantstein is the principal and Chief Executive Officer of Lieb Pharmacy.

### 4.    Pharmacy Defendants

### a.    Total Remedy Defendants

135.    Defendant Mohammad Etminan is an individual residing in Marina del Rey, California. Defendant Mohammad Etminan supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Everything Pharmacy Related II, Inc. d/b/a Total Remedy and Prescription Center ("Total Remedy Pharmacy"), Defendant Mohammad Etminan personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

34

136.    Defendant Total Remedy Pharmacy is a California corporation with a principal place of business in California. Total Remedy Pharmacy maintains an office address of 1234 Wilshire Boulevard, Number 106, Los Angeles, California 90017. Defendant Mohammad Etminan is the owner and principal of Total Remedy Pharmacy.

### b.  **Ascan Defendants**

137.    Defendant Francis Fata is an individual residing in East Atlantic Beach, New York. Defendant Francis Fata supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, as Ascan Pharmacy Inc., of which Fata is the principal, purchased significant quantities of counterfeit Gilead-branded medication. As principal of Ascan Pharmacy, Defendant Francis Fata personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

138.    Defendant Ascan Pharmacy is a New York corporation with a principal place of business in New York. Defendant Ascan Pharmacy maintains an office address of 101-21 Metropolitan Avenue, Flushing, New York 11375. Defendant Francis Fata is the principal of Ascan Pharmacy.

### c.  **Laconia Avenue Defendants**

139.    Defendant Stanislaus Mgbeojirikwe is an individual residing in Floral Park, New York. Defendant Stanislaus Mgbeojirikwe supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications by dispensing counterfeit Gilead-branded medication through Defendant Laconia Avenue Pharmacy Corp.

140.    Defendant Laconia Avenue Pharmacy Corp. is a New York corporation with a principal place of business in New York. Defendant Laconia Avenue Pharmacy maintains an office address of 4041 Laconia Avenue, Bronx, New York 10466. Defendant Stanislaus

Mgbeojirikwe is the supervising pharmacist of Laconia Avenue Pharmacy Corp. Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medications and pedigrees purchased and sold by the pharmacy.

### 5. Distributor Defendants

141. Defendant William Scott Wise is an individual residing in Pinecrest, Florida. Defendant William Scott Wise supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications.

142. Defendant ProVen Pharmaceuticals, LLC is a Delaware limited liability corporation with a principal place of business in Pennsylvania. ProVen Pharmaceuticals, LLC maintains an office address of 410 Butler Pike, Suite A101D, Plymouth Meeting, Pennsylvania 19462. Defendant William Scott Wise is the owner, Chief Executive Officer, and president of ProVen Pharmaceuticals, LLC.

### 6. Collector Defendants

143. Defendant Nicole Alston is an individual residing in Bronx, New York. Defendant Nicole Alston managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

144. Defendant Boris Abramov is an individual residing in Flushing, New York. Defendant Boris Abramov managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

145.     Defendant Hashem Yitbarach LLC is a New York limited liability corporation with a principal place of business in New York. Defendant Hashem Yitbarach LLC maintains an office in Albany, New York. Defendant Boris Abramov is the organizer of Hashem Yitbarach LLC.

146.     Defendant Jeffrey Peterson is an individual residing in Bronx, New York. Defendant Jeffrey Peterson managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

147.     Defendant Brennan Page is an individual residing in Bronx, New York. Defendant Brennan Page managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

148.     Defendant Tariel Begiyev is an individual residing in Cedarhurst, New York. Defendant Tariel Begiyev managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

149.     Defendant Juan Hernandez is an individual residing in Edgewater, New Jersey. Defendant Juan Hernandez is the brother of Defendant Quan Hernandez. Defendant Juan Hernandez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including trafficking bottles of medication knowingly for the purpose of creating counterfeits.

150.     Defendant 2040 Haviland Corp. is a New York corporation with a principal place of business in New York. Defendant 2040 Haviland Corp. maintains a service address of 30

37

Bradhurst Avenue, Suite 1D, New York, NY 10030. Defendant Juan Hernandez is the agent and principal of 2040 Haviland Corp.

### 7.   Asset Holder Defendants

#### a.   Vibe and Sofitel Defendants

151.    Defendant Ronald Vidaurre is an individual residing in Doral, Florida. Defendant Ronald Vidaurre participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

152.    Defendant Vibe Enterprise, Inc. is a Florida corporation with a principal place of business in Florida. Defendant Vibe Enterprise, Inc. maintains an office address of 2335 NW 107th Avenue, Suite B46, Box 142, Doral, Florida 33172. Defendant Ronald Vidaurre is the owner,  principal, and registered agent of Vibe Enterprise, Inc.

153.    Defendant Sofitel Trading Corp. is a Florida corporation with a principal place of business in Florida. Defendant Sofitel Trading Corp. maintains an office address of 2335 NW 107th Avenue, Suite MB46, Box 142, Doral, Florida 33172. Defendant Ronald Vidaurre is the owner,  principal, and registered agent of Sofitel Trading Corp.

#### b.   Skyline Defendants

154.    Defendant Francy Bedoya is an individual residing in Doral, Florida. Defendant Francy Bedoya participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

155.    Defendant Skyline World Group, Inc. is a Florida corporation with a principal place of business in Florida. Defendant Skyline World Group, Inc. maintains an office address of

10925 NW 27th Street, Suite 101, Doral, Florida 33172. Defendant Francy Bedoya is the principal, president, and registered agent of Skyline World Group, Inc.

### c.   **Elite Defendants**

156.     Defendant Maria Bedoya is an individual residing in Doral, Florida. Defendant Maria Bedoya participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

157.     Defendant Elite Distribution, Inc. is a Florida corporation with a principal place of business in Florida. Defendant Elite Distribution, Inc. maintains an office address of 4220 NW 107th Avenue, Apartment 2206, Doral, Florida 33178. Defendant Maria Bedoya is the principal, officer, and registered agent of Elite Distribution, Inc.

### d.   **Precious Metals, Madison Bullion, and Green Capital Defendants**

158.     Defendant Sam Kessler is an individual residing in Far Rockaway, New York. Defendant Sam Kessler participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

159.     Defendant Avi Kessler is an individual residing in Far Rockaway, New York. Defendant Avi Kessler participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

160.     Defendant The Precious Metals Group, Inc. is a New York corporation with a principal place of business in New York. Defendant The Precious Metals Group, Inc. maintains

an office address of 30 W 47th Street, Suite 906, New York, NY 10036. Defendant Avi Kessler is the president and Chief Executive Officer of The Precious Metals Group, Inc.

161.    Defendant Madison Bullion LLC is a New York limited liability corporation with a principal place of business in New York. Defendant Madison Bullion LLC maintains an office address of 30 W 47th Street, Suite 906, New York, New York 10036. Defendant Avi Kessler is the principal of Madison Bullion LLC.

162.    Defendant Green Capital Investors LLC is a New York limited liability corporation with a principal place of business in New York. Defendant Green Capital Investors LLC maintains an office address of 124-15 Metropolitan Avenue, Queens, New York 11415. Defendant Sam Kessler is the organizer of Green Capital Investors LLC.

### e.  Gold Tower Defendants

163.    Defendant Igor Aminov is an individual residing in Rego Park, New York. Defendant Igor Aminov participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

164.    Defendant Gold Tower Refinery Inc. is a New York corporation with a principal place of business in New York. Defendant Gold Tower Refinery Inc. maintains an office address of 55 West 47th Street, Suite J765, New York, New York 10036. Defendant Igor Aminov is the principal and Chief Executive Officer of Gold Tower Refinery Inc.

### f.  All American Heavy Equipment Defendants

165.    Defendant All American Heavy Equipment Import & Export, LLC is a Florida limited liability corporation with a principal place of business in Florida. Defendant All American Heavy Equipment Import & Export, LLC maintains an office address of 20965 SW

236th Street, Homestead, Florida 33031. Defendant Jose Hernandez is the principal and registered agent of All American Heavy Equipment Import & Export, LLC.

### g. **Blue Sea Marine Defendants**

166.    Defendant Alexander Orriols is an individual residing in Dania Beach, Florida. Defendant Alexander Orriols participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

167.    Defendant Blue Sea Marine Inc. is a Florida corporation with a principal place of business in Florida. Defendant Blue Sea Marine Inc. maintains an office address of 90 North Bryan Road, Dania Beach, Florida 33004. Defendant Alexander Orriols is the principal of Blue Sea Marine Inc.

### h. **AMG Logistics and Power Pro Logistics Defendants**

168.    Defendant Alex Galvan is an individual residing in Cornelius, North Carolina. Defendant Alex Galvan participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

169.    Defendant AMG Logistics Sky LLC is a North Carolina limited liability corporation with a principal place of business in North Carolina. AMG Logistics Sky LLC maintains an office address of 19927 Oak Leaf Circle, Cornelius, North Carolina 28031. Defendant Alex Galvan is the principal and Chief Executive Officer of AMG Logistics Sky LLC.

170.    Defendant Power Pro Logistics, LLC is a North Carolina limited liability corporation with a principal place of business in North Carolina. Defendant Power Pro Logistics,

LLC maintains an office address of 19701 Bethel Church Road, Suite 103-210, Cornelius, North Carolina 28031. Defendant Alex Galvan is the principal, Chief Financial Officer, and registered agent of Power Pro Logistics, LLC.

### i. **M & D Co. Defendants**

171.    Defendant M & D Co. Distributors, LLC is a Florida limited liability corporation with a principal place of business in Florida. Defendant M & D Co. Distributors, LLC maintains an office address of 12260 SW 8th Street, Suite 116, Miami, Florida 33184. Defendant Emilio Juvier Vina is the principal and registered agent of M & D Co. Distributors, LLC.

### j. **MDSD Enterprises Defendants**

172.    Defendant Liliana Teresa Sampayo Mena is an individual residing in Pembroke Pines, Florida. Defendant Liliana Teresa Sampayo Mena participated in the trafficking of counterfeit Gilead medications by laundering the conspiracy's ill-gotten gains to obscure the massive illegal profits being earned via the conspiracy.

173.    Defendant MDSD Enterprises, LLC is a Florida limited liability corporation with a principal place of business in Florida. Defendant MDSD Enterprises, LLC has an office address of 10855 NW 1st Street, Number 304, Pembroke Pines, Florida 33026. Defendant Liliana Teresa Sampayo Mena is the principal and registered agent of MDSD Enterprises, LLC.

### k. **Yisel Lopez**

174.    Defendant Yisel Lopez is an individual residing in Pembroke Pines, Florida. Yisel Lopez is the girlfriend of Defendant Armando Herrera. Yisel Lopez is the direct recipient of counterfeiting proceeds, and owns and controls shell companies that hold additional counterfeiting proceeds, including real estate purchased with counterfeiting proceeds.

### 8.    Relief Defendant

175.    Relief Defendant Etzhaim, Inc. is a New York corporation with a principal place of business in New York.  Relief Defendant Etzhaim, Inc. maintains a service address of 80-74 188th Road, Jamaica, New York 11423.  Etzhaim, Inc. is owned by the wife of Defendant Peter Khaim, Oksana Politilova.  Etzhaim, Inc. is the direct recipient of counterfeiting proceeds, including real estate purchased with counterfeiting proceeds.  As alleged above,  Defendant Khaim caused Relief Defendant La Vie Jewels of New York LLC ("La Vie") to purchase the 188th Street Property, and personally paid for the purchase with counterfeiting proceeds.  This Court issued an asset freeze order against Relief Defendant La Vie, enjoining the sale or encumbrance of the 188th Street Property, but prior to the issuance of that order, La Vie transferred title to the 188th Street Property to Etzhaim, Inc. for no consideration.  Defendant Khaim caused La Vie to "sell" the 188th Street Property to Etzhaim Inc. for zero dollars for the purpose of laundering the proceeds of the counterfeiting and maintain those illicit assets nominally in the name of the shell company Etzhaim, Inc.

## JURISDICTION AND VENUE

176.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

177.    The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

178.    As alleged herein, many Defendants are residents of New York and of this District.  For example, the Boulevard Defendants all reside in this District.  Most of the

Pharmacy Defendants are New York pharmacies and their principals and supervising pharmacists who are named as defendants are residents of New York.  The Scripts Defendants are also located in this District and their principal resides in this District.

179.    Several Defendants, including the Safe Chain Defendants and the PharmaPac Defendants, have consented to personal jurisdiction and venue in this District.

180.    As alleged herein, all Defendants transacted business in New York and committed tortious acts in New York in connection with the counterfeiting conspiracy described herein.  For example, Safe Chain and Worldwide Pharma sold, and conspired together to sell, counterfeits to pharmacies in New York City.  ProPharma, through its principal Ellis, and ProVen, through its principal William Scott Wise, both advertise that they sell throughout the United States, maintain active licensure in New York as an out-of-state pharmaceutical wholesaler for the purpose of selling pharmaceutical products in New York, and have sold infringing products into New York. The Synergy Defendants, including Defendant Carlos Vega personally, travelled to New York to conduct the counterfeiting business alleged herein and transmitted the majority of their counterfeiting revenues to New York entities for the purposes of laundering the proceeds in New York and/or purchasing counterfeits in New York.  Many of the Supplier Defendants sold counterfeits to Scripts in New York City.

181.    Several Defendants also transacted business in New York and committed tortious acts in New York by establishing long-term business relationships with New York-based counterfeit sellers, such as Supplier Defendant Boulevard and Distributor Defendant Scripts, and purchasing very large volumes of counterfeits from those Defendants in New York.

182.     As alleged herein, many of the Relief Defendants received the proceeds of counterfeiting, including directly from the purchases and sales to and from New York state and this district.

183.     The Kingpin Defendants, the Leader Defendants, the Marketer Defendants, and the Supplier Defendants (including among others Gentek, RXWholesale.com LLC, My Meds, ITC, Abacus, V & G, and CompaRx) conspired to sell counterfeit Gilead medications to the Scripts Defendants in this District.  These Defendants also conspired to sell counterfeit Gilead HIV medication to New York pharmacies on behalf of Scripts, Safe Chain, and ProPharma. These Defendants also conspired to launder money and/or to source counterfeits in New York and in this District.

184.     The Medicine Shoppe Defendants possess a license to sell pharmaceutical products in New York.  These Defendants negotiated directly with the Boulevard Defendants to purchase counterfeit Gilead HIV medication in New York.  Knowing that the products were counterfeit, The Medicine Shoppe Defendants conspired with the Boulevard Defendants to distribute counterfeit Gilead HIV medication.

185.      This Court also has personal jurisdiction over certain Defendants pursuant to 18 U.S.C. § 1965(d) because these Defendants are liable for substantive RICO violations under 18 U.S.C. § 1962(c).  These Defendants are identified in paragraph 711.

186.     The Court has jurisdiction over the Relief Defendants because each Relief Defendant knowingly aided and abetted the violation of an asset freeze order properly issued by this Court.  Moreover, Relief Defendant AG Worldwide, in concert with Defendants Brosius and Worldwide Pharma, participated in the sale of counterfeits to pharmacies in New York and received funds from such sales.  And as alleged herein, several of the Relief Defendants are New

York entities and New York residents, including 5 Continental Ventures LLC, AP Funding LLC, 441 Willis Ave LLC, La Vie Jewels of NY LLC, and Etzhaim, Inc.

187.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because, as alleged above, multiple Defendants are located in this District, multiple Defendants reside in this District, multiple Defendants have their principal place of business in this District, multiple Defendants sold counterfeit products into this District, multiple Defendants conspired to operate a counterfeiting operation that sold counterfeit products into this District, and because a substantial part of the events giving rise to Gilead's claims occurred in this District.

188.    Venue is also proper over certain Defendants pursuant to 18 U.S.C. § 1965 because these Defendants are liable for substantive RICO violations.  These RICO Defendants are identified in paragraph 711 below.

## FACTUAL ALLEGATIONS

### A.    GILEAD'S HIV AND OTHER MEDICATIONS

189.    For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapeutics that aim to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients around the world treatments that improve care in areas of unmet medical needs.

190.    Gilead has transformed care for people living with serious diseases, *e.g.*, HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first prophylactic medicine to prevent HIV infection, and four hepatitis C therapies.

191.    BIKTARVY® is a complete, one-pill, once-a-day prescription medication used to treat HIV.  Developed by Gilead and first approved by the FDA in 2018, BIKTARVY® is a

single-tablet combination medicine for the treatment of HIV-1 infection, combining the unboosted integrase strand transfer inhibitor (INSTI) bictegravir with Gilead's dual nucleoside reverse transcriptase inhibitor (NRTI) backbone of emtricitabine and tenofovir alafenamide, the components of Gilead's DESCOVY®.

192.   BIKTARVY® has a demonstrated long-term efficacy and safety profile, has few drug interactions and side effects, and a high barrier to developing drug resistance.

193.   Although BIKTARVY® does not cure HIV, when taken every day as prescribed, it can lower the amount of virus in a patient's blood to undetectable levels.  In addition to halting the progression of HIV, research shows that having undetectable levels of the virus prevents transmission of HIV through sex, protecting a patient's sexual partners from possible transmission.

194.   BIKTARVY® also can help increase the number of a patient's CD4 T-cells, which are an important part of a person's immune system.  HIV attacks and destroys CD4 T-cells, which decreases a patient's ability to fight off other infections and increases the risk of a patient contracting an opportunistic infection, which could lead to serious illness or death.

195.   One of the most significant developments in the fight against HIV is the development of drugs for pre-exposure prophylaxis, or PrEP: a method of HIV prevention whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medication on an ongoing basis to decrease their risk of acquiring HIV through sex.

196.   DESCOVY® is a therapy developed and manufactured by Gilead that can be taken for PrEP.  The drug comes in the form of a tablet.  The dosage in the FDA approved label is one tablet per day.

197.    When taken as indicated, DESCOVY® is highly effective at preventing HIV-1 infection in individuals exposed to the virus.

198.    DESCOVY® was approved by the FDA for PrEP in 2019.  It has been an instrumental part of preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV.

199.    Gilead has used and currently is using the Gilead Marks and the Gilead Trade Dress in commerce in connection with its sale of medications, and plans to continue such use in the future.  Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

200.    Gilead has engaged and continues to engage in activities designed to promote its medications and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

## B.    DEFENDANTS' COUNTERFEIT HIV AND OTHER MEDICATIONS

201.    Gilead first learned of Defendants' counterfeiting operation through a series of patient and pharmacy complaints that were reported to Gilead.  In the past several months, Gilead has received multiple complaints from patients and pharmacies about bottles of Gilead HIV medications that were sold by Safe Chain and that, when opened, were actually filled with an entirely different drug.

202.    Gilead was not able in all instances to recover the counterfeit bottles of HIV medications that were the subject of these patient or pharmacy complaints.  But, to date, Gilead has been able to acquire several bottles of counterfeit HIV medications that Safe Chain sold to

U.S. pharmacies.  Gilead's in-house experts examined the bottles and their contents and determined the products to be counterfeit.  Gilead also sent the bottles to an outside laboratory who performed analyses of the bottles, the tamper-proof seals and the adhesives used to affix them, and the tablets inside the bottles.  The outside lab also confirmed that the HIV medications sold by Safe Chain were counterfeit.

203.    Authentic Gilead HIV medication is FDA approved for sale only in Gilead's original, sealed manufacturer bottles: it cannot be sold or dispensed in generic pharmacy vials. The lip of each authentic bottle is covered with a foil tamper-evident seal, which is covered by a screw-on lid.  Safe Chain's counterfeits appeared to use authentic Gilead bottles that once contained authentic Gilead medication.  The original foil on the bottles had been stripped away, the authentic medication removed and replaced with foreign medication, and then a replica of the tamper-evident seal was used to re-seal the bottle.  Traces of the original tamper-proof seal remained in the grooves of the counterfeit bottles and were visually distinguishable from the replica seal.  Lab testing confirmed that both the replica seal and the adhesive used to affix it did not match the original, authentic foil and adhesive used on authentic Gilead product.

204.    The outside laboratory's testing also confirmed what was apparent to the medical professionals and in-house experts who examined the counterfeits: that the tablets inside the bottle were not the Gilead medication listed on the bottle.  In one instance, the counterfeit bottle contained a generic over-the-counter analgesic.  But the most common contents of the tested counterfeits was quetiapine fumarate ("quetiapine"), a non-Gilead medication that is marketed under the brand name SEROQUEL XR® and is also available as a generic.

205.    Quetiapine is a prescription anti-psychotic medication with a number of known serious potential side effects.  Quetiapine can very commonly cause a strong sedated state or

drowsiness.  As noted on the FDA labelling for the drug, these effects are especially acute for first-time users of the drugs.  One patient who unknowingly took SEROQUEL XR® after receiving a counterfeit bottle of BIKTARVY® reported that the patient could not speak or walk afterwards.  Patients who are prescribed quetiapine are warned against driving or operating machinery.

206.    Quetiapine also poses serious potential dangers to patients with common health conditions, such as high blood pressure, diabetes, and low white blood counts, whose conditions must be closely monitored while taking quetiapine.

207.    Because of its potency, the FDA-approved labelling for quetiapine recommends that some new patients be given a small dose – 50 milligrams a day for many conditions – that can be increased over time as the patient's physician tracks any side effects and monitors the patients' reaction to the drug.  The counterfeit Gilead HIV medication contained 300-milligram tablets of quetiapine.

208.    Of course, patients who ingest quetiapine from a counterfeit bottle of HIV medication have no idea that they are taking a medication with these potential side effects and receive no warning of the possible consequences of doing so.  They have no idea they are not supposed to drive, operate heavy machinery, or engage in other activities where sedation or drowsiness are dangerous, and as a result are placed in grave danger of injury or death.

209.    As its investigation continued, Gilead confirmed many additional counterfeits of Gilead-branded HIV medication sold by the Defendants, including by Distributor Defendants ProPharma and Scripts, to contain the wrong medication inside the bottle, including quetiapine as well as other antipsychotic medication manufactured by third parties.

50

210. Patients who receive the Defendants' counterfeits may not receive their prescribed HIV or other medications. For patients treating HIV infection, it is very important that the patient take their prescribed Gilead medication once a day, every day. If a patient skips doses for even a short period of time, the patient faces the risk that the patient's viral load – that is, the amount of HIV in their blood – will increase. Viral rebound can have severe consequences. Over time, it can weaken the patient's immune system and increase the possibility of infections; it can result in progression of the disease and lead to the development of AIDS; and if patients are not virally suppressed they may transmit the virus to their sexual partners.

211. Patients taking DESCOVY for PrEP® must also take the medication regularly as prescribed to receive the prophylactic benefits of the drug. DESCOVY for PrEP® is indicated only for certain individuals at risk for HIV infection. A patient who unknowingly discontinues their DESCOVY® regimen because they have received counterfeit medication would be at risk for contracting HIV while still believing they are being protected from infection.

## C. DEFENDANTS' STREET-LEVEL PURCHASES OF AUTHENTIC GILEAD BOTTLES FROM PATIENTS FOR CASH

212. The counterfeits sold by the conspiracy use once-authentic, Gilead proprietary bottles. As described above, many of the counterfeits use authentic bottles that once contained authentic Gilead-branded HIV medication, but those bottles had their contents emptied, were refilled with the wrong medication, and then were re-sealed using a counterfeit of Gilead's tamper-evident foil seal. Other counterfeits sold by the conspiracy contained Gilead medication, but had counterfeit patient information documents, counterfeit caps, and/or counterfeit pedigrees.

213. The FDA requires Gilead's HIV medications to be sold in the original manufacturer bottles, together with the FDA-approved and -mandated prescribing information/patient instructions, which on authentic bottles are folded up and affixed to the side.

51

These Gilead-branded medications cannot lawfully be repackaged and dispensed in generic pharmacy bottles.  Thus, in order to create the counterfeits, the conspiracy needed to obtain large numbers of original Gilead bottles, either full or empty.  The conspiracy obtained most or all of these bottles by illegally repurchasing already-dispensed bottles directly from HIV patients for cash.

214.    The conspiracy's street-level buyback operations targeted particularly vulnerable populations, such as individuals who are homeless or suffering from drug addiction, who receive their HIV medication for free and may be susceptible to being coerced into giving up their medication for cash.  These illegally repurchased bottles are collected, stripped of their pharmacy-generated patient labeling and cleaned.  On authentic Gilead bottles, the prescribing information/patient instructions are on a single large sheet of paper that is machine-folded and glued to the side of the bottle. When the conspiracy illegally purchased bottles from patients on the street, that document was often missing or damaged. And so the counterfeiters typically attached a counterfeit reprint of the prescribing information/patient instructions. These counterfeit reprints typically contain misspellings, omit entire sections (such as drug interaction warnings), contain outdated information, are printed on low-quality paper that tears upon opening, and consist of multiple sheets of paper that are pasted or taped together.  The counterfeit repurchased bottles are then sold with a counterfeit pedigree that, as described more fully below, fraudulently claims the bottle was purchased from a legitimate supplier, when in fact they were illegally purchased for cash from a vulnerable patient on the street.

215.    The conspiracy's illegal buy-back operation has a devastating effect on any patient who is convinced to forego taking their prescribed medication for cash.  The negative

health consequences of failing to take HIV medication for both the patient and the community are described above.

D.     **DEFENDANTS' USE OF COUNTERFEIT PEDIGREES**

216.     Under the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. §§ 360eee *et seq.*, every sale or transfer of a prescription drug must be accompanied with a record showing the chain of all sales or transfers of that drug, going back to the manufacturer.  In the industry, this is known as the drug's "pedigree," and is also referred to as the drug's DSCSA documentation or "T3" documentation – standing for the three "Ts" of transaction information, transaction history, and transaction statement that must be included with the pedigree.

217.     The FDA's website states that the purpose of the DSCSA's tracing requirements is to "enhance FDA's ability to help protect consumers from exposure to drugs that may be counterfeit[.]"[1]

218.     Counterfeit bottles of HIV and other medications cannot have valid pedigrees.  In order to sell their counterfeit medications, the Defendants created and utilized fake pedigrees that fraudulently represented that the drugs could be traced back to an authentic sale from Gilead.

219.     Gilead has obtained and analyzed the pedigrees used in connection with every bottle of Gilead-branded medication known to have been sold by the conspiracy.  Every one of those pedigrees is counterfeit and fraudulent – many of them obviously so.

220.     In the United States, the only distributors to which Gilead sells its HIV and other medications are Gilead-authorized distributors.  This is a well-known fact in the industry, and is consistent with the practices of other major pharmaceutical manufacturers.  Gilead has sixteen U.S. authorized distributors for HIV medications, and their names are publicly posted on

---

[1] https://www.fda.gov/drugs/drug-supply-chain-integrity/drug-supply-chain-security-act-dscsa

Gilead's website.  Defendants are aware that Gilead sells HIV medications only through those Gilead-authorized distributors.

221.    Many of the pedigrees for the counterfeits contained an immediately detectable falsehood: that Gilead had initially sold the medication to a distributor other than an authorized distributor.  Other pedigrees for the counterfeits did list an authorized distributor as the first purchaser of the drug, and then claimed the drug was sold from there to one or more distributors before it was purchased by Safe Chain.  Gilead's internal records confirm that Gilead had not sold the specific lots of the medication to the authorized distributor listed on the pedigree. Gilead also confirmed with the authorized distributors that the pedigrees were false.

222.    While Gilead has only been able to recover a sample of the counterfeit products that have been reported to it, as part of its investigation Gilead has received copies of pedigrees for thousands of bottles of Gilead HIV and other medications trafficked by the Defendants in this action.  Those pedigrees are fake: they fraudulently list an initial sale made by Gilead that did not occur. Every one of those bottles is an illegitimate product and pursuant to the DSCSA must be quarantined and cannot lawfully be sold.

223.    Every authentic bottle of HIV and other medications that Gilead sells comes with an authentic pedigree that accurately discloses, among other things,  when, where, and to whom Gilead sold that bottle.  The pedigree is part of the product that Gilead sells.  For Gilead, the pedigrees are anti-counterfeiting measures and also play other important internal quality-control functions.  For the distributors, pharmacies, and patients that buy Gilead's HIV and other medications, authentic pedigrees that accurately disclose the original sale of the product are an important feature of Gilead's products that guarantee the medication's authenticity and safety.

224.    Gilead's authentic pedigrees use Gilead's registered trademarks to identify the medication, the origin of the bottle, and the authorized distribution channel in which it was sold. The Defendants' fake pedigrees contain counterfeit copies of Gilead's registered trademarks: unauthorized copies of Gilead's authentic pedigrees that are intended to trick customers into believing they show the real origins and authorized distribution of the medication, but in reality list fictitious transactions that never occurred.

225.    In addition to being counterfeit, the product sold with these fraudulent pedigrees are materially different from authentic Gilead product as Gilead sells it in U.S. commerce.  The counterfeit pedigrees also undermine Gilead's quality-control efforts.

## E.    THE KINGPIN DEFENDANTS ORGANIZE THE CONSPIRACY, SECRETLY CONTROL THE FLY-BY-NIGHT COUNTERFEIT SUPPLIERS, AND REAP UNTOLD MILLIONS IN ILLEGAL PROFITS

### 1.    Lazaro Roberto Hernandez, a.k.a. "Rob"

226.    Kingpin Lazaro Hernandez sits at the top of the known counterfeiting conspiracy. He set up the organization of the counterfeiting ring and its money-laundering apparatus, and he exercised ultimate control over many Supplier Defendants that sold the counterfeits.  The lion's share of the hundreds of millions of dollars earned by the sale of counterfeit Gilead-branded HIV medication went to Hernandez and his co-conspirators through a complex money-laundering scheme.

227.    Hernandez worked in the shadows.  He took extraordinary measures to conceal his identity and ensure his name was not tied, in writing or otherwise, to the counterfeiting conspiracy.  Hernandez avoided email and written communications and used exclusively pre-paid "burner" cell phones.  Even to his lieutenants, the Leader Defendants, he was known only as a voice on the phone using the single-name pseudonym "Robert" or "Rob."  When one of the

55

Distributor Defendants told Leader Defendant Ralhan that they wanted to speak with "Rob," Ralhan responded: "Robert doesn't want to talk to anyone… I've tried trust me, he is not interested."

228.    Written communications with the Leader Defendants confirm that "Rob" was the ultimate source of the counterfeits being sold by the Supplier Defendants.  For example, Leader Defendant Ralhan and Distributor Defendant Brosius repeatedly referred to "Rob" as the "AD," or authorized distributor, for the counterfeits being sold by Supplier Defendant Gentek.

229.    "Rob" was also the individual in charge of making sure the Supplier Defendants were paid.  The Distributor Defendants referred to "Robert" as  "the guy upset about the money," and spoke of the need to "get Robert (the AD) happier."

230.    Leader Defendant Ralhan identified "Rob" as the source of counterfeits sold by Supplier Defendant Gentek.  A prepaid cell phone that "Rob" used to communicate with others in the counterfeiting conspiracy was also listed as the phone number associated with a bank account opened for Supplier Defendant Omom.  That same cell phone number received two-factor authentication texts when "Rob" (actually Kingpin Defendant Hernandez) viewed the Omom bank account online.  The Omom bank account received tens of millions of dollars in counterfeiting proceeds.

231.    Using his "Rob" persona, Hernandez exercised ultimate control over several additional Supplier Defendants and their sale of enormous quantities of counterfeit Gilead-branded HIV medication.

232.    Gilead identified "Rob" by subpoenaing records associated with the various "burner" prepaid cell phones he used to conduct business on behalf of the conspiracy.  Although

those phone accounts did not have any subscriber information – which is the point of using burner phones – the carriers did maintain basic geolocation data.

233.     Using the subpoenaed phone records, Gilead and its investigators identified dates when "Rob" left his base of operations in downtown Miami and appeared in Las Vegas hours later, indicating that "Rob" had flown cross-country.  Gilead's investigators then used public databases to identify public and private flights that left southern Florida and arrived in Las Vegas on dates and within time ranges indicated by the phone records.  Gilead determined that the only flights that matched certain of "Rob's" Las Vegas trips were on private planes affiliated with a casino – *i.e.*, casino-sponsored private flights for high rollers.  Gilead subpoenaed the flight manifests for those flights and reviewed the flight manifests and geolocation data to determine "Rob's" true name and identity. Gilead further confirmed that Kingpin Defendant Hernandez flew on all of those flights.

234.     Subpoenaed records from the casino that sponsored Hernandez's flights confirm that he is a high-stakes gambler who lost several million dollars at that casino alone.  The casino prepared numerous Suspicious Activity Reports on Hernandez, which casinos are required under federal law to submit when they suspect money-laundering activity.  These reports noted that Hernandez walked into the casino with extremely large amounts of cash held in plastic bags, and that he provided the casino verifiably false explanations of where the money came from.  In reality, Hernandez was gambling with illicit proceeds of the counterfeiting ring, and was using the casino to launder the cash.

235.     Hernandez is a convicted felon.  He was previously arrested for armed robbery with a deadly weapon.  In 1990, he was indicted and ultimately convicted for conspiring to possess two kilograms of cocaine with intent to distribute, and was imprisoned until 2000.

236.     On June 17, 2022, when Gilead was preparing its papers to add Hernandez to this action, the FBI arrested Hernandez, charging him with multiple counts of conspiring to introduce adulterated and misbranded drugs, conspiring to traffic drugs with false documentation, and several crimes related to money laundering.  The government has stated it was concerned that Hernandez was planning to flee the country on a private plane.

237.     The federal government's indictment alleges that from 2019 to at least the end of 2021, Hernandez conspired to "establish[] and obtain[] wholesale drug distributor licenses for" fly-by-night companies across the United States, including Supplier Defendant Gentek and Supplier Defendant My Meds.  Hernandez and his co-conspirators illegally diverted "large quantities" of HIV medication and "repackaged the drugs and falsified their packaging, T3s/pedigrees, and other labeling," and "introduced these adulterated, misbranded, and diverted drugs into interstate commerce" by selling and distributing them to co-conspirators at unnamed "Wholesale Companies," who then sold the bottles to "pharmacies located throughout the United States."

238.     The government stated at Hernandez's detention hearing that in the instant civil suit Gilead was "able to seize thousands of bottles of HIV prescription drugs and tie them back to companies [*i.e.*, Supplier Defendants] that the evidence shows were really controlled by Lazaro Hernandez."

239.     In all, the government's indictment alleges that Hernandez and his co-conspirators received over $230 million for these illegally sold medications.  Hernandez is alleged to have laundered those illicit gains by causing the fly-by-night distributors to send the funds to various shell companies, including Asset Holder Defendant MDSD Enterprises.

240.    At Hernandez's detention hearing, the government specified that Hernandez "led an organization in Miami that acquired expensive prescription drugs on the street and by other means and repackaged those drugs and created fraudulent documentation" to sell them, naming as examples Gilead's HIV medications "Biktarvy and Truvada." The government specified that "[t]he mere nature of this scheme involves a lot of cash. The drugs have to be acquired from the street [*i.e.*, purchased from patients] or by theft. Then they have to be relabeled and their pedigrees falsified." *Id.* The government noted that this causes harm to patients, including because some of the repackaged HIV drugs sold by Mr. Hernandez's network had foreign medication inside.

241.    The government has stated that Hernandez not only paid others to launder the conspiracy's illicit gains through shell companies, but that he also paid a co-conspirator to withdraw the cash from those companies and hand-deliver the cash to Hernandez personally, so that Hernandez never directly interacted with the money-laundering entities.

242.    Shortly before he was arrested, Hernandez was involved in the intimidation and beating of a former co-conspirator who was cooperating with the government and was a government witness. That cooperator was spotted and beaten in a Florida strip club, and the witness was told by his assailant, in Spanish, "that's what you get for snitching." Shortly after the assault, the cooperator received an Instagram post that stated: "I saw you get dropped last night at [the strip club]. You rat. Rene is on you, bitch. Mr. Lux, nawww, Mr. RAT better." The Instagram account that sent that post was opened using a burner cell phone number that Hernandez used for counterfeiting business – the same one that was used to open the bank account for Supplier Defendant Omom.

### 2. Kingpin Defendant Armando Herrera a.k.a "Thomas"

243. Kingpin Defendant Armando Herrera also sits at the top of the known counterfeiting conspiracy. With his co-conspirator Kingpin Defendant Hernandez, Herrera set up the organization of the counterfeiting ring and its money-laundering apparatus and exercised ultimate control over many Supplier Defendants that sold the counterfeits.

244. Herrera also worked in the shadows. Like his co-Kingpin Defendant Hernandez, Herrera took extraordinary measures to conceal his identity, including avoiding written communications and using burner cell phones. Herrera also used a single-name pseudonym when dealing even with his lieutenants: "Thomas," or the Spanish-language diminutive "Tomasito."

245. Herrera conspired with Hernandez and others to sell extremely large quantities of counterfeit Gilead-branded HIV medication in the United States. Herrera ultimately controlled multiple Supplier Defendants, including Supplier Defendants Omom and Invicta. Distributor Defendant Brosius referred to "Thomas" as the "HIV middle man," and identified "Thomas" as the individual behind both Omom and Invicta.

246. For example, in April 2021, Brosius wrote that he was "waiting [o]n Thomas for invicta." And in May 2021, Distributor Defendant Safe Chain contacted "Thomas" via the email OmomPharmaceuticals80@gmail.com to order counterfeit HIV medication from Omom. And in June 2021, employees at Distributor Defendant Worldwide Pharma texted a burner cell phone whose number was saved in their phones as "Thomas" or "Tomasito" in an attempt to cancel a forthcoming delivery of counterfeit Gilead-branded HIV medication from Omom.

247. Similarly to how it identified "Rob," Gilead was able to identify "Thomas" by subpoenaing the records of the burner cell phone he used for the counterfeiting conspiracy's

business and using the geolocation data from that phone to identify the dates and times of his air travel. Gilead and its investigators then matched "Thomas's" air travel with public and private flights, subpoenaed the manifests of those flights, and identified Kingpin Defendant Armando Herrera as having been on board on all of the identified flights. Again, Gilead was only able to obtain the name and identity of "Thomas" by diligently reviewing the flight records.

248. Gilead subsequently confirmed Herrera's identity by tracing illicit proceeds from Supplier Defendant Omom to Herrera's front door: he used counterfeiting proceeds to renovate his home. Gilead traced Omom's counterfeiting profits to a money-laundering shell company, Asset Holder Defendant Titan. Titan paid a significant amount of the counterfeiting profits to a company that sells imported stonework and tile. Gilead subpoenaed the records of that seller, which produced an invoice for stonework to be installed in a residential home. The "bill to" line on the invoice listed Asset Holder Defendant Titan (the money launderer for Omom's counterfeiting proceeds), but the invoice identified the purchaser as Armando Herrera.

249. Mr. Herrera has a history of making illicit profits through defrauding individuals living with HIV. In 2008, he pled guilty and was sentenced to three years' imprisonment for running what the government called "a fraudulent HIV infusion clinic" that made fake Medicare claims and also subjected patients to "unnecessary procedures such as paravertebral joint injections."

250. Herrera lives with his girlfriend, Asset Holder Defendant Yisel Lopez. Herrera owns no real estate or vehicles in his own name. Instead, Herrera maintains counterfeiting proceeds, and real estate purchased with counterfeiting proceeds, under Lopez's name. Lopez is a former chiropractic assistant with no independent income. She is the owner of two LLCs: one that owns Herrera's home, and one that owns Herrera's mother's home. Lopez also personally

received repeated payments from two money-laundering entities that themselves received counterfeiting proceeds from Supplier Defendants Omom and Abacus, and personally sent at least one substantial payment back to one of those money laundering entities.

## F.   THE LEADER DEFENDANTS ORCHESTRATE THE PURCHASING, SALE, AND ADVERTISING OF THE COUNTERFEITS

251.    The Leader Defendants are responsible for pushing tens of thousands of bottles of counterfeit Gilead-branded medications with fake pedigrees through the U.S. pharmaceutical distribution chain.  These five individuals managed a host of disparate fly-by-night counterfeiters, including the vast majority or all of the named Supplier Defendants.

252.    The Leader Defendants negotiated the pricing and sale of those fly-by-night wholesalers' counterfeit Gilead-branded medications to at least four licensed gray-market distributors: Distributor Defendants Safe Chain, ProPharma, Scripts, and newly added Distributor Defendant ProVen.  After establishing these counterfeit pipelines to the licensed Distributor Defendants, the Leader Defendants went on to organize the advertising and sale of those counterfeits to pharmacies, supervising a sales force and sometimes directly selling to pharmacies on the distributors' behalf.

### 1.   Leader Defendant Druhv Ralhan and His Shell Company, D&K Healthcare

253.    When Safe Chain first entered the business of buying and selling purported Gilead HIV medication in May 2020, it did so through Defendant Druhv Ralhan (who sometimes went by "Drew").  Ralhan first connected Safe Chain with the fly-by-night counterfeiter Boulevard, and over the course of weeks quickly built up Safe Chain's brand-new HIV business to include various purported Gilead-branded medications.  Ralhan managed Safe Chain's relationship with Boulevard, relaying orders and occasionally making direct use of Boulevard 9229 LLC's sales email address, 9229sales@gmail.com.  The purported Gilead-branded medications that Ralhan

marketed and sold were counterfeit and were accompanied by false pedigrees that misrepresented the origin and chain of custody of the medications.

254.    In the ensuing months, Ralhan introduced Safe Chain to new fly-by-night sources of counterfeit Gilead medication: at minimum, Supplier Defendants Gentek and Omom.  Ralhan once again and directly negotiated the pricing of the purported Gilead HIV medications that Safe Chain purchased from those counterfeiters.  Ralhan also handled issues with Safe Chain's pricing and payments for purported Gilead products sold by the Supplier Defendants.

255.    Ralhan also conspired with Distributer Defendant ProPharma.  He was introduced to Alex Reyes, a ProPharma employee, in early 2021 by his co-leader, Defendant Paul Rosell.  In his phone, Reyes saved Ralhan's name as "Dhruv (HIV MEDS)."  Ralhan had Reyes sign a non-disclosure agreement ("NDA") prior to their discussion of ProPharma's potential sale of Gilead HIV medication through Ralhan and his colleagues.  Ralhan signed that NDA on behalf of Defendant D&K Healthcare, a shell company that he wholly owns.  In email correspondence, Ralhan explained that "we" – meaning at minimum himself and Rosell – "have our own custom software that produces our Pedigree," and discussed "executing a contract with the" distributors who would be providing the HIV medication.  Ralhan specified that the "contract will be from my 'broker' side."

256.    After the deal was struck with ProPharma and Ralhan had established the pipeline for counterfeit HIV medications to ProPharma,  Ralhan supervised and resolved disputes among the sales force that was selling the counterfeits to pharmacies on ProPharma's behalf.  He also submitted some orders directly.  The Gilead-branded medications that Ralhan marketed were counterfeits, bearing falsified pedigrees, falsified instructions for use, and in some cases, containing fake pills.

### 2. Leader Defendant Paul Rosell and His Shell Company, Med-Connect

257. In October 2020, Rosell recruited Distributor Defendant ProPharma into the counterfeiting operation that he and the other Leader Defendants led. Rosell disclosed that he was already selling huge volumes of purported Gilead medication (*i.e.*, the counterfeits) through ProPharma's "two major competitors: Safechain and Scripps [sic]. Safechain is moving about $5M a week and Scripps [sic] is around $8M a week." Rosell's proposal to ProPharma was that his team would handle both the sourcing of the product – initially, through Supplier Defendant Gentek – and the sales to ProPharma's customers. All ProPharma had to do was wait for Rosell's team to generate orders from pharmacies, and then ship the counterfeits and collect payment. As Rosell emphasized in his pitch: "Propharma does not have to provide a sales force." One of ProPharma's board members responded, "Sounds like a great opportunity to expand and grow with the help of established relationships from Paul and his people."

258. Pursuant to Rosell's plan, ProPharma began purchasing counterfeit Gilead medication from Distributor Defendant Omom in February 2021. In April 2021, Reyes announced that ProPharma's share of the sales of the counterfeits would now be made "to Paul [Rosell]'s company," Med-Connect. Reyes explained that ProPharma would pay Med-Connect, and then Rosell "will be in charge of disbursements to the teams." Reyes said Rosell's company was the preferred entity to receive payments because "Paul seems to know both sides."

259. Pursuant to Rosell's plan, ProPharma trafficked more than 17,000 bottles of purported Gilead-branded HIV medication to U.S. pharmacies. These medications were counterfeits, bearing falsified pedigrees, falsified instructions for use, and in some cases, containing fake pills.

### 3. Leader Defendant Venkata Srinivas Mannava and his Shell Company, DSP Consulting, Inc.

260. As with his co-Leader Defendants, Mannava's primary role in the conspiracy was to introduce and manage the relationships between the fly-by-night Supplier Defendants and the Distributor Defendants. Mannava is a former pharmacist and a convicted pharmaceutical fraudster who lost his pharmacist's license and was barred from participating in federal healthcare plans after being convicted for participating in a criminal scheme to fraudulently bill insurance for "expensive HIV and cancer medication" that was neither requested by patients nor actually dispensed. Mannava was also convicted of forging prescriptions for oxycodone, the narcotic at the center of America's opioid addiction epidemic.

261. As one of the ringleaders of the counterfeiting scheme, Mannava used the pseudonyms "Srini K." and "Vas Manna," both of which incorporate elements of his full name: Venkata Srinivas Mannava. Through a combination of public-records searches and documents obtained from the ProPharma seizure, Gilead's investigators were able to definitively identify both of these alternate personas as, in fact, Mannava.

262. Using his "Srini K" persona, Mannava interfaced directly with ProPharma to set up Defendant Pharma Pac, yet another counterfeit Supplier Defendant, as a ProPharma vendor. Mannava also actively managed ProPharma's relationship with at least three counterfeit suppliers – Omom, Invicta, and PharmaPac – addressing issues such as payments, missing invoices, maintaining a steady supply, and pricing.

263. Mannava also used a shell company he founded in March 2021, Defendant DSP, to receive funds for the counterfeits and distribute kickbacks to his co-conspirators. DSP received kickback payments directly from the counterfeit suppliers as well.

264.     Mannava also worked on the sales side of the counterfeiting operation.  Using his "Vas Manna" persona (often shortened to "Vas M"), Mannava worked directly as a sales representative, using a ProPharma email address and selling purported HIV medication directly to pharmacies.  As "Vas Manna," Mannava also worked directly with co-ringleader Ralhan to add new retail pharmacies to the stable of customers for the counterfeits.

**4.     Leader Defendant David Dunn and His Companies PCSIONE, LLC and Pharmacy Consulting Services Inc.**

265.     Gilead identified Leader Defendant David Dunn from seized documents obtained from Distributor Defendant Scripts.  Consistent with the role played by the other Leader Defendants, Mr. Dunn introduced several of the newly named Supplier Defendants to Scripts, acting as a broker between Scripts and the fly-by-night suppliers.

266.     Dunn was the key point of contact between Scripts and newly named Supplier Defendants ITC Group LLC ("ITC") and Abacus Distributors ("Abacus"), both of whom sold large quantities of counterfeit Gilead-branded medication to Scripts.  Dunn  negotiated the pricing for the counterfeits (all at too-good-to-be-true discounts compared to authentic medication), communicated the available inventory of counterfeits from ITC and Abacus, and ensured Scripts paid for the counterfeits it received.  Dunn also managed the flow of the counterfeiting profits to ITC and Abacus, including by depositing checks directly into the Suppliers' accounts.

267.     Dunn was also the individual responsible for sending Scripts the pedigrees for the counterfeits delivered by ITC and Abacus.  Those pedigrees were counterfeit and fraudulent.  Because the counterfeit pedigrees often contained obvious errors, Dunn worked closely with Scripts to "correct" the pedigrees and make them less obviously fake.

268.     As with the other Leader Defendants, Dunn also helped recruit pharmacies to purchase the counterfeit HIV medication he was supplying to Scripts, and was paid an additional cut of the counterfeiting proceeds based on those sales to pharmacies.

269.     Dunn operated in part through two companies he wholly owned: newly named Defendants Pharmacy Consulting Services Inc. and PCSIONE LLC.  Mr. Dunn received his cut of the counterfeiting proceeds through PCSIONE LLC.  And Dunn conducted business with Scripts under the name of, and using the email signature for his other company, Pharmacy Consulting Services, Inc.

### 5.     Leader Defendant John Levitan

270.     Like his co-Leader Defendants,  John Levitan managed the relationship between Supplier Defendants and Distributor Defendants, and is responsible for tens of thousands of bottles of counterfeit Gilead-branded HIV medication being sold into the U.S. distribution stream.

271.     But unlike the other Leader Defendants, Levitan is also directly connected to the Kingpin Defendants, and knew them beyond their pseudonyms.  Levitan and Kingpin Defendant Hernandez know each other well, and both serve or served as executives of the same Florida-based boat company.  In fact, Levitan is responsible for introducing Hernandez – known only as "Rob" to everyone else – to Distributor Defendants Safe Chain and Worldwide Pharma.

272.     Levitan is also a money-laundering expert, and has a central role in the counterfeiting conspiracy's complex money-laundering apparatus.  Levitan is a convicted felon who spent 14 years in prison on money laundering charges.  Among the evidence introduced against Levitan was the fact that he offered a detailed plan to an undercover IRS agent to launder what Levitan thought was $1 million in illegal narcotics profits.  Since his release from prison in

67

2007, Levitan has formed or been named the principal of over 40 different Florida corporate entities, almost of all them registered to the same address in Pensacola, Florida, and approximately a dozen of which purport to be in the medical field.

273.    Levitan also performed duties for the conspiracy similar to his co-Leader Defendants.  For example, Levitan was the primary contact for Supplier Defendant Synergy Group Wholesaler LLC and its principal, Defendant Carlos Vega.  For example, a May 2021 email concerning Synergy states: "I believe you know John [Levitan]. . . . John is going to be involved with inventory and acquisition . . . .  Feel free to discuss things with him.  Nothing else will change on the Po's [sic] and payments and such."  And the following month, Levitan followed up with Defendant Vega, the principal of Synergy, in writing: "We are looking for [more] inventory and I wanted to speak to you, to lock in an agreement for future orders."

274.    Under Levitan's direction, Synergy supplied a large volume of counterfeits to Safe Chain, selling millions of dollars of Gilead-branded medications with clearly counterfeit pedigrees.

275.    Levitan was also involved in managing Supplier Defendant Invicta's relationship with Safe Chain.  On May 21, 2021, Invicta's owner on paper, Defendant Jorge Caba, emailed Levitan and Brosius, writing, "Here is a copy of how the t3 [*i.e.*, the pedigree] is gonna look like.  SafeChain address it not on the paper because I dont have it, but it will be there.  Thank you for the opportunity."  A few days later, on May 25, 2021, Caba sent a copy of Invicta's state distribution license directly to Levitan.

276.    Levitan also introduced at least one other intended supplier of counterfeits to Safe Chain, but this Court enjoined Safe Chain's purchase and sale of Gilead products before that new supplier made a sale.

68

G.    **THE MARKETER DEFENDANTS: DEFENDANTS ZANGARI, MASSANA, PANAGIOTOPOULOS, AND STREAMLINERX SELL THE COUNTERFEITS ON BEHALF OF THE DISTRIBUTOR DEFENDANTS**

277.    The Leader Defendants not only provided the Distributor Defendants access to a stable of counterfeit suppliers, but they also provided the sales force to sell those counterfeits to pharmacies.  The heads of the sales force were referred to as "the Canadian Boys": Defendants Mike Zangari, Riccardo Massana, and John Panagiotopoulos, all of whom live in Canada (together, the "Marketer Defendants").  The Marketer Defendants were responsible for managing the sales force that advertised and sold counterfeits to pharmacies on behalf of, at minimum, Distributor Defendants Safe Chain, ProPharma, and Scripts.  The Marketer Defendants were organized and operated under the direction of the Leader Defendants.

278.    In February 2021, when ProPharma first joined the counterfeiting scheme, all three of the Marketer Defendants were on an initial kick-off call with Leader Defendants Ralhan and Rosell, as well as a follow-up email chain with the subject line "ProPharma – HIV introduction."  All three of the Marketer Defendants managed ProPharma's sales of the counterfeits by receiving emails through the distribution group RXorders@propharmausa.com.  Each of the Marketer Defendants sold purported Gilead products to pharmacies on ProPharma's behalf.  These medications were counterfeits, bearing falsified pedigrees, falsified instructions for use, and in some cases, containing fake pills.

279.    Defendants Zangari and Panagiotopoulos were also responsible for selling counterfeits on behalf of Safe Chain.  Along with Leader Defendant Ralhan, Zangari and Panagiotopoulos shared an email address, brands@pharmasales.com, through which they submitted pharmacy orders to Safe Chain.  Zangari, Panagiotopoulos, and Ralhan split the kickback for Safe Chain's sales of counterfeits among the three of them.

280.     The Marketer Defendants utilized a shell company, Defendant StreamlineRx, in connection with their counterfeit sales.  StreamlineRx was formed in February 2020, and according to its corporate filings its principal is Defendant Pavan Matripragada.   StreamlineRx's website was registered by D&K Healthcare, the shell company owned by Leader Defendant Ralhan.  Streamline advertises itself as a reimbursement manager for pharmacies that boasts it has "proprietary billing methods" that allow pharmacies to "circumvent PBMs" – *i.e.*, the Pharmacy Benefit Managers that set reimbursement rates for insurance plans.  Defendants Zangari and Ralhan submitted invoices to Safe Chain and requested payment for purported Gilead products through StreamlineRx, using an @streamlinerx.net email address.

## H.   THE SUPPLIER DEFENDANTS: ILLEGITIMATE FLY-BY-NIGHT ENITIES THAT SOLD THE COUNTERFEITS TO DISTRIBUTORS

281.     As described above, the counterfeiting conspiracy relied on an expanding stable of fly-by-night Supplier Defendants.  These entities were formed for the purpose of selling counterfeit HIV medication, and did so for as long as they could before garnering unwanted attention, at which point they shut down operations and disappear.  The conspiracy then introduces a new, seemingly unconnected Supplier Defendant to take its place.

282.     The Supplier Defendants all sold counterfeit Gilead-branded HIV medication at prices well below the price Gilead itself charges its authorized distributors.  Many of the Supplier Defendants used identical templates for their product lists and DSCSA pedigree documentation.  These templates often even share a common typographical error, missing the final "s" in "Gilead Sciences."  For example, Defendants Gentek, Omom, PharmaPac, and RXWholesale LLC utilized DSCA pedigree documentation sharing a common template for DSCSA pedigree document.  In addition, multiple of the Supplier Defendants used the same Product List template that appears to have been generated by the same individual.  For example, Omom, Invicta, and

Rapid's Tex all used the sample product list templates, and the metadata for all three documents indicate that they share a common author.

283.     Every bottle of purported Gilead-branded medication sold by the Supplier Defendants was accompanied by a counterfeit pedigree that fraudulently misrepresented when and from whom the Supplier Defendant received the bottle.  The Supplier Defendants of course knew they did not actually obtain the bottles from the sources listed on their counterfeit pedigrees.  There is no question that each Supplier Defendant is a willful counterfeiter.

### 1.     Boulevard and Its Principals, Peter Khaim, Zafar Abdulleav, and Ishbay Shukurov

284.     Supplier Defendant Boulevard sold at least 14,899 bottles of counterfeit Gilead-branded HIV medication, all with counterfeit pedigrees, to Distributor Defendant Safe Chain.  Many of those counterfeits had the wrong pills inside the bottle.

285.     Records that Gilead recovered during the July 26, 2021 seizure show that Khaim was Boulevard's primary point of contact with Safe Chain including in connection with Boulevard's sale and delivery of counterfeit Gilead medications with fake pedigrees.  Khaim directly communicated about the counterfeits with, for example, Charles Boyd and Brosius.  Khaim's name was saved in Charles Boyd's phone as "Peter Boulevard."

286.     Khaim and his brother, Arkaidy Khaimov, are currently under indictment for running a multi-million-dollar pharmaceutical fraud scheme.  The indictment states that the Khaim brothers bribed the nominal owners of several pharmacies – including one nominally owned by Shukurov – to allow them to use those pharmacies to fill fake prescriptions for expensive cancer-related medication.  Khaim and his brother then pushed those fake prescriptions through for insurance reimbursement by using emergency override procedures established for the COVID-19 pandemic.

287.    Khaim's sale of counterfeit HIV medication through Boulevard, again using Shukorov as a false proxy, is a similarly structured scheme – but this time, Khaim put the lives of countless HIV patients at risk with fake drugs.

288.    Khaim was indicted on December 18, 2020.  Safe Chain was aware of, and discussed a press release concerning, Khaim's indictment no later than January 2021.  And yet Khaim continued to sell, and Safe Chain continued to buy, counterfeit Gilead medication in at least February and March 2021.

289.    Khaim arranged for the purported Gilead drugs to be hand-delivered to Safe Chain by his "driver."  Khaim emphasized to Charles Boyd that these hand deliveries were "the best way" to send the counterfeits.  Below is a picture from Safe Chain's files of a delivery of purported Gilead product that Khaim had hand-delivered to Safe Chain on behalf of Boulevard:



290.    Brosius wrote to Charles Boyd that this jumbled mess of obviously illegitimate product was "silly" – but Safe Chain and Worldwide Pharma continued to buy millions of dollars' worth of purported Gilead medication from Khaim and Boulevard.

291.    Safe Chain's communications with Khaim and Boulevard make clear that Safe Chain knew Boulevard was providing fake pedigrees for Gilead products.  At one point, Safe Chain asked if Boulevard had invoices or upstream pedigrees proving that the drugs came from the sources listed on Boulevard's pedigrees.  Using a generic gmail email address, Boulevard offered instead only vague empty assurances: "No I do not.  But it's 100 percent np [*i.e.*, no problem].  You ll have no problems its all accurate."

292.    In several instances, Safe Chain purchased medication from Boulevard, and then sold that medication to pharmacies, without having received any pedigrees from Boulevard at all. For example, in August 2020 Brosius wrote to Charles Boyd and others that pharmacies were demanding the missing pedigrees, but Boulevard was unwilling to provide them until Safe Chain paid its outstanding debt of over $1 million.  Brosius concluded his email by writing, "HELP!" Charles Boyd responded that he had spoken with Khaim and come up with a solution to the problem.

293.    At the seizure at his residence, Shukurov confirmed that he was the owner and principal of Boulevard on paper, but stated that a man paid him $5,000 a month  to "sign some papers" and open businesses in Shukurov's name, including Boulevard.  Shukurov claimed to have no other involvement in Boulevard's business.  Shukurov identified Abdullaev as the individual who paid him to sign the papers founding Boulevard, and Gilead seized a notebook in which Shukurov had recorded Abdullaev's name, phone number, and license plate number. Bank records collected during the seizure and in subsequent discovery confirmed that Shukurov received regular payments of $5,000 or $10,000 from Boulevard.  The bank records showed that Shukurov signed all of Boulevard's checks, including payments to pharmacies and distributors, as well as Boulevard's payments to Shukurov himself.

294.     It was Abdullaev who bribed Shukurov to open Boulevard in Shukurov's name in order to conceal Abdullaev's and Khaim's involvement in Boulevard's criminal counterfeiting. Abdullaev is currently residing in a house owned by a limited-liability corporation that is owned by members of the Khaim / Khaimov family, and is currently deeded to Arkadiy Khaimov, Defendant Peter Khaim's brother and his co-defendant in the pending pharmaceutical fraud criminal action.

**2.      Boulevard's Alter Ego: MFK Management d/b/a Boulevard 9229**

295.     As alleged above, Boulevard sold thousands of counterfeit Gilead-branded products to Safe Chain, all bearing counterfeit pedigrees.  Gilead now knows that Boulevard's principal-in-fact, Peter Khaim, also controlled newly added Defendant MFK Management, which lists both "Boulevard 9229" and "9229 Boulevard" as assumed names.  At Boulevard's request, Safe Chain began sending its payments to Boulevard to bank accounts owned by "MFK Management LLC d/b/a 9229 Boulevard LLC."  Safe Chain wired approximately $10 million to MFK Management as payment for Boulevard's counterfeits.

**3.      Synergy and Its Principal, Carlos Vega**

296.     Supplier Defendant Synergy is a fly-by-night counterfeiter that sold large volumes of counterfeit Gilead-branded HIV medication, all with counterfeit pedigrees, to Distributor Defendant Safe Chain.  Additional details concerning Synergy's willful counterfeiting are set forth in paragraphs 427-443 below.

297.     Synergy is owned on paper by Defendant Carlos Vega.  Vega directly communicated with Safe Chain concerning Synergy's sales of the counterfeits, and was personally involved in creating the fake email trail fraudulently claiming that Synergy purchased

the counterfeits from a Gilead-authorized distributor.  Synergy abandoned its offices prior to being named in this action.

### 4.    Synergy's Co-Conspirators: Julio Martin Gonzales, Cesar Castillo, and DNS Distributor

298.    As alleged above, Defendants Synergy and Carlos Vega sold thousands of counterfeit Gilead-branded products to Safe Chain, all bearing falsified pedigrees.  Vega has asserted that Synergy purchased the counterfeits from two recently formed shell corporations: Defendants Cesar Castillo and DNS Distributor.  Synergy's bank records confirm that Synergy paid those two entities most of the proceeds of its counterfeiting. However, bank records show that Cesar Castillo and DNS Distributor immediately used that money to purchase jewelry and other expensive goods that can be converted to cash.  Cesar Castillo and DNS Distributor are shell entities used to launder the proceeds of Synergy's counterfeiting.

299.    As alleged in further detail below, Defendant Cesar Castillo is a recently-formed Colorado shell company, so-named to intentionally defraud customers into believing that Synergy sourced its counterfeits from the "real" Cesar Castillo, a Gilead-authorized distributor in Puerto Rico.  Vega controls Defendants Cesar Castillo and DNS Distributor.

300.    Defendant Julio Martin Gonzalez is the named principal of Cesar Castillo and DNS Distributor.  Vega has stated that Martin Gonzalez is actively involved in Synergy's business.  Taking Vega at his word, Martin Gonzalez therefore knowingly participated and conspired to participate in Synergy's counterfeit trafficking operation.

### 5.    Gentek and Its Principal, Edel Reyes

301.    Gentek is a fly-by-night counterfeiter that worked with the Leader Defendants to sell counterfeits to multiple Distributor Defendants.  As alleged above, Gentek sold thousands of bottles of purported Gilead medication to Safe Chain.  Some of Gentek's counterfeits contained

Seroquel XL, the powerful antipsychotic, inside the sealed bottle instead of Gilead medication. Gilead has confirmed that all of Gentek's pedigrees for purported Gilead product are fraudulent.

302.    Gentek is owned by Defendant Edel Reyes, who registered the company at his home address.  Gentek opened its doors just months before it started selling counterfeits to Safe Chain, and abandoned its offices before Gilead's investigators visited them.  Seized documents show that Reyes actively marketed and sold counterfeits through Gentek.

### 6.    Rapid's Tex and Its Principal, John Santos

303.    Rapid's Tex is a fly-by-night counterfeiter that worked with the Leader Defendants to sell counterfeits to multiple Distributor Defendants.  As alleged above, Rapid's Tex sold thousands of bottles of purported Gilead medication to Safe Chain.  Gilead has confirmed that every pedigree for every Gilead product sold by Rapid's Tex is fraudulent.

304.    Rapid's Tex is owned and operated by Defendant John Santos.  It is licensed only in its home state of Texas and therefore cannot lawfully sell across state lines.  To sell to Safe Chain, Rapid's Tex participated in a "pass-through" scam whereby it fulfilled Safe Chain's orders by selling the counterfeits  on paper to a different, licensed distributor, which then immediately sold them to Safe Chain.

305.    Safe Chain itself declared in writing that multiple bottles of Gilead medication sold by Rapid's Tex were "bad/counterfeit," noting that they had "experienced them [*i.e.*, the counterfeits] with another" distributor, and so Safe Chain "could not receive/take" those bottles. Santos, Rapid's Tex's owner, was copied on that email.  His response to being told that he had sold counterfeit HIV medication was merely to say "we will be shipping out today another order."

7. **Omom and Its Principals, Gustavo Fernandez, Luis D. Gonzales Herrero, and Jordan Rodriguez Mato**

306.    Omom is another fly-by-night Supplier Defendant whose sales to multiple Distributor Defendants was orchestrated by the Leader Defendants.  Gilead received and tested a counterfeit bottle of BIKTARVY® that Omom had sold to ProPharma, which sold it to a pharmacy.  That counterfeit bottle had the wrong pills inside, and a patient reported being sickened by the counterfeit medication.  Gilead now knows that Omom sold a total of over 18,000 bottles of purported Gilead medication to both ProPharma and Safe Chain, valued at over $52 million. Gilead has confirmed every Omom pedigree for these purported Gilead medications to be fraudulent.  Omom abandoned its offices after learning that Gilead was pursuing the sellers of counterfeits.

307.    Omom's principals used fake names to sell counterfeits.  Howeover, in its corporate filings, Omom lists as its principals Defendants Gustavo Fernandez, Luis D. Herrero-Gonzales, and Jordan Rodriguez Mato.  As discovery will confirm, these Defendants knowingly participated in Omom's counterfeiting activities.

308.    Omom used two related companies to sell the counterfeits and receive the counterfeiting proceeds: Omom Pharmaceuticals, Inc. and Omom Wholesale Corp.  Both entities and their respective principals conspired together and acted as a single entity in selling the counterfeits.  The counterfeit pedigrees for Omom's sales listed Masters Drug Company, Inc. as the seller, and the proceeds of the counterfeiting were sent to Kingpin Defendant Hernandez.  Omom had various bank accounts, all of which listed the registered address of Omom Wholesale Corp. in Rancho Cucamonga, California.  Multiple Distributor Defendants sent correspondence and packages, including returns of counterfeit Gilead-branded medications, to Omom at the Rancho Cucamonga address.

### 8.    Invicta and Its Principal, Jorge Caba

309.    In late May 2021 Invicta joined the stable of Supplier Defendants that the Leader

Defendants used to sell to ProPharma purported Gilead medication with fraudulent pedigrees.

From late May 2021 to the date of Gilead's seizure against ProPharma in August, Invicta sold

3,987 bottles of Gilead medication worth approximately $11.8 million.  Gilead has confirmed

that the pedigrees for every bottle sold by Invicta are fake: those pedigrees all claim that Invicta

purchased from Smith Drug Company, a Gilead-authorized distributor, which has never sold

anything to Invicta.

310.    As with the other counterfeit suppliers, ProPharma's relationship with Invicta was

managed by the Leader Defendants, with sales arranged by the Marketer Defendants.  Safe Chain

also took steps to add Invicta as a supplier in June 2021, but appears not to have completed that

process before this Court enjoined Safe Chain from selling Gilead products.

### 9.    Pharma Pac and Its Principal, Angel Toral

311.    Pharma Pac Wholesale Corp. ("Pharma Pac") is the final counterfeit distributor

that the Leader Defendants introduced to ProPharma.  ProPharma began purchasing purported

Gilead medication from Pharma Pac on August 4, 2021, just weeks before Gilead executed the

seizure at ProPharma's offices on August 23.  During that short period, Pharma Pac sold over

1,000 bottles of purported Gilead medication to ProPharma, valued at over $3 million.  Gilead

has confirmed that every pedigree for every purported bottle of Gilead product sold by Pharma

Pac is fraudulent – they all list a purported first sale from Gilead to an authorized distributor, but

Gilead never made those sales to that authorized distributor.

312.    Pharma Pac's relationship with ProPharma was managed primarily by Leader

Defendant Mannava, using his "Srini K" persona.  For example, Srini K. sent ProPharma a "new

account application" to set up Pharma Pac as a vendor and supplied ProPharma with a Pharma Pac invoice for purported Gilead medication.

313.    Pharma Pac is a fly-by-night counterfeiter that has stolen the identity of an established pharmaceutical repackaging company.  A licensed pharmaceutical repackaging company named Pharma Pac, was founded in 1984.   The "Pharma Pac" that sold counterfeits to ProPharma was founded in January 2021, by its owner and principal, Defendant Angel Toral.  As part of its attempts to pass itself off as its namesake, Defendant Pharma Pac fraudulently utilizes the other Pharma Pac's business address on its corporate filings, and even copied the other Pharma Pac's logo on its pedigrees and invoices.

### 10.    Pharma Pac LLC and Its Principal, Daynel Garcia

314.    The originally named Pharma Pac Defendants, Pharma Pac Wholesale Corp. and Angel Torel, were validly served with this Court's Temporary Restraining Order prohibiting, among other things, their purchase or sale of Gilead-branded HIV medication.  Those originally named Pharma Pac Defendants have defaulted in this litigation.

315.    However, Gilead discovered that after it was incorporated on May 26, 2021, a new entity, Pharma Pac LLC, operating under a new principal, Defendant Daynel Garcia, has been continuing Pharma Pac's counterfeiting operations.  This new entity, Pharma Pac LLC, is operating the exact same scam as the originally named Pharma Pac Defendants: stealing the name, licensure, and logo of the licensed pharmaceutical repackager, the "real" Pharma Pac, to sell counterfeits.  Newly named defendants Pharma Pac LLC and Garcia are closely conspiring with and are in active concert with the originally named defendants Pharma Pac Wholesale Corp. and Toral.  Pharma Pac LLC and Garcia are aware of this Court's injunction against Pharma Pac Wholesale Corp. and Angel Toral, and are acting as their co-conspirers and agents in willfully

violating that injunction.  In 2022, Pharma Pac LLC sold over 1,000 bottles of counterfeit Gilead-branded medication, all with counterfeit pedigrees.  Because this Court has already enjoined all of the Distributor Defendants who purchased from the original Pharma Pac Defendants, the new Pharma Pac LLC sold the counterfeits directly to a pharmacy that is an active member of the counterfeiting conspiracy: newly named Pharmacy Defendant Total Remedy.

### 11.    RxWholesale and its principal, Gabriel Betesh

316.    RxWholesale is a fly-by-night pharmaceutical distributor that was founded in February 2021, and which received a New Jersey wholesale drug license in late March 2021. RxWholesale lists a business address in Brick, New Jersey – but in a familiar pattern, that office was abandoned by the time Gilead's investigators visited it.

317.    Gilead has confirmed from numerous independent sources that RxWholesale is selling purported Gilead medication with fake pedigrees.  For example, AmerisourceBergen ("ABC"), a Gilead-authorized distributor, provided Gilead a copy of a confirmed fake pedigree that falsely claimed RxWholesale had purchased BIKTARVY® from ABC and sold it to Distributor Defendant Scripts.  Separately, in June 2021 a pharmacy that was directly solicited by RxWholesale asked to see the pedigrees in advance, saw that the pedigrees (falsely) listed ABC as the source of over 500 bottles of Gilead-branded medicines, and shared that pedigree with Gilead's counsel.  And Gilead seized from Safe Chain a copy of RxWholesale's application to become a Safe Chain vendor, completed just before the seizure was executed in July 2021. RxWholesale provided a sample pedigree with its application that once again falsely listed ABC as its source, and which listed the wrong address for Gilead as the manufacturer.  Defendant Betesh signed the application form as RxWholesale's President.

80

318.     In an unrelated lawsuit filed in New York Supreme Court, a creditor with a security interest in RxWholesale's inventory has alleged that RxWholesale and Scripts conspired to hide millions of dollars' worth of BIKTARVY®, out of state and out of the reach of the New York City Marshal.  The creditor attached to its Complaint a copy of an invoice showing that in July 2021 alone, RxWholesale sold nearly a thousand bottles of purported Gilead products to Scripts, all at too-good-to-be-true prices.

### 12.     CM Pharma and Its Principals, Robert and Jeffrey Gafnea

319.     CM Pharma is an Alabama drug distribution company owned and operated by Defendants Robert and Jeffrey Gafnea.  CM Pharma is licensed to distribute pharmaceuticals only in Alabama, making it unlawful for CM Pharma to ship across state lines.

320.     In April 2021, CM Pharma sold 100 bottles of purported BIKTARVY® to Safe Chain.  Safe Chain complained that CM Pharma failed to provide pedigrees for the BIKTARVY®, noting, "The man I spoke with Jeff [Gafnea] kind of gave me some run around like answer about why we haven't received them... seemed really odd."  On April 16, 2021, CM Pharma finally sent Safe Chain pedigrees that all claimed that Gilead sold the product directly to Invicta, one of the fly-by-night Supplier Defendants, which then sold the product to CM Pharma. Those pedigrees are fraudulent: Gilead never sold any products to Invicta.

### 13.     Medicine Shoppe, PrimeRX, and Their Principal, Sekar Venkatesh

### a.     Medicine Shoppe

321.     Defendant Medicine Shoppe – *i.e.*, Maryland Pharmacies Inc. d/b/a Medicine Shoppe 1802 – is a single franchisee of a national pharmacy chain, owned and operated by Defendant Sekar Venkatesh.  It is a modestly sized retail pharmacy in a strip mall in suburban Silver Spring, Maryland.  As alleged above, Gilead tested and confirmed to be counterfeit two

bottles of Gilead medications that the Medicine Shoppe had purchased from Safe Chain and then dispensed to patients – one in October 2020, one in February 2021.

322.    At the time of these incidents, Gilead treated Medicine Shoppe as a victim. Recently discovered evidence shows that the opposite is true: Medicine Shoppe is a willful large-scale counterfeiter.  Despite having twice been informed it purchased from Safe Chain dangerous counterfeit HIV medication – including a bottle that contained high-dose Seroquel, the potent antipsychotic – Medicine Shoppe continued making massive purchases of purported Gilead HIV medication from Safe Chain.

323.    In total, Medicine Shoppe purchased over 1,300 bottles of purported Gilead medication from Safe Chain, paying Safe Chain $3.8 million.  All of those bottles had fake pedigrees, and Medicine Shoppe purchased the vast majority of them after it knew Safe Chain was selling counterfeit Gilead HIV medication with foreign medication inside.  Medicine Shoppe continued buying large volumes of counterfeit Gilead medication from Safe Chain until Gilead executed the July 23, 2021 seizure at Safe Chain's premises.

324.    Losing Safe Chain as a supplier did not stop Medicine Shoppe's attempts to buy counterfeits: it simply went straight to Safe Chain's counterfeit suppliers.  When Gilead executed the second round of seizures on August 26, 2021, its investigators seized a cell phone from Defendant Peter Khaim, the New York-based principal of the counterfeit supplier Boulevard. On Khaim's phone was a text chain with Defendant Venkatesh, Medicine Shoppe's owner, directly negotiating the purchase of very large quantities of purported Gilead medications:

Triumeq 75 1800 Tivicay. 75. 900 Dyscovy. 300 600 Biktarvy 200. 1800 Truvada 50. 500

(646) 247-1380 Peter Khaim 8/12/2021 2:33:39 PM

Descovy agreed

(410) 908-2814 Sekar 8/12/2021 2:38:00 PM

Triumeq 75 1000 Tivicay 75 600 Biktarvy 200 1200 Thanks

(410) 908-2814 Sekar 8/12/2021 2:40:29 PM

325.    This text chain lists the medication, the number of bottles, and the proposed price: for example, Khaim offers BIKTARVY®, 200 bottles, for $1800 each – a discount of approximately 45% off WAC – and Venkatesh pushes for a substantially lower price of $1200. At these prices and quantities, Venkatesh clearly knew the prescription medication he was haggling over was not authentic, lawfully acquired Gilead medication.

326.    The sheer volume of Medicine Shoppe's purchases from Safe Chain, and the similarly huge quantities Venkatesh was seeking to purchase directly from Khaim, indicate that not all of these counterfeits were being dispensed to patients through the Medicine Shoppe. Rather, as discovery will confirm, Venkatesh  was selling most of his stock of counterfeit Gilead medication through his pharmaceutical distribution company, PrimeRx.

**b.    PrimeRx**

327.    As Gilead has learned, Venkatesh owns not just Defendant Medicine Shoppe, but also a pharmaceutical distribution company, Defendant PrimeRx.  PrimeRx is registered as a pharmaceutical wholesaler with the FDA and holds licenses in a handful of states, including New York.  PrimeRx lists its business address as the exact same address and suite number in Silver Springs, Maryland as Defendant Medicine Shoppe.

328.     PrimeRx has done business with Defendant ProPharma.  In March 2021, PrimeRx filled out onboarding paperwork with ProPharma that stated it was a "secondary wholesale drug distributor" and listed its ProPharma "rep" as "Drew" – *i.e.*, Leader Defendant Dhruv Ralhan. Although it listed itself as a wholesaler, PrimeRx does not appear to have made any sales to ProPharma – rather, PrimeRx used ProPharma to purchase even more counterfeit Gilead HIV medication.  PrimeRx purchased hundreds of bottles of purported Gilead medication from ProPharma, all with fake pedigrees.  In making those counterfeit purchases from ProPharma, PrimeRx worked directly with Leader Defendant Mannava.  As discovery will confirm, PrimeRx subsequently re-sold those counterfeits, as well as additional counterfeits it received from Medicine Shoppe, to pharmacies throughout the United States.

**14.     My Meds and Its Principals, Stephen Smith and Emilio Juvier Vina**

329.     Supplier Defendant My Meds is a fly-by-night counterfeiter that sold 4,783 bottles of counterfeit Gilead-branded medication to Distributor Defendant Scripts for over $13.6 million.  All of the pedigrees associated with these bottles are counterfeit.

330.     In its indictment of Kingpin Defendant Lazaro Hernandez, the federal government identified My Meds as one of many counterfeit suppliers over which Hernandez had ultimate control.

331.     Kingpin Defendant Hernandez worked anonymously in the background and used Leader Defendants Ralhan and Mannava to manage the sales of the My Meds counterfeits to Scripts.  In the course of these transactions, Defendant Stephen Smith, a My Meds principal, was the primary My Meds contact and personally participated in and approved the sales of the counterfeits to Scripts.

332.     My Meds' pedigrees for the Gilead counterfeits all fraudulently list "M&D Specialty Wholesalers" as My Meds' source of the medication.  "M&D Specialty Wholesalers" is a fictitious name intended to be confused with, and trade on the name of, a legitimate wholesaler, "M&D Specialty Distribution."

333.     My Meds also funneled its counterfeiting proceeds through a series of shell companies that mimicked the name of this legitimate distributor, creating what would appear at first glance to be a legitimate financial trail for the medication.

334.     For example, My Meds sent over $11 million in its counterfeiting proceeds to a shell company: Asset Holder Defendant M & D Co. Distributors, LLC.  That shell company was created by the other principal of My Meds, Defendant Vina, and it proceeded to pay over $8 million of those proceeds to Vina himself.  Another such shell company receiving these proceeds is Asset Holder Defendant MDSD Enterprises, LLC—MDSD being a common abbreviation for the legitimate distributor.

**15.     ITC Group and Its Principal, Frank Betancourt**

335.     Supplier Defendant ITC is a fly-by-night counterfeiter that sold counterfeits to Distributor Defendants Scripts.  Beginning about October 16, 2020, and through about October 12, 2021, ITC sold at least 3,730 counterfeit bottles of Gilead-branded medication to Scripts for over $10.6 million.  All of the pedigrees associated with these bottles are counterfeit.  As with the other Supplier Defendants, ITC has shuttered its doors and abandoned its office space.

336.     ITC was not, and was never intended to be, a legitimate pharmaceutical wholesaler.  Instead, it was created as a means to traffic counterfeit medications.  ITC was founded on June 26, 2020 and received licensure as a pharmaceutical wholesaler in New York on November 16, 2020.

337.     In or about October 15, 2020, a month before ITC obtained its wholesaler license in New York, Leader Defendant David Dunn introduced ITC's principal, Betancourt, to Scripts' owner, Defendant Steven Diamantstein.  Betancourt and Diamantstein began corresponding that same day.  Scripts and ITC entered into a Vendor Agreement the following day.

338.     Thereafter, ITC and Betancourt relied on Scripts and Diamantstein for instructions regarding the process of setting up a company that had the appearance of being a legitimate wholesaler in order to sell counterfeits.

339.     For example, in their first written conversation, Betancourt texted Diamantstein, asking basic questions about how to get licensure, such as "Do we need to apply in NYC or Jersey?" to which Diamantstein responded, "NY State."   In the same conversation, Mr. Betancourt asked Diamantstein to name "someone we can use as a registered agent in NYS." Betancourt also pressed for Scripts to begin making purchases immediately, despite the then-lack of wholesale licensure.

340.     As soon as ITC's New York license went through on November 16, 2020, Scripts placed its first order for counterfeit Gilead-branded HIV medications from ITC.

341.     The counterfeit pedigrees that ITC sent Scripts throughout the course of their transactions were sloppy and plagued with glaring problems, resulting in a stream of complaints from Scripts.  Some of the glaring problems Scripts identified included pedigrees that listed the same date of sale for every transaction from the first supposed sale by Gilead through the final sale to Scripts, pedigrees that did not even list the sales to Scripts, and pedigrees that did not list lot numbers and had incorrect quantities.  Scripts and Diamantstein worked with ITC and Betancourt to revise those counterfeit pedigrees to make them more plausible.

16. **Abacus Distributors and Its Principals, Carlos G. Pimentel, Robert Davis Miller, and Jose Antonio Hernandez**

342.    Abacus is a fly-by-night counterfeiter that sold at least 5,597 counterfeit bottles of Gilead-branded medication to Scripts for over $14.3 million.  Some of Abacus's counterfeits contained aripiprazole, an atypical antipsychotic medication, instead of Gilead medication.  All of the pedigrees for all of the purported Gilead-branded medications sold by Abacus are counterfeit.  As with the other Supplier Defendants, Abacus has shuttered its doors and abandoned its office space.

343.    Abacus was first formed in Texas in February 19, 2019, by Defendant Carlos Pimentel.  Abacus then registered an identically named company in Florida on May 7, 2019, by Defendant Robert Davis Miller, the former President.  On March 16, 2020, Miller was replaced by Jose Antonio Hernandez, the current President.  Hernandez is also a principal for Rapids Tex Wholesale Corp (a previously named Supplier Defendant).

344.    Abacus received a Texas pharmaceutical distribution license in March 2019, and began selling counterfeit Gilead medication to Scripts within months, beginning August 2019. Abacus did not receive licensure in New York until November 24, 2020, and so for over a year its sales to Scripts in New York were unlawful on their face.

17. **CompaRx and Its Principal, Yusniel Forcelledo Perez**

345.    CompaRx LLC ("CompaRx") is another fly-by-night counterfeit supplier that sold counterfeit Gilead-branded medication, all with counterfeit and fraudulent pedigrees.  Like the other Supplier Defendants, CompraRx's sale of counterfeit HIV medication was managed by the Leader Defendants: here, Ralhan and Mannava.

346.    However, CompaRx deviates from the other Supplier Defendants in that, to the best of Gilead's knowledge, CompaRx sold counterfeits not to any Distributor Defendants, but

rather directly to a pharmacy, newly added Pharmacy Defendant Ascan Pharmacy.  CompaRx sold at least 149 bottles of Gilead-branded medication for over half a million dollars to Ascan, all with counterfeit pedigrees.

347.    CompaRX's owner and principal is Yusniel Forcelledo Perez, who personally sold the counterfeits to Ascan.  Perez has personal connections to the counterfeiting conspiracy: for a period of time he shared an address in New Jersey with the principal of Supplier Defendant Omom.

### 18.    Mainspring and Its Principals, Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman

348.    Mainspring is the earliest-known seller of counterfeit Gilead-branded HIV medication.  From February 17, 2017 to November 8, 2018, Mainspring sold 17,219 counterfeit bottles of Gilead-branded medication to Distributor Defendant Scripts through Supplier Defendant Lieb Pharmacy, all with counterfeit pedigrees.

349.    Mainspring's principals—Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman—have all been charged with felonies in connection with this counterfeiting scheme.  All but Silverman have pleaded guilty.

350.    According to the Department of Justice, Mainspring's principals used the company "to pose as legitimate prescription drug wholesalers" and then "obtained prescription drugs from unlicensed, black market sources."  They then "sold the drugs through Mainspring" to wholesalers, "falsely representing that the drugs were legitimately sourced from licensed suppliers."  Mainspring "specialized in expensive name-brand prescription drugs used to treat HIV, such as Atripla," a Gilead-branded HIV medication.

351.    The Department of Justice stated that, to effectuate their scheme, the Mainspring principals "stole the identity of a licensed prescription drug company supplier in California and

prepared paperwork falsely suggesting their drugs came from that supplier," and "further mimicked the appearance of a legitimate supply chain by opening bank accounts in names misleadingly similar to the licensed supplier and routing the proceeds of their fraudulent sales through the accounts."  As alleged above, several other Supplier Defendants have engaged in similar schemes to trade off the names of "real" licensed suppliers.

352.     According to the sworn testimony of the investigating FBI special agent, one Mainspring principal stated that his operation would "re-label bottles of drugs for something more expensive, or a bottle of drugs would contain 'candy' instead of medication."

### 19.     V & G Wholesale and Its Principal, Pavel Lashkevich

353.     V & G is a supplier that reached out to Scripts directly, with its owner, Lashkevich, offering to sell Gilead-branded HIV medication at too-good-to-be-true prices.  V&G sold Scripts 54 bottles of counterfeit Gilead-branded medication, all with counterfeit pedigrees. Like the other Supplier Defendants, V & G has abandoned its offices.

354.     The Scripts employee who made first contact with V & G and Lashkevich reported to Scripts' owner, Steven Diamantstein, that he was "pretty sure [V & G] is fraud," but stated he was following up with Mr. Diamantstein because he "just wanted to make sure wasnt [sic] someone you worked with as he was trying to move brands" – *i.e.*, V & G was selling brand-name drugs (like Gilead-branded HIV medication) as opposed to less expensive generic medication.   Diamantstein eagerly responded: "He wanted to sell me brands?  Send me his phone number please."

355.     V & G was not a legitimate pharmaceutical supplier, but Diamantstein coached Lashkevich on how to take basic steps to appear so.  For example, on March 20, 2019,

Diamantstein texted Lashkevich: "Did you report you [sic] licenses on the FDA website ? Deadline next Friday.  If you need help, I can show you how to do it.  It's easy."

### 20.   Valuecare Pharmacy and Its Princpal, Bakhtiyar Nabiev

356.   Valuecare is a retail pharmacy located in Queens, New York, that doubles as a fly-by-night counterfeit supplier, selling counterfeits to other defendants.  Valuecare was founded on March 8, 2020, by a third party.  On March 22, 2021, that third party sold the pharmacy to its current President, CEO, and Owner, Bakhtiyar Nabiev.  Valuecare shuttered its doors several weeks before it was added as a Defendant to this action.

357.   In April 2021, shortly after Mr. Nabiev took control, Valuecare crossed the line from retail pharmacy to wholesale counterfeit supplier by selling several counterfeit Gilead-branded products to Pharmacy Defendant Medicine Shoppe, all at prices far below WAC and with counterfeit and fraudulent pedigrees.  Communications between Valuecare and Medicine Shoppe regarding additional potential purchases of Gilead medications and the negotiation of their pricing continued through at least July 2021.

358.   In June 2021, Valuecare also sold at least 25 counterfeit bottles of Gilead-branded medication for $53,851.40 to newly named Supplier Defendant My Meds at prices far below WAC.  MyMeds then sold the counterfeit bottles to Scripts.

359.   As was the case with other Supplier Defendants, Valuecare's counterfeit sales to My Meds were managed by Leader Defendants – here, Defendants Mannava and Ralhan.

360.   Valuecare is also connected to the Queens-based fly-by-night Supplier Defendant Boulevard.  For one, Valuecare is at least in part controlled by Defendant Peter Khaim, who was the driving force behind Boulevard and who is currently under two separate indictments for health-care and pharmacy fraud.  Khaim conducted Valuecare's business under the alias "Alex

Kim," using cell phones that Khaim also used to conduct business on behalf of Supplier Defendant Boulevard. In addition, Valuecare's owner, Defendant Nabiev, is the father-in-law of Defendant Zafar Abdullaev, the paper owner of Boulevard that was hired for that role by Mr. Khaim.

### 21. Lieb Pharmacy and its Principal, Raoul Diamantstein

361. Lieb Pharmacy is a pharmacy in Brooklyn, New York. Lieb Pharmacy is located in the same building as Defendant Scripts Wholesale Inc. Defendant Raoul Diamantstein is the principal of Lieb Pharmacy. Defendant Raoul Diamantstein is the father of Defendant Steven Diamantstein, the owner of Distributor Defendant Scripts. Raoul Diamantstein owns the building in which Lieb Pharmacy and Scripts Wholesale are located.

362. Lieb Pharmacy is a New York corporation registered on February 26, 1986. Defendant Raoul Diamantstein has been the principal of Lieb Pharmacy since its inception. Lieb Pharmacy has a pharmacy license in the state of New York.

363. Lieb Pharmacy purchased thousands of bottles of Gilead branded medicine from Supplier Defendant Mainspring Distribution. Lieb Pharmacy then immediately sold those bottles of Gilead branded medicine to Defendant Scripts Wholesale Inc. Scripts' internal records list Lieb Pharmacy as its vendor for the counterfeits that were originally sold by Mainspring, and the pedigrees all list sales from Mainspring to Lieb Pharmacy to Scripts. Each of those pedigrees is counterfeit: they fraudulently claim that Mainspring Distribution purchased from Aamed LLC, which purchased the medication directly from Gilead. In reality, Aamed LLC is not and has never been a Gilead-authorized distributor, and Gilead has never sold any medications to Aamed LLC.

364.    Pharmacy Defendant Lieb Pharmacy sold at least $34 million worth of counterfeit Gilead branded medications to Distributor Defendant Scripts Wholesale Inc.

## I.    THE DISTRIBUTOR DEFENDANTS: LICENSED WHOLESALERS WHO WILLFULLY SOLD THE COUNTERFEITS TO U.S. PHARMACIES

365.    As alleged above, the Distributor Defendants purchased the counterfeits from the Supplier Defendants and sold them to pharmacies across the United States.  The Distributor Defendants used their licensure, their more established business presence, and their relationships with existing pharmacy customers to lend a veneer of legitimacy to the counterfeits and get them onto pharmacy shelves.  The Distributor Defendants knew they were selling counterfeit HIV medication with counterfeit pedigrees, but willfully sold them to make an illicit profit, putting thousands of patients at risk.

### 1.    Safe Chain's Willful Sale of Counterfeit HIV Medications After Being Repeatedly Informed It Was Selling Counterfeits

366.    Safe Chain holds itself out to be a legitimate pharmaceutical distributor, specializing in HIV medications among a few other areas.  In reality, Safe Chain is a willful trafficker of counterfeit HIV and other medications, and has knowingly put an untold number of patients' health and lives at risk in order to make an illicit profit.

367.    Prior to this litigation, Gilead received report after report of counterfeit Gilead HIV medications from pharmacies and customers, all of which Safe Chain had sold to the dispensing pharmacy.  Gilead initially treated Safe Chain as an unwitting distributor of counterfeits, and attempted to work cooperatively with the company to address the problem. Legitimate distributors who learn they have sold counterfeits – let alone bottles of counterfeit HIV medications that actually contain a high-dose antipsychotic – will do everything they can to

ensure they do not sell any more counterfeits, and assist the manufacturer in tracking down the source of the counterfeits.  Safe Chain did the opposite.

368.    In response to Gilead's communications, Safe Chain engaged in a campaign of delay and obfuscation, hiding its suppliers and refusing to provide Gilead with crucial information about the counterfeits.  Meanwhile, Safe Chain continued to buy thousands of bottles of Gilead medication, all of them with fake pedigrees, from the same counterfeit suppliers, even after Safe Chain had been informed that these suppliers were selling counterfeit Gilead HIV medications.

<blockquote>

a.    **Safe Chain Is Notified It Is Selling Counterfeits but Obstructs Gilead's Investigation and Continues Purchasing from Its Counterfeit Supplier**

</blockquote>

369.    In August 2020, White Cross Pharmacy, located in California, reported to Gilead and Safe Chain that a patient had returned a bottle of BIKTARVY® that had foreign medication inside.  The pharmacy had purchased that counterfeit from Safe Chain.  Knowing that the pharmacy had already reported the counterfeit to Gilead, Safe Chain's co-founder Charles Boyd wrote to Gilead to disclose White Cross Pharmacy's report.  On September 11, 2020, Gilead asked Safe Chain to identify who had supplied this counterfeit to Safe Chain, but Safe Chain refused to do so.

370.    In November 2020, Gilead again asked Safe Chain to provide the pedigree and identify the supplier from whom Safe Chain had purchased the counterfeit.  Safe Chain refused, stating only that it had purchased the counterfeits from an "authorized trading partner."  Gilead responded that was "wholly inadequate," noting that Gilead needed that information "to determine how this illegitimate product made its way into the supply chain."

371.    Between August 2020 and early February 2021, Gilead asked Safe Chain on at least five different occasions to produce the pedigree for the counterfeit it sold to White Cross Pharmacy, but each time Safe Chain either refused or ignored the request.

372.    In October 2020, Safe Chain received another report of counterfeit BIKTARVY® from a different pharmacy – Defendant The Medicine Shoppe in Maryland.  The counterfeit BIKTARVY® bottle was actually filled with 300 mg tablets of SEROQUEL XR®.  But this time, Safe Chain knew that the pharmacy had not immediately reported the counterfeit to Gilead. Hoping to avoid detection, Safe Chain tried to dissuade the pharmacy from reporting the incident.  In an email to The Medicine Shoppe, Safe Chain's Director of Compliance suggested that instead of "contact[ing] Gilead," the pharmacy should "return[] it to us, and then let us send it back."  Safe Chain never did report this counterfeit to Gilead.

373.    Gilead only learned about this October 2020 counterfeit report because in February 2021, The Medicine Shoppe received from a patient *another* report of counterfeit BIKTARVY® that the pharmacy had purchased from Safe Chain.  Gilead promptly interviewed The Medicine Shoppe.  During that interview, the pharmacy disclosed its October 2020 counterfeit report to Safe Chain, stating that it had returned the counterfeit bottle to Safe Chain but heard nothing back.

374.    When Gilead confronted Safe Chain about the October 2020 counterfeit report from The Medicine Shoppe, Safe Chain claimed it *had* reported that incident to Gilead, and that Gilead was at fault for not responding to Safe Chain's report.  That claim was false.  Gilead immediately demanded, and later repeated its demand, that Safe Chain substantiate its claim that it had reported the October 2020 incident.  Safe Chain never provided any such corroboration, because it never made any such report to Gilead.

94

375.    Each of the three known examples of counterfeit BIKTARVY® that were reported to Safe Chain between August 2020 and early February 2021 had been supplied to Safe Chain by Gentek LLC ("Gentek"), located in Stamford, Connecticut. During that period, Safe Chain worked to conceal the counterfeit reports from Gilead, and when Gilead learned about them, refused to provide pedigrees or identify its counterfeit supplier.  During that same time period – from the time Safe Chain was first directly told that the Gilead medication it sourced from Gentek was counterfeit to the time Safe Chain revealed Gentek's identity to Gilead – **Safe Chain purchased over 8,000 bottles of Gilead HIV medications from Gentek for over $20 million, including over 3,000 bottles of BIKTARVY®, all while knowing that Gentek was selling dangerous counterfeits.**  Gentek has since been identified by the federal criminal authorities  as under the ultimate control of newly named Kingpin Defendant Lazaro Hernandez.

### b.    Safe Chain Provides Fake Pedigrees to Gilead

376.    Realizing that Gilead's counterfeit investigation was escalating and that it would not be possible to stonewall and obstruct the investigation indefinitely, on February 22, 2021, Safe Chain finally provided the pedigree for the counterfeit BIKTARVY® that White Cross Pharmacy had reported *six months* prior.  Safe Chain also provided pedigrees – one from Safe Chain and one from its supplier – for the two counterfeit bottles of BIKTARVY® that were reported by The Medicine Shoppe.  Each of the pedigrees indicated that Safe Chain had purchased the counterfeit from Gentek.  Each pedigree also indicated that Gentek had purchased the counterfeit from Drogueria Betances, a Gilead authorized distributor located in Puerto Rico.

377.    Gilead determined that those pedigrees were fake.  Gilead did not sell the lot numbers listed on the pedigrees to Drogueria Betances.  And Gilead confirmed with Drogueria Betances that Gentek was not one of its customers.

378.     Gilead has learned that Safe Chain not only provided Gilead with fake pedigrees, but that Safe Chain altered those pedigrees by adding false information immediately before sending them to Gilead.

379.     Gilead obtained from Safe Chain's customer, Defendant The Medicine Shoppe, the pedigree that Safe Chain sent to the Medicine Shoppe in the normal course of business – *i.e.*, at the time it sold the counterfeit bottle to the pharmacy.  The pedigree that Safe Chain sent to its customer and the pedigree it sent to Gilead should, of course, be identical.  They are not, as shown in the figure below:



Pedigree that Safe Chain sent to pharmacy

Pedigree that Safe Chain sent to Gilead

380.     The pedigree that Safe Chain originally sent to The Medicine Shoppe listed an initial sale directly from Gilead to Gentek – an obvious red flag, because Gentek is not a Gilead authorized distributor.  That original pedigree also omitted basic details, such as Gilead's address and the date and reference number for the supposed initial sale from Gilead to Gentek.

381.    But the pedigree that Safe Chain later sent to Gilead had an additional transaction added to the sales chain: a purported initial sale from Gilead to Drogueria Betances, the Gilead authorized distributor.  Moreover, the information missing on the original pedigrees – Gilead's address, date of initial sale, and reference number for initial sale – are now filled in (fraudulently, because those initial sales never happened).  In other words, the original pedigrees, which were immediately recognizable as fake, had been altered to include information that was also fake, but was harder to recognize as such.

382.    Safe Chain sent both sets of pedigrees as PDF files that contain metadata showing the date they were created.  Safe Chain created the pedigree it sent to The Medicine Shoppe on January 8, 2021, the day it sold the bottles to the pharmacy, as would be expected.  But Safe Chain created the altered pedigree on February 19, 2021 – meaning the altered pedigree was created outside the normal course of business, just days before Safe Chain sent it to Gilead.

### c.    Safe Chain's Willful Purchases of Counterfeits from Defendant Boulevard

383.    On October 5, 2020, Safe Chain contacted Gilead with a cryptic request to verify the expiration date on a bottle of BIKTARVY®.  Gilead responded by asking Safe Chain why it was inquiring about the product and requesting more information and photographs of the bottle. Safe Chain did not provide photographs or otherwise explain what had prompted the inquiry, but it did send a purported pedigree document for the bottle.  The pedigree in question claimed an initial sale of BIKTARVY® from Gilead to a "drug co-op," and then to Defendant Boulevard, and then to Safe Chain.  Gilead responded on October 9, 2020 that the transaction history was incorrect, and that the drugs on the pedigree "should be treated as an illegitimate product and quarantined and should be reported to the FDA."  Safe Chain did not respond to Gilead's e-mail.

384.    In March 2021, Gilead received two new complaints from pharmacies – one in New York City and the other in Washington D.C. – about counterfeit bottles of BIKTARVY® and DESCOVY® that the pharmacies had purchased from Safe Chain.  The pharmacy in Washington D.C. provided the pedigree for the counterfeit bottle of DESCOVY®, which indicated that Safe Chain had purchased it from Defendant Boulevard.  Gilead and its outside lab tested both bottles and confirmed they were counterfeit.

385.    On March 23, 2021, Gilead, through outside counsel, wrote to Safe Chain's counsel detailing the two new complaints.  Gilead demanded that Safe Chain quarantine all Gilead product in its inventory and provide all documentation, including pedigrees, of all Gilead-branded medication it had purchased since 2020.

386.    Safe Chain responded on March 26, 2021.  Safe Chain refused to quarantine its Gilead product in inventory or to provide documentation for all its purchases of Gilead product.  Instead, Safe Chain attempted to blame the counterfeiting on Gentek, and claimed that it had ceased all purchases from Gentek.

387.    On March 29, 2021, Safe Chain wrote again to disclose that the same day it sent its previous letter, it received a report from a pharmacy customer in Washington D.C. that it had purchased two counterfeit bottles of BIKTARVY®, each with different lot numbers, from Safe Chain.  Safe Chain stated it was sending samples of those counterfeits to Gilead, and attached their pedigrees, which showed Safe Chain acquired one of the counterfeits from Boulevard.

388.    The pedigrees showed that Safe Chain purchased these two counterfeits from Boulevard months *after* Gilead informed Safe Chain that Boulevard was using fake pedigrees to sell illegitimate Gilead medication and instructed Safe Chain to quarantine medication from Boulevard and report it to the FDA.  Instead, Safe Chain continued buying from Boulevard and

subsequently sold dangerous counterfeits supplied by Boulevard to pharmacies, where they were dispensed to unsuspecting patients, placing the patients' health and lives at risk.

### d.    Safe Chain's Willful Sales of Counterfeits from Rapid's Tex

389.    As alleged above, on March 29, 2021, Safe Chain informed Gilead of two additional counterfeit reports from a pharmacy, one bottle of which Safe Chain purchased from Boulevard.  Safe Chain purchased the other counterfeit from a Texas distributor, Mr. Unlimited LLC ("Mr. Unlimited") who in turn had purchased it from another Texas distributor, Defendant Rapid's Tex Wholesales Corp. ("Rapid's Tex").

390.    Safe Chain's March 29 letter was the first time Gilead learned that Safe Chain was buying counterfeits from Mr. Unlimited and Rapid's Tex.  Safe Chain had sold that particular counterfeit to a Washington D.C. pharmacy on March 22, and the pharmacy reported it as counterfeit on March 26.  But Safe Chain knew it was buying counterfeits from Mr. Unlimited and Rapid's Tex well before that.

391.    On or before March 9, 2021, Safe Chain received what it identified as counterfeit bottles of BIKTARVY® from Mr. Unlimited, which had purchased them from Rapid's Tex. Safe Chain never reported those counterfeits to Gilead, nor did it quarantine them as required by the DSCSA.  Instead, Safe Chain returned the bottles to Rapid's Tex for a refund.  Safe Chain's co-conspirator, Defendant Brosius of Worldwide Pharma, explained in an email:

> There are 3 LOTS of Biktarvy from Gilead that have proven to be bad/counterfeit. . . .  our legal counsel told us we could not take/receive these lots of Biktarvy.  There were 3 units on the prior invoice.  Gilead and the California BOP [*i.e.*, Board of Pharmacy] have deemed those 3 lots as 'bad.'  We explained to Rapid's Tex and they understood.  thanks.

Rapid's Tex responded by announcing "we will be shipping out today another order."

392. Receiving counterfeit Gilead medication from Rapid's Tex did not deter Safe Chain and Worldwide Pharma from continuing to buy several hundred more bottles of purported Gilead medication, all with fraudulent pedigrees and at too-good-to-be true pricing, through these entities.

393. Rapid's Tex's next shipments contained more counterfeit BIKTARVY® with the wrong pills in the bottle with new lot numbers – the bottles that Safe Chain reported to Gilead on March 29, plus two more tested and confirmed counterfeits that were reported by a different pharmacy the following month. These confirmed counterfeits with the wrong pills in the bottle are the ones that were reported to the dispensing pharmacy and to Safe Chain, and which Safe Chain chose to report to Gilead. There are almost certainly many other counterfeits with the wrong pills in the bottle that were never reported to Gilead.

394. Moreover, in order to facilitate its purchase of counterfeits from Defendant Rapid's Tex, Safe Chain and Worldwide Pharma conspired to identify and bribe what they called a "pass-through" wholesaler: Mr. Unlimited.

395. Unlike Rapid's Tex, Mr. Unlimited is an "authorized" distributor under the DSCSA: it has been licensed in Texas as a drug distributor since 2009, maintains a current registration and files annual reports with the FDA, and has an out-of-state pharmaceutical distributor's license in Utah. Under the pass-through scam, Rapid's Tex nominally sold to Mr. Unlimited, who immediately forwarded the supposed Gilead medications to Safe Chain. Rapid's Tex and Mr. Unlimited then papered the "pass-through" transaction by creating, after the fact, invoices, purchase orders, and pedigrees claiming that Mr. Unlimited purchased from Rapid's Tex and sold to Safe Chain.

396. In a Microsoft Teams Chat, Charles Boyd acknowledge that Rapid's Tex's pedigrees had "A LOT of issues," noting that "even the NDC # [*i.e.*, the National Drug Code number] for Biktarvy is wrong."

397. The purpose of the pass-through scam was to use Mr. Unlimited's licensure to "whitewash" the pedigrees. It allowed Safe Chain to claim it was buying directly from a legitimate supplier (Mr. Unlimited) when in fact it was sourcing fake Gilead medications from the unlicensed, fly-by-night counterfeiter Rapid's Tex. For its participation in the scheme, Mr. Unlimited was paid an up to $1500 kickback per order. Safe Chain listed that kickback as a separate line item on its purchase orders as "PASS THROUGH FEE."

398. The Boyds orchestrated the pass-through scam with Brosius and Worldwide Pharma. Safe Chain, Worldwide Pharma, Mr. Unlimited, and Rapid's Tex are all on numerous emails concerning the pass-through scam. When complications arose with the scam, Mr. Unlimited told a Safe Chain employee that he "spoke with Safe Chain's owner," and instructed Safe Chain's representative to get the details from Worldwide Pharma.

399. Safe Chain's "pass through" scam had one shortcoming: the pedigrees it received from Mr. Unlimited still listed the unlicensed counterfeiter Rapid's Tex as an upstream supplier. When the patient complaints continued to roll in and Gilead's investigation intensified, Safe Chain began to create new fraudulent pedigrees that simply erased Rapid's Tex from the chain of sale completely. For example, in March 2021 Safe Chain sold several dozen bottles of BIKTARVY® to The Medicine Shoppe. As with several other orders, Safe Chain had ordered those bottles directly from Rapid's Tex and caused them to be "passed through" Mr. Unlimited. And yet Safe Chain's pedigree for the sale to The Medicine Shoppe fraudulently indicated that Gilead had sold the drugs directly to Mr. Unlimited, with no mention of Rapid's Tex whatsoever.

400.     All of the pedigrees that Mr. Unlimited generated for Safe Chain as part of the pass-through scam stated that Mr. Unlimited received the drugs from Rapid's Tex.  The fraudulent pedigrees claiming that Gilead sold directly to Mr. Unlimited were created by Safe Chain itself, out of whole cloth.

> ### e.     Safe Chain Continues Its Counterfeiting, and Attempts Another Blatant Lie to Cover It Up

401.     As the reports of Safe Chain's sales of counterfeits to pharmacies continued to come in, Safe Chain eventually promised Gilead that it had stopped purchasing from the counterfeit suppliers that Gilead knew about: Gentek, Boulevard, and Mr. Unlimited / Rapid's Tex.  But Safe Chain did not agree to stop buying and selling Gilead HIV medications from illegitimate suppliers.  Instead, Safe Chain came up with another scheme to cover its tracks and throw off Gilead's investigation.

402.     On an April 20, 2021 call between Gilead's counsel and Safe Chain's counsel, Safe Chain stated that it had a new source for Gilead products that was buying directly from Cesar Castillo LLC ("Cesar Castillo"), a Gilead authorized distributor.  Gilead asked Safe Chain to produce pedigrees for those purchases, but Safe Chain did not do so.

403.     On May 3, 2021, Gilead served subpoenas on Safe Chain, Boulevard, and Mr. Unlimited as part of an ongoing lawsuit in Florida federal court concerning fraudulent diversion of Gilead HIV medications (the "Florida Action").  The following day, Safe Chain's counsel memorialized in a letter Safe Chain's earlier representation that it now had a legitimate source for Gilead product:

> Safe Chain has begun making purchases of Gilead-branded products from a supplier who sourced them from Cesar Castillo (Gilead's authorized distributor).  As I mentioned, **Safe Chain has contacted Cesar Castillo to verify that this supplier is not only a customer of Cesar Castillo, but also that their account number on file with Cesar Castillo matches the**

**account number that was listed on the Cesar Castillo invoices provided by the supplier to Safe Chain substantiating the supplier's purchase of Gilead products from Cesar Castillo**.  Safe Chain is willing to provide the list of lot numbers and expiration dates for the products which Safe Chain had purchased from the supplier who sourced them from Cesar Castillo, along with the T3 reports, **provided Gilead agrees to meet the conditions below**.

(emphasis added).  The "conditions" that Safe Chain demanded were untenable.  They included

"**[w]ithdrawal of the Subpoena served on May 3, 2021**," and the following:

Please provide an **acknowledgement that Safe Chain has not falsified any of the T3 Reports** previously provided to Gilead (as had been previously insinuated) **and provide a release to Safe Chain regarding its sales of Gilead-branded medications**. . . . if [Gilead] would like Safe Chain to continue voluntarily producing additional information to Gilead, it will need this protection in place.  This is perhaps the most important requirement."

(emphasis added).

404.   Gilead, of course, did not agree to falsely "acknowledge" that Safe Chain never falsified a pedigree (in fact, Safe Chain had falsified pedigrees), to withdraw the subpoena, or to give a blanket release of all its legal claims against Safe Chain.  And so Safe Chain kept the identity of its new supplier secret.

405.   On May 28, 2021, Defendant Medicine Shoppe, the pharmacy customer who had received multiple counterfeits from Safe Chain, provided Gilead copies of its communications with Safe Chain, including pedigrees.  Among the documents were four pedigrees for Gilead HIV medications, including BIKTARVY®, that The Medicine Shoppe received from Safe Chain on April 19, 2021.  Consistent with Safe Chain's representations to Gilead, the pedigrees did show an initial sale to Cesar Castillo, the authorized Gilead distributor.  The pedigree also identified Safe Chain's new mystery supplier: Defendant Synergy Group Wholesalers LLC ("Synergy").  The pedigrees purport to show that Synergy purchased the Gilead HIV medications from Cesar Castillo and immediately sold them to Safe Chain.

406.    Gilead's subsequent investigation revealed that those pedigrees are fraudulent, and that Safe Chain's claim that it had verified the purchases from Cesar Castillo was a lie. Gilead never sold the lot numbers listed on the pedigrees to Cesar Castillo.  Cesar Castillo has never sold Gilead products (or any other products) to Synergy, has never heard of either Synergy or Safe Chain, and was never contacted by Safe Chain.  In fact, Cesar Castillo has never sold a Gilead product to another distributor, period: it sells only to pharmacies and to medical facilities like hospitals and clinics.

407.    Gilead's investigation has further revealed that Synergy is a sketchy, fly-by-night operation in the same mold as Safe Chain's other counterfeit suppliers.  Synergy received its pharmacy distribution license in September 2020, just months before it started selling to Safe Chain.  It is not licensed to sell drugs across state lines to Safe Chain's warehouses, and it is not registered with the FDA.  It has no website or Internet presence.

408.    The Medicine Shoppe's files included an additional pedigree concerning purchases of nearly 100 bottles of Gilead HIV medications, including BIKTARVY®, from Safe Chain in early March 2021.  The pedigree states that Synergy purchased the drugs directly from Gilead.  That is false.  Synergy is not an authorized distributor, and it has never bought directly from Gilead.

409.    Safe Chain's flagrant lies – lying about having a "new" distributor who was purchasing directly from a Gilead authorized distributor, and lying about having directly verified those purchases with the authorized distributor – were intended to stymie Gilead's investigation and to conceal Safe Chain's continued purchase and sale of dangerous counterfeit Gilead HIV and other medications.

### f. Safe Chain Purchased and Sold the Counterfeits at an Impossible Discount

410. Gilead sells to all its U.S. authorized distributors at a list price known as the wholesale acquisition cost, or WAC. But Safe Chain purchased and sold supposed Gilead medication from its counterfeit suppliers at prices well below WAC – meaning the drugs somehow became less expensive *after* Gilead sold them and they passed through various distributors' hands.

411. In fact, Safe Chain and Worldwide Pharma actively advertised to pharmacies that their sales prices were below WAC. In collaboration with Adam Brosius, the Safe Chain defendants were quoted prices as low as WAC – 25%, an obvious red flag. Safe Chain and Worldwide Pharma knew that was an impossible discount for authentic, legitimately sold Gilead medication.

### g. Safe Chain Purchased Gilead Medication with Obviously Fake Pedigrees

412. The pedigrees that Safe Chain received from its counterfeit suppliers were riddled with errors and anomalies, including stating the same drug was delivered to multiple recipients in different states, all on the same day; indicating that a drug was sold before the upstream distributor even received it; and leaving multiple required fields on the pedigrees blank. At minimum, these errors and inconsistencies were suspect, triggering Safe Chain's obligation under the DSCSA to conduct an investigation. Instead, Safe Chain sold the counterfeits to pharmacies.

### h. Safe Chain's Owners Intentionally Ignored and Circumvented their Director of Compliance

413. During the period it was selling the counterfeits, Safe Chain employed a Director of Compliance, Abbie Divilio, whose job was to ensure Safe Chain complied with the DSCSA.

105

Ms. Divilio testified that she had no actual authority or support in her role, and eventually felt forced to resign because she "felt [she] wasn't able to do [her] job."  Ms. Divilio testified that throughout her tenure she brought an extensive series of red flags about the Supplier Defendants to the attention of Safe Chain's owners, Patrick and Charles Boyd, who overruled her and caused Safe Chain to continue buying the counterfeits.  Ms. Divilio testified that she knew Safe Chain should not have been purchasing from the Supplier Defendants, and that she said so on a daily basis "to anyone who would listen."  Despite the very vocal protests of its Director of Compliance, Safe Chain's purchase and sale of the counterfeits continued unabated.

> ### i.     Safe Chain Knew It Was Buying from Fly-by-Night, Unlicensed, and Unauthorized Counterfeit Suppliers

414.    All of Safe Chain's known counterfeit suppliers – Boulevard, Gentek, Invicta, Omom, Rapid's Tex, and Synergy – are shady, fly-by-night counterfeiters who only recently opened their doors and lacked proper licensure and registration to sell prescription drugs across state lines.  None of them has a website or an Internet presence.  None of them are "authorized" suppliers under the DSCSA, and none of them can lawfully sell prescription medications.

415.    None of the six counterfeit suppliers is registered with the FDA or has met its annual reporting requirements to the FDA.  Moreover, none of them is licensed to sell pharmaceuticals in Utah or Maryland, where they shipped the counterfeit drugs to Safe Chain.

416.    Despite holding themselves out as a legitimate pharmaceutical distribution company,  Safe Chain continued to purchase from suppliers who delivered medications via courier, including in the case of Omom, a "beat up van."

417.    Every time Safe Chain sold a drug that it purchased from one of these counterfeit suppliers, Safe Chain affirmatively certified on its pedigree that it "received the product from a

person that is authorized as required under the Drug Supply Chain Security Act." Every one of those certifications was knowingly false.

418.     Safe Chain, including through Patrick and Charles Boyd, communicated with Defendant Adam Brosius about the counterfeit nature of Defendant Synergy's inventory of purported Gilead medications, and strategized with him about how to obtain counterfeit medications from Defendant Boulevard.

a.     **Safe Chain's Willful Purchases of Counterfeits from Boulevard**

419.     Supplier Defendant Boulevard is not licensed as a pharmaceutical distributor. Boulevard is licensed as a retail pharmacy. All of its sales of prescription drugs to an out-of-state distributor like Safe Chain are illegitimate on their face.

420.     Safe Chain accepted thousands of counterfeit bottles of Gilead-branded medications from Boulevard without ever receiving a single pedigree. Safe Chain began purchasing from Boulevard in May 2020 and immediately began selling those bottles to pharmacies. Boulevard did not send Safe Chain a single pedigree until October 2020. Ms. Divilio, Safe Chain's Director of Compliance, continually pressed for Boulevard to provide the pedigrees and repeatedly informed Charles and Patrick Boyd that Safe Chain could not buy or sell the medications without them, but they overruled her and the flow of counterfeits continued. In fact, in September 2020 Patrick and Charles Boyd expressly discussed the fact that Supplier Defendant Boulevard was selling them counterfeit HIV medication with fraudulent pedigrees. Using the company's Microsoft Teams Chat software, Charles wrote to Patrick Boyd:, "I think we may need to cut off boulevard again. Lots of issues here and read this," providing a link to a news article, which discussed an elaborate patient buyback scheme in Queens, where Boulevard is located. Patrick Boyd responded, "Ugh. Let's get Adam [Brosius] to get him on a call. I think

107

Adam can put him on serious notice that he needs to find the route [sic] of the problem."  In another September 2020 internal chat, Pat Boyd said of Boulevard, "Its [sic] definitely a boulevard issue, they send us shit in bad condition optically and it causes more questions than answers."

421.    Boulevard's owner and principal, Defendant Shukurov, owns another pharmacy that is involved in a massive prescription drug fraud scheme that is the subject of a federal prosecution, and Shukurov is an unindicted co-conspirator in that scheme.

422.    After its counterfeiting came to light, Boulevard abandoned its small offices in a condominium building in Queens and stopped answering its phones.

### b.    Gentek

423.    Defendant Gentek was run out of its principal's home on a lot zoned for residential use in Stamford, Connecticut.

424.    When a pharmacy reported to Safe Chain that it had sold the pharmacy a counterfeit bottle of Gilead HIV medication with a foreign drug inside one of its counterfeits, Defendant Charles Boyd, Safe Chain's co-founder and CEO, emailed Gentek's principal to ask for a refund.  Charles Boyd emphasized that he was seeking a refund only for "this one bottle." The supplier's response email was as follows, with the all-caps and punctuation errors in the original:

> GOOD MORNING
> WILL CREDIT SAFE CHAIN FOR THE PRODUCT. PLEASE GO AHEAD AND DESTROY THE PRODUCT .THATS A MIXED BATCH ERROR ON OUR AD.
>
> SORRY FOR ANY INCONVENIENCE.
>
> **Edel Reyes**
> **PESIDENT**

The abbreviation "AD" stands for "authorized distributor."  The typo "PESIDENT" appears in the signature block of every email Gentek sent to Safe Chain.

425.    That was the entirety of the "explanation" Safe Chain's supplier provided for the counterfeit Gilead HIV medication.  That "explanation" was nonsensical and betrayed Gentek's startling misunderstanding of how pharmaceutical distribution works.  Gilead sells to its authorized distributors filled, sealed, ready-to-dispense bottles of Gilead medication.  Authorized distributors do not open or repackage those bottles.  To claim that a counterfeit bottle containing the wrong medication is the result of an authorized distributor's "mixed batch error" is an obvious and deeply concerning misrepresentation.

426.    Despite knowing that Gentek's explanation was clearly false, Safe Chain did not object.  Instead, Charles Boyd of Safe Chain wrote back cheerily to inquire about his refund: "Thanks!  Please let me know how you would like to handle the credit."

### c.    Synergy

427.    Documents obtained from the Safe Chain seizure show that Synergy engaged in an elaborate ruse in connection with its sale of Gilead products.

428.    As alleged above, in May 2021, Safe Chain claimed it had a new supplier for Gilead products which purchased Gilead-branded medicines directly from Cesar Castillo LLC, a Gilead authorized distributor.  Safe Chain further claimed it had verified this to be true directly with Cesar Castillo, including by verifying its new supplier's account number with Cesar Castillo.  Safe Chain refused to disclose the identity of this new supplier unless Gilead met certain unreasonable "conditions," but Gilead's investigation identified the new supplier as Synergy.

429.    Emails seized from Safe Chain show that in April 2020, Patrick Boyd of Safe Chain wrote to Defendant Vega of Synergy, asking for written confirmation that Synergy had purchased Gilead products from Cesar Castillo.  In response, Vega forwarded Boyd's email to one "Bary Sanchez" at the email "bary.sanchez@cesarcastilloinc.co" requesting this verification. "Mr. Sanchez" replied with the below email:

From: Bary Sanchez <bary.sanchez@cesarcastilloinc.co>
Sent: Tuesday, April 20, 2021 5:00 PM
To: Carlos Vega <carlos@synergygroupwholesaler.com>; Pat Boyd <PatB@Safechain.com>
Subject: Re: Invoice and T3 discrepancies to correct

Hi Carlos / Pat

Acct number is 585720797 .

Bary Sanchez
Account Executive
Cesar Castillo Inc
Carr. #1 Km 21.1 Sector La Muda
Guaynabo, PR 00971
Direct: 787-247-1527
Email: Bary.Sanchez@CesarCastilloInc.co

430.    The above email is a sham.  The signature block shows the name and address of a real Cesar Castillo employee.  The email address, however, is a spoof.  Cesar Castillo's website is www.cesarcastillo.com, and its employees have @cesarcastillo.com email addresses.  The fraudulent email above uses a @cesarcastilloinc.co email address.

431.    According to public records, that sham domain name was registered just a week before the fraudulent "Cesar Castillo" email above was sent:

110

```
Domain Name: cesarcastilloinc.co
Registry Domain ID: D024076EEAFD5420A951CB98F5A7E4531-NSR
Registrar WHOIS Server: whois.domain.com
Registrar URL: www.domain.com
Updated Date: 2021-04-13T01:53:13Z
Creation Date: 2021-04-13T01:53:11Z
Registry Expiry Date: 2022-04-13T01:53:11Z
Registrar: Domain.com, LLC
Registrar IANA ID: 886
```

432.    Shortly before the fraudulent "Cesar Castillo" email was sent, Safe Chain's

Director of Compliance, Ms. Divilio, had emailed Safe Chain's co-owners Charles and Patrick

Boyd noting that Synergy was using a fake email address for a purported contact at Cesar

Castillo, Bary Sanchez, on its pedigrees: "this email is incorrect, from the company webpage

their emails end with 'cesarcastillo.com' not the 'cesarcastilloinc.com' as listed on the Pedigree."

She also included a link to www.cesarcastillo.com to show that was the distributors' actual

website.

433.    Patrick Boyd privately responded to Charles Boyd by saying of Ms. Divilio that

"[s]he has ever [sic] reason to be skeptical," but that she needed to tone down her language.

434.    When the "Cesar Castillo" email from "Mr. Sanchez" came in a couple of weeks

later, Patrick Boyd immediately responded, "Thanks for your help with this Bary."

435.    This was not the first time Synergy had used a fake supplier email address to

pretend it purchased from a legitimate source.

436.    In March 2021, Ms. Divilio, had established a new protocol by which she would

require a proposed HIV vendor to send a sample pedigree, and she would verify all transactions

on the pedigree before Safe Chain could buy from that vendor.  Ms. Divilio testified that she

implemented that protocol in response to learning that Safe Chain had been caught selling

counterfeit Gilead-branded HIV medication with the wrong pills in the bottle from Gentek and

Boulevard.

111

437.     Pursuant to this new protocol, Ms. Divilio required Synergy to submit a sample pedigree when it was presented to her as a proposed new vendor for HIV medications.  On March 3, 2021, Ms. Divilio reached out to the upstream distributor listed on the sample pedigree provided by Synergy.  Ms. Divilio noted that Synergy's pedigree had listed facially false contact information for the upstream distributor: "The contact Jefferey Anderson, his phone was in different area code then [*sic*] where you are located and he is using a Gmail account instead of a company account."

438.     The distributor confirmed to Safe Chain that Synergy's pedigree was fraudulent: "These products were not purchased from us.  We did employ someone named Jeffrey Anderson however he is no longer with the company.  We have no existing relationship with Synergy Group Wholesalers so any Transaction History that they give you with our information is incorrect. We appreciate you bringing this to our attention and will submit a report with the FDA."  Safe Chain's compliance director immediately forwarded that response to Defendant Patrick Boyd, who in turn forwarded it to Defendant Adam Brosius with the following note: "potential problem."

439.     Ms. Divilio testified that the fact that Synergy had failed the protocol she had specifically implemented to avoid buying more counterfeit Gilead-branded medication was, of course, a "big red flag" and meant that Safe Chain should not do business with Synergy.  Ms. Divilio was concerned that the products from Synergy were counterfeit, and communicated that concern to Patrick and Charles Boyd.

440.     Ms. Divilio testified that the decision to nevertheless purchase millions of dollars' worth of counterfeits from Synergy was a decision made by Patrick and Charles Boyd.  Indeed, in communications written behind Ms. Divilio's back, Patrick Boyd and Adam Brosius discussed

112

in April 2021 yet another fraudulent pedigree provided by Synergy.  Boyd noted that "[t]he T3 [*i.e.*, the pedigree] didn't go back to an AD but to a ghetto PR [Puerto Rico] distributor," and that "between that and [Synergy] lying the first time we just need to be careful."

441.    Finally, any doubt that Safe Chain and the Boyds were aware that Synergy was selling counterfeit Gilead-branded HIV medication is put to rest by a Microsoft Teams chat from May 2021, in which Patrick Boyd wrote: "**Did we get any Synergy news**?"  Garrett Mellot, the second in command at Worldwide Pharma responded, "should have inventory today."  Adam Brosius, the owner of Worldwide Pharma, responded bluntly: "**all of their shit is counterfeit**."

442.    But Safe Chain continued to purchase purported Gilead products from Synergy, knowing full well Synergy's business was illicit.

443.    All of the pedigrees for all of the Gilead-branded medications that Synergy sold to Safe Chain are counterfeit and fraudulent.

### 2.    Worldwide Pharma's Willful Counterfeiting

444.    Worldwide Pharma advertises itself as a marketing "sales engine" that connects pharmaceutical distributors with independent pharmacies.  Worldwide Pharma is founded, owned, and operated by Brosius, who at all relevant times was and remains under federal indictment for health care fraud.  Worldwide Pharma and Brosius conspired with Safe Chain to traffic the counterfeits.  Worldwide Pharma and Brosius both worked directly with counterfeit suppliers and with unwitting customers, as well as operated behind the scenes to coordinate and assist Safe Chain in its willful purchase and sale of counterfeit Gilead HIV and other medications.

445.    Worldwide Pharma and Brosius were copied on Safe Chain's purchases of counterfeit Gilead HIV and other medications from Safe Chain's counterfeit suppliers.

Worldwide Pharma and Brosius marketed Safe Chain's products – which, unbeknownst to the customers, were counterfeits – to pharmacies, and convinced pharmacies to buy the counterfeits from Safe Chain. Worldwide Pharma and Brosius also interfaced directly with pharmacies during the purchasing process, sending Safe Chain's invoices and pedigrees directly to pharmacy customers, including pharmacy customers located in New York.

446.    Brosius was previously the chairman of the board of an independent pharmacy, and was tasked with bringing the pharmacy into compliance with federal law and regulations. Instead, Brosius used his position to run a vast, $35-million health care fraud scheme through the pharmacy.

447.    According to the indictment, Brosius caused his former pharmacy to send fake "test" claims to various insurers in order to pinpoint which precise ingredients in particular compounded medications would result in the largest insurance payoff for the pharmacy. Brosius then created preprinted prescription pads that listed a handful of high-value compound medications that could be prescribed by checking a box. Brosius then caused a company he owned, Pharma Sales Group, Inc. (a predecessor to Worldwide Pharma) to hire marketers to recruit physicians who used virtual or remote-consultation platforms. These physicians used Brosius's check-box prescription pads to prescribe unnecessary medications to patients, many of whom they never examined, and then sent the prescriptions to Brosius's pharmacy to get filled. To prevent patients from objecting or returning the medication, Brosius caused the pharmacy to waive the patients' co-insurance, and caused money orders to be forged in the amount of the co-pays submitted to the pharmacy. Brosius caused the pharmacy to pay a percentage of the insurance reimbursements to his wholly owned company.

448.    Brosius was indicted on four counts of health care fraud and conspiracy to commit health care fraud, and payment of kickbacks in connection with a federal health care program, and conspiracy to violate the anti-kickback statute on or about July 10, 2020.

449.    Prior to the indictments, Brosius's pharmacy hired external counsel to conduct an internal investigation, which ended with Brosius being instructed to resign from the board. Immediately after being drummed out of his pharmacy, Brosius founded Worldwide Pharma. Brosius is listed as the company's registered agent and president on the corporate registration, and lists the company's business purpose as "consulting services for pharmaceutical dispensing."

450.    As alleged above, Brosius bluntly admitted, in writing, to the co-owner of Safe Chain that "all of [Supplier Defendant Synergy's] shit is counterfeit."

           a.    The July 26, 2021 Seizure

451.    On July 23, 2021, this Court issued an *ex parte* seizure order permitting seizures at Safe Chain's headquarters and satellite distribution center, and, with Boulevard having abandoned its offices, at the residence of Shukurov.

452.    At the seizure at the two Safe Chain locations, Gilead recovered over a thousand bottles of purported Gilead product from Safe Chain's shelves.  While Gilead's review of the products and documentation seized is ongoing as of the date of this filing, Gilead has confirmed that in addition to counterfeit bottles of BIKTARVY® and DESCOVY®, Gilead seized from Safe Chain counterfeits of seven additional Gilead medications: TRUVADA®, GENVOYA®, ATRIPLA®, SOVALDI®, STRIBILD®, VOSEVI®, and RANEXA®.

453.    The purported Gilead medication seized from Safe Chain showed obvious signs of tampering.  Some of the bottles had obviously fake caps:

115



| Genuine Gilead Cap | Various Counterfeit Caps Found at Safe Chain |
|---|---|

454.    A large number of purported Gilead bottles seized from Safe Chain were missing the FDA-mandated prescribing information/patient instructions that are affixed to the outside of every authentic bottle (often referred to as the "outsert").  Many other purported Gilead bottles showed clear signs that Instructions for Use had been re-glued to the bottles – and often the wrong Instructions for Use.  Some of the Instructions for Use attached to the bottles of purported Gilead medication were counterfeits printed by the counterfeiters, identifiable by, among other things, spelling errors in the documents.

455.    The pedigrees for the purported Gilead product in Safe Chain's inventory were counterfeit and fraudulent.

### 3.    ProPharma's Willful Counterfeiting

456.    In July 2021, Gilead learned from a pharmacy that ProPharma had sold a potentially dangerous counterfeit bottle of BIKTARVY® that contained the wrong drug.

457.    The pharmacy discovered the counterfeit because the patient, who had taken BIKTARVY® for years, felt ill after ingesting the counterfeit, and reported it to his physician.  Gilead retrieved and tested the bottle and confirmed it to be counterfeit with the wrong medication inside the bottle.

116

458.    The reporting pharmacy provided the pedigree for the counterfeit, which indicated that ProPharma had purchased the counterfeit from a distributor named Defendant Omom Pharmaceuticals, Inc. ("Omom"), which claimed to have purchased it from a Gilead authorized distributor.  That pedigree was counterfeit: the claimed initial sale from Gilead to the authorized distributor never occurred.

459.    The reporting pharmacy also provided Gilead with dozens of additional pedigrees for purported Gilead products that it had purchased from ProPharma.  Those pedigrees were also counterfeit and listed transactions that had never occurred.  The vast majority of the pedigrees indicated that ProPharma purchased the purported Gilead drugs from Omom.

460.    Separately, two pharmacies and a pharmacy trade association contacted Gilead to report that they had received fake pedigrees for Gilead medications from ProPharma.  Most of those pedigrees indicated the drugs had come from Omom.

461.    For each and every sale of purported Gilead product that it purchased from Omom, ProPharma knowingly lied on the pedigrees it sent to its customers by falsely certifying that it purchased the drugs from an "authorized" trading partner under the DSCSA.

462.    Although Omom has licensure in North Carolina, and ProPharma has a distribution center in North Carolina, pedigrees show that Omom unlawfully delivered counterfeit medications to ProPharma in Colorado, where Omom does not have licensure to sell across state lines.

463.    Safe Chain has also purchased purported Gilead products from Omom.  Safe Chain orchestrated a "pass-through" scam for its purchases from Omom.  Although Safe Chain's internal records reflect that it purchased the counterfeits directly from Omom, Safe Chain recruited and bribed a properly licensed distributor to make straw "purchases" from Omom and

117

then immediately "sell" those medications to Safe Chain.  This allowed Safe Chain to pretend it was purchasing Gilead products from a legitimate source when in fact it was sourcing counterfeits directly from the unlicensed counterfeiter.

464.    Safe Chain's "pass-through" distributor for its purchases from Omom was Professional Medical Warehouse ("PMW").  ProPharma also used PMW as a pass-through for some of its purchases from Omom.

465.    Shortly after the July 26, 2021 seizure at Safe Chain's premises, Omom abandoned its offices.  Omom's principals used fake names when corresponding with Safe Chain, and as a result, Gilead's investigators were unable to locate Omom or its principals.

466.    ProPharma's owner and principal, Levi Ellis, was personally involved with ProPharma's purchase and sale of the counterfeits at every step.  For example, on numerous emails Ellis reviewed an order for counterfeit Gilead-branded HIV medication and gave his approval to "release" the order.  Ellis also corresponded directly with Leader Defendant Mannava about ProPharma's purchases of the counterfeits.  Ellis also personally transmitted the counterfeit pedigrees directly to ProPhama's customers.

467.    Ellis also used his authority as ProPharma's owner to squash an internal investigation that was about to conclude that the Gilead HIV medication ProPharma was trafficking was counterfeit.

468.    In July 2021, two pharmacy customers contacted ProPharma and informed ProPharma that pursuant to their "policy when working with any new entity/wholesaler," they had personally contacted the two supposed authorized distributors identified on ProPharma's various (counterfeit) pedigrees for Gilead-branded medications: JM Blanco and Smith Drug Co. The pharmacies reported that both Gilead-authorized distributors directly told them "they had

118

never sold those bottles," and that they were not "part of the supply chain as documented on the pedigree received."  Following the dictates of the DSCSA, the pharmacies reported that therefore "the shipments have been quarantined."

469.    ProPharma's management immediately recognized that this news rendered suspect not just particular bottles sold to the two complaining pharmacies, but all of the Gilead-branded medication that ProPharma was buying from the Supplier Defendants through the Leader Defendants.  ProPharma's management therefore recommended an immediate audit, including of a random sample of HIV medications: "Levi [Ellis], would you have someone please call on the T3 [*i.e.*, pedigree] trail and try to verify before we pass to [Leader Defendant] Srini [Mannava]?  Definitely on this specific product but also on a few random other trails, thank you!"  Oct. 13, 2021, Potter Decl. Ex. 175.

470.    ProPharma's investigation barely got off the ground.  The record shows that one employee, a warehouse manager named Ken Caiata, tried to reach one of the authorized distributors listed on the fraudulent pedigrees, JM Blanco.  The warehouse manager complained he had trouble reaching "someone who speaks English" at JM Blanco – which is unsurprising, because JM Blanco is located in Puerto Rico and does not sell into the fifty United States.  The warehouse manager asked "[c]an someone please try to follow up with" JM Blanco, because he was unable to verify the pedigree.  He also made no effort to contact the other authorized distributor listed on the fraudulent pedigrees, Smith Drug Co., which is located in South Carolina and obviously has an English-speaking staff.  A member of ProPharma's leadership team stepped in, saying she would take over the project and would work with another employee to investigate the pedigrees.

119

471.     Less than five minutes later, Ellis replied to everyone on the email chain and shut the investigation down.  Ellis said after "speaking with Ken," the warehouse manager who was unable to reach anyone at JM Blanco, "I don't think we need to be concerned."  Rather than allow his employees to call the authorized distributors to verify the transactions, Ellis's solution was to blacklist the pharmacies that reported the counterfeit pedigrees: "I had MikeF flag the accounts not to sell to."

472.     Another member of ProPharma's management team separately responded to Ellis and pushed back on that decision, referencing ProPharma's legal obligation to investigate suspect pedigrees: "Do you want to chase it down just to be 100% safe or are you good with this?  I'm not 100% up to date with requirements involving verify pedigrees…."  Ellis persisted in shutting down the investigation, giving the bogus excuse that he suspected the pharmacies who reported the fake were lying: "I have a feeling they [the pharmacies] are trying to pull one over [us]."

473.     If Ellis had cared about finding out the truth, he would have allowed ProPharma's employees to take a few minutes to call Smith Drug Co. (or to Gilead itself) and confirm what the pharmacies told him: that the pedigrees were fraudulent.  Instead he continued to cause ProPharma to buy and sell counterfeit HIV medicine.

474.     Gilead conducted a seizure of ProPharma's premises on August 26, 2021.  At the seizure, Gilead seized 1,970 bottles of purported Gilead-branded HIV medication.  All of the bottles had counterfeit pedigrees, and many had counterfeit outserts.

### 4.     Scripts and Its Principal, Steven Diamantstein

475.     Defendant Scripts is a pharmaceutical distributor located in Brooklyn, owned and operated by Defendant Steven Diamantstein.  Like Distributor Defendants Safe Chain and

ProPharma, Scripts is a properly licensed distributor that operates in the gray market, selling discounted prescription drugs outside of authorized distribution channels. And like the other Distributor Defendants, Scripts conspired with the Leader Defendants to willfully sell counterfeit Gilead HIV medication to United States pharmacies.

476.    In January 2020 and again in March 2021, Gilead learned of complaints that Scripts had sold counterfeit Gilead medication to a pharmacy, which subsequently dispensed it to a patient. Both of those counterfeit bottles of Gilead medication contained antipsychotic medication: one had high-dose Seroquel XL, and another had generic aripiprazole, another antipsychotic medicine in the same class as Seroquel. And both counterfeit bottles showed signs of tampering. In April 2021, Gilead engaged in a series of correspondence and meetings with Scripts' counsel about its sale of counterfeit Gilead medication. Scripts refused to provide the documents and information Gilead requested about the counterfeits, although it did say it would stop purchasing from Supplier Defendant Gentek, which sold Scripts the counterfeits.

477.    In late July 2021, Gilead separately received a communication from ABC, one of its authorized distributors, forwarding a fraudulent pedigree for Gilead medication that Scripts had sent to a pharmacy in Texas. The pedigree claimed that Gilead had sold the bottles of BIKTARVY® to ABC, which had sold them to Defendant RxWholesale, which had sold them to Scripts. ABC confirmed that the purported sale from ABC to RxWholesale was false and never occurred.

478.    Gilead learned from information collected at the Safe Chain and ProPharma seizures that Scripts is a co-conspirator in the counterfeiting ring, and worked with the Leader and Marketer Defendants to sell large quantities of counterfeit Gilead HIV medication from numerous illicit suppliers, not only Gentek. As alleged above, the Leader Defendants told

ProPharma in March 2021 that they were selling "$8M a week" in HIV medication through Scripts.  Potter Decl. 172.  Gilead has also received copies of advertising emails that the Marketer Defendants' sales force sent out on Scripts' behalf.  In one instance,  a pharmacy responded to a sales pitch the Marketer Defendants made on behalf of ProPharma by writing, "what happened to Scripts Wholesale?"

479.    After executing this Court's seizure order at Scripts' warehouse, Gilead learned that Scripts is, to Gilead's knowledge, by far the longest-running and highest-volume seller of counterfeit Gilead-branded HIV medication in the United States.  From February 2017 to October 2021, Scripts sold over **54,000** bottles of counterfeit Gilead-branded medication, for which it received over **$137 million**.  Scripts would have continued selling those counterfeits indefinitely but for this Court's injunction and seizure order: Gilead seized from Scripts' shelves over 1,500 bottles of counterfeits, in circulation and ready to ship to pharmacies.

480.    Scripts' counterfeiting was willful.  For example, Scripts purchased over $34 million in counterfeit Gilead-branded medication from Supplier Defendant Mainspring.  Many of those bottles had the wrong medication, or "pebbles" instead of medication, inside of them. Scripts in fact *financed* the creation of Mainspring's black-market counterfeits.  Scripts had a standing order with Mainspring to buy the counterfeit HIV medications, but Mainspring could not supply the counterfeits fast enough.  And so Scripts, through its owner Steven Diamantstein, sent approximately $5 million to Mainspring as an "advance" for the counterfeits Mainspring was to procure.  Scripts and Diamantstein poured Scripts' financial resources into the counterfeiting scheme, financing the counterfeits by maxing out multiple credit cards to the point where Steven Diamantstein's father, Raoul Diamantstein, had to co-sign another credit card.

122

What happened next is what one would expect when one gives a black-market counterfeiter $5 million with no security or documentation of any kind: Mainspring disappeared with the money.

481.    When Mainspring was caught and its principal indicted, Scripts lost approximately $4.8 million of the "advance" it invested into this criminal enterprise.  Scripts is, in fact, currently engaged in multiple litigations with Mainspring and at least one of its principals, attempting to recover some of its sunk investment Scripts and Diamantstein learned no later than November 2018 that Mainspring's principal had been arrested by the FBI and indicted for selling "black market," misbranded prescription medicine. And yet Scripts, knowing that it bought fake HIV medication from a black-market criminal, continued for months after November 2018 to sell the purported Gilead-branded medication it bought from Mainspring.

482.    In a separate litigation, Scripts' owner, Steven Diamantstein, was questioned as to how he justified his continuing sale of counterfeits after he learned about the indictment of Mainspring's principal.  Diamantstein testified: "Well, I didn't know how much of that was illegal or not illegal. . . . And at that point it's innocent until proven guilty, and I don't believe I had an obligation to let the drugs sit around."

483.    To the contrary, the Drug Supply Chain Security Act ("DSCSA") imposes an affirmative duty upon distributors to immediately quarantine even "suspect" drugs and investigate.  But Mr. Diamantstein and Scripts continued to pour these dangerous counterfeit HIV medications into the pharmaceutical supply chain, reaping illicit profits at the expense of patients.

484.    That was in fact just the first time Scripts sold off its stock of counterfeit HIV medication after being directly told by the federal criminal authorities that it was counterfeit. Scripts' playbook was to buy and sell counterfeits from a Supplier Defendant until it got caught,

then cut off all ties with the supplier while continuing to willfully sell off all the counterfeits from that supplier it still had in stock.  This allowed Scripts to continue to turn a profit on its counterfeit HIV medication while emptying its warehouse of the particular counterfeits that it knew were on the government's radar.

485.    For example, in February 2021, the FDA Office of Criminal Investigation contacted Scripts and informed it that the FDA had obtained multiple bottles of HIV medication with the wrong pills inside the bottle that Scripts had sold to pharmacies.  Scripts told the FDA Office of Criminal Investigation that it had purchased those counterfeits from Supplier Defendant Gentek.  After it had that conversation with the FDA, Scripts continued to willfully sell hundreds of bottles of counterfeit Gilead-branded medication it had purchased from Gentek, despite knowing, straight from the FDA's mouth, that those bottles did not contain the HIV medication listed on the label.

486.    Several months later, Gilead separately learned that Scripts had sold additional counterfeit Gilead-branded medication with the wrong pills in the bottle.  Gilead was unaware at the time that the FDA Office of Criminal Investigation had already raised Gentek's counterfeiting with Scripts.  When Gilead contacted Scripts, Scripts identified Gentek as the source of the counterfeits with the wrong pills in the bottle.  Scripts fraudulently told Gilead at that time that "Scripts had no reason to believe that the documents were falsified and that the [Gilead] products had been altered.  Prior to these purchases Gentek had been a reliable and credible vendor."

487.    After cutting ties with Gentek and selling off its remaining stock of Gentek-sourced counterfeits, Scripts moved on to buying counterfeits from another fly-by-night Supplier Defendant: Abacus.  On February 8, 2021 the FDA Office of Criminal Investigation again wrote

to Scripts, this time asking for information about Abacus.  Clearly alarmed, Scripts pushed back, writing: "Why has your investigation now morphed into another supplier and customer of Scripts?"  The FDA responded: "Our job is to determine breaches in the supply chain. Investigative research has led us to another supplier" – *i.e.*, Abacus.

488.    True to form, within two days of the FDA Office of Criminal Investigation identifying Abacus as a suspect, Scripts had willfully sold all of its remaining stock of counterfeit Gilead-branded medication from Abacus to a retail pharmacy, clearing out its warehouse of some 370 bottles, and ensuring that those counterfeits would end up in the hands of hundreds of patients, and not the FDA.  Also true to form, knowing the FDA was onto Abacus, Scripts abruptly stopped buying from Abacus and moved on to purchase from other counterfeit suppliers.

489.    Scripts' owner, Steven Diamantstein, was personally involved in and personally supervised and authorized Scripts' purchase and sale of counterfeit Gilead-branded HIV medication.  For example, as noted above, Diamantstein testified that it was his decision to sell the Mainspring counterfeits after Mainspring's principal was arrested and indicted.  Diamantstein also corresponded directly and regularly with the Leader Defendants about Scripts' purchase and sale of the counterfeits.  For instance, Diamanstein directly communicated with Dunn and Ralhan via calls and texts regarding placing and fulfilling orders to pharmacies for Gilead-brand medications and corresponding payments.  Diamanstein also communicated with the Leader Defendants and Supplier Defendants regarding Scripts' purchases of the counterfeits—for instance, Dunn connected Diamantstein to Frank Betancourt, the principal of Supplier Defendant ITC Group.  Diamantstein thereafter continued conversations with ITC on his own and went so far as to advise Betancourt how to set up shop, including where to obtain wholesaler licenses and

how best to revise pedigrees.  Diamantstein also directly contacted Supplier Defendant V & G, and personally brought that counterfeit supplier on board despite his employees' misgivings that V & G's offerings were likely "fraud."  Diamantstein also personally initiated payments to Gentek via wire, arranged for deliveries from Gentek to be received at Lieb Pharmacy, and filled out a new account application to Gentek on Scripts' behalf.  Diamantstein also corresponded directly with Dunn in relation to orders from Abacus and personally initiated payments to Abacus.  He also personally corresponded with Dunn and Ralhan regarding My Meds' product and personally filled out a credit application to My Meds on Scripts' behalf.

490.    Diamantstein was also personally involved in creation of the counterfeit pedigrees, working directly with Supplier Defendants to "correct" obvious errors on the counterfeits to make the pedigrees less obviously fake.  Diamantstein also personally controlled the finances for the purchasing of the counterfeits, juggling various credit cards as he tried to cobble together sufficient funds to buy the next batch of counterfeit HIV medication.  And as noted above, Diamantstein personally financed the creation of the counterfeits by paying Mainspring $5 million as an "advance" to manufacture more counterfeits more quickly.

**5.    ProVen Pharmaceuticals and Its Principal, William Scott Wise**

491.    Defendant ProVen Pharmaceuticals LLC is a pharmaceutical distributor incorporated in Delaware in 2006 and headquartered in Plymouth Meeting, Pennsylvania. ProVen is properly registered as a pharmaceutical wholesaler with the FDA, with which it has listed its wholesale licensure in 44 states, including Pennsylvania, Florida, and New York.

492.    From information collected at previous seizures and through discovery from other defendants and third parties, Gilead now knows that, like Distributor Defendants Safe Chain, ProPharma, and Scripts, ProVen is a properly licensed distributor that operates in the gray

126

market, selling discounted prescription drugs outside of authorized distribution channels. And like the other Distributor Defendants, ProVen conspired with the Leader Defendants to willfully purchase counterfeit Gilead HIV medication and sell them to United States pharmacies.

493.     ProVen, through its principal William Scott Wise, negotiated with Leader Defendant Rosell in August 2020 for what their emails called an "HIV Business Opportunity," with "WAC minus" pricing to be determined based on "what kind of volume can be put together." Rosell and Wise reached a deal later that same month. Wise personally approved ProVen's venture into purchasing and selling counterfeit Gilead-branded HIV medications.

494.     Rosell and other Leader Defendants connected ProVen to numerous fly-by-night counterfeit suppliers that Gilead has already named as Supplier Defendants. For instance, they facilitated the submission of ProVen's August 2020 customer and credit application to Gentek, ProVen's May 2021 customer application to Invicta, Boulevard's August 2020 vendor application to ProVen, Invicta's June 2021 vendor application to ProVen, and RXWholesale's August 2021 vendor application to ProVen. Wise signed all of ProVen's applications and submitted them to these counterfeiters.

495.     Leader Defendant Rosell facilitated as broker ProVen's counterfeit HIV medication orders with various fly-by-night Supplier Defendants, and, with the help of Marketer Defendants Mike Zangari and Riccardo Massana, to sell those counterfeits to retail pharmacies.

496.     Discovery and seized documents show that ProVen purchased counterfeit Gilead medication from at least two fly-by-night suppliers: Supplier Defendants Boulevard and Invicta.

497.     Gilead has copies of invoices and pedigrees showing that ProVen paid at least $53,757.00 to Invicta on June 16, 2021 for 18 bottles of Gilead-branded medication. The

127

pedigrees for these bottles are counterfeit and fraudulent: they claim that Invicta purchased from Smith Drug Company, a Gilead-authorized distributor, which has never sold anything to Invicta.

498.     Subpoenaed bank records also show that ProVen paid over $1.25 million to Boulevard (through the MFK Management account it used to receive counterfeiting proceeds) between September 10, 2020 and November 25, 2020.

499.     Gilead has received copies of pedigrees showing that these purchases from Boulevard were of bottles of Gilead-branded medications.  Gilead has confirmed that these pedigrees are counterfeit and fraudulent, and list fictitious transactions that never occurred.  ProVen went on to sell Gilead-branded medications to retail pharmacies.

500.     Gilead has limited access to documents concerning ProVen's counterfeiting.  ProVen's sales of counterfeit Gilead-branded medications are significantly greater than set forth above.

## J.     THE PHARMACY DEFENDANTS' WILLFUL COUNTERFEITING

501.     The Pharmacy Defendants all purchased substantial amounts of counterfeit Gilead-branded medication, all with counterfeit pedigrees.

### 1.     Total Remedy Pharmacy and Its Principal, Mohammad Etminan

502.      Total Remedy stands out among the Pharmacy Defendants in several ways.  Total Remedy is a single retail pharmacy in Los Angeles.  Seized documents show that in little more than a year, from April 2020 to August 2021, Total Remedy purchased a staggering volume of counterfeit Gilead-branded medications from each of the three previously named Distributor Defendants: at least818 bottles from Safe Chain for approximately $2 million; at least 1,152 bottles from ProPharma for approximately $3.1 million; and thousands of bottles from Scripts for at least $18.4 million.  In total, over the course of sixteen months this single retail pharmacy

purchased over **$23 million** in counterfeit Gilead-branded medication, all of it accompanied by counterfeit and fraudulent pedigrees.

503. Total Remedy's counterfeiting is unquestionably willful. Over the past year and a half, Total Remedy has received at least five separate formal warnings about the counterfeits it purchased. First, Total Remedy received Gilead's March 2021 email warning about the counterfeit Gilead-branded products that were being circulated at the time by Safe Chain. And each time Gilead executed a Seizure Order and seized counterfeits from Total Remedy's suppliers – first Safe Chain, then ProPharma, and most recently Scripts – Gilead sent Total Remedy a warning letter about the counterfeits and the dangers of buying on the secondary market, and asking Total Remedy to quarantine any bottles it had left in stock. Finally, Distributor Defendant ProPharma itself warned Total Remedy about the counterfeits by issuing a voluntary recall of the HIV medications it had sold to Total Remedy after Gilead's seizure.

504. Total Remedy continued to find ways to willfully purchase large volumes of counterfeit Gilead-branded medication even *after* the Distributor Defendants that were its counterfeit vendors were shut down. As recently as summer 2022, Total Remedy had simply cut out the middle man, and turned to buying counterfeits directly from newly named Supplier Defendant Pharma Pac LLC.

505. As alleged above, Pharma Pac LLC is simply the latest iteration of previously named Pharma Pac Defendants, and is running the exact same scam: a fly-by-night lookalike counterfeiter fraudulently using the name, licensure, address, and logo of a licensed pharmaceutical repackaging company named Pharma Pac.

506. Total Remedy knew all about the Pharma Pac scam. In September, Leader Defendant Mannava emailed Total Remedy's principal, Mohammad Etminan to set up a Zoom

call to discuss a potential (counterfeit) HIV drug sales arrangement with the original Pharma Pac Defendants: "I received a call from Angel Toral [the principal of the originally named Pharma Pac Wholesale Corp.] and he is ok with a zoom meeting this week or early next week. I would like to set up the zoom meeting with everyone (Pharma Pac, Total Remedy and MTS). Please find out the email address to who will be participating from Pharma Pac and let me know the best time for everyone so I can setup the zoom." Etminan responded that he could participate any time. Total Remedy attended the Zoom, but the proposed counterfeiting arrangement fell through when the proposed middleman, MTS, discovered that the Pharma Pac Defendants' pedigrees were counterfeit. And less than a year later, Total Remedy jumped at the chance to buy counterfeits from Pharma Pac LLC directly.

507. Total Remedy's repeated, willful, extremely high-volume purchases from multiple members of the counterfeiting conspiracy, combined with its deal-making directly with the Leader Defendants and Supplier Defendants, make clear that Total Remedy is not merely a purchaser of the counterfeits, but a knowing and active participant and director in the counterfeiting conspiracy.

### 2. Ascan Pharmacy and Its Principal, Francis Fata

508. Ascan Pharmacy, is a retail pharmacy located in the Forest Hills neighborhood of Queens, which is where several other members of the counterfeiting conspiracy are located.

509. Ascan purchased significant quantities of counterfeit Gilead-branded medication directly from a shady fly-by-night Supplier Defendant, CompaRx, Along with Total Remedy, Ascan is the only other known pharmacy that purchased directly from one of the shady Supplier Defendants, as opposed to from a more established Distributor Defendant.

510.    Ascan is a knowing and willful member of the counterfeiting network, and knew that CompaRx was an illegitimate entity established to sell counterfeit HIV medication.

511.    Ascan purchased at least 149 bottles of counterfeit Gilead-branded medication for over half a million dollars directly from CompaRx, all with counterfeit pedigrees.

512.    Fata is the owner and President of Ascan and was personally involved in Ascan's purchase of the counterfeits.  All of CompaRx's invoices and packing lists Fata, with the email address ascanpharmacy@gmail.com, as the "ship to" contact for the counterfeits.  Fata also filled out and signed an application to purchase counterfeits from Distributor Defendant ProPharma as the "person in charge" and "owner" of Ascan.  As the owner and person in charge of Ascan, Fata personally financially benefitted from the counterfeiting and did not exercise her authority to stop it.

### 3.    Laconia Avenue Pharmacy Corp. and its Principal, Stanislaus Mgbeojirikwe

513.    Laconia Avenue Pharmacy Corp. is a retail pharmacy located in Bronx, New York.  Laconia Avenue Pharmacy has recently dispensed counterfeit Gilead-branded medications to unsuspecting patients.

514.    Through a patient complaint received on July 20, 2022, Gilead learned that Laconia Avenue Pharmacy dispensed a counterfeit bottle of GENVOYA® with the wrong pills inside.  The patient reported that he opened the sealed bottle and swallowed one of the counterfeit pills before he noticed that the pills were the wrong color and "smelled like paint."  The patient provided the counterfeit sample to Gilead.

515.    Unlike authentic GENVOYA®, which comes in the form of green tablets with "GSI" embossed on them, the medication inside the counterfeit sold by Laconia Avenue Pharmacy contained blue tablets with "GILEAD" embossed on the side.  The counterfeit

GENVOYA® also had a cotton pad inside the bottle instead of the polyester fiber coil that is included with authentic product. Moreover, the counterfeit sold by Laconia Avenue Pharmacy contained a cardboard circle cut out to fit the bottom of the interior of the bottle, which is not part of the authentic product. The cardboard circle was stained blue. Some of the tablets in the bottle had their blue coating rubbed off, showing the white of the tablet underneath.

516. The patient reported that this was his first time receiving a prescription from Laconia Avenue Pharmacy, and that he had been paid $50 on a prepaid VISA debit card in exchange for transferring his prescription to the pharmacy. The patient reported that the medication was delivered to him on behalf of Laconia Avenue Pharmacy by a driver. The patient subsequently provided Gilead a screenshot of a text from that driver, stating: "I am trying to explain to you the problem that has happened." The patient stated that the driver subsequently offered no explanation other than that there had been a "mixup."

517. Gilead contacted Laconia Avenue Pharmacy after receiving the patient complaint. Laconia Avenue Pharmacy confirmed they had dispensed a bottle of GENVOYA® to the reporting patient. Laconia Avenue Pharmacy stated that it sourced its GENVOYA® from multiple sources, including, it claimed, a pharmacy that had recently shut down. Laconia Avenue Pharmacy then refused to identify that supposed shut-down pharmacy; unlawfully refused to provide Gilead a copy of the pedigree for the counterfeit GENVOYA®; refused to provide its DEA license number; and then hung up the phone.

518. Laconia Avenue Pharmacy bought and sold additional counterfeit Gilead-branded medication that has not been reported to Gilead.

519. Stanislaus Mgbeojirikwe is a principal and authorized official of Laconia Avenue Pharamcy, and acts as its supervising pharmacist. Mgbeojirikwe is responsible for ensuring

132

Laconia Avenue Pharmacy purchases authentic medication through legitimate distribution channels.  As discovery will confirm, Mgbeojirikwe was personally involved in the purchase and sale of the counterfeit Gilead-branded medication, including by approving and supervising Laconia Avenue Pharmacy's purchases of the counterfeits and dispensing them to patients.

### 4. The Remaining Pharmacy Defendants

520.  Each of the remaining Pharmacy Defendants, all of which were first named in the Second Amended Complaint in this action, are located in New York and purchased over ninety-five bottles (and in some cases, hundreds) of purported Gilead medication, all of them with fake pedigrees, from Supplier Defendant Safe Chain.  The remaining Pharmacy Defendants are: Island Chemists, Inc. d/b/a Meadow Drugs & Surgical and its principal, Randolph Mohabir; V.L.S. Pharmacy Inc. and its principal, Gopesh M. Patel; Lin Pharmacy Inc. d/b/a Makki Pharmacy and its principal, Samuel Yakubov, and its supervising pharmacist, Monica A. Ngo; Ascension Pharmacy Holdings I LLC d/b/a Mermaid RX and Ariel Pharmacy and its principal, Alex Gelbinovich.

521.  Each of the remaining Pharmacy Defendants received pedigrees from Safe Chain for purported Gilead medication that were manifestly falsified because, among other things, they listed an initial sale from Gilead not to an authorized distributor, but rather to a fly-by-night counterfeiter.

522.  Despite knowing these pedigrees to be false, the remaining Pharmacy Defendants continued to buy counterfeits from Safe Chain.

523.  Gilead warned each of the remaining Pharmacy Defendants in writing that Safe Chain was selling counterfeit Gilead-branded products with falsified pedigrees.  Despite that warning, the Pharmacy Defendants continued buying counterfeits from Safe Chain.

524.    After executing the Seizure Order at Safe Chain's premises, Gilead sent warning letters and served subpoenas to Safe Chain's pharmacy customers, including the remaining Pharmacy Defendants.  The remaining Pharmacy Defendants ignored this warning as well, and ignored Gilead's duly served subpoenas.

525.    Each of the Pharmacy Defendants' purchase and sale of counterfeit Gilead products with fake pedigrees was knowing and willful, or, at minimum and in the alternative, willfully blind.

526.    The supervising pharmacists for each of the retail pharmacies named as Pharmacy Defendants were in charge of ensuring the pedigrees for prescription drugs purchased by the pharmacy were accurate, and that the pharmacy complied with the DSCSA.  Each of these supervising pharmacists personally approved the purchase of the counterfeits, despite knowing, at minimum, that their pedigrees were counterfeit and fraudulent.

527.    The individual owners of the retail pharmacies named as Pharmacy Defendants personally financially benefitted from the counterfeiting by virtue of their ownership, and each failed to exercise his or her authority to stop it.

## K.    THE COLLECTOR DEFENDANTS WHO PURCHASED BOTTLES ON THE STREET TO MANUFACTURE THE COUNTERFEITS

528.    As alleged above, the counterfeits sold by the counterfeiting conspiracy began with a once-authentic Gilead bottle, which was either empty and refilled with the wrong medication, or which contained Gilead medication and was sold with counterfeit bottle elements, counterfeit patient instructions, and/or counterfeit pedigrees.

529.    The bottles used to manufacture the counterfeits were acquired, at least in large part, via an illegal buyback scheme, in which the street-level Collector Defendants would

134

illegally purchase already-dispensed bottles of Gilead-branded HIV medication from patients living with HIV.

530.     Gilead learned of the illegal buyback scheme through party discovery showing a series of communications between street-level Collector Defendants and Defendant Alex Gelbinovich.  Gelbinovich was first named as a Defendant in this action as principal of fly-by-night counterfeit Supplier Defendant RxWholesale.

531.     In addition to his role as principal of RxWholesale, Gelbinovich also operated various independent pharmacies in New York City.  Gelbinovich used those pharmacies to spearhead a major patient buy-back operation for HIV medication.

### 1.     Boris Abramov, the Supervisor and Organizer

532.     Gelbinovich worked closely with Collector Defendant Boris Abramov, who was an organizer and supervisor in this buy-back operation for Gilead-branded medication in New York City and its environs.  Abramov coordinated with various street-level collectors to purchase already-dispensed bottles of Gilead-branded HIV medication from HIV patients, which were then fed into the conspiracy to create additional counterfeits. Abramov routinely received via text message photographs of scraps of paper with handwritten names, quantities, and prices of Gilead medications that had been or were available for purchase from patients for cash.  Abramov would respond by directing which medications should be delivered to him.

533.     Already-dispensed bottles of HIV medication purchased from vulnerable patients on the street rarely look like new bottles sold through the legitimate supply chain.  Abramov oversaw what he called the "cleaning" of the repurchased bottles: removing pharmacy-generated patient labels, scraping off residue, and generally cleaning the bottles of medication he illegally purchased from patients.  Abramov paid workers to conduct the actual cleaning of the bottles. At

135

one point, Gelbinovich left Abramov a voice message stating that the "clients" were not pleased with the condition of the bottles, communicating to Mr. Abramov that they should be "making sure the product is handled better," including avoiding "sticky stuff" on the bottle.

534.    Bottles of Gilead-branded HIV medication purchased on the street often had missing or damaged prescribing information/patient instructions.  These instructions are often referred to as "outserts," because instead of being placed inside a box (an "insert"), they are folded up and affixed to the outside of the bottle with glue dots.  After the repurchased bottles were "cleaned," low-quality counterfeit reprints of Gilead's authentic outserts were affixed to the bottles.

535.    Abramov also personally created counterfeit pedigrees for some of the repurchased bottles.  Those counterfeit pedigrees fraudulently claimed that the bottles were purchased from a legitimate supplier, not from patients on the street.

536.    Abramov created Collector Defendant Hashem Yitbarach LLC in furtherance of this buy-back operation for HIV medications. Mr. Abramov directed Mr. Gelbinovich to make payments to him via Hashem Yitbarach LLC's bank account. This bank account also received payments from co-conspirator Scripts and from Our Town Pharmacy, owned by Mr. Gelbinovich.

537.    Abramov was aware that this buy-back operation for HIV medication was illegal. Abramov told Gelbinovich that he "can't keep using [his] cell phone for all this business stuff," and suggested that they "gotta keep changing our number every month or so." Abramov agreed to pay cash for burner cell phones for himself and Gelbinovich from a "small bodega place."

## 2.     Nicole Alston, the Street-Level Collector

538.     Gelbinovich and Abramov employed Collector Defendant Nicole "Nikki" Alston as one of the lead street-level collectors who directly interfaced with and purchased HIV medication from vulnerable patients.  Ms. Alston was aware that the bottles she purchased from patients were used to create counterfeits that would be sold to pharmacies.

539.     Ms. Alston was well aware that this buy-back operation for HIV medication had a devastating effect on the health of HIV patients, but laughed it off.  For example, she texted Gelbinovich: "Everybody is good lol[.]  I told you money talks with these people they don't care about their health lol sorry to say. [T]hey rushing me to go sell."

540.     Alston maintained a list of HIV patients who sold back their HIV medications, referring to them as "buybacks" or "bbs." Alston would also send pictures of patients' information directly to Gelbinovich to keep track of the "buyback" patients. Ms. Alston purchased previously-dispensed bottles of Gilead-branded HIV medication from these patients for cash.  Alston and Gelbinovich also offered HIV patients bribes to fill their HIV medication prescriptions at the various independent pharmacies operated by Gelbinovich in New York City.

541.     Alston took direction directly from Gelbinovich and Abramov about which dispensed HIV medications to purchase from patients. At least in part, Alston was paid in luxury handbags and luggage for her role in the buy-back scheme.

542.     Ms. Alston was aware that this buy-back operation for HIV medication was illegal.  On one occasion, she wrote to Gelbinovich: "People are talking about calling the cops and shit you need to answer the phone."

### 3.      Jeffrey Peterson and Brennan Page, the Drivers

543.     Gelbinovich, Abramov, and Alston also worked with Defendants Jeffrey Peterson and Brennan Page, who were drivers for Alston and others in the conspiracy. Peterson and Page drove to gather and deliver bottles of already-dispensed HIV medication purchased from patients.  Peterson and Page would also accompany Alston to meet with Gelbinovich to discuss the illegal buyback scheme. Peterson and Page were paid by Gelbinovich and Alston for their participation in the illegal buyback scheme.  Peterson and Page knew that the bottles they were collecting and transporting were being used to illegally manufacture counterfeits for sale to pharmacies.

### 4.      Tariel Begiyev, Another Street-Level Collector

544.     Defendant Tariel Begiyev has deep ties to the counterfeiting enterprise. Defendant Begiyev is a business associate of Defendant Peter Khaim, the owner of Supplier Defendants Boulevard 9229 and MFK Management.  A series of insurance companies have brought a civil RICO suit against Defendants Begiyev and Peter Khaim, alleging them to be co-conspirator fraudsters.

545.     Gelbinovich also worked with Defendant Begiyev to collect already-dispensed bottles for the counterfeiting conspiracy.  Gelbinovich would ask Begiyev to source counterfeit Gilead medications, and the two would negotiate pricing. As with other Collector Defendants, Begiyev would send pictures of patients' information cards directly to Gelbinovich. Begiyev would then purchase Gilead-branded HIV medication from patients for cash and deliver them to Gelbinovich.  Begiyev often contacted Gelbinovich to receive payment for his service.

546.     Begiyev knew that the bottles he was purchasing and collecting were being used to illegally manufacture counterfeits for sale to pharmacies.

138

### 5. Juan Hernandez and 2040 Haviland Corp.

547. Defendant Juan Hernandez, the brother of Defendant Quan Hernandez, was also personally involved in purchasing already-dispensed bottles of HIV medications, including supervising other street-level collectors. As discovery will confirm, Juan Hernandez utilized his wholly owned company, 2040 Haviland Corp., for the purposes of the illegal buy-back operation, including receiving payment for his role in the conspiracy. For example, in March 2021, Make It Happen Marketing paid Defendant 2040 Haviland Corp. tens of thousands of dollars.

548. Juan Hernandez knew that the bottles he was purchasing and collecting were being used to illegally manufacture counterfeits for sale to pharmacies.

## L. THE ASSET HOLDER DEFENDANTS: MONEY LAUNDERERS WHO HELD AND CONCEALED THE CONSPIRACY'S COUNTERFEITING PROFITS

549. The Kingpin Defendants, Leader Defendants, and the Supplier Defendants acting in concert with them used a series of closely controlled shell entities and purported businesses to conceal and launder the proceeds of their sales of counterfeits, and/or to convert these proceeds into cash as payment to the source of the counterfeits: the "Asset Holder Defendants." Counterfeiting is, in the end, a crime of money. The Asset Holder Defendants are critical members of the counterfeiting conspiracy. The conspiracy would not function without them.

550. Each Asset Holder Defendant, described in detail below, knowingly received counterfeiting proceeds, acted in concert with the Supplier Defendants, and managed critical aspects of the counterfeiting conspiracy, thus enabling the (until now) undetected flow of counterfeiting proceeds.

551. In addition to obfuscating funds through a series of bank transfers, the Asset Holder Defendants enabled the counterfeiting enterprise to obtain large volumes of cash, which

is nearly impossible to trace. This allowed the conspiracy to pay off the Kingpin Defendants and other co-conspirators, as well as to have the cash on hand to run the patient buy-back scheme.

### a. JM Smith

552. Defendant JM Smith is a shell company registered in New Jersey, with Defendant Carlos Hernandez listed as its owner and principal. JM Smith was founded in May 2021, around the same time that the fly-by-night Supplier Defendant Invicta started selling counterfeit Gilead medication to ProPharma. In June and July 2021, Invicta routinely wired the profits of its counterfeiting to JM Smith in several transactions ranging between $100,000 to $400,000, totaling approximately $1.3 million. As alleged above, Invicta is part of the counterfeiting ring organized by the Leader Defendants.

553. In an increasingly familiar pattern for counterfeiters working with the Leader Defendants, JM Smith is an illegitimate shell company blatantly attempting to steal the identity of a real authorized distributor. One of Gilead's seventeen authorized distributors for its HIV medications is Smith Drug Company, which is a subsidiary of JM Smith Corp., a privately held South Carolina corporation that has been in business since the 1920s. The New Jersey shell company, Defendant JM Smith Distributor Corp., has no connection with the real JM Smith Corp. Rather, the shell company is intended to give the appearance of legitimacy to Invicta's counterfeits, which were accompanied by fraudulent pedigrees claiming that the medications came from Smith Drug Company. Indeed, one ProPharma customer insisted on returning purported Gilead medication after calling the real JM Smith to verify one of those fraudulent pedigrees, which confirmed that JM Smith was not "a part of the supply chain as documented on the pedigree received."

b.     **Titan, Tidy Garages, and Their Principal, Gabriel Delgado Ramirez**

554.     Defendants Titan and Tidy Garages are two Florida limited-liability corporations with no pharmaceutical licensure and no known or apparent connections to the pharmaceutical industry.  Titan was founded by Defendant Gabriel Delgado Ramirez on August 31, 2020.  A few days later, Ramirez filed for reinstatement of Tidy Garages, which had been founded years earlier by a third party and had gone inactive.  When he reinstated Tidy Garages, Ramirez listed himself as the new agent and manager.

555.     On June 21, 2021, Ramirez opened a Chase bank account for Titan.  Over the ensuing five weeks, the counterfeit Supplier Defendant Omom deposited over $2 million into Titan Distribution's newly opened account in several installments.  As alleged above, Omom is part of the counterfeiting ring organized by the Leader Defendants.  Those deposits from Omom constituted the vast majority of Titan's receipts during that period.  In that same time period, Omom also deposited $62,845.50 to Tidy Garages in multiple transactions.  Each deposit from Omom to Titan and Tidy Garages referenced an invoice number.

556.     In total, from June 21 to July 30, 2021, Omom deposited $2.19 million into the Titan and Tidy Garages accounts.  During that same period, Omom received approximately $3 million in payments for the counterfeits it sold to Safe Chain.  The money deposited with Titan and Tidy Garages thus represents the great majority of Omom's counterfeiting revenues during that time period.

557.     Omom's only business is selling counterfeits, and Titan opened its bank account for the express purpose of receiving millions of dollars from Omom.  Titan, Tidy Garages, and Ramirez are knowing and willful members and directors of the counterfeiting conspiracy.  As discovery will confirm, they are either receiving payment for the counterfeits Omom sold, or are

helping disguise and distribute Omom's revenues to the party that is receiving the ultimate payment.

### c. Silverline Pharma, ASB Wholesale, and Their Principal, Alberto Alonso Diaz

558.     Defendants Silverline Pharma and ASB Wholesale are both Florida limited-liability corporations founded by Defendant Alberto Alonso Diaz on the same day, March 12, 2021.

559.     As alleged above, Defendant Titan received approximately $2 million from the fly-by-night counterfeiter Omom.  Shortly thereafter, Titan wrote two checks: one to Defendant ASB Wholesale for $287,053, and another to Silverline Pharma for $212,297.  Both payments referenced an invoice number in the memo line.

560.     Just as the evidence shows that Titan received proceeds of Omom's counterfeiting as payment for, or to facilitate payment for, Omom's purchase of the counterfeits, Titan's immediate payment of those counterfeiting proceeds to Silverline Pharma and ASB Wholesale evidences that they, too, are co-conspirators which are either receiving or distributing payment for the counterfeits.

### d. Make It Happen Marketing and Its Principal, Quan Hernandez

561.     Make It Happen Marketing is a New York Corporation that was formed on June 22, 2016 by Defendant Quan Hernandez.  Make It Happen Marketing's corporate filings list no principal place of business or any corporate officers, and the company has been past due to file its corporate statement with New York State since at least June 2018.  Despite its apparent inactivity, between February 18 and March 30, 2021, Make It Happen Marketing received a series of sixteen checks for tens of thousands of dollars each from Boulevard Defendant MFK Marketing d/b/a Boulevard 9229, totaling over $1.1 million during the six-week span.  During

that same period, Boulevard was receiving millions of dollars of payments from Safe Chain, into the same MFK Marketing d/b/a Boulevard 9229 account, for its sale of counterfeit Gilead HIV medication.

562. An attorney named Rina Esterov filed Make it Happen Marketing's certificate of incorporation, and the same attorney also filed the certificate of incorporation for Instacare Pharmacy, an entity that appears in the falsified Boulevard 9229 pedigrees as an intermediary distributor of the counterfeits.

563. Boulevard is a fly-by-night counterfeiter with no business other than the selling of counterfeit medications. Boulevard's transferring over a million dollars' worth of its counterfeiting proceeds to Make It Happen Marketing indicates that the latter is part of the counterfeiting enterprise, and either received payment for supplying the counterfeits, or is helping disguise and distribute Boulevard's revenues to the party which is receiving the ultimate payment.

### e. The Colombian Cell-Phone Money Launderers

564. The United States Attorney's Office for the Southern District of Florida has indicted Supplier Defendant Gentek as part of an illegal money transmitting conspiracy utilizing the purchase and resale of cellphones. Phones are purchased using money obtained illegally in the United States and elsewhere, then resold in Colombia. In doing so, the indicted defendants produce "clean" money that can be reintroduced to the banking system undetected.

565. At least five of the Supplier Defendants in this action laundered tens of millions of dollars through entities currently under indictment or otherwise involved in the cellphone scheme.

143

### 1. Vibe Enterprise, Inc. & Ronald Vidaurre

566.    Defendant Vibe Enterprise, Inc. ("Vibe") is a shell company currently under indictment for its role in the cellphone scheme.

567.    Supplier Defendant Gentek, also under indictment, made at least 82 payments totaling over $17.8 million to Vibe.  Gentek's sole business was the sale of counterfeit HIV medication.

568.    Vibe also received wire transfers from Supplier Defendant Boulevard 9229 and Asset Holder Defendant MDSD Enterprises, LLC (described below) in suspicious, round-dollar figures.

569.    Defendant Ronald Vidaurre is Vibe's principal and registered agent.

570.    As described in the indictment, Defendant Vidaurre worked with others to open bank accounts in Vibe's name.  He also managed the transfer of funds between various accounts in order to avoid detection.

571.    Through the actions described above and others described in the indictment, Defendant Vidaurre, using Vibe, managed a critical aspect of the counterfeiting enterprise – making its profits available for use without detection.

### 2. Sofitel Trading Corp.

572.    Defendant Vidaurre also established and operated Defendant Sofitel Trading Corp. ("Sofitel"), another shell company under indictment for its role in the cellphone scheme.

573.    Sofitel received funds from Supplier Defendant Abacus and now defunct counterfeit supplier A1A Wholesale LLC.

574.    Mr. Vidaurre used Sofitel to funnel money back through Vibe as part of his management of the illegal money transmitting and laundering operation.

144

### 3. Skyline World Group, Inc. & Francy Bedoya

575.    Defendant Skyline World Group, Inc. ("Skyline") is yet another shell company used in the cellphone scheme.

576.    Skyline received over $2.25 million from Supplier Defendant Gentek and over $1.75 million from Supplier Defendant Omom.

577.    Defendant Francy Bedoya is Skyline's principal and registered agent.  She was indicted for her role the money-laundering scheme.

578.    As set forth in the indictment, Defendant Francy Bedoya worked with Defendant Vidaurre, Vibe, and Sofitel to illegally obfuscate the transfer of funds from the United States and elsewhere to Colombia.

579.    Defendant Francy Bedoya's management of the money-transmitting operation included opening bank accounts on Skyline's behalf and using those accounts to funnel money into Brazil through the purchase and sale of cellular telephones.

580.    Defendants Francy Bedoya and Vidaurre used Skyline to add an additional layer between incoming transfers from Supplier Defendants and cell phone purchases, often moving funds from Defendant Skyline to either Defendant Vibe or Defendant Sofitel shortly after it was received.

### 4. Elite Distribution, Inc. & Maria Bedoya

581.    Defendant Elite Distribution, Inc. ("Elite") is yet another entity involved in the cellphone money-laundering scheme.

582.    Defendant Elite received over $5 million from Gentek and proceeded to funnel over $1.6 million of those counterfeiting proceeds into Defendant Vibe.

145

583. Defendant Maria Bedoya is Elite's principal and registered agent. She is a relative of Defendant Francy Bedoya.

584. As with Defendant Skyline, Defendants Maria and Francy Bedoya used Elite to "wash" funds and add another layer between the Supplier Defendants and the cellphones used as a vehicle to illegally move counterfeiting proceeds to Colombia.

585. Defendants Vibe, Sofitel, Skyline, Elite, and their managers Defendants Vidaurre, Francy Bedoya, and Maria Bedoya (collectively, the "Cellphone Scheme Defendants"), knowingly and intentionally laundered counterfeiting proceeds from at least five different Supplier Defendants in this action.

586. The Cellphone Scheme Defendants, alone and in combination, managed the money laundering operation using cellphone purchases and sales. This operation was a critical part of the counterfeiting enterprise, as it facilitated the use of the enterprise's profits and their transfer to Colombia.

587. Without being able to "wash" illicit proceeds using the Cellphone Scheme Defendants and the other Asset Holder Defendants described herein, the enterprise could not operate at its enormous scale or would not exist at all.

588. The Cellphone Scheme Defendants are managers of critical aspects of the counterfeiting conspiracy, performed several acts in furtherance of the conspiracy, and did so with knowledge of the conspiracy.

f. **The Gold Dealer Launderers**

589. Defendants Sam and Avi Kessler are New York-based brothers. They have deep ties to the counterfeiting network, and used their precious-metals companies and other shell entities to launder the counterfeiting proceeds of several Supplier Defendants.

146

590.     At least four of Supplier Defendants transferred millions of dollars in counterfeiting profits to gold dealers owned by Defendants Avi and Sam Kessler, described below.

591.     On paper, these transfers were to purchase gold bullion.  In reality, however, they were purchases of untraceable cash.

592.     Defendants Avi and Sam Kessler and their companies managed the flow of counterfeiting proceeds and their conversion into untraceable funds, which could be used to pay other members of the conspiracy or purchase already-distributed Gilead medications in patient "buy-back" schemes.

**1.  The Precious Metals Group, Madison Bullion, and Avi Kessler**

593.     Defendant Avi Kessler owns and operates precious metals businesses in New York City, Defendant The Precious Metals Group, Inc. ("Precious Metals") and Defendant Madison Bullion LLC ("Madison Bullion").

594.     In just four months, Defendant Precious Metals received over $3.1 million directly from four different Supplier Defendants: Valuecare, MFK Management, Boulevard 9229, and Make it Happen Marketing.  Those transfers of counterfeiting profits dwarfed Precious Metals' other receipts for the time period (between February and July 2021), with the exception of a highly suspicious amount of cash deposits, totaling over $3.6 million.

595.     Defendant Madison Bullion received $700,000 from Supplier Defendant Make It Happen Marketing and $200,000 from an account controlled by Defendant Steven Diamantstein, the owner of Distributor Defendant Scripts.

596.     Defendants Avi Kessler, Precious Metals, and Madison Bullion managed the conversion of counterfeiting proceeds held within the banking system into difficult-to-trace cash.

147

That cash was used to pay members of the conspiracy and purchase already-distributed medication.

597.     Gilead subpoenaed Defendants Precious Metals and Madison Bullion for records related to their purported sale of gold bullion to the Supplier Defendants.

598.     At the time of the subpoenas, Defendants Avi Kessler, Precious Metals, and Madison Bullion were aware of the allegations described in the Complaint.

599.     In response to the subpoenas, Defendants Precious Metals and Madison Bullion produced falsified invoices in an effort to conceal the counterfeiting conspiracy and money laundering operation.  Evidence uncovered during Gilead's investigation demonstrates that the produced invoices (1) do not accurately represent the transactions they purport to and/or (2) were created only in response to the subpoenas and did not exist in any form before the subpoenas were received.

600.     The creation and production of falsified invoices are each separate acts in furtherance of the counterfeiting conspiracy.  As Precious Metals and Madison Bullion's owner and principal, Defendant Avi Kessler managed the creation and production of the falsified invoices.  Defendant Avi Kessler did so while on notice of the allegations described in the Complaint.

601.     By creating and producing falsified invoices in response to the subpoenas, Defendants Precious Metals and Madison Bullion, and their principal, Defendant Avi Kessler, committed a fraud on the court on behalf of the conspiracy.

## 2. Green Capital Investors LLC and Sam Kessler

602. Some of the funds laundered through Precious Metals were first laundered by Defendant Avi Kessler's brother, Sam Kessler, through his shell company, Defendant Green Capital Investors LLC ("Green Capital").

603. Defendant Avi Kessler used Defendant Green Capital to place another layer between the purported gold purchases and the Supplier and Distributor Defendants it received transfers from, all disguised as payments to (what appears on paper to be) a legitimate investment vehicle.

604. Defendants Sam and Avi Kessler worked in conjunction with Defendants Quan and Juan Hernandez to funnel Supplier Defendant Make it Happen Marketing's counterfeiting proceeds through Defendant Green Capital on its way to Defendant Precious Metals. Text messages reference an in-person meeting between Supplier Defendant Quan Hernandez, the principal of Supplier Defendant Make It Happen Marketing, and Defendant Avi Kessler, the principal of Defendant Green Capital. Defendant Sam Kessler sent Supplier Defendant Juan Hernandez (Quan's brother) wire information for Green Capital so that money could be cleaned through multiple layers of shell companies.

605. Between May and August 2021, Defendant Green Capital received over $1.1 million from Supplier Defendants Make It Happen Marketing and Valuecare. During approximately the same time period, Defendant Green Capital funneled that money to Defendant Precious Metals.

## 3. Gold Tower Refinery Inc. and Igor Aminov

606. The counterfeiting enterprise also used shell companies and phony transactions to clandestinely funnel money from purchasers of counterfeits to Supplier Defendants.

149

607.     Defendants Precious Metals and Madison Bullion transferred over $7.8 million to another company, Defendant Gold Tower Refinery Inc. ("Gold Tower"), in the same period they were receiving counterfeit proceeds from the Supplier Defendants discussed above.

608.     Defendant Igor Aminov is Gold Tower's principal, owner, and manager.

609.     Defendants Precious Metals, Madison Bullion, Green Capital, and Gold Tower, and their managers Defendants Avi Kessler, Sam Kessler, and Igor Aminov (collectively, the "Gold Dealer Defendants"), knowingly and intentionally laundered counterfeiting proceeds from multiple Supplier Defendants in this action.

610.     The Gold Dealer Defendants, alone and in combination, managed the money laundering operation using fake gold bullion purchases and falsified invoices.  This operation was a critical part of the counterfeiting enterprise, as it facilitated the use of the enterprise's profits.

611.     Without being able to "wash" illicit proceeds using the Gold Dealer Defendants and the other Asset Holder Defendants described herein, the enterprise could not operate at its enormous scale or would not exist at all.

612.     The Gold Dealer Defendants are managers of critical aspects of the counterfeiting conspiracy, performed several acts in furtherance of the conspiracy, and did so with knowledge of the conspiracy.

### g.     The Abacus Money-Laundering Network

613.     Supplier Defendant Abacus utilized a network of money launderers to clean and manage its counterfeiting proceeds.

150

### 1. All American Heavy Equipment

614.    Supplier Defendant Jose Hernandez opened the primary shell company used to launder Supplier Defendant Abacus's counterfeiting profits, Defendant All American Heavy Equipment Import & Export, LLC ("All American").

615.    Defendant All American purports to be in the construction, mining, forestry, medical, dental, and hospitality industries, but engages in no such business.  Instead, Defendant All American is a shell company used by Supplier Defendant Jose Hernandez to manage and launder Abacus's counterfeiting proceeds.

616.    Defendant All American received over $5 million in counterfeiting proceeds directly from Abacus, comprising the vast majority of funds that Defendant All American received from any source.  Abacus's sole business was the sale of counterfeit HIV medication.

617.    In order to further obfuscate the funds, Defendant All American distributed Abacus's counterfeiting proceeds to a series of additional money-laundering entities, most of which also received payments directly from Abacus itself.

618.    Defendant All American extracted the rest of the $5 million in counterfeiting proceeds in cash withdrawals, payments to Supplier Defendant Jose Hernandez directly, payments to various jewelry and precious-metal stores, and payments to luxury car agencies.

619.    Defendant All American also paid over $150,188 to Vanuatu City Consultant, a company that advertises it can secure Vanuatuan citizenship to married couples for $150,000.  Such "[c]itizenship for sale" has proven popular for "disgraced businesspeople and individuals sought by police in countries all over the world."[2]

---

[2] Euan Ward and Kate Lyons, *Citizenship for Sale: Fugitives, Politicians and Disgraced Businesspeople Buying Vanuatu Passports*, The Guardian, July 14, 2021, *available at*

### 2. Alexander Orriols & Blue Sea Marine Inc.

620. All American sent over $1 million to Defendant Blue Sea Marine Inc. ("Blue Sea"), a boat sales and service company that has nothing to do with All American's purported business.

621. Blue Sea also received over $17,000 from Abacus directly.

622. Blue Sea Marine's principal is Defendant Alexander Orriols.

623. Defendant Orriols has a lengthy criminal history and spent years in prison for his role in a bank fraud and money laundering scheme.

624. Using Defendant Blue Sea Marine, Inc., Defendant Orriols helps manage the laundering and obfuscation of Abacus's counterfeiting profits.

### 3. Alex Galvan, AMG Logistics Sky LLC, and Power Pro Logistics, LLC

625. Defendants All American and Abacus also paid more than $1.4 million to Defendant AMG Logistics Sky LLC ("AMG"), a company with no public profile and no operations.

626. Defendant Alex Galvan owns Defendant AMG, and is the Chief Financial Officer of another entity used to launder Abacus's profits, Defendant Power Pro Logistics, LLC ("Power Pro").

627. Defendant Power Pro received over $1.5 million in counterfeiting proceeds directly from Abacus.

628. Defendant Alex Galvan used the entities under his control, AMG and Power Pro, to manage the laundering of Abacus's counterfeiting proceeds.

---

https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports.

629. Defendants All American, Blue Sea, AMG, and Power Por, and their managers Defendants Jose Hernandez, Alexander Orriols, and Alex Galvan (collectively, the "Abacus Launderer Defendants"), knowingly and intentionally laundered counterfeiting proceeds.

630. The Abacus Launderer Defendants, alone and in combination, managed the money laundering operation using entities that gave the appearance of legitimacy. This operation was a critical part of the counterfeiting enterprise, as it facilitated the use of the enterprise's profits.

631. Without being able to "wash" illicit proceeds using the Abacus Money Launderer Defendants and the other Asset Holder Defendants described herein, the enterprise could not operate at its enormous scale or would not exist at all.

632. The Abacus Money Launderer Defendants are managers of critical aspects of the counterfeiting conspiracy, performed several acts in furtherance of the conspiracy, and did so with knowledge of the conspiracy.

### h. The My Meds Money Launderers

633. Supplier Defendant My Meds also utilized a network of money launderers, including several with names designed to disguise illicit transactions as ones with legitimate, authorized distributors of Gilead-brand medications.

### 1. M & D Co. Distributors, LLC & Emilio Vina

634. Defendant M & D Co. Distributors, LLC ("M & D Co. Distributors") received millions of dollars from Supplier Defendant My Meds in an effort to disguise purchases of counterfeit medication as legitimate purchases from an authorized distributor.

635. Supplier Defendant Emilio Vina, one of My Meds' principals, registered M & D Co. Distributors and remains its principal.

636.     Supplier Defendant Vina chose M & D Co. Distributors' name so that transfers to M & D Co. Distributors could be passed off as purchases from "M&D Specialty Distribution," a reputable, authorized distributor of Gilead-branded medication.

637.     Defendant Vina manages a significant portion of My Meds money laundering operation using M & D Co. Distributors, including at least $12.5 million received from My Meds and disguised as legitimate purchases from M&D Specialty Distribution.

638.     Defendant Vina transferred the majority of those funds, over $8 million, to himself or associated accounts.  Defendant Vina transferred other funds from M & D Co. Distributors to Defendant Vibe, discussed above.

### 2.  MDSD Enterprises, LLC & Liliana Teresa Sampayo Mena

639.     MDSD Enterprises, LLC ("MDSD Enterprises") is another shell entity used to provide the appearance of legitimacy to My Meds' counterfeiting profits.

640.     MDSD Enterprises does business under the name "M&D Specialty Wholesale." M&D Specialty Wholesale is the purported "supplier" of counterfeit medications on My Meds' fraudulent pedigrees.

641.     The names "MDSD Enterprises" and "M&D Specialty Wholesale" were chosen to mask the transfer of counterfeiting proceeds as legitimate purchases of Gilead-branded medication from authorized distributor M&D Specialty Distribution (often abbreviated "MDSD"), a subsidiary of Morris and Dickson Co. (often abbreviated "M&D").

642.     Defendant Liliana Teresa Sampayo Mena is M&D Specialty Wholesale's principal.

154

643. In addition to managing the affairs of Defendant MDSD Enterprises, Supplier Defendant Gentek pays Defendant Sampayo Mena through other shell companies with non-descript names.  MDSD's former officers were similarly paid by the same entities.

644. Defendant Sampayo Mena manages a portion of My Meds' money-laundering operation using MDSD Enterprises.

645. Defendants M & D Co. Distributors, MDSD Enterprises (d/b/a/ M&D Specialty Wholesale), and their principals Defendants Vina and Sampayo Mena (collectively, the "My Meds Money Launderer Defendants"), knowingly and intentionally laundered counterfeiting proceeds.

646. The My Meds Money Launderer Defendants, alone and in combination, managed the money laundering operation using entities that gave the appearance of legitimacy.  This operation was a critical part of the counterfeiting enterprise, as it facilitated the use of the enterprise's profits and disguised the purchase of counterfeit medication.

647. Without being able to "wash" illicit proceeds and disguise illicit purchases using the My Meds Money Launderer Defendants and the other Asset Holder Defendants described herein, the counterfeiting enterprise could not operate at its enormous scale, or would not exist at all.  The My Meds Money Launderer Defendants are managers of critical aspects of the counterfeiting conspiracy, performed several acts in furtherance of the conspiracy, and did so with knowledge of the conspiracy.

### i.  Yisel Lopez

648. Defendant Yisel Lopez is the live-in girlfriend of Kingpin Defendant Herrera. Ms. Lopez is also the owner and principal of the LLC that owns their home, which was purchased

with counterfeiting proceeds. Ms. Lopez is also the principal of the LLC that owns Kingpin Defendant Herrera's mother's house.

649. Kingpin Defendant Herrera is able to operate incognito and enjoy the proceeds he receives from this criminal enterprise because Ms. Lopez keeps significant assets from the criminal enterprise in her name.

650. Ms. Lopez also directly receives counterfeit proceeds. Supplier Defendant Omom, controlled by Kingpin Defendant Herrera and other Kingpin Defendants, laundered millions of dollars through Asset Holder Defendant Titan, a shell company. Titan then made substantial payments to two companies registered to a residential address in the same gated community in which Kingpin Defendant Herrera and Ms. Lopez live. These companies are LE Marketing and Golden Business Consulting Corp. ("Golden Business").

651. LE Marketing and Golden Business each sent multiple "CashApp" payments directly to Ms. Lopez in 2020 and 2021. Ms. Lopez also directly paid Golden Business $10,000 in October 2021.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))
(Against all Defendants except the Relief Defendants)

652. Gilead realleges and incorporates by reference paragraphs 1 through 651 of this Complaint as if fully set forth herein.

653. In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction, counterfeit, copy or colorable imitation of the Gilead Marks and the Gilead Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit Gilead

products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

654.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

655.    Defendants are directly, contributorily, and vicariously liable for their infringement.

656.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

657.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

658.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**SECOND CLAIM FOR RELIEF**
**<u>FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))</u>**
**(Against all Defendants except the Relief Defendants)**

659.    Gilead realleges and incorporates by reference paragraphs 1 through 658 of this Complaint as if fully set forth herein.

660. In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

661. For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Gilead Marks on the labels of the counterfeit bottles of Gilead HIV medications they purchased, advertised, and sold, as well as on altered and/or falsified pedigrees for bottles of Gilead HIV medications.

662. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

663. Defendants are directly, contributorily, and vicariously liable for their infringement.

664. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

665.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

666.     As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
## FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE
### (Against all Defendants except the Relief Defendants)

667.     Gilead realleges and incorporates by reference paragraphs 1 through 666 of this Complaint as if fully set forth herein.

668.     In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit Gilead medication, and in connection with Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States, and/or that are not subject to and subvert Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

669.     Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

670.     Defendants are directly, contributorily, and vicariously liable for their infringement.

671.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

672.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

673.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**FEDERAL FALSE ADVERTISING**
**(Against all Defendants except the Relief Defendants)**

674.    Gilead realleges and incorporates by reference paragraphs 1 through 673 of this Complaint as if fully set forth herein.

675.    In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of counterfeit Gilead medication, and in connection with the sale of  Gilead products with altered and/or falsified pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit Gilead medication.

676.    Defendants advertised, marketed, and promoted the counterfeit Gilead products, and the materially different Gilead products with altered and/or falsified pedigrees, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

677.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

678.    Defendants are directly, contributorily, and vicariously liable for their infringement.

679.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

680.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

681.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**FEDERAL DILUTION OF MARK**
**(Against all Defendants except the Relief Defendants)**

682.    Gilead realleges and incorporates by reference paragraphs 1 through 681 of this Complaint as if fully set forth herein.

683.    The Gilead Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

161

684.     Defendants are selling and/or have sold counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress after such trademarks and trade dress became famous.

685.     By selling these products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Gilead in violation of 15 U.S.C. § 1125(c).

686.     Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

687.     Defendants are directly, contributorily, and vicariously liable for their infringement.

688.     As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

689.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

690.     As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF
## NEW YORK DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION
### (Against all Defendants except the Relief Defendants)

691.     Gilead realleges and incorporates by reference paragraphs 1 through 690 of this Complaint as if fully set forth herein.

162

692.     All of the Gilead Marks and Trade Dress are individually distinctive under New York General Business Law § 360-1.

693.     By selling counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Gilead's business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Gilead, in violation of New York General Business Law § 360-1.

694.     As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

695.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

696.     As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
## NEW YORK DECEPTIVE BUSINESS PRACTICES
### (Against all Defendants except the Relief Defendants)

697.     Gilead realleges and incorporates by reference paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698.     In violation of New York General Business Law § 349, Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or

distributing counterfeit, altered, and/or falsified products unlawfully bearing the Gilead Marks and Trade Dress.

699.    As a direct and proximate result of Defendants' deceptive conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

700.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

### EIGHTH CLAIM FOR RELIEF
### COMMON-LAW UNFAIR COMPETITION
### (Against all Defendants except the Relief Defendants)

701.    Gilead realleges and incorporates by reference paragraphs 1 through 700 of this Complaint as if fully set forth herein.

702.    In violation of the common law of the State of New York and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Gilead by selling the counterfeit, altered, and/or falsified products.

703.    As a direct and proximate result of Defendants' unfair competition, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

704.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

705.    As a direct and proximate result of Defendants' unfair competition, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### NINTH CLAIM FOR RELIEF
### COMMON-LAW UNJUST ENRICHMENT
### (Against all Defendants except the Relief Defendants)

706.    Gilead realleges and incorporates by reference paragraphs 1 through 705 of this Complaint as if fully set forth herein.

707.    By selling the counterfeit, altered, and/or falsified products bearing Gilead's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Gilead's expense in violation of the common law of New York and elsewhere.

708.    Under principles of equity, Gilead is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

### TENTH CLAIM FOR RELIEF
### VIOLATION OF RICO, 18 U.S.C. § 1962(C)
### (Against the RICO Defendants)

709.    Gilead realleges and incorporates by reference paragraphs 1 through 708 of this Complaint as if fully set forth herein.

710.    At all relevant times, Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

711.    At all relevant times, the Kingpin Defendants, the Leader Defendants, the Supplier Defendants, the Marketer Defendants, the Asset Holder Defendants, and Pharmacy

Defendant Total Remedy (as described above and listed in Appendix A) (collectively, the "RICO Defendants") were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

712.    As alleged above, the RICO Defendants are each comprised of natural persons and of corporate entities that they formed to carry out the counterfeiting activities described above.  These corporate entities (as listed in Appendix A) constituted an association-in-fact (the "Counterfeiting Enterprise") for the purpose of manufacturing and/or obtaining counterfeit Gilead-branded HIV medications; trafficking them to Distributor Defendants and pharmacies; distributing false and counterfeit pedigree documentation with the medications that misrepresented the chain of custody of the medications; and laundering the proceeds of the scheme through difficult-to-trace entities that used the proceeds to purchase gold bullion, expensive jewelry, luxury goods, and other items that could be easily converted to cash.  This association-in-fact was a continuing and cohesive unit with specific and assigned responsibilities and constituted an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

713.    Each RICO Defendant, by engaging in the acts set forth in above, including those set forth above, participated in the operation and management of the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

714.    Each RICO Defendant, by engaging in the acts set forth above, including those set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

715.     The RICO Defendants, on numerous occasions, knowingly trafficked in counterfeit Gilead-branded HIV medication.  Each unit of counterfeit medication constituted a separate violation of 18 U.S.C. § 2320(a)(1) and a separate act of racketeering.

716.     The RICO Defendants, on numerous occasions, knowingly trafficked in Gilead-branded HIV medication bearing counterfeit labels, documentation, and packaging.  Each such unit of counterfeit medication constituted a separate violation of 18 U.S.C. § 2320(a)(2) and a separate act of racketeering.

717.     The RICO Defendants, on numerous occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of counterfeit Gilead-branded HIV medication accompanied by counterfeit pedigrees that fraudulently misrepresented the chain of custody of the medications.  Each such shipment of counterfeit medication, and each transmission of counterfeit pedigrees, constituted a separate violation of 18 U.S.C. § 1341 and a separate act of racketeering.

718.     The RICO Defendants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including false and counterfeit pedigrees, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Each counterfeit pedigree transmitted by wire constituted a separate violation of 18 U.S.C. § 1343 and a separate act of racketeering.  The RICO Defendants' use of interstate wire communications to continually upload, transmit, and receive data, information, and communications in furtherance of their counterfeiting business,

including text messages, mobile phone calls, and emails, was also integral to the scheme and the operation and maintenance of the enterprise.

719.    The RICO Defendants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered counterfeiting proceeds to other RICO Defendants with the intent of concealing the nature, location, source, ownership, and control of the counterfeiting proceeds, in violation of the money laundering statute, 18 U.S.C. § 1956.  Each transfer constituted a separate violation of 18 U.S.C. § 1956 and a separate act of racketeering.

720.    Each RICO Defendant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, 1343, and/or 2320. The RICO Defendants' racketeering acts were multiple and repeated, comprising thousands of offenses.

721.    These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants; common victims (patients that depend on authentic Gilead-branded HIV medication, as well as Gilead itself); a common method of commission; and the common purpose and common result of trafficking counterfeit Gilead HIV medication, and of enriching the RICO Defendants while concealing their unlawful activities.

722.    Gilead was directly and proximately injured by the RICO Defendants' pattern of racketeering activity because Defendants' trafficking in counterfeit Gilead-branded products displaced the sale of authentic products and caused Gilead to lose profits.  Gilead was  also was directly and proximately injured by Defendants' pattern of racketeering activity because the sale

168

of counterfeit products bearing Gilead's trademarks and Gilead's name damages Gilead's reputation and goodwill.

723.    As a result of their misconduct, the RICO Defendants are liable to Gilead for its injuries.

724.    The full scope of the RICO Defendants' fraudulent enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through entities as yet unknown.

725.    Pursuant to 18 U.S.C. § 1964(c), Gilead is entitled to recover threefold its damages plus costs and attorneys' fees.

**ELEVENTH CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)**
**(Against the RICO Defendants)**

726.    Gilead hereby repeats and re-alleges the allegations in paragraphs 1 through 725 above as if set forth fully herein.

727.    At all relevant times, Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

728.    At all relevant times, the RICO Defendants, defined above, were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

729.    Each RICO Defendant was associated with the Counterfeiting Enterprise described above, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(d).

Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

730.     The RICO Defendants' conspiracy depended upon, among other things, (a) manufacturing and/or obtaining counterfeit Gilead-branded HIV medication; (b) selling the counterfeit medication through the Supplier Defendants to the Distributor Defendants; (c) the creation of fraudulent and counterfeit pedigrees to accompany the sale of the counterfeits; (d) operating a sales force consisting of the Marketing Defendants to market and sell counterfeits to pharmacies in the names of the Distributor Defendants; (e) creating fraudulent and misleading entities (such as Cesar Castillo and JM Smith) and making numerous misrepresentations for the purpose of creating a false record of legitimacy; (f) illegally purchasing or otherwise obtaining authentic Gilead-branded bottles of HIV medication, whether full or empty, to be used to manufacture the counterfeits; and (g) concealing and laundering the proceeds of the counterfeiting through the Asset Holder Defendants, who funneled these proceeds into products convertible to cash to pay suppliers and enrich the RICO Defendants.

731.     Gilead was directly and proximately injured by the RICO Defendants' pattern of racketeering activity because Defendants' trafficking in counterfeit Gilead-branded products displaced the sale of authentic products and caused Gilead to lose profits.  Gilead was  also was directly and proximately injured by Defendants' pattern of racketeering activity because the sale of counterfeit products bearing Gilead's trademarks and Gilead's name damages Gilead's reputation and goodwill..

732.     As a result of their misconduct, the RICO Defendants are liable to Gilead for its injuries.

733.    The full scope of the RICO Defendants' fraudulent enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through entities as yet unknown.

734.    Pursuant to 18 U.S.C. § 1964(c), Gilead is entitled to recover threefold its damages plus costs and attorneys' fees.

### TWELFTH CLAIM FOR RELIEF
### CONSPIRACY TO VIOLATE LANHAM ACT
### (Against the RICO Defendants)

735.    Gilead hereby repeats and re-alleges the allegations in paragraphs 1 through 734 above as if set forth fully herein.

736.    Each of the RICO Defendants was associated with the Counterfeiting Enterprise described above, and agreed and conspired to violate the Lanham Act, that is, agreed to conduct and participate, directly and indirectly, in the purchase, sale, offering for sale, distribution, or advertising of counterfeit and/or infringing goods, including goods with fake pedigrees, in violation of 15 U.S.C. § 1114(1)(a), 15 U.S.C. § 1114(1)(b), 15 U.S.C. § 1125(a)(1)(B), and/or 15 U.S.C. § 1125(a)(1)(B).  Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

737.    The Defendants' conspiracy depended upon, among other things, (a) obtaining counterfeit Gilead-branded HIV medication; (b) selling the counterfeit medication through the Supplier Defendants to the Distributor Defendants; (c) the creation of fraudulent and counterfeit pedigrees to accompany the sale of the counterfeits; (d) operating a sales force consisting of the Marketing Defendants to market and sell counterfeits to pharmacies in the names of the Distributor Defendants; (e) creating fraudulent and misleading entities (such as Cesar Castillo

171

and JM Smith) and making numerous misrepresentations for the purpose of creating a false record of legitimacy; (f) illegally purchasing or otherwise obtaining authentic Gilead-branded bottles of HIV medication, whether full or empty, to be used to manufacture the counterfeits; and (g) concealing and laundering the proceeds of the counterfeiting through the Asset Holder Defendants, who funneled these proceeds to pay suppliers and enrich the co-conspirator Defendants.

738.    As a result of their misconduct, the co-conspirator Defendants are liable to Gilead for its injuries.

739.    The full scope of the Defendants' conspiracy is not known, and the co-conspirator Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through entities as yet unknown.

740.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

741.    Defendants are directly, contributorily, and vicariously liable for their infringement.

742.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

743.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

744.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against the Relief Defendants)**

745.    Gilead realleges and incorporates by reference paragraphs 1 through 744 of this Complaint as if fully set forth herein.

746.    The Relief Defendants received funds, real property and interests in real property of the Defendants, which are the ill-gotten gains, or are traceable to the ill-gotten gains, derived from the Defendants' conduct alleged above, without consideration.

747.    The Relief Defendants do not have any lawful right, title, or interest in or to the funds, real property and interests in real property of the Defendants, which are the ill-gotten gains, or are traceable to the ill-gotten gains, derived from the Defendants' conduct.

748.    The Relief Defendants obtained the funds under circumstances in which it is not just, equitable, or conscionable for them to retain the funds, and therefore they have been unjustly enriched.

749.    Gilead is entitled to an order, pursuant to common law equitable principles, requiring the Relief Defendants to disgorge the funds, real property and interests in real property of the Defendants, which are the ill-gotten gains, or are traceable to the ill-gotten gains, derived from the Defendants' conduct, and in which the Relief Defendants have no lawful right, title or interest.

## PRAYER FOR RELIEF

WHEREFORE, Gilead demands judgment against Defendants as follows:

A.      preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

(i)      from selling any Gilead medication, whether genuine or counterfeit;

(ii)     from using any of the Gilead Marks and Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medication;

(iii)    from using any logo, trade name, or trademark confusingly similar to any of the Gilead Marks and Trade Dress, which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Gilead;

(iv)     from directly, contributorily, and vicariously infringing any of the Gilead Marks and Trade Dress;

(v)      from otherwise unfairly competing with Gilead in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Gilead medications;

174

(vi)    from falsely representing themselves as being connected with Gilead or sponsored by or associated with Gilead or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Defendants, or any of them, are associated with Gilead;

(vii)   from using any reproduction, counterfeit, copy, or colorable imitation of any of the Gilead Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of medications;

(viii)  from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being authentic Gilead medication and from offering such goods in commerce;

(ix)    from diluting the Gilead Marks and Trade Dress;

(x)     from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be Gilead medication; and

(xi)    from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (x) above; and

   B.  ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

   C.  ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

   D.  awarding to Gilead punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

   E.  awarding to Gilead statutory, actual damages, or threefold damages in an amount to be ascertained at trial, and costs and attorney's fees; and

   F.  awarding to Gilead an accounting, and an award of: (i) all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit medication; (ii) Gilead's lost profits; and (iii) Gilead's remedial costs; and

   G.  awarding to Gilead pre-judgment and post-judgment interest; and

   H.  awarding such other and further relief to Gilead as may be just, proper, and equitable.

  Gilead further demands judgment against the Relief Defendants as follows: ordering that the Relief Defendants disgorge funds, assets, or things of value they hold or control, in which they have no legitimate interest, that were derived from monies or assets obtained by Defendants as a result of conduct alleged above, plus prejudgment interest thereon, as well as awarding such other and further relief to Gilead as may be just, proper, and equitable.

Dated:      New York, New York
            September 28, 2022

                          PATTERSON BELKNAP WEBB & TYLER LLP

                          By: _____
                              Geoffrey Potter
                              Aron Fischer
                              Timothy A. Waters
                              Thomas P. Kurland
                              Maxwell K. Weiss
                              Gizele Rubeiz
                              Angelica Nguyen
                          1133 Avenue of the Americas
                          New York, NY  10036-6710
                          T:  212-336-2000
                          F:  212-336-2222
                          E:  gpotter@pbwt.com
                              afischer@pbwt.com
                              twaters@pbwt.com
                              tkurland@pbwt.com
                              maweiss@pbwt.com
                              grubeiz@pbwt.com
                              anguyen@pbwt.com

                          *Attorneys for Plaintiffs*
                          *Gilead Sciences, Inc., Gilead Sciences Ireland UC,*
                          *and Gilead Sciences, LLC*