**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

GILEAD SCIENCES, INC., *et al.*,

      *Plaintiffs*,

    v.

SAFE CHAIN SOLUTIONS, LLC, *et al.*,

      *Defendants*.

Case No. 1:21-cv-04106 (AMD) (RER)

**SAFE CHAIN PARTIES' OPPOSITION TO GILEAD'S**
**MOTION TO DISMISS THEIR COUNTERCLAIMS**

August J. Matteis, Jr.
William E. Copley
Matthew S. Krauss
William E. Jacobs
Weisbrod Matteis & Copley PLLC
1200 New Hampshire Avenue NW, 4th Floor
Washington, DC 20036
Tel:    202-499-7900
Fax:    202-478-1795
Email: amatteis@wmclaw.com
       wcopley@wmclaw.com
       mkrauss@wmclaw.com
       wjacobs@wmclaw.com

*Attorneys for Safe Chain Solutions, LLC,*
*Charles Boyd, and Patrick Boyd*

September 1, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

LEGAL STANDARD .............................................................................................................. 3

ARGUMENT ........................................................................................................................... 3

I.      Gilead's Misconduct Toward the Safe Chain Parties Was Unfair Competition................ 3

        A.      Gilead Acted Unfairly to Damage Safe Chain's Business...................................... 4

                1.      Gilead Maligned Safe Chain Unfairly in Its E-Pharm/alert........................ 4

                2.      Gilead Continued to Smear Safe Chain in Letters to Its Customers........... 7

        B.      Maryland Does Not Limit Unfair Competition to Direct Competitors................... 8

II.     Gilead Violated the Seal Order in This Case to Defame the Safe Chain Parties................ 9

        A.      Gilead's Statement Was "Of and Concerning" the Safe Chain Parties. ................. 9

        B.      The Safe Chain Parties Are Not Criminals. ........................................................... 13

        C.      Other Defendants' Potential Criminality Does Not Excuse Gilead's Conduct. ..... 14

        D.      Gilead Cannot Justify its Other Defamatory Statements. ..................................... 16

III.    Gilead Tortiously Interfered with the Safe Chain Parties' Business Relationships.......... 17

        A.      Maryland Law Governs Safe Chain's Tortious Interference Claim. ..................... 17

        B.      Safe Chain Pled Gilead's Wrongful Conduct and Tortious Intent. ...................... 19

                1.      Gilead Acted Wrongfully and Improperly................................................. 19

                2.      Gilead Acted with Tortious Intent. ........................................................... 21

        C.      Safe Chain Adequately Alleged Its Business Relationships.................................. 23

                1.      Safe Chain Pled Multiple Relationships in Which Gilead Interfered. ...... 23

                2.      Maryland Law Does not Require Gilead's Knowledge of Safe Chain's
                        Business Relationships, but Safe Chain has Pled It Regardless. .............. 25

CONCLUSION......................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Abbasid, Inc. v. Bank of America, N.A.*,
  463 F. App'x 317 (5th Cir. 2012) ................................................................... 19

*Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*,
  650 A.2d 260 (Md. 1994) ................................................................ 18, 21, 22

*Algarin v. Town of Wallkill*,
  421 F.3d 137 (2d Cir. 2005).......................................................................... 12

*Amusement Industry, Inc. v. Stern*,
  693 F. Supp. 2d 301 (S.D.N.Y. 2010)........................................................... 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................ 3

*Aton Center, Inc. v. CareFirst of Maryland, Inc.*,
  No. CV DKC 20-3170, 2021 WL 1856622 (D. Md. May 10, 2021)........................ 8

*Bagwell v. Peninsula Regional Medical Center*,
  665 A.2d 297 (Md. Ct. Spec. App. 1995) ...................................................... 22

*Baron Financial Corp. v. Natanzon*,
  471 F. Supp. 2d 535 (D. Md. 2006) ................................................................ 4

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................... 25

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*,
  157 F. Supp. 2d 609 (D. Md. 2001) ................................................................ 8

*Brady v. Ottaway Newspapers, Inc.*,
  84 A.D. 2d 226 (N.Y. App. Div. 1981) ........................................... 10, 11, 12, 15

*Cao v. Flushing Paris Wedding Center LLC*,
  No. 20CV2336RPKRLM, 2022 WL 219565 (E.D.N.Y. Jan. 25, 2022) .................. 17

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
  247 F.R.D. 296 (E.D.N.Y. 2007) .................................................................. 24

*Command Technology, Inc. v. Lockheed Martin Corp.*,
  No. 0469, Sept. Term, 2014, 2015 WL 6470277 (Md. Ct. Spec. App. Oct. 27, 2015) ........... 20

*Conklin v. Laxen*,
  180 A.D. 3d 1358 (N.Y. App. Div. 2020) ...................................................... 14

*Diaz v. NBC Universal, Inc.*,
   536 F. Supp. 2d 337 (S.D.N.Y. 2008)........................................................... 10

*Discovery Communications, LLC v. Computer Sciences Corp.*,
   570 F. App'x 306 (4th Cir. 2014) ............................................................... 18

*Doe v. Johns Hopkins Health System Corp.*,
   274 F. Supp. 3d 355 (D. Md. 2017)........................................................ 20, 21

*Driver Opportunity Partners I, LP v. First United Corp.*,
   No. CV RDB-2, 0-2575, 2021 WL 82864 (D. Md. Jan. 8, 2021)........................... 8-9

*Electronics Store, Inc. v. Cellco Partnership*,
   732 A.2d 980 (Md. Ct. Spec. App. 1999) ...................................................... 8

*Elias v. Rolling Stone LLC*,
   872 F.3d 97 (2d Cir. 2017)................................................................. 10, 11

*Ellicott Dredges, LLC v. DSC Dredge, LLC*,
   280 F. Supp. 3d 724 (D. Md. 2017) ......................................................... 3, 18

*Fawcett Publications, Inc. v. Morris*,
   377 P.2d 42 (Okla. 1962) ................................................................. 11, 12

*Foman v. Davis*,
   371 U.S. 178 (1962)...................................................................... 13-14

*Geraci v. Probst*,
   938 N.E. 2d 917 (N.Y. 2010) ................................................................. 9

*Goodrich v. Long Island Rail Road Co.*,
   654 F.3d 190 (2d Cir. 2011).................................................................. 3

*Ground Zero Museum Workshop v. Wilson*,
   813 F. Supp. 2d 678 (D. Md. 2011) .......................................................... 18

*Hughes v. Twenty-First Century Fox, Inc.*,
   304 F. Supp. 3d 429 (S.D.N.Y. 2018)...................................................... 9-10

*Hyperheal Hyperbarics, Inc. v. Shapiro*,
   404 F. Supp. 3d 953 (D. Md. 2019) .......................................................... 25

*Illiano v. Mineola Union Free School District*,
   585 F. Supp. 2d 341 (E.D.N.Y. 2008) ........................................................ 14

*Johnson v. City of Shelby, Mississippi*,
   574 U.S. 10 (2014).......................................................................... 17

iii

*Jones v. Albany County Civil Service Commission*,
    985 F. Supp. 280 (N.D.N.Y. 1997) ........................................................................... 21

*Kinsey v. New York Times Co.*,
    991 F.3d 171 (2d Cir. 2021) ................................................................................... 19

*Knipe v. Skinner*,
    999 F.2d 708 (2d Cir. 1993) ..................................................................................... 9

*Kwang Dong Pharmaceutical Co. v. Han*,
    205 F. Supp. 2d 489 (D. Md. 2002) ......................................................................... 20

*LSR, Inc. v. Satellite Restaurants Inc. Crabcake Factory USA*,
    No. 1:17-CV-03722-SAG, 2020 WL 4903902 (D. Md. Aug. 20, 2020) ................... 8

*Macklin v. Robert Logan Associates*,
    639 A.2d 112 (Md. 1994) ................................................................................... 19, 20

*Mansour v. Fanning*,
    506 F. Supp. 186 (N.D. Cal. 1980) ......................................................................... 11

*Martin Hilti Family Trust v. Knoedler Gallery, LLC*,
    386 F. Supp. 3d 319 (S.D.N.Y. 2019) ..................................................................... 17

*Mascaro v. Snelling & Snelling of Baltimore, Inc.*,
    243 A.2d 1 (Md. 1968) ............................................................................................. 3

*Master International Co. Ltd. v. Blackstone International, Ltd.*,
    No. 12-cv-3758-JKB, 2013 WL 3147010 (D. Md. June 18, 2013) ......................... 20

*Matthew v. Texas Comptroller of Public Accounts*,
    No. 21 CIV 5337 (JPC), 2022 WL 4626511 (S.D.N.Y. Sept. 30, 2022) ........... 16, 21

*MedServ International, Inc. v. Rooney*,
    No. CV AW-05-3173, 2006 WL 8457075 (D. Md. June 28, 2006) ........................... 3

*Neiman-Marcus v. Lait*,
    13 F.R.D. 311 (S.D.N.Y. 1952) .............................................................................. 11

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ..................................................................................... 9

*Philips North America LLC v. Hayes*,
    No. ELH-20-1409, 2020 WL 5407796 (D. Md. Sept. 9, 2020) ............................. 3-4

*Phreesia, Inc. v. Certify Global, Inc.*,
    No. DLB-21-678, 2022 WL 17342067 (D. Md. Nov. 29, 2022) ............................. 20

*Press v. United States*,
No. CV JKB-17-1667, 2018 WL 2237492 (D. Md. May 16, 2018) ...................... 18, 23, 24, 25

*Reed Construction Data Inc. v. McGraw-Hill Companies, Inc.*,
638 F. App'x 43 (2d Cir. 2016) ................................................................................. 19

*RFP LLC v. SCVNGR, Inc.*,
788 F. Supp. 2d 191 (S.D.N.Y. 2011) ................................................................... 21-22

*Sidney Frank Importing Co., Inc. v. Beam Inc.*,
998 F. Supp. 2d 193 (S.D.N.Y. 2014) ..................................................................... 21

*Speedmark Transportation, Inc. v. Mui*,
778 F. Supp. 2d 439 (S.D.N.Y. 2011) ..................................................................... 19

*Stepanov v. Dow Jones & Co., Inc.*,
120 A.D.3d 28 (N.Y. App. Div. 2014) ............................................................... 15, 16

*Sun Dun, Inc. of Washington v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990) ............................................................................... 8

*Tannerite Sports, LLC v. NBCUniversal News Group*,
864 F.3d 236 (2d Cir. 2017) ..................................................................................... 15

*Thompson v. UBS Financial Services, Inc.*,
115 A.3d 125 (Md. 2015) .......................................................................................... 2

*Townsend v. Benjamin Enterprises, Inc.*,
679 F.3d 41 (2d Cir. 2012) ....................................................................................... 17

*Trimed, Inc. v. Sherwood Medical Co.*,
772 F. Supp. 879 (D. Md. 1991) ................................................................................ 4

*Trimed, Inc. v. Sherwood Medical Co.*,
977 F.2d 885 (4th Cir. 1992) ................................................................... 2, 3, 4, 8, 21

*Volvo North America Corp. v. Men's International Professional Tennis Council*,
857 F.2d 55 (2d Cir. 1988) ........................................................................................ 9

*Waypoint Management Consulting, LLC v. Krone*,
No. CV ELH-19-2988, 2022 WL 2528465 (D. Md. July 6, 2022) ........................ 3, 4

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
460 F.3d 281 (2d Cir. 2006) ............................................................................... 18, 19

## Statutes

21 U.S.C. § 360eee-1 ...................................................................................................... 5

## INTRODUCTION

Safe Chain Solutions, LLC ("Safe Chain"), and its founders Patrick Boyd and Charles Boyd (the "Safe Chain Parties") allege that Plaintiffs ("Gilead") while shutting down an HIV drug conspiracy allegedly perpetrated by a handful of other parties also conducted a ruthless campaign to consolidate control over Gilead's distribution channels and drive Safe Chain from the legitimate secondary prescription drug market. Rather than prove the legal insufficiency of those allegations, Gilead presents a counternarrative that its actions were justified to warn the public about the drug conspiracy. Gilead will have a chance to present that story to a jury, but its false narrative fails entirely to support a motion to dismiss. The Safe Chain Parties have stated claims for unfair competition, defamation, and tortious interference with business relations.

The Safe Chain Parties cooperated with Gilead's investigation into suspected counterfeits, provided hundreds of drug pedigrees (which Gilead had no legal right to obtain from them), notified Gilead about several instances of suspected counterfeiting directly, and even invited Gilead to inspect their facilities (which Gilead refused). Countercl. ¶¶ 58-59, 71 [899]. Gilead repaid that cooperation by "demand[ing] that Safe Chain cease transacting in Gilead-branded medicine" and embarking on a concerted, tortious campaign to force it to do so. *Id.* ¶ 65.

For example, Gilead sent an e-Pharm/alert to approximately 55,000 participants in the prescription drug market on March 16, 2021, that contained false and misleading statements about Safe Chain, including an outright lie that Safe Chain was not "authorized" to distribute Gilead drugs. *Id.* ¶¶ 81-86 & Ex. 1. It sent targeted letters to Safe Chain customers including but not limited to Medicine Shoppe #1802 ("Medicine Shoppe") on or around May 19, 2021, telling them that, contrary to FDA guidance, the mere fact that a secondary wholesaler like Safe Chain had sold a product "'***should raise an immediate red flag regarding the product's legitimacy***.'" *Id.* ¶ 88 (emphasis added). Gilead later even violated this Court's Seal Order [20]—an allegation

it conspicuously fails to deny in its motion—to defame the Safe Chain Parties as criminals in an interview with *The Wall Street Journal*. *Id.* ¶¶ 118-31.

Gilead tries to paint its conduct as purely benevolent acts to inform the public about suspected counterfeits, but regardless of what other defendants had done, Gilead had no right to exploit the situation by spreading falsehoods about Safe Chain (*e.g.*, that it was not authorized to sell Gilead products and that the secondary market is inherently suspect). On the contrary, Maryland's common law of unfair competition holds that no one is entitled to "damage[e] … another's business by … unfair methods of any sort." *Thompson v. UBS Fin. Servs.*, 115 A.3d 125, 133 (Md. 2015). What constitutes "unfair competition" is a quintessential question of fact, and juries have found that conduct like Gilead's clearly qualifies. *See, e.g.*, *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 890-91 (4th Cir. 1992). Abundant case law also holds that a party need *not* be a direct competitor to be liable, as Gilead wrongly insists.

Nor can Gilead justify its decision to violate this Court's Seal Order to defame the Safe Chain Parties in the *Journal*. Gilead insists that its statement was not even about the Safe Chain Parties and, even if it were, everything it said was true. Gilead Br. at 6-10 [1142]. Not so. A reasonable reader would have believed Gilead's statement to refer to the Safe Chain Parties, as did its immediate audience—the reporters themselves. Furthermore, Gilead's accusation of criminality is false. Gilead tries to prove otherwise by mischaracterizing the pleadings and presuming the truth of its *own* allegations rather than Safe Chain's. Gilead also tellingly fails to address its other defamatory statements about the Safe Chain Parties, including its false statement that they were not authorized to distribute Gilead drugs, and thereby has waived any argument that those statements are not defamatory.

Gilead's wrongful actions also tortiously interfered with Safe Chain's relationships with

customers and prospective customers, many of whom it identified and targeted using information the Safe Chain Parties had provided in good faith. Countercl. ¶¶ 92-93.

## LEGAL STANDARD

To defeat a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must "draw[] all reasonable inferences in the plaintiff's favor." *Goodrich v. Long Island R.R.*, 654 F.3d 190, 192-93 (2d Cir. 2011).

## ARGUMENT

### I.   Gilead's Misconduct Toward the Safe Chain Parties Was Unfair Competition.

Gilead's campaign against the Safe Chain Parties violated Maryland's common law of unfair competition, which prohibits "'damaging … another's business by fraud, deceit, trickery, or unfair methods of any sort.'" *Waypoint Mgm't Consulting v. Krone*, No. CV ELH-19-2988, 2022 WL 2528465, at *59 (D. Md. July 6, 2022) (quoting *Thompson*, 115 A.3d at 133). "[T]he Maryland Court of Appeals 'has preserved a high degree of flexibility'" on what constitutes unfair competition. *Id.* Fraud, deception, and unlawful acts are not required. *See, e.g.*, *Mascaro v. Snelling & Snelling of Balt.*, 243 A.2d 1, 10 (Md. 1968); *Trimed*, 977 F.2d at 891; *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017).

Maryland courts have "emphasized the broad scope of the conduct actionable under this tort," sustaining unfair competition claims even when the same facts could not support tortious interference. *MedServ Int'l v. Rooney*, No. CV AW-05-3173, 2006 WL 8457075, at *3 (D. Md. June 28, 2006); *accord Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at

3

*18 (D. Md. Sept. 9, 2020). "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself." *Krone*, 2022 WL 2528465 at *60; *see also Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546-47 (D. Md. 2006) ("[T]he controlling legal principles are simply … old-fashioned honesty.").

Courts have ruled that whether conduct constitutes unfair competition is a question of fact for a jury. *See, e.g.*, *Trimed,* 977 F.2d at 891 (affirming jury charge to decide claim "on the basis of common honesty and fairness."). Such claims are ill-suited for resolution on a motion to dismiss. Moreover, juries have found unfair competition in cases like this one. In *Trimed*, a medical device manufacturer told Trimed it intended to end a distribution agreement but told Trimed's customers that Trimed "was no longer an authorized … distributor" before the agreement ended. *Id.* at 888. The manufacturer also contacted Trimed's customers "with the intent to induce [them] to cease purchasing from" Trimed. *Trimed, Inc. v. Sherwood Med. Co.*, 772 F. Supp. 879, 882, 884 (D. Md. 1991), *aff'd*, 977 F.2d 885 (4th Cir. 1992). The manufacturer also told Trimed's customers it could not guarantee their orders unless they bought from it directly, told other distributors not to sell to Trimed, and "used 'scare tactics' to pressure customers to terminate their contracts with Trimed." *Id.* at 884.

A.    **Gilead Acted Unfairly to Damage Safe Chain's Business.**[1]

1.    **Gilead Maligned Safe Chain Unfairly in Its E-Pharm/alert.**

Gilead's e-Pharm/alert, sent to 55,000 participants in the prescription drug market, said "'**[n]either Safe Chain nor Gentek is an authorized distributor of Gilead products, including Biktarvy and Descovy.**'" Countercl. ¶ 85 (emphasis Gilead's). Gilead insists that "[t]here is no dispute that every single sentence of th[is] communication[] is literally true."

---

[1] The Safe Chain Partiers limit their discussion of Gilead's defamatory statement in the *Journal* to Section II to avoid unnecessary repetition, but it also constituted unfair competition.

Gilead Br. at 18-19. On the contrary, this statement was *literally* false, at least as to Safe Chain.

Federal law provides that "the term … 'authorized,' as it relates to a wholesale distributor with respect to prescription drugs, ***shall mean a wholesale distributor with a valid license under State law***." 21 U.S.C. § 360eee-1(a)(6) (emphasis added). Safe Chain is properly licensed in every state where it does business and so was an "authorized distributor of Gilead products" under federal law. *See* Countercl. ¶ 44. Gilead has never suggested that Safe Chain lacked the required state licenses. To misrepresent to 55,000 market participants that Safe Chain lacked authority it in fact had was an unfair act that damaged Safe Chain's business.

Gilead may try to argue in reply that this lie was technically true because Safe Chain is not one of the 16 companies that buys directly from Gilead, which Gilead calls its "authorized distributors." Yet Gilead was careful elsewhere in the e-Pharm/alert to refer to "Gilead authorized distributors" and "our authorized distributors" when referring to those 16 companies. *See generally* [899-1]. It likewise took care with this distinction in the Medicine Shoppe letter, referring there to "non-***Gilead*** authorized wholesalers." *See generally* [1143-1]. Had it wanted to say that Safe Chain was not a "Gilead-authorized" distributor, it could have used those same words again. It chose to make a far more sweeping false statement.

The e-Pharm/alert also directed buyers to purchase "**from Gilead authorized distributors as our authorized distributors share our commitment to patient safety**," falsely suggesting that independent wholesalers and Safe Chain particularly do not value patient safety. [899-1] (emphasis Gilead's). It also said, "Gilead has identified false information on Safe Chain's …pedigree documentation[] provided to pharmacies with their purchase of Biktarvy," falsely suggesting that Safe Chain itself had fabricated the allegedly inaccurate information. *Id.*

Gilead knew those insinuations to be false. Safe Chain had provided Gilead hundreds of

its pedigrees, more than enough to establish that Safe Chain had not fabricated anything but rather relied on the information provided by its upstream suppliers. *See* Countercl. ¶¶ 59, 60 & n.5, 84. The alleged inaccuracies Gilead complains of were not those reflecting transactions between Safe Chain and its immediate trading partners, but rather the acquisition of the drugs by allegedly "shady" upstream suppliers like Gentek. *See* Sixth Am. Compl. ¶¶ 7, 422. In short, Gilead ascribed to Safe Chain inaccuracies on the parts of the pedigrees created by Gentek.

Safe Chain has a long history of commitment to patient safety. It has operated for more than 12 years with an excellent record. Countercl. ¶¶ 44-50. Safe Chain is aware of no complaint about the authenticity of the products it sold before the events of this case. *Id.* ¶ 49. Its conduct in connection with Gilead's investigation is consistent with that record. It quarantined bottles from allegedly suspect product lots and refused future shipments from those lots. *Id.* ¶¶ 54, 69. It reported the situation to the FDA and communicated with Gilead and Gilead's direct distributors. *Id.* ¶¶ 53, 56-57, 61-62. Indeed, Gilead itself learned of several suspect bottles from Safe Chain. *Id.* ¶ 58. Safe Chain even invited Gilead to inspect its facilities. *Id.* ¶ 71. These are hardly the actions of a company that lacked a commitment to patient safety.

Gilead fails to justify these statements from its e-Pharm/alert. It does not even *mention* its false statement about Safe Chain's authorization to distribute Gilead drugs and tries to justify its attribution of allegedly false pedigree information to Safe Chain, claiming it "said nothing at all about who invented the fake information in the pedigrees." Gilead Br. at 14-15. Yet it clearly attributed responsibility to Safe Chain rather than the supplier Gilead knew to be responsible for the alleged inaccuracies by characterizing the documents as "Safe Chain's pedigrees."

Gilead could have fulfilled its professed goal of notifying the public of an apparent danger without maligning Safe Chain unfairly. It could have said Safe Chain was not one of the

16 Gilead-authorized distributors rather than saying Safe Chain was not authorized to sell Gilead drugs at all. It could have encouraged customers to buy from its direct trading partners "because Gilead has vetted those companies' operations" without disparaging Safe Chain's commitment to patient safety. It could have said more accurately it had found false information in "Gentek's pedigrees to Safe Chain" rather than ascribing the alleged errors to Safe Chain.

Gilead's subsequent actions made its motives for those statements clear. Just one week after issuing its e-Pharm/alert, Gilead demanded that Safe Chain stop distributing Gilead-branded drugs entirely. Countercl. ¶ 65. Gilead had no legal authority to make such a demand, so it continued its campaign to drive Safe Chain from the market by other, unfair means.

### 2.    Gilead Continued to Smear Safe Chain in Letters to Its Customers.

Armed with pedigrees identifying Safe Chain's customers, Gilead sent letters maligning Safe Chain's business. *See id.* ¶¶ 92-93. In one letter, Gilead told Medicine Shoppe that the mere *presence* of "'non-Gilead authorized wholesalers'" in a drug's supply chain "'***should raise an immediate red flag regarding the product's legitimacy***.'" *Id.* ¶ 88 (emphasis added).

This characterization is consistent with Gilead's statements in the e-Pharm/Alert (suggesting falsely that Safe Chain is not authorized to distribute Gilead drugs) and in private to Safe Chain (insisting Safe Chain's distribution of Gilead drugs through the secondary wholesale market was an "'unsafe business model.'"). *Id.* ¶ 90. It is also false. The distribution of prescription drugs through the secondary market is both common and unremarkable. *Id.* ¶ 91. The FDA explained in a report to Congress, for example, "'In many cases, a primary distributor purchases prescription drugs from a manufacturer and resells them to one or more secondary wholesalers, who subsequently resell them to other wholesalers'" *Id.* The same report noted that "'drugs may go through several transaction cycles involving multiple primary and secondary wholesalers before arriving at their retail destination.'" *Id.* Far from a "red flag," FDA explained

that secondary wholesalers serve a legitimate, important role, "'help to keep drug prices lower overall," and provide a vital supply line for smaller dispensers. *Id.* ¶¶ 40, 41. Yet Gilead targeted Safe Chain's customers with letters that said the opposite. *Id.* ¶¶ 92, 93.

Gilead fails to justify this statement in its brief. It insists it only urged a pharmacy that had bought allegedly inauthentic drugs to exercise "extra diligence" in the future. Gilead Br. at 16-17. Yet Gilead told Medicine Shoppe to exercise that care at the unfair expense of Safe Chain, saying "a supply chain[] with multiple non-Gilead-authorized wholesalers[] should raise an immediate red flag regarding the product's legitimacy." Contrary to Gilead's present claim, its letter contained no qualification. Gilead was not justified in telling Safe Chain's customers that "extra diligence" meant viewing any Gilead drugs sold by Safe Chain as inherently suspect.

### B.     Maryland Does Not Limit Unfair Competition to Direct Competitors.

Gilead cannot escape liability just because the parties are not direct competitors. Maryland courts have held repeatedly that "actual competition is not required to prove unfair competition, insofar as the parties need not be direct competitors." *LSR, Inc. v. Satellite Restaurants Inc. Crabcake Factory USA*, No. 1:17-CV-03722-SAG, 2020 WL 4903902, at *6 n.5 (D. Md. Aug. 20, 2020). In *Trimed*, for example, the defendant was a medical device manufacturer and the plaintiff a distributor. 977 F.2d at 887.[2]

Gilead relies solely on *Driver Opportunity Partners I, LP v. First United Corp.*, which held that an investment fund could not sue a publicly traded company in which it had invested for trying to disenfranchise the fund's stock voting rights. No. CV RDB-20-2575, 2021 WL

---

[2] *See also Aton Ctr. v. CareFirst of Md., Inc.*, No. CV DKC 20-3170, 2021 WL 1856622, at *13 (D. Md. May 10, 2021) ("Nor does it seem that the law is confined solely to direct competitors."); *Berlyn, Inc. v. The Gazette Newspapers*, 157 F. Supp. 2d 609, 625 (D. Md. 2001) ("Unfair competition claims have survived … where the plaintiff and defendant were not direct competitors."); *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990); *Elecs. Store v. Cellco P'ship*, 732 A.2d 980, 992 (Md. Ct. Spec. App. 1999).

82864, at *1-*2 (D. Md. Jan. 8, 2021). The court reasoned that those parties were not

"'competitors,' *as that term is understood in relation to the tort*," yet it did not suggest a need for

direct competition or cast doubt on any of the foregoing authority. *Id.* at *11. Nor can Gilead

reconcile its position with its *own* assertion of an unfair competition claim against Safe Chain.

*See* Sixth Am. Compl. ¶¶ 749-53.

## II.     Gilead Violated the Seal Order in This Case to Defame the Safe Chain Parties.

Gilead violated this Court's Seal Order and defamed the Safe Chain Parties when it told

*The Wall Street Journal* they were part of "a complex and criminal enterprise distributing

counterfeit medication through the legitimate U.S. supply chain." Countercl. Ex. 2 [899-2].

Gilead does not deny violating the Seal Order to make that statement or that characterizing

someone as a criminal is defamation *per se*. *See, e.g.*, *Geraci v. Probst*, 938 N.E. 2d 917, 922-23

(N.Y. 2010) ("Damages will likewise be presumed for statements that charge a person with

committing a serious crime."). It cannot avoid liability for that misconduct.

New York law requires: "(1) a written defamatory statement of and concerning the

plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5)

special damages or *per se* actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir.

2019). Gilead disputes only two of the elements: whether its statement was "of and concerning"

the Safe Chain Parties and whether it was false.[3] Neither argument justifies dismissal.

### A.     Gilead's Statement Was "Of and Concerning" the Safe Chain Parties.

Gilead cannot avoid liability just because it did not use the Safe Chain Parties' names. A

defamatory statement remains actionable if a reasonable reader would have believed it to

---

[3] Gilead may not raise other arguments for the first time in its reply brief. *See, e.g.*, *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). Nor may a court grant a Rule 12 motion on grounds not briefed by the parties. *See, e.g.*, *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 65 (2d Cir. 1988).

concern the plaintiff. *See, e.g.*, *Hughes v. Twenty-First Century Fox*, 304 F. Supp. 3d 429, 452 (S.D.N.Y. 2018). Furthermore, New York law has long held that members of a small, clearly defined group may pursue claims for defamation directed at the group.

"[W]hen a reference is made to a large group of people, no individual within that group can fairly say that the statement is about him." *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 343 (S.D.N.Y. 2008). "The underlying premise … is that the larger the collectivity named in the libel, the less likely it is that a reader would understand it to refer to a particular individual." *Brady v. Ottaway Newspapers*, 84 A.D. 2d 226, 228 (N.Y. App. Div. 1981). Yet "where a statement defames all members of a small group, the 'reference to the individual plaintiff reasonably follows from the statement.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 108 (2d Cir. 2017) (quoting *Brady*, 84 A.D. 2d at 231). When deciding if group members may sue, "[t]he emphasis … is on distinguishing between a generalization applicable to a class and a specific charge directed at a circumscribed group of individuals." *Brady*, 84 A.D. 2d at 232.

*Brady*, the seminal New York case on this issue, explained that the size of the defamed group, though relevant, "is too narrow a focus to determine the issue of individual application in group defamation." *Id.* at 233. "An absolute limit on size is not justifiable. There is no compelling logic 'in allowing a greater number of wrongs to afford a lesser degree of liability.'" *Id.* at 234. *Brady* adopted instead a test to gauge the "intensity of suspicion" inflicted on the plaintiff. The court balanced the size of the defamed group with its "definiteness in number and composition," its "degree of organization," and "the prominence of the group and … of the individual within the group." *Id.* at 236; *see also id.* ("This list … is not meant to be exclusive.").

In *Brady*, 18 police officers had been indicted for various crimes. *Id.* at 227. A local newspaper said, "'It is inconceivable to us that so much misconduct could have taken place

without the guilty knowledge of the unindicted members of the department.'" *Id.* Several officers who had *not* been indicted sued. Although the newspaper identified none of the plaintiffs by name, the court applied its intensity of suspicion test to hold that they had defamation claims.

*Brady* noted that the group of unindicted officers was comparatively small, although it comprised "at least 53 individuals." *Id.* at 237. The group was smaller than the "600,000,000 Muslims" seeking to "recover damages for the airing of [a] film … insulting and defamatory to the Islamic religion" in *Mansour v. Fanning*, 506 F. Supp. 186, 187 (N.D. Cal. 1980), or 382 saleswomen held not to have actionable defamation claims in *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 316 (S.D.N.Y. 1952). 84 A.D. 2d at 230. Yet *Brady* noted that it was not appreciably larger than a group of 25 salesmen held to have viable claims in *Lait* and "not significant in terms of the public perception of the size of the group." *Id.* "Public perception of the size of the group is an important factor in focusing on the degree of suspicion attributed to individual members of the group irrespective of the actual size of the group." *Id.*[4]

*Brady* reasoned that the unindicted officers had a high degree of organization and did not depend on the defamatory statement to define the group. *Id.* at 238. Its composition was fixed and knowable at the time the statements were made. *Id.* at 239. These factors heightened the potential actionability of the defendant's editorial, as it was more likely a reader could link the defamatory statements with the individual plaintiffs. *Brady* noted that it was not possible on the record before it to assess the prominence of individual plaintiffs within the group but that the group was likely to be subject to heightened attention given the officers' prominence in their community and the seriousness of the criminality alleged. *Id.* at 239-40. The court concluded that

---

[4] *See also Elias*, 872 F.3d at 108 (applying *Brady* to hold defamation of fraternity with 53 members was individually actionable); *Fawcett Publ'ns v. Morris*, 377 P.2d 42, 51 (Okla. 1962) (plaintiff with "a significant team position" on a 60- to 70-man Oklahoma University football team could sue when team accused of "taking amphetamines").

the editorial targeting the unindicted officers was individually actionable. *Id.* at 240-41.

The intensity of suspicion analysis confirms the viability of the Safe Chain Parties' claim. Gilead's statement to the *Journal* undisputedly referred to the defendants in this case, then a group of approximately 75 defendants. *See generally* Second Am. Compl. [147]. That is comparable to the "60- to 70-man Oklahoma University football team" in *Fawcett*, which held that a prominent player on the team could sue for defamation.[5] *Brady*, 84 A.D. 2d at 235. The docket in this case defined the group clearly. Although the composition has evolved, as had the membership in *Brady*'s police department, any reader wondering who the members of Gilead's supposed "criminal enterprise" were merely needed to look at the public docket in this case (or flip the page of *The Wall Street Journal* to see Safe Chain identified by name).

Such an inquiry would quite reasonably have led a reader to conclude that the Safe Chain Parties were members or even leaders of the alleged "criminal enterprise." Safe Chain does not merely hold a "a significant team position," as did the football player in *Fawcett*. As the lead defendant and the only one whose name appears in the case caption, it has a unique prominence among the entities Gilead referenced. Moreover, unlike the defendants in *Fawcett* or *Brady*, Gilead chose to assign Safe Chain that place of prominence by naming it the lead defendant. Drawing all reasonable inferences in the Safe Chain Parties' favor, it is not merely plausible but probable that a reasonable reader would believe that Gilead's statement referred to them.

Gilead's argument that its statement was not "of and concerning" the Safe Chain Parties does not hold water. Gilead does not even mention group defamation in its brief. It notes only that the *Journal*'s references to Safe Chain did not come from Gilead's direct quote. Gilead Br. at 8-9. Yet that fact does not suggest no reasonable reader could conclude that Gilead was

---

[5] Many New York authorities cite *Fawcett* favorably in applying the intensity of suspicion analysis. *See, e.g.*, *Algarin v. Town of Wallkill*, 421 F.3d 137, 140 (2d Cir. 2005); *Brady*, 84 A.D.2d at 23.

referring to Safe Chain; Gilead does not say otherwise. In fact, Safe Chain's prominence in the article suggests that the immediate audience of Gilead's defamatory statement—the reporters themselves—*did* understand it to refer to Safe Chain and so wrote their article accordingly.

### B.  The Safe Chain Parties Are Not Criminals.

Gilead argues that even if it did defame the Safe Chain Parties as criminals, it is immune from liability because they are criminals. *Id.* at 9-10. On the contrary, Gilead has *accused* the Safe Chain Parties of trafficking counterfeit medication. They have denied those allegations. *See, e.g.*, Answer ¶¶ 218, 224-25, 291-92 [899]. They alleged the falsity of Gilead's defamatory statement even more explicitly. Countercl. ¶ 140 ("Safe Chain, Charles Boyd, and Patrick Boyd are not criminals, as Gilead knew when it defamed them as such to *The Wall Street Journal* and elsewhere."), ¶ 141 ("Neither Safe Chain nor the Boyds have ever been charged with any crime in connection with the facts that Gilead alleges in this case, as Gilead knew when it defamed them."). There has been no ruling on Gilead's claims, and it may not presume the truth of its own allegations to establish a defense for defamation. On the contrary, this Court must presume the truth of *Safe Chain's* allegations.

The Safe Chain Parties debunked Gilead's argument in their pre-motion letter. Safe Chain Premot. Ltr. at 2 [987] (addressing Gilead's mischaracterization of counterclaim paragraphs 7, 48, 51, 62, and 63). Gilead doubles down in its present brief, however. Gilead Br. at 10. It no longer references Paragraphs 48, 51, 62, and 63, but it again cites a scrivener's error in Paragraph 7—without acknowledging the Safe Chain Parties' prior explanation for the unintentionally omitted word "allegedly" in that paragraph—and now refers to Paragraphs 9, 83, and 84. *See id.* A scrivener's error should not be misconstrued as an admission of Gilead's core allegation against Safe Chain, much less of criminal culpability. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178 (1962) ("The Federal Rules reject the approach that pleading is a game of skill in which

13

one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").[6]

Nor do its other citations help Gilead. Paragraph 9 points out that when Safe Chain spoke with Gilead about potentially inauthentic drugs and even invited Gilead to visit its facilities, Gilead refused to share any information that would assist Safe Chain's investigation. Paragraphs 83 and 84 refer to Gilead's false suggestion in the e-Pharm/alert that the Safe Chain Parties had fabricated pedigree documentation, an accusation the Safe Chain Parties denied. The Safe Chain Parties do not admit to using inaccurate pedigrees—that is what Gilead has alleged and must prove—but rather that any inaccuracies Gilead claims to have identified were not their doing.

Absent its misrepresentations of the Safe Chain Parties' own pleading, Gilead does not even try to establish that the Safe Chain Parties are criminals. Nor could it do so on a motion to dismiss. Where, as here, the parties dispute the truth of a defamatory statement, "it is not appropriate, at the pleading stage, for the Court to decide the parties' competing factual claims." *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 356 (E.D.N.Y. 2008) (citing *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) ("Resolution of the falsity … inquir[y] typically requires discovery.")); *cf. Conklin v. Laxen*, 180 A.D. 3d 1358, 1361 (N.Y. App. Div. 2020) (submitting documentary evidence to establish truth of defamatory statement "'is an exacting standard, which is not easily met at the pre-answer stage'").

### C.     Other Defendants' Potential Criminality Does Not Excuse Gilead's Conduct.

Gilead argues alternatively that its defamatory statement is literally true as to *other* defendants, and so it cannot be culpable for enmeshing the Safe Chain Parties with the same accusation. *See* Gilead Br. at 6-8. Gilead has alleged the existence of a criminal enterprise by

---

[6] If this Court believes such scrivener's errors constitute admissions, the Safe Chain Parties respectfully request leave to amend their pleading to correct them.

14

*some* of the 75 defendants in this case at the time it violated this Court's Seal Order by speaking with *The Wall Street Journal*.

Courts consider whether a defamatory statement is "substantially true," *i.e.*, whether it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017). When dealing with group defamation, courts have indicated that the substantial truth of the matter may be gauged by the proportion of the group for whom it is true. *See, e.g.*, *Brady*, 84 A.D. 2d at 242. In short, Gilead cannot paint a whole group of defendants as criminals when only a couple are. The Safe Chain Parties understand that although some defendants in this case have been indicted or convicted for related offenses, that small proportion does not establish the substantial truth of Gilead's blanket statement.

Even if Gilead's blanket accusation of criminality among the defendants in this case is substantially true, it does not follow that Gilead did not defame the Safe Chain Parties. Gilead acknowledges that New York recognizes defamation by implication with true statements. Gilead Br. at 8. Plaintiffs in such cases must show "[1] that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and [2] to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co.*, 120 A.D. 3d 28, 37-38 (N.Y. App. Div. 2014). The Safe Chain Parties satisfy both elements.

It bears noting that the quote reprinted in the *Journal* is only part of a larger interview Gilead gave to the *Journal* in apparent violation of the Seal Order. The Safe Chain Parties and this Court currently do not know what else Gilead said in that interview beyond the single defamatory sentence the *Journal* republished. Yet this Court (and eventually a factfinder) must evaluate Gilead's statements "as a whole" to discern whether they "can be reasonably read both

15

to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 120 A.D. 3d at 37. Discovery into the full extent of Gilead's comments is likely to confirm what is already clear. It is natural to construe Gilead's blanket accusation of criminality to apply to the lead defendants. Gilead's immediate audience, the *Journal* reporters, certainly took it that way, writing an article that focused on Safe Chain to the exclusion of almost all other defendants. A reasonable audience also could conclude that Gilead endorsed that inference, as it assigned Safe Chain the place of dubious prominence by naming it the lead defendant and continues to insist that the Safe Chain Parties *are* criminals.

### D.    Gilead Cannot Justify its Other Defamatory Statements.

Gilead wrongly insists that "the Safe Chain Defendants allege only a single statement was defamatory" and Gilead totally ignores the other such statements. Gilead Br. at 6. There is no excuse for Gilead's mischaracterization, as the Safe Chain Parties clearly allege that its statement to the *Journal* was only part of "a campaign to smear Safe Chain in communications with [its] customers and potential customers." Countercl. ¶ 80. They also identified the March 16, 2021, e-Pharm/alert and its letters to Safe Chain's customers, including the May 19, 2021, Medicine Shoppe letter. *Id.* ¶¶ 81-93; *see also* discussion *supra*, Part I.A (discussing these statements). Gilead cannot credibly claim confusion on this point because the parties discussed the e-Pharm/alert and Medicine Shoppe letter as bases for the defamation claim explicitly at the premotion conference. Premot. Conf. Tr. at 4:8-12, 9:12-15 (Apr. 25, 2023). Gilead has thus waived any argument that these communications are not defamatory.[7]

Gilead may try to argue in its reply that the Safe Chain Parties have not adequately alleged those statements as part of their defamation claim because they are not referenced

---

[7] *See, e.g.*, *Matthew v. Tex. Comptroller of Pub. Accts.*, No. 21 CIV. 5337 (JPC), 2022 WL 4626511, at *7 n.5 (S.D.N.Y. Sept. 30, 2022) ("Defendants failed to raise this argument and so the Court considers it waived.").

explicitly under Count I. Yet the Safe Chain Parties incorporated by reference into Count I their preceding allegations, which include those detailing Gilead's other defamatory smears. Countercl. ¶ 156. Furthermore, it is well-established that a litigant only needs to plead the *facts* underlying a cause of action, not legal theories. *See, e.g.*, *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014); *Townsend v. Benjamin Enters.*, 679 F.3d 41, 57 (2d Cir. 2012) ("'The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.'"); *Cao v. Flushing Paris Wedding Ctr.*, No. 20CV2336RPKRLM, 2022 WL 219565, at *3 (E.D.N.Y. Jan. 25, 2022) (quoting *Marbury Mgmt. v. Kohn*, 629 F.2d 705, 712 n.4 (2d Cir. 1980) (plaintiffs "could survive a motion to dismiss despite failing to identify 'the legal theory or theories and statutory basis supporting [their] claim' if they gave 'full notice of the circumstances giving rise to' a cognizable claim")).

## III. Gilead Tortiously Interfered with the Safe Chain Parties' Business Relationships.

### A. Maryland Law Governs Safe Chain's Tortious Interference Claim.

Gilead incorrectly urges this Court to apply New York law to Safe Chain's tortious interference claim. It argues that New York's choice of law rules apply and that the Court need not do a choice of law analysis because there is "no meaningful difference" between the substantive laws of the relevant jurisdictions: Maryland and New York. *See* Gilead Br. at 5-6.[8] Yet some of Gilead's core arguments apply elements of New York law that Maryland does not require. It argues, for example, that Safe Chain fails to allege Gilead's knowledge of its business relationships, "a fundamental element of [a] tortious interference claim" in New York. Gilead Br. at 11. Maryland requires such knowledge when asserting tortious interference with *contract*, but

---

[8] Federal courts typically apply the forum state's choice of law rules even in federal question cases where, as here, the court is exercising supplemental jurisdiction over state law claims. *See, e.g.*, *Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 350 (S.D.N.Y. 2019). A federal choice of law analysis would reach the same result, however, as it also applies the law of the state with the greatest interest in the dispute, here Maryland.

not the "more general tort of interference with business relations." *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 731 (D. Md. 2017) (citing *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs.*, 650 A.2d 260, 268 (Md. 1994)); *accord Discovery Commc'ns v. Computer Scis. Corp.*, 570 F. App'x 306 (4th Cir. 2014).[9] That requires only: "'(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants … ; and (4) actual damage and loss.'" *Alexander*, 650 A.2d at 268-69.

In *Press v. United States*, No. CV JKB-17-1667, 2018 WL 2237492, at *1 (D. Md. May 16, 2018), for example, the defendant posted negative information about the plaintiff on "an 'electronic personnel database maintained by the Department of Defense … for the purpose of collecting reports touching on a person's ability to use and to handle classified information.'" The plaintiff did not allege that the defendant knew of his business relationships or that the posting was intended to interfere with specific relationships. The Court ruled, however, that the relevant question was, "Did … Defendants intend to target, and cause the destruction of, these *types* of business relationships," *i.e.*, did the defendant attempt generally to harm plaintiff's relationships with third parties who viewed plaintiff's status on the DOD database. *Id.* at *10

Given the existence of a conflict, this Court should apply Maryland law. New York (and federal) choice of law principles "'seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.'" *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006). In similar cases, New York courts have weighed where the defendant's conduct and the plaintiff's injury occurred and the policy interests of the relevant states. *Id.* None of these factors weighs towards New York.

---

[9] Gilead's case to the contrary, ironically, erroneously fails to list knowledge as an element of tortious interference under *New York* law. *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 703 (D. Md. 2011).

Gilead's principal place of business is California, but its conduct was broadcast nationally and targeted and injured the Safe Chain Parties in Maryland. *See* Countercl. ¶¶ 16-19; *Cintas*, 460 F.3d at 284 ("[T]he vast majority of the alleged harm occurred in New York (as [plaintiff] is a New York company headquartered in New York)."). Even the Safe Chain conduct Gilead targeted with its tortious interference (*i.e.*, Safe Chain's sale of Gilead-branded drugs) occurred primarily in and from Safe Chain's Maryland headquarters. Furthermore, "where an allegedly defamatory statement is published nationally,'" there is "a presumptive rule that the law of [the] plaintiff's domicile applies" unless "some other state has a more significant relationship to the issue or the parties." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 177 (2d Cir. 2021); *see also id.* at 178 ("Maryland has an interest in protecting its citizens from defamatory conduct."). Accordingly, Maryland has the greatest interest in the dispute. *See also Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 638 F. App'x 43, 47 (2d Cir. 2016) ("Applying New York choice of law …, where the solicited customer and the … plaintiff are both within a given state, that state has the greatest interest in regulating the behavior at issue, even if [it] originates in a different state.").[10] As the following discussion explains, however, the Safe Chain Parties' tortious interference claim would survive even under the New York law Gilead urges.

### B.     Safe Chain Pled Gilead's Wrongful Conduct and Tortious Intent.

#### 1.     Gilead Acted Wrongfully and Improperly.

"To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994). The Safe Chain Parties have shown both. They alleged

---

[10] Safe Chain did not plead the location of each customer whose relationship Gilead interfered with because it would have been improper to include facts relevant only to choice of law. *See, e.g.*, *Abbasid, Inc. v. Bank of Am., N.A.*, 463 F. App'x 317, 318 (5th Cir. 2012) ("[P]arties are not required to plead choice-of-law issues at the outset of a case."). If this Court believes that the choice of law question is dispositive of Gilead's motion, and it should postpone this determination until the close of discovery. *Speedmark Transp. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011).

that Gilead embarked on a campaign against the Safe Chain Parties, defaming them as part of a criminal enterprise, falsely maligning Safe Chain in statements to tens of thousands of customers and prospective customers, and writing individual letter to Safe Chain customers warning them against buying from independent wholesalers. *See* Countercl. ¶¶ 80-93, 119-39, 173-78.

As with unfair competition, "[w]hat is improper or wrongful conduct is incapable of precise definition." *Macklin*, 639 A.2d at 119; *see also* discussion *supra*, Part I.A. "[C]onduct that is quite subtle … can be improper or wrongful." *Macklin*, 639 A.2d at 119. Defamatory statements certainly are sufficient to sustain a tortious interference claim "regardless of whether those statements are specific enough to support a[n independent] claim for defamation." *Doe v. Johns Hopkins Health Sys.*, 274 F. Supp. 3d 355, 370 (D. Md. 2017); *see also Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 496 (D. Md. 2002). Making false statements or spreading rumors about a plaintiff also qualifies. *See, e.g.*, *Phreesia, Inc. v. Certify Global, Inc.*, No. DLB-21-678, 2022 WL 17342067, at *5 (D. Md. Nov. 29, 2022); *Master Int'l Co. v. Blackstone Int'l*, No. 12-cv-3758-JKB, 2013 WL 3147010, at *7 (D. Md. June 18, 2013).

Furthermore, Maryland courts have held that "ordinarily whether particular conduct is proper or improper is a factual question to be determined on the basis of all the facts and circumstances," making the question ill-suited to resolution on a motion to dismiss. *Macklin*, 639 A.2d at 119; *see also Command Tech. v. Lockheed Martin Corp.*, No. 0469, Sept. Term, 2014, 2015 WL 6470277, at *6 (Md. Ct. Spec. App. Oct. 27, 2015). Nevertheless, Gilead's conduct alleged by the Safe Chain Parties undoubtedly qualifies. Gilead says only its e-Pharm/alert and Medicine Shoppe letter "form the basis of their tortious interference claim," yet Safe Chain also alleged that Gilead sent similar letters to dozens if not hundreds of Safe Chain's other customers. Gilead Br. at 13; *accord* Countercl. ¶¶ 92-93. The Safe Chain Parties also alleged that Gilead's

20

defamatory statement to the *Journal* tortiously interfered with its customer relationships. *Id.* ¶ 175. Gilead waived any argument to the contrary by failing to raise it, and defamation is wrongful conduct as a matter of law.[11] *See, e.g.*, *Alexander*, 650 A.2d at 271.

The Safe Chain Parties also have identified multiple false and misleading statements in Gilead's e-Pharm/alert and its letter to Medicine Shoppe. *See* discussion *supra*, Part I.A (discussing wrongfulness of those statements). Misrepresenting Safe Chain's legal authority to distribute Gilead drugs, the legitimacy of drugs obtained through the secondary market, commitment to patient safety, and supposed role in fabricating drug pedigrees more than adequately support a tortious interference claim. *See, e.g.*, *Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 213 (S.D.N.Y. 2014) (noting "multiple cases making allowance for misrepresentations to satisfy the 'wrongful means' element"). At the least, the wrongfulness of Gilead's conduct is a question of fact not appropriate for resolution on a motion to dismiss.

### 2. Gilead Acted with Tortious Intent.

Gilead claims that its campaign against Safe Chain was motivated at least partly by an honest desire to protect patients and wrongly insists that it cannot be held accountable unless its "sole purpose" was to harm the Safe Chain Parties. Gilead Br. at 13. That argument is meritless.

First, Gilead relies exclusively on New York law for the proposition that the "sole purpose" of its conduct must have been to harm Safe Chain. *See id.* Maryland law does not require that harming the plaintiff be the defendant's *sole* purpose. *See, e.g.*, *Trimed*, 977 F.2d at 894 ("Maryland courts have never invoked a 'sole-purpose' requirement.").[12] To be sure,

---

[11] *See, e.g.*, *Matthew*, 2022 WL 4626511, at *7 n.5; *Jones v. Albany Cnty. Civ. Serv. Comm'n*, 985 F. Supp. 280, 282 (N.D.N.Y. 1997) ("A district court may not dismiss an action for failure to state a claim based upon grounds not raised by the parties.")). Gilead may argue it has not waived because it addressed defamation in the defamation section of its brief, but because its defamatory comments can sustain a tortious interference claim even if they do not rise to the level of defamation, Gilead's lack of argument that its comments to the *Journal* does not support tortious interference is a waiver. *See Johns Hopkins Health Sys.*, 274 F. Supp. 3d at 370.

[12] Even Gilead's New York cases require no such showing, only that the defendant acted "'*either* with the sole

Maryland courts have held that malicious intent "may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference." *Alexander*, 650 A.2d at 271. Yet where, as here, the plaintiff has alleged independently wrongful acts, the existence of both legitimate and tortious aims cannot immunize the defendant's conduct.

As with wrongful conduct, the question of the defendant's intent is a fact-specific inquiry ill-suited to resolution on a motion to dismiss. *See, e.g.*, *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 314 (Md. Ct. Spec. App. 1995). The Safe Chain Parties have alleged more than sufficient facts to establish Gilead's tortious intent. They alleged that Gilead's actions were part of a concerted campaign to drive them from the market. Countercl. ¶ 80. They also alleged that Gilead used pedigrees provided in good faith to target Safe Chain's customers with letters wrongly saying that the mere fact products were coming from secondary wholesalers like Safe Chain "should raise an immediate red flag regarding the product's legitimacy." *Id.* ¶ 88.

Other allegations further illuminate Gilead's improper motives. The Safe Chain Parties quoted correspondence in which Gilead explicitly "'demand[ed]'" they stop selling Gilead drugs. *Id.* ¶ 65. They also alleged that Gilead refused Safe Chain's offer to inspect its facilities. *Id.* ¶¶ 71, 75. A party genuinely interested in patient safety presumably would not have refused such an offer. Gilead also apparently violated this Court's Seal Order in its haste to defame Safe Chain to the *Journal*, a fact Gilead has failed to deny and that the Safe Chain Parties allege was calculated to cause them "maximum harm." *Id.* ¶¶ 125, 127. In short, it is more than plausible on the facts pled that Gilead had a tortious intent and took its wrongful actions to serve its "demand that Safe Chain cease transacting in Gilead-branded medicine" one way or another. *Id.* ¶ 65.

---

purpose of harming the [plaintiff] *or* by [wrongful] means.'" *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196 (S.D.N.Y. 2011) (emphasis in original).

**C.      Safe Chain Adequately Alleged Its Business Relationships.**

Gilead does not deny that its campaign against Safe Chain harmed the company's business. It argues merely that the Safe Chain Parties have not adequately alleged either (1) the specific business relationships with which Gilead interfered; or (2) that Gilead *knew* about those relationships. Gilead Br. at 11-13. Both arguments are baseless.

**1.      Safe Chain Pled Multiple Relationships in Which Gilead Interfered.**

Gilead relies on New York case law to argue that the Safe Chain Parties have not adequately pled the business relationships with which Gilead interfered. Gilead Br. at 12. Maryland courts have held that although a plaintiff must allege more than interference with its livelihood in general, "[n]one of the[] elements [of tortious interference with prospective business relations] dictate that a plaintiff must allege specific, concrete prospective business relationships that were harmed in order to state a claim." *Press v. United States*, No. JKB-17-1667, 2018 WL 2237492, at *8 (D. Md. May 16, 2018). A plaintiff need only "'identify a possible future relationship which [was] likely to occur.'" *Id.*

The Safe Chain Parties have more than satisfied that requirement. They pled that 10 Safe Chain customers have both refused to do further business with the company and to pay approximately $339,887.82 in prior debts for Gilead and non-Gilead products due to Gilead's misinformation campaign. Countercl. ¶ 147. They pled that between 2021 and 2022, Safe Chain lost approximately 987 customers representing more than $37 million in annual revenue and approximately $1,462,615.97 in annual profits. *Id.* ¶ 148. Gilead itself undoubtedly knows the names of many of these customers, as it deliberately targeted many of them with letters, of which the Medicine Shoppe letter is but one example.[13] *See id.* ¶¶ 92-93.

---

[13] The Safe Chain Parties can identify these companies in discovery, but if this Court believes their pleading must identify all 987 lost customers by name, the Safe Chain Parties respectfully request leave to amend it accordingly.

Any failure to allege every relevant relationship by name goes only to the extent of Gilead's tortious interference, not its viability.[14] Gilead concedes that the Safe Chain Parties identified several specific prospective business relationships they were unable to consummate due to Gilead's interference, including prospective customers the University of Maryland Medical System ("UMMS") and the Stronghold Group ("Stronghold"), as well as Federal Resources, an existing customer that introduced them to Stronghold. *See id.* ¶¶ 144-46, 178.

Gilead argues that "Safe Chain never had an articulable relationship with" UMMS or Stronghold. Gilead Br. at 13. On the contrary, the Safe Chain Parties alleged that Safe Chain and UMMS had "anticipated working together on multiple product lines" and "were in serious discussions about other products with potential profits in the millions of dollars." Countercl. ¶ 146. Safe Chain also alleged discussions with Stronghold "for an opportunity to fill orders exceeding $10 million." *Id.* ¶ 144. Gilead likewise fails to mention Federal Resources, an *existing* customer with which Safe Chain had an established relationship. *Id.* ¶¶ 144, 178.

The court in *Press* held that similar allegations were more than adequate. A factfinder could assess whether defendants "intend to target … these types of business relationships, or even these specific … relationships." 2018 WL 2237492 at *9. The court rejected the same argument Gilead makes: that the pleading was mere "'wishful thinking' regarding what contracts [plaintiff] may have won." *Id.* The court concluded that arguments about whether the plaintiff would have consummated the prospective relationships or whether they would have been profitable go merely to damages and did not undermine the sufficiency of the claim on a motion

---

[14] The number of relationships Gilead interfered with can be developed in discovery and is relevant only to damages. Courts reject attempts to "dismiss" a category or quantum of relief at the pleading stage as improper. *See, e.g.*, *City of N.Y. v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought."); *Amusement Indus. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) ("A motion to dismiss is addressed to a 'claim'—not to a form of damages.").

to dismiss. *Id.* Indeed, the court noted that the lack of further pleading specificity was largely the fault of the defendants themselves, as the plaintiff alleged that "these relationships were 'made hypothetical by the very wrong of the defendant.'" *Id.* (quoting *Baron*, 471 F. Supp. 2d at 546).

### 2. Maryland Law Does not Require Gilead's Knowledge of Safe Chain's Business Relationships, but Safe Chain has Pled It Regardless.

Gilead's argument that it was not aware of Safe Chain's business relationships is frivolous. As an initial matter, Gilead relies solely on New York law to argue that such knowledge is required, which the foregoing discussion has shown is not required in Maryland. Gilead Br. at 11; *see also* discussion *supra*, Part III.A. Maryland requires only "intent to engage in bad behavior aimed at harming a competitor," which Gilead did by making false, defamatory statements about Safe Chain in national publications and targeted letters to Safe Chain's customers. *Hyperheal Hyperbarics, Inc. v. Shapiro*, 404 F. Supp. 3d 953, 969 (D. Md. 2019).

In any event, Gilead *did* know about many of Safe Chain's business relationships. The Safe Chain Parties gave Gilead hundreds of pedigrees in early 2021 identifying the pharmacies to which they sold Gilead drugs. Countercl. ¶¶ 59, 88-90. "Armed with [that] information …, Gilead sent … letters [like the Medicine Shoppe letter] to every Safe Chain customer it could locate." *Id.* ¶ 93. Gilead cannot reconcile its attempt to justify the Medicine Shoppe letter with its claim that it did not know the identity of Safe Chain's customers. That the Safe Chain Parties cannot yet identify *every* letter Gilead sent and every customer relationship it damaged does not warrant dismissal. Rule 8 "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of a defendant's culpability. *Twombly*, 550 U.S. at 545. That is particularly so where the allegedly "missing" facts are uniquely within the defendant's control.

### CONCLUSION

For the foregoing reasons, this Court should deny Gilead's motion in its entirety.

Dated: September 1, 2023

Respectfully submitted,

*/s/ August J. Matteis, Jr.*

August J. Matteis, Jr.
William E. Copley
Matthew S. Krauss
William E. Jacobs
Weisbrod Matteis & Copley PLLC
1200 New Hampshire Ave. NW, 4th Floor
Washington, DC 20036
T:      202-499-7900
F:      202-478-1795
E:      amatteis@wmclaw.com
          wcopley@wmclaw.com
          mkrauss@wmclaw.com
          wjacobs@wmclaw.com

*Attorneys for Safe Chain Solutions, LLC,*
*Charles Boyd, and Patrick Boyd*