UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
GILEAD SCIENCES, INC., GILEAD SCIENCES
IRELAND UC, and GILEAD SCIENCES LLC,   **MEMORANDUM &**
    **OPINION**
                        Plaintiffs,
                                               21-CV-4106
         -against-                             (Donnelly, J.)
                                               (Marutollo, M.J.)
SAFE CHAIN SOLUTIONS LLC, *et al.*,

                        Defendants.
----------------------------------------------------------------------x

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

Defendants Safe Chain Solutions, LLC, Charles Boyd, and Patrick Boyd (collectively, "Safe Chain") request that the Court enter an order compelling Plaintiffs Gilead Sciences, LLC, Gilead Sciences Ireland UC, and Gilead Sciences LLC (collectively, "Gilead") to respond to interrogatories and document requests and also produce witnesses for depositions in connection with a purported wide-ranging scheme alleged by Gilead in the matter styled *Gilead Sciences, Inc. v. AJC Medical Group, Inc.*, No. 1:20-cv-24523 (S.D. Fla.) (Cannon, J.) ("the Florida Scheme"). *See* Dkt. Nos. 1225, 1235 (collectively, "Safe Chain's Motion to Compel"). For the reasons stated below, Safe Chain's Motion to Compel is **GRANTED IN PART** and **DENIED IN PART**.

## Relevant Procedural Background

Safe Chain's Motion to Compel was filed, pursuant to the undersigned's Individual Practices and Rules, as part of a joint submission by the parties on November 28, 2023 addressing a discovery dispute. *See* Dkt. No. 1225 (setting forth the positions of Safe Chain and Gilead).

On December 1, 2023, during a hearing on a number of discovery-related issues, the Court deferred ruling on Safe Chain's Motion to Compel. *See* Order, dated December 1, 2023; *see also* Dkt. No. 1236. The Court ordered Safe Chain to file a supplemental letter by December 4, 2023

clarifying its position as to why discovery should be granted related to the Florida Scheme. *See* Order, dated December 1, 2023. The Court also ordered Gilead to file a response by December 6, 2023. *See id.*

Safe Chain supplemented the Motion to Compel with a separate letter, with attachments, filed on December 4, 2023. *See* Dkt. No. 1235. Gilead responded with its own letter, plus attachments, filed on December 6, 2023. *See* Dkt. No. 1238.

## Relevant Factual Background

This action arises out of an alleged HIV drug counterfeiting ring involving three groups of participants: suppliers, distributors, and pharmacies. *See* Memorandum Decision and Order, Dkt. No. 781 at 2; *see also* Sixth Amended Complaint, Dkt. No. 1056 ¶¶ 209-19. Gilead alleges that distributor defendants—including Safe Chain, a pharmaceutical distributor—sold Gilead-branded bottles repurposed with non-Gilead drugs, such as anti-psychotic medication, that do not treat HIV. *Id.* Gilead also alleges that defendants—including Safe Chain—sold thousands of Gilead-branded bottles with the correct Gilead medication but accompanied by fake government-required forms called "pedigrees." Dkt. No. ¶¶ 226-33.

Safe Chain contends that "it bought approximately 30,000 bottles of Gilead-branded medication from what appeared to be other licensed wholesalers between May 2020 and July 2021." Dkt. No. 1235. Safe Chain then "sold those bottles to various retail pharmacies." *Id.* Gilead contends that Safe Chain's suppliers were "shady, fly-by-night counterfeiters." Dkt. No. 1056 at ¶ 422. Gilead seeks, *inter alia*, injunctive and monetary relief against all Defendants, including Safe Chain, for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of

2

the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; common-law unjust enrichment and unfair competition; engaging in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c); and conspiracy to engage in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(d). *Id.* at ¶ 12.

Safe Chain intends to "mount[] a vigorous defense" against Gilead's allegations. Dkt. No. 1235. Specifically, Safe Chain contends that Gilead fails "to allege plausibly how thirty thousand [Gilead-branded] bottles ended up in the secondary market." Dkt. No. 1225. While Gilead identifies "street-level buyback operations" that purportedly purchased Gilead drugs from "vulnerable patients" (Dkt. No. 1056 at ¶ 222), Safe Chain contends that the source of many of the Gilead-branded bottles that Safe Chain purchased stems from the Florida Scheme—to wit, a "2019-2020 Florida conspiracy involving dozens of healthcare clinics, pharmacies, doctors, and others" that created "fake patient farms to harvest Gilead drugs illegally from Gilead's Medication Assistance Program ('MAP') and Patient Assistance Program ('PAP')." Dkt. No. 1235. According to Safe Chain, *Gilead itself* raised the Florida Scheme in its First Amended Complaint ("FAC") in *Gilead Sciences, Inc. v. AJC Medical Group, Inc.*, No. 1:20-cv-24523 (S.D. Fla.). *See* Dkt. 1225; Dkt. 1235.

Safe Chain notes that in Gilead's Southern District of Florida litigation, Gilead alleged that the Florida Scheme involved "twelve health clinics, two pharmacies, three testing laboratories, twelve doctors and other prescribers, and numerous other defendants." Dkt. No. 1225 (citing FAC ¶¶ 73, 117). These individuals and entities "recruited eligible individuals to enroll in Gilead's MAP and PAP programs and procured approximately 9,400 suspicious PAP and MAP enrollment cards." Dkt. No. 1225 (citing FAC ¶¶ 336-38). These individuals and entities then "caused fake

3

patients to use those enrollment cards repeatedly to procure Gilead drugs, sometimes even multiple times in the same month," for the purpose of "reselling them to others on the black market." Dkt. No. 1225 (citing FAC ¶¶ 187-93, 246).

Safe Chain argues that "[t]he nature, timing, and scope of the Florida [S]cheme strongly suggests that it is the source of the large quantity of Gilead products at issue in this case." Dkt. 1225. Safe Chain contends that these are the "same drugs that are at issue" in the present litigation in the Eastern District of New York. *See* Dkt. No. 1225.

While Gilead argues that the drugs at issue in the Florida Scheme and in the present case are not linked, Safe Chain notes that, when responding to a Request for Admission about the Florida Scheme, Gilead "could not admit *or deny* such a link." Dkt. No. 1235 at Exhibit C (emphasis in original). Indeed, in its response, Gilead states, *inter alia*, that "after making a reasonable inquiry, Gilead *does not have a basis to truthfully admit or deny* whether some of the counterfeit Gilead-branded medications purchased and sold by the Safe Chain Defendants bore the same lot numbers as the authentic bottles of TRUVADA® and/or DESCOVY® that were lawfully purchased from Gilead's authorized distributors by some of the defendants in the *AJC Medical* case, because in its ordinary course of business, Gilead does not track lot numbers after the first sale of its medicines to one of its authorized distributors." *See* Dkt. No. 1235 at Exhibit C, RFA 18, dated November 9, 2023 (emphasis added).

Safe Chain adds that, "[e]ven if there is no overlap between the bottles harvested [in the Florida Scheme] and the ones Safe Chain sold, Gilead's admitted failure to seek pedigrees in Florida is relevant to showing that its purported reliance on pedigrees as part of its quality control process is pretextual." Dkt. No. 1235. Safe Chain explains that, "[t]o establish Lanham Act liability for Safe Chain's sales of genuine Gilead products, Gilead must overcome the First Sale

4

Doctrine, which provides that a trademark holder's exclusive right to distribute a product that bears its mark is exhausted by the first sale." Dkt. No. 1235 (citing *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992), as amended (Nov. 25, 1992)). As Safe Chain recognizes, "[t]he Second Circuit has held that even a single mistaken failure to follow a quality control process is sufficient to bar a plaintiff from relying on the quality control exception. *See Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 80 (2d Cir. 1994). Safe Chain argues that it is therefore "entitled to take discovery to show how Gilead's admitted failure to seek pedigrees in Florida bars its reliance upon pedigrees to establish a Quality Control Exception to the First Sale Doctrine"—which is an issue that would be further addressed at summary judgment. Dkt. No. 1235.

Further, Safe Chain argues that "[t]o the extent Gilead uncovered the Florida [Scheme] but did nothing for months to protect the public—or legally authorized wholesalers like Safe Chain—from the resale of the harvested drugs, Safe Chain is entitled to argue that unclean hands bar [Gilead's] claims." Dkt. No. 1235.

Gilead vehemently opposes Safe Chain's discovery requests related to the Florida Scheme, arguing that this "eleventh-hour" "fishing expedition" is wholly irrelevant. Dkt. No. 1238. While Gilead "agrees that the 30,000-plus counterfeits that Safe Chain sold are what are at issue in this litigation," Gilead explains that it had previously agreed to produce Fed. R. Civ. P. 30(b)(6) witnesses and has already produced "over 50,000 pages of documents" in response to Safe Chain's document requests—many of which were directed toward Gilead's investigation of the "origins of the Counterfeits Safe Chain sold." *Id.*

Per Gilead, the Florida Scheme is "unrelated to Safe Chain's counterfeiting and irrelevant to this case." Dkt. No. 1238. Gilead explains that "Safe Chain has not issued a single document request, interrogatory, RFA, or deposition notice to any of its co-defendants, including its own

5

upstream suppliers who necessarily know where the counterfeits came from." *Id.* at 2 (emphasis in original). Next, Gilead rejects the merits of Safe Chain's contemplated "unclean hands" and "First Sale" arguments as "frivolous" and "meritless." *Id.* Finally, Gilead notes that the discovery demanded by Safe Chain is unduly broad and burdensome. *Id.* at 5.

### **The Discovery Requests at Issue**

Since first raising the motion to compel, Safe Chain has amended the discovery requests at issue related to the Florida Scheme. As set forth in its most recent submission, Safe Chain's discovery requests seek to address four topics:

> (1) Whether there is an overlap between the bottles of drugs obtained by the Florida conspirators and those ultimately sold to Safe Chain;
> (2) Whether Gilead knew that drugs from the [Florida Scheme] were being resold illegally into the black market before Safe Chain made its purchases of Gilead drugs;
> (3) That Gilead did not recall the lot numbers of drugs involved in the [Florida Scheme] or otherwise alert wholesalers in the secondary market to the potential influx of black-market medication obtained by the Florida conspirators; and
> (4) Whether Gilead's now admitted failure to seek pedigrees regarding the [Florida Scheme]—despite that conspiracy's aim to harvest Gilead drugs for the purpose of "reselling them to others on the black market" (Florida FAC ¶ 246)—undermines its argument that pedigrees are an important part of its quality control process.

Dkt. No. 1235. Given these topics, Safe Chain requests that the Court compel Gilead to respond to Interrogatory No. 18, which questions "overlap in the lot numbers of the bottles obtained by the Florida conspirators and those purchased by Safe Chain"; and multiple requests for documents "about Gilead's investigation and response to the Florida conspirators' harvesting ([Document Request Nos.] 103, 119-122); the volume of drugs the conspiracy obtained ([Document Request Nos.] 111-114); any overlap between those drugs and the ones Safe Chain bought ([Document Request No.] 118)." Dkt. No. 1235. Safe Chain also requests "[d]eposition testimony from two

6

Gilead employees who testified in the Florida litigation—John Devitto and Donna Quan—and a Gilead [Fed. R. Civ. P.] 30(b)(6) representative on related topics."[1]

## Discussion

Fed. R. Civ. P. 26 permits discovery of information relevant to the claims and defenses and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Fed. R. Civ. P. 26 sets forth the parameters for reviewing proportionality, namely "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendments ("The present amendment restores the proportionality factors to their original place in defining the scope of discovery."); *Huayuan Chen v. Stony Brook Univ.*, No. 15-CV-6698, 2018 WL 1368031, at *5 (E.D.N.Y. Mar. 16, 2018) (Shields, M.J.).

Information "is relevant if: '(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016) (Pittman, M.J.) (quoting Fed. R. Evid. 401). "As Rule 26 itself states, '[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable.'" *Morant v. City of New Haven*, No. 3:22-CV-630 (CSH), 2023 WL 4247610, at *7 (D. Conn. June 28, 2023) (citing Fed. R. Civ. P. 26(b)(1)); *see also Barrett v. City of New York*, 237 F.R.D. 39, 40 (E.D.N.Y. 2006) (Matsumoto, J.) (noting that the information sought "need not be admissible at trial to be discoverable").

---

[1] The Court notes that Safe Chain identifies the Fed. R. Civ. P. 30(b)(6) topics relevant to its Motion to Compel as Topics 8h-8j, Topics 18-20, and Topics 46-50. *See* Dkt. No. 1235 at n.3.

"[P]ermissible discovery under Rule 26 must be relevant "to any party's claim or defense," and that means "proportional to the needs of the case." *White v. Cnty. of Suffolk*, No. 20-CV-1501, 2022 WL 1154839, at *2-3 (E.D.N.Y. Apr. 19, 2022) (Wicks, M.J.) ((citing Fed. R. Civ. P. 26(b)(1)). Proportionality goes "hand-in-hand" with relevance. *New Falls Corp. v. Soni*, 16-CV-6805, 2020 WL 2836787, at *2 (E.D.N.Y. May 29, 2020) (Tomlinson, M.J.). "That is, the more relevant the information sought is, the less likely a Court would find the subject discovery disproportionate." *White*, 2022 WL 1154839, at *2.

"The burden of demonstrating relevance is on the party seeking discovery." *Cohen v. City of New York*, No. 05 Civ. 6780 (RJS) (JCF), 2010 WL 1837782, at *2 (S.D.N.Y. May 6, 2010). "Motions to compel are left to the court's sound discretion." *Osdoby v. Handi-Foil Corp.*, No. 22-CV-4199, 2023 WL 8358109, at *2 (E.D.N.Y. Dec. 1, 2023) (Wicks, M.J.) (citations omitted); *see also Liberty Mut. Ins. Co. v. Kohler Co.,* No. 08-CV-867, 2010 WL 1930270, at *2 (E.D.N.Y. May 11, 2010) (Tomlinson, M.J.) ("[A] motion to compel is entrusted to the sound discretion of the district court.").

And "while the scope of discovery is 'broad,' it is not 'limitless.'" *Holloway v. City of New York*, No. 21-CV-3858, 2023 WL 6614599, at *8 (E.D.N.Y. Sept. 28, 2023) (Pollak, M.J.). "The party seeking discovery must show that it is not engaging in merely a fishing expedition." *Id.* (citations omitted).

Here, after balancing the parties' arguments and interests, the Court is convinced that Safe Chain has met its burden of demonstrating the potential relevance of some—but not all—of the discovery requested. Safe Chain has made a sufficient showing that the four topics described above fit within Rule 26(b)(1)'s broad definition of relevance and proportionate to the needs of the case.

8

As an initial matter, the Florida Scheme is relevant to the present litigation. Gilead (not Safe Chain) first raised the Florida Scheme in the FAC in the Southern District of Florida litigation. Gilead argued that the Florida Scheme involved twelve health clinics, two pharmacies, three testing laboratories, twelve doctors and other prescribers, and numerous other defendants that were purportedly engaged in a conspiracy to sell drugs on the black market. FAC ¶¶ 73, 117, 187-93, 246). The Court agrees with Safe Chain that the "circumstances, nature, and timing" of the Florida Scheme are, at bottom, relevant to Safe Chain's defense and in potentially determining the "source of the large quantity of Gilead products at issue in this case." Dkt. 1225. Indeed, the Court is inclined to agree with Safe Chain that this issue may be "critical" to Safe Chain's defense. Dkt. No. 1236 at 38.

Significantly, even though Gilead had the opportunity to unequivocally deny whether the "same drugs that are at issue" in the Florida Scheme are the same as the drugs at issue in the present litigation in the Eastern District of New York, Gilead chose not to do so. *See* Dkt. No. 1225 at Exhibit C. Instead, in response to the pertinent Request for Admission, Gilead stated that it did "not have a basis to truthfully admit or deny whether some of the counterfeit Gilead-branded medications purchased and sold by the Safe Chain Defendants bore the same lot numbers as the authentic bottles of TRUVADA® and/or DESCOVY® that were lawfully purchased from Gilead's authorized distributors by some of the defendants in the *AJC Medical* case, because in its ordinary course of business, Gilead does not track lot numbers after the first sale of its medicines to one of its authorized distributors." *See* Dkt. No. 1235 at Exhibit C, RFA 18, dated November 9, 2023. While the Court makes no determination as to the merits of Gilead's response, such a response certainly raises questions that support Safe Chain's request to seek additional discovery related to the Florida Scheme.

And even if the district judge ultimately determines that there is no overlap between the Florida Scheme and the drugs sold by Safe Chain, the undersigned will also not deny Safe Chain discovery that is reasonably necessary to bring or oppose a motion for summary judgment. *Cf. Sahu v. Union Carbide Corp.*, 262 F.R.D. 308, 314 (S.D.N.Y. 2009) ("The Court will also not deny Plaintiffs discovery necessary to resist the motion for summary judgment[.]). Safe Chain argues that Gilead's admitted failure to seek pedigrees in Florida is relevant to showing that its purported reliance on pedigrees as part of its quality control process is pretextual. Dkt. No. 1235. Limited discovery on this topic is relevant and proportionate to the needs of the case, especially given the Lanham Act claims raised by Gilead. Similarly, there is no basis to preclude Safe Chain from seeking discovery on its alleged "unclean hands" argument given the relevance of the underlying issues of the case.

Accordingly, the Court will permit additional discovery into the Florida Scheme.

First, the Court orders Gilead to respond to Safe Chain's Interrogatory No. 18, which relates to the overlap in the lot numbers of the bottles obtained in the Florida Scheme and those purchased by Safe Chain. *See* Dkt. No. 1225-1.

Next, the Court orders Gilead to respond and, where applicable, produce documents to Safe Chain's Document Requests, specifically: (a) Document Requests Nos. 111-114, which address the volume of drugs related to the Florida Scheme; (b) Document Request No. 118, which addresses any overlap between the drugs related to the Florida Scheme and the drugs purchased by Safe Chain; and (c) Document Request Nos. 119-122, which address monthly prescriptions and reimbursements related to the Florida Scheme. *See* Dkt. No. 1225-1.

The Court denies Safe Chain's motion to compel Gilead to respond to Safe Chain's Document Request No. 103 (Dkt. No. 1225-1). This request seeks "all Documents concerning or

referring to [Gilead's] actions in response to instances of fraudulent dispensing of and/or reimbursement of Gilead Drugs in the United States from 2020 through the present, including through Medicaid and/or Gilead's Advancing Access Patient Assistance Program or Medication Assistance Program." *Id.* This request is among other things, overbroad, unduly burdensome, and not proportional to the needs of the case, especially as it seeks a host of documents that have no relevance or bearing on the present litigation.

Finally, with respect to depositions, Safe Chain shall be permitted to conduct a Fed. R. Civ. P. 30(b)(6) deposition related to the Florida Scheme. Gilead is ordered to produce one (or, should Gilead so decide, more than one) person sufficiently knowledgeable to discuss the Fed. R. Civ. P. 30(b)(6) topics set forth in Safe Chain's December 4, 2023 letter, to wit: "how Gilead responded to the diversion of drugs from its MAP and PAP programs (topics 8h-8j); the fraudulent dispensing and reimbursement requests in MAP and PAP (topics 18-20); the types and lot numbers of drugs harvested by the Florida Conspirators (topic 46); overlapping lot numbers (topic 47); how the drugs reentered and traveled through the stream of commerce (topic 48); whether Gilead considered issuing a recall (topic 49); and Gilead's investigation on the reentry of drugs improperly diverted from MAP and PAP (topic 50)." Dkt. No. 1235.

The Court denies Safe Chain's request to elicit deposition testimony from John Devitto and Donna Quan. Neither of Safe Chain's submissions delineate the type of information sought from those two individuals or why their testimony would be relevant. Safe Chain merely characterizes Ms. Quan and Mr. Devitto as "two Gilead employees who testified in the Florida litigation." *See* Dkt. No. 1235 at n.3. These descriptions are insufficient to warrant their depositions. Safe Chain has simply not articulated a basis as to why it should be allowed to depose the two Gilead employees. The Court thus denies Safe Chain's request as to deposing Ms. Quan and Mr. Devitto.

11

**Conclusion**

Therefore, for the reasons set forth above, it is hereby **ORDERED** that Safe Chain's Motion to Compel is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the fact discovery deadline shall be extended from December 29, 2023 to January 31, 2024 for the limited purpose of permitting the discovery described above related to the Florida Scheme. The deadline for all other discovery shall remain December 29, 2023.[2]

**SO ORDERED.**

Dated: Brooklyn, New York
December 9, 2023

                                                                                                                              */s/ Joseph A. Marutollo*
                                                                                                                              JOSEPH A. MARUTOLLO
                                                                                                                              United States Magistrate Judge

---

[2] During the December 1, 2023 conference, the parties agreed that certain depositions may, on consent of the parties, be re-scheduled to early January 2024 due to scheduling conflicts during the holidays. *See* Dkt. No. 1236 at 51-53. As noted at the December 1, 2023 conference, the Court is amenable to the parties addressing any deposition scheduling issues without court intervention.