

Weisbrod Matteis & Copley PLLC
1200 New Hampshire Avenue, NW
Fourth Floor
Washington, DC 20036

202 499 7900

www.wmclaw.com

William E. Jacobs
Direct Dial: (202) 888-1666
wjacobs@wmclaw.com

January 2, 2023

**By ECF**

Hon. Joseph A. Marutollo
U.S. District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *Gilead Sciences, Inc., et al. v. Safe Chain Solutions, LLC, et al.,* **No. 21cv4106.**

Dear Judge Marutollo:

Safe Chain Solutions, LLC, Charles Boyd, and Patrick Boyd ("Safe Chain") respectfully move to extend the fact discovery deadline for the limited purpose of allowing Safe Chain (or other defendants) to take discovery related to some of Plaintiffs' ("Gilead") late-disclosed witnesses.

**I.     Safe Chain's Argument**

**A.     Gilead Disclosed Many New Witnesses at the Eleventh Hour.**

Gilead served its Rule 26 disclosures (**Ex. A**) on October 29, 2021, naming four Gilead workers, two employees of Gilead-authorized distributors, and defendants in the Second Amended Complaint as "likely to have discoverable information … that [Gilead] may use to support its claims." FRCP 26(1)(A)(i). Surprised that Gilead had not supplemented its disclosures after two years of discovery, Safe Chain asked Gilead on September 29, 2023, if it intended to do so. Jacobs email to Potter (Sept. 29, 2023, 11:38 EDT) (**Ex. B** at 1-2). Gilead did not respond.

Safe Chain then attempted to depose Luis Vazquez and Bruce Gundy, the employees of Gilead-authorized distributors Cesar Castillo LLC and AmerisourceBergen Corp. ("ABC") listed in Gilead's disclosures. Safe Chain's subpoenas were returned unexecuted because Messrs. Vazquez and Gundy had retired. Safe Chain asked Gilead if it still intended to use them to support its claims. Jacobs email to Potter (Oct. 26, 2023, 15:04 EDT) (**Ex. B** at 1). Gilead's counsel said on November 1 that Gilead might rely on current employees of Cesar Castillo and ABC and would amend its disclosures once it decided. Safe Chain asked Gilead on November 7 either to provide updated contact information for Messrs. Vazquez and Gundy or to identify alternate witnesses at Cesar Castillo and ABC so "we may promptly serve them with deposition subpoenas." Jacobs email to Soussou (Nov. 7, 2023, 12:22 EST) (**Ex. C** at 4). Gilead said it would "provide updated contacts, addresses, and telephone numbers for Bruce Gundy and Luis Vazquez, or their appropriate replacements as soon as we can." Soussou email to Jacobs (Nov. 8, 2023, 18:11 EST) (**Ex. C** at 3). Safe Chain noted the next week that "[t]here are now just over

Honorable Joseph A. Marutollo
January 2, 2024, Page 2

six weeks left in discovery (including the weeks of Thanksgiving and Christmas)" and that Gilead's delay was prejudicing Safe Chain's ability to take discovery from any late-disclosed witnesses. Jacobs email to G. Soussou (Nov. 13, 2023, 16:14 EST) (**Ex. C** at 1).

Gilead told Safe Chain on November 17 that it would *not* rely on Messrs. Vazquez or Gundy and suggested that it would identify Michael Cummins at ABC but had not identified a new witness from Cesar Castillo. Gilead said its forthcoming amended disclosures would provide names and contact information for both new witnesses and said that Gilead's amended disclosures would not contain other new witnesses other than defendants named since its initial disclosures.

Gilead served its First Amended Initial Disclosures (**Ex. D**) at 8:05 p.m. on December 15, with two weeks left in fact discovery (including Christmas week). In addition to new Cesar Castillo and ABC witnesses, Gilead also disclosed (a) 1 new Gilead employee; (b) 6 new Gilead-authorized distributors; (c) 84 parties, all of whom have been in this case since at least May 3; (d) 21 other nonparties; (e) 7 common carriers; and (f) more than 100 financial institutions.

### B.  Safe Chain Needs Time to Subpoena Gilead's Late-Disclosed Witnesses.

A party may not delay disclosing witnesses it may use to support it claims "until a time when their adversary could not, consistent with the discovery schedule, seek discovery from them." *JTH Tax, Inc. v. Liberty Tax & Bus. Servs., Corp.*, No. CV 05-1290 CPS JO, 2006 WL 2516473, at *3 (E.D.N.Y. Aug. 29, 2006).[1] Gilead's belated disclosure effectively deprives Safe Chain of the opportunity to take discovery related to, and depose, these witnesses.

Gilead argued in conferral that the newly disclosed witnesses "are not 'new' and should not come as a surprise" because their existence "ha[s] long been known to" Safe Chain. Kurland email to Jacobs (Dec. 18, 2023, 16:43 EST) (**Ex. E**). That is not the disclosure threshold. "[T]o satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial." *Lujan v. Cabana Mgmt.*, 284 F.R.D. 50, 73 (E.D.N.Y. 2012). "The case law makes clear that, even if Defendants were aware that these individuals existed, that awareness did not absolve Plaintiff of her Rule 26(a)(1)(A) disclosure obligation, which 'is fulfilled only if [Plaintiff] informed [Defendants] that [she] might call the witness[es] in support of [her] claims or defenses.'" *Leong v. 127 Glen Head Inc.*, No. CV135528ADSAKT, 2016 WL 845325, at *4 (E.D.N.Y. Mar. 2, 2016) (citation omitted; alterations original).[2]

Although this Court has the power to preclude belatedly disclosed witnesses from testifying at trial, Safe Chain seeks the less drastic remedy of extending discovery to cure any prejudice from

---

[1] Parties have "a duty to seasonably amend their Rule 26(a) disclosures," *Ehrlich v. Inc. Vill. of Sea Cliff*, No. CV04-4025(LDW)(AKT), 2007 WL 1593223, at *2 (E.D.N.Y. June 1, 2007), and must do so "as they learn of additional information during the course of discovery," *Off. Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman*, No. CV135475JSAKT, 2015 WL 9701024, at *5 (E.D.N.Y. Aug. 26, 2015).

[2] *See also Benavidez v. Burger Bros. Rest. Grp.*, No. CV17200DRHAKT, 2019 WL 1459044, at *6 (E.D.N.Y. Mar. 29, 2019); *Badolato v. Long Isld. R.R.*, No. CV 14-1528 (AKT), 2016 WL 6236311, at *4 (E.D.N.Y. Oct. 25, 2016); *Pal v. New York Univ.*, No. 06CIV.5892PACFM, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008) ("Pal's knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if NYU informed Pal that it might call the witness in support of its claims or defenses."); *Lujan*, 284 F.R.D. at 72 ("What matters is that defendants might rely on those former employees in defending the case.").

Honorable Joseph A. Marutollo
January 2, 2024, Page 3

the belated disclosures. *See, e.g.*, *Benavidez*, 2019 WL 1459044, at *7 (reopening discovery for 60 days to allow plaintiffs to depose five of defendant's late-disclosed witnesses and ordering that that "[t]he costs of those depositions shall be borne by the Defendants"); *JTH Tax*, 2006 WL 2516473, at *3 (allowing plaintiffs two months to depose late-disclosed witnesses). This Court has allowed parties "to schedule depositions in early January 2024 in the event that there are holiday-related scheduling issues," but Safe Chain does not understand that order to include depositions or subpoenas not previously served. Dec. 1, 2023, Minute Order. Nor does Safe Chain believe that the first half of January is enough time to subpoena additional non-parties for documents and then take depositions. Safe Chain seeks a 60-day extension of fact discovery.[3]

The defendants collectively have taken 5 depositions in this case, with 1 more scheduled for early January; Gilead has taken 32, with several more pending, without seeking leave to exceed Rule 30(a)(2)(A)(i)'s 10-deposition-per-side limit. Safe Chain seeks leave to exceed that limit to take discovery related to newly disclosed PRX Pharmacy and some or all of the 8 newly disclosed Gilead-authorized distributors. "Once the moving party shows the need for the depositions, the trial court has the discretion to grant the motion." *United States v. Town of Oyster Bay*, No. CV142317ADSSIL, 2016 WL 11265542, at *1 (E.D.N.Y. May 10, 2016). And "'counsel's judgment about [how many depositions] it need[s] is entitled to a good deal of deference.'" *Id.* (alterations original).

Gilead argues Safe Chain willfully bought counterfeit drugs in part because Safe Chain bought from licensed but not Gilead-sanctioned distributors. *See, e.g.*, Gilead Resp. to 'Rog 13 (**Ex. F** at 14-15). Yet recent discovery has shown that Gilead-authorized distributors themselves may have bought and sold allegedly counterfeit Gilead drugs, undermining Gilead's argument that only purchases from Gilead-authorized sources are safe. Whether PRX Pharmacy bought allegedly counterfeit Gilead drugs from McKesson (a Gilead-authorized source), for example, has become a critical issue. PRX told Gilead it bought the suspect drugs from McKesson and sent Gilead invoices McKesson later verified as authentic. Yet Gilead recently revealed that PRX allegedly told Gilead's counsel that PRX's own delivery driver tampered with this medication. Gilead intends to call that pharmacy director to testify about "[t]he sources of PRX Pharmacy's counterfeit Gilead-branded medications." **Ex. D** at 5. Accordingly, deposing PRX's pharmacy director on the source of PRX's counterfeit Gilead medication is critical to allowing Safe Chain to show that Gilead's own authorized distributors were selling counterfeit Gilead medication.

It is also critical for Safe Chain to take discovery related to the eight Gilead-authorized distributors from whom Gilead seeks testimony about their "distribution of authentic Gilead-branded medicines." *Id.* at 4-5. Although Safe Chain did not buy Gilead drugs directly from these entities, Gilead has put the sanctity of its authorized distribution chain at issue. Safe Chain only anticipates subpoenaing documents from and deposing the 9 newly named distributors and PRX Pharmacy, but it also seeks leave to conduct further discovery warranted by what it learns from those documents and depositions.

---

[3] Safe Chain amended its own disclosures on December 18 to identify McKesson Corp. Yet Safe Chain disclosed McKesson as soon as McKesson agreed to provide a sworn declaration and a witness to testify at trial. Safe Chain does not object to any party deposing McKesson during an extended discovery window.

Honorable Joseph A. Marutollo
January 2, 2024, Page 4

## II. Gilead's Argument

### A. Safe Chain Has Known About the "New Witnesses" for Years

Safe Chain was the first-named defendant in this case, and it has had over two years to take discovery – as long or longer than any other defendant.[4] The vast majority of the additional individuals in Gilead's amended disclosures are defendants in this litigation. In its motion, Safe Chain focuses specifically on two categories of witnesses: (1) PRX Pharmacy ("PRX") and (2) the Gilead-authorized distributors that Gilead added to its disclosures.

PRX was not belatedly disclosed. Gilead has always maintained that PRX is irrelevant to this action, and never had plans to call PRX as a witness. But Safe Chain has pursued discovery concerning PRX for months, and has aggressively doubled down on this irrelevant sideshow in recent weeks. Gilead therefore has listed PRX on its amended Rule 26 disclosures to make clear it reserves the right to call PRX in the event Safe Chain continues down this path.

With regard to Gilead's authorized distributors: Safe Chain has known about them since well before this lawsuit was filed. Gilead's authorized distributors are listed publicly on Gilead's website. Safe Chain in fact checked Gilead's online listing of its authorized distributors while Safe Chain was selling the counterfeits. *See, e.g.*, **Ex. 1** at 1. And in this action both Gilead and Safe Chain have affirmatively pled the existence of Gilead's online listing of all its authorized distributors. ECF No. 1 at ¶ 49; ECF No. 899 at 220 ¶ 28.

It is undisputed that counterfeits trafficked by the defendants in this case (including Safe Chain) were *not* purchased from Gilead-authorized distributors. All of the counterfeits were sourced from the black market, and all of them were accompanied by fake pedigrees that listed fictional sales that never occurred. Some of those fake pedigrees attempted to create a veneer of legitimacy by fraudulently listing a fictional purchase from a Gilead-authorized distributor.

When Gilead brought this action, it knew that Safe Chain sold counterfeits with fake pedigrees listing fraudulent sales to and/or from Gilead-authorized distributors AmerisourceBergen ("ABC") and Cesar Castillo ("Castillo"). So in its initial filings, Gilead introduced affidavits from ABC and Castillo confirming the sales listed on Safe Chain's fake pedigrees never occurred (ECF Nos. 9-10) and listed ABC and Castillo on its initial disclosures.

Since that time, this case has expanded dramatically, with new defendants having sold tens of thousands of additional counterfeits, all with their own fake pedigrees, many of which fraudulently list other Gilead-authorized distributors. So Gilead, in an abundance of caution, has amended its Rule 26 disclosures to include other authorized distributors who may give similar testimony *as to other defendants* that the transactions listed on their fake pedigrees never occurred. To be clear: Almost all of the Gilead-authorized distributors added in Gilead's amened disclosures do *not* appear on Safe Chain's fake pedigrees, and so are irrelevant to Gilead's claims vis-à-vis Safe Chain. The only exception is Drogueria Betances, a Puerto Rico-based distributor who, if called to testify, will simply confirm that the counterfeit pedigrees

---

[4] Safe Chain was present and represented by counsel at the initial discovery conference in this case on October 6, 2021. However, Safe Chain waited almost 18 months, until March 2023, to begin serving discovery. Moreover, Safe Chain's claim that it was "surprised" that Gilead had not updated its initial disclosures by September 29, 2023 is disingenuous. Safe Chain first updated its initial disclosures on September 18, 2023.

Honorable Joseph A. Marutollo
January 2, 2024, Page 5

listing its name are false, because Drogueria Betances does not sell and has not sold any Gilead products to entities based outside of Puerto Rico.

> **B. Safe Chain Bought Exclusively from the Black Market, and the "Sanctity" of Gilead's Supply Chain Is Not at Issue**

Safe Chain argues it is entitled to 60 days of unlimited additional discovery because "[w]hether PRX Pharmacy bought allegedly counterfeit Gilead drugs from McKesson (a Gilead-authorized source) . . . has become a critical issue." Not so. Gilead has described elsewhere why the PRX issue is an irrelevant sideshow. Briefly stated, PRX delivered to patients, through a delivery driver, several counterfeit Gilead-branded medications with the wrong pills inside. PRX initially claimed it purchased those counterfeits directly from two different Gilead-authorized distributors. That claim was never credible – PRX was the only pharmacy in the country to assert that it obtained multiple counterfeits directly from a Gilead-authorized distributor – and PRX subsequently determined that its delivery driver had been the cause of the counterfeiting. PRX fired the driver, and the counterfeiting stopped.

Gilead's claims against Safe Chain have nothing to do with PRX. Safe Chain never bought from, sold to, or communicated with PRX. And it is undisputed that Safe Chain has never purchased from a Gilead-authorized distributor, as PRX claimed to have done. PRX simply has nothing to do with Safe Chain's own counterfeiting, Safe Chain's own knowledge that it was buying black-market counterfeits, or the damages caused by Safe Chain's counterfeiting. Even if PRX had purchased counterfeits from a Gilead-authorized distributor – and it did not – that would have zero effect on Gilead's claims or Safe Chain's defenses. "Other distributors sold counterfeits too" is neither a defense nor a mitigating factor for Safe Chain.

In its letter, Safe Chain nevertheless argues that Gilead has somehow "opened the door" to expansive discovery about Gilead's authorized distributors. Safe Chain claims that in an interrogatory response "Gilead argues Safe Chain willfully bought counterfeit drugs in part because Safe Chain bought from licensed but not Gilead-sanctioned distributors." Through that interrogatory response, Safe Chain concludes, "Gilead has put the sanctity of its authorized distribution chain at issue."

That is nonsense. Here is what Gilead actually says in its interrogatory response: "[E]ven after becoming aware of all of the foregoing issues with its suppliers, Safe Chain *never* purchased *any* Gilead-branded medications directly from a Gilead authorized distributor—whenever one of its fly-by-night suppliers shut down, it just pivoted to whatever other one its sales representatives told it to use without taking any serious steps to verify the legitimacy of its products." **Ex. F** at 14-15. That is absolutely true: every bottle of Gilead-branded medication that Safe Chain bought and sold was counterfeit, and each one came from a fly-by-night, black-market supplier. Safe Chain would be caught selling counterfeits from a black-market supplier, pretend to be surprised, and then move on to the next black-market supplier – a pattern it continued until the day Gilead executed a seizure at its warehouse.

To take one example: Safe Chain began purchasing Gilead-branded products from defendant Synergy in April 2021. Safe Chain's Director of Compliance at the time testified that she was on "heightened alert" about Synergy because Safe Chain had purchased counterfeits from its previous suppliers of Gilead-branded medication. **Ex. 2** at 273:15-274:1. The Director of Compliance testified that she had implemented stringent new requirements before bringing on

Honorable Joseph A. Marutollo
January 2, 2024, Page 6

new suppliers, including verifying the supplier's pedigrees to see if they were fake. *Id.* at 275:6-19, 283:14-20. The Director of Compliance duly checked Synergy's pedigrees, and confirmed they were indeed fake – which so alarmed DMS Pharmaceutical Group (the authorized distributor fraudulently listed on Synergy's fake pedigrees) that *it* notified the FDA. *Id.* at 277:2-20. Safe Chain's Director of Compliance repeatedly brought her concerns to Safe Chain's owners; she testified that Safe Chain's owners decided to bring Synergy on as a vendor "over [her] objection," that it "defeats the purpose of these additional checks if you're going to bring someone on board even if you fail them," and that this episode led her to subsequently quit Safe Chain's employ because "[she] wasn't able to do [her] job" as Director of Compliance. *Id.* at 282:14-285:15. In her contemporaneous messages with colleagues, the Director of Compliance was even more blunt, writing: "Synergy, that new wholesaler that [defendant] Adam [Brosius] brought on, gave us some fake pedigrees," that it "just seems too coincidental" that yet another supplier of Gilead HIV medication was providing fake information, noting that "Adam brings such sketchy situations to the table," and agreeing with her colleague who predicted Safe Chain was "going to get ourselves sued." ECF No. 107 at 19. And Adam Brosius, for his part, said it directly, in writing, to Safe Chain's owner: "**all of [Synergy's] shit is counterfeit**." *Id.* at 17 (emphasis added). And yet Safe Chain kept buying counterfeits from Synergy until Gilead executed this Court's Seizure Order at Safe Chain's warehouse.

That is just a sample of the overwhelming evidence of Safe Chain's willful counterfeiting. That evidence is about Safe Chain's knowing purchase of highly dangerous counterfeit HIV medication from the black market; it has nothing to do with Gilead's authorized distributors. Safe Chain's eleventh-hour push to obtain discovery from Gilead's authorized-distributors, who have a consistent track-record of delivering life-saving medication to patients in need nationwide, is a disgraceful attempt to deflect attention away from its own willful counterfeiting. The Court should not permit it.

**C.     Safe Chain Is Impermissibly Seeking Discovery on Its Counterclaims**

Clearly, the additional discovery Safe Chain seeks about Gilead's authorized distributors is of no relevance to Gilead's claims or Safe Chain's defenses in this action. Its only theoretical relevance is to Safe Chain's frivolous counterclaims – discovery upon which is currently stayed.

Specifically, Safe Chain filed counterclaims that Gilead committed defamation and tortious interference when Gilead warned pharmacies about the dangerous counterfeits that Safe Chain sold with the wrong pills in the bottle. ECF No. 899 at 215-251. There is no dispute that Safe Chain in fact sold those dangerous counterfeits; Safe Chain's counterclaim alleges it was tortious for Gilead to recommend, in light of that counterfeiting, that pharmacies buy from a Gilead-authorized distributor. *Id.* at 232 ¶ 86. At a pre-motion conference, Judge Donnelly found that Safe Chain had failed to allege a plausible claim, and so expressly prohibited Safe Chain from taking discovery relevant to its counterclaims while Gilead's motion to dismiss was pending. **Ex. 3** at 26-27. That motion remains pending, and Safe Chain's crusade to attack what it describes as the "sanctity of [Gilead's] authorized distribution chain" for the stated purpose of "undermin[ing] Gilead's argument that only purchases from Gilead-authorized sources are safe," *supra* at 3, is plainly an attempt to get discovery on its frivolous counterclaims in contravention of Judge Donnelly's order. Safe Chain's motion should be denied on that ground as well.

*          *          *

Honorable Joseph A. Marutollo
January 2, 2024, Page 7

For the reasons set forth above, Your Honor should deny Safe Chain's motion to re-open fact discovery for two months.

Respectfully submitted,

*/s/ William E. Jacobs*

William E. Jacobs

*Counsel to Safe Chain Solutions, LLC, Charles Boyd, and Patrick Boyd*