1                    UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3    GILEAD SCIENCES, INC., et al,
                                            Case No. 1:21-cv-04106-AMD-JAM
4              Plaintiffs,

5    v.                                     Brooklyn, New York
                                            March 27, 2024
6    SAFE CHAIN SOLUTIONS, LLC, et          12:06 p.m.
     al,
7
               Defendants.
8

9              TRANSCRIPT OF STATUS CONFERENCE HEARING
                 BEFORE THE HONORABLE JOSEPH A. MARUTOLLO
10                  UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:
     For the Plaintiffs:            Timothy A. Waters, Esq.
12   (Gilead Sciences, Inc.)        Maxwell K. Weiss, Esq.
                                    Thomas P. Kurland, Esq.
13                                  George Soussou, Esq.
                                    Andrew I. Haddad, Esq.
14                                  Patterson Belknap Webb & Tyler,
                                    LLP
15                                  1133 Ave of the Americas
                                    New York, NY 10036
16
     For the Defendants:            Matthew S. Krauss, Esq.
17   (Safe Chain Solutions, LLC)    Weisbrod Matteis & Copley, PLLC
                                    3000 K Street NW
18                                  Suite 275
                                    Washington, DC 20007
19
     For the Defendant:             Matthew Jacobs, Esq.
20   (Mohammad Etminan and          Jacobs Law Group
     Total Remedy Pharmacy)         3435 E. Thousand Oaks Blvd.,
21                                  #3492
                                    Thousand Oaks, CA 91359
22
     For the Defendant:             Mark A. Berman, Esq.
23   (Worldwide Pharma Sales        Hartmann Doherty Rosa Berman &
     Group, Inc. and Adam           Bulbulia, LLP
24   Brosius)                       433 Hackensack Avenue, Suite 1002
                                    Hackensack, NJ 07601
25

```
 1    Appearances (continued):

 2    For the Defendant:            Ryan D. Rainey, Esq.
      (Propharma Distribution,      Quarles & Brady, LLP
 3    LLC)                          33 East Main Street
                                    Ste 900
 4                                  Madison, WI 53703

 5    For the Defendant:            Robert E. B. Hewitt, III
      (Lin Pharmacy Inc., Samuel    Schwartz, Conroy & Hack, PC
 6    Yakubov, Monica Ngo)          666 Old Country Road
                                    9th Floor
 7                                  Garden City, NY 11530

 8    Clerk:                        E.G.

 9    Court Recorder:               Electronic Sound Recording

10    Transcription Service:        Chris Hwang
                                    Abba Reporting
11                                  PO Box 223282
                                    Chantilly, Virginia  20153
12                                  (518) 302-6772

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
25
```

1                              __INDEX__

2

3                                                    <u>Page</u>

   Court's ruling                                    20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 12:06 p.m.)

2              THE CLERK:  I will now ask everyone to unmute their

3     phone.  Thank you.

4              Docket number 21-CV-4106, Gilead Sciences, Inc. v.

5     Safe Chain Solutions, LLC.  Will the parties please state their

6     appearances for the record, starting with Plaintiff?

7              MR. WATERS:  Good afternoon, Your Honor, Timothy

8     Waters from Patterson Belknap Webb & Tyler on behalf of the

9     Plaintiffs.  I'm joined by my colleagues Thomas Kurland,

10    Maxwell Weiss, George Soussou, and Andrew Haddad.

11             MR. KRAUSS:  Good afternoon, Your Honor, Matthew

12    Krauss of Weisbrod Matteis & Copley for the Safe Chain parties.

13             MR. JACOBS:  Good afternoon, Your Honor, Matt Jacobs

14    on behalf of Mohammed Etminan and Total Remedy Pharmacy.

15             MR. BERMAN:  Good afternoon, Your Honor, Mark A.

16    Berman with Hartmann Doherty Rosa Berman on behalf of Adam

17    Brosius and Worldwide Pharma.

18             MR. RAINEY:  Good afternoon, Your Honor, Ryan Rainey

19    from Quarles & Brady on behalf of Propharma Distribution, LLC.

20             MR. HEWITT:  Your Honor, Robert Hewitt from Schwartz,

21    Conroy & Hack on behalf of Lin Pharmacy, Samuel Yakubov, and

22    Monica Ngo.

23             THE COURT:  Okay, thank you.  So, good afternoon,

24    everyone.  We're here for a status conference.  And I wanted to

25    address a few items at least on my list, and then, I'm happy to

1    talk further if there are specific items that need to be raised

2    with anyone.

3              So, first, I appreciate the parties' efforts over the

4    last few months to try to resolve this case or at least

5    portions of this case.

6              I know some -- at least in the last couple months,

7    we've had some resolutions.  And others, you know, I think

8    there have been good negotiations.

9              I encourage the parties to continue those

10   negotiations.  And, you know, to the extent it's helpful, I'm

11   happy to hold either a renewed settlement conference or a

12   settlement conference separately with the parties.

13             Let me just turn first to something that -- I don't

14   think anyone is on for Ms. Lopez, but I know there's a pending

15   motion for an order to show cause that has been referred to me

16   by Judge Donnelly.  That's at docket entry number 1327.

17             Let me hear a little bit further on where things

18   stand there from Gilead?

19             MR. WATERS:  Yes, Your Honor, this is Timothy Waters.

20   The reason that was filed as an order to show cause, Your

21   Honor, is we have an asset freeze against Ms. Lopez.  In

22   violation of that freeze, well, we've learned recently that

23   she's violated that freeze in a couple ways in the past.

24             But the big issue is that she is moving to sell her

25   multimillion dollar home in violation of the freeze.  And she

1   has a -- we've learned that she has a contract of sale that's

2   supposed to close I believe on April 4th.

3          And so, the request was, although we have to deal

4   with her past issues of contempt, we wanted to do this as an

5   order to show cause to get her to respond quickly because the

6   order -- the immediate prejudice we're trying to avoid is an

7   order not prohibiting the sale of the home since there's a

8   third-party buyer involved that seems to be arm's length, but

9   rather, to prevent her from dissipating the proceeds of that

10  sale by requiring her after the mortgage is paid off to pay the

11  proceeds into the Court's escrow.

12         Because she has a history of violating the Court's

13  order, we're concerned that if that sale goes through without

14  further action, that money's just going to disappear.

15         And of course, the whole point of the asset freeze

16  was to have assets that she couldn't spend or dissipate to

17  satisfy a judgment.

18         Ms. Lopez --

19         THE COURT:  So I think that answers my first

20  question, because one thing I was a little bit unclear about

21  was whether there was any prohibition in the asset freeze order

22  or the seizure order from I believe August 22nd.  Is that

23  right, August 22nd, 2023?

24         MR. WATERS:  That sounds correct, but I don't have it

25  in front of me.

1        THE COURT:  What about there's a prohibition on

2   selling property?  It sounds like there was not a prohibition

3   on selling property, right?

4        MR. WATERS:  I apologize, Your Honor.  There was.

5   She was required to disclose real property.  She disclosed the

6   property that she is trying to sell.

7        It freezes all of her assets, but there is a specific

8   line on the asset freeze order, and we call it out in our

9   papers, prohibiting her from encumbering, transferring,

10  selling, et cetera any real property in which she has an

11  interest.

12        This property is owned by an LLC, but it's an LLC

13  that she created.  It's a single member LLC.  And she testified

14  that she's the one who caused the LLC to be made.  She caused

15  this home to be purchased.  And she's the one who's involved in

16  the sale.  She's the one signing all the documents on behalf of

17  the LLC with regard to the home.

18        And it's the home she's lived in for the past two

19  years.  It's a home where we did the seizure when we did a

20  seizure against her.  It's her primary residence despite the

21  fact that it's owned by an LLC.

22        And in the papers, we describe why.  In fact, she

23  testified that she understood that the asset freeze order

24  prevented her from selling this property.

25        THE COURT:  Okay, and apologies, the home is

1    scheduled to close I believe on April 3rd.  How is that

2    information conveyed to Gilead?  Is that something you can

3    share publicly?

4           MR. WATERS:  Yeah, we had issued a subpoena.  When we

5    first learned that she had through her testimony that she had

6    an interest in this property and had sold a previous property,

7    which again, is a previous violation that's not urgent, but

8    needs to be remedied, we learned that she was involved in this

9    house.

10          And we'd issued a subpoena to a real estate agent she

11   knew she was connected with.  And then, at some point, that

12   real estate agent, I believe I'm getting this correct, sent us

13   the contract of sale.

14          THE COURT:  All right, and let's say that sale goes

15   forward on April 3rd.  Why are the proceeds then governed by

16   the asset freeze order?

17          MR. WATERS:  Because those would be proceeds paid to

18   her or paid to the LLC that she wholly controls.  And the asset

19   freeze freezes and prohibits her from spending any assets,

20   liquid or real estate.

21          THE COURT:  And how -- let's say that sale goes

22   forward on April 3rd.  How, if at all, would you propose

23   modifying the current proposed order that you've attached as

24   one of -- on the docket here in which you're arguing that Ms.

25   Lopez should be held in contempt and a variety of other things?

1          MR. WATERS:  So the order that we proposed is that

2     the buyer of the home pays the proceeds of the more -- of the

3     sale not to Ms. Lopez, because she's shown that will not follow

4     the asset freeze order, but rather to the Clerk of the Court,

5     will be held in escrow and effectively frozen.

6          Ms. Lopez, you know, the way these asset freeze

7     orders work, they bind the Defendant, but I can only serve them

8     on banks where I know she has a bank account.

9          So if she were to put them into a new bank account,

10    that bank would not know about the asset freeze order and she

11    could dissipate the assets.  And in fact, we think that's been

12    happening for some time now.

13         So given that the only way -- she's under an asset

14    freeze order.  She can't spend it, but given that she can't be

15    trusted to follow the order and that she's now selling her

16    primary asset, one that was purchased with counterfeiting

17    proceeds, we think the appropriate step is let's take that

18    money out of her hands, put it in the Court's escrow where it

19    will remain frozen, so at least these funds we know will not be

20    dissipated.

21         THE COURT:  I guess what I'm getting at is just as a

22    practical matter, because this has been referred to me for

23    report and recommendation and either Defendant or I realize has

24    not appeared, you know, the -- just want to gather, right,

25    there would be a time period for which objections to any report

1    and recommendation could be given.

2           Because if, for instance, I were to recommend the

3    granting Gilead's motion, how would that play out from your

4    perspective in terms of, you know, by that point it would be

5    after April 4th and would go up to the district judge, how

6    would you -- what would be your proposal at that stage?

7           MR. WATERS:  I believe my proposal would be that

8    under a temporary basis, the funds are ordered to go into the

9    Court's escrow.

10          And in the event that the -- that Ms. Lopez makes

11   objections to the report and recommendation or the District

12   Court in a very unlikely scenario in my mind were to disagree

13   with the report and recommendation, those funds are available

14   and could be immediately paid back.  There's no lasting

15   prejudice to Ms. Lopez.  The sale would go through.  Those

16   funds would be held safe.

17          And if she were to successfully move for the release

18   of those funds, they could be released to her immediately.  The

19   danger is that she gets those funds and that they disappear.

20          THE COURT:  And I know you have the affidavit of

21   service here.  Have you had any contact with Ms. Lopez since

22   the filing of this motion?

23          MR. WATERS:  No, Your Honor.  We've emailed her at

24   every email address we have for her, both the ones we know she

25   uses and we searched to seize the documents for anything else

1    she used.

2         We sent it by Fedex to the house where she's living.

3    I believe we've also provided a copy to her real estate agent,

4    but we have not heard back from her.

5         THE COURT:  All right, anything further that you want

6    to raise that's either in supplement to your papers or anything

7    further you want to raise on this issue with Ms. Lopez?

8         MR. WATERS:  I believe we've covered it, Your Honor.

9    I appreciate you addressing it and understanding the time

10   urgency.

11        Mr. Kurland, I know you worked on these as well, is -

12   -

13        MR. KURLAND:  Yes.  I was just going to say, Your

14   Honor, in the first instance, you know, I believe what's been

15   referred to you is the order to show cause which, you know, is

16   the sort of first step directing her to show cause, you know,

17   on the relief.  It's like a TRO.

18        So that's the sort of quick piece that, you know,

19   we're -- the posture in which it's come to you is a little

20   confusing because ordinarily, you know, the Court would sign

21   that rather quickly because it's like the notice of motion.

22   And then, she'd have an opportunity to appear and respond and

23   challenge the relief.  So that's sort of the initial piece that

24   we're trying to get accomplished quickly.

25        And then, she, you know, pursuant to the order to

1    show cause would have a full and fair opportunity at a time and

2    place the Court directs to appear and contest the longer term

3    relief, right?

4           So we're just trying to preserve the status quo

5    quickly.  You know, already almost 10 days have elapsed since

6    we filed the order to show cause.  So that's where we are right

7    now.

8           THE COURT:  Can I ask -- and I realize there's a

9    lengthy history in this case before I was assigned to it.  Why

10   was this not filed as a temporary restraining order?

11          MR. KURLAND:  Well, it was -- I mean, it was done by

12   the -- I mean, that's why it was done by an order to show

13   cause.

14          There already is an injunction and she's violating

15   the injunction.  So we -- it would be odd to seek a temporary

16   restraining order to restrain someone from, you know, it's like

17   two extra steps.  We already did at the commencement of the

18   case seek a temporary restraining order, which was granted.

19          And then, it was converted to a preliminary

20   injunction.  And now, the proposed sale of the property is in

21   direct violation of the extant injunction.

22          THE COURT:  Okay, so let me get back to you on that.

23   I'll take all that under advisement.

24          Let me turn to a few other issues that impact I think

25   everyone.  I wanted to get a sense of where things stand with

1    expert discovery.

2           Again, right now, initial expert disclosures are

3    going to be served by May 14th.  Rebuttal expert disclosures

4    and reports will be served by June 14th.  And all expert

5    discovery is to be completed by July 16th.

6           As I said multiple times, I want to make this as

7    clear as possible in terms of what the deadlines are, that they

8    won't be extended absent really extraordinary circumstances.

9           So I guess, first, have there been any expert

10   disclosures served as of yet?  I realize there's still time

11   before the deadline, but I'm curious on where things stand.

12          MR. WATERS:  On behalf of the Plaintiffs, Your Honor,

13   we haven't served anything yet.  We do plan on serving expert

14   disclosures and we will do so by the 14th.  We don't anticipate

15   any problems meeting the deadlines.

16          THE COURT:  From the -- any of the Defendants'

17   perspective, I realize these are going to be rebuttal experts,

18   so obviously, it's premature in some ways, but I -- you know,

19   given the timeline here, are any issues with Defendants want to

20   be raised at this point about the rebuttal experts or anything

21   along those lines?  Any of the Defendants?

22          MR. JACOBS:  Judge, this is Matt Jacobs.  You know,

23   we haven't prepared rebuttal disclosures yet, but you know, to

24   the extent that Gilead has their disclosures ready before the

25   May 14th date, there's no obligation for them to provide it,

1      but in the interest of sticking to all these deadlines and

2      making sure we meet them, you know, obviously, we wouldn't

3      object to receiving them early.

4              THE COURT:  So that's fair.  I mean, I'm sure that

5      that's a view shared by all of the Defendants.  And obviously,

6      in the interest of time, I think there may be some benefit to

7      that.  I mean, realistically, the expert disclosures here on

8      the Plaintiff's side, Plaintiff has the burden here, are due

9      May 14th.

10             And then, it's a relatively short period of time

11     although I think fair amount of time by June 14th, but I think,

12     you know, to the extent Gilead does serve them early, I would

13     you know, for what it's worth, I would be, you know, if

14     Gilead's going to serve expert disclosure then on April 1st,

15     I'd be less inclined to then grant any extensions for

16     Defendants who are then claiming they need more time,

17     especially given if Gilead does it early.

18             Again, I'm not planning on doing extensions

19     regardless, but for what it's worth, that may be something that

20     might help push this out.

21             And I encourage the parties again to, you know,

22     produce things early whenever it's possible, although I realize

23     it's a complex litigation that, you know, requires

24     comprehensive assessments by the proposed experts.

25             MR. JACOBS:  Judge, if I may, I mean, clearly

1    Patterson, Gilead's counsel, has substantial experience in this

2    niche.

3        And to the extent their experts are the same ones

4    they've used in prior cases, for example, Abbott, then I think

5    it's an even less of a difficult lift to produce those, you

6    know, earlier than later.

7        MR. KURLAND:  Well, just to be clear, we are planning

8    on serving expert reports.  It's not just like a 3101(d), like

9    we have to do the full 26 report, which is case specific.  So

10   that's what's taking time.  And we'll get it done.  And we'll

11   serve them in accordance with the schedule.

12       And if we happen to finish it early, we'll certainly

13   disclose them early, but we -- and at this point, we're aiming

14   to disclose them in accordance with the schedule.

15       THE COURT:  That's fine.  I would note that counsel

16   Mr. Kurland is right in a sense that -- and just for

17   Defendants' side as well here, you know, the expert disclosures

18   here are everything that's required under Federal Rule 26.  So

19   it's not just the, you know, fee schedule and CV.  It's the

20   full report.  So, you know, just keep that in mind for all

21   sides.

22       Any other issues related to expert discovery that the

23   parties would like to address at this point?

24       MR. WATERS:  Not on behalf of Plaintiffs, Your Honor.

25       THE COURT:  Any from the Defendants?  Okay.

1          MR. JACOBS:  Nothing, Your Honor.

2          THE COURT:  Any other outstanding issues that need to

3    be addressed, putting aside the Lopez matter for the discovery

4    side of things?

5          MR. JACOBS:  Your Honor, I have an issue related to

6    the deposition of Mr. Weinberg that we discussed on the I guess

7    two-party conference a few days ago.

8          And I haven't raised this with Gilead yet, but I

9    think Mr. Etminan in his deposition is limited to 90 minutes,

10   but there's no limitation on Mr. Weinberg's deposition.

11         You know, I take Mr. Waters at his word that he's

12   trying to minimize inconvenience to Mr. Weinberg.  And I'm not

13   necessarily asking for an order, but I just wanted to get a

14   sense from Gilead whether they expect the deposition not to

15   exceed 90 minutes?

16         I think, I mean, if the answer is they expect it to

17   exceed 90 minutes, I think that may be somewhat unreasonable

18   given that Mr. Etminan's deposition is cabined at that length.

19         THE COURT:  Does Gilead want to respond?

20         MR. WATERS:  Yeah, so this is Tim Waters.  90 minutes

21   sounds reasonable to me.  The only caveat I have to say is I

22   don't know what the documents are and I don't know what their

23   volume is.

24         If I get 500 documents, and I have to go through half

25   an hour of just getting to know you, what's your background,

1    how do you know Mr. Etminan, you know, how long have you

2    practiced law, where I don't have to do that with Mr. Etminan

3    because I've already, you know, we've already deposed him, I

4    can see potentially wanting to go slightly over 90 minutes, but

5    I'm going to stay cabined within the scope of the waiver, which

6    we've agreed to.  It's not going to be a full-day deposition.

7           Without seeing documents, I'm loath to put a time

8    limit on it.  But like I said, I can see me going over 90

9    minutes just because of the time it takes to ramp up with a new

10   witness, especially someone I haven't met before and you've

11   said is advanced in years.

12          THE COURT:  Well, again, I'm not going to issue an

13   order on the length of Mr. Weinberg's deposition.  I mean,

14   there's still a chance that his deposition will not be needed

15   based on the document production.

16          And also, I would distinguish I think what Mr.

17   Etminan as counsel noted for Gilead.  I mean, there was already

18   a deposition in place.  So the 90 minutes was really just to

19   make sure that there was sufficient time to address these other

20   issues.

21          I would just encourage the parties, that they're

22   already sound like they're doing, just to be efficient and

23   reasonable, particularly given Mr. Weinberg's situation, you

24   know, and purpose of the deposition.  Okay, anything else from

25   anyone that needs it raised?

1            MR. WATERS:  Your Honor, Tim Waters again.  I

2    actually had a slightly different issue on the same deposition,

3    which is in line with the goal of trying to avoid the

4    deposition of Mr. Weinberg if we can, the way the current

5    schedule is set up, I have three day -- within three days of

6    the documents being produced, I have to depose Mr. Weinberg.

7    Then I have a few more days to depose Mr. Etminan.

8            I'd like to reverse the order there because I think

9    the easiest way for me to tell my client we don't need to

10   depose Mr. Weinberg is I have the documents.  I've taken Mr.

11   Etminan's deposition.

12           And if his testimony is consistent with the

13   documents, then I think it's a very high chance I can say we

14   don't need to depose the lawyer.

15           If though Mr. Etminan, what I have to protect

16   against, Your Honor, is the outside chance that any client

17   could testify, oh, sure, the email says this, but I picked up

18   the phone right afterwards and I told him X, Y, and Z.  And he

19   told me, oh, well then, this situation's completely different,

20   et cetera.

21           I'm not saying Mr. Etminan's going to do that, but if

22   I take his deposition first, that just maximizes the chances I

23   can avoid the deposition of Mr. Weinberg.

24           So the ask is if I could have a week after deposing

25   Mr. Etminan to depose Mr. Weinberg, again, not trying to draw

1    things out.  I'm actually trying to narrow the scope and

2    potentially avoid that deposition.

3                THE COURT:  I'm a little unclear on what the request

4    here is.  My understanding right is that Gilead will depose Mr.

5    Weinberg by April 25th if at all.

6                And then, by April 29th, Mr. Etminan's deposition

7    will be re-opened, right?  So, just to clarify, what are you

8    seeking now?

9                MR. WATERS:  I apologize.  I would like to extend the

10   deadline to depose Mr. Weinberg until May 6th to allow me to

11   give that extra time and to depose Mr. Etminan first, so that I

12   can maximize the chances that we will just cancel Mr.

13   Weinberg's deposition.

14               THE COURT:  All right, any thoughts on that from Mr.

15   Jacobs?

16               MR. JACOBS:  Well, I would love if that were the only

17   reason to do Mr. Etminan's deposition first.  I think

18   the -- another reason may be that Gilead wants to hear what Mr.

19   Etminan says, and then, try to elicit testimony from Mr.

20   Weinberg that shows Mr. Etminan in a poor light let's say.

21               I think the schedule's fine as it is now.  I think

22   that, you know, Gilead -- we're likely to proceed with the two

23   depositions.  I don't think it matters which one we do first.

24   They're both going to testify truthfully.

25               Mr. Weinberg's been a lawyer for 60-plus years.  His

1    answers are going to be what his answers are going to be.  So

2    I'm fine with the schedule now.

3            I think Gilead's already served him with a subpoena

4    for April 25th.  I see no reason why we can't do Mr. Weinberg's

5    deposition that morning and perhaps Mr. Etminan is later that

6    afternoon in the same location, but you know, I'll leave it

7    there.

8            MR. WATERS:  Just to briefly respond, Your Honor.  If

9    this defense had been timely raised, we would have subpoenaed

10    Mr. Weinberg and we would have, as the Plaintiffs and the

11    people asking the deposition, we would have worked with the

12    schedule.

13            I don't see a prejudice there.  I don't think there's

14    any right for Mr. Etminan to go second.  And like I said, my

15    concern here is just I want to not take this deposition if I

16    don't have to (indiscernible).

17            THE COURT:  Right, so I'm going to allow the

18    deposition of Mr. Weinberg to occur by May 6th with the primary

19    reason being that I'm hopeful this will avoid the need to

20    depose Mr. Weinberg, because I just think as a practical

21    matter, you know, it's something I understand the defense

22    that's being raised, but I think the documentation is going to

23    be the critical piece as opposed to a lawyer of advanced years

24    testifying in a deposition.

25            So I'll enter a minute entry after this extending it

1          to May 6th.  I guess I do want to kind of come back to the

2          expert discovery piece.  And I appreciate that I'm still

3          relatively new to the case all things considered.

4                    But I want to be really crystal clear with everyone

5          that the only way I'll move any expert discovery deadlines is

6          if truly exceptional circumstances are shown.

7                    And I think the -- I've learned I suppose from what

8          occurred in December with the fact discovery deadline that is

9          effectively still going on here for, you know, for some

10         purposes, that I think it's very unmanageable.  And I think it

11         creates more confusion and more unnecessary litigation.

12                   So just to be really clear again with everyone, I'll

13         make this tweak to the deadline for Mr. Weinberg's deposition,

14         otherwise fact discovery has been addressed already.

15                   And expert discovery, I'm going to stick to those

16         deadlines.  And then, this case should be ready for motion

17         practice by mid-July, right?  And then, we'll go from there.

18         Okay, anything further from any party?

19                   All right, I'm going to schedule a status conference.

20         Does April 24th, which is a Wednesday, at 12 o'clock work

21         Eastern Time?

22                   MR. BERMAN:  Your Honor, I -- this is Mark Berman.  I

23         have a conflict, but I could probably have a colleague cover it

24         if it's just for status.

25                   THE COURT:  I believe that may be Passover now that

1    I'm looking at my own calendar here.  I don't know if that's an

2    issue.

3                   MR. BERMAN:  It actually is.  It's the second day of

4    Passover.

5                   THE COURT:  All right, so how about May 1st at 12

6    o'clock?

7                   MR. BERMAN:  That works for me, Mark Berman.

8                   MR. WATERS:  No issues on the Plaintiff's side, Your

9    Honor.

10                   THE COURT:  Okay, and we'll set that out.  And then,

11   I'll ask again for similar to the previous conference if

12   there's any discovery issues that need to be addressed, if you

13   could let me know by April 24th, again, I'm hopeful there

14   should be no discovery issues except that the expert discovery

15   deadlines are being worked on and that kind of thing.

16                   But if there is anything, I'll note by April 24th to

17   just file a letter in advance of the conference.  Okay,

18   anything further from anyone?  All right, well, thanks,

19   everyone.  Have a nice rest of the day.

20                   MR. JACOBS:  Thank you, Your Honor.

21                   MR. WATERS:  Thank you Your Honor.

22                   MR. KURLAND:  Thank --

23        (Proceedings concluded at 12:32 p.m.)

24

25

1          **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11   /s/ *Chris Hwang*

12   _____          March 29, 2024

13   Chris Hwang               Date

14   Transcriber

15

16

17

18

19

20

21

22

23

24

25