# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

GILEAD SCIENCES, INC., et al.,

                                   Plaintiffs,

v.

SAFE CHAIN SOLUTIONS, LLC, et al.,

                                 Defendants.

-------------------------------------------------------------- x

Case No. 21-cv-4106 (AMD) (JAM)

**HIGHLY CONFIDENTIAL**

<br>

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF RENEWED MOTION FOR DEFAULT JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ IV

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 3

    **A.**    Gilead's Authentic Medicines and the Defaulted Defendants' Counterfeits ........... 3

LEGAL STANDARD ............................................................................................................ 5

    **A.**    Liability and Causation ............................................................................................ 5

    **B.**    Personal Jurisdiction ............................................................................................... 6

    **C.**    Sufficiency of Pleadings ......................................................................................... 8

    **D.**    Damages ................................................................................................................... 8

ARGUMENT ....................................................................................................................... 10

I.    GILEAD'S LANHAM ACT CLAIMS AGAINST THE DEFAULTED DEFENDANTS ........................................................................................................ 10

    **A.**    Gilead Is Entitled to a Finding of Liability, Including Willful Infringement, Under Its Lanham Act Claims ............................................................................... 10

    **B.**    Gilead's Actual Damages Under the Lanham Act .................................................. 12

    **C.**    The Method and Calculation of Damages Are Not in Dispute .............................. 13

        **1.**    Each Counterfeit Displaced the Sale of an Authentic Product .................. 13

        **2.**    Gilead's Per-Unit Lost Profits .................................................................. 14

            a.    Gilead's Per-Unit Income ............................................................. 15

            b.    Gilead's Per-Unit COGS ............................................................... 15

            c.    The Undisputed Evidence of Defendants' Sales of Counterfeit Gilead-Branded Medicines .......................................... 16

    **D.**    Individualized Evidence of Each Defaulted Defendant's Liability and Damages ................................................................................................................. 18

        **1.**    Zafar Abdullaev .......................................................................................... 18

2.      The Omom Defendants (Omom Pharmaceuticals, Inc., Luis D. Gonzalez Herrero, Omom Wholesale Corp., and Gustavo Fernandez)................................................................................19

3.      The Synergy Defendants (Synergy Group Wholesalers LLC and Carlos Vega) ................................................................................20

4.      Invicta Defendants (Invicta Wholesale Supply LLC and Jorge Caba)................................................................................................21

5.      Pharma Pac Wholesale Corp.....................................................22

6.      Gentek LLC ...............................................................................23

7.      Rapid's Tex Whole Sale Corp. ..................................................24

8.      My Meds Defendants (Stephen Smith and My Meds LLC).....24

9.      ITC Group Defendants (Frank Bentancourt and ITC Group LLC)...........25

10.     CompaRx LLC............................................................................26

11.     Mainspring Defendants (Lorik Papyan, Stephen Silverman, and Mainspring Distribution LLC)..................................................26

12.     Bakhtiyar Nabiev ......................................................................27

13.     Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy................................................................................28

14.     Jeffrey Peterson and Brennan Page...........................................28

15.     Lazaro Roberto Hernandez ........................................................29

16.     Laconia Avenue Defendants (Laconia Avenue Pharmacy Corp. and Stanislaus Mgbeojirikwe) ...................................................31

17.     The Worldwide Pharma Defendants (Worldwide Pharma Sales Group, Inc. and Adam Brosius) .................................................32

18.     John Levitan...............................................................................34

        a.      Levitan's Default and Bad-Faith Litigation Tactics .....................35

        b.      Actual Damages Caused by Levitan .............................................41

E.      Gilead Is Entitled to Mandatory Treble Damages Under the Lanham Act............41

II.     THE COURT SHOULD ISSUE JUDGMENTS FINDING EACH DEFENDANT
        GROUP (CORPORATION PLUS PRINCIPALS) TO BE JOINTLY AND
        SEVERALLY LIABLE .......................................................................................42

        A.      Legal Standard ....................................................................................43

        B.      Defaulted Defendant Groups - Corporation Plus Principal(s) – Are Jointly
                and Severally Liable ...........................................................................44

        C.      Defaulted Defendants in Different Parts of the Supply Chain..............44

        D.      The Defaulted Defendants' Overlapping Sales......................................48

III.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST .................................51

        A.      This Is An "Exceptional Case" that Warrants Prejudgment Interest .....................51

        B.      The Applicable Rate and Compounding of Interest ..............................52

        C.      The Date of Interest Accrual................................................................55

IV.     GILEAD IS ENTITLED TO A PERMANENT INJUNCTION AGAINST ALL
        DEFAULTED DEFENDANTS..........................................................................56

V.      GILEAD HAS COMPLETED A SERVICEMEMBERS CIVIL RELIEF ACT
        SEARCH FOR EACH OF THE INDIVIDUAL DEFAULTED DEFENDANTS
        AND DETERMINED NO DEFAULTED DEFENDANT IS IN MILITARY
        SERVICE .....................................................................................................57

VI.     GILEAD HAS COMPLETED SERVICE ON ALL DEFAULTED
        DEFENDANTS ..............................................................................................58

CONCLUSION...........................................................................................................64

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*4 Pillar Dynasty LLC v. New York & Co.*,
   933 F.3d 202 (2d Cir. 2019)........................................................................51

*Abbott Lab'ys v. Adelphia Supply USA*,
   2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) ...........................................12, 13, 47

*Abbott Lab'ys v. H&H Wholesale Servs., Inc.*,
   2022 WL 17977495 (E.D.N.Y. Dec. 28, 2022), *aff'd*, 2024 WL 4297472 (2d
   Cir. Sept. 26, 2024) ......................................................................... *passim*

*Abbott Labs. v. Adelphia Supply USA*,
   No. 2024 WL 4250223 (E.D.N.Y. Aug. 22, 2024)........................................47

*Abbott Labs. v. Adelphia Supply USA*,
   No. 15-cv-05826-CBA-SDE (E.D.N.Y. July 25, 2024) ...............................47

*Allstate Ins. Co. v. Yadgarov*,
   2014 WL 860019 (E.D.N.Y. Mar. 5, 2014)...................................................64

*Apex Mar. Co. v. Furniture, Inc.*,
   2012 WL 1901266 (E.D.N.Y. May 18, 2012) ...............................................57

*Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*,
   2011 U.S. Dist. LEXIS 111889 (E.D.N.Y. Aug. 31, 2011), *adopted*, 2011 U.S.
   Dist. LEXIS 106308 (E.D.N.Y. Sept. 21, 2011).........................................6, 12, 52

*BAC Local 2, Albany v. Moulton Masonry & Constr., LLC*,
   779 F.3d 182 (2d Cir. 2015)..........................................................................5

*Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*,
   2016 WL 658310 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215
   (S.D.N.Y. Apr. 27, 2016)............................................................................52, 53, 54

*Bus. Casual Holdings, LLC v. TV-Novosti*,
   2023 WL 1809707 (S.D.N.Y. Feb. 8, 2023), *report and recommendation
   adopted*, No. 21-CV-2007 (JGK), 2023 WL 4267590 (S.D.N.Y. June 28,
   2023) .........................................................................................................55

*Cartwright v. Lodge*,
   2017 U.S. Dist. LEXIS 48052 (S.D.N.Y. Mar. 30, 2017) ..........................8

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018)....................................................................................................7

*Choi v. 37 Parsons Realty LLC*,
    642 F. Supp. 3d 329 (E.D.N.Y. 2022) ...................................................................................8

*Contemp. Mission, Inc. v. Famous Music Corp.*,
    557 F.2d 918 (2d Cir. 1977)....................................................................................................9

*Delchi Carrier SpA v. Rotorex Corp.*,
    71 F.3d 1024 (2d Cir. 1995)..................................................................................................16

*Eades v. Kennedy, PC L. Offs.*,
    799 F.3d 161 (2d Cir. 2015)....................................................................................................7

*eBav Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...............................................................................................................56

*Fica Frio, Ltd. v. Seinfeld*,
    434 F. Supp. 3d 80 (S.D.N.Y. 2020)......................................................................................7

*Flanagan v. Odessy Constr. Corp.*,
    2018 WL 1179889 (E.D.N.Y. Feb. 9, 2018),
    *adopted*, 2018 WL 1175164 (E.D.N.Y. Mar. 6, 2018)........................................................54

*Fustok v. Conticommodity Servs., Inc.*,
    873 F.2d 38 (2d Cir. 1989)......................................................................................................8

*Gen. Elec. Co. v. Speicher*,
    877 F.2d 531 (7th Cir. 1989) ................................................................................................12

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.*,
    471 F.3d 1264 (Fed. Cir. 2006).............................................................................................12

*Gomez v. El Rancho de Andres Carne de Tres Inc.*,
    2014 U.S. Dist. LEXIS 45580 (E.D.N.Y. Mar. 11, 2014),
    *adopted*, 2014 U.S. Dist. LEXIS 43988 (E.D.N.Y. Mar. 31, 2014) ................................6, 8, 9

*Gomez v. El Rancho de Andres Carne de Tres Inc.*,
    2014 WL 1310296 (E.D.N.Y. Mar. 11, 2014),
    *adopted*, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014).......................................................55

*Gov't Emples. Ins. Co. v. Sannit-Thomas*,
    2015 U.S. Dist. LEXIS 135117 (E.D.N.Y. Sept. 4, 2015).....................................................17

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
    973 F.2d 155 (2d Cir. 1992)........................................................................................5, 14, 17

v

*GS Holistic, LLC v. New Paradise Inc.*,
  2025 WL 3657152 (E.D.N.Y. Nov. 13, 2025)...............................................................11, 43

*GTFM, Inc. v. Solid Clothing, Inc.*,
  2002 WL 31886349 (S.D.N.Y. Dec. 26, 2002) ...............................................................52, 53

*Gutierrez v. Taxi Club Mgmt.*,
  2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018), *adopted*, 2018 U.S.
  Dist. LEXIS 118262 (E.D.N.Y. July 16, 2018) ........................................................8, 9

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
  955 F.2d 1143 (7th Cir. 1992) ......................................................................................11

*Harris v. Fairweather*,
  2012 U.S. Dist. LEXIS 128409 (S.D.N.Y. Sept. 10, 2012),
  *adopted,* 2012 U.S. Dist. LEXIS 151696 (S.D.N.Y. Oct. 19, 2012) .......................................12

*Hilton v. Int'l Perfume Palace, Inc.*,
  2013 WL 5676582 (E.D.N.Y. Oct. 17, 2013).........................................................................9

*Honeycutt v. United States*,
  581 U.S. 443 (2017).....................................................................................................44

*Hudson Furniture, Inc. v. Mizrahi*,
  No. 20-CV-4891 (PAC) (RWL), 2024 WL 565095 (S.D.N.Y. Feb. 7, 2024),
  *adopted*, 2025 WL 1453584 (S.D.N.Y. May 21, 2025).......................................................53, 54

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
  176 F. Supp. 3d 137 (E.D.N.Y. 2016) ................................................................. *passim*

*Int'l Consulting Servs. v. Cheap Tickets, Inc.*,
  2007 U.S. Dist. LEXIS 71689 (E.D.N.Y Sep. 12, 2007).......................................................52

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
  80 F.3d 749 (2d Cir. 1996)..............................................................................................12

*Intel Corp. v. Terabyte Int'l, Inc.*,
  6 F.3d 614 (9th Cir. 1993) ...........................................................................................10

*Jimenez v. Green Olive Inc.*,
  744 F. Supp. 3d 221 (AMD) (JAM) (E.D.N.Y. 2024).........................................................57

*KatiRoll Co. v. Kati Junction, Inc.*,
  33 F. Supp. 3d 359 (S.D.N.Y. 2014)..............................................................................32

*KAWS v. Individuals, Corps., Ltd. Liab. Companies, P'ships, & Unincorporated
  Ass'ns Identified on Schedule A Hereto*,
  2023 WL 1438637 (S.D.N.Y. Feb. 1, 2023)....................................................................6, 7

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*,
 628 F. Supp. 2d 312 (E.D.N.Y. 2009) ...................................................41, 42

*Kotuwage v. NSS Petro., Inc.*,
 2018 U.S. Dist. LEXIS 21917 (E.D.N.Y. Feb. 8, 2018)...........................17

*Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*,
 No. 11 CIV. 5980 (RA), 2013 WL 5977440 (S.D.N.Y. Nov. 12, 2013),
 *adopted,* 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014)...........................56, 57

*In re Langley*,
 2012 WL 3555484 (Bankr. Ct. W.D. Mich. Aug. 14, 2012) ...................46

*Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*,
 534 F.2d 422 (2d Cir. 1975)..................................................................52

*Manzo v. Sovereign Motor Cars, Ltd.*,
 2010 WL 1930237 (E.D.N.Y. May 11, 2010),
 *aff'd*, 419 Fed. App'x 102 (2d Cir. 2011) ...........................................54

*McDermott, Inc. v. Amclyde*,
 511 U.S. 202 (1994)...............................................................................47

*Melodrama Publ'g, LLC v. Santiago*,
 2015 WL 2380521 (S.D.N.Y. May 19, 2015),
 *adopted*, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015) ...........................53

*Merck Eprova AG v. Gnosis S.P.A*,
 901 F. Supp. 2d 436 (S.D.N.Y. 2012)..............................................52, 53

*Molina v. Xia*,
 2025 WL 2950626 (E.D.N.Y. Oct. 20, 2025)........................................57

*Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*,
 2006 WL 5804603 (S.D.N.Y. Dec. 11, 2006),
 *adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007).......................52, 54

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
 704 F. Supp. 2d 305 (S.D.N.Y. 2010)....................................................57

*Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*,
 2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. Aug. 29, 2012),
 *adopted*, 2012 U.S. Dist. LEXIS 178195 (E.D.N.Y Dec.17, 2012) .......51

*Perez v. Progenics Pharms., Inc.*,
 204 F. Supp. 3d 528 (S.D.N.Y. 2016).....................................................53

*Philip Morris USA, Inc. v. Shalabi*,
    352 F. Supp. 2d 1067 (C.D. Cal. 2004) .................................................................11

*Ramada Inns, Inc. v. Gadsden Motel Co.*,
    804 F.2d 1562 (11th Cir. 1986) .............................................................................9

*Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc.*,
    679 F. Supp. 2d 259 (N.D.N.Y. 2009) ................................................................56

*Rouse v. Broadway & Cooper LLC*,
    753 F. Supp. 3d 153 (E.D.N.Y. 2024) ..................................................................7

*Santillan v. Henao*,
    822 F. Supp. 2d 284 (E.D.N.Y. 2011) ..................................................................6

*Sara Lee Corp. v. Bags of N.Y., Inc.*,
    36 F. Supp. 2d 161 (S.D.N.Y. 1999) ...................................................................10

*Saulpaugh v. Monroe Cmty. Hosp.*,
    4 F.3d 134 (2d Cir. 1993) .............................................................................53, 54

*Schalaudek v. Chateau 20th St. LLC*,
    2017 U.S. Dist. LEXIS 26272 (S.D.N.Y. Feb. 24, 2017),
    *adopted*, 2017 U.S. Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017) ....................6, 9

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) .................................................................................47

*Sexy Hair Concepts, LLC v. Sexy Hair, Inc.*,
    2013 WL 5460629 (E.D.N.Y. Sept. 30, 2013) ....................................................56

*Simon Prop. Grp. L.P. v. Brandt Const., Inc.*,
    830 N.E. 2d 981 (Ind. Ct. App. 2005) .................................................................46

*Singer v. Olympia Brewing Co.*,
    878 F.2d 596 (2d Cir. 1989) .................................................................................46

*Singh v. Meadow Hill Mobile Inc.*,
    2023 WL 3996867 (S.D.N.Y. June 14, 2023) .....................................................46

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) .............................................................................................47

*Sunward Elecs., Inc., v. McDonald*,
    362 F.3d 17 (2d Cir. 2004) ...................................................................................11

*Taubman Co. v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ...............................................................................11

*TigerCandy Arts, Inc. v. Blairson Corp.*,
 2012 WL 760168 (S.D.N.Y. Feb. 23, 2012),
 *adopted*, 2012 WL 1948816 (S.D.N.Y. May 30, 2012)..............................................53

*Trans World Airlines, Inc. v. Hughe*s,
 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds sub nom. Hughes Tool Co.
 v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973).....................................................6

*U.S. v. Nucci*,
 364 F.3d 419 (2d Cir. 2004)........................................................................................45

*United States v. Brosius*,
 Case No. 24-cr-20255-WPD (S.D. Fla.) ....................................................................33

*United States v. Yalincak*,
 30 F.4th 115 (2d Cir. 2022) .............................................................................45, 46, 50

*USA v. Hernandez*,
 22-cr-60129, ECF No. 102 (S.D. Fl. June 20, 2023) .................................................30

*Wilson v. Great Am. Indus., Inc.*,
 763 F. Supp. 688 (N.D.N.Y. 1991),
 *aff'd in part, rev'd in part*, 979 F.2d 924 (2d Cir. 1992).............................................53

**Statutes**

11 U.S.C. § 521(a)(1)..........................................................................................................37

11 U.S.C. § 1109(g) ............................................................................................................40

15 U.S.C. § 1114(a) ............................................................................................................41

15 U.S.C. §1116(a) .............................................................................................................56

15 U.S.C. § 1117(a) ......................................................................................................12, 51

15 U.S.C. § 1117(b) ..................................................................................................... *passim*

18 U.S.C. § 371...................................................................................................................30

18 U.S.C § 1956(h) .............................................................................................................30

26 U.S.C. § 6621(a)(2)........................................................................................................53

26 U.S.C. § 6622.................................................................................................................53

28 U.S.C. § 1961(a) ............................................................................................................53

50 U.S.C. § 3931.................................................................................................................57

California Corporations Code § 1702 ...................................................................................61

Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq*. ......................................4

Lanham Act..................................................................................................................1, 2, 43

Servicemembers Civil Relief Act ......................................................................................57

Texas Business Organizations Code 5.251 .........................................................................62

**Other Authorities**

Fed. R. Civ. P 4(e)(2)(A) ....................................................................................................58

Fed. R. Civ. P 4(e)(2)(b) ....................................................................................................58

Fed. R. Civ. P 4(e)(2)(c) ....................................................................................................63

Fed. R. Civ. P 4(e)(1)......................................................................................................61, 63

Fed. R. Civ. P 4(h)(1)(A) ...........................................................................................59, 61, 62

Fed. R. Civ. P. 5(a)(2).........................................................................................................64

Fed. R. Civ. P. 55(b)(2).........................................................................................................8

Fed. R. Civ. P 60(b) ............................................................................................................46

*McCarthy on Trademarks and Unfair Competition* § 30:75 (5th ed.) .............................12

N.Y. C.P.L.R. § 302(a)(2)......................................................................................................7

N.Y. C.P.L.R. § 308.............................................................................................................61

N.Y.C.P.L.R. § 311(a)(1).....................................................................................................59

N.Y. C.P.L.R. § 5001...........................................................................................................55

N.Y. C.P.L.R. § 5004...........................................................................................................52

N.Y. Comp. Codes R & Regs. tit. 22 § 202-b(f)(1).............................................................63

Restatement (Second) of Torts § 879...................................................................................45

**Highly Confidential**

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (collectively, "Gilead") respectfully submit this brief in support of their claimed damages against Lazaro Roberto Hernandez, Zafar Abdullaev, the Synergy Defendants (Synergy Group Wholesalers LLC and Carlos Vega), the Omom Defendants (Omom Pharmaceuticals Inc., Luis D. Gonzalez Herreo, Omom Wholesale Corp., Gustavo Fernandez), the Invicta Defendants (Invicta Wholesale Supply LLC and Jorge Caba), Pharma Pac Wholesale Corp., Gentek LLC, Rapid's Tex Whole Sales Corp., the MyMeds Defendants (Stephen Smith and My Meds LLC), the ITC Group Defendants (Frank Bentancourt and ITC Group LLC), CompaRx LLC, the Mainspring Defendants (Lorik Papyan, Stephen Silverman, and Mainspring Distribution LLC), Bakhtiyar Nabiev, Jeffrey Peterson, Brennan Page, the Laconia Avenue Defendants (Laconia Avenue Pharmacy Corp. and Stanislaus Mgbeojirikwe), John Levitan, Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx,  Ariel Pharmacy, and the Worldwide Pharma Defendants (Adam Brosius and Worldwide Pharma Sales Group, Inc.) (collectively, the "Defaulted Defendants").

## PRELIMINARY STATEMENT

Gilead moves for default judgment on its Lanham Act claims[1] against the Defaulted Defendants, all of whom conspired to traffic counterfeit versions of Gilead's life-saving medications.  As set forth in Gilead's Complaint, the Defaulted Defendants preyed on vulnerable patients by buying already-dispensed bottles of Gilead-branded HIV medication off the street and processing them into counterfeits, including by filling the bottles with the wrong medication and applying a fake foil seal to make them seem unopened, and by creating counterfeit pedigrees

---

[1] Although Gilead asserted additional claims in its pleadings, including civil RICO claims and state-law claims, Gilead limits the instant motion to default judgment on its Lanham Act claims (and thus to those defendants who are in default against whom Gilead has asserted Lanham Act claims).

**Highly Confidential**

with false chains of sale.  This Court has already issued preliminary injunctions against each of the Defaulted Defendants, finding that Gilead was likely to succeed on the merits of its claims against each.  Although Gilead's evidence of the Defaulted Defendants' liability is substantial and uncontroverted, by virtue of their default the allegations against each of them are deemed admitted.  The only question for this Court at this stage is the quantum of damages.

Gilead's damages award against the Defaulted Defendants has three components.  First, Gilead seeks actual damages under the Lanham Act based on each Defaulted Defendants' role in the scheme and the resulting financial harm to Gilead.  Second, Gilead seeks a mandatory award of trebled damages for willful counterfeiting under the Lanham Act.  Third, Gilead seeks an award of prejudgment interest on its actual damages.

On a motion for default judgment, Gilead is entitled to all factual inferences being resolved in its favor.  Gilead's actual-damages methodology and calculations are straightforward and are set out in the opinion of its damages expert, Dr. Gregory Bell.  As Dr. Bell explains, the counterfeits were disguised as authentic Gilead-branded medicines and were dispensed to U.S. patients holding a prescription that could only lawfully be filled by authentic, name-brand Gilead medicine.  Thus, each counterfeit sold displaced the sale of an equivalent authentic bottle of Gilead-branded medicine.  Gilead's per-bottle actual damages are therefore the wholesale price it would have received for the displaced sale of an authentic bottle of Gilead-branded medication, minus the incremental costs of producing that bottle.  And although Gilead needs only to calculate its damages with "reasonable probability," Gilead seeks in this motion a very conservative estimate of its losses, and seeks default judgments that substantially understate Gilead's actual damages.

2

**Highly Confidential**

The Defaulted Defendants' counterfeiting scheme stands apart from the reported Lanham Act caselaw. This is not a case about fake designer handbags or bootleg T-shirts. The Defaulted Defendants conspired to enrich themselves and endanger patients by passing off counterfeit Gilead-branded medications as authentic life-saving drugs. The human cost of their scheme is horrific: every counterfeit bottle they sold represents a patient who was deprived of his or her prescribed HIV medication. The Defaulted Defendants are presumed as a matter of law to have acted knowingly and willfully by virtue of their decision not to participate in this litigation. The Court should award treble damages and pre-judgment interest. The Defaulted Defendants' conduct deserves to be condemned to the fullest extent of the law, to serve as an important deterrent to them and to others who seek to line their own pockets by endangering patients and populations dealing with serious disease.

FACTUAL BACKGROUND

Given the Court's familiarity with the background of this case, Gilead briefly summarizes the relevant facts as to the Defaulted Defendants, as alleged in the operative pleadings. ECF No. 1644.

**A.     Gilead's Authentic Medicines and the Defaulted Defendants' Counterfeits**

Gilead develops and markets lifesaving medications, including medications for HIV and hepatitis C, which have transformed care for people living with serious diseases. ECF No. 1644 ¶¶ 14, 198. In connection with the sale of its medications, Gilead owns and uses a number of well-established and famous registered trademarks that appear on its genuine medications, as well as distinctive packaging to distinguish its medications in the marketplace. *Id.* ¶ 17; *see also* ECF No. 1644 Ex. A (listing trademarks). To ensure patient safety, Gilead's medications move through a tightly controlled supply chain. Specifically, the only distributors to whom Gilead sells its medicines in the United States are a small number of Gilead-authorized distributors, who

3

**Highly Confidential**

are listed on Gilead's website.[2]  Gilead sells its medicines to every Gilead-authorized distributor

at the same, single list price for that medicine known as the wholesale acquisition cost, or

"WAC."  ECF No. 1644 ¶ 418.

Federal law (specifically, the Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et*

*seq.*) requires that each Gilead medication be accompanied by a pedigree: a document tracking

every sale of the physical bottle from seller to seller, all the way back to the manufacturer.  ECF

No. 1644 ¶¶ 2, 224.   The pedigree is part of the product that Gilead sells.  *Id.*  ¶ 231.  These

pedigrees are an important anti-counterfeiting and quality-control measure for Gilead.  *Id.*; *id.* ¶

225.  For the distributors, pharmacies, and patients that buy Gilead's HIV and other medications,

authentic pedigrees that accurately disclose the original sale and chain of custody for the product

are an important feature of Gilead's products that guarantee the medication's authenticity and

safety.  *Id*. ¶ 231.  Gilead's authentic pedigrees use Gilead's registered trademarks to identify the

medication, the origin of the bottle, and the authorized distribution channel in which it was sold.

*Id.* ¶ 232.

Defendants knowingly and willfully conspired to manufacture, sell, market, and

distribute counterfeit prescription Gilead medications.  *Id.* ¶ 1.  Defendants' counterfeiting

scheme relied on passing off their counterfeits as authentic Gilead medications to unsuspecting

patients, who were prescribed these medications to treat potentially life-threatening health

concerns.  Specifically, Defendants conspired to purchase and re-use once-authentic Gilead

packaging.  Defendants primarily purchased bottles of Gilead-branded HIV medication from

vulnerable populations on the street, such as unhoused individuals and/or drug users, for cash.

*Id.* ¶¶ 222.  They then stripped the bottles of their required pharmacy-generated patient labeling,

---

[2] Gilead, *Gilead's Authorized Distributors*, https://www.gilead.com/medicines/authorized-distributors.

**Highly Confidential**

and typically also attached counterfeit, often misspelled patient instructions that lacked important, or contained inaccurate, information. *Id.* The counterfeits were thereafter sold with a counterfeit pedigree that fraudulently claimed the products were purchased from a legitimate supplier when, in fact, they were illegitimately purchased from a vulnerable patient – with potentially devastating effects to that patient, who was prescribed that medication to treat or prevent serious disease. *Id.* ¶¶ 232–33. In some instances, Defendants replaced Gilead's authentic medications with other drugs, such as a prescription antipsychotic medication, placing patients who received that medication at risk of serious injury or death. *Id.* ¶¶ 212–17.

Every bottle of Gilead-branded medication at issue in this case was accompanied by a false pedigree with a fictitious transaction history that never occurred. *Id.* ¶¶ 226–27. These false pedigrees, which made unauthorized use of Gilead's registered trademarks, were intended to trick customers into believing the medication originated from Gilead and was distributed through legitimate channels, when in fact it was purchased from a patient off the street. *Id.* ¶¶ 226-227, 232-233.

## LEGAL STANDARD

On a motion for default judgment, the plaintiff has a duty to establish the defaulted parties' liability when all the factual allegations in the complaint are taken as true, as well as sufficient evidence to establish the amount of damages. *See generally BAC Local 2*, *Albany v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187-190 (2d Cir. 2015). The legal standards for such a finding of liability and damages are set forth below.

### A.    Liability and Causation

When a defendant is held in default, all well-pleaded allegations in the operative pleadings, and all reasonable inferences that can be drawn therefrom, are deemed admitted, other than allegations of the quantum of damages. *See, e.g.*, *Greyhound Exhibitgroup, Inc. v. E.L.U.L.*

5

**Highly Confidential**

*Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992); *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 U.S. Dist. LEXIS 45580, at *4 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 U.S. Dist. LEXIS 43988 (E.D.N.Y. Mar. 31, 2014); *Schalaudek v. Chateau 20th St. LLC*, 2017 U.S. Dist. LEXIS 26272, at *6-7 (S.D.N.Y. Feb. 24, 2017), *adopted*, 2017 U.S. Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017).  While, as discussed below, the plaintiff must demonstrate the quantum of damages, the fact that the defendants' actions caused the plaintiff to suffer damages is admitted.  *Santillan v. Henao*, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011) (at default judgment, plaintiff entitled to finding "that damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged.")  (citation omitted); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 70 (2d Cir. 1971) (holding plaintiff did not have the burden to show any violation of the law or causation, but just "the extent of the injury caused [plaintiff], in dollars and cents."), *rev'd on other grounds sub nom. Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973).

In a Lanham Act case, when a defendant defaults, the defendant's acts of infringement are deemed to be willful as a matter of law.  *Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*, 2011 U.S. Dist. LEXIS 111889, at *21-22 (E.D.N.Y. Aug. 31, 2011) (collecting cases holding defendants deemed willful infringers by virtue of their default), *adopted*, 2011 U.S. Dist. LEXIS 106308 (E.D.N.Y. Sept. 21, 2011).

## B.      Personal Jurisdiction

Gilead's well-pled allegations must also be accepted as true for purposes of establishing personal jurisdiction over each Defaulted Defendant.  *KAWS v. Individuals, Corps., Ltd. Liab. Companies, P'ships, & Unincorporated Ass'ns Identified on Schedule A Hereto*, 2023 WL 1438637, at *2 (S.D.N.Y. Feb. 1, 2023).  Here, there are several theories of personal jurisdiction

6

**Highly Confidential**

that apply to the Defaulted Defendants, any one of which is sufficient to establish this Court's jurisdiction.

Several of the Defaulted Defendants are residents of New York, and are therefore subject to this Court's general jurisdiction. *E.g.*, *Rouse v. Broadway & Cooper LLC*, 753 F. Supp. 3d 153, 167 (E.D.N.Y. 2024). And this Court has already analyzed, ruled upon, and upheld Gilead's various theories of specific jurisdiction, in the context of denying a Rule 12(b)(2) motion to dismiss. ECF No. 781. <u>First</u>, this Court has jurisdiction over any Defaulted Defendant who sold a counterfeit to a buyer in New York. *Id.* at 12 (citing *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015)). <u>Second</u>, this Court has jurisdiction over any Defaulted Defendant who sold counterfeits into other U.S. states knowing those products would eventually end up in New York. ECF 781at 15 (citing *Fica Frio, Ltd. v. Seinfeld*, 434 F. Supp. 3d 80, 87 (S.D.N.Y. 2020)); *see also* ECF 781 (non-defaulted defendants' assertion of his Fifth Amendment rights at deposition sufficient to find he knew his counterfeits would end up in New York). <u>Third</u>, this Court has conspiracy jurisdiction under CPLR § 302(a)(2) over any Defendant alleged to be a participant in a conspiracy where one of the Defendants' co-conspirators sold counterfeits into New York. *Id.* at 19 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)).

Here, while numerous theories of personal jurisdiction apply to the various Defaulted Defendants, as set forth below <u>all</u> of the Defaulted Defendants are alleged to have been members of a nationwide conspiracy to sell counterfeit Gilead-branded drugs, and so <u>every</u> Defaulted Defendant falls within the conspiracy theory of personal jurisdiction. That said, the factual basis for this Court's jurisdiction over each Defaulted Defendant is set forth in Sections I.D and II.A.6, *infra*.

7

**Highly Confidential**

### C.    Sufficiency of Pleadings

On a motion for default judgment, district courts have discretion whether to *sua sponte* review the pleadings for sufficiency before proceeding to a damages inquest. *Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 335-36 (E.D.N.Y. 2022).  "Although the Court of Appeals has not defined the parameters for the exercise of that discretion," district courts "apply the same standard that applies to a court's determination of whether to dismiss a complaint *sua sponte* at the outset of a case." *Id.*; *see also id.* at 336 (finding it "inappropriate [for the court] . . . to take on the role of counsel for a defendant when the defendant itself has chosen not to appear," but that default judgment may be denied where the "complaint is frivolous, or if it is plainly barred by judicial immunity or some other preclusive doctrine").

### D.    Damages

To determine damages against defaulted defendants, the Court must conduct an inquest. Fed. R. Civ. P. 55(b)(2).  At the Court's discretion, the inquest can take the form of an evidentiary hearing or submissions based on affidavits and documents.  *See Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).  It is especially appropriate for the damages inquest to be done on the paper record, without an evidentiary hearing, where the Court is already familiar with the facts.  *Id.*

The burden of proof at the damages inquest is significantly lower than at a jury trial.  At an inquest, Gilead's burden is to establish only a "reasonable basis" for its damages.  *See Gomez*, 2014 U.S. Dist. LEXIS 45580, at *4 (emphasis added); *Cartwright v. Lodge*, 2017 U.S. Dist. LEXIS 48052, at *12 (S.D.N.Y. Mar. 30, 2017) (in case of default, plaintiff must provide "some reasonable basis to quantify" damages); *Gutierrez v. Taxi Club Mgmt.*, 2018 U.S. Dist. LEXIS 106808, at *7 (E.D.N.Y. June 25, 2018), ("In the damages phase, the court must ensure that there

8

**Highly Confidential**

is a reasonable basis for the damages requested in a default judgment motion,"), *adopted*, 2018

U.S. Dist. LEXIS 118262 (E.D.N.Y. July 16, 2016).

Importantly, at the inquest, all reasonable inferences from the facts concerning damages

must be drawn in Gilead's favor. *See Gomez*, 2014 U.S. Dist. LEXIS 45580, at *4; *Schalaudek*,

2017 U.S. Dist. LEXIS 26272, at *6 ("[P]laintiffs are entitled to all reasonable inferences from

the evidence presented in support of their damages claims" at a damages inquest); *Gutierrez*,

2018 U.S. Dist. LEXIS 106808 at *7 ("In the damages phase [of a default judgment] … [t]he

moving party is entitled to all reasonable inferences from the evidence it offers.").

In a Lanham Act case, the plaintiff's low burden for proving damages at inquest is

coupled with the Lanham Act's already plaintiff-friendly standards for proving the amount of

damages. Under the Lanham Act, once the fact (as opposed to the amount) of damages is

established – as it is here as a matter of law due to the defendants' default – "a mark holder is

held to a lower standard in proving the exact amount of actual damages." *Abbott Lab'ys v. H&H*

*Wholesale Servs., Inc.*, 2022 WL 17977495, at *3 (E.D.N.Y. Dec. 28, 2022), *aff'd*, 2024 WL

4297472 (2d Cir. Sept. 26, 2024). Under that relaxed standard, "courts may entertain some

degree of speculation in computing the amount of damages, particularly where the inability to

compute them is attributable to the defendant's wrongdoing." *Id*. (quotation marks and citation

omitted); *see also Hilton v. Int'l Perfume Palace, Inc.*, 2013 WL 5676582, at *7 (E.D.N.Y. Oct.

17, 2013); *see also Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.

1977) ("[W]hen the existence of damage is certain, ... the burden of uncertainty as to the amount

of damage is upon the wrongdoer.") (emphasis added; citations omitted); *Ramada Inns, Inc. v.*

*Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("[A] plaintiff may recover upon a

showing of the extent of damages as a matter of just and reasonable inference, although the result

9

**Highly Confidential**

may be only an approximation."); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir.

1993) (holding actual damages may be proved using methods that are "somewhat crude," as long

as they are "n[ot] ... fanciful."); *Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F. Supp. 2d 161, 169

(S.D.N.Y. 1999) ("[I]n determining infringement damages, courts are to resolve against the

defendants any factual uncertainties … when the defendants left the uncertainty by not

responding to the evidence of [infringing] sales with evidence of their own." (citation omitted)).

**ARGUMENT**

Although Gilead would be entitled to a finding of liability as to all of its claims asserted

against the Defaulted Defendants, for purposes of default judgment, Gilead chooses to rely solely

on its Lanham Act claims against the Defaulted Defendants.

The argument section of this brief is divided into four parts.  First, Gilead addresses its

Lanham Act claims against the Defaulted Defendants, including the legal standard, proof of

liability, calculation and defendant-by-defendant proof of damages, and entitlement to treble

damages.  Second, Gilead analyzes issues of joint-and-several liability among the Defaulted

Defendants.  Third, Gilead discusses its entitlement to pre-judgment interest against the

Defaulted Defendants.  Fourth and finally, Gilead sets forth the bases for ordering permanent

injunctive relief against the Defaulted Defendants.

I.    **GILEAD'S LANHAM ACT CLAIMS AGAINST THE DEFAULTED
      DEFENDANTS**

    A.    **Gilead Is Entitled to a Finding of Liability, Including Willful Infringement,
            Under Its Lanham Act Claims**

With the allegations of the operative pleadings, the corrected Sixth Amended Complaint,

admitted, and all inferences drawn in Gilead's favor, the liability of each of the Defaulted

Defendants under the Lanham Act is not in dispute.  Indeed, the Court has already found

Gilead's Lanham Act claims valid and likely to succeed against all of the Defaulted Defendants

10

**Highly Confidential**

in issuing preliminary injunctions and asset freezes against them.  *See, e.g.*, ECF Nos. 69, 199, 280.

Gilead sets forth in Section I.D, *infra*, the individualized allegations and evidence against each Defaulted Defendant, including proof of their counterfeit sales.  But more generally, each of the Defaulted Defendants is alleged to have sold counterfeit Gilead-branded medications bearing multiple counterfeit Gilead Marks.[3]  ECF No. 1644 ¶¶ 220-32.  Every one of these counterfeits was sold accompanied by a fake pedigree, bearing unauthorized replicas of Gilead Marks, that bore a fake chain of custody that falsely claimed to trace the bottle back to an original sale by Gilead.  *Id.* ¶¶ 226–233.  Moreover, Gilead has alleged that the Gilead-branded medicines sold by the Defaulted Defendants had multiple other counterfeit elements: bottles with the wrong pills inside; bottles with counterfeit reproductions of Gilead's Patient Information documents (which also bear the Gilead Marks) adhered to them; bottles with replica seals to make them appear unopened; and bottles with counterfeit labels.  *Id.* ¶¶ 217, 220, 222.  The sale of these counterfeits is a *per se* violation of Gilead's trademark rights under the Lanham Act.  *See Sunward Elecs., Inc., v. McDonald*, 362 F.3d 17,  25 (2d Cir. 2004); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act."); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003); *Philip Morris USA, Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2004).  And in addition to the corporations that made the counterfeit sales, each of the individual Defaulted Defendants is personally liable, on a joint and several liability basis, with their respective companies as a moving, active, conscious force behind the infringement.  *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 155 (E.D.N.Y. 2016); *GS*

---

[3] The Gilead Marks are those set out at Exhibit A to the corrected Sixth Amended Complaint, ECF No. 1644.

**Highly Confidential**

*Holistic, LLC v. New Paradise Inc.*, 2025 WL 3657152, at \*7 (E.D.N.Y. Nov. 13, 2025), *Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 5696148, at \*16 (E.D.N.Y. Sept. 30, 2019).

Finally, Gilead reiterates that each of the Defaulted Defendants is deemed to be willful as a matter of law by virtue of their default. *E.g.*, *Aw Indus.*, 2011 U.S. Dist. LEXIS 111889, at \*21-22.

The Court should therefore find that each of the Defaulted Defendants is liable for willful counterfeiting under the Lanham Act.

**B.    Gilead's Actual Damages Under the Lanham Act**

The Lanham Act entitles Gilead to its actual damages suffered as a result of the Defaulted Defendants' infringing conduct. 15 U.S.C. § 1117(a). Actual damages under the Lanham Act are defined as "lost sales or revenue" (as well as other expenditures such as corrective advertising not at issue here). *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) (citation omitted); *see also Harris v. Fairweather*, 2012 U.S. Dist. LEXIS 128409, at \*17-18 (S.D.N.Y. Sept. 10, 2012) (collecting cases), *adopted,* 2012 U.S. Dist. LEXIS 151696 (S.D.N.Y. Oct. 19, 2012). Where a plaintiff elects to seek its actual damages (as opposed to the defendant's profits or statutory damages), a full damages award is mandatory: the Lanham Act provides no discretion for a downward adjustment. *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006) (while "[a] district court ha[s] discretion under § 1117" to award less than the defendant's full profits, "§ 1117 does not allow for a downward adjustment of actual [i.e., lost revenue] damages"); *see also Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 535-36 (7th Cir. 1989); *McCarthy on Trademarks and Unfair Competition* § 30:75 (5th ed.) ("There is no equitable basis to refuse the recovery of actual losses…."). Here, Gilead has elected to seek its actual damages: *i.e.*, its lost profits due to the infringement.

12

**Highly Confidential**

### C.    The Method and Calculation of Damages Are Not in Dispute

As set forth in Dr. Gregory Bell's expert report, dated May 14, 2024, Gilead's damages are straightforward and easily calculated.  Dr. Bell is a seasoned and well-respected damages expert who holds an M.B.A. and a Ph.D. in business economics, both from Harvard University, and is a Group Vice President at Charles River Associates, an economics and management consulting firm.  Ex. 1 (Bell Rpt.)[4]; *see also Abbott Lab'ys*, 2019 WL 5696148, at *47 ("Dr. Bell's expert opinions have been relied on by other courts in this Circuit.").  Dr. Bell's report is completely unrebutted: no Defendant in this case, defaulted or otherwise, submitted a rebuttal expert report, and no Defendant chose to depose Dr. Bell.

### 1.    Each Counterfeit Displaced the Sale of an Authentic Product

As Dr. Bell explains in his report, each counterfeit Gilead-branded medication sold in U.S. commerce represents a lost sale of a unit of the equivalent authentic Gilead-branded medicine.  Ex. 1 ¶¶ 7-8.  The counterfeits were disguised as authentic Gilead-branded medicines and were used to fill the prescriptions of unwitting U.S. patients.  *Id.* ¶¶ 7, 20-22.  Those patients – also victims of Defendants' counterfeiting scheme – believed they were receiving the *only* thing that could lawfully fill their prescription: the authentic Gilead-branded medicine their doctor prescribed.  *Id.*  Each counterfeit medication sold represents a patient who came to the pharmacy seeking to purchase Gilead's legitimate medications, and instead was given a potentially dangerous counterfeit.  *Id.*  Thus, each patient who received a counterfeit would have, but for the counterfeiting, received authentic Gilead-branded medicine, and that authentic medicine would necessarily have been sold by Gilead.  *Id.*; *see also, e.g.*, ECF No. 1644 ¶¶ 1-3, 209-219 (explaining patients who received counterfeits did so unwittingly); *id.* ¶ 770

---

[4] All references to exhibits are references to the exhibits of the Declaration of Timothy A. Waters, dated March 20, 2026, and attached hereto.

13

**Highly Confidential**

("Defendants' trafficking in counterfeit Gilead-branded products displaced the sale of authentic products and caused Gilead to lose profits.").

In short, the unique nature of this counterfeiting case, involving counterfeit brand-name prescription drugs sold in place of authentic drugs, leaves no doubt that each counterfeit caused Gilead to lose the sale of an equivalent authentic product. But as noted above, on a motion for default judgment, Gilead's allegations regarding causation of damages must be assumed to be truthful, and all inferences from those allegations drawn in Gilead's favor. *E.g.*, *Greyhound Exhibitgroup, Inc,* 973 F.2d at 158. And Gilead's burden of proof of causation under the Lanham Act is low to begin with: "[A] plaintiff need not present absolute proof that purchasers of the infringing product would have bought [plaintiff's] product instead. Rather, plaintiff's burden of proof is one of reasonable probability." *Innovation Ventures*, 176 F. Supp. 3d at 162 (citation omitted). In short, there can be no question that Gilead is entitled on this motion to a finding that each counterfeit product displaced the sale of an authentic product, on a one-for-one basis. *See Abbott Lab'ys,* 2022 WL 17977495, at *6-7.

### 2. Gilead's Per-Unit Lost Profits

Because each counterfeit sold caused Gilead to lose the sale of an authentic product, Gilead's actual damages – i.e., its lost profits – are the wholesale price Gilead would have received for the equivalent authentic medication, minus the incremental costs of manufacturing that authentic medication.

These calculations are not complex. Gilead's per-unit profits are the wholesale price that Gilead receives when it sells the medicine in U.S. commerce, minus the incremental cost of manufacturing that unit of medicine. Dr. Bell's calculations of both elements – price received and incremental cost incurred – are based on undisputed evidence and highly conservative assumptions that understate Gilead's true damages.

14

**Highly Confidential**

        a.     Gilead's Per-Unit Income

In the United States, Gilead sells its medicines to all of its authorized wholesalers at the same set price: WAC. Ex. 1 ¶ 25; ECF No. 8 (Sunkara Decl.) ¶ 13. ████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████

        b.     Gilead's Per-Unit COGS

Dr. Bell is also extremely conservative in deducting Gilead's per-unit manufacturing costs, also known as "costs of good sold" or COGS. Gilead publicly reports its global COGS, as a percentage of net sales, in its annual Form 10-K financial statements. *See* Ex. 1 ¶ 30 (citing Gilead Form 2021 10-K at 58); Ex. 6 (Declaration of John Jorden) ¶ 3; Exs. 7-13 (Gilead's Form 10-K statements for damages period). That publicly reported COGS figure is calculated across all of Gilead's products globally -- not just the U.S. HIV medicines that were almost entirely at issue in this case. Ex. 1 ¶ 30; Ex. 6 ¶ 3. Gilead's Vice President of Finance has reviewed the Gilead COGS reported in its Form 10-K annual reports, as well as data concerning COGS for the U.S. Gilead-branded medicines at issue in this suit. Ex. 6 ¶ 4. Mr. Jorden has confirmed that for each product at issue for the 2017-2022 damages period, ████████████████████

██████████████████████████████████████

████████████████████████████████████

15

**Highly Confidential**



In sum, as set forth in Dr. Bell's unrebutted report and supported by undisputed evidence, the highly conservative estimate of Gilead's actual damages for each counterfeit sold in U.S. commerce is:  that product's WAC price (███████████████████████████████████) minus Gilead's COGS for the product, as reported in Gilead's public 10-K reports (████ ██████████████████████████████████).

> c.    The Undisputed Evidence of Defendants' Sales of Counterfeit
>        Gilead-Branded Medicines

By virtue of their default, the Defaulted Defendants are deemed to have admitted that every bottle of Gilead-branded medicine they trafficked is a counterfeit bearing one or more of the counterfeit features detailed in Gilead's pleadings: wrong pills inside the bottle, counterfeit reproductions of patient information documents, counterfeit labels, and/or counterfeit pedigrees. *See* ECF No. 1644 ¶¶ 1-3, 10, 220-22, 229-32, 245, 248, 261, 278, 282, 292, 299, 309, 311, 337,

---

[5] In addition to COGS, Gilead sometimes incurs an additional cost when its medicines are sold into the United States: if a patient's health insurer pays for the medicine, Gilead typically pays a contractually set rebate to that insurance company. *See* Ex. 1 ¶¶ 25-26. However, that rebate is immaterial to Gilead's damages calculations, because Gilead pays that same rebate regardless of whether the bottle is authentic or counterfeit. *Id.*

Insurance companies do not knowingly pay for counterfeit medications. *Id.* If a counterfeit is sold through the patient's insurance, that means the counterfeit was disguised as an authentic bottle of Gilead-branded medicine and processed by the insurance company as though it were authentic, and so Gilead paid the contractual rebate on that medicine. *Id.* Because Gilead paid rebates on the counterfeit sold through insurance, and but for the counterfeiting would have paid those same rebates on authentic medicines, those rebates are not a variable cost and have no effect on Gilead's damages. *Id.*; *see Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1029-30 (2d Cir. 1995) ("[C]ourts generally do not include fixed costs in the calculation of lost profits.  This is, of course, because the fixed costs would have been encountered whether or not the breach occurred.... [T]he district court was correct to use the standard formula employed by most American courts and to deduct only variable costs from sales revenue to arrive at a figure for lost profits." (citation omitted)).

**Highly Confidential**

340, 343, 349, 353-54, 364-68, 384-85, 391-408, 427-28, 446, 449, 451, 466-71, 484-87, 493-94,497, 541-43, 551; *see, e.g., Greyhound Exhibitgroup, Inc.,* 973 F.2d at 158. In calculating each Defaulted Defendant's damages, Dr. Bell relies on the undisputed evidence of each Defendant's trafficking of these counterfeit Gilead-branded medicines. Specifically, Dr. Bell relied on each Defaulted Defendants' own purchase and sales records where available, and where not, then upon the business records produced by suppliers who sold to and/or the customers who purchased from that Defaulted Defendant.[6] *See, e.g.,* Ex. 1 ¶ 15. Courts have credited Dr. Bell's reliance on this type of data as "particularly reasonable" in assessing damages in similar circumstances. *See Abbot Lab'ys*, 2022 WL 17977495, at *4 (holding in a damages inquest relating to counterfeit medical devices that "[r]elying on the purchase data here as a proxy for sales is particularly reasonable and does not constitute impermissible speculation … to the extent that sales data is not available, it is because the … [D]efendants have not provided it."). Dr. Bell compiled spreadsheets that summarize, in detail, all such transactions for each of the Defaulted Defendants. Ex. 1 at Exs. E-1, F-1. The documentary evidence underlying Dr. Bell's spreadsheets for each Defaulted Defendant is set forth immediately below.

---

[6] Some of the non-defaulted Defendants who purchased counterfeits from Defaulted Defendants have settled with Gilead. For several reasons – including that Gilead settled numerous claims, including those giving rise to damages well beyond Gilead's actual damages – the Defaulted Defendants would not be entitled, under any circumstances, to set off any portion of its liability against the settlement payments Gilead has received. But the Court need not reach the issue, because by virtue of their default, the Defaulted Defendants have waived any right to seek or receive any such set-offs. *Gov't Emples. Ins. Co. v. Sannit-Thomas*, 2015 U.S. Dist. LEXIS 135117, at *30 (E.D.N.Y. Sept. 4, 2015), *adopted*, 2015 U.S. Dist. LEXIS 130582 (E.D.N.Y. Sept. 27, 2015) (collecting cases and holding "a defendant in default may not invoke the benefits of the set-off rule.") (internal quotation marks omitted). And even if they had not waived their right to seek a set off (which they have), the Defaulted Defendants have made no effort to meet their burden of establishing their right to a set-off. *Id.*; *see also Kotuwage v. NSS Petro., Inc.*, 2018 U.S. Dist. LEXIS 21917, at *30 (E.D.N.Y. Feb. 8, 2018), *adopted*, 2018 U.S. Dist. 37364 (E.D.N.Y. March 7, 2018) [magistrate's recommendation, 2019 U.S. Dist. LEXIS 37053 (E.D.N.Y March 6, 2018); adopted by, 2019 U.S. Dist. 50498 (E.D.N.Y. March 25, 2019)]("When a non-settling defendant seeks a set-off, the burden rests squarely upon [defendant] to show the extent to which a recovery against it would be duplicative of [a plaintiff's] recovery from settling defendants.") (alterations in original) (internal quotation marks omitted).

17

**Highly Confidential**

### D. Individualized Evidence of Each Defaulted Defendant's Liability and Damages

#### 1. Zafar Abdullaev

Gilead has alleged that Zafar Abdullaev, through his entity, Boulevard 9229 LLC, supplied a large number of counterfeit Gilead-branded medicines to Safe Chain, all with fake pedigrees. *See, e.g.,* ECF No. 49 ¶ 4. Moreover, Gilead has alleged that Abdullaev "managed, supervised, ratified, and personally participated in the trafficking of counterfeit Gilead HIV medications," "personally financially benefited from the trafficking of counterfeit Gilead medications," and "failed to exercise his authority to stop" the trafficking of counterfeit Gilead medications." ECF No. 1644 ¶¶ 25-26. This Court has personal jurisdiction over Abdullaev because he is a New York resident.[7] ECF No. 49 ¶ 19; ECF No. 1644 ¶ 26. The Clerk has issued certificates of default against Abdullaev. ECF Nos. 1166, 1656.

The business records of Boulevard's customers, Safe Chain and ProVen Pharmaceuticals, LLC ("ProVen"), show that Abdullaev, through Boulevard, sold 10,719 bottles of Gilead-branded medication. *See* Ex. 1 at Ex. E-1; ECF Nos. 1119-1–1119-2 (showing pedigrees sent between Boulevard and ProVen); Ex. 20 (showing Safe Chain purchases of Gilead medicines from Boulevard). As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Abdullaev's infringement (before trebling) to be $25,214,292. *See* Ex. 1 at Ex. F-1.

---

[7] As set forth above, Gilead has numerous theories of personal jurisdiction over the Defaulted Defendants, which this Court has already upheld. ECF No. 781 at 14-20. For concision, in summarizing the allegations against each of the Defaulted Defendants, Gilead recites only a single theory of personal jurisdiction: whichever is first among the list the Gilead sets forth at pp. 7-9, *supra*. Gilead does not waive and retains all other theories of jurisdiction supported by the record.

18

**Highly Confidential**

### 2. The Omom Defendants (Omom Pharmaceuticals, Inc., Luis D. Gonzalez Herrero, Omom Wholesale Corp., and Gustavo Fernandez)

Gilead has alleged that the Omom Defendants supplied a large number of counterfeit Gilead-branded medicines to multiple Distributor Defendants, including ProPharma and Safe Chain, all with fake pedigrees. *See, e.g.,* ECF No. 147 ¶¶ 270-271. Omom Pharmaceuticals Inc. and Omom Wholesale Corp. (together, "Omom") are fly-by-night Supplier Defendants whose sales to Safe Chain and ProPharma were orchestrated by the Leader Defendants, who oversaw the conspiracy. *Id.* ¶ 270. Leader Defendant Ralhan introduced Safe Chain to Omom and negotiated the pricing of the purported HIV medicines Safe Chain purchased. *Id.* ¶ 243.

Gilead has alleged that Omom sold counterfeits. For example, Gilead received and tested a counterfeit bottle of BIKTARVY® that Omom had sold to ProPharma, which sold it to a pharmacy. *Id.* ¶ 270. That counterfeit bottle had the wrong pills inside, and a patient reported being sickened by the counterfeit medication. *Id.* Gilead has confirmed every pedigree for the purported Gilead medications that Omom sold to Safe Chain and ProPharma to be fraudulent. *Id.*

Further, Gilead has alleged that Omom actively participated in the conspiracy. For example, Defendants Gentek, Omom, PharmaPac, and RXWholesale LLC utilized DSCSA pedigree documentation sharing a common template. *Id.* ¶ 260. Moreover, Omom abandoned its offices shortly after learning that Gilead was pursuing the sellers of counterfeits. *Id.* ¶ 270. Gilead has alleged that Omom's principals, Messrs. Herrero-Gonzales, Fernandez, and Mato knowingly participated in Omom's counterfeiting activities. *Id.* ¶ 271. This Court has personal jurisdiction over the Omom Defendants because they conspired with Safe Chain and ProPharma to sell counterfeits, and because the counterfeits sold to Safe Chain and ProPharma were in turn sold to New York pharmacies. *Id.* ¶¶ 225-28; *see also* Exs. 14-16 (showing Safe Chain and

19

**Highly Confidential**

ProPharma sales into New York).  The Clerk of Court has entered certificates of default against the Omom Defendants.  ECF Nos. 422, 1656.

The business records of the Omom Defendants' customers, ProPharma and Safe Chain, show that the Omom Defendants sold 13,451 bottles of Gilead-branded medication.  *See* Ex. 19 (showing Safe Chain purchases from the Omom Defendants); Ex. 17 (ProPharma Invoices) at 737-1649 (showing ProPharma purchases from the Omom Defendants); Ex. 1 at Ex. E-1.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Omom Defendants' infringement (before trebling) to be $30,199,280.  *See* Ex. 1 at Ex. F-1.

### 3.    The Synergy Defendants (Synergy Group Wholesalers LLC and Carlos Vega)

Gilead has alleged that Synergy Group Wholesalers LLC ("Synergy") supplied counterfeit Gilead-branded medications to Safe Chain, all with fake pedigrees.  ECF No. 49 ¶ 160.  Gilead has further alleged that Carlos Vega is the principal of Synergy and a moving, active, and conscious force behind its unlawful conduct.  *Id.* ¶¶ 26, 150-159.  The Clerk of Court has also entered certificates of default against the Synergy Defendants.  ECF Nos. 422, 1656. This Court has already held that it has personal jurisdiction over Synergy's principal, Carlos Vega, for acts that he committed through Synergy.   ECF 781.  This Court has jurisdiction over Synergy for the same reasons.

The business records of Synergy's customer, Safe Chain, show that Synergy sold 2,848 bottles of Gilead-branded medication.  *See* Ex. 19 (showing Safe Chain's purchases from Synergy); Ex. 1 at Ex. E-1.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual

20

**Highly Confidential**

damages caused by Synergy Defendants' infringement (before trebling) to be $6,453,322. *See* Ex. 1 at Ex. F-1.

### 4.    Invicta Defendants (Invicta Wholesale Supply LLC and Jorge Caba)

Gilead has alleged that the Invicta Defendants supplied a large number of counterfeit Gilead-branded medicine to ProPharma, all with fake pedigrees. *See, e.g.,* ECF No. 1644 ¶ 317. Invicta was actively coordinating with other members of the conspiracy. For example, Invicta used the same sample product list template as Omom and Rapid's Tex, and metadata indicate that they share a common author. *Id.* ¶ 290. Moreover, Gilead has alleged that Invicta's principal, Jorge Cava, "supervised, ratified, and personally participated in the trafficking of counterfeit Gilead medications," "personally financially benefited from the trafficking of counterfeit Gilead medications" and "failed to exercise his authority to stop" the trafficking. *Id.* ¶ 66. Specifically, on May 21, 2021, Caba, emailed Levitan and Brosius, writing, "Here is a copy of how the t3 [*i.e.*, the pedigree] is gonna look like. SafeChain address it not on the paper because I dont [sic] have it, but it will be there. Thank you for the opportunity." *Id.* ¶ 283.

This Court has personal jurisdiction over the Invicta Defendants because they conspired with ProPharma to sell counterfeits into the State of New York, and because the counterfeits sold to ProPharma were in turn sold to New York pharmacies. Ex. 17 at 1-736 (showing ProPharma's purchases from Invicta); Ex. 16 (showing ProPharma's sales, including sales into New York). The Clerk has issued certificates of default against the Invicta Defendants. ECF Nos. 1598, 1656.

The business records of the Invicta Defendants' customers, ProPharma and ProVen, show that the Invicta Defendants sold 4,779 bottles of Gilead-branded medication. *See* Ex. 17 at 1-736; Ex. 18 (showing ProVen's purchases from Invicta); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described

21

**Highly Confidential**

above, Dr. Bell calculates the actual damages caused by the Invicta Defendants' infringement (before trebling) to be $10,590,428. *See* Ex. 1 at Ex. F-1.

### 5.    Pharma Pac Wholesale Corp.

Gilead has alleged that Pharma Pac Wholesale Corp. ("Pharma Pac") supplied a large number of counterfeit Gilead-branded medicines to ProPharma, all with fake pedigrees. *See, e.g.,* ECF No. 147 ¶ 274. Pharma Pac was set up directly by one of the Leader Defendants, Venkata Srinivas Mannava, to be a ProPharma supplier. *Id.* ¶¶ 251, 275. To conceal the identity of the counterfeits, Pharma Pac stole the identity of an established pharmaceutical repackaging company, also named Pharma Pac. *Id.* ¶ 276. As part of its attempts to pass itself off as its legitimate namesake, Defendant Pharma Pac fraudulently utilized the legitimate Pharma Pac's business address on its corporate filings, and even copied the legitimate Pharma Pac's logo on its pedigrees and invoices. *Id.* Gilead has confirmed that every pedigree for every purported bottle of Gilead product sold by Pharma Pac Wholesale Corp. is fraudulent – they all list a purported first sale from Gilead to an authorized distributor, but Gilead never made those sales to that authorized distributor. *Id.*

This Court has personal jurisdiction over Pharma Pac because it conspired with ProPharma to sell counterfeits into the State of New York, and because the counterfeits sold to ProPharma were in turn sold to New York pharmacies. Ex. 17 at 1650-1722 (showing Pharma Pac sales to ProPharma); Ex. 16 (showing ProPharma's sales, including sales into New York). The Clerk has issued certificates of default against Pharma Pac Wholesale Corp. ECF Nos. 422, 1656.

The business records of Pharma Pac Wholesale Corp.'s customers, ProPharma and Total Remedy Pharmacy f/k/a Everything Pharmacy Related II, Inc., show that the Pharma Pac Wholesale Corp. sold 2,665 bottles of Gilead-branded medication. *See* Ex. 17 at 1650-1722;

22

**Highly Confidential**

ECF 608-72 (showing Total Remedy/Pharma Pac Invoices and Pedigrees); Ex. 1 at Ex. E-1.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Pharma Pac Wholes Corp.'s infringement (before trebling) to be $6,440,587.  *See* Ex.1 at Ex. F-1.

### 6.    Gentek LLC

Gentek LLC ("Gentek") supplied a large number of counterfeits to multiple Supplier Defendants, including Safe Chain and Scripts.  *See, e.g.,* ECF No. 147 ¶¶ 137.  Gentek has since been identified by the federal criminal authorities as under the ultimate control of Kingpin Defendant Lazaro Hernandez.  ECF. No. 1644 ¶ 383; Ex. 25 (Herrera Factual Proffer).   Lazaro Roberto Hernandez managed, supervised, ratified, and personally participated in the trafficking of counterfeit Gilead HIV and other medications.  ECF No. 1644 ¶ 104; Ex. 24 (Hernandez Factual Proffer).  Lazaro Roberto Hernandez controlled the supply of the counterfeits, including by exercising ultimate control over numerous fly-by-night counterfeit Supplier Defendants in this action.  *Id.*  This Court has personal jurisdiction over Gentek because it sold counterfeits to Scripts in New York.  Ex. 22 (Scripts purchases and sales, showing purchases from Gentek). The Clerk has issued certificates of default against Gentek.  ECF Nos. 422, 1656.

The business records of the entities that Gentek sold to, Safe Chain and Scripts, show that Gentek sold 31,792 bottles of Gilead-branded medication.  *See* Ex. 22 (showing Scripts' purchases from Gentek); Ex. 20 (showing Safe Chain's purchases from Gentek); Ex. 1 at Ex. E-1.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Gentek's infringement (before trebling) to be $72,149,171.  *See* Ex. 1 at Ex. F-1.

23

**Highly Confidential**

### 7.    Rapid's Tex Whole Sale Corp.

Gilead has alleged that Rapid's Tex Whole Sale Corp. ("Rapid's Tex") supplied a large number of counterfeit Gilead-branded medicines to Safe Chain, all of which with fake pedigrees, by selling to an entity known as Mr. Unlimited LLC, who in turn sold to Safe Chain. *See, e.g.,* ECF No. 147 ¶¶ 151-155. Safe Chain itself declared in writing that multiple bottles of Gilead medication sold by Rapid's Tex were "bad/counterfeit." *Id.* ¶ 153. Nevertheless, Safe Chain continued to buy counterfeits from Rapid's Tex, and Rapid's Tex continued to ship counterfeit medicines, including BIKTARVY® to Safe Chain. *Id.* ¶¶ 154-55. This Court has personal jurisdiction over Rapid's Tex because they conspired with Safe Chain to sell counterfeits into the State of New York, and because the counterfeits sold to Safe Chain were in turn sold to New York pharmacies. *Id.*; *see also* Exs. 14-15 (showing Safe Chain's sales into New York); Ex. 20 (showing Safe Chain's purchases from Rapid's Tex). The Clerk has issued certificates of default against Rapid's Tex. ECF Nos. 422, 1656.

The business records of Rapid's Tex customer, Safe Chain, show that Rapid's Tex sold 1,451 bottles of Gilead-branded medication. *See* Ex. 20 (showing Safe Chain's purchases from Rapid's Tex); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Rapid's Tex infringement (before trebling) to be $3,370,426. *See* Ex. 1 at Ex. F-1.

### 8.    My Meds Defendants (Stephen Smith and My Meds LLC)

Gilead has alleged that the My Meds Defendants supplied a large number of counterfeits to Distributor Defendant Scripts, all with fake pedigrees. *See, e.g.,* ECF No. 778 ¶ 337. Kingpin Defendant Hernandez worked anonymously in the background to manage the sales of the My Meds counterfeits to Scripts. *Id.* ¶ 237. In the course of these transactions, Defendant Stephen

24

**Highly Confidential**

Smith, a My Meds principal, was the primary My Meds contact and personally participated in and approved the sales of the counterfeits to Scripts. *Id.* ¶ 331. This Court has personal jurisdiction over the My Meds Defendants because they sold counterfeits to Scripts in New York. *Id.* ¶ 110; Ex. 22 (showing Scripts' purchases from the My Meds Defendants). The Clerk has issued certificates of default against the My Meds Defendants. ECF Nos. 840, 1598, 1656.

The business records of the My Meds Defendants' customer, Scripts, show that the My Meds Defendants sold 4,783 bottles of Gilead-branded medication. *See* Ex. 22 (showing Scripts' purchases from the My Meds defendants); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by the My Meds Defendants' infringement (before trebling) to be $10,899,758. *See* Ex. 1 at Ex. F-1.

### 9. ITC Group Defendants (Frank Bentancourt and ITC Group LLC)

Gilead has alleged that the ITC Group Defendants supplied a large number of counterfeit Gilead-branded medicines to Distributor Defendant Scripts, all with fake pedigrees. *See, e.g.*, ECF No. 778 ¶¶ 183, 335-341. Betancourt corresponded with Scripts' owner, Defendant Steven Diamantstein, regarding advice on how to acquire a wholesale license and to prepare fake pedigrees. *Id.* ¶¶ 337-341. This Court has personal jurisdiction over the ITC Group Defendants because they sold counterfeits to Scripts in New York. *Id.* ¶¶ 183, 335-341. The Clerk has issued certificates of default against the ITC Group Defendants. ECF Nos. 1598, 1656.

Scripts' business records show that the ITC Group Defendants sold 4,779 bottles of Gilead-branded medication. *See* Ex. 22 (showing Scripts' purchases from the ITC Group Defendants); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual

25

**Highly Confidential**

damages caused by the ITC Group Defendants' infringement (before trebling) to be $8,567,955.

*See* Ex. 1 at Ex. F-1.

### 10. CompaRx LLC

Gilead has alleged that CompaRx LLC supplied a large number of counterfeit Gilead-branded medicines to a New York pharmacy, Defendant Ascan Pharmacy Inc. ("Ascan"), all with fake pedigrees. *See, e.g.*, ECF No. 1644 ¶¶ 353-54. This Court has personal jurisdiction over CompaRx LLC because it sold counterfeits to Ascan Pharmacy in New York. *Id.* ¶ 354; ECF No. 609-3 (showing CompaRx LLC's sales to Ascan). The Clerk has issued certificates of default against CompaRx LLC. ECF Nos. 1598, 1656.

Ascan's business records show that CompaRx LLC sold 135 bottles of Gilead-branded medication. *See* Ex. 27 (Ascan-CompaRx purchases); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by CompaRx LLC's infringement to be $315,397. *See* Ex. 1 at Ex. F-1.

### 11. Mainspring Defendants (Lorik Papyan, Stephen Silverman, and Mainspring Distribution LLC)

Gilead has alleged that the Mainspring Defendants supplied a large number of counterfeit Gilead-branded medicines to Distributor Defendant Scripts, all with fake pedigrees. *See, e.g.*, ECF No. 778 ¶ 348. Mainspring's principals—Edvin Ovasapyan, Hakob Kojoyan, Lorik Papyan, and Stephen Silverman—have all been charged with felonies in connection with this counterfeiting scheme. *Id.* ¶ 349. All but Silverman have pleaded guilty. *Id.* According to the Department of Justice, Mainspring's principals used the company "to pose as legitimate prescription drug wholesalers" and then "obtained prescription drugs from unlicensed, black market sources." *Id.* ¶ 350. They then "sold the drugs through Mainspring" to wholesalers,

26

**Highly Confidential**

"falsely representing that the drugs were legitimately sourced from licensed suppliers." *Id.* Mainspring "specialized in expensive name-brand prescription drugs used to treat HIV, such as Atripla," a Gilead-branded HIV medication. *Id.*; *see also id.* ¶¶ 351-352 (giving further details of the scheme). This Court has personal jurisdiction over the Mainspring Defendants because they sold counterfeits to Scripts in New York. *Id.* ¶ 188; Ex. 21 (showing Scripts' purchases from the Mainspring Defendants). The Clerk has issued certificates of default against the Mainspring Defendants. ECF Nos. 822, 1598, 1656.

Scripts' business records show that the Mainspring Defendants sold 17,587 bottles of Gilead-branded medication. *See* Ex. 21 (showing Scripts' purchases from the Mainspring Defendants); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by the Mainspring Defendants' infringement (before trebling) to be $32,050,169. *See* Ex. 1 at Ex. F-1.

### 12.    Bakhtiyar Nabiev

Gilead has alleged that Bakhtiyar Nabiev, through his entity, Valuecare Pharmacy, Inc., supplied counterfeit Gilead-branded medicines, all with fake pedigrees, to Defendant My Meds, who in turn sold the counterfeits to Defendant Scripts and others. *See, e.g.*, ECF No. 778 ¶¶ 356-59. Nabiev's counterfeit sales to My Meds were managed by the Leader Defendants. *Id.* ¶ 359. This Court has personal jurisdiction over Nabiev because he is a resident of New York. *Id.* ¶ 131. The Clerk has issued certificates of default against Nabiev. ECF Nos. 822, 1656.

The business records of Valuecare's customers, Ascan, My Meds, and Medicine Shoppe, show that Nabiev, through Valuecare, sold 1,121 bottles of Gilead-branded medication. *See* ECF Nos. 1119-4, 608-79, 608-80, 608-84 (showing sales between Valuecare and Ascan, My Meds, and Medicine Shoppe); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the

27

**Highly Confidential**

methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Nabiev's infringement (before trebling) to be $2,685,270. *See* Ex. 1 at Ex. F-1.

### 13. Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy

Gilead has alleged that the Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy ("Ascension") purchased counterfeit Gilead-branded medications from Safe Chain, although it knew that the pedigrees that accompanied Safe Chain's medications were fake. *See, e.g.*, ECF No. 147 ¶¶ 230-32. Ascension continued to purchase counterfeit medications from Safe Chain even after Gilead sent warning letters and served subpoenas to Safe Chain's pharmacy customers. *Id.* ¶¶ 233-35. This Court has personal jurisdiction over Ascension because it is a resident of New York. *Id.* ¶ 90. The Clerk has issued certificates of default against Ascension. ECF Nos. 422, 1656.

Safe Chain's business records show it sold Ascension 216 bottles of Gilead-branded medication. *See* Exs. 14-15 (Safe Chain's sales, showing sales to Ascension); Ex. 1 at Ex. E-3. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Ascension's infringement (before trebling) to be $475,780. *See* Ex. 1 at Ex. F-1.

### 14. Jeffrey Peterson and Brennan Page

Gilead has alleged that Defendants Jeffrey Peterson and Brennan Page managed, supervised, ratified, and personally participated in the trafficking of counterfeit Gilead-branded medicines, including trafficking bottles of already-dispensed medication knowingly for the purpose of creating counterfeits. ECF No. 778 ¶¶ 146–47. More specifically, Peterson and Page drove to gather and deliver bottles of already-dispensed HIV medication purchased from

28

**Highly Confidential**

patients. *Id.* ¶ 543. Peterson and Page would also accompany Defendant Nicole Alston to meet with Gelbinovich to discuss the illegal buyback scheme. *Id.* Peterson and Page were paid by Gelbinovich and Alston for their participation in the illegal buyback scheme. Peterson and Page knew that the bottles they were collecting and transporting were being used to illegally manufacture counterfeits for sale to pharmacies. *Id.* This Court has personal jurisdiction over Peterson and Page because each is a New York resident. *Id.* ¶¶ 146-47. The Clerk has issued certificates of default against Peterson and Page. ECF Nos. 822, 1656.

Peterson and Page provided these counterfeit Gilead-branded medications to Gelbinovich, ECF No. 778 ¶ 543, who in turn sold them through Supplier Defendant RxWholesale to Scripts, *id.* ¶ 530; Ex. 22 (Scripts' purchases and sales, showing purchases from RxWholesale).

Scripts' business records show that RxWholesale sold 1,559 bottles of Gilead-branded medication. *See* Ex. 22 (Scripts' purchases and sales, showing purchases from RxWholesale); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Peterson's and Page's infringement (before trebling) to be $3,572,045. *See* Ex. 1 at Ex. F-1.

### 15.    Lazaro Roberto Hernandez

Defendant Lazaro Roberto Hernandez managed, supervised, ratified, and personally participated in the trafficking of counterfeit Gilead and other HIV medications. ECF No. 778 ¶ 104. He sits at the top of the conspiracy and set up the organization of the counterfeiting ring and its money laundering apparatus. *Id.* ¶ 226. As a federal indictment stated, from 2019 until at least the end of 2021, Hernandez conspired to "establish[] and obtain[] wholesale drug distributor licenses" for fly-by-night companies across the United States, including Supplier Defendant Gentek and Supplier Defendant My Meds. Ex. 23 (Hernandez Indictment) ¶ 4.

29

**Highly Confidential**

Hernandez exercised ultimate control over many Supplier Defendants that sold the counterfeits, including Gentek and My Meds.  ECF No. 778 ¶¶ 237-40.   Hernandez was the ultimate source of the counterfeits sold by the Supplier Defendants.  He and his co-conspirators illegally diverted "large quantities" of HIV medication and "repackaged these drugs and falsified their packaging, T3s/pedigrees, and other labeling," and "introduced these adulterated, misbranded, and diverted drugs into interstate commerce" by selling and distributing them to co-conspirators who sold the bottles to "pharmacies located throughout the United States."  Ex. 23 (Hernandez Indictment) ¶¶ 5-7, 9; *see also* ECF No. 778 ¶ 240 (alleging that the Government specified at Hernandez's detention hearing that Hernandez "'acquired expensive prescription drugs on the street and by other means and repackaged those drugs and created fraudulent documentation' to sell them, naming as examples Gilead's HIV medications 'Biktarvy and Truvada.'").  Hernandez pled guilty to Counts I and III of this indictment; specifically, to conspiracy to introduce adulterated and misbranded drugs and to defraud the United States (in violation of 18 U.S.C. § 371) and to conspiracy to commit money laundering (in violation of 18 U.S.C § 1956(h).  *USA v. Hernandez*, 22-cr-60129, ECF No. 102 (S.D. Fl. June 20, 2023).  He is currently serving a 15-year prison sentence for these crimes.  *Id.*  This Court has personal jurisdiction over Hernandez because he conspired with Defendants My Meds and Gentek to sell counterfeits into New York, specifically, by selling those counterfeits to Scripts, a New York company.  ECF No. 778 ¶¶ 230, 237; Ex. 22 (Scripts' purchases and sales, showing purchases from MyMeds and Gentek).  The Clerk has issued certificates of default against Hernandez.  ECF Nos. 822, 1656.

Scripts' and Safe Chain's business records show that Gentek sold 31,792 bottles of Gilead-branded medication, and MyMeds sold 4,783 bottles of Gilead-branded medication.  *See* Ex. 22 (Scripts' purchases and sales, showing purchases from MyMeds and Gentek); Ex. 20

30

**Highly Confidential**

(Safe Chain's purchases, showing purchases from Gentek); Ex. 1 at Ex. E-1. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Gentek's infringement to be $72,149,171, and the actual damages caused by My Meds' infringement to be $10,899,758, for a total (before trebling) of $83,048,929. *See* Ex. 1 at Ex. F-1.

### 16.    Laconia Avenue Defendants (Laconia Avenue Pharmacy Corp. and Stanislaus Mgbeojirikwe)

Gilead has alleged that the Laconia Avenue Pharmacy Corp. ("Laconia Avenue Pharmacy") and its supervising pharmacist, Stanislaus Mgbeojirikwe, purchased counterfeit medications and dispensed them to patients. *See, e.g.*, ECF No. 778 ¶¶ 513-519; *accord.* ECF No. 1644 ¶¶ 521-527. As set out in Gilead's complaint, Gilead received a report from a patient regarding one of the counterfeits that Laconia Avenue Pharmacy and Mgbeojirikwe dispensed. Specifically, Gilead received a report that Laconia Avenue Pharmacy provided a patient with a bottle with counterfeit blue tablets that purported to be GENVOYA®, with the word "GILEAD" embossed on the side of the tablets. ECF No. 778 ¶ 514-15; ECF No. 1644 ¶ 523; *see also* ECF No. 778 ¶¶ 523-25 (giving additional details about the scheme). Authentic GENVOYA® comes in the form of green tablets with "GSI" embossed on them. *Id.* ¶ 515. As alleged in Gilead's complaint, this reported counterfeit is only one of the counterfeits Laconia Avenue Pharmacy and Mgbeojirikwe dispensed. *Id.* ¶ 518; ECF No. 1644 ¶ 526. As Laconia Avenue Pharmacy's supervising pharmacist, Mgbeojirikwe was personally involved in the purchase and sale of Gilead-branded counterfeit medicines, including by approving and supervising the pharmacy's purchase of the counterfeits and dispensing them to patients. ECF No. 778 ¶ 519; ECF No. 1644 ¶ 527.

31

**Highly Confidential**

This Court has personal jurisdiction over Laconia Avenue Pharmacy and Mgbeojirikwe because they are New York residents. ECF No. 778 ¶¶ 139-40; ECF No. 1644 ¶¶ 139-140. The Clerk has issued certificates of default against Laconia Avenue Pharmacy and Mgbeojirikwe. ECF No. 822, 1656.

Dr. Bell did not analyze Laconia Avenue Pharmacy's sales in his report in this case. However, Dr. Bell submitted a report in *Gilead et al. v. Khaim et al.*, 24-cv-4259 (E.D.N.Y.) ("*Gilead II*"), Gilead's follow-on action, which does analyze Laconia Avenue Pharmacy's sales.[8] Dr. Bell's report in *Gilead II* uses the same methodology, conservative assumptions, and calculations described above, and relies on data from (1) Laconia Avenue Pharmacy's sales made on online pharmacy-to-pharmacy marketplaces, and (2) products dispensed to patients that were subject to Medicaid rebates. Ex. 26 (Bell *Gilead II* Rpt.) ¶ 28. Based on this data, Dr. Bell finds that Laconia Avenue Pharmacy and Mgbeojirikwe distributed 264 bottles of Gilead-branded medicines. Dr. Bell calculates the actual damages caused by the Laconia Avenue Defendants' infringement (before trebling) to be $642,694. *See* Ex. 26 at Ex. F.

### 17. The Worldwide Pharma Defendants (Worldwide Pharma Sales Group, Inc. and Adam Brosius)

Gilead alleges that the Worldwide Pharma Defendants "conspired with Safe Chain to traffic the counterfeits" and "worked directly with counterfeit suppliers with unwitting customers, as well as operated behind the scenes to coordinate and assist Safe Chain in its willful purchase and sale of counterfeit Gilead HIV and other medications." ECF No. 1644 ¶ 452. Discovery in this matter confirmed the same.

---

[8] The owner of Laconia Avenue Pharmacy, Christy Corvalan, was not named in this action, because Gilead at the time did not know her identity. Ms. Corvalan is a defendant in *Gilead II.* The damages analysis vis-à-vis Ms. Corvalan is identical to the damages analysis for the other Laconia Avenue Defendants because they are all jointly and severally liable for Laconia Avenue Pharmacy's counterfeit sales. *E.g.*, *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014).

**Highly Confidential**

Through most of fact discovery, the Worldwide Pharma Defendants participated in this litigation. Brosius was deposed in this action. Ex. 76. There is no dispute that Brosius was the founder and owner of Worldwide Pharma. Ex. 76 at 25:15-17. He was also a co-owner of Safe Chain. Ex. 76 at 161:7-11. The Worldwide Pharma Defendants worked hand-in-hand with Safe Chain to traffic counterfeit Gilead-branded HIV medicines. Ex. 76 at 82:16-23. Brosius introduced Safe Chain to several fly-by-night counterfeit suppliers including Boulevard and Gentek; Ex. 76 at 58:2-21, 69:3-70:3, 71:4-7, 80:20-81:1, 205:4-8; Synergy, *id.* at 196:10-12; Rapid's Tex, *id.* at 98:8-12, 192:1-3, 205:4-8; Mr. Unlimited LLC, *id.* at 185:10-186:3, 186:18-187:17; Omom, *id.* at 240:23-241:7, 256:14-257:5; CM Pharma, 205:9-17, 226:17-227:1; and Invicta, *id.* at 237:8-10. Safe Chain acquired all of its Gilead-branded medications from these wholesalers. The Worldwide Pharma Defendants then utilized a staff of over forty sales associates to sell these counterfeits to pharmacies nationwide. Ex. 76 at 51:19-52:23, 54:24-55:3.

The Worldwide Pharma Defendants did not meaningfully dispute that all of the Gilead-branded medications Safe Chain acquired were counterfeit. *See* Ex. 76 at 323:4-16 (Brosius admitted he has no examples of Safe Chain pedigrees that he knows to be correct and has no reason to disagree with Gilead's position that every Safe Chain pedigree was fake). Further, Brosius sent a Microsoft Teams message to Patrick Boyd of Safe Chain and Garrett Mellot of Worldwide Pharma stating, about counterfeit supplier Synergy, "all of their shit is counterfeit." ECF No. 1644 ¶ 458.

Brosius was also criminally charged for his role in the counterfeiting scheme. *See generally, United States v. Brosius*, Case No. 24-cr-20255-WPD (S.D. Fla.). On April 18, 2025, Brosius pled guilty. *See id.* at ECF No. 65. Brosius admitted that he purchased the counterfeit Gilead-branded medicines with "falsified information in the T3s/pedigrees, and [was] made

**Highly Confidential**

aware that the T3s/pedigrees contained falsified information." *Id*. at pp. 3-4. Brosius also admitted that he, along with Safe Chain's other owners, Patrick Boyd and Charles Boyd, "carried out a scheme to defraud pharmacy customers, their patients, and health care benefit programs by knowingly distributing [counterfeit Gilead-branded medicines] with falsified T3s/pedigrees designed to conceal the true origin of the drugs." *Id*. at p. 3.

This Court has personal jurisdiction over the Worldwide Pharma Defendants because they sold counterfeits into New York. Exs. 14-15 (showing Safe Chain sales into New York). The Clerk has issued certificates of default against Brosius and Worldwide Pharma. ECF Nos. 1620, 1656.

The business records of Safe Chain show that the Worldwide Pharma Defendants, through Safe Chain, sold 28,180 bottles of Gilead-branded medication. *See* Exs. 14-15 (Safe Chain sales); Ex. 1 at Ex. E-2. As set forth above, the Worldwide Pharma Defendants were an active and moving force behind all of Safe Chain's counterfeit sales. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by the Worldwide Pharma Defendants' infringement (through Safe Chain, and before trebling) to be $63,547,387. *See* Ex. 1 at Ex. F-2.

### 18. John Levitan

Defendant John Levitan managed, supervised, ratified, and personally participated in the trafficking of counterfeit Gilead and other HIV medications. ECF No. 1644 ¶ 106. He managed and directed an enterprise dedicated to the sale of counterfeit Gilead HIV medication accompanied by counterfeit and fraudulent documents. *Id.* Like his co-Leader Defendants, he sits at the top of the conspiracy and set up the organization of the counterfeiting ring and its money laundering apparatus. *Id.* ¶¶ 278-80. Levitan introduced Lazaro Hernandez to Distributor Defendants Safe Chain and Worldwide Pharma. *Id.* ¶ 279. Further, Levitan played an integral

34

**Highly Confidential**

role in directing Safe Chain's operations. He was the primary contact for Supplier Defendant Synergy Group Wholesaler LLC and its principal, Carlos Vega. *Id.* ¶ 281. For example, a May 2021 email concerning Synergy states: "I believe you know John [Levitan]. . . . John is going to be involved with inventory and acquisition . . . . Feel free to discuss things with him. Nothing else will change on the Po's [sic] and payments and such." *Id.* And the following month, Levitan followed up with Defendant Vega, the principal of Synergy, in writing: "We are looking for [more] inventory and I wanted to speak to you, to lock in an agreement for future orders." *Id.* Under his direction, Synergy supplied a large volume of counterfeits to Safe Chain, selling millions of dollars of Gilead-branded medications with clearly counterfeit pedigrees. *Id.* ¶ 282. Similarly, Levitan managed the relationships between Invicta and other suppliers and Safe Chain. *Id.* ¶¶ 283-84.

This Court has personal jurisdiction over Levitan because he conspired with Safe Chain, Synergy, Invicta, and others to sell counterfeits into New York, including by directing Synergy and Invicta to make counterfeit sales to Safe Chain, which Safe Chain then sold to New York pharmacies. Exs. 14-15 (showing Safe Chain sales into New York). The Clerk has issued certificates of default against Levitan. ECF Nos. 839, 1656.

### a.    Levitan's Default and Bad-Faith Litigation Tactics

The road to Levitan's default in this case is a case study in bad-faith litigation tactics. Levitan was first named in Gilead's Fourth Amended Complaint, which was initially filed on July 29, 2022. ECF No. 606-1; *see also* ECF No. 778 (corrected Fourth Amended Complaint). He was served on August 18, 2022. ECF No. 823. He initially failed to answer or otherwise defend this action, and so the Clerk of Court initially entered a certificate of default against him on October 28, 2022. ECF No. 839.

**Highly Confidential**

On May 30, 2023, counsel for Levitan moved to appear *pro hac vice*, for the limited purpose of contesting jurisdiction, which this Court permitted on June 2, 2023.  ECF No. 1102; Min Entry dated June 2, 2023.  Two months later, on July 27, 2023, Levitan's counsel filed a motion to dismiss the default judgment that had been entered against him, ECF No. 1150, which was fully briefed on August 8, 2023, ECF No. 1164.

On October 10, 2023, then-Magistrate Judge Reyes held a conference to discuss the motion, during which the Court suggested the following proposal: (1) the default would be vacated, (2) Levitan would accept service of the complaint, (3) Levitan would disclose his assets within 30 days, (4) Levitan would appear for a deposition within 45 days, and (5) Levitan would answer within 60 days.  October 10, 2023 Minute Entry.  Gilead and Levitan agreed to this proposal, *id.*; ECF No. 1201, and the Court entered an order vacating the default on this basis, October 12, 2023 Minute Entry.

Levitan immediately failed to comply with *any* of these deadlines or defend this action. His attorney refused to accept discovery requests on his behalf.  ECF No. 1207.  Instead, on November 10, 2023 – the day he had promised to provide his financial disclosures – he filed for bankruptcy, ECF No. 1217.  Levitan then took the position that the bankruptcy automatically stayed Gilead's action against him.  ECF No. 1237.  To be clear, this timing is no coincidence. Levitan admitted in response to questioning from counsel for the trustee of his estate that he filed for bankruptcy on that date because it was his deadline to disclose his financial assets to Gilead. ECF No. 1454-1 at 2:15-21.

From the start, Levitan failed to provide financial disclosures to the bankruptcy court as required when he filed his petition.  *See In re: John D Levitan* (Bankr. S.D. Fla.), No. 23-19295 (CLC), ECF Nos. 2–5.  When Levitan failed to include his schedules of his assets, liabilities,

36

**Highly Confidential**

income, and expenditures or his statement of financial affairs with his petition, the bankruptcy

court set November 24, 2023 as the deadline for Levitan to correct these deficiencies. *See In re:*

*Levitan*, ECF No. 6. Levitan then engaged in a series of maneuvers to continue to extend his

deadline to produce his financial disclosures, including multiple motions to extend his disclosure

deadline, as well as converting his petition from Chapter 11 to Chapter 7. *In re: Levitan*, ECF

Nos. 25, 37, 42. He filed his schedules and statement of financial affairs on January 8, 2024,

three months after he filed bankruptcy. *In re: Levitan*, ECF Nos. 46, 47, 48. Those schedules

were woefully incomplete, including because they did not reflect Levitan's receipt of millions of

dollars in commissions for brokering sales of counterfeit Gilead-branded HIV medications,

which Gilead knows about through subpoenaed bank records in this action. Not knowing this, on

February 21, 2024, the trustee of Levitan's estate certified that Levitan had met the filing

requirements of 11 U.S.C. § 521(a)(1). *In re: Levitan*, ECF No. 71. But after Gilead notified the

bankruptcy court of the subpoenaed bank records in its possession, *see In re: Levitan*, ECF No.

88, the trustee withdrew that certification, and Levitan's financial disclosures remained

incomplete. *In re: Levitan*, ECF Nos. 88, 91.

Gilead appeared as a creditor in the bankruptcy, and thereafter served document requests,

interrogatories, and a deposition notice on Levitan in the bankruptcy action on February 9, 2024.

Levitan did not respond to these either, and so Gilead and the bankruptcy trustee filed motions to

compel. *In re: Levitan*, ECF Nos. 78, 83. True to form, Levitan did not respond to the motions

to compel either. On April 10, the bankruptcy court granted both motions, directing Levitan to

(1) respond to the discovery requests by April 23 and (2) appear for a deposition no later than 30

days after his production of all information responsive to the requests. *In re: Levitan*, ECF Nos.

95, 97. The bankruptcy court also ordered that, if Levitan failed to produce information

37

**Highly Confidential**

responsive to any of the discovery requests, he had to provide a sworn explanation of what efforts he had undertaken to obtain the information not produced. *Id.*

Levitan again refused to comply. Instead, he made a deficient production of mostly public documents. In response, the trustee moved to show cause as to why Levitan should not be held in contempt for his failure to comply with the court's order compelling the production of these documents. *In re: Levitan*, ECF No. 105. The Court ordered a show cause hearing, and ordered Levitan to appear in person.

On May 23, Levitan participated in the deposition using a mobile device while sitting in what appeared to be a busy hotel lobby in what he said was Dubai. *See* ECF No. 1454-2 8:10-14. In this deposition, Levitan admitted that his document production was deficient, that he had not provided answers to Gilead's interrogatories, and that he had not provided a sworn statement about what discovery efforts he had undertaken. *Id.* 23:22-24:2, 29:17-31:10, 34:5-25. In other words, he conceded that he violated the bankruptcy court's orders granting Gilead and the trustee's motions to compel, just as he had previously violated this Court's orders to disclose his assets and sales.

Aside from those admissions, the deposition was a farce. Levitan was evasive, hostile, uncooperative, and in several cases obviously untruthful, conspiratorial, and inflammatory. *See id.* 31:20-32:23, 37:3-6, 132:9-134:5, 137:15-138:5, 139:11-140:1. For example, he claimed without any support that Gilead bribed the judge who issued the seizure order against him in this case, which he claimed to have learned from FBI agents whom he said were themselves indicted for their participation in the same scheme. *Id.* 31:20-32:23, 110:4-12. (It should go without saying that Levitan's statements are false and slanderous.) Additionally, Levitan asserted that the FBI was investigating whether *Gilead* was selling counterfeit versions of its own

38

**Highly Confidential**

medications, and that the FBI forbade Levitan from disclosing his cooperation with that investigation – another false claim for which Levitan naturally declined to provide any support. *See id.* 104:15-106:11, 115:12-117:8, 139:20-140:1. Levitan was deposed for only three hours. Then he abruptly refused to continue because he said he was tired, his blood pressure was too high, and he had to go prepare for a meeting with the "ruler of Dubai." *Id.* 135:12-136:8, 139:4-141:20.

Thereafter, on May 24 and again on May 30, Gilead contacted Levitan's bankruptcy counsel to schedule Levitan's supplemental production as well as the continued deposition, but Levitan's counsel failed to provide any specific dates. After all this, on June 4, Gilead notified the bankruptcy court of Levitan's non-compliance with the Court's orders and moved for an order to show cause why Levitan should not be held in contempt. *See generally* ECF No. 1382-1.

On June 6, the bankruptcy court held a show cause hearing. ECF No. 1382-3 (transcript from June 6 hearing). Levitan did not appear, and the bankruptcy court subsequently granted Gilead's and the trustee's motion to show cause. ECF No. 1398-1, ECF No. 1398-2. In response to Gilead's motion, the bankruptcy court ordered Levitan to again sit for a deposition. ECF No. 1398-1. At that deposition, Levitan (1) admitted that he has never searched for documents responsive to Gilead's document demands despite the Order Compelling Discovery Responses; (2) admitted that he could not confirm that the bankruptcy schedules he filed were accurate, and claimed not to know all his business interests; and (3) repeatedly insisted various documents bearing his signature were forged. ECF No. 1453-3 at 190:15-209:7, 236:1-18, 237:11-238:19, 241:8-24, 250:20-251:18. He then proceeded to invoke his Fifth Amendment rights in refusing

**Highly Confidential**

to answer any questions about his involvement in the counterfeiting scheme at issue in this litigation. *See, e.g., id.* 266:10-320:2, 277:11-17, 286:11-22.

Four days after Levitan's deposition, the bankruptcy court held a show cause hearing. The bankruptcy judge stated from the bench that she would dismiss Levitan's bankruptcy in its entirety and forbid him from refiling for bankruptcy for two years – four times as long as the default statutory period of 180 days, 11 U.S.C. § 1109(g) – as a sanction for his willful non-compliance with the bankruptcy court's orders. ECF No. 1454-4 at 23:22-24:1. On August 7, 2024, the bankruptcy court issued a written order dismissing Levitan's bankruptcy with a two-year prejudice period "based on his knowing and willful failure to abide by orders of the Court, including but not limited to the [orders compelling him to produce discovery], and his knowing and willful failure to file accurate schedules of his assets and liabilities." *See* ECF No. 1454-5 at 6. The court also directed Levitan to pay Gilead's counsel's fees and costs associated with Levitan's non-compliance with the bankruptcy court's orders.

Following the lifting of the stay in this matter, Gilead filed a motion to hold Levitan in default. ECF No. 1452-55. Levitan did not respond to that motion. On September 3, 2024, Judge Marutollo scheduled a conference to discuss Gilead's motion for September 12, 2024 and ordered Levitan to appear. September 3, 2024 Dkt. Entry. In response, Levitan filed a letter saying that he was interviewing attorneys to represent him, and alerted the Court that he had filed a lawsuit against Gilead's counsel and Gilead. ECF No. 1473. Levitan failed to appear at the September 12, 2024 conference. *See* Sept. 12, 2024 Dkt. Entry. Thereafter, Judge Marutollo directed the Court to maintain the notation of default as to Levitan, citing principally Levitan's failure to produce the disclosures ordered by Judge Reyes, and agreed to by the parties, on November 10, 2023. *Id.* Levitan's latest submissions to the Court, ECF Nos. 1651-1655, were

**Highly Confidential**

just the latest in a series of bad-faith and frivolous attempts by Levitan to delay this litigation

without actually participating, as Gilead has already set forth. ECF No. 1657 at p. 2.

b.    <u>Actual Damages Caused by Levitan</u>

Safe Chain's business records show that it sold 28,180 bottles of Gilead-branded

medication. *See* Exs. 14-15 (Safe Chain sales); Ex. 1 at Ex. E-2. As set forth above, Levitan

was an active and moving force behind all of Safe Chain's counterfeit sales. As set forth in Dr.

Bell's report, and using the methodology, conservative assumptions, and calculations described

above, Dr. Bell calculates the actual damages caused by Levitan's infringement (through Safe

Chain, and before trebling) to be $63,547,387. *See* Ex. 1 at Ex. F-2.

**E.    Gilead Is Entitled to Mandatory Treble Damages Under the Lanham Act**

The Lanham Act requires an award of treble damages and attorneys' fees in this case. In

assessing damages for willful violation of 15 U.S.C. § 1114(a) involving a counterfeit mark (as

Gilead alleges in Count One of its Complaint), the court "shall … enter judgment for three times

such profits or damages, whichever amount is greater…." 15 U.S.C. § 1117(b). In such cases,

treble damages must be awarded "unless the court finds extenuating circumstances." *Id.*[9]

Awards of treble damages are the norm for willful counterfeiters. *Koon Chun Hing Kee*

*Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d  312,  325 27 (E.D.N.Y.

2009) ("Congress has indicated that it will be a rare case in which a defendant who has trafficked

in goods or services using a mark that he or she knows to be counterfeit can show that he or she

should not be assessed treble damages.") (cleaned up). Extenuating circumstances that justify

deviation from this norm are limited: for example, a court might find extenuating circumstances

and decline to issue treble damages where a defendant is "an unsophisticated individual, operating

---

[9] Gilead is also entitled to an award of its attorneys' fees, but does not seek such relief in this motion in order to avoid the burden on Gilead and the Court of calculating and apportioning such fees.

41

**Highly Confidential**

on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family." *Id.* at 325 (internal quotation marks and citations omitted). Here, the Defaulted Defendants willfully counterfeited life-saving HIV medicine, putting thousands of patients at risk, as part of a sophisticated, nationwide conspiracy that has already led to numerous criminal convictions. They are the polar opposite of the type of defendants who might qualify for a finding of "exceptional circumstances" that would exempt them from otherwise mandatory treble damages and attorneys' fees for willful counterfeiting. Because there is no basis for a finding of exceptional circumstances here, Section 1117(b) requires an award of treble Gilead's actual damages against the Defaulted Defendants.

## II. THE COURT SHOULD ISSUE JUDGMENTS FINDING EACH DEFENDANT GROUP (CORPORATION PLUS PRINCIPALS) TO BE JOINTLY AND SEVERALLY LIABLE

As is common in complex counterfeiting cases, some of the Defaulted Defendants have overlapping liability – i.e., multiple Defaulting Defendants are liable for the sale of, and the resulting actual damages from, the same particular counterfeit bottle. There are two scenarios in which this occurs: (1) within defendant "groups" consisting of a corporation and its principal(s), where each member of the group is liable for the sale of that particular bottle; and (2) when different Defaulted Defendants occupy different positions in the supply chain for that particular bottle. In each case, the Defaulted Defendants who sold the same particular counterfeit are jointly and severally liable for the same damages.

As set forth below, pursuant to black-letter case law, this Court must issue judgments for the full amount of damages caused by each Defaulted Defendant, regardless of any overlapping sales. Where applicable, the Court can and should issue single judgments against Defaulted Defendant "groups" on a joint-and-several liability basis, because each member of those groups sold the same products and faces an identical damages award – full stop. For Defaulted

42

**Highly Confidential**

Defendants in different parts of the supply chain, it would be a misapplication of the law and impractical for the Court to attempt to issue judgments that attempt to capture their overlapping liability: because several Defaulted Defendants were involved in multiple supply chains, their overlapping joint-and-several liability and the need to avoid double recoveries must be addressed, if necessary, at the collections stage.

### A.      Legal Standard

It is well established under the Lanham Act that defendants that sold the same infringing product are jointly and severally liable for the damages resulting from the sale (or other use in U.S. commerce) of that bottle. *E.g.*, *Innovation Ventures*, 176 F. Supp. 3d at 155; *GS Holistic*, 2025 WL 3657512, at *7.

Each Defaulted Defendant is fully liable for the damages caused by each of the counterfeit bottles it sold, regardless of who else may have sold that same bottle. "A creature of tort law, joint and several liability applies when there has been a judgment against multiple defendants. If two or more defendants jointly cause harm, each defendant is **held liable** for the entire amount of the harm; provided, however, that the plaintiff **recover** only once for the full amount." *Honeycutt v. United States*, 581 U.S. 443, 447-448 (2017) (emphasis added) (citation omitted).   As the Second Circuit recently explained, joint-and-several liability is intended to benefit plaintiffs in exactly the scenario that Gilead faces here:

> Where two co-defendants in a civil lawsuit are found jointly and severally liable for the full amount of the damages, the plaintiff can collect that entire amount from one defendant, in full, without collecting anything from the other defendant, if that is the most expedient way for the plaintiff to enforce the judgment and be made whole… In such a scenario, if the plaintiff collects the entire amount of the judgment from one defendant, that defendant can then sue her co-defendant for contribution. **The principle animating these rules is to prioritize the injured plaintiff by allowing him to collect from any tortfeasor he can**, while leaving the defendant tortfeasors to fight amongst themselves.

43

**Highly Confidential**

*United States v. Yalincak*, 30 F.4th 115, 122-23 (2d Cir. 2022) (emphasis added); *see also id.* at

123 ("In situations in which all of the tortfeasors are liable for the entire harm, the injured person

is entitled to maintain an action against one or any number of the tortfeasors and to obtain

judgment against any one or any number for the full amount of the harm, although no more than

one satisfaction can be obtained for the harm." (quoting Restatement (Second) of Torts § 879

cmt. b (1979)).

### B.    Defaulted Defendant Groups - Corporation Plus Principal(s) – Are Jointly and Severally Liable

As noted above, it is well-established that individuals who are the active and moving

forces behind a corporation's sale of counterfeit products are directly and personally liable for

those sales, on a joint-and-several liability basis with the corporation itself. *E.g.*, *Innovation*

*Ventures*, 176 F. Supp. 3d at 155; *GS Holistic*, 2025 WL 3657512, at *7. For that reason, in this

motion and throughout this case, Gilead has referred to defendant "groups" – e.g., the Omom

Defendants – comprised of a corporation and its principal(s). Because every member of such a

group is liable for the exact same sales of the exact same infringing products, they are liable for

the exact same damages, as set forth section I.D, *supra*. *See id.* It thus follows that a single

judgment can be entered against the corporation and its principal(s), specifying that each of

member of that group is jointly and severally liable for the damages award. *See, e.g.*, *GS*

*Holistic*, 2025 WL 3657512, at *7.

### C.    Defaulted Defendants in Different Parts of the Supply Chain

It is also well-established that every member of the supply chain is liable under the

Lanham Act for selling (or otherwise using in commerce) an infringing product, on a joint-and-

several liability basis with everyone else who sold that particular infringing product. *E.g.*,

*Innovation Ventures*, 176 F. Supp. 3d at 155-157. It is equally well-established that a plaintiff

**Highly Confidential**

can collect its damages only once per infringing product. *Id.* Here, each counterfeit bottle sold in U.S. commerce caused Gilead to lose the profits it would have earned on the sale of an equivalent authentic bottle. As Gilead has stated throughout this litigation, Gilead can collect its actual damages only once per counterfeit bottle.

In some factual scenarios, crafting a judgment that applies to all members of an infringing supply chain is a straightforward exercise. For example, if a single distributor sold all the infringing product at issue to a single retailer, then both the distributor and retailer are liable for the exact same infringing products and the exact same resulting damages, and a single damages judgment can be issued against both of them on a joint-and-several liability basis. But in more complex factual scenarios, such as the counterfeiting conspiracy at issue in this case, with numerous overlapping and asymmetrical supply chains, delineating the various lines of overlapping liability in a single judgment or even a series of judgments is not practicable.

Of course, that does not mean that judgments should not issue. There is no requirement that a judgment against a particular defendant specify all co-defendants with whom the judgment debtor is jointly and severally liable. For example, in *U.S. v. Nucci*, 364 F.3d 419 (2d Cir. 2004), the district court had issued separate awards against multiple co-defendants for the same injury, without mentioning their joint-and-several liability; the defendant argued those judgments were erroneous because they "create[] the possibility that a victim could receive a windfall" via a double recovery. *Id.* at 422. The Second Circuit rejected that argument and affirmed the judgments, holding that "a district court does not commit error by failing to state explicitly that a victim's recovery shall be limited to the amount of its loss," and that as a matter of law, regardless of the language of the judgments, the victims could "not collect more from all defendants together than will make [them] whole." *Id.* at 424; *see Yalincak*, 30 F.4th at 126-127

45

**Highly Confidential**

(clarifying that "*Nucci* references the classic meaning of joint and several liability in tort law, and explains that in that context, 'once the *plaintiff collects* the full amount' of a judgment from one co-defendant, the other co-defendants are absolved from further liability." (emphasis in original) (quoting *Nucci*, 364 F.3d at 423)) (internal citations omitted); *see also Yalincak*, 30 F.4th at 131 ("[T]he rule against double recoveries operates to reduce the total amount the victim can collect.").

In short, when defendants are jointly and severally liable, a full *judgment* must issue against each of them, and the prevention of double recoveries occurs at the time of the *execution* of that judgment – i.e., at the recovery stage. If (and only if) a plaintiff recovers from one of a group of jointly and severally liable co-defendants, those co-defendants can use that payment as a credit or setoff against the judgment against them. *Yalinack*, 30 F.4th at 131-132; *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) (a payment by one defendant may be applied as a "credit against judgment" for another defendant, if the payment and the judgment "represent common damages"); *Innovation Ventures*, 176 F. Supp. 3d at 163 ("To avoid a double recovery ... [t]o the extent that plaintiffs **recover** lost-profit damages for a particular [bottle] from one defendant in a particular chain of distribution, the liability of any other defendant in that distribution chain is reduced accordingly." (emphasis added)); *Singh v. Meadow Hill Mobile Inc.*, 2023 WL 3996867, at *9 (S.D.N.Y. June 14, 2023) (the issue of double recovery is "immaterial to the factors the Court must consider" in a motion to vacate default judgment under FRCP 60(b), and "Plaintiff may address any double recovery issues in post-judgment collection proceedings.") (quoting *In re Langley*, 2012 WL 3555484, at *3 (Bankr. Ct. W.D. Mich. Aug. 14, 2012)); *Simon Prop. Grp. L.P. v. Brandt Const., Inc.*, 830 N.E. 2d 981, 992 (Ind. Ct. App.

46

**Highly Confidential**

2005) (citing "the well-established rule that double recovery is prevented at the execution of judgment stage.")

The burden of establishing that a co-defendants' payments against a judgment should apply as a "setoff" or "credit" against one's own judgment falls entirely on the defendant. *Kotuwage v. NSS Petro., Inc.*, 2018 WL 1189332, at *12 (holding that where a "defendant seeks a set-off, the burden rests squarely upon defendant to show the extent to which a recovery against it would be duplicative of a plaintiff's recovery" from other defendants) (quotation omitted), *adopted in full*, 2018 WL 1187397 (Mar. 7, 2018).[10]

The case cited by this Court at the last status conference, *Abbott Labs. v. Adelphia Supply USA*, 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019), demonstrates this point. *Abbott* involved several hundred defendants at different stages in a distribution chain who sold infringing medical devices, often to each other; there was no dispute that in many cases, multiple defendants were liable for selling the same infringing unit. *See id.* at *51. At summary judgment, the non-defaulting defendants raised the specter of double recoveries; the plaintiff responded that double recoveries was an issue for the collections stage, arguing that it was entitled to a full judgment against each defendant and could "collect its damages from whomever it chooses" until made whole. *Id.* Because the court denied summary judgment as to damages, it expressly declined to decide the issue of double recoveries at the time, holding it would be "premature" to resolve the dispute at the summary-judgment stage. *Id.*

---

[10] This is in accordance with a long line of caselaw holding that ***defendants*** bear the risk of uncertainty as to the damages they caused. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Schonfeld v. Hilliard*, 218 F.3d 164, 174-75 (2d Cir. 2000); *see also McDermott, Inc. v. Amclyde*, 511 U.S. 202, 219 (1994) ("The law contains no rigid rule against overcompensation. Several doctrines ... recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation.").

**Highly Confidential**

After the court in *Abbott* awarded summary judgment on liability but denied it on damages, the non-defaulting defendants all settled. *See, e.g., Abbott Labs. v. Adelphia Supply USA*, Case No. 15-cv-05826-CBA-SDE, Dkt. No. 2105 (E.D.N.Y. July 25, 2024). But the plaintiff subsequently moved for a monetary judgment against 28 defaulted defendants, where the issue of double recoveries was live and required resolution – and the court resolved it in the plaintiff's favor. *Abbott Labs. v. Adelphia Supply USA*, 2024 WL 4250223 (E.D.N.Y. Aug. 22, 2024), *report & recommendation adopted in full by* 2024 WL 4263935 (E.D.N.Y. Sept. 23, 2024).

In *Abbott* there were significant overlapping sales among different defaulted defendants. For example, one defaulted defendant had purchased all of its infringing product from an upstream defaulted defendant. *Abbott*, No. 15-cv-05826(CBA)(SDE), Dkt No. 2084, Exs. D, N. But in ordering a default judgment award, the Court nevertheless ordered that judgment be entered for the full amount of damages caused by each defaulted defendants' sales, without taking into account the overlapping sales with other defaulted defendants. *Id.* at *8-11. If the plaintiff had collected the full judgments issued against all defaulted defendants, that would have constituted an impermissible double (or more) recovery – but the *Abbott* Court left that issue to be addressed, if necessary, at the recovery stage.

The *Abbott* court did, however, issue single damages awards against corporation-and-its-principal(s) groups on a joint and several liability basis, because each member of that group was liable for the same damages for the same infringing units. *Id.* at *13. This Court should do the same here.

D.    **The Defaulted Defendants' Overlapping Sales**

Pursuant to the Court's January 16, 2026 Order, and as discussed at the January 8, 2026 hearing, Gilead attaches hereto as **Exhibit 75** a demonstrative showing the overlapping sales of

48

**Highly Confidential**

the Defaulted Defendants here, as summarized in the Bell Report. As reflected in that demonstrative, outside of the Defendant "groups," the overlapping sales among the Defaulted Defendants fall into a few categories.

First, a number of Defaulted Defendants did not sell to any other defaulted Defendants, and thus have no overlapping liability with other Defaulted Defendants: the Mainspring Defendants, Jeffrey Peterson, Brennan Page, CompaRx, the ITC Defendants, the My Meds Defendants, Pharma Pac, Bakhityar Nabiev, and the Invicta Defendants.

Second, a number of Defaulted Defendants sold exclusively to Safe Chain, and so *all* of their sales overlap with Defaulted Defendants Levitan and the WorldWide Pharma Defendants, the active and moving forces behind Safe Chain. These Defaulted Defendants who sold exclusively to Safe Chain are: the Synergy Defendants, Rapid's Tex Whole Sales Corp., and Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy.

Third, three Defaulted Defendants sold *some* of their counterfeits to non-defaulted defendants, and *some* of their counterfeits to Safe Chain. Gentek sold 13,489 out of its total of 31,792 counterfeits to Safe Chain; Abdullaev sold 10,193 out of its total 10,719 counterfeits to Safe Chain; and the Omom Defendants sold 1,215 out of their total 13,451 counterfeits to Safe Chain. Exs. 19-20.[11] Those sales to Safe Chain overlap with the downstream sales made by Defaulted Defendants Levitan and the Worldwide Pharma Defendants, the active and moving forces behind Safe Chain.

---

[11] The damages associated with each of those counterfeit bottles depends on the type of medicine and the year it was sold, as set forth in Bell Report Exhibit D. Because each Defendant is fully liable for the damages caused by all the bottles it sold, the Bell Report calculates damages in terms of each Defaulted Defendants' total sales, without delineating which portion of those damages are based on sales to what co-defendant. In post-judgment proceedings, where Defendants bear the burden of proving their right to any set-off or credit, Defendants are free to trace the particular bottle(s) for which they claim credit through the sales records, and then damages associated with each such bottle pursuant to the per-bottle damages set forth in Bell Report Exhibit D.

**Highly Confidential**

Fourth, Lazaro Hernandez was the active and moving force behind two entities, Gentek and MyMeds. Thus, Gentek's liability fully overlaps with Hernandez, and the MyMeds Defendants' liability also fully overlaps with Hernandez's.

That fourth and final category poses additional complications. For example, because Gentek sold only some of its counterfeits to Safe Chain, there are three supply chains implicated by Hernandez's sales: (1) Hernandez → Gentek →Worldwide/Levitan; (2) Herandez → Gentek → non-defaulted defendant; (3) Hernandez → MyMeds → non-defaulted defendant.

The graphic attached as **Exhibit 75** demonstrates why the Court should not issue judgments that attempt to fully account for each Defaulted Defendants' overlapping joint-and-several liability with other Defaulted Defendants in the same supply chain.

To demonstrate the impracticality of issuing judgments otherwise, take a hypothetical situation where Gilead recovered a sum of money – say $1,000,000 – from Defaulted Defendant Lazaro Hernandez, the kingpin of the conspiracy, who controlled Defaulted Defendants Gentek and MyMeds. No matter how the judgements are written, it is impossible to determine in advance how the hypothetical million dollars collected from Hernandez would be apportioned: i.e., whether it could be claimed as an offset by Gentek or MyMeds – and if claimed by Gentek, whether it could be further claimed by Levitan and Worldwide as an offset for the portion of Gentek's counterfeit sales that went to Safe Chain. As the Second Circuit made clear, that is the defendants' problem, not the plaintiff's: the plaintiff gets to "collect form any tortfeasor he can … leaving the defendant tortfeasors to fight amongst themselves" after collection occurs. *Yalinak*, 30 F.4th at 123.

In reality, it is highly unlikely that Gilead's collections from the Defaulted Defendants will even approach the threshold where anyone has to be concerned about double recoveries.

50

**Highly Confidential**

Many of the corporate Defaulted Defendants are now-abandoned shell companies whose empty or nearly empty bank accounts have been frozen; several of the individual Defaulted Defendants are imprisoned. Principals of judicial economy thus reinforce what the caselaw provides: judgment should be entered against each Defaulted Defendant for the full amount of damages associated by the infringing bottles that defendant sold, and any potential for double recoveries can be addressed by the interested parties in the unlikely event that the issue arises during collection.

## III.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST

Gilead is also entitled to an award of prejudgment interest against the Defaulted Defendants.

### A.    This Is An "Exceptional Case" that Warrants Prejudgment Interest

Prejudgment interest is not automatic under the Lanham Act; rather, this Court should award prejudgment interest if it finds this to be an "exceptional case," as that term is used in Section 35 of the Lanham Act, 17 U.S.C. § 1117(a). *4 Pillar Dynasty LLC v. New York & Co.*, 933 F.3d 202, 215 (2d Cir. 2019).

As noted above, Gilead is entitled to mandatory treble damages under Section 1117(b) because the Defaulted Defendants engaged in willful counterfeiting. Section 1117(a), on the other hand, gives district courts discretion to award up to treble damages even absent willful counterfeiting in "exceptional cases." Thus, this Court need not engage in the Section 1117(a) "exceptional case" analysis for the purpose of awarding treble damages or attorneys' fees, because those awards are mandatory under Section 1117(b). But the Court must determine whether this is an "exceptional case" as defined by Section 1117(a) solely for the purpose of prejudgment interest. *4 Pillar Dynasty*, 933 F.3d at 215-16.

51

**Highly Confidential**

For the reasons discussed above, there can be little doubt that this case qualifies as an "exceptional case" under the Lanham Act. In addition to the horrific human cost of the Defendants' counterfeiting life-saving HIV medicine, all of the factors that courts consider to contribute to a finding of exceptionality are all present here: willful infringers, highly conservative damages calculations, and a strong need for deterrence and to protect the public. *See, e.g. Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*, 2012 U.S. Dist. LEXIS 183253, at *28-29 (E.D.N.Y. Aug. 29, 2012) ("Courts have held that treble damages [for an exceptional case] may be appropriate where, as here, the infringer has engaged in willful behavior"), *adopted*, 2012 U.S. Dist. LEXIS 178195 (E.D.N.Y Dec.17, 2012); *AW Indus.*, 2011 U.S. Dist. LEXIS 111889, at *21) (trebling actual damages "given the conservative nature of … [plaintiff's] actual damages calculation"); *Merck Eprova AG*, 920 F. Supp. 2d at 431 (finding of an exceptional case "confirmed by the need to deter [the defendant] from engaging in such willful violations in the future").

### B.    The Applicable Rate and Compounding of Interest

The appropriate rate of prejudgment interest to be applied lies in the sound discretion of the Court. *See GTFM, Inc. v. Solid Clothing, Inc.*, 2002 WL 31886349, at *4 (S.D.N.Y. Dec. 26, 2002). Prejudgment interest should be awarded "to: (i) ensure that an infringer not profit in any way from its misconduct; and (ii) provide a specific and general deterrent to those who might exploit another's trademark rights without authorization." *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*, 2006 WL 5804603, at *7 (S.D.N.Y. Dec. 11, 2006), *adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007). Courts have found these objectives particularly salient where the defendant has engaged in willful infringement or has defaulted. *See Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *12 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016).

52

**Highly Confidential**

Courts in the Second Circuit have generally adopted one of three interest rates. Many have utilized the 9% rate called for in N.Y. C.P.L.R. § 5004. *See, e.g.*, *GTFM*, 2002 WL 31886349, at *4; *Bumble & Bumble*, 2016 WL 658310, at *12; *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *27 (E.D.N.Y Sep. 12, 2007); *Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at *7. The Second Circuit, in analogous contexts, has confirmed that it is proper "to look to state law in order to determine the appropriate rate." *Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975).

Other courts, by comparison, have borrowed from Section 1117(b) of Title 15, which governs unlawful uses of counterfeit marks and utilizes the interest rate established under 26 U.S.C. § 6621(a)(2): the federal short-term rate plus three points, which currently would calculate to 7.03%. *See, e.g.*, *Melodrama Publ'g, LLC v. Santiago*, 2015 WL 2380521, at *7 (S.D.N.Y. May 19, 2015), *adopted*, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015); *Merck Eprova AG v. Gnosis S.P.A*, 901 F. Supp. 2d 436, 461 (S.D.N.Y. 2012); *TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 WL 760168, at *1 (S.D.N.Y. Feb. 23, 2012), *adopted*, 2012 WL 1948816 (S.D.N.Y. May 30, 2012).

Finally, some courts have used the federal post-judgment interest rate set out at 28 U.S.C. § 1961(a). *See Hudson Furniture, Inc. v. Mizrahi*, No. 20-CV-4891 (PAC) (RWL), 2024 WL 565095, at *14 (S.D.N.Y. Feb. 7, 2024) (collecting cases), *adopted*, 2025 WL 1453584 (S.D.N.Y. May 21, 2025).

Where the purpose of the damages award is to make the plaintiff whole, the Second Circuit has stated that goal "can only be achieved if interest is compounded." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (in Title VII action, finding failure to apply

53

**Highly Confidential**

a compound rate of interest an abuse of discretion).  Courts applying a 9% interest rate have typically compounded on an annual basis.  *See Wilson v. Great Am. Indus., Inc.*, 763 F. Supp. 688, 691 (N.D.N.Y. 1991), *aff'd in part, rev'd in part*, 979 F.2d 924 (2d Cir. 1992); *Bumble & Bumble*, 2016 WL 658310, at *12; *GTFM*, 2002 WL 31886349, at *4; *cf. Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 549 (S.D.N.Y. 2016) (applying 9% interest rate with annual compounding for Sarbanes-Oxley cause of action, finding monthly compounding "unnecessary").  Section 1117(b) and 28 U.S.C. § 1961(a), on the other hand, call for prejudgment interest to be compounded on a ***daily*** basis.  *See* 26 U.S.C. § 6622; *see, e.g.*, *Flanagan v. Odessy Constr. Corp.*, 2018 WL 1179889, at *8 (E.D.N.Y. Feb. 9, 2018), *adopted*, 2018 WL 1175164 (E.D.N.Y. Mar. 6, 2018) (compounding daily in ERISA case); *See Hudson Furniture,* 2024 WL 565095, at *14 (compounding daily in copyright and trademark infringement case); *but see Manzo v. Sovereign Motor Cars, Ltd.*, 2010 WL 1930237, at *12 (E.D.N.Y. May 11, 2010) (applying interest rate embodied in Section 6621(a)(2), but compounding annually), *aff'd*, 419 Fed. App'x 102 (2d Cir. 2011).

Here, the Court should apply the New York statutory 9% rate, compounded annually, when calculating pre-judgment interest.  That rate is both legally appropriate and necessary to make Gilead whole.  *See Saulpaugh*, 4 F.3d at 145.  Gilead is seeking its actual losses, not statutory or hypothetical damages.  For years, Gilead did not have access to and was therefore unable to spend or invest those funds in research and development.

For the same period of years, the Defaulted Defendants had full access to and use of their ill-gotten gains, essentially receiving an interest-free loan for that entire period.  Applying the New York 9% rate, compounded annually, will ensure that the Defaulted Defendants do not

54

**Highly Confidential**

profit from their misconduct. *See Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at *7.

And perhaps most importantly, awarding the proposed 9% rate with annual compounding will serve as a clear deterrent to the Defaulted Defendants and any other would-be counterfeiters who view willful counterfeiting as part of a lucrative business plan. *See id.*; *Bumble & Bumble*, 2016 WL 658310, at *12. The Court should enter a comprehensive prejudgment interest award.

### C.    The Date of Interest Accrual

Finally, in addition to setting the rate and compounding of prejudgment interest, the Court in its discretion should set the date(s) on which prejudgment interest begins to accrue. Courts have generally found that prejudgment interest should begin to accrue at or in proximity to the time the unlawful act occurred. *See, e.g.*, *Bus. Casual Holdings, LLC v. TV-Novosti*, 2023 WL 1809707, at *13 n. 6 (S.D.N.Y. Feb. 8, 2023) ("With respect to copyright infringement, pre-judgment interest ordinarily would begin from the date of infringement."), *report and recommendation adopted*, No. 21-CV-2007 (JGK), 2023 WL 4267590 (S.D.N.Y. June 28, 2023); *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 WL 1310296, at *10 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014) (relying on N.Y. C.P.L.R. § 5001, the companion to § 5004, and explaining in an FLSA case that "interest may be calculated from the earliest ascertainable date the cause of action existed," or , where "damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.'").

Here, the Defaulted Defendants' infringement occurred over the course from 2017 to 2022. Given the breadth of their infringement, the Court should apply pre-judgment interest once per each of the given years, as appropriate for each Defendant, based on the time that they each began infringing on Gilead's marks. In his report, Dr. Bell noted that he "reserve[d] the

55

**Highly Confidential**

right to calculate prejudgment interest on all damages in this matter, at the appropriate time, as directed by the Court." Ex. 1 ¶ 5. At this Court's direction, Dr. Bell can calculate the appropriate prejudgment interest for each of the Defaulted Defendants.

## IV.  GILEAD IS ENTITLED TO A PERMANENT INJUNCTION AGAINST ALL DEFAULTED DEFENDANTS

As noted above, this Court has already issued a preliminary injunction against each of the Defaulted Defendants prohibiting, among other things, their purchasing, selling, distributing, marketing, or otherwise using any of the Gilead Marks. *See, e.g.,* ECF No. 280. In entering those preliminary injunctions, this Court found, among other things, that Gilead was likely to succeed on its Lanham Act claims, that Gilead would be irreparably harmed absent an injunction, that the balance of the equities tipped in Gilead's favor, and that the public interest favored an injunction. *E.g.*, *id.*

Now, each of the Defaulted Defendants' liability has been established as a matter of law in light of their default, and the remainder of the analysis has not changed. After a finding of liability, courts apply the familiar four-factor test to determine whether a permanent injunction should issue: "(1) [t]hat [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBav Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, Gilead easily satisfies each of these four factors. First, Gilead is entitled to a statutory presumption of irreparable harm, 15 U.S.C. §1116(a); and in any event, irreparable harm is "automatically satisfied by actual success on the merits." *Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc.*, 679 F. Supp. 2d 259, 291 (N.D.N.Y. 2009). Second,

56

**Highly Confidential**

the requirement that Gilead show it has no adequate remedy at law, "is satisfied 'where the record contains no assurance against defendant's continued violation' of plaintiff's trademark." *Sexy Hair Concepts, LLC v. Sexy Hair, Inc.*, 2013 WL 5460629, at \*4 (E.D.N.Y. Sept. 30, 2013) (citation omitted); *see also Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*, , 2013 WL 5977440, at \*11 (S.D.N.Y. Nov. 12, 2013) ("Where default is entered, a court may infer from a defendant's default that it is willing to, or may continue its infringement.") (citation and quotation marks omitted), *adopted*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014). Third, the balance of hardships clearly weighs in Gilead's favor: the Defaulted Defendants cannot claim any hardship in being ordered not to engage in or facilitate counterfeiting of HIV medicines, and in any event, the Defaulted Defendants "ha[ve] not identified any hardships for the Court to consider." *Id.*, 2013 WL 5977440 at \*12. Fourth, the public interest is clearly in favor of Gilead, the lawful manufacturer of life-saving medicines, and not the Defaulted Defendants, who participated in a conspiracy to illegally counterfeit those medicines, creating an enormous risk to patient health and safety. *See, e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

The court should therefore issue a permanent injunction against all the Defaulted Defendants, identical in substance to the permanent injunctions this Court has issued against other Defendants in this action. A Proposed Permanent Injunction is submitted herewith.

**V.    GILEAD HAS COMPLETED A SERVICEMEMBERS CIVIL RELIEF ACT SEARCH FOR EACH OF THE INDIVIDUAL DEFAULTED DEFENDANTS AND DETERMINED NO DEFAULTED DEFENDANT IS IN MILITARY SERVICE**

The Servicemembers Civil Relief Act ("SCRA") requires a plaintiff seeking default judgment to "file with the court an affidavit stating whether or not the defendant is in military service and showing necessary facts to support the affidavit." 50 U.S.C. § 3931. "To comply with the SCRA, Plaintiff may, for example, obtain a report certifying active-duty military status

57

**Highly Confidential**

through the [SCRA] website." *Jimenez v. Green Olive Inc.*, 744 F. Supp. 3d 221, 244 (AMD) (JAM) (E.D.N.Y. 2024) (internal citations omitted). "The non-military affidavit must be based not only on an investigation conducted after the commencement of an action or proceeding but also after a default in appearance by the party against whom the default judgment is to be entered." *Apex Mar. Co. v. Furniture, Inc.*, 2012 WL 1901266, at *1 (E.D.N.Y. May 18, 2012). The SCRA requirement does not apply to corporate defendants. *Molina v. Xia*, 2025 WL 2950626, at *10 n.8 (E.D.N.Y. Oct. 20, 2025).

As it did in connection with its original motion for default judgment, ECF No. 1636 at 2, after new certificates of default were issued against all Defaulted Defendnats, Gilead again ran a search for each individual Defaulted Defendant through the SCRA website, at https://scra.dmdc.osd.mil/scra. The results of the search confirmed that no individual Defaulted Defendant is an active-duty service member. Waters Decl. Exs. 28-43.

## VI.    GILEAD HAS COMPLETED SERVICE ON ALL DEFAULTED DEFENDANTS

As set forth in Gilead's supplement to the motion for default, Gilead properly served each of the Defaulted Defendants. ECF No. 1636 at pp. 3-10. For completeness, Gilead explains its method of service for each Defaulted Defendant below. Affidavits of service for each Defaulted Defendant are attached as Waters Decl. Exs. 44-74.

Pursuant to Federal Rule of Civil Procedure 4(e)(2)(A), a defendant may be served by "delivering a copy of the summons and of the complaint to the individual personally." Gilead served the following individual Defaulted Defendants by delivering the summons, operative complaint, and other papers initiating this action to them personally:

- Gustavo Fernandez. Waters Decl. 44; ECF No. 189

- Lazaro Hernandez. Waters Decl. 45; ECF No. 691

58

**Highly Confidential**

- Frank Betancourt.  Waters Decl. Ex. X46; ECF No. 682.

- Jeffery Peterson.  Waters Decl. Ex. 47; ECF No. 686.

- Stanislaus Mgbeojirikwe.  Waters Decl. Ex. 48; ECF No. 709.

- Stephen Silverman.  Waters Decl. Ex. 49; ECF. No. 710.

- Zafar Abdullaev.  Waters Decl. Ex. 50; ECF No. 96 at 1-2.

- Carlos Vega.  Waters Decl. Ex. 51; ECF No. 96 at 3-4.

Federal Rule of Civil Procedure 4(e)(2)(b) permits service by "leaving a copy of each [of the summons and complaint] at the individual's dwelling place or usual place of abode with someone of suitable age and discretion who abides there."  Pursuant to this rule, Gilead served the following individual Defaulted Defendants by leaving a copy of the summons, operative complaint, and other initial papers at the individual Defendant's dwelling place or usual place of abode with someone of suitable age and discretion who abides there:

- Jorge Caba.  Waters Decl. Ex. 52; ECF No. 194 at 10.[12]

- Luis D. Gonzales Herrero.  Waters Decl. Ex. 53; ECF No. 245

- Bakhityar Nabiev. Waters Decl. Ex. 54; ECF No. 673

- Stephen Smith.  Waters Decl. Ex. 55; ECF No. 711.

- Lorik Papyan.  Water Decl. Ex. 56; ECF No. 1285-1 at 49.[13]

- John Levitan.  Waters Decl. Ex. 57; ECF No. 823.[14]

---

[12] Gilead also mailed a copy of the papers to Caba's last known address.  Waters Decl. Ex. 52; ECF No. 194.

[13] Gilead also mailed a copy of the papers using First Class mail to Papyan's address.  Waters Decl. Ex. 56; ECF No. 1285-1 at 49.

[14] Levitan also agreed to accept service during a conference before then-Magistrate Judge Reyes.  Oct. 10, 2023 Minute Entry.  Further, as noted below, Gilead also served Levitan in accordance with the applicable seizure order by leaving a copy of the summons, complaint, and initial papers at his premises during the seizure Gilead executed there.  ECF No. 629 at 10.

**Highly Confidential**

Pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1), service upon a corporation is proper where a plaintiff follows the state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made. New York law permits serving a business corporation by delivering the summons "upon any domestic or foreign corporation, to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." N.Y.C.P.L.R. § 311(a)(1). Gilead served the following Defaulted Defendants pursuant to these provisions by delivering true and correct copies of the complaint, summons, and other initial papers as set forth below:

- Worldwide Pharma Sales Group Inc. was served by delivering true and correct copies to its manager, who specifically stated he was authorized to accept service. Waters Decl. Ex. 58; ECF No. 31 at 7.[15]

- Synergy Group Wholesalers LLC was served by delivering true and correct copies of the complaint, summons, and other initial papers to Carlos Vega in his capacity as the principal of Synergy Group Wholesalers LLC. Waters Decl. Ex. 59; ECF No. 96 at 3-4.

- Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy was served by delivering true and correct copies of the complaint, summons, and other initial papers to its pharmacist, N. Yevdayeva, who specifically stated she was authorized to accept service. Waters Decl. Ex. 60; ECF No. 126 at 17-18.

- Mainspring Distribution LLC was served by delivering true and correct copies of the complaint, summons, and other initial papers to Stephen Silverman, a principal of Mainspring Distribution LLC. Waters Decl. Ex. 61; ECF No. 740.

- My Meds LLC was served by delivering true and correct copies of the complaint, summons, and other initial papers to Stephen Smith, its principal. Waters Decl. Ex. 62; ECF No. 834.

- Omom Pharmaceuticals, Inc. was served by delivering true and correct copies of the complaint, summons, and other initial papers to Gustavo Fernandez, its principal. Waters Decl. Ex. 63; ECF No. 189.

---

[15] Worldwide Pharma Sales Group Inc. and Adam Brosius also appeared in this case with counsel, who agreed to accept service. Waters Decl. Ex. 58 at 8-9; ECF No. 31 at 8-9.

60

**Highly Confidential**

- ITC Group LLC was served by delivering true and correct copies of the complaint, summons, and other initial papers to its principal, Frank Bentancourt, at the execution of the seizure at his address. Waters Decl. Ex. 64; ECF No. 685.

New York law permits serving a business corporation with process by "delivering to and leaving with the secretary of state or a deputy … duplicate copies of such process together with the statutory fee." N.Y. B.C.L. § 306. Pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1), and N.Y. B.C.L. § 306, Gilead served the following Defendants by delivering true and correct copies of the complaint, summons, and other initial papers to the New York Secretary of State, together with the statutory fee:

- CompaRx LLC. Waters Decl. Ex. 65; ECF No. 1285-1 at 14.

Pursuant to Federal Rules of Civil Procedure 4(e)(1) and N.Y. C.P.L.R. § 308, service of process may be accomplished on an individual:

(1) "by delivering the summons within the state to the person to be served";

(2) "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served …" or

(4) "where service under paragraphs one and two cannot be made with due diligence, by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business."

Gilead served Brennan Page pursuant to Paragraph 4 of N.Y. C.P.L.R. 308 by leaving true and correct copies of the complaint, summons, and other initial papers at his usual place of abode and mailing such papers in an envelope bearing the words "Personal and Confidential",

61

**Highly Confidential**

after first attempting service pursuant to Paragraphs 1 and 2 of N.Y. C.P.L.R. 308. Waters Decl. Ex. 66; ECF No. 676.

Gilead also served certain Defaulted Defendants pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1), which permit service following state law for serving a summons in an action brought in courts in the state where service is made. Pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1) and California Corporations Code § 1702, Gilead obtained an order from this Court permitting it to serve Pharma Pac Wholesale Corp. and Omom Wholesale Corp. through serving the California Secretary of State. ECF No. 253. Gilead properly served Pharma Pac Wholesale Corp. and Omom Wholesale Corp. by delivering true and correct copies of the complaint, summons, and other initial papers to the California Secretary of State. Waters Decl. Exs. 67-68; ECF No. 285.

Pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1) and Texas Business Organizations Code 5.251, Gilead served Defendant Rapid's Tex Wholesale Corp. by delivering true and correct copies of the complaint, summons, and other initial papers to the Texas Secretary of State as the designated agent to accept service of process on behalf of Rapid's Tex Wholesale Corp. Waters Decl. Ex. 69; ECF No. 272.

Gilead served Defendant Gentek LLC, pursuant to Federal Rules of Civil Procedure 4(h)(1)(A) and 4(e)(1) by mailing true and correct copies of the complaint, summons, and other initial papers via registered or certified mail, return receipt requested to Gentek LLC's principal office as shown on the company's most recent annual report filed by the Secretary of State, which constitutes proper service under Connecticut General Statute § 34-243r(c). Waters Decl. Ex. 70; ECF No. 258.

**Highly Confidential**

Gilead served certain Defaulted Defendants in this case in accordance with the applicable seizure order.  Each seizure order in this case provided that "service by any person of this Order, the papers upon which it was granted, and the summons and complaint in this action shall be made at the time of the seizure by delivering true copies thereof to any person of suitable age found at the premises or, if no persons are present, by leaving them in a conspicuous place at the premises, and that such service be deemed sufficient service." *E.g.*, ECF No. 165. Gilead served Defendant Invicta Wholesale Supply LLC at the seizure it conducted on its premises by leaving in a conspicuous area (specifically, the front entrance desk) a copy of the summons, complaint, and other initial papers.  Waters Decl. Ex. 71; ECF No. 1285-1 at 28-38; *see also* ECF No. 165 at 10.[16]  Gilead likewise served Defendant Laconia Avenue Pharmacy Corp. by leaving a copy of the documents in a conspicuous location within its offices (in front of the main pharmacy computer) during the execution of the applicable seizure order.  Waters Decl. Ex. 72; ECF No. 690; *see also* ECF No. 629 at 10.  Gilead further served John Levitan by leaving a copy of the papers at his place of residence during the seizure it executed there.  Waters Decl. Ex. 57; ECF No. 823.

Finally, Federal Rule of Civil Procedure 4(e)(2)(c) permits service by delivering a copy to an agent authorized by appointment or by law to receive service of process.  Defendants Adam Brosius and Worldwide Pharma Sales Group, Inc. were served by providing a copy of the operative complaint, summons, and all initial papers to their attorney, Jesse C. Dresser, Esq., who agreed to accept service on their behalf.  Waters Decl. Ex. 73 at 8-9; ECF No. 31 at 8-9.[17] Pursuant to Federal Rule of Civil Procedure 4(e)(1), and N.Y. Comp. Codes R & Regs. tit. 22

---

[16] Additionally, counsel for Defendant Invicta Wholesale Supply LLC subsequently appeared and received the complaint, summons, and initial papers.  ECF No. 196.

[17] As noted above, Gilead also caused a copy of these papers to be delivered to Worldwide Pharma Sales Group, Inc., where they were left with an individual who confirmed he was authorized to accept service.

**Highly Confidential**

§ 202-b(f)(1), "initiating documents may be served … by electronic means if the party served agrees to accept such service." Gilead served Carlos Vega by emailing his counsel, who agreed to accept service via email, a copy of the operative complaint, summons, and all initial papers. Waters Decl. Ex. 74; ECF No. 759.[18]

On December 16, 2025, Gilead filed a Corrected Sixth Amended Complaint. ECF No. 1644. There were no substantive changes made to the Corrected Sixth Amended Complaint; Gilead merely attached Exhibit A and Exhibit B, which were unintentionally omitted from the then-operative Sixth Amended Complaint. *See* Dec. 12, 2025 ECF Order. Given that there were no substantive changes, Gilead was not required to again effectuate service of the amended pleading against any already-defaulted defendants beyond filing the pleading on the public docket. *See, e.g., Allstate Ins. Co. v. Yadgarov*, 2014 WL 860019, at *8 (E.D.N.Y. Mar. 5, 2014); Fed. R. Civ. P. 5(a)(2). None of the Defaulted Defendants responded to the Corrected Sixth Amended Complaint, and new certificates of default were entered against them. ECF No. 1656.

## CONCLUSION

For the reasons stated above, this Court should enter a damages award (1) finding Gilead's actual damages against each Defaulted Defendant, as set forth in the chart below; (2) issuing a damages award of treble the actual damages for each Defaulted Defendant, pursuant to 15 U.S.C. § 1117(b); and (3) awarding Gilead prejudgment interest against each of the Defaulted Defendants at 9% per annum, calculated beginning the year in which the record reflects the defendant's first sales of Gilead-branded products began, to be calculated via a future submission. The Court should also issue a permanent injunction against all of the Defaulted

---

[18] As noted above, Gilead also personally served Vega in his individual capacity and in his capacity as the principal of Synergy Wholesale Group.

**Highly Confidential**

Defendants in the form of the Proposed Permanent Injunction submitted herewith.

| Defendants | Actual Damages | Treble Damages |
|---|---|---|
| Lazaro Roberto Hernandez | $83,048,929 | $249,146,787 |
| Zafar Abdullaev | $25,214,292 | $75,642,876 |
| Synergy Defendants (Synergy Group Wholesalers LLC and Carlos Vega) on a joint and several liability basis | $6,453,322 | $19,359,966 |
| Omom Defendants (Omom Pharmaceuticals, Inc., Luis D. Gonzalez Herrero, Omom Wholesale Corp., and Gustavo Fernandez) on a joint and several liability basis | $30,199,280 | $90,597,840 |
| Invicta Defendants (Invicta Wholesale Supply LLC and Jorge Caba) on a joint and several liability basis | $10,590,428 | $31,771,284 |
| Pharma Pac Wholesale Corp. | $6,440,587 | $19,321,761 |
| Gentek LLC | $72,149,171 | $216,447,513 |
| Rapid's Tex Whole Sales Corp. | $3,370,426 | $10,111,278 |
| My Meds Defendants (Stephen Smith and My Meds LLC (Pennsylvania)) on a joint and several liability basis | $10,899,758 | $32,699,274 |
| ITC Group Defendants (Frank Bentancourt and ITC Group LLC) on a joint and several liability basis | $8,567,955 | $25,703,865 |
| CompaRx LLC | $315,397 | $946,191 |
| Mainspring Defendants (Lorik Papyan, Stephen Silverman, Mainspring Distribution LLC) on a joint and several liability basis | $32,050,169 | $96,150,507 |
| Bakhityar Nabiev | $2,685,270 | $8,055,810 |
| Laconia Avenue Defendants (Laconia Avenue Pharmacy Corp. and Stanislaus Mgbeojirikwe) on a joint and several liability basis | $642,694 | $1,928,082 |
| The Worldwide Pharma Defendants (Adam Brosius and Worldwide Pharma Sales Group, Inc.) on a joint and several liability basis | $63,547,387 | $190,642,161 |
| John Levitan | $63,547,387 | $190,642,161 |
| Jeffrey Peterson and Brennan Page on a joint and several liability basis | $3,572,045 | $10,716,135 |

65

**Highly Confidential**

| Defendants | Actual Damages | Treble Damages |
|---|---|---|
| Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy | $475,780 | $1,427,340 |

**Highly Confidential**

Dated:      New York, New York
            March 20, 2026

                Respectfully submitted,

                PATTERSON BELKNAP WEBB & TYLER LLP

                By:    */s/ Timothy A. Waters*
                      Geoffrey Potter
                      Timothy A. Waters
                      Thomas P. Kurland

                1133 Avenue of the Americas
                New York, NY 10036-6710
                T:  212-336-2000
                E:  gpotter@pbwt.com
                    twaters@pbwt.com
                    tkurland@pbwt.com

                *Attorneys for Plaintiffs Gilead Sciences, Inc., et al.*

**Highly Confidential**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Civil Rule 55.2, I, Timothy Alan Waters, hereby certify that I caused a copy of Plaintiffs' papers in support of their motion for default judgment damages and a permanent injunction, as well as the applicable certificate of default, to be mailed to the Defaulted Defendants at their last known residences or business addresses, as set forth below.[19]

| Defendant | Last Known Address |
|---|---|
| Ascension Pharmacy Holdings I LLC d/b/a Mermaid Rx and Ariel Pharmacy | 2311 Mermaid Ave<br>Brooklyn NY 11224 |
| Gentek LLC | 45 Cedar St Unit 3<br>Stamford, CT 06902 |
| Luis D. Gonzalez Herrero | 10160 NW 19 Ave, Apt 132<br>Miami, FL 33147 |
| Omom Pharmaceuticals, Inc. | c/o Gustavo Fernandez<br>9265 Archibald Ave<br>Rancho Cuamonga, CA 91730 |
| Omom Wholesale Corp. | c/o Jordan Rodriguez Mato<br>9265 Archibald Ave<br>Rancho Cuamonga, CA 91730 |
| Pharma Pac Wholesale Corp. | 1400 W Grand Ave<br>Grover Beach, CA 93433 |
| Rapid's Tex Whole Sales Corp. | c/o Fernando Ramon Gonce Cutie<br>1500 Lawnmont #1214<br>Round Rock, TX 78664 |
| Synergy Group Wholesalers LLC | 3010 NW 5 St<br>Miami, FL 33125 |
| Bakhtiyar Nabiev | 6315 Everton St.<br>Rego Park, NY 11374 |
| Brennan Page | 3511 Hull Ave, Apt 2D<br>Bronx, NY 10467 |
| Jeffrey Peterson | 1970 Anthony Ave, Apt 2F<br>Bronx, NY 10457 |
| Lazaro Roberto Hernandez | Register No. 28798-004<br>Miami FCI<br>15801 S.W. 137th Avenue<br>Miami, FL 33177 |

---

[19] In light of the volume of exhibits annexed to the Declaration of Timothy A. Waters filed in support of this motion, I have caused a letter with a link to download those exhibits to be sent to each of the Defaulted Defendants, along with instructions to contact Plaintiffs' counsel in case of any difficulty accessing the exhibits.

**Highly Confidential**

| Defendant | Last Known Address |
|---|---|
| Mainspring Distribution LLC | c/o Stephen Silverman<br>10877 Wilshire Blvd, Ste 610<br>Los Angeles, CA 90024 |
| Stanislaus Mgbeojirikwe | 8455 256 St, #P<br>Floral Park, NY 11001 |
| John Levitan | 511 Windrose Cir<br>Pensacola, FL 32507 |
| My Meds LLC (Pennsylvania) | 589 Bethlehem Pike, Ste 500<br>Montgomeryville, PA 18936 |
| Zafar Abdullaev | 63-15 Everton St<br>Rego Park, NY 11374 |
| Stephen Silverman | 12562 The Vista<br>Los Angeles, CA 90049 |
| Carlos Vega | 3010 NW 5 St<br>Miami, FL 33125 |
| CompaRx LLC | 701 Hartle St Ste 704<br>Sayreville NJ 08872 |
| Frank Betancourt | 1756 N Bayshore Dr, #351<br>Miami FL 33132 |
| Invicta Wholesale Supply LLC | 1126 Industry Dr<br>Tukwila, WA 98188 |
| ITC Group LLC | 1756 N Bayshore Dr, #351<br>Miami FL 33132 |
| Jorge Caba | 2295 Bermuda Dr<br>West Palm Beach, FL 33406 |
| Laconia Avenue Pharmacy Corp. | 4041 Laconia Ave<br>Bronx, NY 10466 |
| Lorik Papyan | 333 E Magnolia Blvd, #203<br>Burbank, CA 91502 |
| Stephen Smith | 816 Ridgeview Ct<br>Sellersville, PA 18960 |
| Adam Brosius | 122 Andrews Avenue, Unit B<br>Delray Beach, FL 33483 |
| Worldwide Pharma Sales Group, Inc. | 455 NE 5th Avenue, Ste D434<br>Delray Beach, FL 33483 |

Dated: New York, New York
    March 20, 2026

                                          */s/ Timothy A. Waters*
                                         TIMOTHY A. WATERS